```
1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
2                      HOUSTON DIVISION

3
    RULFORD G. ALDRIDGE,        .  Civil Action
4                               .  No. H-05-608
            Petitioner,         .
5                               .
                                .
6   VS.                         .
                                .
7                               .
    NATHANIEL QUARTERMAN,       .
8                               .  February 26, 2009
            Respondent.         .  9:00 A.M.
9                               .  HOUSTON, TEXAS

10                  TRANSCRIPT of PROCEEDINGS
            BEFORE THE HONORABLE GRAY H. MILLER
11               UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13

14  FOR PETITIONER:          MR. JAMES GREGORY RYTTING
                             MR. PHILIP HARLAN HILDER
15                           Hilder & Associates, PC
                             819 Lovett Boulevard
16                           Houston, Texas 77006

17  FOR RESPONDENT:          MR. KATHERINE D. HAYES
                             MR. GEORGETTE P. ODEN
18                           Office of Texas Attorney General
                             P.O. Box 12548
19                           Austin, Texas 78711

20

21

22  ALSO PRESENT:            Mr. Rulford G. Aldridge

23

24
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.
```

1   **APPEARANCES (Continued):**

2

3   OFFICIAL COURT REPORTER: MS. STEPHANIE KAY CARLISLE-NEISSER
                                U.S. District Court
4                               515 Rusk, Suite 8016
                                Houston, Texas 77002
5                               713.250.5157

6

7

8

9

10

11                                  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2                                              PAGE

 3

 4  WITNESSES:

 5  DOUGLAS DAVIS

 6       Direct Examination by Mr. Rytting..........10
         Cross-Examination by Ms. Hayes.............48
 7       Redirect Examination by Mr. Rytting........61

 8  DR. WALTER QUIJANO

 9       Direct Examination by Mr. Rytting.........66
         Cross-Examination by Ms. Hayes............96
10       Redirect Examination by Mr. Rytting......121
         Recross-Examination by Ms. Hayes.........134
11       Further Redirect by Mr. Rytting..........140
         Further Recross by Ms. Hayes.............141
12
    DR. JEROME BROWN
13
         Direct Examination by Mr. Rytting.........143
14       Cross-Examination by Ms. Hayes............148
         Redirect Examination by Mr. Rytting.......153
15       Recross-Examination by Ms. Hayes.........154
         Further Redirect by Mr. Rytting..........155
16
    GLADYS ALDRIDGE
17
         Direct Examination by Mr. Rytting.........156
18       Cross-Examination by Ms. Hayes............173

19

20

21                        *  *  *

22

23

24

25
```

1          **P R O C E E D I N G S**

2              (February 26, 2009)

3          THE COURT:  All right.  We are here in Civil Action

4    5-608, Rulford Aldridge versus Quarterman.  And this is a

09:11:07AM  5    hearing with respect to competency on the habeas petition.

6    Would the attorneys please make their appearances, starting

7    with the attorney for the petitioner.

8              MR. RYTTING:  James Rytting.  James Rytting.

9              THE COURT:  Yes, sir.

09:11:21AM 10              MR. HILDER:  Philip Hilder.

11              THE PETITIONER:  Your Honor, I have an objection.  I

12    object to him being referred to as my counsel.  I appear pro

13    se.

14              THE COURT:  Okay.  They are your counsel.

09:11:32AM 15              THE PETITIONER:  I appear pro se.

16              THE COURT:  Yes, sir.  I understand you're here, but

17    these are your counsel.

18              THE PETITIONER:  I have given Notices of Appeal to

19    you, two Notices of Appeal, two affidavits of bias and two

09:11:40AM 20    Notices of Appeal.  I have a copy here in the bag.

21              THE COURT:  All right, sir.  If you are going to be

22    disruptive, I am going to have to remove you from these

23    proceedings.  Would you just be quiet for a moment?

24                  Yes, sir?

09:11:50AM 25              MR. HILDER:  Philip Hilder.

1              THE COURT:  All right, sir.  And for the respondent?

2              MS. HAYES:  Katherine Hayes from the Attorney

3    General's office.

4              THE COURT:  All right.

09:11:59AM  5              MS. ODEN:  Georgette Oden.

6              THE COURT:  All right.  Thank you.

7              All right.  The schedule, I think my case

8    manager has communicated it to everyone, we are going to go

9    until about 4:15 this afternoon.  We'll probably take a lunch

09:12:12AM  10   break around noontime.  If we are not finished with the

11   evidence this afternoon, we'll come back tomorrow morning

12   starting at 9:00 o'clock and go until about 1:00 o'clock.  If

13   we are still not finished with the evidence at that point,

14   we'll come back on Monday and finish up.

09:12:28AM  15             Do you think that's a reasonable schedule?  Do

16   you think we will be finished by Friday at 1:00?

17             MR. RYTTING:  Your Honor, I anticipate being

18   finished by Friday at 1:00.

19             THE COURT:  All right.  All right.  Good.  Let's

09:12:42AM  20   deal with the exhibits that have been tendered by both sides,

21   starting with the exhibits tendered by the petitioner.  I have

22   a copy -- a courtesy copy of all the exhibits up here.  I have

23   reviewed the objections filed by the respondent to certain of

24   the petitioner's exhibits.  Do you have any other exhibits

09:13:06AM  25   that you want to object to at this time, other than the ones

1  that you have objected to in writing?

2         MS. HAYES:  No, Your Honor.

3         THE COURT:  All right.  I'm going to overrule those

4  objections, and I'm going to admit petitioner's exhibits.

5      (Petitioner's exhibits admitted.)

6         THE COURT:  The respondent's exhibits, I don't

7  remember seeing any objections from the petitioner on

8  respondent's exhibits.  Are there objections to any of the

9  respondent's exhibits by the petitioner?

09:13:31AM 10         MR. RYTTING:  Yes.  We did file objections to the

11  respondent's exhibits, Your Honor.

12         THE COURT:  All right.

13         MR. RYTTING:  Do we have an extra copy?

14      (Pause)

09:14:05AM 15         MR. RYTTING:  Your Honor, if I may approach.

16         THE COURT:  Yes, you may.

17             Thank you.  Let me just briefly...

18      (Pause)

19         THE COURT:  All right.  I apologize for missing

09:15:09AM 20  this.  I'm going to overrule these objections and admit the

21  respondent's exhibits.

22      (Respondent's exhibits admitted.)

23         THE COURT:  So, all of the exhibits are going to be

24  admitted into evidence at this time.

09:15:18AM 25             The -- would the petitioner's attorney care to

1   make an opening statement of any kind, or do you want to go

2   directly to the evidence?

3          MR. RYTTING:  I'll make a brief statement, Your

4   Honor.

5          THE COURT:  All right.

6          MR. RYTTING:  And it has to do with the proposed

7   issues for the hearing that we submitted.

8          THE COURT:  Yes.

9          MR. RYTTING:  I just wanted to clarify that as I

09:15:44AM 10   understand it how this proceeding will go, we believe that the

11   Court will first make a threshold determination about whether

12   there has been some evidence of incompetency at the time of

13   trial submitted by petitioner in the course of these

14   proceedings, of course, and including in the documents that we

09:16:05AM 15   will provide the Court.

16            The standard, I believe, is that if the

17   evidence that was at trial and available to counsel or

18   available to the Judge raised a bona fide doubt, a substantial

19   doubt, about the petitioner's competency, then it was

09:16:21AM 20   obligatory for either the Court or counsel to request a

21   hearing and convene a hearing to determine competency.  That

22   wasn't done at trial.  I think we will clearly be able to show

23   that we satisfy that standard that there was a substantial

24   doubt raised by the evidence that was available either to

09:16:42AM 25   counsel or to the Court.

1           After that threshold is made, I believe that

2  what the Court has to determine is whether it is even possible

3  to have a retrospective hearing in this case, 19 years after

4  the fact, when we do not have a hearing at trial --

09:17:02AM  5  contemporaneous with trial in which Mr. Aldridge was cleared

6  by the Court, by a psychiatrist, or anyone else that was

7  medically trained to determine his mental status during the

8  proceedings.

9           THE PETITIONER:  May I object?

09:17:20AM 10           THE COURT:  No, sir, you may not.

11           THE PETITIONER:  Misinformation.

12           THE COURT:  You may not.

13           Go ahead, sir.

14           MR. RYTTING:  If that's the case, then I believe

09:17:27AM 15  that the law is that this Court will have to order a retrial

16  or that this prisoner be released.  However, if the Judge does

17  make the determination that today, sitting here 19 years after

18  the fact, it is possible to conduct a hearing, then we go on

19  with the actual determination of competency at the time of

09:17:51AM 20  trial.  I do realize that the case law permits sort of -- will

21  permit the Court to hold a hearing that considers these

22  questions, as they are intertwined all at once, and make a

23  determination.

24           THE COURT:  And that is my intention.  That is what

09:18:09AM 25  we're doing here today.  So, that is my intention to address

1   all of those issues in this hearing and then make the

2   determinations after thorough review of all the evidence that

3   is submitted here today.

4            MR. RYTTING:  Yes, Your Honor.  I have nothing

09:18:21AM 5   further.

6            THE COURT:  All right.  Thank you.

7                 Does the respondent care to make an opening

8   statement of any kind?

9            MS. HAYES:  No, Your Honor, not at this time.

09:18:28AM 10           THE COURT:  Okay.

11                All right.  Call your first witness.

12           MR. RYTTING:  May I address one other issue?

13           THE COURT:  Yes, sir.

14           MR. RYTTING:  We have several other exhibits that we

09:18:38AM 15  would like to mark and admit as we go.  They are going to be

16  records from the trial, the trial transcripts.  And I'm not

17  sure if there's objections to that or not.

18           MS. HAYES:  No, Your Honor.

19           THE COURT:  All right.  Fine.  That's fine.

09:18:54AM 20          MR. RYTTING:  My first witness is Douglas Davis.

21           THE COURT:  All right.  Mr. Davis, would you come

22  forward, please?

23                All right.  Raise your right hand, please,

24  Mr. Davis, and --

25           THE WITNESS:  Yes, sir.

1    THE COURT:  -- be sworn in.

2        (**DOUGLAS DAVIS,** Petitioner's witness, Sworn.)

3        THE COURT:  All right.  Have a seat in the witness

4    chair, please.

09:19:29AM  5    THE WITNESS:  Thank you.

6        THE COURT:  Yes, sir.

7                    **DIRECT EXAMINATION**

8    **BY MR. RYTTING:**

9    Q.   Mr. Davis, would you identify yourself for the record?

09:19:36AM 10    A.   My name is Douglas Davis.

11    Q.   And were you the attorney at trial on State versus

12    Aldridge?

13    A.   Yes, one of them.

14    Q.   And who was the other attorney?

09:19:47AM 15    A.   Randy Bates.

16    Q.   And at that trial you represented Rulford Aldridge; is

17    that correct?

18    A.   Yes.

19    Q.   I would like to turn to the -- that issue of mental

09:20:18AM 20    illness in this case.  And you recognized at trial that

21    Mr. Aldridge was mentally ill; is that correct?

22    A.   Yes.  I felt he had mental problems.  And so, I requested

23    the Court to allow me to contact a psychiatrist to have him

24    evaluated.

09:20:39AM 25    Q.   And who did you hire to conduct the mental health

1  examination of Mr. Aldridge?

2  A.   Dr. Walter Quijano.

3  Q.   What was Dr. Walter Quijano asked to do for you?

4  A.   Basically to evaluate Mr. Aldridge based on records that

09:21:04AM 5  I supplied to Dr. Quijano and to determine whether or not he

6  felt that Mr. Aldridge was competent to stand trial and also

7  to determine whether, in his opinion, Mr. Aldridge -- if there

8  was any question as to his sanity.

9  Q.   And did Mr. Quijano produce a report for you?

09:21:30AM 10  A.   I believe he did, yes.

11  Q.   And that report was also based on a psychological

12  interview of Mr. Aldridge.  Is that fair to say?

13  A.   I believe Dr. Quijano did interview him.  I was not

14  present during that interview.

09:21:45AM 15  Q.   Do you recall what date that interview was conducted?

16  A.   I have no idea.

17  Q.   I would like to refer you to -- it would be Petitioner's

18  Exhibit No. 8.

19          MR. RYTTING:  If I may approach the witness?

09:22:37AM 20          THE COURT:  You may.

21  BY MR. RYTTING:

22  Q.   Mr. Davis, do you recognize this report?

23  A.   I'm sure this is probably the report that was supplied to

24  me by Dr. Quijano but, honestly, because this happened some

09:23:14AM 25  19 years ago, I don't have any real independent recollection

1    of it, but I'm sure this is it.

2    Q.    Were you able to review this report for your deposition,

3    in this recent deposition in this case?

4    A.    I don't recall if I reviewed it or not.

09:23:32AM   5              THE COURT:  What exhibit are you on, again?

6              MR. RYTTING:  Our Exhibit No. 8.

7              THE COURT:  Exhibit No. 8?

8              MR. RYTTING:  Which should be the forensic

9    psychological report of Dr. Walter Quijano.

09:23:41AM   10              THE COURT:  In my book it's Mr. Davis' affidavit.

11   Exhibit 12 is the report.  I'm sorry.  I'm in the respondent's

12   exhibits.  My fault.  I'm sorry.

13                    All right.  Go ahead.

14   BY MR. RYTTING:

09:24:01AM   15   Q.    And if you would read under the section of Mr. --

16   Dr. Quijano's report entitled "procedures."

17   A.    "No. 1, clinical interview with defendant on the 26th of

18   March, 1990."  Would you like me to keep going?

19   Q.    No thanks.

20   A.    Okay.

21   Q.    And the date that this report was produced was May 15th,

22   1990; is that correct?

23   A.    I will take your word for it.  I don't remember.

24   Q.    And May 15th was the second day of trial in this case.

09:24:37AM   25   Is that consistent with your recollection?

1  A.   I don't recollect at all, to be honest with you; but, you

2  know, I'm sure that's in the record.

3  Q.   And I believe the record will reflect that

4  guilt/innocence started on May 14th and that the punishment

09:24:57AM  5  was the second day, May 15th, of a two-day trial.  Is that

6  consistent with your recollection?

7  A.   Again, I don't recollect; but I have no argument with

8  that.

9  Q.   So, it is fair to say that you didn't get this report

09:25:10AM  10  until you were in the middle of trial?

11  A.   I would say probably so, if that's what the record

12  reflects; but I'm positive that I would have spoken to

13  Dr. Quijano prior to that about this.

14  Q.   Do you have any records of any conversations with

09:25:29AM  15  Dr. Quijano or any independent recollection?

16  A.   I have absolutely no records of this case at all.  I

17  disposed of those years ago.

18  Q.   You can also call -- you also called -- strike that.

19         I would like you to turn to -- I would like to

09:26:08AM  20  show you the section of his report in which Mr. -- Dr. Quijano

21  talks about the ability to assist counsel, referring to

22  Mr. Aldridge.  And if I may, it says that -- it reflects that

23  you filed a motion for a competency evaluation raising

24  defendant's ability to assist in his own defense and

09:26:52AM  25  complained that defendant's related strange and fantastic

1   stories about the conducts charged; is that correct?

2            MS. HAYES:  Could you specify what page you are on

3   now?

4            MR. RYTTING:  I would be glad to.  It would be

09:27:07AM 5  page -- the numerical page is page 9.

6   A.   This is what Dr. Quijano, I guess, discovered during his

7   interview with Mr. Aldridge.  Again, I was not present during

8   it.

9   BY MR. RYTTING:

09:27:28AM 10 Q.   But do you recall filing a motion in this case in which

11  he said that he was acting strangely?

12  A.   I don't recall filing a motion, but I'm sure we would

13  have filed a motion with the Court in order to have a -- have

14  an expert appointed to evaluate Mr. Aldridge.

09:27:47AM 15 Q.   And is it your recollection that Mr. Aldridge did act

16  strangely during the course of your representation of him?

17  A.   Yes.

18  Q.   And, in fact, you had -- you -- your conversations with

19  him -- your conversations with him, as far as you can recall,

09:28:11AM 20 resulted in a -- his expression of a certain type of defense

21  that he wanted to present; is that correct?

22  A.   I don't know that he exactly wanted to present it.  If he

23  had insisted on taking the stand, then certainly I would have

24  advised against it; but obviously he has the right to take the

09:28:34AM 25 stand.  He, as I recall, mentioned -- and this is about the

1 only thing I really recall as far as what his possible defense

2 was that he said that the man that he had murdered had raped

3 Mr. Aldridge numerous times.

4        THE PETITIONER:  I never said such a thing.  Fraud

09:28:59AM 5 on the court.

6        THE COURT:  Quiet, please, sir.

7 BY MR. RYTTING:

8 Q.  And that was part of his defense, was it not?  That's

9 what he wanted you to defend him on the basis of?

09:29:11AM 10 A.  No.  I wouldn't say that.  I think that was his

11 explanation for what he did.  Again, if he had wanted to

12 present that defense and take the stand, I couldn't stop him;

13 but, again, I would have advised him not to because simply it

14 didn't happen.

09:29:28AM 15 Q.  You were convinced that this defense was fabricated or

16 delusional; is that correct?

17 A.  Correct.  Basically, when you looked at the way the

18 offense was committed, as I recall -- again, this was not

19 something that I recalled independently.  It's just been since

09:29:48AM 20 we have been involved in this process, but I'm sure I knew it

21 at the time -- that Mr. Aldridge had purchased a gun and had

22 not admitted on the form to purchase it that he was a

23 convicted felon, and then he shot and killed the complainant

24 and robbed him and then fled afterwards.  So, I don't think

09:30:12AM 25 his actions were consistent with the story that he told Randy

1  Bates and me.

2  Q.   His actions that you talk about, what was the source of

3  information that you relied on in determining what his actions

4  were?  Was it the police reports and the crime scene evidence?

09:30:36AM  5  A.   That would be correct.  We would have been given access

6  to all the police reports, all the medical exams, all that

7  type of thing that is generally present in a murder case.

8  Q.   And you would have shown your client this evidence, would

9  you not?

09:30:55AM  10  A.   I don't know that we would have actually given him police

11  reports.  Probably what we would have done -- and, again, I

12  don't recall -- was to tell him what the evidence was against

13  him, summarize it for him.  If he wanted to see it, I'm sure

14  we might have been able to show it.  And, you know, frankly, I

09:31:15AM  15  remember back then, I don't think the DA's office would

16  actually give us copies of the report to take with us.  You

17  could take notes from those all you wanted, but I don't think

18  the policy was to actually give you the police reports.

19  Q.   But it would be your practice as an attorney to explain

09:31:36AM  20  what the State alleged against him and what the State's

21  evidence against him was; is that correct?

22  A.   Certainly.

23  Q.   And in the face of this explanation and of this evidence

24  which you believe showed what his real conduct was, he

09:31:52AM  25  insisted that what happened was a sexual assault.  Is that

1   fair to say?

2   A.   That's what his story was, yes.

3   Q.   And he stuck with that throughout; is that correct?

4   A.   Yes.

09:32:01AM 5   Q.   At the punishment phase of this trial, you called several

6   family members; is that correct?

7   A.   It is.  And, again, I didn't recall that until we began

8   this process.  But I remember now that we did call, I believe,

9   some relatives of his.

09:32:44AM 10   Q.   And one of the -- have you had a chance to review their

11   testimony?

12   A.   I don't remember that I had.

13   Q.   Do you have an independent recollection of -- or any

14   recollection of what they may have testified about?

09:33:07AM 15   A.   I think, as I recall, we put them on there in an attempt

16   to show the jury that Mr. Aldridge was suffering from mental

17   problems.  We were trying to mitigate the punishment in an

18   attempt to get him a life sentence versus a death sentence.

19   Q.   And was part of that mitigation evidence

09:33:31AM 20   Mr. Aldridge's -- testimony by these relatives about

21   Mr. Aldridge's fear of being persecuted by Nazis and others?

22   A.   I don't recall exactly what it was.  I do recall

23   Mr. Aldridge had a lot of odd beliefs, mostly dealing with --

24   I don't know how to put it.  It's not Islam as it is, but I

09:33:56AM 25   guess Islam as he believes it to be.

1    *Q.*   So, he had some very strange -- what appeared to be very

2    strange religious beliefs.

3    *A.*   That's true.

4    *Q.*   And you wouldn't contest the record if it reflected a

09:34:18AM 5    Cheryl Aldridge -- let me ask you this:  When you put on

6    Cheryl Aldridge, do you believe that she was testifying

7    truthfully and accurately about her brother?  Do you have any

8    reason to suspect that she might have been making things up?

9    *A.*   I don't recall her testimony.  I don't think we would

09:34:35AM 10   have put her on if we had thought that she was lying.

11   *Q.*   So, if the record reflects that she mentioned -- she

12   stated that her uncle, I believe, Mr. Aldridge, talked about

13   conspiracies, talked about prisoners and being let loose to

14   persecute him and follow him, you wouldn't contest to the

09:35:04AM 15   accuracy or the validity of that statement, correct?

16   *A.*   Well, that's what she said.  So, I had no reason to doubt

17   her word.

18   *Q.*   And, similarly, with Virginia Lee Aldridge, who also

19   testified at trial, she gave a similar story about

09:35:29AM 20   Mr. Aldridge's mental problems and persecution that he faced;

21   is that correct?

22   *A.*   If that's what the record reflects.  I don't recollect

23   it.

24   *Q.*   And Brenda Garrett, too, she was Mr. Aldridge's sister

09:35:47AM 25   who grew up with Mr. Aldridge.  She also testified about --

1   I'll just quote it -- people being dispatched from prison and

2   about Nazis and stuff like that, which Mr. Aldridge said were

3   persecuting him.  You wouldn't contest that testimony?

4   A.   I wouldn't contest if it was said, no.

09:36:11AM  5   Q.   Okay.  And at trial you had every reason to believe that

6   these witnesses who were describing Mr. Aldridge's odd beliefs

7   were -- again, were giving a fair account of what they had

8   seen and what they had heard their brother and their uncle say

9   to them?

09:36:31AM 10   A.   It wouldn't have surprised me if he had said that to

11   them.  He had, as I said before, strange beliefs.

12   Q.   It is fair to say he had a history of paranoid, strange

13   beliefs?

14   A.   I would -- I wouldn't say that he didn't, no.

09:36:50AM 15   Q.   One of the other pieces of evidence that came in at the

16   punishment phase, I believe, were the writings of

17   Mr. Aldridge.

18          MR. RYTTING:  And I believe that these are at

19   Exhibit 3, Your Honor, what has been admitted as Exhibit 3.

09:37:29AM 20          THE COURT:  Thank you.

21   BY MR. RYTTING:

22   Q.   And have you had a chance to review these since trial,

23   look at these -- these records?

24   A.   I believe that you showed me some during the course of

09:37:41AM 25   the deposition.  I don't remember that I saw them all, but I

1    do remember seeing at least some of them.

2    Q.   And -- and what is your opinion of the writings that you

3    saw in the course of the deposition?  What did they intend to

4    show?

09:38:02AM  5    A.   I don't really remember.  Again, it was just something to

6    do with his odd beliefs and -- because I didn't feel that I

7    could present Dr. Quijano to put on evidence in mitigation --

8    because Dr. Quijano did find that he had mental problems, I

9    didn't think I could put that on as evidence due to the

09:38:31AM  10   problem of T.D.C. records that I turned over to Dr. Quijano.

11   So, we were trying to present some evidence of Mr. Aldridge's

12   mental problems in another way since I didn't feel I could

13   present Dr. Quijano because that would have allowed the

14   introduction of those T.D.C. disciplinary records.

09:39:00AM  15   Q.   So, let's just get back to Exhibit 3.  I would like to

16   read a portion of it.  It would be on the -- I guess you could

17   call it the chronological page.

18            Chronological page 5, where he starts out

19   describing who he is; and he says, "There are many who wish to

09:39:35AM  20   call my name 'Nature' for the following reasons; and I have

21   refused the name, while displaying the 'Nature,' remembering

22   it written that the Prophet Muhammad said whenever there is a

23   hidden (quality) 'Nature' in one whom Allah wants revealed" --

24            THE REPORTER:  I'm sorry.  If you can repeat that.

25   BY MR. RYTTING:

1  *Q.*   "Whenever there is a hidden (quality) 'Nature' in one

2  whom Allah wants revealed, Allah 'some times' employs the

3  'worst.'  The most evil enemy.  This one has to reveal hidden

4  (quality) or 'Nature.'"

09:40:21AM  5              And he goes on, "Since my youth (early

6  childhood), I have been under the care, watchful eyes of many

7  spirits.  They have lead [sic] me into great pains and

8  suffering while guarding me from others."

9              And it continues in this vein.

09:40:44AM 10              My understanding of the mitigation strategy is

11  that these were presented as writings that represented

12  Mr. Aldridge's actual belief; is that correct?

13  *A.*   We presented those in an attempt to show that he had

14  mental problems.  Whether or not he actually believes that

09:41:04AM 15  himself, only he can say.

16  *Q.*   But you didn't have any doubts about whether he believed

17  it or not?

18  *A.*   I don't know whether he does or not, but I know that that

19  was certainly what I felt was an indication of the mental

09:41:19AM 20  problems that he had.

21  *Q.*   And it wouldn't surprise you to find that in his writings

22  he talks about being sexually molested by children, for

23  example, molested by their eyes, sexually molested by their

24  eyes?

09:41:43AM 25  *A.*   I have no doubt that he probably would write that.

1  Q.   And he actually believed that -- wrote that the Prophet

2  Muhammad was also similarly molested.

3  A.   I don't remember.  I wouldn't know.

4  Q.   But it's -- you wouldn't say that is inconsistent with

09:42:03AM  5  Mr. Aldridge's writings or his behavior in the statements; is

6  that correct?

7  A.   That would be correct.

8  Q.   Now, in between the time that Dr. Quijano interviewed

9  Mr. Aldridge, which was March 26th of 1990, and the date of

09:42:34AM 10  trial, there were approximately 45 days, correct?

11  A.   I will take your word for it.

12  Q.   45 to 50 days intervened.

13          You didn't have him examined, again, did you?

14  A.   I don't believe we did.

09:42:54AM 15  Q.   And during that time he was -- was it your understanding

16  that he was being treated or on medication?

17  A.   I don't remember whether he was on medication or not.

18  Q.   It wouldn't surprise you, though, that he wasn't on

19  medication and he's never been medicated.  Is that fair to

09:43:15AM 20  say?

21  A.   I wouldn't know.

22  Q.   You didn't ask the prison or the Harris County Jail to

23  treat him or put him on any sort of psychiatric regimen or

24  pharmacological regimen, did you?

09:43:31AM 25  A.   If the doctor had recommended that I do that, I would

1  have done that; but I had no such recommendation.  So, I

2  didn't.

3  Q.   Well, actually, if I can see Exhibit No. 8, again.  I

4  believe that was -- I believe that was precisely the

09:43:55AM  5  recommendation of Dr. Quijano that this patient be treated

6  and -- treated with compassion, as he put it, and given

7  psychiatric care.  Was that --

8  A.   That's -- I wouldn't have any argument with that.

9  Q.   Okay.  And one of the other things you didn't do, I think

09:44:31AM  10  the record will show, is ask for a competency hearing in this

11  case; is that correct?

12  A.   I did not.

13  Q.   Neither -- in fact, you didn't ask for a competency

14  hearing at any time --

09:44:54AM  15  A.   I did not.

16  Q.   -- during the proceedings.

17         Now, looking back at the record, don't you

18  think there was at least some evidence raising a doubt about

19  Mr. Aldridge's competency to stand trial?

09:45:08AM  20  A.   Well, again, as I have said before, I felt Mr. Aldridge

21  had mental problems.  I brought in a doctor whom I felt would

22  be good because Dr. Quijano is -- I remember, had been the

23  head of the psychiatric unit at T.D.C.; and I felt that he

24  would be a good choice because he was used to dealing with

09:45:38AM  25  prisoners and folks charged with criminal offenses, that he

1  would also be familiar with some of the aspects of competency

2  and insanity for criminal trials.

3           And Dr. Quijano said that Mr. Aldridge was

4  competent and that he was sane, and I believe that myself.

09:46:04AM 5  So, his opinion dovetailed what I believed.  I feel that

6  Mr. Aldridge had mental problems, but I felt that he was --

7  had a coherent understanding of what was going on.  He was

8  able to assist Randy Bates and me.  Again, he had strange

9  beliefs, no question; but as far as his ability to understand

09:46:32AM 10  what was going on, Dr. Quijano found that he was competent and

11  able to assist us and understand the proceedings.  I felt that

12  myself, and I still feel that way today.

13  Q.   You felt that; but you can't recite a single example of a

14  conversation or an interaction with Mr. Aldridge in which to

09:46:57AM 15  base that opinion, can you?

16  A.   Well, it was 19 years ago.  I don't remember specific

17  conversations I had with him, but I think you can see here

18  today he seems to have an understanding of what's going on in

19  court.  It was the same way back then.

09:47:11AM 20  Q.   You made the same sort of judgment back then as you did

21  now based on his demeanor and based on his appearance in court

22  today?

23  A.   Well, you know, I can't make a judgment as to him today.

24  What I am saying is, I had numerous conversations with him.

09:47:28AM 25  We went over the evidence with him.  He seemed to understand

1  what was going on, and he didn't have outbursts in trial like

2  he is doing here today.  I thought that he might be actively

3  hostile to me because I'm a white person and he was a black

4  Muslim and there was some hostility there.

09:47:52AM  5            That's one of the reasons I got Randy Bates to

6  help me out.  He is a nice guy.  He is an easy-going guy, and

7  he's an African American.  And I thought if there was some

8  difficulty in communicating with Mr. Aldridge that Randy Bates

9  could bridge that gap better than I.  And -- as far as I

09:48:17AM 10  recall, we didn't have -- other than his odd beliefs, there

11  was -- there was no overt hostility, I will put it that way.

12  Q.  He seemed cooperative to you.  Is that fair to say?

13  A.  I think he was.

14  Q.  Okay.  But when he cooperated, when he talked, all you

09:48:38AM 15  can remember is that he -- the only specific memory that you

16  have is that he kept saying he was sexually assaulted by the

17  victim.  Isn't that what you said in your deposition?

18  A.  Well, I don't even remember what occurred during the

19  trial.  I don't even remember putting on family members until

09:48:57AM 20  we got into this.  And I have tried a number of capital

21  murders.  I have tried probably 150 jury trials in the course

22  of my career.  I don't remember.  I just don't.  I don't have

23  any records of it.  It is 19 years ago, and I don't even

24  remember where I was living at the time.  So --

09:49:10AM 25  Q.  But one thing does stand out; and that is, is his

1  continued insistence that the victim raped him.  You recall

2  that?

3  A.   I remember him saying that.

4  Q.   So, let's turn maybe to the testimony of Randy Bates at

09:49:26AM 5  trial.  He actually testified in this trial; is that correct?

6  A.   Right.  Again, we were trying to show some indication of

7  the mental problems that Randy and I felt that Mr. Aldridge

8  was suffering from.

9  Q.   And, in fact, his testimony does indicate some of the

09:49:46AM 10  mental problems, does it not?

11  A.   It does.

12  Q.   It says that his conversations with Mr. Aldridge were not

13  rational, correct?

14        MS. HAYES:  Objection.  The record actually isn't in

09:49:59AM 15  plural.  I mean, it may have been the answer... did you have a

16  conversation?

17        THE COURT:  All right.  Let's stick to the record.

18  BY MR. RYTTING:

19  Q.   You were the one that examined Mr. Bates, correct?

09:50:31AM 20  A.   Yes.

21  Q.   So, if I may, the redirect examination of Mr. Bates --

22  during your redirect examination of Mr. Bates, you asked him:

23  There would be times -- whether -- let's see.  The question

24  was:  "Without going into what Mr. Aldridge said, can you

09:51:17AM 25  describe the -- I guess the tenor of the conversations that we

1  had with him?"

2            And Mr. Bates responded, "There would be times

3  when I would ask him a question, and he would respond

4  appropriate to the question.  There would be other times that

09:51:29AM 5  I would ask him questions, and his answer would have nothing

6  to do with what I asked him about."

7            And you asked him, "How would you characterize

8  his thoughts?  Was there anything odd about them or to you?"

9            And the answer was:  "Quite odd."

09:51:44AM 10           Here's the next question:  "Was there any talk

11  about the spirits controlling people?

12            The answer:  "Quite a bit of talking about

13  that."

14            QUESTION:  "Any talk about conspiracy?"

09:51:54AM 15           "Quite a bit of talking about that."

16            QUESTION:  "People after him?"

17            ANSWER:  "Yes."

18            QUESTION:  "Different groups?"

19            And this doesn't represent an isolated

09:52:09AM 20  incident, does it, Mr. Douglas [sic]?

21  A.   No.

22  Q.   It represents the consistent experience that Mr. Bates

23  had with his client; is that correct?

24  A.   And myself, as well.

09:52:22AM 25  Q.   And you believe now -- as you have testified, this is a

1  long time ago -- that Mr. Bates' testimony at trial and the

2  record of his testimony at trial is a better indication of

3  what Mr. Aldridge was -- was like and how he behaved.  Isn't

4  that fair to say?

09:52:53AM  5  A.   I would think that would be fair, yes.

6  Q.   One last question.  When it comes to requesting and

7  obtaining a hearing, are you familiar with the standard that

8  has to be met to get a competency hearing?

9  A.   It's been a long time.  I don't remember the exact

09:53:38AM  10  standards; but as I recall, it was something along the lines

11  that he had to have a rational understanding of what was

12  happening to him or a reasonable understanding or something

13  like that and that he could reasonably assist his attorneys

14  with his defense.

09:53:57AM  15  Q.   And what was your burden that you had to show in order to

16  get a hearing?  Do you recall?

17  A.   I think we could probably just request a hearing from the

18  Judge, as I recall.  I don't really remember.

19  Q.   I mean, what type of showing?  Do you have to have clear

09:54:14AM  20  evidence?  Do you have to have proof beyond a doubt?  What is

21  the standard?

22  A.   I don't recall what it was.  It's not beyond a reasonable

23  doubt.  I know that.  It's some lesser standard, but I don't

24  recall what it was.

09:54:47AM  25  Q.   And at the time of trial, were -- were you aware of what

1  type of evidence that might be taken into consideration by the

2  judge in determining whether to convene a competency hearing?

3  *A.*   Probably.

4  *Q.*   Okay.  What is your understanding of what you might have

09:55:21AM  5  to show to a Judge in order to get a hearing?

6  *A.*   I don't recall what it would have been.

7  *Q.*   Would it surprise you to know that you can present

8  psychiatric findings?

9  *A.*   Sure.  I know that.  That's probably one of the main

09:55:42AM 10  components, I would think.

11  *Q.*   And it doesn't -- even if there is a finding of

12  competency, if there's other indications in the report that

13  may support a request for a hearing.  Is that your

14  understanding?

09:55:57AM 15  *A.*   I would think that's probably correct, yes.

16  *Q.*   There was clearly, don't you think, evidence that Mr. --

17  Dr. Quijano's report and his interview indicating that

18  Mr. Aldridge was -- some reason to think he was incompetent,

19  don't you think?

09:56:17AM 20  *A.*   I felt that there was indications that he had mental

21  problems.  I don't think that there was an indication from

22  Dr. Quijano that he was incompetent because he found that he

23  was competent, and that's what I believed.

24  *Q.*   Well, I'm talking about his clinical evaluation, what he

09:56:32AM 25  reported your client telling him.

1  *A.*   Well, he told us a lot of the same types of things; and I

2  still felt that he was competent myself, as did Dr. Quijano.

3  *Q.*   Well, here's -- if I may just read from his report what

4  he told Dr. Quijano about the essential data of the supposed

09:57:01AM  5  crime that was committed.  As we look at page 7 on his report,

6  it says, "On the day of the conducts charged, Rulford arrived

7  earlier than the victim whose career he was trying to help.

8  After regaining strength to try to beat the guy and the

9  spirits one more day, he set up things to open up.  But the

09:57:19AM 10  guy, who must have been on the roof because he felt his power

11  to be very close, knew of his thoughts and wanted to get him

12  with possession of a handgun to which the other spirits said

13  no.  The victim was previously advised by the spirits not to

14  participate, and Rulford had previously thought of killing the

09:57:37AM 15  victim.  The supervisor discussed with the manager that

16  Rulford was about to kill the victim through the guy.  Rulford

17  walked by them, and the supervisor told the manager" --

18          THE REPORTER:  I'm sorry.  I'm having trouble

19  hearing you.

20  BY MR. RYTTING:

21  *Q.*   I'll start with "Rulford walked by them, and the

22  supervisor told the manager they should prevent Rulford from

23  killing the victim as a plot to prevent Rulford from going to

24  the Middle East for which McDonald's could be held responsible

09:58:10AM 25  if the trip failed.  The guy then prevented Rulford by

1  blackout from assuring the manager he would not kill the

2  victim."

3            You had no reason at that time to think that

4  Mr. Aldridge didn't believe exactly what he told Dr. Quijano;

09:58:28AM  5  is that correct?

6  A.   Well, there was evidence that he didn't believe that

7  because of the way that the crime was committed and set up.

8  That was rational.

9  Q.   Did you ask Dr. Quijano what his opinion was about

09:58:45AM  10  whether Aldridge believed what he was telling him?

11  A.   I don't remember if I did or not; and I don't think there

12  was any way to determine that, whether he was telling the

13  truth or not.  In fact, that's something only he can know --

14  Mr. Aldridge.

09:58:58AM  15  Q.   Well, we know that isn't true, that this account that he

16  gives is not true.  It is false, right?  We can determine it

17  is false.

18  A.   About all the --

19  Q.   Yes.

09:59:09AM  20  A.   Sure.

21  Q.   The question is whether he believed it.

22  A.   Right.

23  Q.   And would it surprise you to know that Dr. Quijano has

24  stated in deposition that he absolutely did believe that?

09:59:22AM  25  A.   I wasn't present at his deposition.  So, I don't know.

1  Q.   But you didn't ask if he believed that.

2  A.   I'm sorry.

3  Q.   You didn't ask Dr. Quijano if -- is it fair to say that

4  you didn't ask Dr. Quijano:  Does my guy actually believe what

09:59:41AM 5  he tells you during the interview?

6  A.   I have no recollection of what the conversation was

7  between Dr. Quijano and myself.  I was concerned about his --

8  Mr. Aldridge's apparent mental problems.  And so, I asked for

9  an expert to come in and take a look at it; and the expert

10:00:01AM 10  found that he was legally competent and legally sane.  And

11  that's what I went with.

12  Q.   Again, you came -- did you come to an independent

13  conclusion that Mr. Aldridge was competent to stand trial,

14  independent of Dr. Quijano's report?

10:00:54AM 15  A.   What I'm telling you is exactly what I have said before.

16  I thought he had mental problems.  I thought they needed to be

17  looked at by a competent expert.  Dr. Quijano made those

18  findings, and I felt his findings were correct.

19  Q.   I would -- I have to ask you a couple of questions

10:01:25AM 20  about your background.  You don't have any training in

21  psychology or psychiatry, do you?

22  A.   No.

23  Q.   And you didn't at the time?

24  A.   No.

10:01:38AM 25  Q.   You didn't understand what psychosis was, for example?

1  *A.   No, just only what a layman might know or read about in*

2  *the paper.*

3  *Q.   Or delusion -- you didn't have an understanding of what a*

4  *delusion system was.  Is that fair to say?*

10:01:58AM 5  *A.   No.  I don't claim to try to understand a lot of*

6  *psychiatric terms or psychology, other than what a normal*

7  *layman might understand.*

8  *Q.   And you weren't in a position to determine whether -- by*

9  *yourself, when you were interviewing Mr. Aldridge, whether he*

10:02:17AM 10  *was hallucinating, whether he was hearing voices, were you?*

11  *A.   No.  That's why I got Dr. Quijano.*

12  *Q.   So, throughout your representation of Mr. Aldridge, he*

13  *could have been hallucinating, correct?*

14  *A.   Possibly.*

10:02:33AM 15  *Q.   In fact, doesn't Dr. Quijano's interview indicate that*

16  *throughout his -- the psychological interview of his client,*

17  *Mr. Aldridge was actively hallucinating and delusional?*

18  *A.   I have no reason to quarrel with Dr. Quijano's findings.*

19  *Q.   You didn't ask him if he was delusional.  You didn't ask*

10:03:04AM 20  *him if he was hallucinating, did you?*

21  *A.   I may have.  I don't remember.*

22  *Q.   Is it your understanding that one of the other bases for*

23  *obtaining a competency hearing could be a history of odd and*

24  *strange behavior?*

10:03:37AM 25  *A.   I expect so, yes.*

1    Q.    And in this case Mr. Aldridge certainly seemed to have a

2    history of odd and strange behavior, did he not?

3    A.    He did, but the witness that I had -- or -- the question

4    was resolved in my mind through what Dr. Quijano found in his

10:03:57AM 5    report and what he told me.   That's why I didn't request a

6    competency hearing.

7    Q.    But he did have a history -- you understood he had a

8    history of bizarre beliefs, bizarre behavior?

9    A.    That's what I was told.

10:04:13AM 10    Q.    Have you ever participated in a competency hearing?

11    A.    Yes.

12    Q.    And how many times have you done that?

13    A.    It was probably a lot of times.   When I was a prosecutor

14    with the district attorney's office, there were -- I wouldn't

10:04:55AM 15    say a real regular occurrence, but it wasn't something that

16    was real unusual either.

17    Q.    And as a defense attorney, did you ever participate in

18    competency hearings?

19    A.    I suspect I did, yes.

10:05:09AM 20    Q.    And was this experience before or after the Aldridge

21    case, as a defense attorney?

22    A.    I don't remember if it was before or after.

23    Q.    As a prosecutor, your position was generally in

24    opposition to the defense's claim that their client was

10:05:52AM 25    incompetent; is that correct?

A.   Generally, it was not.  We would look at the report that
the doctor who evaluated the defendant would come up with.
Actually, probably, most of the time I was allied with the
defense.  Because when we had the competency hearing, it was
10:06:11AM  generally because the defendant was found to be incompetent;
but a jury had to make that finding.  So, the defense and the
prosecutor, me, would tell the jury that we were in agreement
that the defendant was incompetent and that we felt that the
jury should find that he was incompetent; and generally they
10:06:35AM would do that based on that representation and the doctor's
reports.
Q.   Do you have any recollection of any particular case in
which this was done?
A.   No.
10:06:43AM Q.   I would like to turn one more time to the report of
Dr. Quijano.  It has to do with the defense that Mr. Aldridge
told them he was going to put on.  And it says this:
          THE COURT:  Which page, counsel?  Which page?
          MR. RYTTING:  It's page 9 of the report.
10:07:15AM BY MR. RYTTING:
Q.   "He will advance the following arguments and evidence to
prove himself not guilty.  The victim was part of the
conspiracy with individuals and spirits that repeatedly
harassed him by sexual assault and controlling his thoughts
10:07:31AM and preventing him from fulfilling his religious destiny in a

1    Muslim country."

2              That is the defense that Mr. Aldridge told

3    Dr. Quijano he was going to put on.  And your testimony has

4    been that what you recall from your client is that he

10:07:49AM 5    essentially stuck by that defense in this case.  Is that fair

6    to say?

7    A.    I remember -- all I really remember about what he said

8    was is that the complainant had repeatedly sexually assaulted

9    him.  That's basically what I remember.  That's what he told

10:08:13AM 10   Dr. Quijano.  Again, I have no reason to quarrel with what's

11   in Dr. Quijano's report.  But as far as independent

12   recollection, that's about all I remember.

13   Q.    Well, that recollection fits quite nicely with what

14   Dr. Quijano found by his psychological interview about Mr. --

10:08:34AM 15   about what Mr. Aldridge thought the defense should be in this

16   case?

17   A.    Well, I don't know if that's the -- if you are talking

18   about as far as presenting it to a jury.  I mean, that was the

19   story he told about -- told us about why he did what he did.

10:08:53AM 20   And, again, as a lawyer, I would have advised him not to

21   present that because there was absolutely no evidence that

22   that occurred.  It just didn't happen.  And I felt that

23   putting on a defense like that would have been

24   counterproductive, and I would have advised against it.  But

10:09:11AM 25   if he insisted on wanting to testify, that's his right.

1 Q.   You would have allowed your client to put on a delusional

2 defense?

3 A.   If that's what he wanted to put on, I mean -- if he felt

4 like this guy raped him -- lots of defendants tell lies when

10:09:33AM 5 they testify.  This would have been another.  I don't -- you

6 know, is it delusional; or is it a lie?  I don't know.

7 Q.   Well, you didn't find out.  That's the problem, right?

8 A.   I knew it wasn't true.  I can't tell -- you know, I had

9 him evaluated by an expert.  That's the best I can do.

10:09:57AM 10 Q.   But still even today you can't tell -- you didn't know at

11 the time whether this was delusional or a lie.  That's what

12 you are saying, right?

13 A.   I can't tell you.

14 Q.   And the same can be said about his writings and his --

10:10:24AM 15 the rest of the psychological interview that -- the results of

16 the psychological interview, his stories about spirits on the

17 roof, about being molested constantly, about his desire to go

18 to Iran to fulfill his testimony (sic), all of that, in fact,

19 you didn't know when you were in trial whether he was

10:10:43AM 20 fabricating it or actually believed it.  Is that fair to say?

21 A.   One of the reasons why I wanted to get Dr. Quijano is

22 because defendants have been known to embellish or to fake

23 being mentally ill, and I felt --

24 Q.   I understand that.

10:10:58AM 25 A.   I felt that because Dr. Quijano was conversant with

1   prisoners and had dealt with them on a regular basis, that he

2   would be more aware of something like that.

3   Q.   But the question was whether you knew at the time of

4   trial or --

10:11:29AM  5   A.   I don't think anybody can know what goes on in his mind,

6   whether it is a delusion or if it's a lie.  You can have an

7   opinion about it; but as far as truly knowing, no one could

8   know except Rulford Aldridge.

9   Q.   Okay.  And did you get an opinion on whether this was a

10:11:47AM  10  delusion or a lie from anybody?

11  A.   I don't remember.  Again, I say -- he has mental

12  problems.  I have no doubt that probably he had some

13  delusions.  Whether all of that was what he believed or not, I

14  can't tell you.

10:12:07AM  15  Q.   Well, let's assume this is all delusional just for a

16  moment.  How could someone that believed this -- believed that

17  this is what his defense was going to be, assist you in a

18  trial, in a capital murder trial?

19  A.   I had -- it wasn't like his conversations were all just

10:12:38AM  20  looney.  He understood what was going on.  He basically said

21  he killed this man because he raped him a number of times.  I

22  didn't believe that.  End of story.

23  Q.   When it came to defending Mr. Aldridge, you put on a

24  different defense than the one that Mr. Aldridge told

10:13:33AM  25  Dr. Quijano he was going to sponsor at trial.  Is that fair

1    enough to say?

2    A.   Yes.

3    Q.   And Mr. Aldridge didn't assist you at all with that

4    defense.  That was your own decision.

10:13:47AM   5    A.   I don't remember if he assisted us with that or not.

6    When you're -- I've tried a lot of capital murders; and as far

7    as the guilt/innocence, there's virtually no question as to

8    guilt of the defendant.  If you are going to -- as a

9    prosecutor, if you are going to seek a death penalty, it has

10:14:11AM   10   to be pretty much a hundred percent bullet proof as far as

11   guilt.  So, as a defense lawyer, your eye is more towards the

12   punishment phase and trying to mitigate the punishment.

13   Q.   I guess the point is, though, was there -- there was no

14   help with -- the defense that you put on, he was no use to you

10:14:41AM   15   at all.

16   A.   I don't remember the conversations I had with

17   Mr. Aldridge.  I'm assuming that he helped us because we

18   had -- we did have rational conversations with him.

19   Q.   Again, you keep saying you had a rational conversation

10:14:57AM   20   with him; but each one turns to -- if I'm not correct, the

21   record will reflect that the only thing you remember is this

22   business about him being raped and sexually assaulted by the

23   victim.

24   A.   That's the only specific thing I remember.

10:15:20AM   25   Q.   Okay.  Again, let's go back to this report.  You didn't

```
 1  get this report until the middle of trial.  That's when it
 2  said it was completed.  You may not have got it all until the
 3  trial was over, as soon as the trial was complete, May 15th,
 4  which is the date of this report; is that correct?
```
10:15:51AM
```
 5  A.   Well, I'm not going into a trial without having at least
 6  talked to Dr. Quijano to get his findings.  That wouldn't make
 7  any sense.
 8  Q.   But you still have no memory of talking with Dr. Quijano
 9  at all prior to the trial?
```
10:16:13AM
```
10  A.   I would have talked to him.  I don't remember it, but I
11  wouldn't have gone into the trial without some feedback from
12  Dr. Quijano.  There's no reason for me to ask for an
13  evaluation and then just blow it off.
14  Q.   Well, here's a report that's nearly 13 pages long, single
```
10:16:36AM
```
15  spaced.  Did you ever go up to Conroe to see him at his
16  office?
17  A.   I don't remember if I did.
18  Q.   Did he ever come down to see you?
19  A.   I don't recall whether we did that or not.
```
10:16:47AM
```
20  Q.   And you don't have any phone records of conversations
21  with Dr. Quijano?
22  A.   No.
23  Q.   And how long do you think it would -- you don't actually
24  have any recollection of any conversations, even though -- how
```
10:17:06AM
```
25  long do you think it would take to explain this to somebody,
```

1  the significance of this, and go through the results of this

2  interview?

3  A.   I wouldn't know.

4  Q.   Did Dr. Quijano have any input whatsoever into your

10:17:49AM 5  defense of your client?

6  A.   I don't remember.

7  Q.   You didn't put on an insanity defense in this case --

8  A.   No.

9  Q.   -- correct?

10:18:18AM 10  A.   That's correct.

11  Q.   And one of the reasons is maybe because you didn't have

12  this report; is that correct?

13  A.   The main reason I didn't put on an insanity defense is

14  there was no finding by Dr. Quijano that he was insane.

10:18:42AM 15  Insanity in Texas was extremely difficult to prove.  I think

16  it had to be basically that what the defendant -- when he

17  committed the murder, committed the crime, that he didn't know

18  what he was doing was wrong.  I don't think there's any

19  indication from the way this crime was committed that

10:19:03AM 20  Mr. Aldridge didn't know it was wrong.  He fled afterwards,

21  after he robbed and killed the complainant.  And as a general

22  rule, insanity defenses don't work.

23  Q.   Do you know what a command hallucination is?

24  A.   I'm sorry?

25  Q.   A command hallucination?

1    A.   I don't know what that is.

2    Q.   And you didn't know at trial, I take it?

3    A.   I don't know if I did or not.

4    Q.   It's not something you forgot?

10:19:33AM   5    A.   I don't know.  Possibly.

6    Q.   Did you ask Dr. -- did you ask Dr. Quijano was he under

7    the influence of command hallucinations during the commission

8    of this crime?

9    A.   I wouldn't remember that.

10:19:58AM   10    Q.   Would you have put on an insanity defense if your expert

11    had told you that he was under the influence of command

12    hallucinations when he committed this crime?

13    A.   If I thought he was insane and had evidence to back it

14    up, likely I would have tried it.

10:20:16AM   15    Q.   You don't consider evidence of command hallucination at

16    the time of the offense evidence that he was insane?

17    A.   I don't know what command hallucination is.  What I am

18    telling you is he knew -- I felt he knew that what he did was

19    wrong.  I didn't feel that he met the legal definition of

10:20:37AM   20    insanity based on the evaluation by Dr. Quijano and from what

21    I observed from the evidence and the crime.

22    Q.   It didn't look like he was acting in the presence of --

23    under the influence of a severe mental disease at the time of

24    the crime?

10:20:55AM   25    A.   He had mental problems.

1  *Q.*   That wasn't my question.  Based on the report and the

2  account of the crime, some of which we have read in the record

3  here, doesn't it appear to you that he was acting under the

4  influence of --

10:21:11AM  5  *A.*   There's nothing in the report that says --

6          THE COURT:  One at a time.  One at a time, please.

7  Let him finish his question.

8          THE WITNESS:  Yes, sir.

9  BY MR. RYTTING:

10:21:16AM  10  *Q.*   And because of a severe mental illness...

11  *A.*   He has a mental illness.  There's nothing in there that

12  indicated that he was insane.  It indicates he has mental

13  illness.

14  *Q.*   Let me rephrase it.  The question -- not rephrase it.

10:21:41AM  15  Let me restate the question again because you answered a

16  different question.

17          I asked you:  Is there evidence in that report

18  that he was acting due to or because of a severe mental

19  illness at the time of the crime?

10:21:53AM  20  *A.*   If that's what the report says, I don't have no reason to

21  argue with it.

22  *Q.*   If that's what your expert would have told you at trial,

23  would you have considered and wouldn't that be grounds for

24  presenting the insanity defense?

10:22:14AM  25  *A.*   Well, the problem I had -- I would have loved to have

1   presented Dr. Quijano to a jury to present evidence of

2   Mr. Aldridge's mental problems.  The problem I had was the

3   disciplinary records at T.D.C. indicated that Mr. Aldridge had

4   quite a few run-ins with the guards there, and the main thing

10:22:43AM  5   I recall was that he had stabbed another inmate in the face

6   with a fork.  So, I had to weigh the -- do I put on

7   Dr. Quijano and present the evidence of his mental problems,

8   knowing that the prosecutor didn't have those records.  He had

9   subpoenaed them.  He didn't get them.  I don't know why.  I

10:23:06AM  10  had them.

11          But if I put on Dr. Quijano, I would have had

12  to turn those records over to the prosecution because it would

13  have been something that Dr. Quijano considered during his

14  evaluation.  And, frankly, I thought that that would severely

10:23:26AM  15  undercut any argument you had at the penalty phase of the

16  trial in which you try to tell the jury that if you give this

17  man life rather than death, he is going to spend his time in

18  prison and he won't be a threat to anybody else.  Well, those

19  records indicate he was a threat.

10:23:48AM  20  Q.  The insanity defense, as you understand it, is a defense

21  that comes in at guilt/innocence, right, not at the punishment

22  phase.

23  A.  Right.

24  Q.  And did the T.D.C. records have anything to do with the

10:24:05AM  25  possibility of putting on an insanity defense?

1   A.   I had -- I figure with an insanity defense, the only way

2   it is going to work is if you have a doctor, a psychiatrist,

3   or someone who is going to say he is insane.  I didn't have

4   that, and just throwing out -- throwing out things without

10:24:27AM  5   that is not going to work, in my opinion.

6   Q.   So, it really wasn't the T.D.C. records in this case that

7   made the decision?

8   A.   I had no evidence he was insane, not enough to put on a

9   defense.  And generally they don't work.

10:24:56AM 10   Q.   Well, let's turn to the second half of the test of

11   insanity, which is sometimes used in some jurisdictions; and

12   that is whether he understood the nature and quality of his

13   actions.

14           MS. HAYES:  I'm objecting to this line of

10:25:14AM 15   questioning since it is not the standard we use in Texas.

16   There's just no point in even going into the McNaughton rule.

17           MR. RYTTING:  That has to do with the recent Supreme

18   Court case, *Clark versus Arizona*.  It's *Clark versus Arizona*,

19   Your Honor.  And in that case the Supreme Court considered the

10:25:33AM 20   Arizona statute in which only one half of the McNaughton test

21   is used.  And that is the same as Texas, where they only use

22   what they call the moral prong.  Did they understand at the

23   time of the -- at the time of the offense, or was their mental

24   illness such at the time of the offense that they weren't able

10:25:50AM 25   to understand that their action was wrong.  And they -- and

1    that was Arizona standard because it was in Texas.

2              But the complaint was -- of Clark was

3    precisely:  Look, you don't use both prongs in Arizona.  You

4    don't use the second half in which you sometimes call the

10:26:10AM 5    cognizant test.  Did they understand the nature and quality of

6    their actions?  And in addressing this question, the Court

7    said:  Look, that doesn't mean the test from Arizona is

8    deficient.  Because if you find that a client doesn't

9    understand the nature and quality of his actions, you are

10:26:32AM 10    almost invariably going to determine that he is -- doesn't

11    meet the first prong of the McNaughton test, that that is a

12    condition of -- for -- and very relevant to determining this

13    moral -- the moral prong.

14              So, there's no harm in just having the moral

10:26:52AM 15    prong.  Certainly that just means that certainly that evidence

16    about the nature and quality of the action is highly relevant

17    as to whether an insanity defense can be put on.  Of course,

18    it is.  If a guy is completely delusional about what he is

19    doing, it's impossible to say that:  Well, he, nonetheless,

10:27:13AM 20    understood that what he was doing was wrong.  And that's why

21    this is a relevant line of questioning.

22              And the Court in *Clark* isn't just resting on --

23    isn't making new law.  They make it pretty clear that this

24    isn't sort of a new determination, that this sort of has been

10:27:32AM 25    the way that the test has been looked at, that one prong

1  essentially incorporates the other.  And that's why I think it

2  is relevant in going into this line of questioning here,

3  despite the fact that the Texas standard has just that one

4  half of the McNaughton test.

10:27:48AM  5          THE COURT:  Okay.  I am going to sustain the

6  objection.  Let's take a 20-minute break.  Thank you.

7      (Break)

8          THE COURT:  All right.  Ready to proceed?

9          MR. RYTTING:  Yes, Your Honor.  I am ready to

10:55:08AM 10  proceed.

11          THE COURT:  Okay.

12  BY MR. RYTTING:

13  Q.   Just returning briefly to the issue of the insanity

14  defense, do you recall anything at trial or on the record that

10:55:26AM 15  indicated Mr. Aldridge thought that what he did on the day of

16  the crime was illegal?

17  A.   Well, I don't know that we ever really discussed it with

18  him in those terms.  Again, he claimed that this fellow had

19  sexually assaulted him before.  If that was true, he went in

10:55:53AM 20  there and just shot him, that would be illegal.

21  Q.   You didn't ask him if he thought this was --

22  A.   No.

23  Q.   -- violated any law?

24  A.   No.

10:56:00AM 25  Q.   Was there any indication that -- you know, he may have

48

1   been remorseful; but did he think that what he was doing was

2   advancing some other cause or some other purpose?

3   A.   You know, again, all I can say is that all I

4   independently remember is that he said that this fellow had

10:56:26AM 5   raped him; and I don't recall anything really other than that.

6                MR. RYTTING:  I'll pass the witness.

7                THE COURT:  Thank you very much.

8                     Cross-examination?

9                     **CROSS-EXAMINATION**

10:56:59AM 10  **BY MS. HAYES:**

11  Q.   Good morning, Mr. Hayes.

12  A.   Morning.

13  Q.   I'm Katherine Hayes with the Attorney General's office.

14  I would like to talk to you briefly about how specifically did

10:57:09AM 15  you choose Dr. Quijano to do the evaluation.

16  A.   As I recall, I asked around to several people; and I

17  found that Dr. Quijano, as I remember, had been the head of

18  the psychiatric unit at T.D.C., Texas Department of

19  Corrections.  And I thought that would be just about perfect

10:57:36AM 20  for the situation that we had because he would be familiar

21  with the criminal process and also in dealing with the

22  prisoners.

23  Q.   So, you did consult with other attorneys about making

24  that decision with Dr. Quijano?

10:57:51AM 25  A.   Yes.  I don't remember where I got his name; but it was

1  likely from another attorney, I would imagine.

2  Q.   Do you recall if Dr. Quijano at any point had indicated

3  that perhaps Mr. Aldridge had exaggerated some of his stories?

4  A.   He very well may have.  I don't recall.  I know that

10:58:27AM 5  because Mr. Aldridge, I think, held a responsible job at the

6  time, there was some -- again, I have no question that he had

7  some mental problems; but I think there was a question in my

8  mind as to exactly how severe it was, you know, because he was

9  able to hold a responsible job prior to this killing.

10:58:51AM 10  Q.   Can you explain what you mean?  Do you remember any of

11  the specifics about the job or what kind of job he held?

12  A.   I don't remember the name of the place; but as I

13  remember, I think it was a fast-food -- you know, something

14  similar to Jack-In-The-Box, McDonald's, I believe.  And I

10:59:18AM 15  think he may have been an assistant manager, if I remember

16  right; but I could be wrong.

17  Q.   Do you recall if he was living on his own or if he was

18  living with family members when the crime happened?

19  A.   I believe he was living on his own.

10:59:32AM 20  Q.   Do you recall if he -- if he had a car at the time or had

21  a car before?

22  A.   I don't remember.

23  Q.   Now, you mentioned that there was -- you would not go to

24  trial without having at least talked to Dr. Quijano to get his

11:00:01AM 25  opinion.

1   *A.*   True.

2   *Q.*   Okay.  So, you hired him to do an evaluation.  So, at

3   least you had to confer with him before proceeding in to

4   trial.  Would that be correct?

11:00:09AM  5   *A.*   Definitely.

6   *Q.*   Okay.  Now, the first thing that you could do -- I

7   suppose when Dr. Quijano is hired, it was for the competency

8   evaluation.  So, at what point in trial proceedings would you

9   have to proceed on -- if you came back and said the defendant

11:00:24AM  10   is, in fact, incompetent, at what point would you need to be

11   moving ahead with incompetency?

12   *A.*   In an ideal world, I would have liked to have done that

13   well prior to jury selection.

14   *Q.*   Okay.  So, if the evaluation happens at the end of March

11:00:44AM  15   and the jury selection is in late April of 1990 -- I know

16   there was a comment made about that -- with the report not

17   coming out until May 15th, 1990, there was some 45 or 50-day

18   gap between the evaluation and when the report came out.  Does

19   that sound familiar with the questioning from earlier?

11:01:09AM  20   *A.*   It does.

21   *Q.*   Okay.  Does that mean that in that gap, that you had no

22   other dealings with Dr. Quijano or reprising him of the

23   situation with Mr. Aldridge?

24   *A.*   No.

11:01:24AM  25   *Q.*   I would like to turn your attention to Plaintiff's

1   Exhibit 8.  And at page 3 --

2   A.   I'm sorry.  I don't have it.

3           MS. HAYES:  If I may approach?

4           THE COURT:  You may.

5   A.   Thank you.

6   BY MS. HAYES:

7   Q.   Part of the questioning earlier was about some of the

8   things that occurred during Dr. Quijano's questioning -- or

9   Dr. Quijano's evaluation; and it involved that he had reviewed

11:02:11AM 10   some records, I believe.  Do you recall what records offhand

11   you may have provided to Dr. Quijano?

12   A.   I know I provided a record of his disciplinary records at

13   T.D.C.  Mr. Aldridge, I think, had a prior record.  I likely

14   would have provided some of those, as well.

11:02:42AM 15   Q.   Would it assist your recollection if Dr. Quijano had

16   listed some of the materials that he reviewed in advance?

17   A.   Yes.

18   Q.   Okay.  If I could direct you to page 3, where Dr. Quijano

19   details some of the things that he reviewed underneath the

11:02:57AM 20   "history" section.

21   A.   I've got it.

22   Q.   Okay.  I'm looking at the second paragraph under

23   "history."  He says that he reviewed personal writings,

24   including an August 2nd, 1989, letter to a brother Muslim in

11:03:16AM 25   Dubai.

1  A.   I see that.

2  Q.   Okay.  And that relates -- that he was receiving

3  persecution from Nazis, gays, blacks, and other prison trash.

4  Okay.

11:03:28AM  5              Do you recall -- if the record reflects that

6  you actually admitted that letter at punishment as Defense

7  Exhibit 2, in addition to providing that to Dr. Quijano, would

8  you have a reason to refute that?

9  A.   No, not at all.

11:03:48AM 10  Q.   Okay.  On the next -- the thing that's listed, it says

11  that there is a strange October 8th, 1988, letter to the Texas

12  Department of Labor and Standards.

13  A.   I see that.

14  Q.   Do you recall having provided that to Dr. Quijano?

11:04:03AM 15  A.   Not independently; but if he said I did, I'm sure I did.

16  Q.   Do you recall admitting that at the punishment hearing as

17  Defense Exhibit 4?

18  A.   Obviously I must have.

19  Q.   Do you recall -- also, it says a strange April 30th,

11:04:20AM 20  1990, letter to the IRS.

21  A.   I see that.

22  Q.   The next thing, it says strange writings during jury

23  selection on April 18th of 1990.  Do you agree that you

24  provided that to Dr. Quijano?

11:04:35AM 25  A.   Obviously I did.

1  *Q.*   So, if Dr. Quijano evaluates Mr. Aldridge in March, at

2  least it appears several weeks later you are still apprising

3  him apparently of some of the current events that -- some of

4  the things that were wrong with Mr. Aldridge.  Would you agree

11:04:55AM 5  with that statement?

6  *A.*   Yes, I would.

7  *Q.*   Okay.  Would you also agree that during the punishment

8  phase, you in turn took that letter and admitted that at trial

9  as your Defense Exhibit 5?

11:05:03AM 10  *A.*   I would imagine I did if it is there.

11  *Q.*   And then also one of the things that Dr. Quijano lists is

12  that he also reviewed strange writings found in Aldridge's

13  possession at the time of his arrest.  Do you recall providing

14  those to Dr. Quijano?

11:05:20AM 15  *A.*   I remember providing Dr. Quijano with a lot of strange

16  writings that he did.  I don't remember if it was these

17  specifically, but obviously I must have.

18  *Q.*   Okay.  And if the record reflects that the writings that

19  were in Mr. Aldridge's possession are in the trial record as

11:05:34AM 20  Defense Exhibit 3, then you obviously would have entered that

21  at punishment, as well; is that correct?

22  *A.*   Yes.

23  *Q.*   Okay.  So, if you considered those four exhibits

24  together, the trial exhibits -- 2, 3, 4, and 5 -- it would be

11:05:47AM 25  correct to say that you provided your expert a chance to

1  review writings and evaluate whether that impacted competency

2  before you went ahead and proceeded with trial?

3  *A.*   Yes.

4  *Q.*   Okay.  And the same thing as far as sanity, that he had

11:06:04AM  5  an opportunity to review those letters and determine if they

6  at all would impact his sanity opinion.

7  *A.*   Yes.

8  *Q.*   So, when the comment is made about there being a 45-day

9  gap timeline between evaluation and when you actually get the

11:06:18AM  10  report, that doesn't mean that there is a void between you and

11  Dr. Quijano communicating about this case.  Would that be

12  correct?

13  *A.*   Obviously, looking at this, we must have been in

14  communication throughout.

11:06:31AM  15  *Q.*   And do you recall -- also, if you look at the same page,

16  page 3, it talks about T.Y.C. records.  That would Texas Youth

17  Commission records.  So, if the record reflects that

18  Dr. Quijano reviewed those, would those have been provided by

19  your office?

11:06:45AM  20  *A.*   Yes.

21  *Q.*   Okay.  Would the T.Y.C. records -- for what purpose would

22  you be providing T.Y.C. records to Dr. Quijano?

23  *A.*   Well, those are his prior -- it is his prior criminal

24  record; and I would think that that would be something that is

11:07:04AM  25  important for a psychiatrist to look at in coming to an

1  evaluation, as far as whatever he needs to be looking at.  I

2  mean, he needed everything that was available.

3  *Q.*   Okay.  So, if a professional was trying to determine

4  maybe when mental illness or mental problems started to

11:07:26AM 5  appear, maybe they would be documented in those records.

6  Would that be a fair assessment?

7  *A.*   I know a lot of times T.D.C. records and that type thing

8  would have reports in there regarding any treatments that were

9  given to prisoners, psychiatric treatments and otherwise.

11:07:47AM 10  *Q.*   And on a similar line, you provided the Texas Department

11  of Criminal Justice, although I guess probably then it was

12  T.D.C., records, Texas Department of Corrections.  Those were

13  also provided to Dr. Quijano?

14  *A.*   They were.

11:08:00AM 15  *Q.*   And the records, if I am correct, would reflect that he

16  had committed -- prior to this capital murder, in 1972 he

17  committed nine different aggravated robberies and an assault

18  to murder, I believe is what the charge was.  Does that sound

19  correct?

11:08:23AM 20  *A.*   Yes.  I knew he had a pretty bad criminal history.  I

21  didn't remember exactly what it was; but if that's what is

22  reflected in here, that's likely correct.

23  *Q.*   Do you recall anything about the -- everything about this

24  case -- when people started to say that Aldridge first started

11:08:46AM 25  acting strange?

1    *A.*   I don't remember.

2    *Q.*   Okay.  Do you recall any time that people said any event

3    that might have caused it?

4    *A.*   I think his sister or relative said something about -- I

11:09:06AM  5    don't remember.  She may have mentioned something about a

6    childhood incident, but I don't recall exactly.

7    *Q.*   Okay.  Do you have any recollection of talking with

8    Aldridge's family members about -- about his arrest?

9    *A.*   I don't.  I don't recall.

11:09:28AM 10    *Q.*   Do you recall whether Mr. Aldridge's -- after the crime

11    was committed in Houston, that he ended up leaving the --

12    actually leaving the state?

13    *A.*   I remember he fled, yes.

14    *Q.*   Do you remember where he fled?

11:09:47AM 15    *A.*   I want to say it was out of the country, but I can't

16    remember.

17    *Q.*   If the record showed that he fled to Mexico City and then

18    on to Toronto, would that sound correct?

19    *A.*   If that's what the record reflects, I don't have any

11:10:05AM 20    reason to argue with it.

21    *Q.*   You had said earlier that one of the considerations, I

22    believe, was about whether Mr. Aldridge actually appreciated

23    whether his conduct was wrong or whether it was illegal.

24    Would those be factors that you would have considered in

11:10:24AM 25    whether he appreciated the wrongfulness of his acts?

1    A.    Certainly I think flight is a consideration.

2    Q.    Do you have any recall whether the record shows that

3    Mr. Aldridge had asked family members to go into his apartment

4    to get a passport or maps or money?

11:10:45AM 5    A.    I don't independently recall that.  I don't.

6              I do think that one of his sisters helped him

7    in some fashion, but I don't remember what it was.

8    Q.    If, in fact, one of the sisters had been arrested for

9    helping -- with an evade arrest, an offense similar to that,

11:11:16AM 10   would that be a consideration in deciding if you were going to

11   ever present that individual as a witness?

12   A.    Certainly if she assisted him in escaping, I don't

13   believe that would be someone that I would want to put on the

14   stand as a credible witness.

11:11:36AM 15   Q.    And if, in fact, the record shows that Gladys Aldridge,

16   Mr. Aldridge's older sister, had helped him -- be one of the

17   people to escape the area, then would you have reason to doubt

18   that Gladys was the one that was involved?

19   A.    That's likely correct if that's what it says.

11:11:56AM 20   Q.    Do you recall if in your investigation that -- would you

21   have had access to the HPD files or the sheriff's office files

22   of the original investigation into the case?  Is that

23   something the D.A.'s office would have access to?

24   A.    You mean the capital murder?

11:12:16AM 25   Q.    Yes.

1   A.    Yeah.   They would have let me review all of the Houston

2   police reports that were done by the homicide detectives and

3   the other police officers.

4   Q.    Okay.   And would that include witness statements?

11:12:29AM   5   A.    Yes.

6   Q.    Okay.   So, when Gladys Aldridge was arrested and ended up

7   giving two statements to the police, then that would be

8   included in the record for your review?

9   A.    Yes.   I'm sure it would have been.   If the police -- if

11:12:43AM   10   HPD took those statements, those would have been made

11   available.

12   Q.    Okay.   And the same for the half brother, Edward Ford, if

13   his statement was in the file, you would have had an

14   opportunity to review that?

11:12:54AM   15   A.    Yes.

16   Q.    Okay.   And the same for James Aldridge, the nephew; is

17   that also correct?

18   A.    Yes.

19   Q.    Okay.   And then another statement from Anthony Aldridge,

11:13:05AM   20   because that's Gladys' son, and another nephew, if his

21   statement was in the file, you would have had an opportunity

22   to review that?

23   A.    Yes.

24   Q.    Okay.   In deciding the extent of his involvement and

11:13:17AM   25   awareness of what is going on with the crime, would it be

1  important to look at statements that people have made about

2  their interaction with him in dealing with him immediately

3  after the crime?

4  A.   Yes.

11:13:29AM 5  Q.   If those statements -- in fact, if Gladys' statement had

6  said that Mr. Aldridge had told her he did not want the family

7  to be involved because it would be better that way, would that

8  be taken as an indication that he's aware that there may be

9  some trouble?

11:13:58AM 10  A.   That's the way I would take it.

11  Q.   Do you recall about Edward Ford, the step brother, if you

12  have those reports to review, that Edward Ford has reported

13  that Mr. Aldridge told him there was a robbery and that he had

14  killed someone at McDonald's and stolen the money?  Do you

11:14:21AM 15  recall that in the actual report with Edward Ford?

16  A.   I don't recall it right now; but if it was in the HPD

17  report, I'm sure that I saw that.

18  Q.   If -- in planning his escape or his leaving Houston

19  immediately after the crime, if Mr. Aldridge was, in fact,

11:14:42AM 20  doing some of the driving around in the area, would that be an

21  indication that he's -- he's doing some day-to-day functions,

22  apparently?

23  A.   I would consider driving a day-to-day function, yes.

24       MS. HAYES:  If I could take just a minute.  We have

11:15:43AM 25  covered so much.  I am still trying to catch up with my notes.

1        THE COURT:  All right.

2     (Pause)

3        MS. HAYES:  Your Honor, in order to speed this

4  along, what I would like to do -- we had listed Mr. Davis as

11:16:31AM  5  one of our witnesses.  I prepared -- I plan to go ahead and

6  call him on direct, but I could probably go ahead and cover

7  these other matters on my own with direct.  But I will just

8  limit my cross for right now to those questions and then just

9  reserve the right to call Mr. Davis back.

11:16:53AM 10        THE COURT:  All right.  Do you have any redirect?

11        MR. RYTTING:  Yes, Your Honor, I do.

12        THE COURT:  Do you have any objection to the

13  state doing their cross -- I mean, their direct of this

14  witness at this point while he is on the stand?

11:17:14AM 15        MS. HAYES:  I, actually, Your Honor, was intending

16  to have to call him back later and not take care of the direct

17  right now.

18        THE COURT:  All right.  All right.

19        MS. HAYES:  We've covered so much that I wanted to

11:17:23AM 20  make sure I had all bases covered.

21        THE COURT:  All right.  Go ahead, Mr. Rytting.

22        MR. RYTTING:  I have no objection, Your Honor.

23        THE COURT:  Okay.  Do you have any other questions

24  of this witness?

11:17:33AM 25        MR. RYTTING:  Yes, Your Honor.  There are a few

1    questions on redirect.

2           THE COURT:  All right.

3                   **REDIRECT EXAMINATION**

4    **BY MR. RYTTING:**

11:17:52AM  5    *Q.*   The respondent has noted that you sent some writings to

6    Dr. Quijano, but you don't know how he got them or what the

7    communication along -- whether there was any communication

8    with Dr. Quijano about those writings; is that correct?

9    *A.*   I don't remember; but I'm assuming that -- you know, we

11:18:20AM 10    obviously would have supplied them to him and likely spoken to

11    him; but I don't have any independent recollection of that.

12    *Q.*   And she mentioned that you didn't call Gladys Aldridge as

13    a witness, correct?

14    *A.*   Apparently not.

11:18:39AM 15    *Q.*   And you didn't call Judy Turner as a witness?

16    *A.*   I don't remember who Judy Turner is; but I -- if I didn't

17    call her, obviously I didn't.

18    *Q.*   And there's other reasons for interviewing a witness

19    besides presenting them at trial, is there not?

11:19:03AM 20    *A.*   Potentially.

21    *Q.*   Have you had a chance to review the statement of Gladys

22    Aldridge in this case?

23    *A.*   No.

24    *Q.*   I would like to ask you some questions about our

11:19:31AM 25    Exhibit 24, Petitioner's Exhibit 24.

1          MR. RYTTING:  Strike that, Your Honor.  I don't have

2     questions for this witness about this exhibit.

3          THE COURT:  All right.

4     BY MR. RYTTING:

11:20:06AM 5     Q.   I do have questions about Judy Turner, which is

6     Petitioner's Exhibit 25.  And Ms. Turner was the sister of

7     Mr. Aldridge.  Do you understand that?

8     A.   I'll take your word for it.  I don't remember.

9     Q.   She was at the time -- she was born in 1950, according to

11:20:30AM 10    her statement; and at the time of the trial she would have

11    been 40 years old.

12               But instead you called a niece -- two nieces,

13    Virginia and Cheryl Aldridge -- at the time I believe their

14    age was 13 and 17 -- who talked about Mr. Aldridge, correct?

11:20:48AM 15    A.   Frankly, I don't recall them at all.

16    Q.   And you wouldn't argue if their testimony indicated that

17    they had limited contact with Mr. Aldridge?

18    A.   If that's what it says, I have no argument with that.

19    Q.   Actually, Judy Turner's statement reflects that

11:21:07AM 20    Mr. Aldridge, after he got out of prison, came to live with

21    her.

22    A.   Okay.

23    Q.   In fact, while he was living with her, he exhibited

24    extraordinarily strange behavior.  For example, according to

11:21:25AM 25    Ms. Turner, she had 6 and 7-year-old children who were scared

1  to talk with him and asked her if he was crazy.  She reports

2  that Garfield talked to himself a lot.  And Garfield is the

3  middle name of Mr. Aldridge.  "He talked loud.  He woke me up

4  a couple of times, and the den is not close to my bedroom.

11:21:48AM  5  I've seen people who have been in war and are shell shocked.

6  Garfield was like that.  He was jumpy and nervous all the

7  time.  I never remember him sleeping."

8          And she goes on to say that "The kids told me

9  that Garfield was seeing ghosts" and describes -- goes on to

11:22:07AM  10  describe his strange behavior.  She also gives a little bit

11  about the family history, about the mother who had some

12  strange habits, indicating that this may have been a -- there

13  might be some genetic basis to his mental illness.  Don't you

14  think that would have been -- is that not some evidence

11:22:33AM  15  raising a doubt about Mr. Aldridge's competency?

16  A.   I don't know if it is competency.  I know he's got mental

17  problems, though.  I think it shows that he has mental

18  problems.  As far as I was concerned, I relied on the report

19  by Dr. Quijano and my own belief that he was competent.

11:22:52AM  20  Q.   And, again, it shows clearly a history of very strange,

21  bizarre behavior on the part of your client?

22  A.   Yeah.  There's no question he's different.

23  Q.   So, too, in the statement of Brenda Garrett, she actually

24  described strange behavior during the time of trial

11:23:16AM  25  proceedings.  Would you argue with that?

1  *A.*   I don't remember it; but I'm sure that's probably

2  correct, if that's what's there.

3  *Q.*   And she confirms, I believe, that Mr. Aldridge thought

4  that you were part of a conspiracy against him.

11:23:36AM  5  *A.*   He never indicated as much to me, that I recall.  Again,

6  I don't recall him being overtly hostile to Randy or me; but,

7  again, I don't remember specifics.

8  *Q.*   In particular, Paragraph 20 of this statement, of

9  Petitioner's 26, page 4, Paragraph 20, Brenda states, "I

11:24:28AM  10  visited Garfield when he was in the county jail.  He was

11  awaiting trial for killing Mr. Stone.  We had moved."  She

12  explains where she lived; and she goes on to say, "I remember

13  trying to explain to Garfield that his lawyers were trying to

14  help him.  He would say they -- I would say, 'They are here to

11:24:50AM  15  help you.'  He did not want to hear it.  He would tell me that

16  his lawyers and the judge were against him.  He did not want

17  anything to do with his lawyers.  He said he wanted a

18  different judge and different attorneys.  A lot of the

19  conversation was Garfield telling me how his lawyers were

11:25:06AM  20  trying to put the blame on him for things other people were

21  doing.  He would give me the names of people that committed

22  the crimes, very strange names.  They were like names from

23  another language."

24  *A.*   Well, as far as -- I don't mean to make light of it; but

11:25:30AM  25  when you are an appointed lawyer over in the county jail,

1    they call you -- they say you're, as the prisoners call it, a

2    free-world lawyer.  And there are a lot of defendants, a lot

3    of prisoners, who felt because you were appointed by the Court

4    or by the state, that you were in league with the prosecutors.

11:25:52AM  5    And that was a fairly common thing over there.  So, I don't

6    know if he picked some of that up from other prisoners, you

7    know, at least that aspect; but that wasn't an unusual feeling

8    among the population of the Harris County Jail, I can tell you

9    that.

11:26:09AM  10   Q.    Well, the reason for...  he was a normal person and a

11   normal criminal, if there is such a thing, is skeptical about

12   appointed lawyers is because he is mentally ill.  Isn't that

13   fair to say?

14   A.    Well, he is mentally ill; but, again -- he had strange

11:26:25AM  15   beliefs, but it wasn't like this guy was just out of his mind

16   when we were talking to him.  He appeared to be coherent.  You

17   could speak to him about what was going on.  He seemed to

18   understand what was going on.  He would speak to us.  He had

19   odd beliefs.

11:26:46AM  20   Q.    So, I think we covered this area; but just to close, his

21   behavior didn't strike you as odd, just what he was telling

22   you?

23   A.    Well, certainly what he was doing struck me as odd; or I

24   wouldn't have asked Dr. Quijano to take a look at him.

11:27:57AM  25           MR. RYTTING:  I'll pass the witness, Your Honor.

1          THE COURT:  All right.  Thank you.

2                Anything further?

3          MS. HAYES:  No, Your Honor.  We will go ahead and

4    reserve everything for redirect.

11:28:08AM 5          THE COURT:  All right.  Thank you, Mr. Davis.  You

6    may step down.

7          THE WITNESS:  Thank you, sir.

8          THE COURT:  Subject to being recalled later on.

9          THE WITNESS:  Yes, sir.

11:28:13AM 10          THE COURT:  All right.  Thank you.

11    (Witness released)

12          THE COURT:  Who is your next witness?

13          MR. RYTTING:  Yes, Your Honor.

14          THE COURT:  Who is your next witness?

11:28:18AM 15          MR. RYTTING:  I'll call Dr. Quijano.

16          THE COURT:  All right.  Dr. Quijano.

17                Would you come forward and raise your right

18    hand, please, to be sworn in.

19          (**WALTER QUIJANO,** Petitioner's witness, Sworn.)

11:28:45AM 20          THE COURT:  All right, Doctor.  If you will have a

21    seat in the witness chair, please, sir.

22                    **DIRECT EXAMINATION**

23    **BY MR. RYTTING:**

24    *Q.*   Dr. Quijano, could you identify yourself to the Court?

11:29:02AM 25    *A.*   My name is Walter Quijano, Q-U-I-J-A-N-O.

Q.   Would you briefly state some of your qualifications and training?

A.   I have a Bachelor's degree in general psychology, a Master's degree in clinical psychology, Ph.D. in clinical psychology.  I have completed all the education and training experience requirements to be licensed as a psychologist by the Texas State Board of Examiners of Psychologists.

I have worked both in the private and public sector.  I have a short stint at the Federal Correctional Institution in Terminal Island.  I was staff psychologist at the Texas Department of Corrections.  I was chief psychologist in a state hospital in Oklahoma, Eastern State Hospital in Oklahoma.  I was program director in a private hospital, alcoholism treatments, in Oklahoma and then in San Antonio.  I returned to the then Texas Department of Corrections to be director of psychiatric services and chief psychologist.

Around the mid-'80s I opened a private practice in Conroe, Texas, where I have worked since.  I have private general clinical psychology patients.  I have forensic work doing competency and insanity evaluations for the local district courts in surrounding counties.  I do evaluations and treatment for juvenile and adult probation.

Q.   And you were retained by Doug Davis and Randolph Bates to examine Rulford Garfield Aldridge at his -- prior to his trial in 1990, correct?

1  A.   Yes.

2  Q.   And you produced a report that we entered as Exhibit 8.

3           And I would like to hand you this report.  Do

4  you recognize that report as the report you made in this case?

11:32:12AM 5  A.   Yes.

6  Q.   And you came to a conclusion about Mr. Aldridge's mental

7  illness, did you not?

8  A.   Yes.

9  Q.   And what was the diagnosis that you arrived at?

11:32:30AM 10  A.   Schizophrenic disorder, paranoid type.

11  Q.   And what type of mental illness is schizophrenia,

12  paranoid type?

13  A.   Schizophrenia is a thinking disorder, a major thinking

14  disorder where there is an abnormality in the content of the

11:33:02AM 15  thought and in the manner of thought.

16  Q.   And would you describe Mr. Aldridge's mental illness as a

17  severe mental illness?

18  A.   Yes.

19  Q.   And why is that?

11:33:16AM 20  A.   Because it is.  It is schizophrenic, and he has both

21  disorders of content and process.

22  Q.   What is a disorder -- could you describe both of those,

23  if you would?

24  A.   Content means what he thinks about is abnormal.  It is

11:33:43AM 25  not what most of us think.  And process is the way he thinks,

1    the flow of his thinking, gets derailed.

2    Q.   And were those -- are those symptoms of schizophrenia?

3    A.   Yes.

4    Q.   And were those present during your interview --

11:34:07AM  5    A.   Yes.

6    Q.   -- of Mr. Aldridge?

7    A.   Yes.

8    Q.   Would you describe him as pervasive?

9    A.   Yes.

11:34:13AM 10    Q.   And was he suffering, at the time you interviewed him,

11   from hallucinations and delusions?

12   A.   He -- he made -- sent messages or sent indications that

13   he was.

14   Q.   Was there any doubt in your mind, at the time of the

11:34:44AM 15   interview, that he was ex -- that he was delusional?

16   A.   That he was delusional?  No, there was no doubt.

17   Q.   And was his delusion -- did his delusion -- what did his

18   delusions involve, in particular?

19   A.   Many delusions, being persecuted by bias people.

11:35:06AM 20   Q.   Were these delusions connected with his legal system in

21   any way -- his legal situation in any way?

22   A.   The one delusion that he talked about, that would be the

23   victim of a case was sexually assaulting him.

24   Q.   That was one of them.  Were there not many others in your

11:35:29AM 25   report that you -- you recorded and described?

1    A.    Many other --

2    Q.    Delusional beliefs.

3    A.    Related to the offense, this is what I can remember.

4    There may be others; but directly related to the offense, this

11:35:47AM  5    is -- this is the one most directly related to it.

6    Q.    That's the most directly related to it, but he had others

7    that were not about -- that are connected with what appears

8    maybe to a layperson as religious beliefs?

9    A.    Yes, but it had nothing to do with the murder.  The

11:36:35AM  10    murder was strictly related, according to his version, to the

11    victim having assaulted him -- sexually assaulted him.

12    Q.    Wasn't there some connection with his destiny of going to

13    Iran or going to a Muslim country?

14    A.    Not directly related to the murder, but the -- there was

11:37:04AM  15    some relationship about somebody or somebody's preventing him

16    from going to a Muslim country.  He had many other delusions

17    that were not related to the murder.

18    Q.    Okay.  In the course of examining Mr. Aldridge, did you

19    have any question about whether he actually believed what he

11:37:56AM  20    was telling you?

21    A.    No.  Because if you ask him, if you believe what you have

22    been telling me for the last hour or so, he would say:  Yes, I

23    believe.

24    Q.    Okay.  Was there -- what is malinger?

11:38:14AM  25    A.    There are two types of malingering.  One would be a

1  person who is not mentally ill who presents himself as

2  mentally ill or, more commonly, a mentally ill person who

3  exaggerates his mental illness.  He is mentally ill; but he

4  exaggerates mental illness, depending on the secondary gains

11:38:39AM 5  that he may be able to derive.

6  Q.    And was there any indication that Mr. Aldridge was

7  malingering his illness?

8  A.    The illness, no.  The exaggeration -- the hearing voices

9  in my presence, looking under tables and chairs like that,

11:39:00AM 10  that is suspicious behavior; but overall he is mentally ill.

11  Q.    And have you seen any records since then that indicated

12  that his men -- his behavior and his hallucinations continued?

13  A.    Well, yes.  Yes.  He hallucinates and has delusions.  It

14  is when you are actively hallucinating in front of people,

11:39:29AM 15  that it becomes suspicious.  Because generally these people

16  can, what is called, compensate.  They can pull themselves

17  together long enough to not be actively ill in front of

18  people.

19  Q.    But there was no indication in your report that

11:39:48AM 20  Mr. Aldridge engaged in any of that, is there?

21  A.    No.  In my report I report in paragraphs descriptions of

22  how he would behave, that he would appear like he was

23  listening to somebody talking to him or -- he said "somebody."

24  I would put that in quotation marks -- not quotation marks but

11:40:19AM 25  parentheses.

1   *Q.*   And, in fact, Mr. Aldridge, when you did his history, he

2 denied any previous psychiatric problems.

3   *A.*   Well, he is not convinced he is mentally ill.

4   *Q.*   Okay.  He has no insight into his condition?

11:40:37AM  5   *A.*   Correct.

6   *Q.*   And that's another indication that he's not malingering;

7 isn't that true?

8   *A.*   He is not malingering that he is mentally ill.  He can

9 malinger -- he can exaggerate the degree or the intensity of

11:40:59AM  10 the illness.

11   *Q.*   Well, you say he can; but -- I just want to make sure.

12 In this report at least, you don't say that he did; is that

13 correct?

14   *A.*   In this report there is no statement saying that he

11:41:08AM  15 malingered by exaggeration.

16   *Q.*   So, when he gives you a -- when your report reflects that

17 he said, for example, "The guy" -- referring to who knows

18 what -- "surrounded by a white supremacist effort camouflaged

19 as a Muslim but actually working for prison officials had a

11:41:39AM  20 vision of Rulford being the Muslim messiah described in Muslim

21 literature.  The guy in the supremacist devised a plot to

22 prevent division in the Middle East from coming to life.  The

23 victim, who was made to feel little about himself, was set up

24 by the guy and the supremacist to prevent the trip to the

11:41:59AM  25 Middle East."

1          That's something that Mr. Aldridge believed,

2  right?

3  *A.*    Yes.

4  *Q.*    And he could not distinguish that from other things we

11:42:09AM  5  consider real.

6  *A.*    Yes.

7  *Q.*    And once more, this is another delusional belief; is that

8  correct?

9  *A.*    Yes.

11:42:18AM  10  *Q.*    And it is connected with his legal situation?

11  *A.*    Yes.

12  *Q.*    In particularly the murder in this case?

13  *A.*    Yes.

14  *Q.*    These firmly held sincere beliefs of Mr. Aldridge.

11:42:31AM  15          MS. HAYES:  What page were you on?

16          MR. RYTTING:  This is page 6 of our Exhibit No. 8.

17  BY MR. RYTTING:

18  *Q.*    And it goes on, "They knew Rulford did not believe in

19  weapons, and they had to devise a way for him to have one.

11:42:56AM  20  One day he was fired upon on the way to work; but he still

21  refused to get one because he believed all life was sacred and

22  he had no right to interfere, no matter how diabolic, unless

23  it affected they" -- meaning the victim -- "began to sexually

24  assault him at work and the deceased was a participant.  The

11:43:15AM  25  guy felt that was a soft spot in him, as told by the white

1  supremacist.  The victim followed him around, and Rulford

2  could feel sexual assault as the victim stood behind him.  The

3  victim then told Rulford on many occasions that the only way

4  he could stop sexually molesting him was for Rulford to kill

11:43:37AM  5  him."

6              Now, again, this was reported by you.  And I

7  will ask again.  These are statements that Mr. Garfield

8  believes; is that correct?

9  A.   Yes.

11:43:45AM  10  Q.   Okay.  And he believed them at the time of the interview?

11  A.   Yes.

12  Q.   And those are firm beliefs of his?

13  A.   Yes.

14  Q.   He cannot be moved off, in your opinion, from those

11:43:57AM  15  beliefs?

16  A.   Yes.  Most paranoias are immovable.

17  Q.   So, it is fair to say that not only during the interview

18  but even afterwards, Mr. Aldridge held beliefs such as this?

19  A.   Yes.

11:44:19AM  20  Q.   And likely the very same constellation of beliefs about

21  being assaulted, about being sexually molested, and so forth,

22  as an explanation for his legal situation.  Is that fair?

23  A.   His explanation, yes.

24  Q.   And he actually believed that?

11:44:36AM  25  A.   Yes.

1   *Q.*   And you would expect, in your view, he maintained and

2   retained those beliefs even throughout the proceedings against

3   him?

4   *A.*   Yes.

11:44:46AM 5   *Q.*   There was no possibility, really, that Mr. Aldridge got

6   better and stopped holding beliefs such as this about why he

7   was in the legal predicament he was; is that correct?

8   *A.*   Correct.

9   *Q.*   Let me return briefly to the issue of whether he could

11:45:33AM 10   exaggerate or did exaggerate.   Now, Mr. Aldridge did not

11   believe he was mentally ill, correct?

12   *A.*   I don't think so.

13   *Q.*   So, how would he be able to exaggerate his mental

14   illness?

11:45:47AM 15   *A.*   By claiming things that are not going on.

16   *Q.*   I guess the point is this:   If he doesn't believe he is

17   mentally ill and doesn't want other people to believe he is

18   mentally ill -- I mean, is that fair to say, he didn't want

19   people to think he was crazy?

11:46:07AM 20   *A.*   Uh-huh.

21   *Q.*   And there was no -- then what motivation would he have to

22   exaggerate his mental illness?

23   *A.*   Secondary gains.   Why mentally ill people exaggerate,

24   because when they exaggerate, they get some benefits out of

11:46:35AM 25   the exaggeration.

1    Q.    That puts some insight into their mental illness.  You

2    just testified he didn't appear to have any.

3    A.    No.  He may not see himself as mentally ill; but he knows

4    that when he exaggerates, he gets certain things and when he

11:46:54AM 5    doesn't, he doesn't get certain things.  That much he knows.

6    Q.    But, Dr. Quijano, I guess the point I would like to make

7    is -- even if he is exaggerating, let's say, he believes those

8    exaggerations; was that correct?

9    A.    I mean, you can say that he believes his exaggeration.

11:47:31AM 10    Q.    He actually thinks this is true, what he told you is

11    true.  We've gone over that, correct?

12    A.    From his perspective, yes.

13    Q.    Okay.  I need to go over some of the relationship that --

14    the relationship between you and the attorneys in this case.

11:48:08AM 15    Do you recall any conversations with Mr. Davis or Mr. Bates

16    about Mr. Aldridge?

17    A.    I don't recall specific incidents; but, yes, we had a

18    series of conversation.  But I cannot tell you who, when, what

19    we talked about.

11:48:26AM 20    Q.    You believe you had a series of conversations.  And was

21    this something that you testified to in deposition, a memory

22    of a series of conversations?

23    A.    I cannot remember specific instances; but given the

24    gravity of this case, the complexity of the case, it is

11:48:58AM 25    improbable that the expert and the lawyers would not talk.

1    And so, I cannot tell you how many times, where, what topics

2    were discussed each time; but we discussed the case.

3    Q.   So, it could be that you didn't discuss it at all?

4    A.   Huh?

11:49:16AM 5    Q.   It could be that you had no meaningful discussion at all,

6    nothing --

7    A.   No.  That's improbable.  That is almost insulting to me

8    and to Davis.

9    Q.   Well, the report was produced when?  When was this report

11:49:31AM 10   produced?

11   A.   May the 15th.

12   Q.   And trial began May the 14th?

13   A.   Yes.

14   Q.   So, they did not have the forensic report until May the

11:49:45AM 15   15th.

16   A.   They didn't have a written report.

17   Q.   Is that your usual practice, to hold off on the written

18   report until after trial has begun?

19   A.   It is not usual, but it happens many times -- it just

11:50:00AM 20   happened two weeks ago -- when all the data prepared, ready to

21   go; but it is not written down because you wait for the

22   last-minute changes, last-minute data.

23   Q.   What last-minute data came in in this case?

24   A.   No.  I'm saying you don't -- you ask me whether it is

11:50:40AM 25   usual for me to write reports after the case.  I said no.

There have been instances, it just happened two weeks ago,
where I have the data ready to go and have been discussed with
the lawyers, but I have not written the report.

Q.   But in this case, though, was there -- is there any
indication that you received last-minute data?

A.   It could be that we were in constant communication as he
was doing during the trial, during -- who knows, 20 years ago.

Q.   Constant communication?

A.   It could be that that's how it happened.  Because it is
improbable that we would not -- we would not talk.

Q.   But you have no recollection of this?

A.   I do not have specific dates, times, when, with whom,
phone, person, no specifics like that, sir.

Q.   Do you have any billing records or anything like that
that would indicate that you spent an exceptional amount of
time on this case?

A.   No.  The state does not pay for that kind of work anyway.

Q.   So, you're basically speculating about that constant or
continuous or frequent communications?

A.   No, that's not a speculation.  That is sure.  But you are
speculating that I did not talk to him.

Q.   Well, you may have talked to him; but you have no
recollection --

A.   No, no, no.

          THE COURT:  One at a time, please.

1  A.   I talked to him.

2  BY MR. RYTTING:

3  Q.   When?

4  A.   That's what I am telling you.  I did not -- 20 years ago.

11:52:24AM  5  I cannot tell you when, how, where; but I definitely talked to

6  him.

7  Q.   How long?

8  A.   Long enough, necessary for the case; but I cannot tell

9  you how long.

11:52:35AM 10  Q.   Was it an hour-long conversation?

11  A.   No.  More than that.  This is a complicated case.  This

12  is a very serious case.

13  Q.   Do you have -- do you have -- this is a complicated case,

14  and you didn't produce the report for your attorneys until

11:53:10AM 15  after the trial had started.

16  A.   I didn't produce a written report until May the 15th.

17  Q.   And if the Attorney General is correct, the last piece of

18  evidence that you had was -- came in at voir dire, which

19  started the previous month, and it was several writings; is

11:53:32AM 20  that correct?  Do you remember that --

21  A.   I don't remember that.

22  Q.   -- from Doug Davis' testimony?

23       You were present when Doug Davis testified,

24  correct?

11:53:42AM 25  A.   Yes, but I don't remember that.

1  *Q.*   And you also were present when he said he doesn't

2  remember talking with you at all, he just assumes he must

3  have?

4  *A.*   He never talked to me?

11:53:52AM  5  *Q.*   Well, you were present when he said he didn't have any

6  recollection.  And you are here now saying that you may have

7  talked with him for hours about a complicated case.

8           MS. HAYES:  Objection, Your Honor.  I know the

9  record will speak for itself; but, you know, he's not saying

11:54:06AM  10  he doesn't have a recollection of never talking to him.  It

11  has always been he can't tell the specifics.  It has been

12  19 years.  So, you've got to give a little bit of leeway.

13           THE COURT:  I understand.  I understand.

14  BY MR. RYTTING:

11:54:32AM  15  *Q.*   Now, in your -- when determining the competency in a

16  complicated case like this, Mr. -- Dr. Quijano, is it

17  important to examine the witness near the time of trial?

18  *A.*   At the time the question of competency is raised, that is

19  when I examine them.

11:55:02AM  20  *Q.*   Yes.  But is it -- does competency -- does the level of

21  competency change?

22  *A.*   Yes.

23  *Q.*   In a complicated case with a serious mental illness such

24  as this, is it important to monitor the client?

11:55:16AM  25  *A.*   Yes.

1   Q.   Would you recommend that at least another psychiatric or

2   psychological investigation or evaluation take place?

3   A.   No.

4   Q.   Isn't that -- I sat in your office only a couple of days

11:55:29AM  5   ago in which you said that a competency examination near the

6   time of trial should take place.

7   A.   Because you ask different questions each time.  So, I

8   give difference answers.  You asked me in the office if the

9   lawyer sees evidence of incompetency, would I recommend a

11:55:53AM  10   reexamination hearing?  I said yes.  But if you mix one or

11   two words or one or two phrases, the question changes; and the

12   answer changes.

13   Q.   Okay.  And you saw the testimony -- you've read the

14   testimony of Dr. Bates -- I mean, Mr. Bates, the trial

11:56:07AM  15   attorney, did you not?

16   A.   Mr. Who?

17   Q.   Mr. Bates, Randolph Bates, the second chair in this case.

18   A.   Yes.

19   Q.   And you were here when his testimony was read in this

11:56:19AM  20   court, correct?

21   A.   Yes.

22   Q.   And he said conversations with his client are irrational

23   and that he thinks that there's people out there during the

24   interview, during the attorney/client interview.  Now, is that

11:56:29AM  25   reason to have this client examined?

1    *A.*   No.

2    *Q.*   Why isn't it a reason to have a client examined?

3    *A.*   You cannot confuse mental illness with incompetent.  If

4    the person is mentally ill, hallucinating, delusional,

11:56:55AM  5    whatever, that's one question.  The next question is:  Is he

6    competent?  Can he understand the proceedings in court?  If he

7    does, it does not matter whether he is mentally ill or not.

8    He is competent.  You have to have both.  If you are mentally

9    ill and incompetent or incompetent alone, you can raise the

11:57:17AM 10    issue; but mental illness alone, particularly if it had been

11    ruled out already, it is not raised each time.

12    *Q.*   You came to the conclusion that he was competent to stand

13    trial, correct?

14    *A.*   Yes.

11:57:36AM 15    *Q.*   But you realize that other reasonable psychologists who

16    obtained the same results that you did by interview could come

17    to a different conclusion, correct?

18    *A.*   Another psychologist can come to a different conclusion;

19    but if that psychologist follows the law, he would come to the

11:57:58AM 20    same conclusion that I did.

21    *Q.*   I would like to show you your deposition.

22              MS. HAYES:  Improper predicate, Your Honor.  We

23    object that he is trying to impeach him this way.

24              THE COURT:  What is the purpose of the deposition?

11:58:22AM 25              MR. RYTTING:  Impeachment, Your Honor.

1          THE COURT:  All right.  The question you asked him

2    that you're going to impeach him on?

3          MR. RYTTING:  I'm going to ask him whether he said

4    in deposition that other professionals --

11:58:30AM  5          MS. HAYES:  Your Honor, I object to him reading the

6    question aloud.  He still has to have the proper predicate

7    before he impeaches.  If he reads the question, then he's just

8    circumventing around to being able to lay the proper

9    foundation before he impeaches.

11:58:41AM 10          THE COURT:  All right.  Sustained.

11    BY MR. RYTTING:

12    Q.   Do you recall giving a deposition in this case?

13    A.   Yes.

14    Q.   And do you recall being asked the following question:

11:59:07AM 15          "QUESTION:  I just want to clarify that you

16    told me that this wasn't a clear-cut case?"

17          MS. HAYES:  Objection, relevance.

18          THE COURT:  Overruled.

19    BY MR. RYTTING:

11:59:22AM 20    Q.   And do you recall how you responded?

21    A.   Repeat the question for me.

22    Q.   I asked when it came -- when it came to determining

23    competency, I asked you, "I just want to clarify that you told

24    me that this wasn't a clear-cut case?"

11:59:39AM 25    A.   Yes.

1  *Q.*   And your answer was?

2  *A.*   Read me the answer.

3  *Q.*   "Correct."  And you answered:  "Correct."

4  *A.*   Yeah.

11:59:46AM  5  *Q.*   And it goes on, "And other professionals -- reasonable

6  professionals could disagree with that judgment?"

7          MS. HAYES:  Objection, again, Your Honor.  This is,

8  again, leading towards impeachment that's not the proper

9  foundation...

12:00:00PM  10          THE COURT:  I understand.  I am going to let him go

11  ahead.

12          MS. HAYES:  Just for the record, could you tell us

13  what page you're on?

14          MR. RYTTING:  We're on page 85 of the deposition.

12:00:10PM  15  BY MR. RYTTING:

16  *Q.*   And do you recall moving your head up and down?

17  *A.*   No.

18  *Q.*   And if the record reflected that you did, would that

19  indicate an affirmative answer on your part?

12:00:22PM  20  *A.*   Yes.

21  *Q.*   Okay.  And do you recall this question being asked next

22  in the deposition:  "I just want to make sure that the reason

23  they might disagree is that they" --

24          THE COURT:  You can have a running objection.

12:00:31PM  25          MS. HAYES:  Thank you, Your Honor.

1  BY MR. RYTTING:

2  Q.  -- "is that although you didn't find that the evidence

3  warranted the conclusion that he wasn't competent to stand

4  trial, that doesn't mean that there was significant and

12:00:41PM 5  substantial evidence in the record from which a reasonable

6  psychologist could conclude that there was an issue of

7  competency."

8              Do you remember that question?

9  A.  Yes.

12:00:48PM 10  Q.  And you answered:  "Correct."  Do you recall giving that

11  answer?

12  A.  Yes.

13  Q.  Okay.  If I may go on, do you recall this question being

14  asked at the deposition that there was -- "I mean, this isn't

12:01:27PM 15  sort of a thin case, an obvious case, where you have to piece

16  through the evidence and come up with a story about how this

17  guy might understand what is going on.  There is very solid

18  indications that he could have serious trouble comprehending

19  the nature of the charges."

12:01:42PM 20              THE COURT:  Page and line, please.

21              MR. RYTTING:  Page 85 through page 86, lines 23

22  through line 5.

23              MS. HAYES:  Just to clarify, does my running

24  objection continue through all different categories of the

12:01:54PM 25  impeachment; or do I need to reallege as to each different --

 1            THE COURT:  No.  It continues all through this.

 2            MS. HAYES:  Thank you, Your Honor.

 3    BY MR. RYTTING:

 4    Q.   "There is very solid indications that he could have

 5    serious trouble comprehending the nature of the charges -- I

 6    mean, not the nature of the --

 7            THE REPORTER:  Please start reading from the

 8    beginning, please.

 9    BY MR. RYTTING:

12:02:14PM 10    Q.   The question is:  "I mean, this isn't sort of a thin case

11    and obvious where you have to piece through the evidence and

12    come up with a story about how this guy might not understand

13    what is going on.  There is very solid indications that he

14    could have serious trouble comprehending the nature of the

12:02:33PM 15    charges -- I mean, not the nature of the charges against him

16    but serious trouble assisting his attorneys."

17                And, again, if the record reflected that you

18    moved your head up and down, would you disagree with it?

19    A.   Who was talking when you just quoted?

12:02:48PM 20    Q.   I was the one talking.

21    A.   Okay.

22    Q.   And you agreed?

23    A.   Yes.

24    Q.   And very -- the next question, at line 7, page 86:  "And

12:02:58PM 25    very serious trouble at arriving at a factual and rational

1  understanding of the proceedings."

2            And you gave an answer.  "His," meaning the

3  biggest argument in favor of this would be -- well, do you

4  remember what your answer was?

12:03:13PM  5  A.   No.

6  Q.   "His biggest argument would be that he wants me to

7  present a delusional defense.  I don't want to go with that.

8  So, we are at odds," meaning the attorney and you.

9  A.   Yes.

12:03:25PM  10  Q.   And you agreed with that, correct?

11  A.   Yes.

12  Q.   You also gave -- provided an affidavit in this case, did

13  you not?

14  A.   Yes.

12:04:34PM  15            MR. RYTTING:  If I may approach the witness?

16            THE COURT:  You may.

17  BY MR. RYTTING:

18  Q.   Do you recognize that?

19  A.   Yes.

12:04:42PM  20  Q.   And one of the things you say in this affidavit is

21  that -- well, if you would, read Page 2, the second full

22  paragraph.

23  A.   My May 15, 1990 evaluation indicates that Mr. Aldridge

24  suffered from schizophrenia.  The narrative that I obtained

12:05:21PM  25  from Mr. Aldridge in advance, leading to his arrest, is

1  also... with association of content.  Although I concluded

2  that Mr. Aldridge was competent to stand trial, other

3  professionals in my field certainly could have reached the

4  opposite conclusion.  If counsel consulted with me about my

12:05:43PM  5  report, I would have to inform them of this.

6  Q.   Is that a true statement?

7  A.   Yes.

8  Q.   And on page 3, I would like to call your attention to the

9  third full paragraph, starting with "federal habeas counsel."

12:06:16PM  10  If you would, read that.

11  A.   "Federal habeas counsel has provided me with a statement

12  by Gladys Aldridge.  The statement describes Mr. Aldridge's

13  behavior while incarcerated on a 1972 burglary charge.  The

14  statement indicated that the onset of Mr. Aldridge's psychosis

12:06:40PM  15  may have occurred 10 years or more before trial.  This is

16  important forensic information that I did not have when I

17  finalized my May 15, 1990, report.  For one thing the history

18  of bizarre conduct and beliefs is evidence that Mr. Aldridge

19  was not malingering near the time of trial.  For another thing

12:07:04PM  20  the statement shows that Mr. Aldridge's delusional thinking

21  was associated with his experience in and perception of the

22  criminal justice system.  This is also important psychological

23  information.  This history suggests that symptoms of

24  Mr. Aldridge's mental illness would become more acute and

12:07:25PM  25  pervasive in the courtroom than they were within the more

1  controlled and less confrontational setting of a forensic

2  psychological interview."

3  Q.   And is that a true statement?

4  A.   Yes.

12:07:37PM 5  Q.   And, finally, might as well continue with this exhibit,

6  you read the second full paragraph.  The third full paragraph,

7  if you would, read what you have wrote there on page 3 -- or

8  what you agreed to on page 3.

9  A.   "Federal habeas counsel has provided me with the trial

12:08:46PM 10  testimony of co-counsel, Randolph Bates.  Mr. Bates testified

11  that during attorney/client interviews, there would be times

12  when he would ask Mr. Aldridge a question; and he would

13  respond appropriately to the question.  There would be times

14  when he would ask Mr. Aldridge questions, and his answer had

12:09:11PM 15  nothing to do with what I asked him about.  Mr. Bates also

16  testified that during attorney/client interview, Mr. Aldridge

17  talked quite a bit about spirits controlling people and

18  conspiracies and different groups of people out to get him."

19  Q.   And if you turn over to the next page where the paragraph

12:09:30PM 20  continues on page 4.

21  A.   "Mr. Bates characterized his communications with

22  Mr. Aldridge as quite odd and irrational.  I was not informed

23  of trial counsel's specific problems.  It is my forensic

24  psychological opinion that trial counsel's direct testimony

12:09:50PM 25  that his client was paranoid, delusional, and irrational

1    during attorney/client communications is clear evidence that

2    Mr. Aldridge was not presently able to consult with counsel

3    with a rational degree of understanding."

4    Q.    Is that a true statement?

12:10:07PM  5    A.    Yes.

6    Q.    So, it is your forensic -- which means that Mr. Aldridge,

7    in your forensic psychological opinion, was not competent at

8    trial.

9    A.    No.  He was competent when I saw him.

12:10:23PM  10    Q.    So, when you saw him?

11    A.    Yes.

12    Q.    So -- which is different from making a conclusion that he

13    was competent at trial?

14    A.    No.  I wasn't asked to conduct -- to examine him during

12:10:39PM  15    trial.

16    Q.    To make a determination, wouldn't you need to examine him

17    close to the time of trial?

18    A.    If I were to make another determination --

19    Q.    To make a determination, would you not need to examine

12:10:52PM  20    him close to the time of trial?

21    A.    If I was asked to do another opinion, then I would have

22    to re-examine him.

23    Q.    To form an opinion about whether he was at trial --

24    A.    Yes.

12:11:07PM  25    Q.    -- at trial he was competent, you would need to examine

1   him again?

2   A.   Yes.

3   Q.   Dr. Quijano, you said a little while ago that people,

4   even if they have a major disorder like Mr. Aldridge's,

12:12:03PM  5   specifically schizophrenia, can pull themselves together and

6   act competent in front of others.  Is there anything in the

7   scientific literature or psychological history that you can

8   point to in which this has been confirmed?

9   A.   Of course.

12:12:21PM 10   Q.   What?

11   A.   There is periods of waxing and waning of schizophrenia.

12   There is periods of --

13   Q.   Maybe you misunderstood the question.  I asked the

14   question in the literature, psychological literature.  That

12:12:38PM 15   means in the journals, the professional publications.

16              And just to clarify, I believe you said that

17   they could not stop hallucinating; is that correct?  Did you

18   say that they could stop hallucinating?

19   A.   Yes.

12:13:11PM 20   Q.   By a force of will, is that what you meant?

21   A.   No.

22   Q.   They just may be --

23   A.   In the course of the illness.

24   Q.   So the record won't reflect, then, that -- if the record

12:13:30PM 25   reflects that you said that they can choose to stop actively

1 hallucinating in front of others, that would be a mistake on

2 your part, if you said that, correct?

3 A.   No.  That's not a mistake.  People can stop hallucinating

4 when their attention is directed to something else.  There

12:13:52PM 5 is -- in the DSM-III there is a diagnosis modification called

6 remission -- schizophrenia, in remission -- meaning at that

7 period of time, schizophrenia is not active.  So, it is a very

8 acknowledged phase of illness that people who are mentally ill

9 are not mentally ill 24 hours a day; and those who are, are

12:14:20PM 10 most likely malingering.

11 Q.   There is no indication anywhere that Mr. Aldridge was in

12 remission at any time, is there?

13 A.   When a mentally ill person, such as a schizophrenic, goes

14 through maybe two or three days when they don't... he is in

12:14:49PM 15 remission at that moment.

16 Q.   Do you have any evidence that that happened in this case?

17 A.   No.  But from what I hear in the testimony, there were

18 times when they were able to discuss the case rationally,

19 coherently.  That is a remission phase.

12:15:07PM 20 Q.   You would say that -- you would say that a client or a

21 patient was in remission phrase based on testimony like that?

22 A.   Well, you are asking me for an example.  I said if the

23 person -- if a schizophrenic person is ever to converse with

24 you for an hour to two hours coherently, of course he's in

12:15:34PM 25 remission for those two hours.

1    *Q.*    And you are assuming that that actually happened in this

2    case?

3    *A.*    No.  I'm not assuming anything.  I'm answering your

4    question that there is a such thing as remission in mental

12:15:43PM  5    illness.

6    *Q.*    But I am talking about this case.  You have no evidence

7    that that ever happened in this case?

8    *A.*    No, I have no evidence.  I am telling you that mentally

9    ill people can conduct long conversations without being,

12:15:58PM 10    quote, crazy at the time.

11    *Q.*    Some mentally -- I'm talking about Mr. Rulford Garfield

12    Aldridge.

13    *A.*    He can, too.  He did with me during the competency.

14    *Q.*    Okay.  During your exam -- this is your example of a long

12:16:15PM 15    conversation?

16    *A.*    Yeah.

17    *Q.*    That indicates he was in remission?

18    *A.*    Read my report carefully, and you will see that the first

19    part of the interview where he was a free flowing -- he was

12:16:33PM 20    given time to tell his story, a very, very crazy story.  When

21    that was done, we went into the next phrase of the

22    examination, which was competency.  Very directed questions.

23    Do you understand this?  Do you understand that?  He did very

24    well during that phase of the examination.

12:18:14PM 25    *Q.*    When you said that this -- you indicated that this

1  interview here indicated that he was in remission.

2  A.   During the phase -- there are phases in a conversation

3  when a schizophrenic person can remit or can put aside the

4  active mental illness and focus on the business; and then if

12:18:37PM  5  you allow them to do a free-flowing type of conversation,

6  then, of course, they will go back to free associating.

7  Q.   And that's what you think remission is?

8  A.   (No response.)

9  Q.   Correct?

12:18:55PM  10  A.   What's the question?

11  Q.   You think that that would be an example of remission,

12  what you are talking about?

13  A.   Yes.  That's an example of a mental illness that at the

14  moment is not active.

12:19:08PM  15  Q.   And, again, that's your understanding of the term.

16  That's what you believe is in the literature.  That's what you

17  think is -- what a good psychologist refers to when they talk

18  about the remission of an illness or a remission of a mental

19  illness?

12:19:28PM  20  A.   A time during which an active illness is not active.

21  Q.   There's nothing in your report that indicates that, for

22  any part of it, he was not actively mentally ill?

23  A.   Well, it doesn't say so; but if you read it, you know

24  when you go to the competent portion, it is a very smooth

12:20:06PM  25  interview.  There were no gestures of:  I'm hearing things.

1  I'm seeing things.  He answered questions directly.  He was

2  very, very goal oriented during that phase.

3  *Q.*   Now, you testified -- you mention in your report that

4  Mr. Aldridge has, I guess, a flat or blunted affect.

12:20:45PM  5  *A.*   Yes.

6  *Q.*   And that is an indication or a sign of his illness; is

7  that correct?

8  *A.*   An indication of --

9  *Q.*   That's an indication or a sign of his illness; is that

12:20:57PM  10  correct?

11  *A.*   I can't hear you.  Indication of --

12  *Q.*   Is that an indication or sign -- one of the common signs

13  of the illness that he suffers from?

14  *A.*   It could be, yes.

12:21:05PM  15  *Q.*   And the fact that he is actually sitting there looking

16  poker faced, that doesn't mean that he is not actively

17  psychologically hallucinating, correct?

18  *A.*   No.  He could be worrying about the case.  He could be

19  hallucinating.  He could be worrying about what to say.  Who

12:21:34PM  20  knows.

21  *Q.*   Uh-huh.  And even when he is answering questions in what

22  you think -- or what you believe is a goal-directed manner, he

23  still could be -- since he is suffering from schizophrenia --

24  *A.*   Oh, yeah, you are always schizophrenic.  The question

12:21:51PM  25  is -- I'm always diabetic; but when I take my medications

1  right and eat right, my diabetes is not active.

2  Q.   And he wasn't on any medication, correct?  He was not on

3  any medication?

4  A.   Correct.

12:22:17PM 5        MR. RYTTING:  I'll pass the witness.

6        THE COURT:  All right.  I think this would be a good

7  opportunity for us to take our lunch break.  Let's break for

8  an hour.  Be back here at 20 minutes after 1:00, please.

9  1:20.

12:22:27PM 10        (Lunch recess)

11        THE COURT:  All right.  Doctor, do you want to come

12  up and resume the witness stand, please?

13        MR. RYTTING:  Your Honor, may I just notify the AG

14  that Gladys Aldridge is here; and she is in the courtroom at

01:28:09PM 15  the moment.  We haven't invoked the Rule.

16        MS. HAYES:  We will now.  We invoke the Rule.

17        THE COURT:  All right.  Ms. Aldridge, the Rule has

18  been invoked, which means that potential witnesses are not

19  allowed to sit in the courtroom.  So, you will have to remain

01:28:30PM 20  outside until you're called as a witness in this case and not

21  discuss your testimony with any other witnesses in the case

22  until after you have testified.  All right.  Thank you.

23        (Ms. Aldridge leaves the courtroom)

24        THE COURT:  All right.  You may proceed.

25                    **CROSS-EXAMINATION**

1  **BY MS. HAYES:**

2  *Q.*   Good afternoon, Dr. Quijano.  I would like to ask you

3  first -- you started off talking about your qualifications.

4  By the time that you did the evaluation in this case in March

01:29:19PM  5  of 1990, how much experience did you have doing forensic

6  psychological evaluations?

7  *A.*   By that time I would have been considered a veteran

8  because I started my forensic work in 1977.  When I was chief

9  psychologist for eastern State Hospital in Oklahoma, we were

01:29:48PM  10  the forensic unit for the eastern third of Oklahoma.

11  *Q.*   By the time you actually had a chance to evaluate

12  Mr. Aldridge, how many competency evaluations had you

13  performed?  In a ballpark figure.

14  *A.*   In the hospital I did maybe four a week, and I was there

01:30:13PM  15  for four years.  Then after that, in private practice, maybe I

16  would do two a month.

17  *Q.*   And that would be for how long?

18  *A.*   Since '77 until '90.  So, that's about 20 years.

19  *Q.*   Okay.  And how about the same for sanity evaluations, are

01:30:35PM  20  they usually done at the same time?

21  *A.*   They are done at the same time, but the sanity is not as

22  frequent.

23  *Q.*   And have you had cause to be able to lecture or to teach

24  about forensic psychological evaluations?

01:30:55PM  25  *A.*   Yes.

1    Q.    Okay.  Would you explain what kind of context you have

2    done that?

3    A.    We had -- there was the Texas Psychology Foundation --

4    Texas Psychology Foundation published a book called The

01:31:16PM   5    Forensic Journeyman Clinician, and I was asked to write a

6    chapter in the book.  And after that I have internship

7    students come to the office and discussions in Texas

8    Psychological Association meetings.

9    Q.    Have you had the role of explaining to a Court or a jury

01:31:44PM   10   the difference between competency and mental illness?

11   A.    Yes.

12   Q.    All right.  Would you -- I know there was a lot discussed

13   at the start; but could you just, in sort of a nutshell

14   version, explain what we are really looking for?  What's the

01:31:58PM   15   difference between the two?

16   A.    A mental illness is, of course, a disorder a person has

17   that may be considered or -- considered by the neurological

18   system of the American Psychiatric Association as an illness.

19   Just because a person is mentally ill does not mean he is

01:32:26PM   20   necessarily incompetent to stand trial.  There are two

21   separate questions.  A person can be not mentally ill and

22   incompetent.  It can be mentally ill and incompetent, but he

23   can also be mentally ill and competent.  It is his ability --

24   the law defines competency as his ability to essentially

01:32:54PM   25   understand factual, rational understanding of the proceedings

1    against him and his ability to work with his lawyer,

2    regardless of whether he is mentally ill or not.

3    Q.    Does the Diagnostic and Statistical Manual, the DSM of

4    mental disorders, does it inform the psychological community

01:33:22PM  5    about certain factors that you should consider when you are

6    dealing with defendants that are presenting mental illness

7    symptoms?

8    A.    Yes.

9    Q.    Okay.  How so?

01:33:33PM  10   A.    The DSM-IV warns about malingering, particularly for

11   patients who have -- who have reason to benefit from --

12   through secondary gains, benefit from being mentally ill.  So,

13   in the DSM-IV is a warning that people who are criminally

14   involved, the clinician must be very cautious and look for

01:34:05PM  15   potential malingering which, as I said, could mean fabricating

16   symptoms or exaggerating symptoms.

17   Q.    Okay.  In your years of experience at T.D.C.J., or at

18   Texas Department of Corrections, in your role there, would

19   that assist you in being able to deal with a defendant

01:34:28PM  20   population that might be presenting mental illness issues?

21   A.    My experience in the Texas prison system, with the

22   federal prison system, and my stint at the state hospital

23   where we had forensic case law helped me -- prepare me for

24   this type of work.

01:34:52PM  25   Q.    Now, would you say in your years of experience, that you

1   dealt with many defendants who are psychotic?

2   A.   Yes.

3   Q.   Okay.  Now, in this case -- I know in your report, which

4   is Petitioner's 8, also Respondent's 12, you refer at length

01:35:10PM  5   to Mr. Aldridge having delusions.

6   A.   Yes.

7   Q.   Okay.  And hallucinations.

8   A.   Yes.

9   Q.   And that he even had a flat affect.

01:35:19PM  10   A.   Yes.

11   Q.   Okay.  And then you had given a clinical impression of

12   being a paranoid schizophrenic.

13   A.   Yes.

14   Q.   All right.  Despite listing all of those in the report,

01:35:30PM  15   you still said that he is competent to stand trial.

16   A.   Yes.

17   Q.   So, they're not -- are they mutually exclusive, or --

18   well, let me strike that.

19            There's been a lot of questioning about the

01:35:45PM  20   extent of whether Mr. Aldridge has a serious mental illness.

21   Is a serious mental illness enough to get him over the hump to

22   show that he is, in fact, incompetent?

23   A.   No.

24   Q.   Why not?

01:35:58PM  25   A.   It is not the presence or absence of the mental illness.

1    It is his ability to understand what he is charged with, the

2    consequences of the proceedings, and his ability to work with

3    his lawyer.  That is the criteria used, not the presence or

4    absence of mental illness.  The presence or absence of mental

01:36:27PM 5    illness can explain his competency but does not cause it.

6    Q.    When you are assessing his competency and you are looking

7    first -- would you explain what the definition is that you

8    were following in 1990?

9    A.    Of incompetency?

01:36:42PM 10    Q.    Yes, please.

11    A.    Does the person have a factual understanding of the

12    proceeding against him, a rational understanding of the

13    proceeding against him, or the ability to assist counsel in

14    his own defense?

01:36:57PM 15    Q.    Now, in determining the factual understanding aspect of

16    that definition, what in particular did you look for in this

17    case?

18    A.    It is very simple.  Does the person understand what he is

19    charged with?

01:37:12PM 20    Q.    Okay.  Did -- obviously, since you found him competent,

21    you found he did have a factual understanding.

22    A.    Yes.

23    Q.    Now, when we say "factual understanding," we're talking

24    factual understanding of the proceedings against him; isn't

01:37:24PM 25    that correct?

A.   Correct.  The first part refers to the charge and what led to the charge.

Q.   Okay.  Now, what led to the charge, as they've argued, has some delusion tied up with it.  Does that mean now that we are dealing with someone who doesn't have a factual understanding?

A.   No.  A person can have a serious mental illness and still know that he is charged of, in this case, murder.  He can still relate how it developed and the consequences, what he did before, what he did after, what he did during.  He can clearly state that.  Now, he can couch that in strange ways, crazy ways.  But if he is able to tell us what he is charged with, what led to that and what he did afterwards, then he would be competent to stand trial, and if he can work with his lawyers.

Q.   Now, looking, again, at the rational understanding of proceedings aspect, was Mr. Aldridge able to explain the operative facts of the crime to you?

A.   Yes.

Q.   Okay.  What do you recall his explanations of the operative facts?

A.   Well, number one, he related how he bought the gun, that he lied to the -- or did not tell the -- did not tell the truth, in that he was a felon, and then that he went to the store early and then that the -- this person was there and

1    somebody was trying to convince him not to shoot, but then

2    he -- so, he said -- he related how he shot the person, how he

3    convinced the person or threatened the person with the gun to

4    open the safe but always couched in a mental illness form.

01:39:45PM 5    Open the safe for me because I will not touch the safe because

6    I'm a shareholder of the company.  But open the safe for me.

7              Then he realized that the person was still

8    alive.  So, he shot him again.  Coached him into doing this

9    again, saying:  Go back there and shoot him one more time.

01:40:05PM 10   And then, of course, they escape.  Well, when he left the

11   place, his family members wanted him to join in another crime;

12   and he said:  No.  I will not commit another crime.

13   Q.   Okay.  So, at least as far as the fact that he bought the

14   gun, he goes to the shop early, he opens the McDonald's, he

01:40:33PM 15   shoots the manager, he shoots him twice, he has him opening

16   the safe, he takes the money from the safe, he was getting on

17   the bus, he was meeting up with his family, all of these

18   details have been explained to you by Mr. Aldridge.

19   A.   Correct.

01:40:47PM 20   Q.   Regardless of the fact that there may be some aspects of

21   delusional beliefs mixed in; like, say, for example, there's a

22   guy on the roof.

23   A.   Correct.

24   Q.   All right.  And when you dealt with Mr. Aldridge, is it

01:41:03PM 25   your impression that he understood that the charges against

1  him, the charges he faced, were serious?

2  A.   Yes.

3  Q.   Okay.  How did you assess that?  Just in interview or

4  how?

01:41:13PM 5  A.   Interview as to what are the consequences if you are

6  found guilty, not guilty.  He was able to explain all of that.

7  Q.   Did he appear to appreciate the wrongfulness of his

8  conduct?

9  A.   Yes, in two ways.  He understood that it was wrong

01:41:39PM 10  because it was a crime; i.e., I will not commit another crime.

11  And then he has -- he also has previously mentioned that he

12  doesn't want to kill anybody.  So, there is that intrinsic

13  value for life.  There's also the extrinsic consequence of the

14  act.

01:42:04PM 15  Q.   In your determination of this factor, did you include

16  information about his depart from the Houston area immediately

17  after the crime?

18  A.   That is where -- the information about that shows two

19  things:  Number one, that at the time of the conduct charged,

01:42:32PM 20  that he was not affected to a debilitating degree by the

21  mental illness because of that escape procedure and that the

22  manner with which the crime was committed was not

23  schizophrenic at all and it was organized.  It was goal

24  directed.  The escape was the same thing.

01:42:58PM 25              And that escape -- answering the second

1  question, the insanity question, does he know what he did was

2  wrong, yes, he did.  He knew it was wrong; number one, because

3  he told his people that I will not commit another crime;

4  number two, he escaped.

01:43:22PM 5  Q.   In your declaration that you gave in 2006, which has been

6  offered as the Petitioner's 28, you were asked at the very end

7  about -- and I know we objected about the McNaughton test.

8  There was just a comment that you made about:  Well, if the

9  McNaughton was accepted, maybe he might be insane.

01:43:48PM 10                 To date have you seen any evidence that has

11  caused you to change your original opinion on sanity at all?

12  A.   No.

13  Q.   So, even with him being delusional or hallucinating, even

14  with the letters, even with the conduct, is it your testimony

01:44:06PM 15  that he still appreciates the wrongfulness of his act?

16  A.   Yes.  Immediately after the act, it is a very important

17  point of study and intermediate after the act where the escape

18  procedure happened in a very organized fashion, although it's

19  still described in a crazy manner.

01:44:28PM 20  Q.   If you are assessing sanity, then, you are obviously

21  focused on the conduct at the time of the crime and

22  immediately after.

23  A.   Yes, because the law says:  Does he understand that the

24  conduct was wrong at the time of the crime?  So, the closer we

01:44:48PM 25  get to the crime, the closer evidence we have, the more

106

1   accurate we become.

2   *Q.*   Is there any value at all in offering an opinion that

3   perhaps Mr. Aldridge is insane now, if you are trying to

4   determine the correctness of the opinion about sanity back in

01:45:04PM   5   1990?

6   *A.*   No.

7   *Q.*   The same thing for competency, is there really a point in

8   deciding that right now in 2009 he might be incompetent when

9   you are trying to decide the correctness of the determination

01:45:18PM   10   back in 1990?

11   *A.*   Both insanity and competency are time limited.  They are

12   describing the person at that moment in time, not five years

13   later or 20 years later.

14   *Q.*   If you wanted to -- assuming you had not been called in

01:45:38PM   15   to do an evaluation and someone is thinking:  Okay.  We have

16   evidence that he might have a mental problem, and we want to

17   do a retrospective assessment, then, as a professional, would

18   your opinion be limited to the conduct that is occurring up

19   to, you know, 1990s when the crime occurs?  What kind of time

01:45:57PM   20   period for records and people and interviews -- what are we

21   talking about as far as the operative time period to consider?

22   *A.*   It would be events, behaviors, talk, language, at or

23   around the time of the crime, very circumscribed.

24   *Q.*   What weight, if any, would the fact that Mr. Aldridge had

01:46:25PM   25   a competency hearing on whether he was competent when he

1   waived state habeas counsel in 1990?  Would that weigh at all

2   in the determination of his competency to actually stand trial

3   in 1990?

4   A.   No.

01:46:40PM 5   Q.   Oh, I said the wrong year.  The state hearing is '95, and

6   the trial was 1990.  So, the state habeas hearing was

7   five years later.  So, I guess the answer would still be the

8   same?

9   A.   The answer is no.

01:46:52PM 10   Q.   Is there any weight that should be even assigned to the

11   results that professionals reached in 1995 in deciding a

12   competency to waive counsel issue -- is there any weight that

13   should be assigned to that when you're deciding if the

14   correctness of your competency evaluation in 1990 -- deciding

01:47:13PM 15   that -- yes -- whether it is correct or not?  Maybe I should

16   reword that.

17              What weight should be assigned to a 1995

18   hearing on competency to waive counsel when we are assessing

19   the correctness or trying to decide whether your competency

01:47:31PM 20   evaluation seems --

21   A.   There should be no retroactive application of a

22   competency opinion done five years later, then making it

23   applicable to five years before.  It cannot be done.

24   Q.   So, for example, if -- not only with the hearing in

01:47:52PM 25   1995 -- I know you've probably had a chance to review a lot of

1    the exhibits that are being offered.  There are numerous

2    letters and pleadings and things that have been filed from '90

3    through 2006.

4                Would, say, after 1990 -- would really anything

01:48:12PM  5    from 1991 and later matter much if we're looking at your

6    initial assessment?

7    A.   No.

8    Q.   If you are making an assessment on competency, as you did

9    in your report, you have set out the questions and -- or the

01:48:29PM 10    responses that you were able to glean from Mr. Aldridge on

11    certain prongs when you are looking at each of the aspects.

12    Is that something that's required when you are making a

13    competency report?

14    A.   Yes.  In Texas there is a -- literally -- there's

01:48:46PM 15    literally an outline that you have to follow, published by

16    the -- I think it is called court administration -- court

17    administration office.  There is a form that you have to

18    follow.

19    Q.   And that's been in effect for how long?  Do you know?

01:49:05PM 20    A.   The new form, I don't know.  But -- maybe 10 years, the

21    new form.  But before that it was by statutes; and it was left

22    to the different mental health people to write it the way they

23    wanted to, as long as you address the three questions.

24    Q.   If you were -- I notice from your report, which is the

01:49:32PM 25    Petitioner's Exhibit 8 and Respondent's Exhibit 12, that it

1  says that part of your clinical evaluation involved conducting

2  the -- or administering the MMPI, the Minnesota Multiphasic

3  Inventory test.

4  A.   Yes.

01:49:50PM  5  Q.   Why in particular did you choose that test?

6  A.   Well, the MMPI is the most research instrument of

7  personality as well as psychological symptoms.  It's also well

8  researched among the criminal population.

9  Q.   Okay.  What would be the importance of -- or is there an

01:50:25PM  10  importance to giving a test that is actually been

11  standardized, maybe, with a criminal population?

12  A.   It is very important because the validity of the test

13  depends on which population it was standardized.  And so, you

14  cannot just pick a test, a Canadian test, and then apply it to

01:50:52PM  15  the United States and say it is valid.  You can say it is

16  suggestive of something; but the validity has to be defined by

17  the characteristic of the test, which means it is used among

18  the criminal population.

19  Q.   When you did your evaluation of Mr. Aldridge -- I know on

01:51:21PM  20  the report that we were just talking about, you listed off

21  different written materials that you were provided from the

22  Texas Youth Commission, Texas Department of Corrections

23  records, Harris County District Court judgment sentences,

24  personal writings.  These are listed on page 1 of the report.

01:51:38PM  25  And then on page 3 you go into some detail about the specific

1   letters and specific dates.

2            Since one of the -- at least one of the letters

3   is that jury selection note from April of 1990.  So, since

4   that is included in your report, would you agree that you are

01:51:56PM 5   at least receiving materials from counsel, that he is trying

6   to -- that at least apprise you -- or sending you materials as

7   things progress?

8            Did you -- when you were deposed in November of

9   this past year, do you recall that there was questioning and

01:52:19PM 10   you were asked at length about the date of the written report

11   that you issued in this case?

12   A.   Yes.  It was the first, I guess, subject of the

13   questionings about the dates of the report.

14   Q.   Do you recall explaining about whether you had a practice

01:52:41PM 15   or whether there was a reason for waiting to actually issue

16   the written report?

17   A.   I speculated because it's not documented in the report.

18   But I speculated that I communicated already to the lawyers.

19   I continued to receive information from them because of the

01:53:12PM 20   letters I got; but I could not pin down how often, when I

21   talked to them.  It is not a -- it's not a common happening

22   that that report is not done.  In capital cases it is more

23   frequent than non-capital cases where there's just constant

24   postponement of trials and things like that, and you wait

01:53:46PM 25   until you are told to wrap it up.

1  Q.   If Mr. Aldridge was then -- at the time that you actually

2  evaluated him in March of 1990, if he was still functioning at

3  the same level by the time he goes into trial, then would you

4  be comfortable saying he is still at the same -- that he has

01:54:10PM 5  not changed as far as competency or sanity?

6  A.   Yes.  Because one possibility is that he was not

7  medicated.  So, he was at the peak of his illness.  It is

8  different if he was medicated when I saw him, removed from

9  medication during the trial.  Then he might become -- he might

01:54:35PM 10  be competent, say, and become incompetent.  But all conditions

11  were the same at the time I saw him and at the time he was

12  tried.

13  Q.   And when you are talking right now about medicine,

14  that -- we don't have any evidence here that Mr. Aldridge had

01:54:50PM 15  ever been put on medicine, correct?

16  A.   No.  There was no medicine, most likely because he was

17  functioning quote normally, with a regular job, his own

18  apartment, and interacting with his family.

19  Q.   Now, under what situation, then, since he was in Harris

01:55:12PM 20  County custody with the Mental Health Mental Retardation -- I

21  guess MHMRA before trial, under what situation would they be

22  able to medicate Mr. Aldridge?

23  A.   In Texas there are only two conditions where you can

24  force medicate, and that is danger to himself or danger to

01:55:38PM 25  others.  If he is not going to be dangerous to himself or

1  others, they would not force medicate him.  There is a federal

2  decision called the Vitek decision, V-I-T-E-K, wherein

3  correctional institutions, you don't have to get a court order

4  to force medicate.  You can have a local administrative

01:56:00PM  5  decision-making body.  But that is not used unless you are a

6  danger to yourself or others or you're clearly deteriorating

7  that you are no longer functioning.  If you are functioning

8  with crazy ideas, they will leave you alone.

9  Q.   So, there are people at the jail that are able to

01:56:18PM 10  evaluate -- to decide if he is deteriorating to make the

11  recommendation then to put him on medication, correct?

12  A.   Yes.  There is a procedure -- all jails -- federal,

13  county, state -- there's a procedure by which there is a

14  screening procedure by the healthcare people.  Additionally,

01:56:41PM 15  officers are trained.  I think they are required 12 hours of

16  mental health training a year to recognize signs and symptoms

17  of mental illness and when they should call in for force

18  medication.

19  Q.   Now, does the fact that he has killed somebody -- I guess

01:56:58PM 20  for lack of a better term, killed someone in the free world --

21  does that mean that he is automatically a danger to others

22  once he is locked up in jail and would be medicated?

23  A.   No.  Most people who cannot behave well in the free

24  world, behave well in structured settings such as jails and

01:57:18PM 25  prisons.  So, the nature of the crime does not dictate whether

1    the person is medicated or not.

2    Q.    Okay.  So, the fact of whether he would or would not have

3    been medicated, they weren't waiting on you to go back in and

4    reevaluate and make a medicine determination, correct?

01:57:34PM   5    A.    No, they were not waiting on me.  Besides my opinion

6    would not carry weight because I don't have what is called

7    clinical privilege in the jail.  There are people that were

8    credentialed to make those decisions.  I am not privileged to

9    render that kind of opinion to the healthcare people.

01:57:58PM  10    Q.    Now, given the evaluation of Mr. Aldridge and all the

11    very detailed stories and the delusions and all the things

12    that are included in your report, would you expect someone who

13    has just told you this rendition of all the beliefs to

14    actually be able to maintain a job, to make it to work, to go

01:58:27PM  15    work every day, to have a good work record?  Is somebody that

16    you read, your report on, would you expect them to be able to

17    function out in the free world?

18    A.    If you read the symptoms alone -- if you listen to the

19    symptoms alone, you would say this person cannot function.

01:58:49PM  20    This person is incompetent.  So, you have to test it.  This

21    person is mentally ill to X degree.  Is he functioning or not?

22    Then you check.  He is going to work.  He's paying his bills.

23    He's going to work regularly.  Then he is mentally ill but

24    functioning.

01:59:11PM  25                    But the same thing with competency.  Listening

the first hour of his conversation with me, of course, you

raise the hypothesis this person is incompetent.  Now let's

put it to a test.  The test was done, and he did very well.

And so, you go with the data.  You do not automatically decide

01:59:32PM that because the person is mentally ill, he must be

incompetent.

Q.   If you have evidence -- if you were determining

competency and you have evidence that suggests that he is

keeping himself well fed and maintaining an apartment and all

01:59:58PM those -- he is driving, he has a car, he has a bank account,

he is being evaluated as an outstanding worker, if that's --

     MR. RYTTING:  I'll have to make an objection.  I

would like to object.  I see no foundation in the record and

the evidence so far that he was doing any of these activities

02:00:16PM on any sort of regular basis including the driving behavior

and regular attendance at work.

     MS. HAYES:  I will be glad to give all the

records --

     MR. RYTTING:  None.

02:00:27PM      THE COURT:  All right.  Go ahead.

     MS. HAYES:  Okay.  He's able to maintain a job.

That's in the trial record, Volume 20.  That's Virginia

Aldridge, page 226.  He makes it to work.  That's Virginia

Aldridge, again, page 226.  He goes to work every day.  That's

02:00:40PM Cheryl Aldridge, page 242.  That's Volume 20 of the reporter's

1    record.  He is prompt and never tardy.  That's Al Collins.  He

2    testified at guilt/innocence.  He is the manager at the

3    McDonald's.  He's also the one that said Aldridge would call

4    in if he can't make it to work.  He's also the one that moved

02:01:00PM  5    Aldridge from different McDonald's because he was pleased with

6    the work that he was doing.  He referred to him at page 124 in

7    Volume 16 in the reporter's record as an outstanding worker.

8    He was also rated as an outstanding worker by Eugenia Rangel

9    [phonetics] who testifies at Volume 16, reporter's record,

02:01:16PM  10   page 37 and 48.

11             Again, Al Collins describing him as very

12   responsible, Volume 16, page 124.  He always accomplished the

13   job above and beyond what is expected, again, Al Collins, page

14   124.  He was actually offered or asked whether he would like a

02:01:34PM  15   management position at McDonald's, and he said that he would

16   think it over.  That's Al Collins' testimony, the trial

17   record, page 16 -- or Volume 16 of the reporter's record, 187.

18             The fact that he is working up to save money

19   and has a bank account so that -- or working up to save money

02:01:51PM  20   to be able to go wherever he wanted to go, that's Virginia

21   Aldridge, Volume 20 of the reporter's record, Page 227.  That

22   he's saving money, again, Virginia Aldridge, page 227.

23             THE REPORTER:  I'm sorry.  Can you slow down,

24   please?

25             MS. HAYES:  Sure.  I can even give you the list.

1          He is saving money.  That's Virginia Aldridge,

2  Volume 20, page 227.  He is saving money to leave town, more

3  goal-directed behavior.  Again, Virginia Aldridge, Volume 20,

4  page 227.  That he is saving money specifically when he is

02:02:23PM  5  working at McDonald's, that is Brenda Garrett, Volume 20, page

6  255.

7          He has a car note to pay is one of the reasons

8  why he's working, Virginia Aldridge, Volume 20, page 227.  He

9  had his own car, a little gray car, Brenda Garrett, Volume 20,

02:02:46PM  10  page 255.  He is driving in Houston even on the morning of the

11  crime.  Immediately after the crime, he is driving when they

12  go to San Antonio.  That is James Aldridge's testimony -- or

13  James -- yeah, James -- oh, James Thomas -- James Aldridge

14  Thomas, Volume 16, reporter's record, page 241.

02:03:10PM  15          He represents himself and successfully

16  litigates a lawsuit in small-claims court, winning $350 in

17  damages, following an accident on June 4th, 1989.  The

18  incident is 1989.  I'm not -- the lawsuit is between then and

19  the murder.  That was the testimony of Ken Garwick [phonetics]

02:03:33PM  20  at punishment, Volume 20.  I don't have the page number.  But

21  it's one of the state witnesses.  I can give you a page

22  number.

23          He had his own apartment.  He is able to eat

24  and keep himself well fed and well-nourished, Virginia

02:03:48PM  25  Aldridge, Volume 20, page 226.  Able to bathe himself, keep

1  himself clean, again, Virginia Aldridge, 226, the same volume,

2  20.  That he dresses himself like a normal person, Volume 20,

3  again, Virginia Aldridge, page 226.

4            THE COURT:  All right.  The objection is overruled.

5            MS. HAYES:  Okay.

6  BY MS. HAYES:

7  *Q.*  So, if you have evidence of all these types -- and there

8  are many more examples of how he is functioning out in the

9  everyday society.  When you are evaluating him on competency,

02:04:27PM 10  how do these kinds -- this kind of information play in on your

11  competency determination back in 1990?

12  *A.*  It is the kind of behavior that is called adapted

13  behavior skills; and clearly his adapted behaviors is more

14  than adequate, more than minimum.  So, if you have a person

02:04:46PM 15  like that who is also very, very crazy, you know he's both.

16  He is mentally ill and able to function.  So, you can assume

17  it.

18            So, after I listen to his story, I say:  Well,

19  let's put it to the test, whether he can put it aside and then

02:05:03PM 20  focus on the competency questions, which he did.  And if you

21  read the whole report, the flow becomes more intelligible as

22  you go along.  The initial one is his presentation of what we

23  call his expressive speech.  He is not asked questions.  You

24  just go:  Tell me about this.  Then he delivers his

02:05:30PM 25  presentation.

1          Expressive.  An expressive speech in

2     schizophrenia is more likely to be peppered with crazy ideas.

3     The second part of speech is called receptive speech where you

4     say:  Okay.  Now, answer me very, very specific questions.  At

02:05:51PM 5     that moment most schizophrenics can answer expressive

6     questions -- receptive questions.  Tell me, do you understand

7     your right to remain silent?  If they say no, do you -- if a

8     policeman comes to talk to you about your crime, will you talk

9     to him, yes or no?  No, I will not talk to him.  Would you

02:06:16PM 10    refer him to your lawyer?  Yes, I would.

11          Then you are able to draw a conclusion whether

12    he understands, for example, his Fifth Amendment rights.

13    Simply asking him, do you understand your Fifth Amendment

14    rights, may not generate the answer.  And even if it did, you

02:06:33PM 15    make sure he understands because he is mentally ill.

16          MS. HAYES:  If I could have one moment.

17          THE COURT:  Yes.

18      (Pause)

19    BY MS. HAYES:

02:07:19PM 20    Q.    The question is:  When you talk to him at the very start

21    and you are doing the open-ended interview and he is coming up

22    with the wild stories, that's in your report, correct?

23    A.    Yes.

24    Q.    When you are asking him the very specific questions,

02:07:34PM 25    we're talking questions like what's the role of the judge?

1  *A.*    Correct.

2  *Q.*    What's the role of the attorney?

3  *A.*    Correct.

4  *Q.*    Do I have an avenue if I am not happy with my attorney's

02:07:45PM  5  performance, those are the types of questions that -- he could

6  answer those correctly.

7  *A.*    Correct.  What are you charged with?  What happens if you

8  are found guilty?  What happens if you are found not guilty?

9  If I am guilty and you think the trial is unfair, what would

02:08:01PM  10  you do?  If you are found guilty and you thought your lawyer

11  was incompetent, what would you do?  Do you know what

12  incompetent means?  Do you know what appeal means?

13            And you break it down to a language that he

14  uses and understands.  If you ask those questions to a normal

02:08:19PM  15  person, you don't have to break it down; but because he is

16  mentally ill, you ask more questions so you know he

17  understands what he is telling you.

18  *Q.*    If for some reason you weren't able to break those

19  questions down, then you would be left with -- I guess

02:08:39PM  20  breaking those questions down allows you to work with someone

21  who is delusional or psychotic so that you can get directed

22  responses and get to the goal of what you are trying to ask.

23  Would that be correct?

24  *A.*    What happens is when you break it down, if the

02:08:55PM  25  schizophrenia is very, very strong, that is uncontrollable, it

1  will, what we call, interject themselves into the

2  conversation.

3  Q.   Did you see any of that here?

4  A.   No.   That's the reason why I found him competent in spite

02:09:10PM  5  of being schizophrenic, because when it was time -- when the

6  time came to focus on the nitty-gritty, he was able to

7  suspend; and there was no intrusion, what we call thought

8  interjection or thought intrusion, into the discussion.   And

9  that must have been what happened with the lawyers; that in a

02:09:31PM 10  free-flowing conversation, there is this wild talk but then

11  when it comes to answering "yes" or "no," where do we go, he

12  is able to do that.

13  Q.   Okay.   And I may have asked this, but I want to make

14  doubly sure.   When you gave your affidavit originally in

02:10:02PM 15  2006 -- and it's been attached to the writ -- it has been

16  argued that you are now changing your opinions about

17  competency and sanity.   Is that what the Court is supposed to

18  take from that 2006 affidavit?   Are you now saying in 2006

19  that you think you -- that it should have been a different

02:10:25PM 20  determination?

21  A.   No.   I was -- that affidavit -- next time a lawyer asks

22  me to sign an affidavit, I will be more careful.   I was told:

23  Can you present a set of data to another psychologist, and can

24  another psychologist render a different opinion?

02:10:44PM 25                    I said yes.   I said that if you follow strictly

1  what the law says, that he or she will come up with the same

2  conclusion I did.  But, of course, it is possible somebody

3  else can look at that and say:  Well, he is incompetent.

4  Q.   Have you to date had any other -- other than this case,

02:11:04PM  5  where you have given an opinion that someone was competent and

6  had that -- had another expert challenge it?

7  A.   No.  No.  The jury doesn't always buy incompetence.

8         MS. HAYES:  Nothing further, Your Honor.

9         THE COURT:  All right.  Thank you.

02:11:28PM  10         Any redirect, sir?

11         MR. RYTTING:  Yes, Your Honor.

12                  **REDIRECT EXAMINATION**

13  **BY MR. RYTTING:**

14  Q.   Did I understand correctly that your opinion has not been

02:11:36PM  15  challenged by another expert?

16  A.   Not in --

17  Q.   Regarding competency?

18  A.   Not in court.  It is possible to have a hearing without

19  me and they contradicted me, but not in open court like this.

02:12:13PM  20  Q.   Let's see.  You mentioned about breaking down the

21  questions for Mr. Aldridge.  Do you believe this is -- what is

22  the basis in the literature or in the practice for

23  recommending this in the case of someone who suffers from

24  schizophrenia?

02:12:34PM  25  A.   It's a very simple rule in basic psychology, and all

1   psychologists know it.

2   Q.   Well, I just want to know.  Is it in the literature?  Is

3   there anyplace that you could cite us to, any documents, any

4   journal, any treatise in which this is recommended that the

02:12:49PM  5   way to determine competency when you are faced with a patient

6   suffering from schizophrenia?

7   A.   May I say this is a very basic rule in psychology, which

8   everybody is trained to do.  It is called operationalize the

9   answers.  Operationalization.

02:13:05PM  10  Q.   So, the answer is:  No, you do not know of a text or

11  treatise in which this is the recommended procedure to

12  determine incompetency on a schizophrenic?

13  A.   I do not know where you got that.  My answer was yes.

14  It's called operationalization.

02:13:22PM  15  Q.   Okay.  So, where is this theory set forth in a

16  psychological treatise?

17  A.   It is not a theory.  It is an interviewing technique.  If

18  you read any basic interview technique textbook, it will tell

19  you to operationalize the concepts.

02:13:48PM  20  Q.   And then does it say specifically that you are supposed

21  to do this for people that are suffering from schizophrenia or

22  psychosis?

23  A.   No.  It should be done with anybody but particularly with

24  mental ill people with legal consequences because you do not

02:14:03PM  25  want them to say:  Yes, I understand my Fifth Amendment right

1   and be satisfied.  You have to make sure they understand what

2   the Fifth Amendment rights mean.

3            Many times I would say:  Do you understand your

4   Fifth Amendment rights?

02:14:17PM  5            Yes.

6            What is your Fifth Amendment right?

7            It's free speech.

8   Q.  So, when someone is mentally ill, oftentimes when you are

9   asking -- strike that.

02:14:30PM 10            When someone is suffering from mental illness,

11  when you ask these truncated controlled questions as opposed

12  to an open-ended question, you get a different question?

13  A.  Open-ended questions with schizophrenics?

14  Q.  Yes.

02:14:46PM 15  A.  Yes.  You will get -- a number of symptoms will increase

16  with open-ended and will decrease with close-ended.

17  Q.  Let me get this correct.  You think open-ended

18  questions -- are they the ones that are stimulating symptoms?

19  A.  No.  They are unstructured; and so, the frequency of

02:15:08PM 20  errors and confabulations increase.

21  Q.  So, actually, when you ask an open-ended question, what

22  happens is the degree of the delusions and the extent to which

23  they are hallucinating may become more apparent?

24  A.  Correct.  Then you have to test the theory.  Can he

02:15:27PM 25  discipline himself enough with a structured question?  The

1    answer is -- then you try it.  If you can't, then you say yes.

2    Q.   If you asked him:  Well, why are -- he may say:  Yes, my

3    Fifth Amendment right is the right to remain silent.

4              And if you ask him:  Well, why would you need a

02:15:44PM  5    right to remain silent, you would give some strange and -- you

6    could get some strange and fantastic answer; is that correct?

7    A.   If you ask why, but never ask why.  Why is a very poor

8    interview question.

9    Q.   Well, when you ask someone who is not mentally ill, why

02:16:05PM  10   would you want the right to remain silent, that's a very good

11   question, is it not?

12   A.   But you don't ask why.  You never ask questions why in a

13   good interview.

14   Q.   Okay.  And what is the basis for this opinion?  Where did

02:16:22PM  15   you get this from?

16   A.   Good training, good schooling.  I was told never to ask

17   why.  You will lead to nowhere.  What you want to ask is:  Do

18   you understand your Fifth Amendment rights, yes or no?  What

19   is your Fifth Amendment rights?

02:16:42PM  20             The right to remain silent.

21             What is the purpose of -- what does it do for

22   you that you remain silent?

23             Then he will say:  Oh, because I don't want

24   them to use it against me.

02:16:55PM  25             Very good.  But you do not say why because then

1  you would have a philosophical discussion as to why you have

2  the right.  You don't ask why in interview questions of this

3  type.

4  Q.   But, again, someone who suffers from schizophrenia, if

02:17:12PM  5  you ask that, you won't get a philosophical discussion.

6  You'll get a delusional expression, delusional and

7  hallucinatory belief.  Is that what is going to happen?

8  A.   No.  You are going to get philosophical answers from

9  schizophrenics.

02:17:41PM 10  Q.   You said that you relied on functional -- what you were

11  calling functional behavior, Mr. Aldridge's ability to

12  function.  But you didn't have any information from

13  shareholders or any of the other people that she talked about

14  before you made your report, did you?

02:17:59PM 15  A.   That is the beauty of my evaluation.  Because my

16  conclusion --

17  Q.   I asked you -- no, no.  You did not have that information

18  in front of you, did you?

19  A.   I do not recall if I did; but even if I did not, it is a

02:18:15PM 20  beautiful evaluation because it turns out to be corroborated

21  independently of other people.

22  Q.   What's corroborated?

23  A.   That he is able to function even with his schizophrenia.

24  Q.   And is this part of the test for competency, functioning?

02:18:36PM 25  A.   Is he able to function in the court system with the

1   schizophrenia.  We need to check.  You ask those questions.

2   He was able to function.  I said he is competent.

3   Q.   Is that your understanding of what the standard is?

4   A.   Yes.

02:18:49PM 5   Q.   Does that standard incorporate the idea of functioning?

6   A.   Correct.

7   Q.   Sitting quietly in the courtroom like Mr. Aldridge right

8   now?

9   A.   No.  That's not --

02:18:57PM 10   Q.   Is that an example of functioning?

11   A.   No.  To me that was functioning; rational, factual

12   understanding, and -- or -- it is not "and," it's "or" -- or

13   an ability to assist counsel.

14   Q.   And where has this ever been described as a standard that

02:19:18PM 15   can be inferred from functioning?

16   A.   That's what you're inferring.

17   Q.   Well, what is your idea of functioning?  When you talk

18   about functioning -- let's clarify that.  What is functioning?

19   A.   To see if he is able to function in court.  Do you

02:19:33PM 20   understand that you are charged with capital murder, yes or

21   no?  Do you -- what happens if you are found guilty?  What

22   happens if you are found not guilty?  Do you understand that

23   the district attorney, the DA, is against you?  Do you

24   understand your lawyer is for you?

02:19:57PM 25                    Most of them will say:  He is supposed to be

1   for me.

2   Q.   And that is sufficient for you.  That's what you

3   believe --

4   A.   No, that's not for me.  That's what the law specifies.

02:20:06PM  5   Q.   This is what you need for a competency examination.  So,

6   if Mr. Aldridge -- if you asked Mr. Aldridge:  Is the DA

7   against you?

8   A.   Yes.

9   Q.   And he says, yes, that's a sign that he is competent?

02:20:21PM  10  A.   Part.

11  Q.   And if you ask him why is the DA against you and he gives

12  you some fantastic hallucinating response, is that important

13  to try --

14  A.   That's why you don't ask the question why.  You ask:  The

15  DA is against you?

16              Yes.

17              Tell me how the DA is against you.

18              Oh, he will send me to prison.  He will give me

19  the death penalty.

02:20:43PM  20              Thank you.  Next question.

21  Q.   You talk about corroboration.  Point to one thing in your

22  report that was corroborated by anyone.

23  A.   The one thing that's corroborated --

24  Q.   I'll show you your report.  Some finding that was

25  corroborated about his functionality.

```
 1            THE REPORTER:  I'm sorry.  I didn't hear you.
 2   BY MR. RYTTING:
 3   Q.    Some finding in his report related to what you've been
 4   calling his functionality that was corroborated.  This is,
 5   again, our Exhibit 8.
 6   A.    The biggest finding that's been corroborated is his
 7   ability to set aside his mental illness and function; work,
 8   home, bank, social relationship, as well during the interview
 9   and how he is expected to behave in a court of law.  That's
10   the corroboration.
11   Q.    You talk about setting aside his mental illness.  What do
12   you mean by that?
13   A.    When a person is mentally ill, they have the ability to
14   suspend that and then engage the person in a normal
15   conversation.  Some people can do that; some cannot.  That is
16   why you have to test it.
17   Q.    You believe that Mr. Aldridge can suspend his mental
18   illness?
19   A.    Yes, while he is actively involved in conversation.
20   Q.    Where is this --
21   A.    Where in the literature?
22   Q.    Yeah.  Where in the literature does this idea of the
23   suspension of schizophrenia occur?
24   A.    It is called waxing and waning.  It is called remission.
25   It's called earlier remission, good remission.  It's called
```

02:21:57PM  5
02:22:19PM 10
02:22:34PM 15
02:22:49PM 20
02:23:05PM 25

1  functionality, mentally ill but functioning.

2  Q.   What authority -- what source is this theory that you are

3  expounding on?  Explain -- name me any paper that you have

4  read, a department that has found this view about

02:23:25PM  5  schizophrenia, anything.

6  A.   I cannot give you a specific paper, but I can lead you to

7  what literature you should be reading on.

8  Q.   Okay.  Go ahead and lead me to that.

9  A.   It is called schizophrenia.

02:23:40PM 10  Q.   So, in other words, you can't name -- not only can't you

11  name a specific one, you can't even give me anything close to

12  a general area?

13  A.   The general area is schizophrenia.  There's a whole area

14  in psychology called schizophrenia.  Read the schizophrenia,

02:23:56PM 15  the way they think, pathology, psychopathology, waxing and

16  waning.

17  Q.   To finish up, you earlier testified, I believe, when

18  asked about the specific passages in this report, that

19  Mr. Aldridge truly believed them, correct?

02:25:49PM 20  A.   Yes.

21  Q.   And you said it is likely that he maintained those

22  beliefs throughout the proceedings against him.

23  A.   Yes.

24  Q.   Those fixed unmovable beliefs that colored his perception

02:26:04PM 25  of the trial and of his legal situation; is that correct?

1   A.   It is possible that that happened, yes.

2   Q.   But, in fact, you testified that that is what is

3   happening in this case, that he has a fixed delusional system,

4   correct?

02:26:29PM  5   A.   Yeah.  But I think you over misinterpreted what fixed

6   means.  Schizophrenia waxes and wanes, active, inactive,

7   active, inactive --

8   Q.   Is that what you said or did not say earlier?

9   A.   I did not -- if you are telling me that his schizophrenia

02:26:48PM  10  is a hundred percent of the time in his mind, the answer is

11  no.

12  Q.   When it comes to waxing and waning and remission and

13  functionality, these terms that you've been using, are they

14  all the same, the same concept, with different names?

02:28:45PM  15  A.   It's actually the same; that when the illness is

16  inactive, the person can function better.

17       (Pause)

18          RYTTING:  Pardon me, Your Honor.  I'm about to wrap

19  up.

02:29:39PM  20          THE COURT:  All right.

21       (Pause)

22          MR. RYTTING:  Pass the witness.

23          THE COURT:  Anything else?

24          MS. HAYES:  No, Your Honor.

02:30:51PM  25          THE COURT:  I have a couple.

1          Doctor, when you talk about remission and

2   waxing and waning of the schizophrenia, are you saying that

3   the disease actually goes away or that the symptoms go away?

4          THE WITNESS:  That's a better way to do it.  The

02:31:12PM  5   disease is there, but the symptoms go away.

6          THE COURT:  All right.  So, the disease is always

7   present.

8          THE WITNESS:  Always there, like the diabetes, like

9   I said, yeah.

02:31:21PM  10          THE COURT:  There are times when the symptoms wax

11   and wane.

12          THE WITNESS:  And sometimes a more engaging activity

13   can dislodge the symptoms.

14          THE COURT:  All right.  Thank you.

02:31:34PM  15          I think you said -- I'm referring now to your

16   affidavit, which was signed in 2006, which is Petitioner's

17   Exhibit 28.  Do you have a copy of that in front of you?

18          THE WITNESS:  No.

19          THE COURT:  Can we provide him a copy of that,

02:31:52PM  20   please?

21          MS. HAYES:  I have a copy, Your Honor.

22          THE COURT:  Extra copy?  Thank you.

23          I think you said earlier that next time someone

24   provides you with an affidavit, that you would read it more

02:32:13PM  25   carefully.  Did you prepare any part of this affidavit

1   yourself?

2          THE WITNESS:  No.

3          THE COURT:  Did you change in any way the affidavit

4   that was submitted to you before you signed it?

02:32:25PM 5          THE WITNESS:  The part that says "struck with

6   permission."

7          THE COURT:  All right.  On page 1.

8          THE WITNESS:  Uh-huh.

9          THE COURT:  All right.  Let me refer you to page 3

02:32:32PM 10   of your affidavit, the last paragraph where it says, "Federal

11   habeas counsel has provided me with the trial testimony of

12   co-counsel, Randolph Bates," and then a description of what

13   Mr. Bates testimony was at trial concerning Mr. Aldridge.

14          Going on to page 4, at the top of the page, you

02:32:58PM 15   say, "I was not informed" -- or the affidavit says, "I was not

16   informed of trial counsel's specific problems.  It is my

17   forensic psychological opinion that trial counsel's direct

18   testimony that his client was paranoid, delusional, and

19   irrational during attorney/client communications is clear

02:33:19PM 20   evidence Mr. Aldridge was not presently able to consult with

21   counsel with a rational degree of understanding."

22          Do you see where you say that in your

23   affidavit?

24          THE WITNESS:  Yes.  Yes.

02:33:32PM 25          THE COURT:  Is that correct or incorrect?

1          THE WITNESS:  That is correct.  If -- I was never

2     told that until this affidavit.  But if that is true, that

3     that was going on, he was incompetent.

4          THE COURT:  All right.  So, if Mr. Bates' testimony

02:33:49PM  5     during the trial was true with respect to Mr. Aldridge's

6     inability to interact constructively with his counsel, then

7     your opinion would be that he was incompetent to stand trial;

8     is that right?

9          THE WITNESS:  Yes.

02:34:05PM 10          THE COURT:  All right.  So, that is a change in your

11     opinion; but it is based on information that you did not know

12     at the time you prepared your original report.

13          THE WITNESS:  New data, yes.

14          THE COURT:  All right.  But what you're saying --

02:34:15PM 15     and I want to get this very clear in my mind.  What you are

16     saying is that based on new and additional information that

17     you did not have at the time you did your original report in

18     1990 --

19          THE WITNESS:  Yes.

02:34:27PM 20          THE COURT:  -- it is now your opinion that he was

21     not competent to stand trial in 1990.

22          THE WITNESS:  And given what Mr. Bates testified to.

23          THE COURT:  All right.

24          All right.  I think that's it.  Does anybody

02:34:50PM 25     have any follow-up after that that they want to ask the

1    witness?

2              MR. RYTTING:  No, Your Honor.

3              MS. HAYES:  One rather quick question.

4              THE COURT:  All right.

5                     **RECROSS-EXAMINATION**

6    **BY MS. HAYES:**

7    *Q.*   Would that still be your opinion if -- knowing that the

8    testimony by Mr. Bates was offered at punishment in mitigation

9    instead of at -- instead of at an earlier part in the trial

02:35:13PM 10    proceedings?

11   *A.*   The testimony was given on punishment, not on -- it is a

12   possibility that he was competent during the guilt/innocence;

13   and when he was found guilty, he then compensated.  I'm just

14   guessing.  How you could explain why he would decompensate

02:35:45PM 15   during the guilt/innocence, the lawyer saying he was competent

16   and then became incompetent during that punishment.  I'm

17   inferring that that could be how it happened.

18   *Q.*   Would that still be your opinion, then, if Bates also

19   testified that it was not a consistent situation or not a

02:36:14PM 20   consistent type of --

21   *A.*   Okay.

22              MR. RYTTING:  I will just object.  It's

23   mischaracterizing the record.

24              THE COURT:  Do we have Bates' testimony?

02:36:26PM 25              MR. RYTTING:  We do, Your Honor.

1          MS. HAYES:  We do, Your Honor.

2          THE COURT:  The question I have, counsel, I guess,

3  is:  Even though Bates' testimony was offered during the

4  punishment phase of the trial, was his testimony about his

02:36:41PM  5  interactions with Mr. Aldridge limited only to the punishment

6  phase of the trial; or did it deal with the whole period of

7  interaction, including the guilt and innocence phase?  That's

8  what I am not clear about.

9          MS. HAYES:  I know -- we're talking about Volume 20

02:37:02PM  10  of the reporter's record.  His testimony at punishment starts

11  at 256, but he doesn't end testimony -- give a date on when

12  any of the conversations occurred or if it just popped up then

13  or if it was something earlier, but what he does say is that,

14  by Page 256 -- I'm sorry.

02:37:23PM  15          What he does say is that, by page 257, they're

16  talking about -- it was on cross-examination that it came out

17  of punishment on Page 258, Your Honor.  It starts around line

18  10 -- or line 9:  "Without going into anything that you two

19  may have said, were you able to speak with each other

02:37:45PM  20  intelligently in the English language?"

21          Bates' answer is:  "Sometimes."

22          And then it goes on at line 22:  "Has he been

23  able to answer the questions that you asked him?"

24          Line 24:  "Sometimes."

02:37:56PM  25          When he goes to redirect on Page 259, "Again,

1  he does mention about spirits and conspiracy, people after

2  him," again, it is "Sometimes."

3            When it gets to page 260:  "Was he able to

4  speak with you about what happened on January 3rd," that's

02:38:15PM  5  lines 3 through 5, he says:  "Yes."

6            "And you are trying to save his life right now,

7  right?"

8            The answer:  "Yes."

9            "Or at least get the jury to answer one of the

02:38:27PM  10  two special answers no?"

11            He says:  "Yes."

12            When they stop and they go to further redirect,

13  that's when they ask the question:  Did the -- "Again, without

14  going into the conversation, did the conversation -- was it

02:38:38PM  15  rational to you?"

16            And he said:  "No."

17            So, Your Honor will remember that I had

18  objected earlier because I knew that the use of the -- when

19  they asked about it being rational, it was only -- at that

02:38:50PM  20  point offered in a singular tense, although there are other

21  times when he says:  Sometimes we didn't get the right

22  answers.  Sometimes we did.

23            But there is nothing in here that gives a date

24  period of when that may have been occurring.  That was Volume

02:39:06PM  25  20, 256 to about 260.

1          MR. RYTTING:  May I, Your Honor?

2          THE COURT:  Yes.

3          MR. RYTTING:  There's every indication that this is

4    a description of his interaction with Mr. Aldridge and no

02:39:24PM 5    indication that he suddenly decompensated at the punishment

6    phase and that this suddenly came up.  I don't see how the

7    record can plausibly be read to say that.  He is talking in

8    general about his experience with -- in the attorney/client

9    interviews with Mr. Aldridge.  And it was confirmed, I

02:39:44PM 10   believe, and the record will reflect it, by Mr. Davis'

11   recollection, that this is how the interaction with

12   Aldridge -- Mr. Aldridge went.

13          And it is confirmed, too, by his own specific

14   recollection of what Mr. Aldridge expressed; and that was this

02:40:09PM 15   delusional defense about people sexually assaulting him and

16   the victim sexually -- I mean, the victim sexually assaulting

17   him, and that was going to be his defense.  It cannot be

18   cabined in any sensible way, nor can the affidavit be

19   considered in that sense to just punishment phase issue that

02:40:33PM 20   was sprung up at the spur of the moment.

21          MS. HAYES:  One last question to Dr. Quijano.

22          THE COURT:  All right.

23   BY MS. HAYES:

24   Q.   When you answered that in your -- in the statement about

02:40:44PM 25   having -- about your conclusion on the testimony, did you read

1    the entire testimony at punishment when you offered that -- or

2    did the defense lawyer summarize the testimony for you when

3    you did the affidavit?

4    A.    I don't recall, but I must have read it because that's a

02:41:08PM  5    pretty serious statement to make.   My understanding of that

6    statement was that was the way Aldridge was all the time.

7    Q.    Okay.   So, you were here earlier when Mr. Davis testified

8    that that wasn't a consistent way of dealing with him.

9    Sometimes he would be okay and other times not.   Were you here

02:41:26PM  10   when that -- maybe not that phrase but that temper of

11   testimony.

12   A.    The way Mr. --

13            MR. RYTTING:   I will object that that

14   mischaracterizes Mr. Davis' testimony.

02:41:38PM  15           THE COURT:   Well, here's what I would like to do.   I

16   would like to take about a 10-minute break.   I would like the

17   doctor to read the trial testimony that we have of Mr. Bates,

18   and then I would like him to tell me whether or not that in

19   any way changes his opinion that he expressed here today.   So,

20   let's take a 10-minute break.

21            Doctor, please review that testimony; and we'll

22   come back.   Okay.   Thank you.

23       (Recess)

24            THE COURT:   All right.   Has the doctor now had the

02:57:35PM  25   opportunity to review the testimony of Mr. Bates?

```
         1            THE WITNESS:  Yes.

         2            THE COURT:  All right.  Based upon your review of

         3    that testimony, is it your opinion that Mr. Aldridge was not

         4    able to consult with his counsel with a rational degree of

02:57:53PM 5    understanding at his trial in 1990?

         6            THE WITNESS:  No, he would not be competent, given

         7    that description, if that description is meant to describe

         8    most of their interactions.

         9            THE COURT:  All right.  So, your opinion would be

02:58:13PM 10   that he was not competent to stand trial?

        11            THE WITNESS:  If that kind of interaction was

        12    characteristic of most of the interaction.

        13            THE COURT:  All right.  Anybody want to ask any

        14    follow-up questions?

02:58:27PM 15           MS. HAYES:  Yes.

        16            THE COURT:  All right.

        17    BY MS. HAYES:

        18    Q.   And if it was not characteristic of most interactions,

        19    then your opinion would be?

02:58:33PM 20   A.   Then you have to check when is he focused and when he is

        21    not focused.  If he is not focused when there are -- if he is

        22    focused when they are on business matters versus just talking

        23    or exploring, it makes a big difference.  So, it has to be:

        24    Was the mentally ill symptoms active during the business of

02:59:08PM 25   his defense?
```

1  *Q.*   Was it your impression from Doug Davis' testimony that

2  most of the time he was focusable -- is that a word -- able to

3  be focused?

4  *A.*   From the testimony of Mr. Davis this morning, he sounded

02:59:36PM 5  competent.  From the written testimony, there was some --

6  sometimes, sometimes yes, sometimes no.  But when he was asked

7  was he focused, we are talking about the crime itself, the

8  answer was yes.

9          MS. HAYES:  Nothing further.

02:59:57PM 10          THE COURT:  Okay.

11          MR. RYTTING:  Just a couple of questions, Your

12  Honor.

13                **FURTHER REDIRECT EXAMINATION**

14  **BY MR. RYTTING:**

02:59:57PM 15  *Q.*   When -- you were here when Mr. Davis -- I mean,

16  Mr. Douglas said that -- or Doug Davis -- when Doug Davis said

17  that the best -- probably the best evidence of the interaction

18  between the attorneys in this case and the nature of their

19  interaction was Mr. Bates' testimony and not his recollection,

03:00:56PM 20  were you not?

21  *A.*   If that is the best evidence?

22  *Q.*   That Doug Davis on the stand said -- acknowledged that

23  his recollection of what the interactions with Mr. Aldridge

24  was not the best evidence, that instead Mr. Bates'

03:01:15PM 25  contemporaneous testimony about the interactions with his

1    client was, in fact?

2    *A.*   Then you have to go by that, yes.

3    *Q.*   So, you go by that.  I mean, as a forensic scientist,

4    that is what you would go by?

03:01:30PM  5    *A.*   Yes.  Because one is saying:  I'm not sure, and this is

6    better than mine.

7             MR. RYTTING:  No other questions.

8             THE COURT:  Do you have anything else?

9             MS. HAYES:  One more.

03:01:40PM 10             THE COURT:  Sure.  Go ahead.

11                    **FURTHER RECROSS-EXAMINATION**

12    **BY MS. HAYES:**

13    *Q.*   Of course, keeping in mind that this is being offered at

14    punishment, does that also end up affecting your opinion?

03:01:58PM 15    *A.*   The way to offer the punishment evidence has to be -- the

16    color of the punishment evidence has to be -- has to be

17    considered well because in punishment you throw everything

18    that you think can help.  I'm just -- well, if the -- okay.

19    There was no testimony other than punishment, right?

03:02:34PM 20    *Q.*   Right.

21    *A.*   Yeah.

22             MS. HAYES:  Then nothing further.

23             THE COURT:  One other question, Doctor.  In your

24    professional opinion, is it possible to determine today

03:02:49PM 25    whether Mr. Aldridge was competent to stand trial in 1990?

1    THE WITNESS:  No.  You have to have agreed rules,

2  such as we would only make judgment on the basis of what we

3  can gather from that moment.  And if you agree on that, then

4  you can; but it's not possible to interview him as if we were

03:03:17PM  5  still there.

6    THE COURT:  But you did interview him.

7    THE WITNESS:  Correct.

8    THE COURT:  At that time.

9    THE WITNESS:  Correct.

03:03:24PM 10    THE COURT:  And you concluded at that time that he

11  was competent.

12    THE WITNESS:  Correct.

13    THE COURT:  But you have now concluded, based on

14  additional information, that he was not competent in 1990.

03:03:34PM 15    THE WITNESS:  If you move to the trial period and

16  you introduce new data, yeah, you can make judgment like that,

17  yeah.

18    THE COURT:  All right.  Thank you.

19      Anything else?

03:03:44PM 20    MR. RYTTING:  No further questions.

21    MS. HAYES:  Okay.  Nothing further, Your Honor.

22    THE COURT:  All right.  You may step down.  Thank

23  you.

24    THE WITNESS:  Thank you, Judge.

03:04:11PM 25    (Witness released)

1          THE COURT:  All right.  Who is your next witness?

2          MR. RYTTING:  Dr. Jerome Brown.

3          THE COURT:  All right.  Dr. Brown.

4     (**JEROME BROWN, M.D.,** Petitioner's witness, Sworn.)

03:04:40PM  5          THE COURT:  Thank you.  If you'll have a seat in the

6     witness chair, Dr. Brown.

7                        **DIRECT EXAMINATION**

8     **BY MR. RYTTING:**

9     *Q.*  Dr. Brown, would you state your -- some of your

03:04:57PM 10   credentials and your background and your qualifications?

11    *A.*  I'm a psychologist licensed by the State of Texas.  I

12    have been practicing as a mental health professional for about

13    40 years.  My practice now mainly involves forensic-type work

14    or courtroom-related work.  However, I have also been a

03:05:23PM 15   professor at Baylor College of Medicine.  I have a private

16    practice.  I have been a senior member of the Harris County

17    Forensic Psychiatry Unit and have also provided

18    court-appointed mental health expert testimony in surrounding

19    counties and some states.

03:05:43PM 20   *Q.*  And in 1995 you examined doctor -- on two occasions you

21    examined Mr. Aldridge.

22    *A.*  That's correct.

23    *Q.*  Once in January?

24    *A.*  Correct.

03:05:59PM 25   *Q.*  And once in March?

A.   March, right.

Q.   Did you bring those copies with you to the courtroom?

A.   Yes.

Q.   So, you have a copy to look at.

03:06:21PM    MR. RYTTING:  And those would be our exhibits -- the reports that you made would be our Exhibit No. 1, Your Honor. That's from March 27th, 1995.  And the other one is our Exhibit No. 6, which is from January 31st of 1995.

BY MR. RYTTING:

03:06:47PM Q.   You were asked to evaluate Mr. Aldridge in January of 1995 by Judge Raines [phonetics]; is that correct?

A.   That's correct.

Q.   And at this stage of the proceedings, the question was whether Mr. Aldridge was competent to -- the question that you

03:07:13PM answered was whether at this point Mr. Aldridge would be considered competent to stand trial, correct?

A.   Correct.

Q.   And your conclusion in 1995, at least, was -- was what?

A.   He was not competent.

03:07:27PM Q.   And what was the basis of that conclusion?

A.   The interview that I conducted revealed that he suffered from a severe mental illness that significantly impaired his ability to rationally and satisfactorily understand what was taking place, as far as his legal proceedings.

03:07:46PM Q.   And how would you characterize his -- his explanation of

1  his legal circumstances?

2  A.   Well, his explanation of the legal circumstances was

3  never able to be given without referring to the context of his

4  delusions.   In other words, he could not understand his legal

03:08:14PM   5  situation other than in the broad context of his delusional

6  beliefs about those proceedings as well as the people in those

7  proceedings, including his own attorneys.

8           As a matter of fact, that's why he stated he

9  wanted to represent himself, which is the issue that brought

03:08:32PM  10  him back from prison to be seen by me.   He was demanding that

11  he represent himself; and the reason was his attorneys were

12  unqualified or incompetent because they were part of the

13  conspiracy against him.   So, he could not trust any attorney

14  that might be given to him to work with.

03:08:53PM  15  Q.   And when you make this assessment about his competency to

16  stand trial, is it fair to say that you were very confident in

17  your conclusion?

18  A.   Well, I don't think I would write a conclusion if I

19  wasn't confident about it.   I would have to gather information

03:09:18PM  20  until I got to the place that I would feel confident.

21  Q.   You've been in the courtroom while Dr. -- well, both Doug

22  Davis, Mr. Davis, and Mr. Quijano -- Dr. Quijano testified; is

23  that correct?

24  A.   Yes.

03:09:52PM  25  Q.   And you heard the -- and I take it you've reviewed the

1    report Dr. Quijano made in 1990; is that correct?

2    A.   Yes.

3    Q.   And were the -- is the -- were the results of that

4    clinical interview similar to the types of psychological

03:10:21PM 5    information that you gathered from Mr. Aldridge in 1995?

6    A.   Very similar.

7    Q.   And based on that -- and so, is it fair to say that if he

8    was exhibiting the same types of delusion beliefs and other

9    thought disorders that you -- in 1990 that you documented in

03:10:54PM 10   1995, is it reasonable to think he may not have been competent

11   at trial.

12   A.   I think there's a very high probability that he would not

13   be competent at that time, also.

14   Q.   And you actually examined Mr. Aldridge two times, did you

03:11:22PM 15   not?

16   A.   Yes.

17   Q.   You conducted two forensic interviews.

18   A.   Right.

19   Q.   Not forensic, two psychological interviews with him.

03:11:28PM 20            The second time you interviewed him, you came

21   to the conclusion not only that he was incompetent to stand

22   trial but that he met the standard for being incompetent to be

23   executed.

24   A.   That's correct.

03:11:44PM 25   Q.   Which is a very -- is it your understanding that's an

1   even higher threshold or even more difficult standard to

2   reach?

3   A.   Yes.   The standard is very, very conservative.   The

4   Wainwright standard.

03:12:00PM 5   Q.   And if I may, I will present -- I will approach with this

6   second -- this second forensic interview.   And if you would

7   turn to page -- what would be page 3, the first full paragraph

8   where you talk about the mental status examination and what it

9   reveals.

03:12:54PM 10             And you state that "The defendant continues to

11   exhibit the same delusional ideation he has always exhibited

12   when seen by this examiner."

13   A.   True.

14   Q.   Okay.   "And in this respect, he has not changed his

03:13:06PM 15   beliefs or his interpretation of why he is in his present

16   legal circumstance."

17   A.   Yes.

18   Q.   Now, you go on to acknowledge that he's well aware that

19   he's been convicted of capital murder and has been given the

03:13:20PM 20   death penalty.   But then why does -- what was significant

21   about -- or let me put it this way:   Why did that not tip the

22   scales for you towards the finding of competency either to

23   stand trial or to be executed?

24   A.   Because his delusions lead him to interpret those

03:13:47PM 25   circumstances he finds himself in as part of a giant

1   conspiracy or plot that has been going on against him for many

2   years; and this is simply a continuation of the, let's say,

3   persecution that he has endured.  And because of that, he does

4   not properly understand the reason why this sentence is to be

03:14:11PM  5   carried out against him.  He has a different understanding as

6   to why; and because that understanding is psychotic and

7   delusional, it is irrational and unreasonable.

8   Q.   And just the same question, the results of the interview

9   that Dr. Quijano conducted in 1990 and which you have heard in

03:14:43PM 10   this courtroom, again, they are similar in their nature and in

11   their content to what you observed in 1995.  Is that fair to

12   say?

13   A.   Yes, it is.

14   Q.   Again, just to cross that T, it would be your opinion

03:15:09PM 15   based on the interview that Dr. Quijano conducted that

16   Mr. Aldridge was not competent to stand trial?

17   A.   Well, based on what Dr. Quijano reported in his report, I

18   would not consider Mr. Aldridge competent at that stage.

19            MR. RYTTING:  I have no further questions.

03:15:31PM 20            THE COURT:  All right.  Thank you.

21            Cross-examine?

22            MS. HAYES:  Yes, Your Honor.

23                       **CROSS-EXAMINATION**

24   **BY MS. HAYES:**

03:15:35PM 25   Q.   Just to clarify, Dr. Brown, the first exam that you do of

1  Mr. Aldridge in January, '95, which is the Petitioner's

2  Exhibit 6, the question before the Court was whether he was

3  competent to waive counsel, right?  I mean, he wasn't facing a

4  trial at that time.  It was just whether he was competent to

03:15:57PM  5  waive counsel.

6  A.   Right.

7  Q.   Okay.  The March one that you did, you were asked to

8  evaluate competency for execution.  There wasn't an execution

9  date set, though, was there?  The Court was just kind of

03:16:06PM  10  contemplating whether it was even a possibility.

11  A.   Frankly, I don't know the context of the referral.  We

12  do -- at that time the place I was working at would do the

13  evaluations on court order, and sometimes we don't know why

14  the Court order is issued specifically.

03:16:28PM  15  Q.   When you saw him in 1995, how much -- or would you have

16  agree that -- strike that.

17        Would you agree that not every schizophrenic

18  has the same progressions of their disease?

19  A.   Certainly.

03:16:50PM  20  Q.   And that some actually progress more rapidly, others more

21  slowly; would you agree with that?

22  A.   Yes, I would.

23  Q.   Okay.  How much more or less paranoid was Aldridge, say,

24  one year before you saw him?

03:17:03PM  25  A.   I couldn't say.

1 *Q.* So, how about two years?

2 *A.* Same thing.

3 *Q.* So, when you see him in '95, you're reporting that he --

4 similar things to Dr. Quijano, but I guess we're sort of in

03:17:23PM 5 the position -- you reached a different conclusion from

6 Dr. Quijano than what he did five years earlier, correct?

7 *A.* I think I probably would; but, again, I can't -- I'm not

8 offering a competency evaluation opinion on Mr. Aldridge in

9 1990.  I'm just saying what I've seen in Dr. Quijano's report

03:17:45PM 10 is very, very similar to what I saw in Mr. Aldridge.

11 *Q.* So, that is the extent of your opinion, is that it is

12 very similar kinds of results but you are, in fact, only

13 focused on what you offered in 1995.

14 *A.* That's all that I can really properly do, yes.

03:18:03PM 15 *Q.* Okay.  I notice on -- one quick last question.  In your

16 March 27th report, which is P1, Petitioner's 1, at page 3, the

17 first full paragraph says, "Mental status examination reveals

18 the defendant to be alert; well-oriented; able to communicate

19 his ideas in a straightforward, direct, and reasonably

03:18:28PM 20 intelligent fashion.  There's no looseness, tangentiality or

21 any other signs of thought disorder."

22 *A.* Correct.

23 *Q.* And even with those good qualification -- I guess, for

24 lack of a better word -- good qualities, you still found that

03:18:45PM 25 he was not competent to stand -- to face execution?

*A.*   That's right.  In spite of those relatively intact
abilities, he was still too mentally ill.

*Q.*   Okay.  Were you aware -- I know you were here today when
we were talking about different testimony and what the records
03:19:09PM   show.  Were you ever aware of all the information about how
Aldridge was functioning before he ever entered T.D.C.J.
custody on the capital offense?

*A.*   No.

*Q.*   Were you made aware of any of the statements that family
03:19:21PM   members made about what Mr. Aldridge related to them as the
reasons for his crime?

*A.*   No.

*Q.*   Were you provided any records other than Dr. Quijano's
report to consider about -- in offering your opinion today?

03:19:39PM   *A.*   Only Dr. Quijano's affidavit.  That was it.  And the
report.

*Q.*   Okay.  When you said that the delusion led Mr. Aldridge
to interpret circumstances as being part of a plot, was he
still able to tell you the key operative facts of his crime;
03:20:10PM   for example, that he goes and he buys a gun a couple of days
before the murder?

*A.*   I don't think we discussed that -- those kinds of
details --

*Q.*   So, he --

03:20:20PM   *A.*   -- about how he carried out the offense.

1  *Q.*   Okay.  So, when you make the comment in the '95 report

2  that his delusions are leading him to interpret circumstances

3  as part of a plot, that's what you are presented with in '95

4  but not necessarily what was presented back in 1990, correct?

03:20:49PM 5  I mean, there --

6  *A.*   Well, setting aside what Dr. Quijano reported, no, I

7  don't have any other information about 1990.

8  *Q.*   And Dr. Quijano's report, Petitioner's 8 -- well, let me

9  back up.

03:21:05PM 10              In your two reports, I believe there are

11  references to where Mr. Aldridge talks about having things --

12  that he is the victim of experiments or government

13  experiments?

14  *A.*   Correct.

03:21:17PM 15  *Q.*   Okay.  And that he's an alchemist and sort of -- is

16  manipulating how everything is working?

17  *A.*   True.

18  *Q.*   And a sufi is also at fault for some of what is going on,

19  correct?

03:21:30PM 20  *A.*   Correct.

21  *Q.*   Okay.  And then there's also talk in your two affidavits

22  about a conspiracy with the attorneys and sort of the whole

23  system at that point being against him, correct?

24  *A.*   Right.

03:21:40PM 25  *Q.*   Okay.  Those are not really representative of

1  Dr. Quijano's report from five years earlier.  You didn't see

2  a sufi or an alchemist mentioned with Dr. Quijano's report?

3  A.   I don't think so.

4  Q.   Okay.  So, the types of delusions that he is having

03:21:59PM  5  are -- would you agree that they are changing over time?

6  A.   They do sometimes, yes.

7  Q.   Okay.  And so, you -- in fact, when you interview him and

8  evaluate him in 1995, even though it is similar to what

9  Dr. Quijano did, it's still -- it's based on how he is

03:22:15PM  10  operating right now in '95 and is not necessarily indicative

11  of his true level of understanding back in 1990?

12  A.   That's true.

13  Q.   Okay.

14        MS. HAYES:  Thank you.  No further questions.

03:22:26PM  15        THE COURT:  Any redirect?

16        MR. RYTTING:  Just a couple of questions.

17                  **REDIRECT EXAMINATION**

18  **BY MR. RYTTING:**

19  Q.   The types of symptoms that Mr. Aldridge was exhibiting

03:22:38PM  20  were delusional and -- the types of delusions were similar,

21  were they not?

22  A.   Very similar.

23  Q.   The content might have changed somewhat?

24  A.   Yeah.  You often see that.  That's -- but the basic

03:22:56PM  25  manner, let's call it, or the context or the general theme,

1  let's say, of the delusions remain relatively fixed usually.

2  Q.   And judging from Dr. Quijano's interview, they were

3  fixed.  They were pervasive.  In his interview he calls it the

4  legal situation that he thought he faced at that time.  Is

03:23:21PM  5  that fair to say?

6  A.   It appears to be so, yes.

7  Q.   And were you surprised, after reading the narrative

8  report of Dr. Quijano's conclusion based on his psychological

9  interview, that Mr. Aldridge was competent?

03:23:38PM 10  A.   That surprised me, yes.

11        MR. RYTTING:  No further questions.

12        THE COURT:  All right.  Anything else, Ms. Hayes?

13        MS. HAYES:  One last question.

14                    **RECROSS-EXAMINATION**

03:23:55PM 15  **BY MS. HAYES:**

16  Q.   The idea about symptoms changing -- or symptoms being

17  delusional and the content sort of changes, that sort of idea,

18  is that the concept that people have been kicking around today

19  about waxing and waning?

03:24:05PM 20  A.   No.

21  Q.   Okay.  If the severity of the illness or how Mr. Aldridge

22  is able to present himself, the description of that paragraph

23  that I read in the March '95 evaluation about reasonably

24  intelligent, conversations straightforward, direct, no

03:24:27PM 25  looseness, all that, that's not the same type of description

1  that Dr. Quijano is giving here with part of his evaluation,

2  is it?

3  A.   No.  I would say that -- I bet you -- well, I believe

4  that Dr. Quijano was seeing those same things with this man.

03:24:45PM  5  In other words, I think that this man is capable, when you are

6  not covering his delusional areas, of responding to you in a

7  fairly straightforward, articulate, and reasonably intelligent

8  fashion.  You can, for example, talk about the weather; and he

9  would probably look like a regular guy.

03:25:03PM 10  Q.   Now, when you are asking him about the role of the judge,

11  the role of the attorneys, the role of the appeal, you've

12  heard testimony he is able to answer all that, no problem.

13  A.   I think he probably can.

14  Q.   Okay.

03:25:16PM 15          MS. HAYES:  Nothing further, Your Honor.

16          THE COURT:  All right.  Are we done?

17                **FURTHER REDIRECT EXAMINATION**

18  **BY MR. RYTTING:**

19  Q.   Dr. Brown, when a patient such as Mr. Aldridge is

03:25:40PM 20  answering a question about the weather and responding to

21  everyday -- in a way it looks like everyday conversation, he

22  may very well be still actively hallucinating and delusional;

23  is that correct?

24  A.   No.  The delusions are there whether you are talking

03:26:01PM 25  about them or not.

```
 1  Q.    Thank you.

 2              MR. RYTTING:  No further questions.

 3              THE COURT:  All right.  We're finished, I think.

 4                   Thank you, Doctor.

 5              THE WITNESS:  Thank you, Judge.

 6      (Witness released)

 7              THE COURT:  All right.  Who is your next witness?

 8              MR. RYTTING:  Gladys Aldridge, Your Honor.

 9              THE COURT:  All right.

10                   When you get up there, would you please raise

11  your right hand and be sworn in as a witness?

12      (GLADYS ALDRIDGE, Petitioner's witness, Sworn.)

13              THE COURT:  You may have a seat.  Thank you.

14                       DIRECT EXAMINATION

15  BY MR. RYTTING:

16  Q.    Ms. Aldridge, would you identify yourself for the record?

17  A.    Okay.  Well, my name is Gladys Aldridge.

18  Q.    How are you related to Mr. Aldridge?

19  A.    He is my brother.

20  Q.    Did you help raise Garfield?

21  A.    Yes, I did.

22  Q.    You are his oldest sister; is that correct?

23  A.    Yes, I am.

24  Q.    I would like you to start off with what you can remember

25  about -- let's just call it the early years with Mr. Aldridge
```

03:26:10PM (line 5)
03:27:33PM (line 10)
03:28:25PM (line 20)
03:28:50PM (line 25)

1  and what those were like for him and the family.

2         MS. HAYES:  I object.  The early years is pretty

3  broad.  And I'm afraid it is getting more into like the

4  punishment issue about mitigation.  If it can be narrowed.

03:29:14PM  5         THE COURT:  What are you proposing he narrow it to?

6         MS. HAYES:  It was the "early years" phrase, like

7  from childhood to -- I'm not sure.

8         THE COURT:  All right.

9         MR. RYTTING:  Childhood.

03:29:28PM  10  BY MR. RYTTING:

11  Q.   Can you -- do you have any recollection or memories about

12  Mr. Aldridge's childhood and what that was like?

13  A.   Okay.  Well, sure.  We had difficult times, you know; and

14  he did, too.  Is there a specific question that you need to

03:29:47PM  15  ask me?

16  Q.   No.  What was the relationship with your mom like?

17  A.   Okay.  Our mother did not raise us.  Our dad raised all

18  six of us.

19  Q.   And did you notice anything about your mother that you

03:30:01PM  20  thought was unusual?

21  A.   Okay.  My mother?

22  Q.   Yes.

23  A.   Well, my mother -- when her and my dad separated, I was

24  in kindergarten.  I was going into the first grade.  So,

03:30:14PM  25  that's all that we knew about Mother, is that, you know, she

1  would get us ready to go to school and just everything and --

2  you know, and that she was Mother.  And then I came home one

3  time from school -- I was in kindergarten -- and our mother

4  wasn't there anymore.

03:30:31PM 5  Q.   Did you -- was there a time when you began -- you had

6  some questions or worries about whether your mom might not be

7  right in her head or might have some mental problems?

8  A.   Okay.  Well, the only thing that I know about Mom is

9  forced fed because I was very young.  But the thing about it

03:31:03PM 10 is that when we know that Mom wasn't living with us anymore

11 after school because she was gone.  But the thing about it is

12 that our father never told us anything about our mother's

13 mental state of mind.  We began to learn things as we just

14 growed up.

03:31:19PM 15 Q.   And what were some of those things?

16 A.   Well, we never saw my mother again.  And when we saw our

17 mother again, I was in elementary school.  Okay.  So, you

18 might want to just rephrase it so I can just see for example

19 because -- which things?

03:31:37PM 20          Now, our mother wasn't there for us; but our

21 daddy was.  But we was raised by a nanny.  She was living with

22 us in the home.

23 Q.   What nanny was this?  Do you remember what --

24 A.   Yes.  The first nanny was Ms. Ina Bess Griffin.

03:31:52PM 25 Q.   And how did she treat Garfield?

1  A.   Okay.  Well, you know what?  Ms. Ina Bess was very

2  strict, and she whooped all of us.  That's understandable.

3  And Garfield, he caught whippings, too.  Yes, he did.  She was

4  kind of abusive now because I would know that because I was

03:32:13PM  5  raised by her and I have scars on me right today from some of

6  her whoopings.

7  Q.   And how -- Garfield was -- he was a slight -- what we

8  call slight or slim, slender build, right?

9  A.   Yes.  He was always built that way.

03:32:35PM 10  Q.   And kind of small?

11  A.   Yes.  Uh-huh.

12  Q.   He had some older brothers, didn't he?

13  A.   Yes, he did.  He had two of them.  It was our older

14  brother Terrol Aldridge and Holbert Lee Aldridge.

03:32:50PM 15  Q.   And how did they get along?

16  A.   Well, we all knew that our oldest brother Terrol -- that

17  he tried to like discipline us, you know; but as far as they

18  got along, Holbert Lee and Garfield had their indifferences

19  pretty regular.  Holbert Lee was like a bully.

03:33:09PM 20  Q.   Did he -- did he ever physically beat up Mr. Aldridge?

21  A.   Who?  Holbert Lee?  Yes.  They got into fights, and he

22  would jump on Garfield off and on.  But, you know, when daddy

23  came home, I would tell him; and so, Holbert Lee would get a

24  whooping.

03:33:34PM 25  Q.   Holbert Lee is spelled H-O-L -- it's Holbert, right?

1  *A.*   Yes, it's Holbert.

2  *Q.*   H-O-L-B-E-R-T?

3  *A.*   Yes, it is.

4  *Q.*   And the second -- his middle name is Lee; is that

03:33:43PM  5  correct?

6  *A.*   Yes, it is.

7  *Q.*   Okay.  Just to make sure the record is clear.

8            I would like -- during -- when he was young up

9  until the time he was, say, 17, did you think there was

03:34:36PM 10  anything wrong with Mr. Aldridge?

11  *A.*   Our father or --

12  *Q.*   No.  With Garfield.

13  *A.*   Well, you know what?  Garfield and Holbert Lee both got

14  in and out of trouble.  And, see, Garfield -- he did his part

03:34:52PM 15  of being devious just like Holbert Lee did.  And pretty

16  much -- that's pretty much how he and Holbert Lee got along.

17  But the most thing is that Garfield was mostly picked on all

18  the time, and not just by Holbert Lee but by other people in

19  the neighborhood because he was just short.  So, they would

03:35:13PM 20  call him Shorty or call him different names.

21  *Q.*   And at some point in time, Mr. Aldridge was arrested and

22  he was convicted of robbery and sent to prison; is that

23  correct?

24  *A.*   Garfield?

03:35:28PM 25  *Q.*   Garfield.

1  *A.*   Yes, he was in January of 1990.

2  *Q.*   You mean -- I'm talking about the robbery in 1970,

3  correct?

4  *A.*   Okay.  Now, the robbery is what you are speaking about

03:35:42PM 5  now?

6  *Q.*   Yes.

7  *A.*   Yes, he did.  He got into some trouble with some more

8  boys, and they had robbed the place.  And then that's when he

9  was sentenced to T.D.C.  And he was 17.

03:35:51PM 10  *Q.*   At some point when he was in T.D.C.J., did you visit him

11  while he was in prison?

12  *A.*   Yes, I did.

13  *Q.*   Okay.

14  *A.*   All the time.

03:35:59PM 15  *Q.*   When you visited him at first -- for the first couple of

16  years, what was it like?  What were the visits like -- the

17  first few years.

18  *A.*   Okay.  Now, the first few years, he was okay.  The first

19  few years.  That was in the 70s.  Because he left in the 70s.

03:36:18PM 20  But then when he got the injury that he had sustained while he

21  was incarcerated in the prison and the progress down through

22  the years and then his personality began to change.

23  *Q.*   And how did you know that?  And why did you say that?

24  What leads you to believe that his personality --

03:36:38PM 25  *A.*   Okay.  I -- because me and Garfield very close, very

1   close.  Not only did I raise him, we are very close.  And, so,

2   see, Garfield -- well, sometimes he would like forget things

3   or either he would have to question you more than once or

4   twice.  And then I began to notice that he would complain of

03:37:03PM  5   headaches all the time, and he would rub his head.  So, I

6   would tell it to daddy.

7   Q.   And was there any time when Garfield -- when you visited

8   Garfield that he would act out or would exhibit --

9   A.   Well, after the injury, when we visit Garfield, he would

03:37:24PM  10   act out all the time.

11   Q.   When you say "act out," can you describe a little bit

12   what that means?

13   A.   Well, he was hollering and screaming and talking loud;

14   and he was using profanity.  And sometimes the guards had to

03:37:36PM  15   calm him down or either tell daddy and I that we would have to

16   go, unless he would maintain his behavior.

17   Q.   And would he say what you would consider to be strange

18   things to you?

19   A.   Well, of course, it was very strange.  We all knew that.

03:37:56PM  20   Q.   What are some of the examples that you recall?

21   A.   It was so many.  I know that some of the things that I

22   recall is when Garfield began to change into -- like Garfield,

23   after he was injured, there was a big difference.  He was off

24   to himself a lot, and he wouldn't do a lot of communicating.

03:38:21PM  25   Garfield would not do that.

1  Q.   He would not what?

2  A.   Do a lot of communicating.  I mean, this is with the

3  family or anyone else.

4  Q.   But before he was glad to see you?  Before his injury,

03:38:38PM  5  which is -- the injury you are talking about, I believe,

6  occurred in 1976.

7  A.   Yes.  That was his first injury to his skull.  Yeah.

8  They told our father, the doctors, that another inch that it

9  would have killed him.

03:38:55PM 10  Q.   Did you receive any letters from Garfield during this

11  time?

12  A.   Yes, I did.  Plenty.

13  Q.   And this was in the 80s?

14  A.   Yes, I did.

03:39:05PM 15  Q.   What were those letters like?

16  A.   Well, Garfield was talking about the Nazis, and he was

17  talking about people was after him.  And he was talking about

18  that he had enemies and that they was trying to kill him.  He

19  would get -- get rid of him.  So, what I would do, I would

03:39:27PM 20  just ask Garfield, well, who was he talking about?

21  Q.   And what would he respond?

22  A.   And so he would say:  Gladys, well, you know, they

23  standing here right now.  But there was nobody there.  So, at

24  one point when I got nervous, I had missed a couple of weeks

03:39:45PM 25  visiting him because it bothered me; and I told my father it

1    did.

2    Q.   And would he write to your other sisters, Brenda and

3    Judy?

4    A.   Oh, yes.  He would write to me and Brenda.  It is me and

03:40:00PM  5    Brenda that visit Garfield all those years in prison.  It was

6    me and Brenda.  It wasn't Judy.

7    Q.   So, when you went to visit Garfield, did you go take the

8    bus down from, what, the Sears building downtown?

9    A.   Yes, I did.  Yes, I did.

03:40:20PM  10   Q.   And go to the prison from there?

11   A.   Yes, I did.

12   Q.   With Brenda?

13   A.   Yes.

14   Q.   So, you told -- do you remember when Garfield got out of

03:41:03PM  15   prison?

16   A.   Yes, I do, because he came to stay with me.

17   Q.   And what happened when he came to stay with you?  What

18   did you see?

19   A.   Well, he knocked on the door and I opened it and he was

03:41:17PM  20   just standing there with his arms fold.  And then when I told

21   him that he could stay with me and the kids, he did do that.

22   Q.   How was he dressed?

23   A.   Garfield had -- he had on his blue jeans and a shirt, and

24   he was real prompt.  You know, he was always like -- like he

03:41:43PM  25   was in the military, like he would just stand tall.  But

Garfield was mostly dressed like in just pants and a shirt.

Q.   Did he have a turbine on?  Do you recall?

A.   Of course, he did.  We all knew that.  Yes, he did.
Because his bedroom was upstairs, because I live in a town
03:42:04PM house; and, yes, he would wear his turbine all the time.

Q.   And did he ever wear a white robe?

A.   You know that was?  That had something to do with part of
the Muslim religion, and that was his religion.  So, he would
wear it.  Yes, he would.  Off and on, yes, he would.

03:42:32PM Q.   What was his room like?

A.   Okay.  Garfield room was immaculate clean.  I mean, it
was a bed in there; but he didn't sleep in the bed because it
bother him.  Garfield slept on the floor.  And I asked:  Well,
why wouldn't he just sleep in the bed that he would be more
03:42:54PM comfortable?  But he didn't.  He was more distant, more quiet.
And Garfield was just like he wasn't there.  We knew he was
there.  But then he would complain to me about the Nazis and
these people was trying to kill him and that I was letting
them come into the room.  And he would leave the house and
03:43:16PM then he would come back to the house and then he would go
upstairs, he said, to pray.

Q.   So, did he at some point accuse you of letting people
into his room?

A.   Of course, he did that.  As a matter of fact, I
03:43:37PM thought -- I thought at first -- well, he wasn't real serious.

1  When I discovered he was serious, that's when I told Garfield:

2  I didn't let anybody in your room.  I said:  The kids don't

3  even go into the room.

4              But he said:  Gladys, no.  You opened the door

03:43:52PM  5  and let the Nazis and let other peoples come upstairs and go

6  into my bedroom.

7              And we got into a dispute about it, and I told

8  him that I would put a lock on the door if that would satisfy

9  him.  But he said, no, that he didn't want a lock on the door.

03:44:11PM  10  But that's pretty much what he accused us of during this time,

11  well, especially me, period, you know.

12  Q.   Was there -- did he have anything that was -- that he

13  prayed to in his room?  Did he build anything, like an alter?

14  A.   In the bedroom, no.  All I know is that Garfield -- when

03:44:39PM  15  I went in the room one day -- I was curious.  So, Garfield had

16  bowed down to his knees, and he had his hands in a praying

17  position with his head bowed.  But he didn't have any

18  particular thing in his room that he -- you know, like an idol

19  or anything that he prayed at.  His praying time was always

03:45:00PM  20  before sundown, and his praying was always before the sun

21  rose.  And I asked him about that.

22  Q.   In your statement you mention that when he was staying

23  with you, that Garfield had headaches a lot.  Do you remember?

24  A.   Yes, he did.

03:45:31PM  25  Q.   And he also -- and he wore a back brace.

1  A.   Yes, he did.

2  Q.   Do you remember why he was -- why he was wearing that?

3  A.   Well, yes.  Because when he came home, he had made it

4  pretty clear to us that due to the injuries that he sustained

03:45:51PM 5  from some of the guards and the inmates, it messed up his neck

6  and back.  And that's the reason that he had to wear the

7  braces.

8  Q.   And at some point did -- well, did you notice any other

9  odd behavior, what you considered strange behavior, like

03:46:13PM 10  walking around at night and things like that?

11  A.   Never did.

12  Q.   Pardon me?

13  A.   Well, yes, I do.  As a matter of fact, he did that pretty

14  regular.  You know what?  See, Garfield would come down the

03:46:28PM 15  stairs; and the stairs would make a little squeak.  This was

16  before Garfield came.  But then you know what?  Garfield

17  always walked down those stairs, and you would never know that

18  he was down the stairs.  Because I was in the kitchen and I

19  was fixing to turn a light on and I jumped.

03:46:45PM 20         I said:  Garfield, you scared me to death.  I

21  didn't hear you coming.

22         And he stood there with his hands fold and

23  said:  What are you doing, Gladys?  Letting somebody in?

24         I said:  No, Garfield.  I was in here trying to

03:47:00PM 25  get a cup of coffee.  But he scared me then.

1    *Q.*    And did he scare your children?

2    *A.*    Yes.  Oh, they were very scared of Garfield.  And that's

3    the reason why I told daddy that he would have to come and get

4    him because the kids was even scared to sleep in their own

03:47:17PM    5    rooms and they were scared of Garfield.  And I'm their mother,

6    and a mother protects their children.  So, my father came and

7    got Garfield.

8    *Q.*    Now, what happened when he went and stayed with your

9    father?

03:47:30PM    10    *A.*    Well, when he went to stay with Dad, he was saying that

11    he would hear noises under the house; and he said that the

12    Nazis was under the house and that they were coming out to get

13    him to kill him.  And he would accuse Daddy and our stepmother

14    of letting certain ones in the house, in the room.  And that's

03:47:59PM    15    when our daddy began to realize himself that something was

16    wrong with Garfield, and Garfield had to move from there.

17    *Q.*    So, one more question about your mother, Gladys.  It has

18    to do with page 1, paragraph 4, of your affidavit.  I think

19    you have that.

03:49:00PM    20             You said that your mother sometimes talked and

21    laughed to herself and would carry on a long conversation to

22    herself.  Do you remember that, your mother doing that?

23    *A.*    Yeah.  Could you repeat that?

24    *Q.*    You said that sometimes your mother talked and laughed to

03:49:16PM    25    herself and --

A.   Oh, yes.  We all knew about that.

Q.   And she would carry on long conversations with herself?

A.   Yes.  Yes, she would do that.

Q.   And did you ever see her or hear her doing that?

03:49:29PM A.   Well, yes, we did.  I did.  All of us did.  But then, you know, we had to learn that Mother was like that way because she had a nervous breakdown after she had Garfield.  And so, Mother stayed that way; and Mother never changed being that way.  And she was still that way when she died in January of

03:49:52PM '05.  It just got worse, but that's all.  And I was the main person -- I would stay with my mother because she was living by herself.

Q.   Did Garfield -- when he stayed with you, did he ever talk about spirits and people molesting -- spirits molesting him at

03:50:23PM all?

A.   Of course he did.  He would talk about spirits was in the house and that spirits was all around us and that they was coming to kill him.  And he said that I was in on it.

THE REPORTER:  I'm sorry.  That you were?

03:50:44PM THE COURT:  Did you say that he said you were in on it?

THE WITNESS:  Yes.  Yes, Your Honor.

BY MR. RYTTING:

Q.   Gladys, I'm going to ask you a few questions about the

03:51:43PM day -- or the -- that Ben Stone died and what happened.  You

1   helped Garfield get to San Antonio on that day, didn't you?

2   A.   Yes, we did.  Because my son had encouraged me to bring

3   Garfield to San Antonio.  Because he said that Garfield had

4   missed the bus or something and that he was my brother and

03:52:17PM 5   that we needed to drop him off in San Antonio.

6   Q.   Okay.  And there was some other things that happened

7   beforehand on that day.  Do you recall any of that?

8   A.   Okay.  You are talking about the same day?

9   Q.   Yes, the same day.

03:52:31PM 10   A.   Okay.  Well, Garfield came to my house about -- between

11   6:00 a.m. and 6:30 in the morning; and it was storming, a

12   hundred percent raining.  And I opened the door to let him in.

13   When I looked up and saw it was him, Garfield was acting real

14   strange.  Matter of fact, I went back to the bedroom to get

03:52:52PM 15   into the bed, he walked into the room and just stood like a

16   salute with his arms fold.

17            I said:  "Garfield, what is wrong?"

18            So, he said:  "Well, really, Gladys, it's

19   nothing.  I was trying to see if you can get ahold of Terrol."

03:53:07PM 20            And Terrol was our oldest brother.  And I kept

21   on trying all that day to get ahold to him on his job, but I

22   couldn't reach him.

23   Q.   And then you made a number of trips in the car with

24   Garfield, did you not?

03:53:22PM 25   A.   Who?  Me?

1   *Q.*   Yeah.

2   *A.*   Oh, yes, I did.  It was my car.  As a matter of fact, I

3   had taken a sleeping pill; and after that he was driving my

4   car.  And then when -- I woke up at one point, and then

03:53:40PM   5   Garfield -- he was driving my car.  And I remember that we had

6   stopped off to get some gas, and I had went into the store to

7   make a collect call to call my kids and check on them.

8   *Q.*   Here you are talking about going to San Antonio?

9   *A.*   Yes.

03:53:59PM   10   *Q.*   But beforehand did you go to a motel?

11   *A.*   Yes.  I dropped him off around the corner at a motel

12   because I was trying to find my oldest brother.

13   *Q.*   Did you want him in the house?

14   *A.*   Huh?

03:54:15PM   15   *Q.*   You didn't want him in the house, did you?

16   *A.*   Well, of course not, not then.

17   *Q.*   And was -- did any of this make any sense to you?

18   *A.*   Well, you know what?  After the Garfield... again because

19   our oldest brother had explained to us that he was like

03:54:39PM   20   schizophrenic and that he going to have blackouts and things.

21   And so, therefore, in between the time that I left Garfield

22   and then I returned back home and then Garfield ended up

23   calling me.  So, I couldn't get Garfield; but I know that

24   Garfield was acting very strange.  I asked him what was wrong;

03:55:01PM   25   and he said nothing, that he just wanted me to call our oldest

 1  brother.

 2  Q.   So, at one point when you are traveling back and forth

 3  from the hotel, Garfield gets out and goes hides somewhere,

 4  doesn't he?

03:55:14PM 5  A.   You said he did what?

 6  Q.   Did he get out and go hide in the bushes somewhere?

 7  A.   Oh, you know what?  I completely woke up, and we was at

 8  some bus terminal in San Antonio.  I was completely woke up

 9  because it was late through the night.  And that's when I

03:55:34PM 10  asked my son and my nephew:  Where did Garfield go?  And so,

 11  then my son said:  Mamma, I think something is wrong here; and

 12  it has to do with Garfield.

 13  Q.   At this point was he ever talking with you, when he was

 14  living with you, about going to a Muslim country or anything

03:55:57PM 15  like that?

 16  A.   Oh, of course.  That's the reason I was trying to get

 17  ahold of my brother Terrol.

 18  Q.   Is that -- that's what he was planning to do.  That's

 19  what he --

03:56:08PM 20  A.   Yes, that's what he was planning to do.  Yeah.  He said

 21  that people was after him and that he couldn't stay in this

 22  country or stay in this same place and that he had wanted to

 23  go over into the land to where Muslim be to where they can

 24  feel free.

03:56:59PM 25           MR. RYTTING:  I'll pass the witness, Your Honor.

1      THE COURT:  All right.  Thank you.

2           Cross-examination?

3      MS. HAYES:  Please.

4                **CROSS-EXAMINATION**

03:57:05PM  5   **BY MS. HAYES:**

6   Q.   Good afternoon.

7   A.   Good afternoon.

8   Q.   I'm Katherine Hayes with the Attorney General's office.

9   A.   Okay.

03:57:09PM  10   Q.   I just have a few questions about a couple of issues.

11   A.   Okay.

12   Q.   One thing, I know that you call him Garfield?

13   A.   Yes.

14   Q.   Garfield went to prison in 1972 when he had done a couple

03:57:27PM  15   of robberies.  He robbed a meat packing company?

16   A.   Yes, he did.

17   Q.   Okay.  And he also robbed a Monterey House, too, hadn't

18   he, within about a week or 10 days of each other?

19   A.   Well, that's what -- well, that's what we heard.  But,

03:57:39PM  20   see, I know about the first robbery.  But the Monterey House,

21   we just heard; but we never knew Garfield really did that.

22   Q.   Okay.  And so, he is in prison in -- he's in prison in

23   1972 for those offenses.

24   A.   Yes.

03:57:55PM  25   Q.   And so, the hoe or ax injury that happens is while he is

1  in prison on those offenses?

2  A.   Yes, it was.

3  Q.   If the medical records showed that the accident actually

4  happens around 1976, does that sound about right?  It was

03:58:10PM  5  about four years after he had been in prison.

6  A.   Yes.  Yes.  Because it was in the 70s when it happened.

7  Q.   Okay.  And before he had gone to prison for those

8  robberies, he also had sort of a rather checkered past when he

9  was growing up.  Didn't he get into a lot of trouble, too, as

03:58:34PM  10  he has been growing up?

11  A.   Well, yes, he did.

12  Q.   Okay.  He has dependency complaints filed.  Did you know

13  about any of those?

14  A.   Well, yes.  I knew that he did because he spoke about it.

03:58:48PM  15  Q.   How about -- he had a burglary.  He'd burglarized a

16  residence, too, when he was 14.  Did you know he had done

17  that?

18  A.   Well, what his friend said -- and I only knew that

19  because I observed that.

03:59:06PM  20  Q.   And then there was, I think, a robbery of a -- or a

21  burglary of a drive-in grocery, too, that was probably about

22  the same year?

23          MR. RYTTING:  I have an objection to relevancy, Your

24  Honor.

03:59:16PM  25          THE COURT:  Sustained.

1  BY MS. HAYES:

2  Q.   What I am curious about, Ms. Aldridge, is the first

3  times, I guess, that -- that you started to say he was acting

4  a little odd or acting different was after the head injury,

03:59:32PM  5  right?

6  A.   Yes.

7  Q.   He's already becoming -- doing -- getting into criminal

8  activity well before he's had the head injury.

9  A.   Well, yes, he did.  And my brother did, yes.

03:59:46PM  10  Q.   Now, when he was out before the capital murder happens,

11  he was working at the McDonald's, right?  Were you still in

12  touch with him much when he was working at the McDonald's?

13  A.   The first McDonald's, me and him did.  That was on

14  Tidwell and Shepherd.

04:00:06PM  15  Q.   Okay.  Do you know how many he ended up working at?

16  A.   Well, it was that one; and then I learned later on that

17  when he moved from the north side, that was because one of our

18  siblings, Holbert Lee, kept on messing with him.  And so, he

19  moved to the north side -- the south side.  And then we

04:00:25PM  20  learned that he was at McDonald's over there.

21  Q.   And at that point is he living on his own, in his own

22  apartment?

23  A.   Yes, he was.

24  Q.   Okay.  Did you know whether he had a bank account when he

04:00:39PM  25  was working at McDonald's?

1  A.   No, I do not know that.

2  Q.   When this capital crime happened, when he was trying to

3  leave the Houston area, were you ever told by him that he

4  needed cash and you could have his Pulse card so you could get

04:00:56PM  5  money out of his account if you needed to?

6  A.   No.  That's not true.  No.

7  Q.   Okay.  Did he have a car?

8  A.   No, Garfield did not have a car because he rode a

9  bicycle.

04:01:05PM  10  Q.   Okay.  Do you know if he ever had a car?

11  A.   No.

12  Q.   No, you don't know; or no, he didn't have a car?

13  A.   No, he did not have a car.

14  Q.   Okay.  Did you know that he had been in a lawsuit where

04:01:18PM  15  he managed to sue somebody in court and represent himself?

16  A.   Well, we just really heard about that.  Well, the family,

17  we just heard about.  And then, too, Garfield had said it; but

18  we didn't know just what type of a lawsuit.  But I knew that

19  he was suing somebody.

04:01:37PM  20  Q.   When he was in prison in -- for the -- for all the

21  robberies back in the '72 offense that he got 16 years for, he

22  wrote letters to y'all, right, when he was in prison?

23  A.   Yes, he did.

24  Q.   Could you tell that when he was in prison, that he

04:02:05PM  25  started to convert and become a Muslim while he was in prison?

1   A.   Yes, he did.

2   Q.   And did he take that -- seem to take that very seriously?

3   A.   Oh, yes, he did.

4   Q.   And was Eddie Ford, also -- he was a Muslim, too, wasn't

04:02:20PM 5   he?

6   A.   Yes, he was.

7   Q.   And so, they could -- could they talk Arabic together

8   or -- someone had said that in one of the reports they would

9   talk together so that they understood each other.  Were you

04:02:32PM 10   ever around them when they would be talking in --

11   A.   Only briefly.  Edward Ford was a character.  He was

12   speaking briefly with Garfield because we didn't know that

13   Garfield spoke it until Edward Ford started speaking it.

14   Q.   Did you know that back at the time of trial, there were

04:02:54PM 15   some family members that came; like Brenda, your sister, and,

16   I guess, Cheryl and Virginia came to testify?

17   A.   Yeah.  That was my daughters.

18   Q.   Okay.  And I know each of them gave opinions that nobody

19   had thought about getting any kind of professional help for

04:03:11PM 20   Garfield.  Was that -- was that something y'all ever thought

21   about, that he ever was so mentally ill he might need some

22   assistance or some help?

23   A.   Well, we didn't.  Because when Garfield got injured in

24   the prison system, well, he came home injured that away; and

04:03:28PM 25   his mind was already that way.  And he had served almost

1   14 years, and he came home that way.

2   Q.   So, when he got out of prison, did y'all ever try to get

3   anybody to see him for mental health reasons or to help out

4   with any mental health reasons?

04:03:46PM 5   A.   No, that we did not do.  Huh-uh.

6   Q.   Now, when the crime ends up happening, when he ends up

7   killing the manager at the McDonald's, you said he shows up at

8   your place really early that morning; is that right?

9   A.   Yes, he did.

04:04:02PM 10   Q.   I know you said twice he was acting very strange.

11   What --

12   A.   Yes.

13   Q.   What was he doing?

14   A.   He was just standing with his arms folded, and he was

04:04:13PM 15   just telling me -- and I was asking him what was wrong.  So,

16   he says:  Gladys, nothing.  I want to get ahold of Terrol.

17   And that was our oldest brother.

18   Q.   Okay.  And what about that was strange?

19   A.   Okay.  Well, Garfield began to pace the floor back and

04:04:33PM 20   forth.  He did.

21   Q.   Okay.  Did he seem upset?  Did he seem --

22   A.   No.  That's it.  Garfield wasn't upset.  He was just --

23   you know, he was just calm.  Because, see, Garfield never had

24   too much to say to none of us.

04:04:54PM 25   Q.   So, right after the crime, you said at one point that he

1  is driving your car -- or you woke up once, and he was driving

2  on the way to San Antonio.

3  A.   Yes.  I woke up, and he was driving.

4  Q.   Okay.  And was he also driving when y'all headed over to

04:05:11PM  5  the apartment to go get the passport and the money and --

6  A.   No.  Garfield was not with us.  That was Edward, Jr.

7  Garfield was back at the motel.

8  Q.   Okay.  So, was there a time that Garfield got out of the

9  car and hid behind bushes while people went into the

04:05:32PM 10  apartment?

11  A.   No.  No.  Because Garfield was dropped off at that motel.

12  Q.   Okay.

13  A.   Up on the north side.

14  Q.   So, if -- I know it's been a long time.  It's 19 years.

04:05:55PM 15  A.   Yes.  Uh-huh.

16  Q.   Would you agree that the statements that you made to the

17  police when you were actually arrested for your role in trying

18  to help Garfield get away from Houston, that that would

19  probably also help kind of document a timeline of things that

04:06:10PM 20  are going on with Garfield right after the crime?

21  A.   Well, you know what?  We didn't even suspect that

22  Garfield had done anything.  I didn't even pick up on anything

23  that he had done.  And we didn't even know anything about

24  that.  I didn't.

04:06:27PM 25  Q.   Okay.  So, you didn't hear Garfield tell Eddie Ford that

1    he committed a robbery or that he had shot someone?

2    A.   Oh, Lord, no.  Huh-uh.

3    Q.   How about -- did you ever ask him if he had done

4    something -- that he had done something that he couldn't

04:06:50PM  5    reverse?

6    A.   No.  No.  We never talked about that.

7    Q.   Okay.  If your police statement, which is in

8    Exhibit 17 -- it's the HPD records, 282 through 283.  If the

9    police records show that you asked him something about what

04:07:09PM 10    has he done and he was responding:  If I did something, they

11    deserved it, would that be an accurate statement?

12    A.   Well, you know what?  In that police report statement, I

13    asked Garfield myself was something wrong; and he said no.

14    Q.   Okay.  And, in fact, if in your statement to the

15    police --

16    A.   Yes.

17    Q.   -- page 282, where you said that he told you he didn't

18    want any of his family to know anything about what he'd done

19    because it would be better for us, would that sound correct?

04:07:47PM 20    A.   Well, you know what?  Now, what are you specifying?  I

21    mean -- okay.  Rephrase that, please.

22    Q.   Did Garfield tell you that on that morning, that he

23    didn't want any of you to know anything about what he had done

24    because it would be better for y'all?

04:08:02PM 25    A.   Oh, Lord, no.  Because we didn't know nothing.

1  Q.   Okay.

2  A.   I didn't even know anything, and I opened the door.

3  Q.   Okay.  That hasn't always been your testimony, has it?

4          MR. RYTTING:  Your Honor, I would ask that she lay a

04:08:18PM 5  foundation.  Could she maybe show the witness what that

6  statement --

7          THE COURT:  I think that's where she's headed.

8              Go ahead.

9          MS. HAYES:  Thank you.  May I approach, Your Honor?

04:08:27PM 10  THE COURT:  You may.

11          THE WITNESS:  I need my eyeglasses.

12  BY MS. HAYES:

13  Q.   I am showing Respondent's Exhibit 17, pages 282?

14  A.   I wear eyeglasses.

04:08:44PM 15  Q.   Oh, okay.  I have a magnifying glass.

16  A.   Oh, okay.  That will work.

17          THE COURT:  She's got her glasses.

18          MS. HAYES:  I've got a magnifying glass.

19  A.   I am going to use my eyeglasses.

04:09:22PM 20  BY MS. HAYES:

21  Q.   What I would like to show you is this square that I have

22  marked here in red.  Would you agree if I am reading this

23  correctly:  "Garfield first told me that he did not want any

24  of the family to know anything about what he had done because

04:09:36PM 25  it would be better for us"?

1   *A.*   It's there.  Okay.  I see what the statement says.  But

2   when it gets to the point to where he said Garfield first told

3   me that he did not want any of the family to know anything

4   about what he had done because it will be better for them,

04:09:56PM  5   what Garfield stated was that nothing was wrong.  And I just

6   had to reply back to Garfield was something wrong.

7   And right here to where he said, well, because

8   it would be better for us, what Garfield was saying to me and

9   what he said here:  No, because it has nothing to do with

04:10:21PM  10   anyone else.  And so, he was saying that it was none of my

11   business, basically, and that he was okay.  And then he

12   started talking -- random talking again.

13   *Q.*   Okay.  So, the comment about that it would be better for

14   us was -- yeah.  If you'd look at that part again.

04:10:39PM  15   *A.*   It would be better for us that we did not know anything?

16   *Q.*   Uh-huh.  Page 282, probably right underneath the intro

17   paragraph.

18   *A.*   You know what?  Garfield said -- it says that Garfield

19   told me -- okay.  What Garfield told me is that he didn't want

04:11:09PM  20   any of the family in his business.  That's what he was talking

21   about.  He said he wanted me to get ahold of Terrol.  And so,

22   when they put this statement down here that he had -- that he

23   had done because it would be better for us all.  Okay.  Now,

24   what had happened here, what I said -- I said and they put it

04:11:32PM  25   their way:  Garfield and Edward Ford had gotten into it that

1  same morning.

2  *Q.*   That same morning he, Garfield, and Eddie Ford had gotten

3  into it?

4  *A.*   Yes, they did.

04:11:45PM 5  *Q.*   Okay.

6  *A.*   Uh-huh.  They did.  Then this one I remember where it

7  says -- where Garfield first told me that he did not want any

8  of the family to know anything about what he had done because

9  it would be better for us, Garfield was saying to Edward, Jr.,

04:12:04PM 10  because they had gotten into it, is that if he knew -- well,

11  Edward, Jr., had asked Garfield what was wrong; and me -- I

12  caught the end of it.  Uh-huh.  I did.

13  *Q.*   So, you caught the end --

14  *A.*   Yes, I did.

04:12:19PM 15  *Q.*   -- of Eddie Ford asking Garfield what had happened?

16  *A.*   Yeah, had asked, you know, was anything wrong or did he

17  do something.

18  *Q.*   Okay.

19  *A.*   Uh-huh.  Now that I remember.

04:12:28PM 20  *Q.*   Okay.  Do you remember what the response was?  What did

21  Garfield say?  That was the response?

22  *A.*   Okay.  Garfield stated to Edward Ford that it was none of

23  his business.

24  *Q.*   Okay.  But that's not written in that statement.

04:12:46PM 25  *A.*   Okay.  That's what I am looking at here.  Statements can

1  be put the way they want to be put when some peoples do this.

2  Now, Garfield told me that he did not want any of the

3  family -- any of the family to know anything about what he had

4  done.

04:13:05PM  5  MR. RYTTING:  Your Honor, may I -- sorry to

6  interrupt.  But do you have another copy of that statement?

7  We have -- we don't have any of these exhibits.

8  MS. HAYES:  It is in the -- it is the giant box

9  of --

04:13:31PM  10  MR. RYTTING:  Do you have another copy?  Is this the

11  first statement that you're talking about?

12  MS. HAYES:  It's her second statement to police.

13  Her two statements to the HPD are at 278.

14  MR. RYTTING:  Is this a police report?

04:13:45PM  15  MS. HAYES:  Her signed statements to police when she

16  was arrested.  The first statement is pages 278 to 280, and I

17  am asking her about 281 or 282.

18  THE COURT:  How much longer do you think you are

19  going to be with this witness?

04:14:04PM  20  MS. HAYES:  I think I've pretty much got the answer

21  on that.  Maybe less than five minutes.

22  BY MS. HAYES:

23  Q.   Okay.  Let me go ahead and move on to something else,

24  then.  Thank you.

04:14:15PM  25  On the morning that Garfield is there in your

1  apartment, did there come a time when you found out that

2  Garfield's -- that Eddie Ford had taken Garfield's gun?

3  A.   Now, all I know about that is that -- that was an

4  argument that had went on, and all I know is that Garfield had

04:14:42PM 5  called from the motel room.  He said that Eddie Ford had taken

6  something that belongs to him.

7              And so, I asked him what was it.

8              So, he said:  Just tell Eddie Ford to bring

9  back what he had taken.  But, see, I didn't actually see it,

04:15:01PM 10  the gun or know what it was.  But, see, Eddie Ford did.

11  Q.   Okay.  So, it is your testimony today that Garfield told

12  you that he was looking for something; but Garfield never told

13  you he was looking for the gun that Eddie Ford took from you?

14  A.   Was Garfield looking for the gun?  No.  Garfield told me

04:15:22PM 15  on the telephone -- he said that Eddie Ford had went in to his

16  duffel bag and that he had taken something out of the bag and

17  that he wanted it back.

18  Q.   Okay.  So, are you -- you're testifying today that he

19  never told you it was his gun that had been taken out of the

04:15:41PM 20  bag.  Is that what you are saying today?

21  A.   That's what I am saying today.  Because, see, the part

22  about the gun, that came up like when we was out of town.

23  But, also, Eddie Ford -- his wife had told me he had brought

24  something in the house in a box.  Yeah, she did.

04:16:10PM 25  Q.   I've got to do it again.

1          MS. HAYES:  May I approach?

2          THE COURT:  You may.

3          MS. HAYES:  All right.  It's still HPD 282.

4     BY MS. HAYES:

04:16:24PM 5     Q.  I've got it right here.  It is the last paragraph on page

6     282, and it starts here -- would you agree I'm reading this

7     right -- "After we let Garfield out at the Olympic Motel, I

8     called him later that day.  He told me that he was looking for

9     Edward, Jr., because Edward, Jr., had taken his gun out of his

04:16:47PM 10    gym bag.  I then went" -- and then you go on and tell about

11    going to recover the weapon.

12              But then do you remember giving Garfield back

13    the gun, taking the gun to go give it back to Garfield?

14    A.  No.  You know what?  I didn't take the gun back.  What it

04:17:09PM 15    was -- what was in the box, it was stating it was a gun.  But,

16    see, that's when my son came in at.  He followed me and I gave

17    the box to my son and he took it to the motel.

18    Q.  Okay.  So, you and James went back to the motel with a

19    box that you knew now had a gun in it to go give it back to --

04:17:31PM 20    A.  No.  See, me and James didn't go back to the motel.  My

21    son came back home and my son got the box and he took it to

22    the motel himself.  And he told me that he would take it from

23    there.

24    Q.  Good enough.

04:18:14PM 25              MS. HAYES:  Nothing further, Your Honor.

1          THE COURT:  Thank you.

2               Any redirect?

3          MR. RYTTING:  No, Your Honor.

4          THE COURT:  All right.  Thank you.  You may step

04:18:23PM  5   down, Ms. Aldridge.

6          THE WITNESS:  Thank you, sir.

7        (Witness released)

8          THE COURT:  All right.  I think that should wrap it

9   up for today.  We will start back at 9:00 o'clock in the

04:18:33PM 10   morning.  So, I will see everyone here at 9:00.

11        (Proceedings concluded for the day)

12                        * * *

13   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled cause, to the best
14   of my ability.

15

16   //s_____        12/03/2009
     Stephanie Kay Carlisle-Neisser CSR, RPR        Date
17   Official Court Reporter

18

19

20

21

22

23

24

25