```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION


 3
     RULFORD G. ALDRIDGE,        .  Civil Action
 4                               .  No. H-05-608
              Petitioner,        .
 5                               .
                                 .
 6   VS.                         .
                                 .
 7                               .
     NATHANIEL QUARTERMAN,       .
 8                               .  February 27, 2009
              Respondent.        .  9:16 A.M.
 9                               .  HOUSTON, TEXAS

10                   TRANSCRIPT of PROCEEDINGS
               BEFORE THE HONORABLE GRAY H. MILLER
11                 UNITED STATES DISTRICT JUDGE

12   APPEARANCES:


13


14   FOR PETITIONER:           MR. JAMES GREGORY RYTTING
                               MR. PHILIP HARLAN HILDER
15                             Hilder & Associates, PC
                               819 Lovett Boulevard
16                             Houston, Texas 77006

17   FOR RESPONDENT:           MR. KATHERINE D. HAYES
                               MR. GEORGETTE P. ODEN
18                             Office of Texas Attorney General
                               P.O. Box 12548
19                             Austin, Texas 78711

20


21


22   ALSO PRESENT:             Mr. Rulford G. Aldridge

23


24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

1   **APPEARANCES (Continued):**

2

3   OFFICIAL COURT REPORTER: MS. STEPHANIE KAY CARLISLE-NEISSER
                             U.S. District Court
4                            515 Rusk, Suite 8016
                             Houston, Texas 77002
5                            713.250.5157

6

7

8

9

10

11                          *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2                                                    PAGE

3

4   WITNESSES:

5   DR. DIANE MOSNIK

6        Direct Examination by Mr. Rytting..........192
        Cross-Examination by Ms. Oden..............235

7

8

9                          * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **P R O C E E D I N G S**

2                    (February 27, 2009)

3                    THE COURT:  All right.  Are you are ready to

4    proceed?

09:16:14AM  5                    MR. RYTTING:  Yes, Your Honor.

6                    THE COURT:  Who is your next witness?

7                    MR. RYTTING:  Diane Mosnik will be our next witness.

8    Before we proceed with that, we had several exhibits --

9    several exhibits, three of which were brought to the Court's

09:16:40AM  10   attention yesterday.  They are the -- and I will show them to

11   opposing counsel -- the trial testimony of Virginia Lee

12   Aldridge, Cheryl Aldridge, and Brenda Garrett.

13                    THE COURT:  All right.  And have you marked those

14   as --

09:16:57AM  15                    MR. RYTTING:  We have marked them as Exhibit --

16   Brenda Garrett's as Exhibit 38, Virginia Lee Aldridge's

17   testimony as Exhibit 39, and Cheryl Aldridge's is Petitioner's

18   Exhibit 40.

19                    THE COURT:  All right.

09:17:20AM  20                    MS. ODEN:  Can we have a copy?

21                    THE COURT:  Do the Respondents have any objection to

22   those exhibits?

23                    MS. ODEN:  No, Your Honor.

24                    THE COURT:  All right.  They'll be admitted.  And if

09:17:31AM  25   you can provide a copy to the other side, that would be

         1   useful.

         2         (Exhibits admitted.)

         3             MR. RYTTING:  Finally, Exhibit 41, which is

         4   Dr. Mosnik's updated curriculum vitae.

09:17:56AM  5             THE COURT:  All right.  Any objection?

         6             MS. ODEN:  No.

         7             THE COURT:  All right.  It's admitted.

         8         (Exhibit admitted.)

         9             THE COURT:  All right.  Are you ready for the

09:18:05AM 10   witness?

        11             Doctor, raise your right hand and be sworn in.

        12         (**DIANE MOSNIK, M.D.,** Petitioner's witness, Sworn.)

        13             THE COURT:  All right.  If you'll have a seat in the

        14   witness chair, please.

        15                     **DIRECT EXAMINATION**

        16   **BY MR. RYTTING:**

        17   *Q.*   Dr. Mosnik, can you identify yourself for the Court and

        18   the record?

        19   *A.*   Yes.  My name is Diane, D-I-A-N-E; middle initial M; last

09:18:41AM 20   name Mosnik, M-O-S-N-I-K.

        21   *Q.*   And can you briefly state what you were retained to do in

        22   this case?

        23   *A.*   Yes.  I was asked to do a diagnostic evaluation and

        24   competency evaluation on Mr. Aldridge.

09:19:01AM 25   *Q.*   Could you describe your qualifications?

1  *A.*   Certainly.  I completed my Ph.D. at the Finch University

2  of Health Sciences/The Chicago Medical School in north

3  Chicago, Illinois, with a Master's and dissertation topic in

4  the area of schizophrenia.

09:19:21AM  5         I completed an internship and fellowship with a

6  special focus in the area of clinical neuropsychology and

7  schizophrenia.  And I have been practicing in the field as a

8  clinical neuropsychologist licensed in the states of Texas and

9  Wisconsin since 2001.

09:19:37AM 10  *Q.*   Do you have any grants or publications?

11  *A.*   I do.

12  *Q.*   Could you briefly describe what those are?

13  *A.*   Since I have been practicing and while in graduate

14  school, I obtained three independent -- independently funded

09:19:52AM 15  grants to study in the areas of schizophrenia and

16  neuroimaging, and I have a number of presentations and

17  publications at national conferences in the area of

18  schizophrenia and neuropsychology.

19  *Q.*   And do you have any training or education in forensic

09:20:11AM 20  psychology?

21  *A.*   I do.  Yes.  I participated in forensic psychology

22  classes as part of my graduate training program as well as

23  undergraduate.  And since obtaining my license, I have

24  participated in conferences specifically designated for the

09:20:28AM 25  training of forensic psychologists.  So, several of the

1   conferences where you're trained in understanding the legal

2   aspect and clinical assessment in forensic competency

3   evaluations.  I also complete continuing education credits in

4   the area of forensic psychology.

09:20:49AM  5   Q.   Have you had any experience in other cases as a --

6   A.   I have.

7   Q.   -- doing a forensic diagnosis?

8   A.   Yes, I have.

9   Q.   And what in particular?

09:21:00AM  10   A.   I have a handful of cases in the area of criminal

11   competency evaluations; but I do, on a regular basis in my

12   clinical practice, several cases a month in determining the

13   competency of individuals in a variety of contexts.  So, the

14   ability to make medical decisions, financial decisions, care

09:21:24AM  15   for themselves, engage in legal contracts, that sort of thing.

16   Q.   And do you have to make a judgment about when their --

17   let's call it their level of mentation started to deteriorate

18   in the past?

19   A.   I do.  That is a regular part of my practice.

09:21:40AM  20   Q.   And, Dr. Mosnik, what were you asked to do in this case?

21   A.   Well, I believe I was called in specifically given my

22   expertise in the area of schizophrenia, that this was a

23   question in this case; and as you're aware, it is a little bit

24   atypical to do a retrospective evaluation.  But the reason

09:22:06AM  25   that I was asked to do this is because, given the diagnosis of

1  schizophrenia, there's evidence in the literature that

2  suggests that the disease, that the type and severity of the

3  symptoms in terms of the delusions, hallucinations, as well as

4  the cognitive dysfunction associated with schizophrenia is

09:22:25AM  5  present during the prodromal and initially acute phase of the

6  disorder.  So, it would be reasonable that an evaluation that

7  I conducted in 2006 would be very similar to the patient's

8  presentation at the time of the trial.

9  Q.   Okay.  We'll get into that a little bit later in more

09:22:45AM 10  detail, I believe.

11         In preparing for this -- in preparing to form

12  an opinion about Mr. Aldridge's competency, what type of

13  investigation did you do?

14  A.   I did a clinical diagnostic and neuropsychological

09:23:05AM 15  evaluation to determine whether or not he met the criteria for

16  diagnosis of schizophrenia, determine the nature and severity

17  of his symptoms, the level of cognitive dysfunction associated

18  with that to determine if that pattern met the criteria for

19  the diagnosis of schizophrenia, how long he has been diagnosed

09:23:23AM 20  or had symptoms that would meet criteria for a diagnosis of

21  schizophrenia, and then the forensic aspect, whether or not he

22  understood the proceedings and of course the case against him,

23  his understanding of -- the factual understanding of the legal

24  proceedings and issues related to competency in that arena.

09:23:45AM 25  Q.   And did it you produce a report based on this -- well,

1    let me strike that.

2               Did you -- what did you review in terms of

3    records?

4    A.   I reviewed extensive records, including the T.D.C.J., the

5    juvenile records.   I reviewed all the records from around the

6    time of the trial, including the testimony during the

7    punishment phase by Mr. Bates, the statements and affidavits

8    of Mr. Aldridge's sisters, letters and things that were

9    available in the records, T.D.C. records, all of those.

10   Q.   Did you review any other reports by other psychologists

11   in this case?

12   A.   I did.   I reviewed the initial competency evaluation

13   conducted by Dr. Quijano in March of 1990.   I reviewed the two

14   competency evaluations completed by Dr. Brown in 1995 as well

15   as the evaluation completed by Dr. Silverman in 1995, and I

16   also reviewed and incorporated a number of the writings and

17   summations that Mr. Aldridge completed.

18   Q.   Okay.   And just for the record, those psychological

19   evaluations would be Petitioner's No. 1, which is the March

20   27th, 1995, psychological evaluation by Dr. Jerome Brown; is

21   that correct?

22   A.   That is correct.

23   Q.   As well as Petitioner's No. 8, which is the forensic

24   psychological evaluation by Walter Quijano; is that correct?

25   A.   That's correct.

1   *Q.*   And the two others are respectively Petitioner's No. 5,

2   which is the January 27, 1995, competency evaluation by Edward

3   G. Silverman and the January 31, 1995, psychological

4   evaluation by Dr. Jerome Brown.

09:25:56AM 5   *A.*   That's correct.

6   *Q.*   And in preparation did you also review the depositions of

7   Dr. Thomas Allen and Dr. Walter Quijano?

8   *A.*   Subsequent to the submission of my report, yes, more

9   recently.

09:26:28AM 10   *Q.*   Did you attempt to interview anybody in this case?

11   *A.*   I did.  I had a meeting scheduled with Mr. Douglas Davis

12   and went to his office downtown here in Houston.  I waited for

13   an hour and a half, and he didn't present for that meeting.  I

14   attempted to contact him by phone and was eventually able to

09:26:45AM 15   do that, and he had said that he wasn't able to make that

16   meeting nor to reschedule with me.

17   *Q.*   Did you review any scientific literature in preparation

18   for your testimony today or -- first in preparation for -- in

19   preparing for the report?

09:27:12AM 20   *A.*   I did, extensively.  In reading the literature on

21   schizophrenia and related fields to my practice on a monthly

22   basis, schizophrenia specifically every other month.  But I

23   have in particular when I was working on the case and more

24   recently.

09:27:30AM 25   *Q.*   Were you able to make a diagnosis in 2006?

1  A.   I was.

2  Q.   And what was that diagnosis?

3  A.   Schizophrenia, paranoid type with features of

4  disorganized type.

09:27:50AM 5  Q.   Would you describe for the Court a little bit about -- or

6  explain the nature of the illness, the nature of

7  schizophrenia, for the Court?

8  A.   Well, schizophrenia is a brain disorder.  It is a

9  disorder of thinking, as Dr. Quijano mentioned; but it is also

09:28:10AM 10  a disorder of impaired perception.  So, an individual who has

11  schizophrenia misperceives or has an inability for their brain

12  function, their sensory function, to perceive incoming sensory

13  information from the environment.  So, they perceive thoughts

14  and things that are occurring in their brain as actual sensory

09:28:32AM 15  phenomena.  They have difficulty ascribing agency and action

16  to their own actions and owning their own actions, and these

17  are tied to neurobiological subtraits to the structural and

18  functional working of the brain.

19  Q.   What are some of the symptoms that are typical or

09:28:52AM 20  characteristic of schizophrenia?

21  A.   There's a couple of categorizations.  So, typically they

22  are referred to as the positive and negative symptoms of

23  schizophrenia.  But positive symptoms are those that are seen

24  greater than, if you will, in the normal population.  So,

09:29:08AM 25  things that are above and beyond normal perception.  So,

1  delusions, auditory hallucination, visual hallucinations,

2  formal thought disorder.

3            And then the negative symptoms are loss of

4  certain functions like apathy; loss of affective responsivity,

09:29:28AM 5  so loss of emotional processing; loss of social contacts,

6  friends, dating, romantic relationships, that sort of thing.

7  Q.   Is there also a category generally described as

8  disordered thinking?

9  A.   Yes.  What we call formal thought disorder.

09:29:45AM 10  Q.   And what does that include?

11  A.   It's in the area of expressive language.  So, it's a way

12  that we measure a person's thoughts.  So, that can take the

13  form of thought blocking where an individual is speaking and

14  is experiencing thoughts and then they suddenly stop and they

09:30:04AM 15  lose their train of thought; but it is a rather abrupt and

16  complete loss of that train of thought.

17            Thought insertion where thoughts can be

18  inserted and they don't experience them as their own.  Poverty

19  of content of speech and poverty of speech.  So, a person

09:30:23AM 20  could maybe not speak very much or they may speak very

21  fluently and speak a great deal, but there's not a lot of

22  content or meaning included in what they're saying.

23  Illogicality of speech, so they can talk about a lot of

24  things; but the speech is illogical in sequence and in

09:30:43AM 25  meaning.

```
 1  Q.   And in this case was -- were these symptoms, positive and

 2  negative symptoms, as well as the disordered thinking present

 3  when you interviewed Mr. Aldridge?

 4  A.   Yes, they were.  All of them were.

 5  Q.   And can you describe in a little bit more detail what

 6  symptoms he was suffering from, in your opinion, during the

 7  interview?

 8  A.   Of course.  In regards to the positive symptoms,

 9  Mr. Aldridge demonstrated a number of delusional material.

10  Specifically, he had delusions of control, delusions of

11  persecution, and semantic delusions as well as grandiose

12  delusions and significant religious delusions.

13  Q.   What are semantic delusions?

14  A.   They're the report of physical symptoms, such as an

15  illness or pain or a deformity in their body, that is not

16  associated with any medical entity or by observation with

17  patients reporting that is not physically there.  So, they may

18  report, you know, a cut or something or a bump; and then when

19  examined by a physician, that doesn't exist.

20  Q.   And when it comes to auditory hallucinations, are -- and

21  especially in Mr. Aldridge's case, are there several types

22  besides just hearing a voice?  Do they sometimes hear

23  conversations?

24  A.   Yes.  Mr. Aldridge did experience auditory hallucinations

25  as well as visual hallucinations.  His auditory hallucinations
```

09:30:59AM (line 5)
09:31:18AM (line 10)
09:31:47AM (line 15)
09:32:07AM (line 20)
09:32:24AM (line 25)

were comprised of a couple of subtypes.  Voices conversing,

where you hear a number of voices talking to each other and

speaking to you; as well as command hallucinations where there

is a single voice or multiple voices speaking directly to you

09:32:46AM 5  and commanding you to do something.

6  Q.   And the visual hallucinations, were you able to identify

7  any or characterize their content?

8  A.   Yes.  They were visually perceiving spirits, sort of

9  vague, visual, human form what he described as spirits and

09:33:13AM 10  individuals that were coming after him, watching him.

11  Q.   Were these symptoms, these hallucinatory symptoms,

12  present throughout the interview, in your opinion?

13  A.   Yes.

14  Q.   And what is a delusional system?

09:33:39AM 15  A.   Well, a delusional system is an incorporation of sort of

16  an overriding theme to the delusional content.  It can be an

17  incorporation of several types of delusions, as in this case.

18  So, there's some grandiose, some religious, and some

19  persecutory delusions; and they're interwoven into the

09:33:59AM 20  person's perception of their world.  That's how they view

21  their world.  So, we describe them that way.

22  Q.   And in your opinion, did he have a delusional system?

23  A.   He did, yes.

24  Q.   And would you describe it as fixed?

09:34:17AM 25  A.   I would, yes.

1  *Q.*   And what does that mean?

2  *A.*   Fixed means that it is relatively permanent.  It is

3  firmly held and firmly believed, regardless of any data that

4  you can present that might disconfirm that belief system or

09:34:34AM 5  theory that they have.

6  *Q.*   And what were some of the techniques or methods that you

7  used to determine -- or make your diagnosis, first of all, of

8  Mr. Aldridge's mental illness?

9  *A.*   I used a number of symptom rating scales that have been

09:34:55AM 10  in the field of schizophrenia for a number of years; the scale

11  for the assessment of positive symptoms, scale for the

12  assessment of negative symptoms, the brief psychiatric rating

13  scale.  So, during the course of the clinical interview, I

14  interviewed the patient to see if those symptoms present

09:35:11AM 15  themselves during the clinical interview, then with direct

16  query of the patient regarding those symptoms, and then a

17  neuropsychological evaluation where I administered a number of

18  cognitive measures, looking for a specific pattern of deficits

19  that we see in cognitive testing in patients with

09:35:32AM 20  schizophrenia.

21  *Q.*   And are you familiar -- what do you think is the

22  relationship of Mr. Aldridge's mental illness to the issue of

23  competency?

24  *A.*   I think his disorder specifically is related because of

09:35:52AM 25  the severity and nature of his delusional network, his

1   delusional symptoms.  So, the severity of them, the

2   pervasiveness of them, the degree to which he believes them,

3   and the pervasiveness by which they overtake his life and his

4   perception of the world around him.

09:36:13AM 5   Q.   Are you familiar with the standards of competency to

6   stand trial?

7   A.   I am.

8   Q.   And what is your understanding of what those standards

9   are?

09:36:22AM 10   A.   For the competency to stand trial, there are two prongs:

11   that an individual has to have sufficient present ability to

12   consult with their attorney with a reasonable degree of

13   rational understanding; and, two, they have to have a rational

14   as well as factual understanding of the proceedings against

09:36:39AM 15   them.

16   Q.   And in your opinion was -- did Mr. Aldridge satisfy

17   either of those prongs?

18   A.   No.  I don't believe that he did.

19   Q.   At the time of your interview?

09:36:51AM 20   A.   Yes.  That is correct.

21   Q.   And what did you do to determine whether he satisfied

22   either of the standards for competency?

23   A.   I asked questions relating to his understanding of the

24   proceedings against him.  He was able to tell me that he was

09:37:21AM 25   on death row for capital murder.  However, he was never able

1   to state that in the absence of his delusional explanation for

2   that.  So, while he said:  I'm on death row for capital

3   murder.  I didn't commit any murders.  They murdered me.  They

4   are trying to murder me by setting me up for capital murder

09:37:43AM   5   and would go on and on in his delusional network.  So, he was

6   never able to state or recognize that he was actually on death

7   row because he committed an act of -- you know, that he did

8   that act.

9           And I also asked additional questions about his

09:37:58AM   10   understanding of the court system, and we talked specifically

11   about:  Within the domain of the adversarial nature, do you

12   understand that there's going to be a side that's against you

13   and there's a side that's for you?  And he understood the

14   system -- that the entire system is against him.  So, he was

09:38:17AM   15   not able to differentiate that there were people that were, in

16   fact, working for him.  So, he was able to say that, you know:

17   I have an attorney appointed to me.  I am supposed, I should

18   say, have an attorney appointed to me but I haven't had any

19   attorneys who have actually worked for me or who have been

09:38:35AM   20   helpful to me and they are all part of this conspiracy.

21           So, again, he was never able to see that he

22   actually has attorneys who have been, you know, working for

23   him or report any of that information separate from his

24   delusional explanation.

09:39:11AM   25   Q.   Would it help if you had a copy of your report to

1  testify?

2  A.    Sure.

3          MR. RYTTING:  If I may approach?

4          THE COURT:  You may.

09:39:37AM  5  A.    Thank you.

6  BY MR. RYTTING:

7  Q.    This is Petitioner's Exhibit No. 7, the report of

8  Dr. Mosnik.  If you would turn to page 6, the second full

9  paragraph, you say that "The client was unable to discuss the

09:40:28AM  10  certain events that led to his arrest and conviction without

11  reference to delusional ideas and his persecutory explanation

12  for the situation."  And then you give an explanation of why

13  this is so, I believe.

14          Could you please expound on how you came to

09:40:48AM  15  that conclusion?

16  A.    Right.  That was particularly related to both data that I

17  reviewed from Dr. Quijano's report, in terms of the patient's

18  ability to explain the sequence of events and the time frame

19  more contemporaneous with the actual crime, as well as

09:41:04AM  20  questions that I asked him during my clinical interview in

21  2006 and found, you know, the same -- essentially the same

22  presentation, that his delusional network was the explanation

23  for the events leading up to the crime and were actively

24  ongoing at the time of the crime.

09:41:25AM  25          Did I answer your question, or was there

1    another part?

2    Q.   No.   That answered the question.

3              You've read the reports of Dr. Brown, and you

4    heard his testimony yesterday?

09:41:38AM 5    A.   Yes, I did.

6    Q.   And in 1995 you came to the conclusion that -- if this is

7    correct -- Mr. Aldridge was suffering from schizophrenia,

8    correct?

9    A.   Yes.

09:41:46AM 10    Q.   And that his perception of his legal situation was

11    intertwined and completely colored by his mental illness, his

12    delusional system; is that correct?

13    A.   Yes.

14    Q.   And were your findings in 2006 similar to what Dr. Brown

09:42:07AM 15    found?

16    A.   They were, yes.

17    Q.   And in what ways?   What were some of the most significant

18    ways?

19    A.   Well, the same thing; just that the severity and the

09:42:17AM 20    extent of his delusional network, the content of his delusions

21    was very consistent over time and really just the fixed nature

22    of -- the degree in which he believed these and the

23    pervasiveness of those delusions.

24    Q.   And you also heard Dr. Quijano testify and read his

09:42:36AM 25    report, correct?

1  *A.*   I did, yes.

2  *Q.*   And were your findings in 2006 similar to what

3  Dr. Quijano found in 1990 during his clinical interview?

4  *A.*    In his clinical interview, yes, very much so.

09:42:50AM 5  *Q.*   Could describe -- in what ways?  What were the most

6  significant ways they were similar?

7  *A.*    Well, in terms of making his clinical diagnosis,

8  Dr. Quijano describes elaborately -- it says delusional

9  network expressed by Mr. Aldridge at that time.  So, you know,

09:43:08AM 10  the persecutory delusions are grandiose, the religious

11  delusions.  They're intertwined in his experience of the

12  events leading up to the crime, during the actual time of the

13  crime.  They are even included in his supposedly factual

14  rendering of his understanding of the court proceedings.

09:43:31AM 15  *Q.*   And were you able to review any evidence -- Dr. Quijano

16  made these findings prior to the trial, of course; is that

17  correct?

18  *A.*   Yes.

19  *Q.*   A month beforehand.

09:43:43AM 20  *A.*   Yes.

21  *Q.*   Approximately.

22  *A.*   It was back in March of 1990.

23  *Q.*   Did you also review this -- some of the evidence -- or

24  all the evidence that Mr. -- that Dr. Quijano had at his

09:43:56AM 25  disposal when he made his -- when he published his report in

1  May 15th of 1990?

2  *A.*   Yes, I did.

3  *Q.*   And those would include writings of Mr. Aldridge that

4  were introduced at trial?

09:44:13AM  5  *A.*   Yes, they do include those.

6  *Q.*   And they included as well the -- pardon me.

7              Did you also review the evidence that

8  Dr. Quijano relied upon when he provided his statement in

9  2006?

09:44:57AM 10  *A.*   You mean the data that came in after his evaluation, like

11  the court records, the testimony of Mr. Bates?

12  *Q.*   Yes.

13  *A.*   Yes, I have.

14  *Q.*   And upon considering both the report of Dr. Quijano and

09:45:12AM 15  the testimony of Mr. Bates, would you agree with Dr. Quijano's

16  conclusion that Aldridge was incompetent to stand trial?

17  *A.*   At the time of the trial?  Yes, I absolutely agree with

18  that.

19  *Q.*   If you would, please -- was there any other evidence that

09:45:46AM 20  you found in the record that indicated that Mr. Aldridge was

21  incompetent at the time of trial?

22  *A.*   I'm not sure what you're asking.

23  *Q.*   Well, upon review of some of the records in this case,

24  including -- well, strike that.  I will turn to a different

09:46:15AM 25  line of questioning at the moment.

1                What is it about Mr. Aldridge's diagnosis, his

2    schizophrenia, that is relevant to the question of his

3    incompetency at the time of trial based on your 2006 report?

4    A.    Right.  If you can establish a patient meets all the

09:46:41AM 5    criteria for a diagnosis of schizophrenia, the definition of

6    the disorder -- and there's extensive information provided in

7    the scientific literature that document -- that these

8    symptoms, the delusions and the cognitive functions associated

9    with the disorder, are present at the initial onset of the

09:47:00AM 10   disease.  So, the disease is not one of neurodegeneration as

11   in, say, something like dementia where it starts out with mild

12   and gets progressively worse.  The brain dysfunction and the

13   symptoms that are present in the disease are present at the

14   beginning of the disease.

09:47:16AM 15                So, they are present from day one and can be as

16   severe at that time as later.  So, the fact that he has

17   schizophrenia at that time and at the time that I saw him and

18   the deficits that I saw in 2006, I can, you know, make the

19   assertion that those were present at the time of the trial.

09:47:38AM 20   Q.    So, when you reviewed Dr. Quijano's report, was it clear

21   to you that he had a full-blown -- what -- what you might call

22   full-blown schizophrenia?

23   A.    Absolutely.  He was psychotic.

24   Q.    So, he was in what you might call an acute phase?

09:47:57AM 25   A.    Well, I have to say I don't know that Mr. Aldridge has

210

1    been in acute phase.  His symptoms have appeared to be fairly

2    severe and significant, pervasive, since the beginning.  So, I

3    don't know if it was an acute phase; but it was certainly an

4    active pervasive phase with active positive and negative

09:48:18AM  5    symptoms at that time.

6    Q.    Were you able to make a determination of when this

7    disease first broke or the onset of it, or did you come to an

8    approximate time?

9    A.    I did, yes.

09:48:32AM 10    Q.    And what was that?

11    A.    The best I could put together with the information from

12    the sister's report, the writings of Mr. Aldridge himself, and

13    other records, I believe it was around 1980 or around that

14    time.

09:48:46AM 15    Q.    And this is consistent with some of the estimations of

16    the onset of this disease that you've seen in other records

17    and reports by other psychologists?

18    A.    It is, yes.

19    Q.    In Dr. Quijano's 1990 report he described a -- a defense

09:49:30AM 20    that Mr. Aldridge was going to put on, a defense that involved

21    sexual assault by the victim and by his spirits.

22    A.    Yes.

23    Q.    Do you recall that?

24    A.    I do.

09:49:45AM 25    Q.    What type of defense, in your view, is this?

1    *A.*    I would say that's an irrational defense.

2    *Q.*    And is there any evidence that he persisted in this

3    defense throughout trial?

4    *A.*    Yes.  I believe there is evidence that supports that

09:50:01AM  5    conclusion.

6    *Q.*    What was that?

7    *A.*    The testimony of Mr. Bates during the punishment phase of

8    the trial, so their reports of difficulty communicating with

9    the patient and presenting alternate defense strategies; that

09:50:16AM 10    the one thing that Mr. Davis remembers, despite full

11    recollection of the trial, is that the client, Mr. Aldridge,

12    repeatedly spoke about being sexually molested by the client

13    [sic].  That's one thing that stood out in his head and from

14    what he recalled from his time at the trial working with

09:50:39AM 15    Mr. Aldridge.

16    *Q.*    Is it fair to say that he persisted in a delusional

17    defense throughout trial?

18    *A.*    Yes.  That is my perception.

19    *Q.*    And Mr. Aldridge also has a diagnosis of paranoid

09:50:51AM 20    schizophrenia, does he not?

21    *A.*    That's correct.

22    *Q.*    What does that mean?  Paranoid part?

23    *A.*    Well, it really refers to the nature of the content of

24    his delusions.  So, a significant portion of his delusions

09:51:07AM 25    revolve around persecutory delusions.  They're individual

1    spirits, groups, organizations that are out to get him, that

2    are out to murder him, harm him, that are torturing him,

3    physically abusing him, molesting him.  So, they are against

4    him.  They are not there to help him, including the judicial

09:51:26AM   5    system, whereas, judges, everybody that's been involved in

6    this case is part of that persecutory delusion that they are

7    out to get him.

8    Q.   And have you seen any evidence in the record of

9    Mr. Aldridge's incorporating people in the legal system --

09:51:43AM   10   lawyers, judges -- into his paranoia delusional system?

11   A.   Yes.  That was pervasive during my interview with him.

12   In fact, you were frequently spoken about, Mr. Rytting.

13   Q.   In what sense?

14   A.   In the sense that he recognized you were appointed as his

09:52:02AM   15   attorney, but he stated specifically that he had recused you;

16   that you were not, in fact, his attorney and you were part of

17   this ploy in this government conspiracy; that you were, in

18   fact, not working to help him; that you were against him.

19   Q.   And has he come to the same conclusions about other

09:52:20AM   20   attorneys in the past?

21   A.   Yes.  He was actually able to name almost all of his

22   attorneys and the judges involved in his cases, and all of

23   them are involved in this network of Nazis and Sufi mystics

24   that are out to murder him, release other prisoners from

09:52:39AM   25   prison to come after him and torture him and torturing him

1   with spirits.  So, yes.

2   Q.   And was this -- was there some evidence that he had

3   already -- that he was incorporating his attorneys, Doug Davis

4   and Randolph Bates, into his delusional network at the time of

09:52:57AM 5   trial?

6   A.   Yes.

7   Q.   What was that?

8   A.   Well, I think in Mr. Bates' testimony he talks about that

9   and alludes to that.  And in Dr. Quijano's report there's some

09:53:07AM 10   evidence of that, as well.

11   Q.   And what about the statement of Brenda Garrett?

12   A.   Yes.  During her visits to the prison to see

13   Mr. Aldridge, yes, she also reported that.

14   Q.   If you have a client who is suffering from this type of

09:53:27AM 15   schizophrenia, paranoid schizophrenia, is it possible for his

16   attorneys to convince him that they are not in a conspiracy

17   against him?

18   A.   No.

19   Q.   And they confront him with evidence to the contrary?

09:53:44AM 20   A.   No, it is not.

21   Q.   And why is that?

22   A.   There is research, in fact, conducted that shows that

23   patients with schizophrenia, particularly those with delusions

24   and paranoid schizophrenia, have an inability, a brain

09:53:58AM 25   inability, to incorporate or what's known as a bias against

1    the incorporation of disconfirmatory evidence.  So, they stick

2    in their -- again, the fixed nature of delusions, they stick

3    with their statement and belief, as illogical as it may seem,

4    even in the face of contradictory information.

09:54:17AM  5    Q.   And this is different from simply being stubborn, isn't

6    it?

7    A.   It is.  Their brain is literally telling him that their

8    view is correct.

9    Q.   And when you say "the brain is telling them," can you

09:54:28AM  10   explain a little bit about what's going on and why that is the

11   case?

12   A.   Sure.  The synapses are firing and giving them

13   information.  The brain is not able to discriminate whether

14   that information is coming from an internal source versus an

09:54:44AM  15   actual tangible environmental source.  So, it is interpreted

16   as real.  So, when they hear a voice telling them something,

17   it literally reacts in the brain as if they are hearing --

18   like my voice right now is being transmitted to your ears, the

19   same sensory stimulation and brain interpretation that is

09:55:05AM  20   going on.  They are not able to discriminate between the two.

21   Q.   And is the same -- is it the same sort of biological

22   connection with the delusional system that they form, as well?

23   A.   It is.  That's more extensive.  So, there is shown to be

24   involvement of the thalami, bilateral thalami, which is

09:55:23AM  25   considered the neuro relay center, if you will, in the brain.

1  The projections to the frontal lobes, the mesial and dorsal

2  prefrontal cortices are involved --

3           THE REPORTER:  I'm sorry.  Can you slow down?

4           THE COURT:  You're going to have to slow down a

5  little bit.  You may have to spell a couple of those.

6           THE REPORTER:  Can you speak up a little bit louder?

7           THE WITNESS:  Okay.  Sure.

8           THE REPORTER:  If you can start over.  "That's more

9  extensive."

10           THE WITNESS:  Could you read a little more of that,

11  please?

12           THE REPORTER:  "There is shown bilateral" --

13  A.   -- thalamic, T-H-A-L-A-M-I-C, nuclei involvement in the

14  brains of schizophrenias, as well as the projections from the

09:55:53AM 15  sensory regions of the brain to the frontal cortex.  The

16  mesial and dorsal prefrontal cortices, C-O-R-T-I-C-E-S, are

17  shown to be dysfunctional both in terms of miroimaging studies

18  and structurally.  In addition, there's been shown to be

19  hypometabolism by neuroimaging studies in the left temporal

09:56:18AM 20  and left occipital lobes with patients of schizophrenia,

21  particularly those with delusions of a religious nature and

22  paranoid nature.

23  Q.   So, through an active will or through an active

24  concentration, can Mr. Aldridge disabuse himself of his

09:56:44AM 25  delusional system?

1  A.   No.  They can talk through it and talk about other

2  things, but they are always present.  They cannot stop them on

3  their own freewill.  They cannot stop them or make them go

4  away.

09:56:58AM  5  Q.   So, they can no more do that than somebody can will their

6  diabetes to go away.  Is that fair to say?

7  A.   That's correct.

8  Q.   It is an organic, physical -- physically-based,

9  biologically-based ailment.  Is that fair to say?

09:57:14AM  10  A.   That is correct.

11  Q.   And earlier you talked about problems with agencies that

12  you noticed with Mr. Aldridge.

13  A.   Uh-huh.

14  Q.   What is an example that you saw when you interviewed him?

09:57:53AM  15  A.   Well, when he is talking about the actual crime that

16  he -- he said to me during my interview, as well as during

17  Dr. Quijano's interview, that there was another presence that

18  was there that was making him blackout and that was telling

19  him, you know, to do this.  In fact, it had been present for a

09:58:11AM  20  period of months prior to this.  A command hallucination is

21  what we would term it clinically.  But this voice was present

22  that was urging him to do this and he was blacking out and he

23  did not feel that he actually committed the act.

24  Q.   And was there any indication, too, that he felt he could

09:58:35AM  25  commit acts using causal powers that we don't expect people to

1   exercise?

2            I mean, besides the -- let me put it this way:

3   Besides being forced to act in certain ways, did he think he

4   could act in ways that are out of the ordinary?

09:58:57AM 5   A.   No.  He actually didn't report having any special powers,

6   other than if you consider that a special power.  Well, he, I

7   guess, in a sense, did consider that a special ability; but he

8   did not believe that he had like powers of God where he could

9   make natural disasters happen, which can sometimes be seen in

09:59:16AM 10  schizophrenia.  But he did believe that he could communicate

11  with the television, that the television was sending him

12  messages as was the radio, and that was coming through the

13  prison walls; that a variety of celebrities, both local and

14  national, were communicating with him and were able to get

09:59:33AM 15  messages to him.  But he believed that he was, I guess,

16  sensorally perceptive, if you will; that he could hear these

17  things and that these were actual -- these voices and these

18  messages were meant for him and that he was able to perceive

19  them and get them, receive them.

09:59:51AM 20  Q.   Now, getting back to the earlier issue about spirits

21  causing him to do things and the issue of agency, is it your

22  opinion that he is absolutely confident and believed without

23  question that that is the case, that that is what is happening

24  to him?

10:00:12AM 25  A.   Yes.  I believe that he firmly believes that.

1  Q.    And is there any evidence in the literature that people

2  who suffer from schizophrenia have problems with even

3  identifying themselves as the agents of the acts that they

4  commit or the actions that they engage in?

10:00:34AM  5  A.    There is, in fact, literature that speaks specifically to

6  that.  They have a significantly impaired ability to ascribe

7  themselves as the actor to their own actions and to recognize

8  actions as their own.

9  Q.    Is it fair -- in your opinion, was this a problem or a

10:01:01AM 10  symptom that Mr. Aldridge exhibited?

11  A.    Yes.  I would say so.

12  Q.    Is that proof both in your 2006 interview and in the

13  record?

14  A.    Yes.

10:01:13AM 15  Q.    And by "the record," I mean --

16  A.    Dr. Quijano --

17  Q.    -- the 1990 report of Dr. Quijano.

18  A.    Yes.

19  Q.    Would you say that Mr. Aldridge also has a history of

10:01:38AM 20  pronounced irrational behavior?

21  A.    Yes.  I mean, the presence of delusions and

22  hallucinations are considered irrational and unusual behavior,

23  yes.

24  Q.    And so, referring specifically to the testimony of Gladys

10:01:55AM 25  Aldridge and to the statement of her sisters which are in the

1   record as -- at Petitioner's Exhibits 24, 25, and 26, do they

2   describe what you would call a history of odd conduct?

3   A.   Oh, absolutely.  Certainly from the time that he was

4   released -- well, actually in the time that he was in prison,

10:02:30AM 5   they describe an increasingly bizarre content and change in

6   his writings, in the letters that he wrote to them.  And then

7   after -- following his release from prison in 1986, when he

8   showed up at Gladys' home, he had significantly odd and

9   atypical behavior, you know, wearing turbines and white gowns

10:02:51AM 10   and walking around at night, not talking to them, not

11   communicating with them and talking to himself, reporting the

12   presence of spirits, believing that his sisters and her

13   children -- Gladys and her children were letting Nazis and

14   other spirits into his room.  He knew they were there despite

10:03:10AM 15   all evidence to the contrary.

16          So, yes, significantly to the point that she

17   actually asked him to leave; and then that actually continued

18   at his father's house, in fact, it worsened because -- my

19   recollection is his father's home at that time was up on

10:03:24AM 20   bricks.  So, it didn't have a foundation.  And Mr. Aldridge

21   was very distraught about that and really believed that the

22   Nazis and spirits were living underneath the home and were

23   able to get directly into the home.  So, they weren't able to

24   keep him there either.

10:03:41AM 25   Q.   And you reviewed, too, the testimony of Virginia Aldridge

1    and Cheryl Aldridge?

2    A.   I did, yes.

3    Q.   And I'm talking about the testimony of the 1990 trial and

4    the testimony of Brenda Garrett; is that right?

5    A.   Yes, I have.

6    Q.   And do they, too, describe a history of bizarre behavior

7    and conduct?

8    A.   Yes, they do.

9    Q.   And in what ways -- in what ways, if you can recall their

10   testimony?

11   A.   Well, when he says, you know, we are talking about being

12   frightened of him, that he was always talking about spirits,

13   and that people were out to get him, that people were hurting

14   him and trying to murder him, you know, where they couldn't

15   see any spirits, kind of walking around, sneaking around the

16   house quietly and that sort of thing.

17   Q.   And I believe it was Gladys Aldridge who was asked if she

18   had sought psychological help or counseling for Mr. Aldridge.

19   Do you recall that?

20   A.   During testimony yesterday, yes, she was asked that.

21   Q.   And she said no.  In your experience is that any

22   indication at all that Mr. Aldridge may not have had a

23   psychological problem?

24   A.   Is it an indication that he didn't have --

25   Q.   Yes.

1   A.   No, it is not an indication that he didn't have a

2   psychiatric problem.

3   Q.   And why not?

4   A.   That is common practice.  Often family members --

10:05:22AM   5   particularly, you know, over the years -- that have kept

6   family members who are odd or atypical and engaged in unusual

7   behavior, private.  They have kept that within the home.  Many

8   people have like a distrust of psychiatrists and the negative

9   connotations associated with going to a psychiatrist or a

10:05:44AM   10   therapist and don't.  Also, the layperson is not able to make

11   a diagnosis of schizophrenia.  So, you often just think their

12   family member -- oh, that's So-and-So.  That brother is odd

13   and sort of accept that as who that person is.

14   Q.   And have you seen this in your practice?

10:06:02AM   15   A.   I have, extensively.

16   Q.   We went over yesterday with some of the other witnesses

17   whether there was evidence at the time of trial -- substantial

18   evidence -- that Mr. Aldridge was incompetent to stand trial.

19   What is your opinion about whether there was evidence before

10:06:49AM   20   Doug Davis or before the trial court in this case about

21   whether there was a bona fide doubt about Mr. Aldridge's

22   competency?

23   A.   Are you asking if it was present prior to --

24   Q.   Yeah.  I'm just talking about the evidence that you have

10:07:07AM   25   seen, the evidence that existed at the time of trial.  Let's

1    just talk about Mr. Davis in particular.  And that was

2    available to Mr. Davis.

3              Did this raise in your view a real question, a

4    substantial question, about whether Mr. Aldridge was

10:07:20AM  5    competent?

6    A.   It did.  I mean, certainly the relation of events as

7    presented in Dr. Quijano's report describes a severe

8    delusional network that was just fixed and pervasive.  If you

9    follow the literature, there is information that talks about

10:07:40AM  10   increased environmental stress that is contributing to the

11   severity of delusional presentation.  So, as a clinician, I

12   would inform the legal counsel of that and want to know his

13   status during the trial.

14   Q.   So, you are aware of significant information, in your

10:08:11AM  15   opinion, that showed he was incompetent before trial?

16   A.   Yes.

17   Q.   And afterwards, if you read records from the Texas

18   Department of Criminal Justice that indicated that he was

19   persistent in his --

10:08:21AM  20   A.   Yes, I did.

21   Q.   What, in particular?

22   A.   The testimony of the family members, the testimony of

23   Mr. Bates during the trial.  I also reviewed T.D.C. records,

24   you know, from 1990 that indicate the ongoing presence of

10:08:48AM  25   delusional, in fact, to obviously the present day, the date

1   that I interviewed him.

2   Q.   I would like to show you what's been admitted as

3   Petitioner's Exhibit No. 2.  It's a clinical note from the

4   Texas Department of Criminal Justice.

10:09:29AM  5             MR. RYTTING:  May I approach, Judge?

6             THE COURT:  Yes, sir.

7   BY MR. RYTTING:

8   Q.   And if we go down -- part way down the page, we see the

9   statement -- just start --

10:09:46AM 10             MS. ODEN:  What page is that?

11             MR. RYTTING:  The first page of that exhibit, the

12   clinical notes.

13   BY MR. RYTTING:

14   Q.   And what is this exhibit?

10:09:58AM 15   A.   I did review this.  An L.P.C. within, I guess, T.D.C.,

16   the correctional facility, mental health provision, did an

17   interview and screening with Mr. Aldridge.

18   Q.   And what did she find?  What are the principal findings?

19   A.   Do you want me to read the entire thing, or do you want

10:10:23AM 20   me to start at her discussion?

21   Q.   I think for these purposes just start with the

22   discussion.

23   A.   Okay.  "Per the discussion, reviewed the following:

24   auditory and visual hallucinations day and night, command

10:10:34AM 25   hallucinations including commands to hurt both himself and

         1   others, hallucinations interfering with his sleep, poor

         2   concentration, variable appetite, in part possibly to instill

         3   self discipline but also suggestion of control via

         4   hallucinations, both persecutory and grandiose hallucinations,

10:11:01AM 5   the possibility he believes himself to possess special powers.

         6   And these experiences started at least 10 years ago."

         7   Q.   Is this consistent with Dr. Quijano's findings -- or at

         8   least his clinical interview?

         9   A.   Yes.

10:11:15AM 10  Q.   And in your opinion what is the possibility that between

        11   the time of Dr. Quijano's interview and Dr. -- and the

        12   findings that the examiner at T.D.C. made in, I believe, June

        13   of 1990, after trial, that there was an improvement in

        14   Mr. Aldridge's cognitive abilities or condition?

10:11:44AM 15  A.   I would say there is no possibility of that.

        16   Q.   Okay.  Why?

        17   A.   Just in the nature of the disorder.  When you are -- when

        18   you have active symptoms to this severity, they do not go away

        19   for minutes, hours, days.  And the circumstances, including

10:12:01AM 20  the increased environmental stress at the time of the trial,

        21   there's only reason to believe that the symptoms would

        22   increase.  There's no indication of anything that would cause

        23   them -- there's no treatment, there's no social support, plus

        24   there's increased environmental stress, there is nothing that

10:12:17AM 25  would support a decrease in the presence of his symptoms.  In

1  fact, it would support an increase eventually.

2  Q.   Has this been reported in the literature, the effect of

3  environmental stress on symptoms and cognitive deficits from

4  people who suffer from schizophrenia?

10:12:38AM  5  A.   Yes, it has.  In fact, it's been specifically

6  independently related to the severity of delusions.

7  Q.   So, in other words, a capital trial is highly likely to

8  increase the severity of someone's delusional and

9  hallucinatory experience.  Is that fair to say?

10:12:58AM 10  A.   I would absolutely say that, and I would specifically say

11  that in Mr. Aldridge's case because his delusions incorporate

12  the court system and are very persecutory in nature.

13  Q.   Okay.  And does this confirm your conclusion that he was

14  not competent to stand trial?

10:13:17AM 15  A.   It does, yes.

16  Q.   And that he was not able to assist his attorneys with a

17  rational degree of understanding?

18  A.   Yes, it does.

19  Q.   And yesterday there was some discussion of testimony that

10:13:46AM 20  Dr. -- that Mr. Aldridge gave during the punishment phase of

21  the trial.  Mr. Aldridge, that is.

22  A.   Yes.

23  Q.   And did you have an opportunity to review that testimony?

24  A.   I did, yes.

10:13:57AM 25  Q.   And what was your -- in your opinion what did his

1  testimony indicate?

2  *A.*   I felt that it was consistent with delusional ideation.

3  *Q.*   In what way?

4  *A.*   If you look at the specific pattern of his statements,

10:14:22AM 5  what he is saying in response to direct questioning by

6  counsel, he is not able to maintain the thread of the

7  questions presented by the attorney and he insists -- he

8  sticks with this statement that he was physically abused and

9  beaten by these officers, in fact, confusing locations, city

10:14:46AM 10  versus county jail, despite, again, disconfirmatory evidence,

11  this factual evidence, to contradict his statements.  So, he

12  never varies.  He never, you know, lightens up on, if you

13  will, his statement.  He presents it as strongly each time it

14  is asked, despite any of the questions that the attorneys come

10:15:09AM 15  up with it or evidence to contradict it.  So, to me, that is

16  evidence of a fixed delusional belief; that he is not, you

17  know, tracking what they're saying and he holds this belief

18  despite that evidence.

19  *Q.*   And are there indications that he had this -- that he had

10:15:24AM 20  formed at least this type of delusional belief about guards

21  and about other guards beating him, guards kicking him prior

22  to the trial?

23  *A.*   Yes.  Certainly from the statements of his family members

24  and in his own writings, there's a reference to, in addition

10:15:46AM 25  to the Nazis and other things beating him, guards frequently

1   physically abusing him, molesting him, prior to that, yes.

2   Q.    Yesterday, when Dr. Quijano testified, he talked about

3   the remission -- remission in the context of schizophrenia,

4   even remission during his clinical interview of Mr. Aldridge.

10:16:53AM 5   Do you recall that --

6   A.    Yes, I do.

7   Q.    -- that discussion?

8                 And what is -- in your opinion, is the validity

9   of Mr. -- Dr. Quijano's conclusion, if there was a remission

10:17:06AM 10  in this case?

11  A.    I don't believe that his definition of the word

12  "remission" is valid.  The word "remission," as it relates to

13  schizophrenia, is the same as it relates to a medical

14  diagnosis.  So, the term "remission" refers to -- an absence

10:17:26AM 15  or, if you will, a return to a baseline state of functioning

16  with no active symptoms or a very low level of active symptoms

17  present if treated.  So, there's no active signs of disease.

18  And the prevailing understanding in the literature is that

19  this must be for a continuous period of six months.  It can be

10:17:48AM 20  sometimes for shorter periods of time on medication treatment;

21  but even on medicines, it is typically perceived to be about

22  six months.  There is no evidence that there's any remission

23  that last minutes, hours, days.

24  Q.    So, there's no evidence and there's no -- that you know

10:18:10AM 25  of -- there's no research that establishes that?

1  *A.*   That is correct.

2  *Q.*   There's also some talk about waxing and waning of

3  symptoms.  What is your opinion about this and the relevance

4  in this case?

10:18:26AM  5  *A.*   Well, I don't use the term "waxing and waning" to refer

6  to the process in schizophrenia.  As mentioned by Dr. Brown

7  and Dr. Quijano, once a person is diagnosed with

8  schizophrenia, that is a lifelong disorder.  An individual

9  typically goes into remission upon treatment, with a

10:18:48AM  10  pharmacological agent.  When those medications are stopped,

11  the most prevalent is a return to psychotic symptoms.

12       There are periods of acute exacerbation of

13  symptoms where individuals can, you know, become -- have a

14  significant increase in the severity and pervasiveness of

10:19:09AM  15  their hallucinations or delusions and then periods of what is

16  referred to as stability of symptoms.  So, during -- because

17  in between those acute episodes, there is a relative

18  stability; but the presence of those symptoms, hallucinations,

19  delusions, as well thought disorder and the negative symptoms

10:19:27AM  20  of schizophrenia are still present.

21  *Q.*   And there was also some suggestion about the possibility

22  of exaggerating symptoms in this case, in particular

23  Mr. Aldridge could be exaggerating symptoms in some way or

24  form.  What is your opinion about that, when it comes to

10:20:01AM  25  people that suffer from schizophrenia in general?

1  A.   Well, the majority of patients with schizophrenia,

2  including Mr. Aldridge, have no insight into the presence of

3  their symptoms as symptoms.  As I mentioned, their brain is

4  not able to discriminate between an actual sensory input that

10:20:21AM  5  comes from the environment versus one that's coming from

6  inside their brain.  They do not have an awareness that some

7  of the things they are experiencing or thinking are not real

8  in terms of how we experience the world, you know, somebody

9  who doesn't have a disorder like schizophrenia.  So, if they

10:20:39AM  10  don't have awareness of those symptoms and don't believe

11  they're having any abnormal symptoms that this, in fact, is

12  what they're experiencing, they are not able to generate those

13  symptoms or to make them up, if you will.

14  Q.   Dr. Quijano also suggested that there was some

10:21:07AM  15  functionality -- I believe that was the term that he used --

16  that he observed during his psychological evaluation of

17  Mr. Quijano [sic].  Were you able to form an opinion about

18  this concept and the way he was using it?

19  A.   Well, that is the term that he used.  I'm not certain

10:21:34AM  20  what that term means; but, you know, following your line of

21  questioning at that time, he ended up saying it was related to

22  Mr. Aldridge's ability to report his factual understanding of

23  the legal -- the legal criteria, the legal -- the roles of the

24  people involved in the legal proceedings.

10:21:59AM  25  Q.   What is your opinion of this abuse of function --

1   functioning or functionality in this sense?

2   A.   I've never heard of it used in that context.

3   Q.   You also talked about functionality, I guess, in what you

4   would consider his daily living; is that correct?  Do you

10:22:17AM  5   recall that?

6   A.   Right.

7   Q.   Something like adaptive functioning, is that what you

8   took that to mean?

9   A.   Right.  That is one area that we assess.  So, there are

10:22:27AM  10   different areas of functioning.  One is social functioning.

11   One is adaptive functioning or, you know, activities of daily

12   living.  Another is cognitive functioning.  Another is

13   intellectual functioning.

14   Q.   What he was talking about when he talked about

10:22:45AM  15   functionality or functioning in terms of the interview, could

16   that have been -- is that closely -- is that cognitive

17   functioning in your opinion?  Do you think that is what he was

18   talking about?

19   A.   He may have been referring to that or to the adaptive

10:23:02AM  20   functioning, I guess, yes.

21   Q.   But do you recall him saying that the two were

22   correlated?  Is that possible to correlate these two in a

23   meaningful way?

24   A.   I don't recall him saying it was correlated to cognitive

10:23:17AM  25   functioning.  I think he did try to say it was correlated with

1  his factual understanding and his functioning in the world,

2  like his adaptive functioning in the world.  I think he was

3  saying that it was corroborated by that, is my recollection.

4  Q.   And what, in your opinion, is the significance of this

10:23:32AM  5  for competency?

6  A.   Well, when we do an evaluation, those are separate

7  domains.  So, we assess, you know, social functioning,

8  adaptive function, cognitive function separately.  So, one

9  doesn't corroborate the others.  There is independent sources

10:23:54AM 10  of information.  They are relevant to look at in terms of

11  competency.  The most relevant are a person's level of

12  cognitive functioning.

13  Q.   Turning to the adaptive -- the alleged adaptive

14  functioning of Mr. Aldridge, did you make a -- come to an

10:24:18AM 15  opinion about his adaptive functioning or his problems that he

16  may have had adapting before he went to prison?

17  A.   I did, yes.

18  Q.   And what were some of the indications to you that he was

19  not adapting?

10:24:34AM 20  A.   I mean, we have a restricted period of time to assess

21  because, you know, he was in prison.  But even in prison, he

22  didn't always maintain appropriate responsibility for work,

23  his duties, and showed apathy in terms of not showing up for

24  work.  At a period of time from 1986 to 1990, when he was

10:24:55AM 25  working and living and functioning out in the free world, if

232

 1  you will, he showed inconsistencies in his ability to maintain

 2  things.  So, maintain his activities of daily living.

 3            He -- places that he resided, he went back and

 4  forth between his various sisters' homes, his father's home,

10:25:20AM  5  living with a godmother and -- his stepmother -- I'm sorry,

 6  not godmother, stepmother -- to living in apartments

 7  independently but for brief periods of time.  There's no

 8  indication in the record that he was able to stay at any one

 9  place for any longer than a few months.  His workplace -- he

10:25:41AM 10  worked at McDonald's.  He worked at a number of different

11  McDonald's.  So, there's no evidence to indicate that he was

12  able to sustain consistent placement in either a living

13  situation or a work situation and to do that independently.

14  He was able to function in society with significant support

10:26:07AM 15  provided by his family members.

16  Q.   Was there any indication in the record that he was -- for

17  example, that he wasn't properly grooming?

18  A.   In the records from T.D.C. there were, yes.

19  Q.   Okay.  What was -- what is significant about that, if

10:26:30AM 20  anything?

21  A.   Well, one of the features in schizophrenia patients who

22  suffer from schizophrenia is they have a deterioration in

23  personal hygiene.  So, while they are typically neat in the

24  clothes that they wear, they typically don't like to shower,

10:26:47AM 25  shave, bathe, get their haircut, that sort of thing.  They

1   don't like to maintain those features of personal hygiene.

2   Q.   And was there evidence that he was refusing to shower?

3   A.   There were, yes.

4   Q.   Refusing to shave?

10:26:58AM 5   A.   Yes.

6   Q.   While he was -- and these are from his records of prior

7   incarceration --

8   A.   Yes.

9   Q.   -- from '72 to '86.

10:27:07AM 10   A.   Yes.  And in the '90s, as well.

11   Q.   And, finally, Dr. Quijano talked about direct questioning

12   and breaking down the question.

13   A.   Could I add something to the previous question?

14   Q.   Sure.

10:27:28AM 15   A.   There were also reports from Gladys that he wasn't

16   sleeping or eating regularly either.

17   Q.   Okay.  And, again, what is significant about that?

18   A.   Well, maintaining consistency, you know, your ability to

19   feed yourself and sleep and take care of yourself, those are

10:27:43AM 20   activities of daily living.

21   Q.   There was some testimony that he owned an automobile.

22   What was your findings on review of the records in this case?

23   A.   Yes.  I did see some references to that in the records.

24   He did apparently attempt to own a vehicle at two times but

10:28:09AM 25   was not able to do that.  One of the vehicles was repossessed

1  after a short period of time, as he was not able to pay for

2  it.  Another vehicle that he purchased apparently had some

3  engine troubles or -- from his report apparently he put

4  something into the engine or something, and then it wasn't

10:28:29AM  5  able to function.  He wasn't able to pay for it.  So, he

6  returned that vehicle.

7  Q.   And it sounds like Mr. Aldridge rode a bike from the

8  statements of his sisters, from Cheryl at trial and Virginia

9  at trial; is that correct?

10:28:47AM  10  A.   Yes.

11  Q.   Was -- did he experience any problems with this mode of

12  transportation?

13  A.   Yes.  I have to say from his writings, his

14  descriptions -- and these were clearly incorporated into his

10:29:01AM  15  delusional beliefs.  He believed, you know, people were trying

16  to hit him.  There were numerous reports, particularly three

17  that he refers to, of attempts at hit and run and people -- in

18  his writings of people yelling at him while he is riding on

19  the side of the road.  And I think it is very likely that he

10:29:21AM  20  was not abiding by the rules of riding his bicycle along

21  roadways that are occupied by vehicles.

22  Q.   So, in other words, he couldn't even adapt to the rules

23  of the road that govern bicycle transportation?

24  A.   That seems very likely, yes.

10:29:38AM  25  Q.   And the reason for his inability is due to his mental

1   illness; is that correct?

2   A.   Yes.

3      (Pause in the proceedings)

4         MR. RYTTING:  Your Honor, I will pass the witness.

10:30:38AM  5         THE COURT:  All right.  Thank you.

6            My plan is to go for about another maybe

7   15 minutes or so and take a break -- about a 30-minute break

8   at 10:45.

9            Do you want to go ahead and begin your

10:30:48AM 10  cross-examination?

11         MS. ODEN:  Yes, Your Honor.

12               **CROSS-EXAMINATION**

13  **BY MS. ODEN:**

14  Q.   Good morning, Dr. Mosnik.

15  A.   Good morning.

16  Q.   Before we get started talking about all these issues, I

17  was wondering if you could tell us where these vehicle reports

18  are that you mentioned because we don't have these.  The

19  vehicle reports about his car?

10:31:03AM 20  A.   They're in -- I read about his having a vehicle in the

21  writings of Mr. Aldridge and some information on the papers

22  that we got from his sister Gladys.

23  Q.   Okay.

24         MS. ODEN:  Could we see these papers from his sister

10:31:20AM 25  Gladys?  If you could find those and hand those to Kathy while

1    I'm crossing her, that would be great.

2                    Or maybe y'all can find those during the break.

3            THE COURT:  Yes.  That would be fine.  Why don't you

4    go ahead.

10:31:49AM  5            MS. ODEN:  Okay.

6    BY MS. ODEN:

7    *Q.*   Your Ph.D. thesis was on the effects of quitting smoking

8    on cognition in schizophrenia patients, correct?

9    *A.*   Not on quitting smocking.  It was on the effects of

10:32:01AM 10   smoking, the withdrawals from smoking.

11   *Q.*   And withdrawal from smoking.

12   *A.*   Right.  I just kept the cigarettes from them.  None of

13   them were quitting smoking.

14   *Q.*   But it was something to do with smokers that were

10:32:10AM 15   schizophrenics and the effect of smoking on their cognition?

16   *A.*   It was in patients with schizophrenia who smoked.

17   *Q.*   Okay.  And your Master's thesis was the effects of

18   phenylalanine loading on tardive dyskinesia in schizophrenia

19   patients.

10:32:27AM 20   *A.*   That's correct.

21   *Q.*   And your research grants dealt with medication for

22   amyotrophic lateral sclerosis and schizophrenia, right?

23   *A.*   That is correct.

24   *Q.*   And none of those were any kind of forensic or criminal

10:32:43AM 25   context; is that correct?

1   A.   That is correct.

2   Q.   Some of the papers that you've written deal with the

3   anatomy of odor sensation, M.R.I.s on brains of people with

4   fetal alcohol syndrome?

10:32:57AM  5   A.   Uh-huh.

6   Q.   People with Alzheimer's?

7   A.   Uh-huh.

8   Q.   People with, again, ALS, Lou Gehrig's disease.  And your

9   teaching --

10:33:09AM  10   A.   And the schizophrenia.  I did dysfunctional neuroimaging

11   in schizophrenia.

12   Q.   Functional neuroimaging --

13   A.   Yes.

14   Q.   -- in schizophrenia?

15   A.   Yes.

16   Q.   Okay.  But none of those involved anything either

17   forensic or criminal in context?

18   A.   That is correct.

19   Q.   Your teaching experience, you've taught courses in

10:33:25AM  20   psychometric, you know, evaluations; is that right?

21   A.   That's correct.

22   Q.   Interpersonal therapy?

23   A.   That's correct.

24   Q.   Occupational therapy?

10:33:31AM  25   A.   No.  I'm not an occupational therapist.  I'm a

238

 1  neuropsychologist.

 2  Q.   Okay.  Oh, I'm sorry.  In 2002 and 2003, you were giving

 3  a lecture series in a Master's program in occupational

 4  therapy.

10:34:02AM  5  A.   It was occupation medicine.

 6  Q.   Occupational medicine.  Okay.

 7              And you've also monitored or taught some

 8  courses in resident training?

 9  A.   Yes.

10:34:13AM  10  Q.   Okay.  And none of those dealt with forensic or criminal

11  issues?

12  A.   That was part of the subject material.  I have had

13  interns and fellows, post-doctorate fellows, in

14  neuropsychology, clinical psychology, and residents -- medical

10:34:29AM  15  residents in psychiatry and neurology.  So, yes, portions of

16  those included criminal cases, forensic evaluations, that type

17  of thing; but none of them were designed specifically to

18  address solely that topic.

19  Q.   Okay.  You mention that your forensic training, besides

10:34:47AM  20  maybe a course or two in undergraduate or graduate psychology,

21  mainly comes from conferences.

22  A.   Training conferences.

23  Q.   Right.

24  A.   Presentations at conferences where you're being trained

10:34:59AM  25  in how to administer and interpret tests and evaluate

1  competency for the hearings.  That's correct.

2  *Q.*  What books or publications do you recognize as learned

3  treatises in the topic of forensic psychology?

4  *A.*  Well, I mean, there are scales that I've used like in

10:35:18AM  5  MacArthur and ECST in terms of energies that are designed to

6  assist with competence --

7  *Q.*  I mean more like books; books, learned treatises,

8  publications as opposed to tests.  For example, detecting

9  malingering, do you believe that that's a learned treatise?

10:35:36AM  10  *A.*  Yes, I do.

11  *Q.*  How about forensic psychiatry?

12  *A.*  Yes, I do.

13  *Q.*  The handbook of psychology?

14  *A.*  Yes.

10:35:42AM  15  *Q.*  Okay.  Could you tell us what hindsight bias is?

16  *A.*  Sure.  It's believing -- I guess when you have a current

17  understanding of something and then looking back at something

18  and that view being, I guess, influenced by what your

19  information now is.

10:36:06AM  20  *Q.*  I'm sorry.  Can you say that again?  I guess I'm not

21  following you.

22  *A.*  So, knowledge that you have now influences your view or

23  perception of something that happened previously.

24  *Q.*  Okay.  And how about confirmation bias?  Are you familiar

10:36:23AM  25  with that term?

1   *A.   I am familiar, but I'm not sure that I could define that*

2   *for you.*

3   *Q.   Okay.  Could you tell us a little bit about the*

4   *difference between causation and correlation?*

10:36:34AM  5   *A.   In what context?*

6   *Q.   In the psychology context?*

7   *A.   Can you repeat the question, please?*

8   *Q.   Could you tell us a little bit about the difference*

9   *between causation and correlation?*

10:36:45AM  10  *A.   Certainly.  Causation to say that something caused*

11  *something else, that's implying that an action contributed to*

12  *the evolution or generation of something else happening.  It*

13  *directly related to making something else occur.  It caused it*

14  *to happen.  Correlation, so like in basic science.  So, you*

10:37:08AM  15  *may have two findings in psychology that seem to hang along*

16  *together, that seem to show up together in certain*

17  *populations.  So, they seem to be correlated.  But we don't*

18  *know whether one or not came first or second or whether*

19  *there's a causal relationship, but they do seem to be related.*

10:37:28AM  20  *Q.   Would you agree that an example of a similar concept*

21  *would be the idea that all bachelors are men but not all men*

22  *are bachelors?*

23          *It's logical, right?  You have to be male to be*

24  *a bachelor.*

10:37:45AM  25          MR. RYTTING:  I object to the relevance of this line

1  of questioning.  I don't know if this is a 702 issue or if

2  it's -- but I can't see the connection to the case.

3           MS. ODEN:  We'll tie it together.

4           THE COURT:  I am going to give her a little

10:37:55AM 5  latitude.

6  BY MS. ODEN:

7  Q.   I mean, you would agree that to be a bachelor, you have

8  to be male, correct?

9  A.   Yes.

10:37:59AM 10  Q.   But it is not necessarily the case that all males are

11  bachelors?

12  A.   That is correct, that at any one point in time, yes.

13  Q.   You have indicated that you have some limited forensic

14  experience; is that right?

10:38:14AM 15  A.   Yes.

16  Q.   You said you testified or you've been involved in a

17  handful of criminal cases?

18  A.   Yes.

19  Q.   Okay.  Could you tell us what cases those are?

10:38:24AM 20  A.   Yes.  I was involved in the Andrea Yates case, on the

21  team, and assisted in evaluating her and helping them come to

22  an opinion on the case.

23  Q.   Who did you assist?

24  A.   Dr. George Ringholz.

10:38:38AM 25  Q.   Were you working for the State or for the defense?

```
 1  A.   I was working for Baylor College of Medicine with
 2  Dr. Ringholz.
 3  Q.   Okay.  And which side of the litigation retained
 4  Dr. Ringholz?
 5  A.   The defense.
 6  Q.   Who else?
 7  A.   I've had Mr. James Colburn, Marcus Green, some clinical
 8  patients.  I don't remember the name of my patient in
 9  Wisconsin that we went to court on.  Elsie Birdsell.
10  Q.   How do you spell that last name?
11  A.   B-I-R-D-S-E-L-L.  First name Elsie, E-L-S-I-E.
12  Q.   Uh-huh.  Was that here in Texas?
13  A.   No.  That was in Wisconsin.
14  Q.   Okay.
15  A.   And Dr. Daniel Yeh.
16  Q.   Uh-huh.
17  A.   Y-E-H.
18  Q.   Now, in Daniel Yeh's case for diminished competency back
19  in February of 2006; is that right?
20  A.   I actually performed initially a clinical evaluation.
21  Q.   Uh-huh.  But when you testified in *United States versus*
22  *Yeh*, which was in September of 2008, you testified on the
23  issue of diminished capacity.
24  A.   That is correct.
25  Q.   It was actually here in Judge Melinda Harmon's court,
```

10:38:48AM (line 5)
10:39:17AM (line 10)
10:39:31AM (line 15)
10:39:46AM (line 20)
10:39:58AM (line 25)

```
 1  right?
 2  A.   It was.
 3  Q.   And you are aware that Judge Melinda Harmon found your
 4  reasoning in that case to be Alice in Wonderland?
 5  A.   Yes, I am well aware of that.
 6  Q.   And you remember that she said it was too fanciful --
 7  A.   Uh-huh.
 8  Q.   -- didn't make sense, and wasn't good science?
 9  A.   Yes, I am aware of that.
10  Q.   And in James Colburn, the case that you mentioned, you
11  were evaluating him for competency to be executed.
12  A.   That is correct.
13  Q.   You evaluated him in February, 2003?
14  A.   I couldn't tell you the exact dates; but that sounds
15  about right, yes.
16  Q.   Okay.  You found him to be schizophrenic and, therefore,
17  not competent to be executed.
18  A.   That's correct.
19  Q.   But Dr. Conroy disagreed with you, correct?
20  A.   Yes.
21  Q.   Dr. Massey disagreed with you?
22  A.   I don't have recollection of that evaluation.
23  Q.   Dr. Petvold, P-E-T-V-O-L-D, disagreed with you?
24  A.   I don't have a memory of all the names involved in that
25  case.
```

10:40:10AM (line 5)
10:40:22AM (line 10)
10:40:33AM (line 15)
10:40:43AM (line 20)
10:40:59AM (line 25)

1  Q.   Okay.  Do you remember that Dr. Axelrad, A-X-E-L-R-A-D,

2  disagreed with you?

3  A.   I mean, if you say that's in the record.  Again, I don't

4  remember all the names involved in that.

10:41:06AM  5  Q.   Do you remember Dr. Quijano being involved in that case?

6  A.   I do not, no.

7  Q.   So, you don't remember that he disagreed with you there

8  either?

9  A.   I don't have recollection of that, no.

10:41:15AM 10  Q.   Did you know that Mr. Colburn was actually executed in

11  March of that year?

12  A.   Yes, I did know.

13  Q.   So, the Court disagreed with you, as well.

14  A.   Eventually, yes.

10:41:24AM 15  Q.   You mentioned in the past, in Dr. Yeh's case, that you

16  examined a couple of people on death row.  That would be

17  Marcus Green and James Colburn; is that right?

18  A.   And Mr. Aldridge.

19  Q.   And Mr. Aldridge.  Anybody else?

10:41:41AM 20  A.   No.

21  Q.   When you formulated your opinion for this report, you had

22  not yet reviewed the records from Houston Police Department

23  surrounding the investigation of this crime or the arrest of

24  Mr. Aldridge; is that right?

10:41:59AM 25  A.   I did review those records.

1   Q.   Okay.  You didn't list those in your report, and you

2   didn't mention them in your report.  Did you find them to be

3   at all useful in forming your opinion?

4   A.   What was your original question?

10:42:13AM  5   Q.   When you formed your opinion and wrote your report, you

6   had not yet had the opportunity to review the Houston Police

7   Department records surrounding the investigation of this crime

8   and the arrest of Mr. Aldridge; is that correct?

9   A.   I don't know.  I have reviewed many, many records.  So,

10:42:34AM 10   whether I reviewed them prior to my report --

11   Q.   Okay.

12   A.   -- or subsequent to them, I don't know.

13   Q.   Okay.  If you did not indicate having reviewed them when

14   you wrote your report, would you feel that your report was

10:42:45AM 15   accurate; or do you think you maybe reviewed things and just

16   didn't list them in your report?

17   A.   It may be that I didn't list them, but I try to list

18   everything that I reviewed.

19   Q.   Okay.  So, at this point we don't know if you reviewed

10:42:59AM 20   them or not; but if you don't mention them in your report,

21   they must have not played a big role in your opinion.  Is that

22   the case?

23   A.   That can certainly be it.

24   Q.   You did review his T.D.C.J. records --

25   A.   Yes.

1   *Q.*   -- and the 2006 statement of Judy Turner, his sister?

2            If you say you did in your report, you probably

3   did?

4   *A.*   I'm sorry.  I'm still thinking about the previous

10:43:25AM  5   question.  So, could you repeat this question?

6   *Q.*   Sure.  Did you review the 2006 statement of Judy Turner,

7   his sister?

8   *A.*   Yes, I did.  The one that I didn't review prior to my

9   report was Gladys'.  That took place after I left.

10:43:43AM 10   *Q.*   Okay.  And you reviewed the 1995 evaluations by

11   Drs. Brown and Silverman?

12   *A.*   Yes, I did.

13   *Q.*   Okay.  You didn't mention anything in your report about

14   the questions that you asked Mr. Aldridge to determine whether

10:44:05AM 15   or not he was competent to stand trial.

16   *A.*   Well, I didn't write the questions specifically, no; but

17   I alluded to them in --

18   *Q.*   In your reply, right?

19   *A.*   Within my report.  No, no.  Within my report on page --

10:44:22AM 20   I'm trying to find it -- under my current clinical and

21   behavioral observations.

22   *Q.*   Which is page 4.

23   *A.*   On page 6.

24   *Q.*   Okay.

10:44:38AM 25   *A.*   And I talk about particularly important -- that's where I

1  incorporated and I made a note in there that I did not talk

2  about all of the -- so, I didn't list my specific questions;

3  but Dr. Quijano didn't in his report, nor did Dr. Silverman or

4  Dr. Brown list their specific questions.

10:44:52AM 5  Q.   Okay.  So, the sentence in that paragraph that you are

6  referring to, which is the second paragraph on page 6, the

7  sentence that you are referring to is:  "The client was unable

8  to discuss the circumstances that led to his arrest and

9  conviction without reference to delusional ideas and his

10:45:09AM 10  persecutory explanation for his situation.  While he was able

11  at times to state that he was on death row for capital murder,

12  he did not comprehend and could not convey the understanding

13  that he was being punished for the crime he committed, as he

14  firmly believes he did not commit the offense as described."

10:45:27AM 15          Is that the illusion that you're referring to?

16  Right?

17  A.   Those are in response to questions that I asked him.

18  Q.   Okay.

19  A.   In addition to the beginning of the report where I asked

10:45:38AM 20  him about his lawyer, his current lawyer.

21  Q.   So, what questions did you ask him?  Did you use some

22  kind of list to go through to structure that part of the

23  interview?

24  A.   I do.  I ask about what their understanding of the court

10:45:53AM 25  proceedings are.  Do they understand the nature?  And what I

1 asked Mr. Aldridge specifically:  Does he understand the

2 nature of the proceedings?  So, I'm trying to get at do they

3 understand that there's a side that's for and against, you

4 know, that there's a prosecution and a defense side, the

10:46:09AM 5 adversarial nature of that, who the major players are in the

6 course of that, the legal proceedings, what the charges are

7 against them, what the severity of those charges are, what the

8 consequences of those charges are, different reasonable

9 defenses that could be discussed with their attorneys, what

10:46:31AM 10 those options are, options for how they could plead, and how

11 they could cooperate with their attorney to review and come to

12 a decision about how they might plead guilty, not guilty, not

13 guilty by reason of insanity.  So, those are the questions and

14 ideas that I try to cover.

10:46:51AM 15 Q.   You were able to review Dr. Allen's report in which he

16 critiqued your evaluation after, of course, you had filled out

17 your report; is that right?

18 A.   That is correct.

19 Q.   And, in fact, you filed a reply -- or you wrote a reply

10:47:07AM 20 and gave it to Mr. Aldridge's attorneys to have filed in

21 court.

22 A.   I did, yes.

23 Q.   All right.  And when you wrote that reply, you wanted to

24 more fully explain your position for the benefit of the Court;

10:47:19AM 25 is that right?

1  A.   Certainly.

2  Q.   You presumably wanted it to be complete and accurate?

3  A.   Yes.  I wouldn't disagree with that.

4  Q.   Okay.  And, yet, when you wrote that reply, your only

10:47:32AM 5  answer to Dr. Allen's critique that you did not perform a

6  competency evaluation was that you asked Mr. Aldridge

7  questions about the crime that he committed; was that right?

8  A.   I would have to see the statement that I wrote.

9  Q.   Okay.  So, if that is what is in the statement that you

10:47:52AM 10  wrote, you would agree that is accurate?

11  A.   That that's the only thing that I asked?

12  Q.   That's what is in your statement.

13  A.   Where I said the only thing that I asked Mr. Aldridge?

14  That is not accurate.  That's not the only thing that I asked

10:48:03AM 15  Mr. Aldridge.

16  Q.   Okay.  In evaluating someone's mental capacity, it is

17  important not to just look at test results, but you have to

18  look at their day-to-day functioning; isn't that right?

19  A.   Yes.  That's one of the pieces of information.

10:48:18AM 20  Q.   Okay.  And one way to detect if a person is malingering

21  or exaggerating symptoms is to compare how they do when they

22  are being interviewed in a clinical setting or tested in a

23  clinical setting with how they do in day-to-day living.

24  A.   Uh-huh.

10:48:37AM 25       THE COURT:  All right.  I think this would be a good

1   time to take our break.  We are going to break for 30 minutes.

2   Come back at 11:15; and then I would plan to go all the way

3   through to 1:00 o'clock, if necessary, without a break.  Okay.

4   Thank you.

10:48:48AM   5        (Break)

6   BY MS. ODEN:

7   Q.   Doctor, thank you, during the break we were able to get

8   one of the documents that we had referred to as -- you had

9   referred to as a vehicle report, which is actually --

10            MS. ODEN:  May I approach, Your Honor?

11            THE COURT:  You may.

12   A.   I didn't refer to it as a vehicle report.  I said some

13   information about that he had a car.

14   BY MS. ODEN:

11:23:13AM  15   Q.   Okay.  So, what I'm showing you appears to be a letter

16   from the Texas Department of Health; and it is stapled to what

17   appears to be a letter from Mr. Aldridge.  Is that what you

18   were referring to as having reviewed and determined that he

19   had had a car?

11:23:23AM  20   A.   Yes.  One of the indications that he had a car, yeah.

21   Q.   Okay.  All right.  Were there any other documents that

22   you reviewed that you didn't list in your report that were not

23   turned over to the respondent, to us?

24   A.   Not documents like that.  They're writings of

11:23:38AM  25   Mr. Aldridge himself.

1  *Q.*   Okay.  So, I suppose you are probably not the correct

2  person to ask if everything that you've reviewed was turned

3  over to us.  But there were other writings such as that that

4  you reviewed that may not have been listed in your report?

11:23:53AM  5  *A.*   Those records I reviewed recently now.

6  *Q.*   Okay.  All right.

7  *A.*   His writings have already been turned in.  That's already

8  been part of the record.

9  *Q.*   Okay.  But, for example, that writing was not part of the

11:24:09AM 10  record.

11  *A.*   Right.  That's something that was just reviewed recently.

12  *Q.*   Just reviewed recently.

13  *A.*   Correct.

14  *Q.*   So, perhaps when we are done talking, you can show me the

11:24:17AM 15  other writings that you reviewed recently that helped form

16  your opinion.

17  *A.*   There were no other records that aren't in the record.

18  *Q.*   Nothing else besides this one letter to the Department of

19  Motor Vehicles.

11:24:28AM 20  *A.*   Right.  The writings that I am referring to are in August

21  of 1990, writings by Mr. Aldridge that are already in the

22  record or evidence.

23  *Q.*   Okay.

24        MR. RYTTING:  We need to make a clarification.  You

11:24:43AM 25  want records that she has reviewed since the report; is that

1  correct?

2        MS. ODEN:  Yes.  Anything that she reviewed that she

3  is relying on to testify about and help support her opinion is

4  something that we are entitled to receive.

11:24:57AM  5        MR. RYTTING:  We will get you the copies of --

6        MS. ODEN:  Great.

7        MR. RYTTING:  -- of that information.

8        MS. ODEN:  Great.  Thank you.

9        MR. RYTTING:  I'll try to do it -- I can't say we're

11:25:04AM  10  going to get it by the end of -- before this proceeding here

11  ends, but certainly by the end of -- by today you will have

12  what was reviewed.

13        MS. ODEN:  Fantastic.

14        THE COURT:  All right.  Thank you.

11:25:16AM  15  BY MS. ODEN:

16  Q.   Doctor, I did want to go back and talk for just a little

17  bit about what you wrote in your reply to Dr. Allen.

18  A.   Okay.

19  Q.   Because we had discussed it briefly.  I'm specifically

11:25:29AM  20  referring to page 3, and I will bring you a copy of that.

21        MS. ODEN:  Do you have -- you have her reply, right,

22  James?

23        MR. RYTTING:  Yes, I do.

24        MS. ODEN:  May I approach, Your Honor?

11:25:38AM  25        THE COURT:  You may.

253

```
 1  BY MS. ODEN:
 2  Q.   I'm showing you page 3 of your reply.  That is your reply
 3  document, isn't it?
 4  A.   It is.
 5  Q.   Okay.  And I am referring to the second paragraph on the
 6  page --
 7            THE COURT:  Is this an exhibit?
 8            MS. ODEN:  It was attached to the petitioner's reply
 9  to the respondent's reply.
10            THE COURT:  All right.
11            MS. ODEN:  And I believe it was Exhibit A.
12            THE COURT:  All right.  It has not been marked as a
13  trial exhibit?
14            MS. ODEN:  No, it has not.  I believe it was just
15  filed as a pleading.
16            THE COURT:  All right.
17            MS. ODEN:  Am I correct, James?
18            MR. RYTTING:  That is correct.
19            THE COURT:  Okay.
20            MS. ODEN:  Okay.
21  BY MS. ODEN:
22  Q.   So, I'm referring to your second paragraph.  Can you --
23  or any part of that document -- can you tell us where you
24  refer to the kinds of questions or interactions you had with
25  Mr. Aldridge regarding his competency to stand trial?
```

11:25:46AM (line 5)
11:25:56AM (line 10)
11:26:05AM (line 15)
11:26:09AM (line 20)
11:26:18AM (line 25)

1  A.   I put a general statement in here that I believe you are

2  mischaracterizing.   I did not say that I only questioned him

3  about the crime.

4  Q.   Okay.   That's not my question.   Hold on one second,

5  Doctor.

6          Tell us where in your reply -- read us the part

7  that talks about your interaction with Mr. Aldridge regarding

8  his competency to stand trial.

9  A.   Okay.

10  Q.   Take your time.

11  A.   It's the one line.   I did question Mr. Aldridge about the

12  crime when I interviewed and tested him.

13  Q.   And you were writing that in response to the critique by

14  Dr. Allen that you did not conduct a competency evaluation,

11:26:59AM  15  that you had not asked Mr. Aldridge about the role of the

16  different players in the courtroom, et cetera.

17  A.   That's correct.

18  Q.   Okay.   And when you wrote that reply, as you said before,

19  I think you said, you were doing it so you could help the

11:27:13AM  20  Court have a fuller understanding or a complete understanding

21  of your actions in the case and your opinion.

22  A.   That is not an all-inclusive statement.   I mean, this

23  report or this reply is not all inclusive for everything that

24  I asked and everything I said.   This was a response in part to

11:27:31AM  25  what we felt were salient issues.   So, no, I did not list all

1   the questions.  But by that question, my intent was to say

2   that I asked questions about the crime, meaning the time of

3   the crime.

4   Q.   The time of the crime.

11:27:43AM  5   A.   Right.

6   Q.   Okay.

7   A.   And the issues relating to the proceedings relating to

8   that --

9   Q.   Okay.

11:27:49AM 10   A.   -- by not excluding them and not saying that I only asked

11   one question about the crime.

12   Q.   Did you think one of the salient issues that you needed

13   to respond to from Dr. Allen was his argument that you did not

14   ask questions appropriate for a competency evaluation,

11:28:06AM 15   questions not related to the crime but questions related to

16   the proceedings and his understanding of the proceedings?

17   A.   The one that I did that was alluded to in my report, as

18   we said, is on page 6 in the second paragraph when I asked him

19   about the attorney.  That was included in the report.

11:28:22AM 20   Q.   Okay.  I'm sorry, Doctor.  Maybe I'm not being clear.

21   That is not my question.  I'm not asking you about your

22   report.  I'm asking about your understanding of Dr. Allen's

23   critique.

24              Is it your understanding that what Dr. Allen

11:28:34AM 25   felt was missing in your competency questioning was

1  questioning about his understanding, Mr. Aldridge's

2  understanding, of the proceedings themselves?

3  A.   Yes, that is what Dr. Allen felt was missing.

4  Q.   Okay.  And your choice of how to respond to his critique

11:28:51AM 5  was, again, to affirm that you had asked Mr. Aldridge

6  questions about the crime and the time of the crime; is that

7  right?

8  A.   I'm asserting to him that I did ask relevant questions

9  relating to those issues.

11:29:07AM 10  Q.   Okay.  Okay.  I think we are clear, then.

11              You mentioned during your direct examination

12  that Mr. Aldridge suffers from somatic delusions.  What

13  specific somatic delusions did he report to you?

14  A.   A feeling of pain in his ear from a noise coming in his

11:29:24AM 15  left ear, feeling of excruciating pain; and that he had

16  experienced some other wounds that he was trying to show me,

17  things on his skin and his face where he had wounds and scars

18  where there were none visibly evident to me.

19  Q.   And did he experience those at the same time as auditory

11:29:44AM 20  or visual hallucinations?

21  A.   The excruciating pain in the ear was associated with a

22  sound, a piercing excruciating sound and pain coming through

23  his left ear.  But there was no indication that that was a --

24  a visual hallucination was going on or an auditory

11:30:03AM 25  hallucination was going on.

1  Q.   So, it is possible, then -- if I understand you

2  correctly, there's no indication that he was experiencing an

3  auditory hallucination at the same time that he had the pain

4  in his ear?

11:30:15AM  5  A.   Not at the same time.  It was a separate symptom.

6  Q.   Okay.

7  A.   So, the somatic delusion is separate from an auditory

8  hallucination.

9  Q.   Okay.  So, he wasn't experiencing the pain as a result of

11:30:28AM  10  a sound?

11  A.   He was experiencing not as -- the pain not as the result

12  of an auditory hallucination.

13  Q.   Okay.  All right.  Were the voices that Mr. Aldridge

14  heard -- did he report them as hearing them inside his head or

11:30:47AM  15  outside his head?

16  A.   It's coming from outside his head.

17  Q.   Okay.  You mentioned that he had a schizoid pattern of

18  deficit in his cognitive abilities, that he had a pattern

19  typical of schizophrenia.  What is that pattern of cognitive

11:31:03AM  20  deficit that's typical of schizophrenia?

21  A.   Can you show me where you are referring?

22  Q.   Can I show you?  I didn't take a transcript.  I'm talking

23  about your testimony during your direct examination.

24  A.   Oh, I thought you were talking about something in my

11:31:14AM  25  report.

1  *Q.*   No.  I'm sorry.  You were describing that you had done

2  neuropsychological testing.

3  *A.*   I did not use the word "schizoid."

4  *Q.*   That would be my mistake.  I apologize.

11:31:25AM  5  *A.*   That is a different clinical term completely.

6  *Q.*   Okay.  Can you tell us what is the pattern of cognitive

7  deficits that is typical of schizophrenia?

8  *A.*   Yes, I can.  In patients with schizophrenia, there

9  typically is a general overall lowering of cognitive

11:31:40AM 10  functioning in the areas of verbal memory, executive

11  functioning, visual construction can be impaired more relative

12  to a greater degree than other areas of cognitive functioning.

13  *Q.*   And so, were the tests that you administered to

14  Mr. Aldridge during your evaluation, were they designed to

11:32:00AM 15  detect some of these typical patterns of schizophrenics or

16  schizophrenia?

17  *A.*   Yes.  They included tests that would elicit those

18  deficits or evaluate for those deficits, and it was -- it

19  included other tests, as well; and you shouldn't see deficits

11:32:17AM 20  as severe.  So, it was a full battery of cognizant tests.

21  *Q.*   Were any of the tests you administered to Mr. Aldridge

22  specifically designed to test for malingering?

23  *A.*   No.  The entire battery can be used that way.

24  *Q.*   What malingering test do you usually administer,

11:32:32AM 25  specifically, I'll say, in a forensic contest?

1   *A.*   It depends on the individual; but in terms of personality

2   characteristics, the MMPI or the PAI have scales for

3   determining whether or not a person is presenting themselves

4   in a more positive or a negative light than usual or

11:32:54AM 5   inconsistent in their responding, those sort of factors in

6   regards to malingering in regards to symptom report.

7              In terms of cognitive functioning, if I believe

8   that a patient could be malingering in terms of cognitive

9   performance and memory testing, I would use some tests of

11:33:13AM 10   memory malingering.  There are some computerized tests like

11   Victoria and Word Memory Test that I would use to assess

12   malingering in that domain.

13   *Q.*   And why would you choose not to administer any of these

14   tests to Mr. Aldridge?

11:33:27AM 15   *A.*   One, there was no indication that he was malingering on

16   cognitive testing.  In the field of neuropsychology, although

17   there are a number of tests designed specifically to assess

18   malingering, there's a variety of literature available on

19   specific tests that are designed as a neuropsychological

11:33:43AM 20   instrument; and we can look at the pattern on those tests to

21   determine whether or not a patient is malingering.  Because,

22   as you know, lawyers can get ahold of tests that assess

23   malingering; and patients can be trained on how to respond to

24   them.

11:33:57AM 25              So, there is literature available with findings

1    that show tests, like the California Verbal Learning Test, the

2    Rey Verbal Learning Test, that are actually neuropsychological

3    tests; and we can determine from the patterns' responses and

4    answers whether there is malingering performance.

11:34:14AM  5          In addition, the pattern performs across the

6    entire battery of tests.  So, whether or not that is

7    consistent with a patient's schizophrenia or not.  So, whether

8    the entire profile would be malingering can be assessed.

9    Q.   Didn't you notice an elevation on the L-scale in the

11:34:30AM 10    MMPI-II that you administered to Mr. Aldridge?

11    A.   I did not administer the MMPI-II to Mr. Aldridge.

12    Q.   I'm sorry.  I misspoke.  That Dr. Quijano administered.

13    A.   I did not evaluate -- the MMPI was not given any raw data

14    from his.  I only got his report.

11:34:45AM 15    Q.   Okay.  All right.

16    A.   I did not see the scales or anything for the MMPI-II.

17    Q.   Okay.  How do you structure the questions that you ask

18    during a clinical interview?  How do you decide -- for

19    example, are there any sample types of questions out there for

11:35:04AM 20    psychological professionals that give you guidance on how to

21    conduct a competency evaluation?

22    A.   Of course there are.  I mean, in Texas -- when I was in

23    Texas, I am aware of the Texas Code of Criminal Procedure.

24    That's the state codes.  So, they give a list of the areas

11:35:20AM 25    that need to be covered; and I cover those areas in general.

1  There are specific scales that are designed that I was trained

2  in at the conferences that I've attended.

3            THE REPORTER:  I'm sorry.  If you could maybe speak

4  up.

5            THE WITNESS:  Okay.  Do you want me to repeat

6  anything?

7            THE REPORTER:  Yes.

8            THE WITNESS:  Where would you like me to start?

9            THE REPORTER:  "They give a list that need to be

10  covered."

11            THE WITNESS:  So in the code?

12            THE REPORTER:  Yes.

13            THE WITNESS:  Okay.

14            THE REPORTER:  And speak up.

11:35:41AM 15  A.   So, the Texas State Code presents an outline of areas

16  that need to be reviewed.  So, those are the areas that I

17  review.  So, they include an area that client's ability to

18  understand the legal proceedings, the nature of the charges

19  against them, the consequences of those, the client's ability

11:35:57AM 20  to participate in determining, as I said, guilty, not guilty,

21  those types of things.

22  BY MS. ODEN:

23  Q.   I think we've already gone into exactly what the

24  questions might cover, but what I'm looking for --

11:36:10AM 25  A.   I'm getting to that.  There are specific scales available

1    in MacArthur, which is one --

2    Q.   Which one did you use in this case?

3    A.   I did not use a specific scale.  As you know, there's

4    different circumstances in this case than there are typically

11:36:22AM  5    when you are doing competency evaluation.  So, I'm doing an

6    evaluation, one, to determine where he is at now.  He is

7    not -- at the time of my evaluation in 2006, was not standing

8    trial.

9    Q.   Correct.

11:36:35AM  10   A.   So, I can't ask him questions about standing trial now.

11   So, in order to make that decision, I had to use the evidence

12   that was given to me, the data that was given to me at the

13   time of Dr. Quijano's evaluation.  So, I had to incorporate

14   his responses to the answers -- the answers that he gave in

11:36:55AM  15   response to Dr. Quijano's questions.

16   Q.   So, you did --

17   A.   So, I questioned him about what was relevant currently,

18   which is his current understanding of his legal proceedings.

19   If I would have asked him about the court case in 1990, that

11:37:09AM  20   would have been assessing his memory for those events, which

21   is inaccurate.  So, no, I did not use a structured interview

22   in this case.

23   Q.   What questions did you ask Dr. -- Mr. Aldridge?

24   A.   I asked him what is his understanding of his current

11:37:24AM  25   legal proceedings --

1  Q.   And what did he tell you?

2  A.   -- who his lawyer was.

3  Q.   What did he tell you?  Would it help you to look at your

4  notes?

11:37:32AM  5  A.   No.

6  Q.   Okay.

7  A.   I mean, you can give them to me.  That would be fine.

8          MS. ODEN:  May I approach, Your Honor?

9          THE COURT:  You may.

10  BY MS. ODEN:

11  Q.   This is Respondent's Exhibit 4.  Maybe we can start by

12  saying if you can point out what pages of your notes

13  correspond to that section of your clinical interview.

14  A.   As you know, I spent five hours with Mr. Aldridge.  There

11:37:58AM  15  was no way that I could write down every single thing that he

16  said.

17  Q.   Sure.

18  A.   It was all intertwined in his delusional network.

19  Q.   Okay.

11:38:05AM  20  A.   So, the sum of what he answered to me was in response to

21  who his attorney was.  He gave me the name of his attorney.

22  Q.   Did you write that down anywhere in your notes?  I found

23  your handwriting a little hard to read.  So, this will help

24  me.

11:38:20AM  25  A.   I could not tell you what page that is on right now.  I

1 would have to relook over all of my notes.

2 Q.   Did you look over your notes from your interview with

3 Mr. Aldridge before you came to testify today?

4 A.   I did.

11:38:30AM 5 Q.   Okay.  If you could help me -- if you wrote it down

6 during your interview, could you show me where?

7 A.   I would have to look through this.

8 Q.   Okay.

9 A.   (Witness looks through the documents.)

11:39:10AM 10          On the first page -- the second page you can

11 see that he's writing -- I don't -- I haven't written my

12 questions.  I only write down his responses.

13 Q.   Okay.

14 A.   He's talking about state court, habeas corpus.  These are

11:39:21AM 15 proceedings that he's filed.  So, this is -- I'm asking him

16 about what is his current understanding of his case.  That's

17 how we start out.  What's your current understanding?

18          And he's just telling me all these things that

19 he's filed, you know, state court, falsified, that they're

11:39:34AM 20 falsified documents, that's he's filed different things.  And

21 he just goes through these cites sort of, you know, randomly.

22 Federal courts, there's constitutional rights, illegal

23 incarceration challenges, the federal rules, my statutes, pro

24 forma.  They've only been appointed as a matter of form.  They

11:39:53AM 25 ignore my writings.  I mean, it's -- Bush is involved in my

1   case.  He's been brought up to speed on my case.  The judge is

2   involved.

3          I mean, the first three pages -- all of this is

4   completely delusional.

5   Q.   Okay.

6   A.   This is all in response to questions that I have asked

7   him about his involvement in the current legal proceedings.

8   Q.   Okay.  So, after you ask him generally what his legal

9   status is, did you ask him who his attorneys were?

11:40:21AM 10   A.   Yes.  That was the very first question I asked when I

11   came in and talked about what kind of evaluation I am going to

12   do and that I was actually appointed by his attorney.

13   Q.   And who did he say his attorneys were?

14   A.   He said that James Rytting was one of his attorneys.

11:40:38AM 15   Q.   Did you write that down anywhere?

16   A.   Excuse me.  That's written on the back of my consent

17   form.  That's what I remember.  Is that in here?

18   Q.   I didn't hear that.

19   A.   I'm asking if that's in here.

11:40:57AM 20   Q.   I don't know.

21          MS. HAYES:  It's not in the materials that we had

22   received, and I don't believe --

23   A.   It's on my consent form.

24          MS. ODEN:  James, if you have a different copy of

11:41:48AM 25   her notes and her raw data that has it --

1  A.    I don't see it here.

2  BY MS. ODEN:

3  Q.    Okay.  Doctor, were you aware that we requested to get

4  all of your notes and raw data from your testing back in

11:42:25AM  5  August?

6  A.    I sent everything.

7  Q.    Okay.  Were you aware that we received it in October and

8  we had to continue making additional requests because there

9  were -- there were documents that were missing?

11:42:39AM  10  A.    I am not aware of that, no.

11  Q.    Okay.

12  A.    When Mr. Rytting asked me for the documents, I

13  photocopied everything and sent it out the same day.

14  Q.    Okay.

11:42:50AM  15          MS. ODEN:  Is there a different version,

16  Mr. Rytting --

17          MR. RYTTING:  No, not that I know of.

18          MS. ODEN:  Okay.

19  BY MS. ODEN:

11:42:54AM  20  Q.    So, you haven't found the consent form that Mr. Aldridge

21  signed where you noted what he said about his attorneys?

22  A.    I have it in my file, but it is not in here.

23  Q.    Okay.  What are the other questions that you asked him

24  about his competency?

11:43:09AM  25  A.    I asked him about -- say that again.  About his

1 competency?

2 Q.   About competency.  You were evaluating him for

3 competency.

4 A.   You said what other questions you asked him about his

11:43:24AM 5 competency.

6 Q.   About his competency.  What question --

7 A.   You mean to determine whether he is competent or not?

8 Q.   Yes.

9 A.   Okay.  Because I didn't ask him whether he felt he was

11:43:32AM 10 competent or not.  I'm confused about what you are asking me.

11 Q.   What was the next question you asked him?

12 A.   Oh, at the time of my 2006 interview, I asked him the

13 first general question:  What is your understanding of the

14 current legal proceedings against you?  And then specifically

11:43:57AM 15 when --

16 Q.   I'm sorry.  Let me stop you.  I thought your first

17 question was:  Who are your attorneys?

18 A.   Well, yes.  This is in the clinical interview.  That was

19 when I went over the consent.

11:44:08AM 20 Q.   Okay.  So --

21 A.   So, yes, that was it.  My immediate first question, when

22 I went over the consent with him and explained to him who

23 appointed me, we did discuss his attorney at that point.

24 Q.   Okay.

11:44:16AM 25 A.   But then in my clinical interview, since I had already

1  talked to him about that, I didn't bring up the attorney

2  again.

3  *Q.*  Okay.

4  *A.*  Because he had stated that -- you know, that that

11:44:25AM  5  attorney has been recused by me; and I don't recognize him.

6  He is part of the conspiracy, and I don't recognize him as my

7  attorney.

8           So, then in that clinical portion, I asked

9  questions related to the competency in regard to the legal

10  proceeding.

11           THE REPORTER:  I'm sorry.  You have to slow down.

12           THE WITNESS:  I'm sorry.

13  *A.*  During my clinical interview, the section where I was

14  asking him about legal proceedings, I asked him first a

11:44:54AM  15  general question about what is your current understanding of

16  the legal proceedings at this point in time?  Okay.  Are you

17  aware of the charges against you?  That's when he said:  I'm

18  on death row for capital murder.  I did not do capital murder.

19  They are trying to murder me.  And he went on about the Sufis

11:45:16AM  20  and then the Nazis and the mystics, the spirits, et cetera, in

21  relation to that.

22           And then I talked a little bit about how he

23  understood that there was a side that was against him and a

24  side that was for him in court, trying to get, as I had

11:45:35AM  25  mentioned, the adversarial nature of the legal proceedings.

269

1   And he was only able to say that everybody was against him,

2   every lawyer that's been appointed to him, every judge, and

3   all of the courts, the federal and the state.  They don't read

4   my writings.  They don't, you know, answer my appeals.  So, he

11:45:54AM  5   was not able to state that he was aware that there was a

6   distinction between those that were there to support him and

7   those that were there to prosecute him.

8   Q.   Is that reflected in your interview notes?

9   A.   Again, that's part of all of this.

11:46:07AM  10  Q.   Can you show me?

11  A.   Writings.  Again, I don't have my questions written down.

12  I only have his responses.

13  Q.   Show me his responses to that.

14  A.   I mean, that's all of this.

11:46:18AM  15  Q.   Because I can't read your writing, it would really help

16  me and it would probably help the Court if you could read for

17  us from your writings what he said.

18  A.   Okay.

19  Q.   Or what you wrote down that he said.

11:46:30AM  20  A.   Okay.

21  Q.   And what page are you on?

22  A.   I'm starting with page 1.  I'm going to read my notes.

23  Q.   Okay.  This is actually page 2 from Respondent's

24  Exhibit 4.

11:46:43AM  25  A.   It is page 1 of my notes.

1  Q.   That's fine.  This is for the record so the Court can

2  look back and read along with you.

3  A.   Okay.  So, it starts off talking about the state court.

4  And this is -- to make sure, again, I can't write verbatim.

11:46:58AM  5  He is a very verbose gentleman.  The state court falsified --

6  he is talking about they falsified his documents, and he filed

7  a habeas corpus.  It has never been followed up on.

8  Dr. Silverman offered me a new trial, a not guilty verdict, a

9  full capital murder trial.  So, he's, you know,

11:47:19AM  10  misinterpreting what Dr. Silverman did.  Dr. Silverman didn't

11  offer him a new trial.

12  Q.   If you can just read --

13           MR. RYTTING:  I object, Your Honor.  I would like

14  this to be by question and answer since it's -- particularly

11:47:29AM  15  because it is cross-examination, and she is asking a very

16  open-ended question to -- that is going to result in, I don't

17  know, probably -- it was a five-hour interview.  It is going

18  to be a five-hour recitation of notes.

19           THE WITNESS:  I mean, the answers, Your Honor, are

11:47:47AM  20  in all of my notes.  It is not a specific location for them.

21           THE COURT:  I see that these handwritten notes in

22  the beginning of Exhibit -- of Respondent's Exhibit 4 go from

23  approximately page 2 to page 10.  Is it your intention to ask

24  her to read all of those notes?

11:48:10AM  25           MS. ODEN:  I just want to find out where in the

1  notes she has recorded his answers to some of these questions

2  about competency.

3  A.   All of this.  All of my writing are his answers to my

4  questions.

11:48:23AM 5          MS. ODEN:  So, it is difficult for me to break it

6  up.  I'm trying to break it up into question and answer form,

7  and I am hoping that we can just get to the parts of the notes

8  that answer those specific questions.  I found it very

9  difficult to read her handwriting.

11:48:40AM 10          THE COURT:  Well, I would agree.  The handwriting is

11  difficult to read.  But the Doctor is saying that all of her

12  questions deal with his competency.  So --

13          THE WITNESS:  The other data that I have is on the

14  cognitive test.

15          MS. ODEN:  Correct.

16          THE WITNESS:  And those are on the answers -- the

17  answers on the cognitive test.

18          MS. ODEN:  Right.

19          THE WITNESS:  So, this interview portion is all

11:48:58AM 20  about the competency stuff.

21          MS. ODEN:  Correct.  And we're just -- we're just

22  talking about the answers to the competency portion of the

23  exam, not all the cognitive testing.

24          THE WITNESS:  That's -- all of these handwritten

11:49:10AM 25  notes are.

272

1          MS. ODEN:  Correct.

2          THE COURT:  All right.  So, everything that she's

3     got handwritten here in the first, say, ten pages -- her

4     testimony is that this all relates to the questions regarding

11:49:20AM  5     his competency.

6          MS. ODEN:  That is my understanding at this point,

7     Your Honor.

8          THE COURT:  Okay.  Do you have a specific question

9     about something -- like a specific question that she asked

11:49:32AM  10    about competency where the answer is in here?  Is that what

11    you're trying to get at?

12         MS. ODEN:  That's what I am trying to get at.  And

13    my understanding from Dr. Mosnik is that there was not a

14    specific question with a specific answer that he just spoke

11:49:44AM  15    and she wrote down.

16              Is that correct?  You wrote down --

17         THE WITNESS:  I asked specific questions, yes,

18    open-ended questions about his understanding -- as I told you,

19    the three questions that I asked.  And he is verbose.  This is

11:49:58AM  20    his answer.  He goes on and on and on.  That is correct.

21         THE COURT:  I think the problem is that it is not

22    broken down.  Question No. 1, when I asked him X --

23         THE WITNESS:  That's correct.

24         THE COURT:  -- goes from page 2 to 3.  It is not

11:50:11AM  25    broken down that way, as I appreciate it.

1          THE WITNESS:  That's correct.  I did not write down

2    my question.

3          MS. ODEN:  Something Dr. Mosnik just said alerted me

4    to something.

5    BY MS. ODEN:

6    Q.   You just said "the three questions that I asked."  If I

7    understand correctly, you asked:  Who are your attorneys?

8    A.   I'm talking about the clinical interview.  I asked that

9    initially.

11:50:25AM 10    Q.   Okay.  What are the three questions you asked during the

11    clinical interview about competency?

12    A.   What is your understanding of the current legal

13    proceedings --

14    Q.   Okay.

11:50:34AM 15    A.   -- that you are undergoing or experiencing?  Are you

16    aware that -- I actually didn't ask are you aware because I

17    asked open-ended questions, not where I lead them or give them

18    an answer to the question.

19          So, discussing the role of the prosecution and

11:50:53AM 20    the defense.

21    Q.   Okay.

22    A.   And then understanding of the charges against him.

23    Q.   Okay.  So, those -- were there other questions that you

24    asked that were outside of those three areas?

11:51:04AM 25    A.   No.

1    Q.    In his competency section?

2    A.    No.

3    Q.    Okay.

4    A.    But I did utilize his answers to the questions that

11:51:15AM  5    Dr. Quijano asked him at the time of the trial.  Again, he was

6    not faced with a trial at the time that I interviewed him.

7    Q.    Correct.  So, you did kind of a modified competency

8    examination by asking just these three questions that were

9    relevant to this circumstance.

11:51:31AM 10    A.    Right.  Because I was asked to determine whether he would

11    be competent now to have an understanding of the proceedings

12    against him and then whether or not I could determine a

13    retrospective evaluation of his answers with the data that I

14    had at the time of the 1990 trial, was he competent to stand

11:51:49AM 15    trial at that time.

16    Q.    What was -- tell me, again, what the third question that

17    you asked during your evaluation was.

18    A.    What the charge against him was.

19    Q.    Okay.  So, he understood that it was capital murder?

11:52:00AM 20    A.    No, he did not, not outside of his delusional network.

21    As I said, he said:  I am on death row for capital murder, but

22    I did not kill anybody.  The Sufi killed this person; and they

23    are murdering me, blah, blah, blah.  So, no, he never was able

24    to state that independent of his delusional network.

11:52:19AM 25    Q.    Okay.  So, if I am understanding you correctly, he

1  understood that he was on death row for capital murder; but he

2  didn't agree that he committed it.  He felt he was being

3  framed, et cetera.  Is that an adequate summary?

4  A.   No.  I don't believe that it is.  I think you are trying

11:52:36AM 5  to tease something apart that can't be teased apart by the

6  client.  The client is not able to differentiate the two.  He

7  can't separate the two.  That's my point.

8  Q.   And how is that any different from some other person on

9  death row who says:  Yeah, I'm on death row for capital

11:52:53AM 10  murder; but I didn't commit it.  The other guy did it.  I

11  didn't do the murder?

12  A.   That is not what Mr. Aldridge is saying.  He is saying

13  that somebody committed a murder through him, that used his

14  body, commanded him to do this.  And they are Sufi mystic.  It

11:53:09AM 15  goes on and on.  I can go -- that the Nazis are torturing him

16  and the Sufi mystic, that he is designed to be the second

17  messiah in the Muslim world, and people are trying to murder

18  him.  The courts are involved in this, and everybody has set

19  him up for a capital murder charge.  Even though he didn't

11:53:25AM 20  kill anybody, they are murdering him through him.

21  Q.   Okay.  But that's --

22  A.   So, he's not simply saying:  I didn't do it.

23  Q.   But that's nothing like what he said back in 1990, right?

24  A.   It is like what he said in 1990.  There was a voice on

11:53:39AM 25  the roof commanding him -- causing him to black out.  People

1   were after him and being released from prison and were after

2   him to murder him and that he was blacking out and the voices

3   were telling him that he had to kill.  He didn't want to kill.

4   Q.   That's one of the versions that he told in 1990; but

11:53:57AM  5   there were a lot of other versions that he told in 1990,

6   weren't there?

7   A.   I'm not aware any other versions.  What other a lot of

8   versions did he tell?

9   Q.   You are not aware of the other versions of the story?

11:54:09AM  10  A.   From Dr. Quijano's report?

11  Q.   Did you read the Houston Police Department records that

12  were provided in August, 2007?  The records indicating he told

13  his nephew James that he had -- let me look at the specifics.

14          He told James that he got involved in a scuffle

11:54:30AM  15  with his manager and killed him in self-defense and then

16  emptied out the safe to make it look like a robbery.  Are you

17  aware that?

18  A.   No.

19  Q.   That's Respondent's Exhibit 17 at page 68.

11:54:41AM  20          Are you aware that immediately after the crime,

21  he said:  I'm in a jam, and I need some help, to his -- I

22  think it is his brother-in-law, Edward Ford?

23  A.   No, I am not aware of that.

24  Q.   That's Respondent's Exhibit 17 at page 44.  Are you

11:54:56AM  25  aware --

1          MR. RYTTING:  I'll object to the form of the

2    question was she aware that he said this or that.  These are

3    reports from people who -- this is hearsay in the context of

4    this trial certainly about what Mr. Aldridge was telling the

11:55:11AM 5    witnesses that were used at trial.  We don't have those

6    witnesses here to cross-examine about the reliability of their

7    reports, and reporting of what Mr. Aldridge said or the

8    circumstances under which these supposed statements were made

9    is completely unreliable information.

11:55:31AM 10          MS. ODEN:  She's an expert.  She can take it into

11    consideration.  If she wasn't provided those documents, I'm

12    certainly entitled to impeach her opinion with them.

13          THE COURT:  I agree.  Overruled.

14    BY MS. ODEN:

11:55:41AM 15   Q.   Okay.

16   A.   I didn't review the Houston Police Department records.

17   Q.   Okay.  So, let me ask you how these different factors or

18   statements might affect your opinion.

19          MR. RYTTING:  May I ask the respondent to show her

11:55:55AM 20   the documents to which she is referring to?

21          MS. ODEN:  Sure.

22          THE COURT:  You may.  I think that would be useful.

23              Identify these again by exhibit number.

24          MS. ODEN:  Not a problem, Your Honor.  These are all

11:56:16AM 25   from Respondent's Exhibit 17.

1            May I approach?

2            THE COURT:   You may.

3    BY MS. ODEN:

4    Q.   Doctor, I'm showing you Respondent's Exhibit 17, page 44.

11:56:26AM 5    In the last paragraph of the page, there are some pink

6    highlight.  Go ahead and you can review the whole page if you

7    want, but --

8    A.   Well, if you could -- I'm not familiar with the setup of

9    this information --

11:56:40AM 10   Q.   This is the Houston Police report.

11   A.   But when it says "information from Sergeant Brian

12   Foster," does that mean this is him talking?  Who is talking?

13   Who -- what is this --

14   Q.   This is the entry in the police report that deals with

11:56:55AM 15   the investigation of the crime.  So, one of the detectives

16   that is investigating the crime is making these entries as

17   they are proceeding with their investigation.  So, they are

18   noting information that they are receiving from different

19   sources.

11:57:08AM 20   A.   Okay.

21        (Pause in the proceedings)

22   A.   What does "he"?

23   BY MS. ODEN:

24   Q.   I think it is "he."  "He."  This is a Xerox copy.  So,

11:57:35AM 25   the first letter along the side might be cut off.

1   *A.*   Okay.

2   *Q.*   Okay.  I'm referring to Respondent Exhibit 17, pages 270

3   to 272.  This is the sworn affidavit of Edward Ford.  Have you

4   ever seen that document before?

11:58:23AM  5   *A.*   I have not, no.

6   *Q.*   Okay.  Go ahead and review it.  I'm sorry.  Including

7   page 273.  I was holding onto the last page by accident.

8   There you go.

9        MS. HAYES:  If I may ask, Your Honor.  273 was the

11:58:55AM 10   one page that was missing from the original non-redacted

11   records that we sent you, but then that was included in an

12   overnight.  So, if you don't have 273 --

13        THE COURT:  I have it.

14        MS. HAYES:  Okay.

11:59:05AM 15        THE COURT:  Thank you.

16     (Pause in the proceedings)

17   *A.*   Okay.

18   BY MS. ODEN:

19   *Q.*   Now, I'm showing you Respondent's Exhibit 17, Page 274 to

12:02:44PM 20   277.  This is the sworn statement of James Thomas.  Have you

21   ever seen that before?

22   *A.*   No, I haven't.

23   *Q.*   Go ahead and review that.

24   *A.*   That's a little difficult to read.

12:02:56PM 25   *Q.*   I feel your pain.

1          (Pause in the proceedings)

2               MR. RYTTING:  Your Honor?

3               THE COURT:  Yes.

4               MR. RYTTING:  Is it possible to get an idea from

12:12:53PM 5  respondent about how much material she wishes Dr. Mosnik to go

6    over?

7               MS. ODEN:  I've got one more sworn statement that

8    was in the police file from Gladys Aldridge, but -- I would

9    have shown it to her way earlier if I had known she hadn't

12:13:07PM 10 seen this.  I would have given it to her yesterday.

11              THE COURT:  How many pages is that?

12              MS. ODEN:  This is four pages.  The fifth is just

13   the signature.

14              THE COURT:  All right.  How far along are you on

12:13:23PM 15 that?

16              THE WITNESS:  I'm on the last page.

17              MR. RYTTING:  Then, Your Honor, I propose that

18   they -- I'm not even sure if this is proper impeachment.  She

19   hasn't read this material.  If they wish, they can have their

12:13:36PM 20 expert comment on the significance of it and they can have a

21   more complete record.  Is the complaint, the impeachment that

22   you didn't get all the records and you didn't read these

23   police reports and statements of witnesses at trial?  That

24   impeachment has been done.  I'm not sure what additionally is

12:13:55PM 25 going to be accomplished through our witness that they could

1    not do through Tom Allen giving his expert opinion about the

2    significance of these reports, as far as the competency issue.

3            THE COURT:  Well, I'm interested in what this

4    witness thinks about the significance of these, assuming that

12:14:10PM 5    they're true.  So, I'm going to let her read the other report;

6    and then let's go on.

7            THE WITNESS:  Okay.  I'm on the last paragraph.

8            MS. ODEN:  No problem.

9        (Pause in the proceedings)

12:14:57PM 10 A.   Okay.

11           MS. ODEN:  May I approach?

12           THE COURT:  You may.

13 BY MS. ODEN:

14 Q.   Doctor, I'm showing you Respondent's Exhibit 17, page 278

12:15:04PM 15 to 283.  This is the sworn statement -- two sworn statements

16 from Gladys Aldridge.

17 A.   Okay.

18 Q.   I assume you haven't seen those before?

19 A.   I have not.

12:15:14PM 20 Q.   Okay.

21       (Pause in the proceedings)

22 A.   Okay.  Oh, wait.  This -- is this page 2?  There was a

23 signature page and then another page --

24 BY MS. ODEN:

12:23:31PM 25 Q.   That's her second statement.

1  A.   Okay.  All right.  So, then I have one more page.

2  Q.   Okay.

3       (Pause in the proceedings)

4  A.   Do you know if these are on the same day?  What the date

5  of these are?

6  BY MS. ODEN:

7  Q.   The date should be on here.

8  A.   This looks like 1/13/90, but I'm not sure about the date

9  on this one.  Is that also?

12:24:00PM 10  Q.   It is 1/13.  The military time is a little hard to read,

11  but it will also say under the date what time the statement

12  was taken.

13       (Pause in the proceedings)

14  A.   Okay.

12:25:31PM 15  BY MS. ODEN:

16  Q.   So, Doctor, having read some statements by family members

17  about Mr. Aldridge's account of the crime before he was

18  arrested, you see that there are actually some different

19  versions out there of what happened during the crime; is that

12:25:46PM 20  right?

21  A.   They are those individuals' perspectives, yes.  I have to

22  say that the statements from Gladys and James -- I'm familiar

23  with a lot of that material from their testimony and other

24  statements they made.  So, a lot of that was consistent with

12:26:01PM 25  things that I've read.  The ones that I had never seen

1  anything about is these here from -- I never saw anything from

2  Eddie Ford, any of those.  Those are new.

3  Q.   So, we see that, according to these individuals,

4  Mr. Aldridge variously accounted for his crime as self-defense

12:26:17PM  5  or as a robbery where he needed to kill the witness or where

6  he killed the person during the scuffle and made it look like

7  a robbery by stealing the money.

8  A.   No.  I'm not coming to those conclusions from reading

9  this.

10  Q.   Okay.

11  A.   I don't see anywhere in here where he says it was

12  self-defense, and I don't see anywhere he's saying -- they're

13  saying that he said he had to make it look like a robbery.

14  Q.   Okay.

12:26:42PM  15  A.   They're explaining the details.  And there's nowhere in

16  here that would rule out that he was also hallucinating and

17  delusional at the time.

18  Q.   That's not my question.

19  A.   I don't see anywhere where there's anything that says

12:26:51PM  20  anything about self-defense or making it look like a robbery.

21  Q.   Okay.  Are you -- so, you are probably not familiar,

22  then, with -- you were here during the testimony from Gladys

23  and you read her statements and you read Edward Ford's

24  statement, all three of which agree that Garfield had a gun

12:27:15PM  25  and was trying to decide what to do with the gun afterwards,

1  correct?

2  A.   That's according to their statements, yes.

3  Q.   Correct.  And, of course, we don't have Garfield's

4  statement because he didn't make a statement.

12:27:25PM  5  A.   Well, actually, that's not true.  In these statements

6  there's no indication that Garfield is trying to figure out

7  what to do with the gun.  The statements seem to be related to

8  the fact that he recognizes the gun is missing and that he

9  thinks Eddie took it and he wants to get it back.  So, that's

12:27:41PM  10  my reading of these statements, is that he is trying to get

11  the gun back from Eddie.

12  Q.   Okay.

13  A.   So, there's no statement where they're saying he's trying

14  to do something to get rid of the gun.  Nobody said he is

12:27:52PM  15  trying to get rid of the gun.

16  Q.   Okay.  We could spend the time necessary to have you read

17  the whole Houston Police Department file and the accounts of

18  all the interviews that they did, and maybe that's something

19  that you could do in preparation for the rest of your

12:28:06PM  20  testimony in this case.

21           But if you were to read accounts that indicated

22  after the crime, Garfield was asking people's advice:  What do

23  I do with the gun?  How do I get rid of the gun?  Do I keep

24  the gun, does that indicate to you that perhaps there is some

12:28:23PM  25  part of his mind that is operating a little more rationally

1    and a little bit less delusionally after the crime?

2    A.    What that says to me is that Mr. Aldridge is confused,

3    that he doesn't have a plan, that he doesn't know what to do

4    with it.

12:28:41PM  5    Q.    Okay.  So, if you were to read things that indicated, for

6    example, that he was trying to figure out how to escape and

7    escape the detection of the authorities, you would interpret

8    that as confusion and not as rational problem solving; is that

9    right?

12:28:58PM 10    A.    Right.  He doesn't seem to have a plan.  He doesn't seem

11    to have any steps laid out.  The only goal that he had that's

12    been present forth, that he has this goal to get out of this

13    country, to go to a Muslim country, to die on Muslim land.

14    Q.    Okay.

12:29:18PM 15    A.    So, that's -- there's nowhere that he goes to Gladys and

16    tells -- he doesn't tell her, you know, do this, do this, do

17    this and have a plan.  There seems to be running back and

18    forth to -- from Gladys' apartment to Eddie's apartment to a

19    couple of different hotels doing things.  So, it seems pretty

12:29:32PM 20    haphazard to me and it seems like there's four other people

21    contributing advice and telling him to do different things.

22    So, at this point I don't know what Mr. Aldridge is saying or

23    what they're saying or having him do.

24    Q.    So, your interpretation is that they are the ones

12:29:47PM 25    directing his behavior, not him?

1  *A.*   No.  I'm saying that there are -- these three other

2  people are involved.  So, I don't know -- it seems to me that

3  Mr. Aldridge is not organized, that he doesn't seem to have a

4  plan for escape, as you put it.

12:30:01PM 5  *Q.*   And you would probably discount the fact that he went out

6  and bought the gun a couple days ahead of the robbery and lied

7  on the form so that he would be able to buy the gun because

8  that wasn't planned?

9  *A.*   I've never said that I have discounted that.  You are

12:30:18PM 10  putting words in my mouth.

11  *Q.*   Would you discount that, or would you agree that that

12  indicates some degree of planning?

13  *A.*   No.  That's in the record, that he purchased a gun and

14  that he lied on there about his felony history prior to that

12:30:30PM 15  on the application.

16  *Q.*   And you would interpret that as an evidence -- a piece of

17  evidence indicating he was planning and using forethought?

18  *A.*   I don't think that in and of itself says that he's

19  planning.  I think that says that he's capable of purchasing a

12:30:44PM 20  gun.

21  *Q.*   Okay.

22  *A.*   It doesn't say anything about his thought pattern and

23  whether he is thinking about using it for a specific thing, in

24  terms of planning or something in the future.  It shows that

12:30:53PM 25  he was capable of purchasing the gun.

1    Q.   And talking about the running around that he was doing

2    after the offense, wouldn't you agree that him saying:   We

3    need to go to my apartment and y'all need to go in and get me

4    clothes and a passport and I am going to hide so that nobody

12:31:12PM  5    catches me in my apartment, you wouldn't agree that that's

6    some indication of rational problem solving?

7    A.   No.  You could also interpret that that's based on his

8    delusions.  And, one, my understanding from their reports and

9    my read of these things you just had me read and my awareness

12:31:25PM 10    of also their testimony and these other -- the affidavits that

11    I read, is that he said to go get -- to my apartment to get my

12    passport.  There was no mention that he said to get the

13    clothes.  They went in there and got that together for him,

14    but they didn't say that he said to get those things.  They

15    went into the apartment -- the only thing that there's record

16    that they said Mr. Aldridge told them to get was his passport.

17    And they didn't say that he said he had to hide.  He just went

18    behind the bushes.  In the statements that Gladys said is that

19    he kept saying people are out -- my enemies are out to get me.

12:32:02PM 20    So, he felt -- which is consistent with his delusions that

21    people were out to get him or his enemies were out to get him.

22    He hid.  But they didn't say anything about him saying he had

23    to hide.

24    Q.   Doesn't he also say that the police are out to get him?

12:32:13PM 25    A.   I don't see that in here, no.

1   Q.    Okay.

2   A.    Can you show me where that is?

3   Q.    Some of the other running around that he does is to go

4   pick up his nephew James, right?

12:32:25PM 5   A.    James is one of the people that's involved in this.

6   That's correct.  I don't know who picked up who.

7   Q.    They go pick James up because Garfield wants to get a

8   hotel, but he knows he can't get a hotel room without I.D.

9   So, he wants to use James' I.D. to get the hotel room; isn't

12:32:42PM 10   that right?

11   A.    My understanding is that James was already in the car,

12   that James went with Gladys and Aldridge in the beginning and

13   that they -- yes, that they used James' I.D.

14   Q.    And you also read --

12:32:52PM 15   A.    My understanding is that they did that when they got to

16   the hotel.  They went to a hotel, and then they asked, you

17   know, Mr. Aldridge:  Do you have an I.D.?

18              And he says:  No.

19              And James said:  I have I.D.  And so, then

12:33:02PM 20   James went in with his I.D.

21   Q.    And you also read in James' statement that Garfield said:

22   I killed my manager because we got in a fight, and I stole the

23   money afterwards to make it look like a robbery.  That's page

24   68.

25   A.    Okay.

```
 1   Q.   I'm sorry.  That was the police report.  I don't know
 2   what page number --
 3            MR. RYTTING:  Page 68.
 4   BY MS. ODEN:
 5   Q.   That was the police report version.  I don't know what
 6   page number it is in James's sworn affidavit.
 7   A.   Okay.
 8   Q.   Okay.  So --
 9   A.   Okay.  Say that -- tell me, again, what page that is on
10   here.
11   Q.   Again, I don't have the page number since you have the
12   actual sworn statement in front of you.
13   A.   Okay.
14   Q.   If James' statement says that Garfield said:  I stole the
15   money after I killed the manager to make it look like a
16   robbery --
17   A.   I just read that, and I don't have a recollection of that
18   saying that.  So, I am going to find that section.
19   Q.   Doctor, let me --
20   A.   Oh, here.  Garfield said that him and his manager -- and
21   he had to shoot him.  He did not say that they had been
22   fighting.
23   Q.   Doctor, let me stop you.  Since that is in the record,
24   let me make this a little bit easier because the police report
25   version is a little bit easier to read.
```

Timestamps in left margin:
12:33:24PM (line 5)
12:33:46PM (line 10)
12:33:55PM (line 15)
12:34:41PM (line 20)
12:34:59PM (line 25)

1          MS. ODEN:  May I approach, Your Honor?

2          THE COURT:  You may.

3     BY MS. ODEN:

4     Q.   This is Respondent's Exhibit 17, page 68.  What I am

12:35:08PM 5     reading from is at the very bottom of the page, and I'm going

6     to read this.  Tell me if I read this right.

7                "The suspect told James that he had become

8     involved in a struggle with the manager of the McDonald's

9     where he worked and he had to kill him.  Garfield also told

12:35:20PM 10    James since he had to kill the man, that he stole the money

11    out of the safe to make it look like a robbery."

12    A.   Okay.

13    Q.   So, if that is what Garfield told James, wouldn't that be

14    an indication to you of some rational understanding or

12:35:35PM 15    rational problem solving at the time of the offense?

16    A.   No.  Because we don't know if he was also delusional at

17    that time.

18    Q.   And his delusion was, again, the version he told you with

19    the Sufis?

12:35:50PM 20    A.   Believing that somebody else had worked through him to

21    commit this murder because of the voices commenting these

22    command hallucinations and his concern that people were

23    molesting him and after him and trying to murder him, yes.  If

24    nobody asks about that, patients with schizophrenia do not

12:36:08PM 25    volunteer that volitionally.  So, that has to be directly

1    queried.  So, I cannot say that based on this alone that is a

2    rational statement.  One, it is a statement of James about

3    what Aldridge said; and James did not question him about

4    whether or not -- you know, why he believed that there was any

12:36:26PM  5    voices telling him to do that.

6    Q.   So, a schizophrenic who is actively hallucinating and

7    actively delusional will choose to only express verbally the

8    ordinary sounding explanation for a crime -- i.e., that he got

9    in a fight, had to kill him, stole the money to make it look

12:36:45PM  10   like a robbery -- and will not volitionally express this

11   florid hallucination that he killed him because he was being

12   sexually assaulted and the Sufi in his left ear told him he

13   had to do it and acted through him?

14   A.   One, we are talking about whether or not he was

12:37:04PM  15   delusional and hallucinating at the time of the crime, not at

16   the time that he is talking to James.  So, he may not have

17   been having an auditory hallucination at the moment that he

18   spoke to James.

19   Q.   I thought you said it was pervasive, that it was all the

12:37:17PM  20   time --

21   A.   It is.  I said there's no --

22   Q.   -- wax and wane.

23   A.   That is what I said.  I said there is no -- you don't

24   have auditory hallucinations -- once they are pervasive, you

12:37:31PM  25   have them.  You don't experience them every second.  They are

1  in your mind.  You don't speak about them every second.  Once

2  you are diagnosed and you have those symptoms, they are

3  pervasive.  The delusions are fixed.  That doesn't mean that

4  doesn't prohibit him from having speech -- subjects not

12:37:44PM  5  related to that.

6              So, what I am saying is there is no evidence --

7  well, there's two things.  One, there is no evidence, based on

8  this statement from James, that he wasn't hallucinating or

9  delusional at the time of the crime or when he was talking to

12:37:59PM  10  James.  Okay?  One, I don't have the chance to talk to James

11  and query was there anything going on?  Did he make any other

12  comments?  I'm sure this is not a complete and absolutely

13  every single thing that happened, every single thing that was

14  said was in this account.  This is very brief.  Or if even

12:38:14PM  15  other questions were asked of James or Mr. Aldridge about

16  this.  So, no.  I'm saying based on this information, I cannot

17  determine about whether this is a rational act telling him

18  this or not.

19  Q.  So, in order for your interpretation to be accurate, we

12:38:32PM  20  have to believe that at the time of the crime, Mr. Aldridge

21  was not acting according to his, basically, lifelong pattern

22  of committing robberies and attempted or completed murders but

23  he was acting according to a command hallucination in his mind

24  because of --

12:38:53PM  25              MR. RYTTING:  I have to object to the form of the

1  question and the information that there was a lifelong

2  pattern.  I believe there was one incident in -- I mean, two

3  incidents, I think, before 1972; and then he was incarcerated.

4          THE COURT:  All right.  I'm going to sustain that.

12:39:09PM  5  Rephrase your question.

6  BY MS. ODEN:

7  Q.   Okay.  Doctor, so, in order for us to believe your

8  interpretation, we are going to have to ignore the fact that

9  he was first adjudicated of robbery when he was 14 years old

12:39:20PM 10  and by the time he was 17, had committed several robberies and

11  was sent to prison for robbery and had also committed an

12  attempted murder.  We have to ignore that pattern and we have

13  to believe that he committed this robbery and murder because

14  of a hallucination that was so profound and so strong in his

12:39:40PM 15  mind that he completely believed it wasn't him doing it but

16  that was, nevertheless, not strong enough that he would

17  immediately talk about it when he was fleeing the scene of the

18  crime; and his only explanation to his family members was that

19  he had done a hit, he had a committed a robbery, he --

12:40:02PM 20          MR. RYTTING:  I will have to object to the form of

21  the question.

22          THE COURT:  It's really --

23          MR. RYTTING:  It's about ten of them.

24          THE COURT:  It is a very extended question.  Can you

12:40:14PM 25  simplify it?

1                    MS. ODEN:  I'm sorry.

2    BY MS. ODEN:

3    Q.   All right.  Let me break it down.

4                    Doctor, are you aware -- you reviewed his

12:40:28PM  5    T.Y.C. youth records, his juvenile criminal history.

6    A.   I did, yes.

7    Q.   So, you are aware -- it's found on T.Y.C. records at page

8    9 -- that in 1968 he was convicted of burglary of a residence.

9    A.   I am.

12:40:41PM 10    Q.   And on the same page he was convicted four months later

11   of burglary of a drive-in grocery.

12   A.   Yes.

13   Q.   And the same page, about a month later he was convicted

14   of breaking and entering a residence.

12:40:53PM 15    A.   Yes.

16   Q.   I shouldn't say convicted.  I should say adjudicated.

17   A.   Right.

18   Q.   Same thing.

19                    In 1969 he was adjudicated of auto theft.

12:41:02PM 20    A.   Yes.

21   Q.   Okay.  And he was committed to the Gatesville School for

22   Boys.  You are familiar with all of that.  In 1970 he has a

23   burglary.  That's for priors, page 198.  And you know in 1972

24   there were the four robberies by assault and the one assault

12:41:23PM 25    to murder.

1                    You are familiar with those?

2   A.    Yes.

3   Q.    Okay.  Again, later in 1972 the robbery at the meat

4   packing plant in Houston.

12:41:34PM 5   A.    Uh-huh.

6   Q.    So, you would agree that there is a pattern from 1968

7   onward of committing robberies, burglaries, assaults,

8   attempted murder?

9   A.    Well, one, there's a number of circumstances involved in

12:41:45PM 10   all of those.

11   Q.    Of course.

12   A.    So, yes, I am absolutely aware of those.

13   Q.    Okay.

14   A.    And, again, those were prior to the onset of his

12:41:51PM 15   schizophrenia.

16   Q.    Right.  So, then we have this offense which, according to

17   various interpretations, was either because he was being

18   sexually assaulted by this manager or a Sufi told him to do it

19   or the man on the roof told him to do it or somebody else told

12:42:08PM 20   him to do it or he got in a scuffle with the manager and it

21   was self-defense and that he stole the money to make it look

22   like a robbery, correct?  Those are some of the different

23   interpretations or accounts that we have in the records?

24   A.    Well, the only -- I mean, there's no change in sort of

12:42:27PM 25   his delusional accounts of this voice, this person on top of

1  the roof telling him to do this and causing him to black out

2  while he is doing this.  So, he doesn't at one time say it's a

3  Sufi and one time say it's not.  So, there's that explanation

4  and --

12:42:39PM 5  Q.   But there actually is a distinction, right?  Because when

6  does he reportedly make these statements?  Either post crime

7  or post arrest.  All the statements that we know that he makes

8  post crime but before he is arrested are all the ordinary kind

9  of explanations for the crime, right?  Self-defense, I got in

12:43:01PM 10 a scuffle, I stole the money to make it look like a robbery, I

11 committed a robbery, don't worry, I killed the witness.  Those

12 are all --

13 A.   That doesn't exclude the possibility of the delusional

14 account at the time.

12:43:12PM 15 Q.   Agree.

16 A.   He does say to Gladys that my enemies are after me.

17 Q.   Right.

18 A.   And we have already established that his delusions are

19 present prior to this; and this is following his break in

12:43:27PM 20 prison of becoming schizophrenic, becoming psychotic.

21 Q.   After he is arrested is when we get his statements about

22 why he did it consistent with these delusions.

23 A.   Right.  That's the first time it is queried.

24 Q.   Well, we don't know that, do we?  Because you don't --

12:43:44PM 25 you just said you don't know what questions were asked --

1   A.   Right.

2   Q.   -- during the post-crime, pre-arrest stage.

3   A.   That's correct.

4   Q.   So, we don't know if that's the first time he was

12:43:54PM   5   queried.

6   A.   Are you talking about by family members?

7   Q.   By anybody.

8   A.   This is the first time that we know it is being queried.

9   That is correct.

12:44:01PM   10   Q.   Okay.  Is it possible that the version that he gave you

11   is not the true version?

12   A.   In the face of all the evidence and the symptoms that he

13   presented prior to and after, no.

14   Q.   Is it possible that the version that he gave you is

12:44:19PM   15   colored by the fact that his schizophrenia has gone untreated

16   for all these years and so, it is likely to be worse now than

17   it was in 1990?

18   A.   Could you repeat that?

19   Q.   Is it possible that the version that he gave you in 2006

12:44:36PM   20   is colored by the fact that he's had untreated schizophrenia

21   all these years and so, presumably his schizophrenia is worse

22   than it was in 1990?

23   A.   No.  In fact, the pattern of schizophrenia is not that it

24   gets worse over time.  So, the deficits that you see are

12:44:54PM   25   present at the beginning of the illness.  And the reports in

1  Dr. Quijano's report indicate that a very similar

2  presentation, in terms of the types and severity of the

3  symptoms, as Dr. Quijano himself stated, he has a severe

4  mental disease with fixed delusional beliefs, religious,

12:45:11PM  5  grandiose delusions.  So, no.  It is a chronic disease.  It is

6  a chronic longstanding disease.

7  Q.    Actually, the diagnostic and statistical manual disagrees

8  with you, doesn't it?

9  A.    No.

12:45:26PM  10  Q.    The diagnostic and statistical manual, you'd agree, is a

11  reliable source of information about schizophrenia?

12  A.    Absolutely.

13  Q.    Sure.

14          MS. ODEN:  May I approach, Your Honor?

12:45:32PM  15          THE COURT:  You may.

16          MS. ODEN:  I'm showing her page 302.

17  BY MS. ODEN:

18  Q.    Tell me if I am reading this correctly.

19          "Prodromal symptoms are often present prior to

12:45:48PM  20  the active phase and residual symptoms may follow it.  Some

21  prodromal and residual symptoms are relatively mild or

22  subthreshold forms of the positive symptoms specified in

23  criterion A."  And then I'm skipping down here.

24          "Individuals who have been socially active may

12:46:05PM  25  become withdrawn.  They lose interest in previously

1   pleasurable activities.  They may become less talkative and

2   inquisitive, and they may spend the bulk of their time in bed.

3   Such negative symptoms are often the first sign to the family

4   that something is wrong.  Family members may ultimately report

12:46:20PM  5   that they experience individual as gradually slipping away."

6   A.    That is during the prodromal phase, before they have

7   their acute psychotic break.  That is correct.  That's not in

8   disagreement to what I said.

9   Q.    So, is it possible, Doctor, that a patient who actually

12:46:35PM  10   has schizophrenia doesn't suddenly go from white to black; but

11   they have worsening of their symptoms such that people

12   perceive them as getting worse?

13   A.    Certainly they can have exacerbations and worsening of

14   their symptoms and at periods of time when they get better.

12:46:53PM  15   Q.    Okay.  So, is it possible that Mr. Aldridge was not

16   floridly, actively, acutely schizophrenic at the time of his

17   crime?

18   A.    State that again.

19   Q.    Is it possible that Mr. Aldridge was not floridly,

12:47:10PM  20   acutely schizophrenic at the time of his crime?

21   A.    Well, but all the evidence suggests that -- the

22   information that I have that's at the time -- available at the

23   time of the crime indicates that he was.

24   Q.    The evidence that you've reviewed, except for those three

12:47:32PM  25   reports that you just saw --

1  A.   And, again, I don't think those refute that there could

2  be presence of active psychosis.

3  Q.   The evidence that you've been able to see, aside from

4  those three reports that you just saw, all of that evidence

12:47:45PM  5  came from post-arrest statements and interviews; isn't that

6  right?

7  A.   No.  There's information in his records from prison and

8  the letters to his family prior to -- you know, and the

9  evidence from 1986 to 1990 in terms of his behavior being

12:48:01PM  10  bizarre and these reports of spirits and delusions being

11  present prior to that time.

12  Q.   Sure.  But you just told us that a person doesn't

13  hallucinate 24/7, that sometimes they are hallucinating and

14  sometimes they are not, correct?

12:48:15PM  15  A.   I said sometimes they are reporting their hallucinations,

16  and sometimes they're not.

17  Q.   So, what you're telling us is that someone with

18  schizophrenia is actively hallucinating at all times?

19  A.   No.  Not every second of every day, no.

12:48:31PM  20  Q.   Okay.  So, it is possible that there are times when

21  they're not hallucinating.

22  A.   Yes.

23  Q.   So, isn't it possible, then, that when he committed the

24  crime, he was not hallucinating?

12:48:44PM  25          We can't know, right?

1    A.   Right.   I guess based on the records, it indicates that

2    he is.

3    Q.   Right.   And the reports that reflect that he was

4    hallucinating at the time of the crime are all based on his

12:48:56PM   5    statements post arrest.

6    A.   That is correct.

7    Q.   His statements pre-arrest, what we know of them, show

8    something different, don't they?

9                   But we don't know if they are complete, right?

12:49:09PM  10    A.   We don't know that they show something different.

11    Q.   Okay.   When you interviewed him and asked him questions

12    about his competency, questions designed to help you form an

13    opinion on his competency, you chose not to ask him questions

14    related to his competency at the time of trial.   Can you tell

12:49:27PM  15    us again why you didn't do that?

16    A.   Because that would be assessing memory.

17    Q.   Okay.

18    A.   I assessed him 17 years -- 16 years post.

19    Q.   So, if he was able to tell you something about his

12:49:43PM  20    understanding of the legal process when he was facing trial,

21    would that not have indicated something about his competency

22    at the time of trial as well as something about his memory?

23    A.   Sixteen years have passed.   That's too much time.   It is

24    not at the time of the crime.   And Dr. Quijano and others have

12:50:03PM  25    already testified to the fact that when you do a competency

302

evaluation, it has to be related to the information that's
available at that time.  It has to be in the time frame of
that trial.

Q.   So, basically, the questions that you asked Mr. Aldridge
indicate to us now that he's not competent now; but the
answers to those questions don't tell us how he was at the
time of trial.

A.   That the -- right.  I did determine whether he was able
to understand his case currently.  That is correct.  And then
with the combination of my diagnosis and the presence of his
symptoms and cognitive impairment and the history of
schizophrenia and in combination with the records available
from the time of the original trial, an assessment was also
made about whether or not he was likely to -- competent to
stand trial at the time of the trial.

Q.   Okay.

A.   That is correct.

          THE COURT:  Counsel, I think this might be a good
stopping point.  How much longer do you think we have on
cross?

          MS. ODEN:  More than 12 minutes.

          THE COURT:  That's what I thought.  Why don't we
take a break and come back at 10:00 on Monday morning.  We'll
resume at 10:00 o'clock Monday morning.  All right.  Thank
you.

1          MS. HAYES:  I just have one quick issue.

2          THE COURT:  Yes.

3          MS. HAYES:  It will be real quick.

4          THE COURT:  Yes.

12:51:17PM 5          MS. HAYES:  Do you want everything done by the end

6  of Monday, or is there a possibility that it may --

7          THE COURT:  I thought we were going to be finished

8  by 1:00 o'clock today.  That's what I was told.

9          MS. HAYES:  It never plays out that way.

12:51:32PM 10          THE COURT:  Do you think it is going to go longer

11  than Monday?  I've got a jury trial that we have set for

12  Monday which we pushed to Tuesday.

13          MS. HAYES:  Would it be possible to start a half an

14  hour earlier, maybe by 9:30 Monday morning?  I know Georgette

15  is flying back in from Austin, but it lands at 8:00.  And I'm

16  thinking 9:30 would be a good --

17          THE COURT:  We can start at 9:00 on Monday morning.

18  I just thought we weren't going to have to go the whole day,

19  but we can start at 9:00.

12:51:59PM 20          MS. HAYES:  Okay.  We can start at 9:00.  And

21  knowing her flight lands at 7:50 at Hobby, she will just grab

22  a cab straight here.

23          THE COURT:  Okay.

24          MS. HAYES:  It might be just a few minutes after.

12:52:08PM 25          THE COURT:  All right.  9:00 o'clock.

1          MS. HAYES:  Another quick question.

2          THE COURT:  Yes.

3          MS. HAYES:  When you admitted all the exhibits at

4     the start of the hearing --

5          THE COURT:  Yes.

6          MS. HAYES:  -- I think you referred to my exhibit

7     list, but we had also filed an amended exhibit list that had

8     the complete chronology as our Exhibit 29.  Is that also

9     admitted?

12:52:23PM 10          THE COURT:  Yes.  Yes, it is.

11          MS. HAYES:  Okay.

12          THE COURT:  There wasn't an objection to that, as I

13     noted, from the petitioners, was there?

14          MS. HAYES:  No.  They had filed --

12:52:31PM 15          MR. RYTTING:  Well, we had an objection to it; but

16     all objections were overruled.

17          THE COURT:  Yes.  Okay.

18          MS. HAYES:  Okay.  The only last thing, if the Court

19     has to file exhibits or do anything in this break while we're

12:52:41PM 20     gone is that we ask that two of our exhibits be filed under

21     seal because I don't think I could redact out everything with

22     the personal information.

23          THE COURT:  All right.

24          MS. HAYES:  And that would be our Exhibit 17, which

12:52:52PM 25     is the HPD records.

1          THE COURT:  Okay.

2          MS. HAYES:  And then our exhibit with the Texas

3  Youth Commission records.  That's our Exhibit 13.

4          THE COURT:  All right.

12:52:58PM  5          MS. HAYES:  Everything else is redacted completely.

6          THE COURT:  Okay.  All right.

7              Rhonda, make a note of that and make sure that

8  that gets under seal.

9              I was also told that there was a discovery of

12:53:09PM 10  some -- you can all sit down -- that there was a discovery of

11  some defense counsel records.

12          MR. RYTTING:  Yes.

13          THE COURT:  Is that right?

14          MR. RYTTING:  Yes.  We are going to produce those.

12:53:19PM 15          THE COURT:  Those have been shared.  Okay.

16          MS. HAYES:  Well, I think what we've agreed -- this

17  afternoon I'm going to come over and I'm going to take all

18  seven boxes and I will be spending my weekend -- are there

19  six boxes or seven boxes?

12:53:32PM 20          MR. RYTTING:  You have one box.

21          MS. HAYES:  I have one box.  So, they have six more.

22          MR. RYTTING:  Just to be clear, you will get

23  whatever state habeas file was, how many boxes or how many

24  different boxes, you'll get state habeas counsel boxes.

12:53:45PM 25          MS. HAYES:  And my intention is to spend the weekend

1  going through all of those, and if anything comes out that we

2  need to -- at least it will be here ready for the hearing by

3  Monday.

4          THE COURT:  All right.

12:53:57PM  5          MS. HAYES:  And then Monday after the hearing, we

6  will return the boxes to y'all.

7          THE COURT:  Okay.  All right.  Very good.  We will

8  see you Monday, 9:00 o'clock.

9     (Recessed until Monday)

10                     * * *

11  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled cause, to the best
12  of my ability.

13

14  //s_____    12/11/2009
   Stephanie Kay Carlisle-Neisser CSR, RPR    Date
15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**'**

**'72** [1] - 233:9
**'86** [1] - 233:9
**'90s** [1] - 233:10

**/**

**//s** [1] - 306:14

**1**

**1** [4] - 196:19,
269:22, 269:25,
272:22
**1/13** [1] - 282:10
**1/13/90** [1] - 282:8
**10** [1] - 224:6, 270:23
**10:00** [2] - 302:23,
302:24
**10:45** [1] - 235:8
**11:15** [1] - 250:2
**12** [1] - 302:21
**12/11/2009** [1] -
306:14
**12548** [1] - 188:18
**13** [1] - 305:3
**14** [1] - 293:9
**15** [1] - 235:7
**15th** [1] - 208:1
**16** [1] - 301:18
**17** [11] - 276:19,
276:24, 277:25,
278:4, 279:2,
279:19, 281:14,
290:4, 293:10,
301:18, 304:24
**1968** [2] - 294:8,
295:6
**1969** [1] - 294:19
**1970** [1] - 294:22
**1972** [3] - 293:3,
294:23, 295:3
**198** [1] - 294:23
**1980** [1] - 210:13
**1986** [3] - 219:7,
231:24, 300:9
**1990** [20] - 196:13,
207:3, 207:22,
208:1, 210:19,
218:17, 220:3,
222:24, 224:13,
231:24, 251:21,
262:19, 274:14,
275:23, 275:24,
276:4, 276:5,
297:17, 297:22,
300:9

**1995** [7] - 196:14,
196:15, 196:20,
197:2, 197:3, 206:6,
246:10
**1:00** [2] - 250:3,
303:8

**2**

**2** [5] - 223:3, 269:23,
270:23, 272:24,
281:22
**2001** [1] - 193:9
**2002** [1] - 238:2
**2003** [2] - 238:2,
243:13
**2006** [15] - 195:7,
197:25, 205:21,
206:14, 207:2,
208:9, 209:3,
209:18, 218:12,
242:19, 246:1,
246:6, 262:7,
267:12, 297:19
**2007** [1] - 276:12
**2008** [1] - 242:22
**2009** [2] - 188:8,
191:2
**24** [1] - 219:1
**24/7** [1] - 300:13
**25** [1] - 219:1
**26** [1] - 219:1
**27** [3] - 188:8, 191:2,
197:2
**270** [1] - 279:2
**272** [1] - 279:3
**273** [3] - 279:7,
279:9, 279:12
**274** [1] - 279:19
**277** [1] - 279:20
**278** [1] - 281:14
**27th** [1] - 196:20
**283** [1] - 281:15
**29** [1] - 304:8

**3**

**3** [3] - 252:20, 253:2,
272:24
**30** [1] - 250:1
**30-minute** [1] - 235:7
**302** [1] - 298:16
**31** [1] - 197:3
**38** [1] - 191:16
**39** [1] - 191:17

**4**

**4** [4] - 246:22,
263:11, 269:24,
270:22
**40** [1] - 191:18
**41** [1] - 192:3
**44** [2] - 276:24, 278:4

**5**

**5** [1] - 197:1
**515** [1] - 189:4

**6**

**6** [4] - 205:8, 246:23,
247:6, 255:18
**68** [4] - 276:19,
288:24, 289:3, 290:4

**7**

**7** [1] - 205:7
**702** [1] - 241:1
**713.250.5157** [1] -
189:5
**77002** [1] - 189:4
**77006** [1] - 188:16
**78711** [1] - 188:19
**7:50** [1] - 303:21

**8**

**8** [1] - 196:23
**8016** [1] - 189:4
**819** [1] - 188:15
**8:00** [1] - 303:15

**9**

**9** [1] - 294:8
**9:00** [5] - 303:17,
303:19, 303:20,
303:25, 306:8
**9:16** [1] - 188:8
**9:30** [2] - 303:14,
303:16

**A**

**A.M** [1] - 188:8
**abiding** [1] - 234:20
**abilities** [2] - 224:14,
257:18

**ability** [11] - 194:14,
203:11, 205:18,
217:7, 218:6,
229:22, 232:1,
233:18, 261:17,
261:19, 306:12
**able** [43] - 197:14,
197:15, 197:25,
201:6, 203:24,
203:25, 204:6,
204:15, 204:16,
204:21, 207:15,
210:6, 212:21,
214:13, 214:20,
217:14, 217:18,
219:23, 221:10,
225:16, 226:6,
229:4, 229:12,
229:17, 232:8,
232:12, 232:14,
233:25, 234:1,
234:5, 247:10,
248:15, 250:7,
269:1, 269:5,
274:23, 275:6,
286:7, 300:3,
301:19, 302:8
**abnormal** [1] -
229:11
**above-entitled** [1] -
306:11
**abrupt** [1] - 199:15
**absence** [2] - 204:1,
227:14
**absolutely** [6] -
208:17, 217:22,
219:3, 225:10,
292:12, 295:12
**Absolutely** [2] -
209:23, 298:12
**abuse** [1] - 229:25
**abused** [1] - 226:8
**abusing** [2] - 212:3,
227:1
**accept** [1] - 221:13
**accident** [1] - 279:7
**accomplished** [1] -
280:25
**according** [5] -
283:3, 284:2,
292:21, 292:23,
295:16
**account** [3] - 282:17,
292:14, 296:14
**accounted** [1] -
283:4
**accounts** [4] -
284:17, 284:21,
295:23, 295:25
**accurate** [5] -

245:15, 249:2,
249:10, 249:14,
292:19
**act** [6] - 204:7, 204:8,
216:23, 217:3,
217:4, 292:17
**acted** [1] - 291:13
**acting** [2] - 292:21,
292:23
**action** [2] - 198:15,
240:11
**Action** [1] - 188:3
**actions** [6] - 198:16,
218:4, 218:7, 218:8,
254:21
**active** [11] - 210:4,
215:23, 224:18,
227:16, 227:17,
298:20, 298:24,
300:2
**actively** [5] - 205:23,
291:6, 291:7,
299:16, 300:18
**activities** [4] -
230:11, 232:2,
233:20, 299:1
**actor** [1] - 218:7
**acts** [2] - 216:25,
218:3
**actual** [8] - 198:14,
205:19, 207:12,
214:15, 216:15,
217:17, 229:4,
289:12
**acute** [7] - 195:5,
209:24, 210:1,
210:3, 228:12,
228:17, 299:7
**acutely** [2] - 299:16,
299:20
**adapt** [1] - 234:22
**adapting** [2] -
231:16, 231:19
**adaptive** [8] - 230:7,
230:11, 230:19,
231:2, 231:8,
231:13, 231:15
**add** [1] - 233:13
**addition** [4] - 215:18,
226:24, 247:19,
260:5
**additional** [2] -
204:9, 266:8
**additionally** [1] -
280:24
**address** [1] - 238:18
**adequate** [1] - 275:3
**adjudicated** [3] -
293:9, 294:16,
294:19

**administer** [4] - 238:25, 258:24, 259:13, 260:11
**administered** [5] - 202:17, 258:13, 258:21, 260:10, 260:12
**admitted** [7] - 191:24, 192:2, 192:7, 192:8, 223:2, 304:3, 304:9
**adversarial** [3] - 204:11, 248:5, 268:25
**advice** [2] - 284:22, 285:21
**affect** [1] - 277:18
**affective** [1] - 199:4
**affidavit** [2] - 279:3, 289:6
**affidavits** [2] - 196:7, 287:10
**affirm** [1] - 256:5
**afternoon** [1] - 305:17
**afterwards** [3] - 222:17, 283:25, 288:23
**agencies** [1] - 216:11
**agency** [2] - 198:15, 217:21
**agent** [1] - 228:10
**agents** [1] - 218:3
**ago** [1] - 224:6
**agree** [14] - 208:15, 208:17, 240:20, 241:7, 249:10, 271:10, 275:2, 277:13, 283:24, 286:11, 287:2, 287:5, 295:6, 298:10
**Agree** [1] - 296:15
**agreed** [1] - 305:16
**ahead** [6] - 235:9, 236:4, 278:6, 279:6, 279:23, 286:6
**ahold** [1] - 259:22
**aided** [1] - 188:25
**ailment** [1] - 216:9
**alcohol** [1] - 237:4
**Aldridge** [89] - 188:22, 191:12, 192:24, 196:17, 200:3, 200:9, 200:24, 203:16, 206:7, 207:9, 208:3, 208:16, 208:20, 209:25, 210:12, 210:20, 211:11,

211:15, 211:19, 213:13, 215:24, 216:12, 218:10, 218:19, 218:25, 219:20, 219:25, 220:1, 220:17, 220:18, 220:22, 221:18, 222:4, 223:17, 225:20, 225:21, 227:4, 228:23, 229:2, 231:14, 234:7, 235:21, 244:18, 244:19, 244:24, 245:8, 246:14, 248:1, 249:6, 249:13, 249:15, 250:17, 250:25, 251:21, 253:25, 254:7, 254:11, 254:15, 256:5, 256:12, 257:13, 258:14, 258:21, 259:14, 260:10, 260:11, 262:23, 263:14, 264:3, 266:20, 275:12, 277:4, 277:7, 280:8, 281:16, 283:4, 285:2, 285:22, 286:3, 287:16, 288:12, 288:17, 291:3, 292:15, 292:20, 299:15, 299:19, 302:4
**ALDRIDGE** [1] - 188:3
**Aldridge's** [16] - 191:16, 191:17, 195:12, 196:8, 200:21, 202:8, 202:22, 209:1, 212:9, 221:21, 224:14, 225:11, 229:22, 248:20, 256:1, 282:17
**alerted** [1] - 273:3
**Alice** [1] - 243:4
**all-inclusive** [1] - 254:22
**alleged** [1] - 231:13
**Allen** [7] - 197:7, 252:17, 254:14, 255:13, 255:24, 256:3, 281:1
**Allen's** [3] - 248:15, 249:5, 255:22
**alluded** [2] - 246:17, 255:17
**alludes** [1] - 213:9

**almost** [1] - 212:21
**alone** [1] - 291:1
**ALS** [1] - 237:8
**ALSO** [1] - 188:22
**alternate** [1] - 211:9
**Alzheimer's** [1] - 237:6
**amended** [1] - 304:7
**amyotrophic** [1] - 236:22
**anatomy** [1] - 237:3
**Andrea** [1] - 241:20
**answer** [10] - 205:25, 249:5, 269:4, 270:14, 271:6, 271:8, 272:10, 272:14, 272:20, 273:18
**answered** [2] - 206:2, 263:20
**answers** [12] - 260:4, 262:14, 270:19, 271:1, 271:3, 271:16, 271:17, 271:22, 274:4, 274:13, 302:6
**apart** [2] - 275:5
**apartment** [6] - 285:18, 287:3, 287:5, 287:11, 287:15
**apartments** [1] - 232:6
**apathy** [2] - 199:4, 231:23
**apologize** [1] - 258:4
**appeals** [1] - 269:4
**APPEARANCES** [2] - 188:12, 189:1
**appeared** [1] - 210:1
**appetite** [1] - 224:2
**application** [1] - 286:15
**appointed** [7] - 204:17, 204:18, 212:14, 264:24, 265:12, 267:23, 269:2
**appreciate** [1] - 272:25
**approach** [9] - 205:3, 223:5, 250:10, 252:24, 263:8, 278:1, 281:11, 290:1, 298:14
**appropriate** [2] - 231:22, 255:14
**approximate** [1] - 210:8
**area** [9] - 193:4,

193:6, 193:17, 194:4, 194:10, 194:22, 199:11, 230:9, 261:17
**areas** [9] - 193:15, 230:10, 258:10, 258:12, 260:24, 260:25, 261:15, 261:16, 273:24
**arena** [1] - 195:24
**argument** [1] - 255:13
**arrest** [9] - 205:10, 244:23, 245:8, 247:8, 296:7, 297:2, 300:5, 301:5, 301:7
**arrested** [3] - 282:18, 296:8, 296:21
**ascribe** [1] - 218:6
**ascribing** [1] - 198:15
**aside** [1] - 300:3
**aspect** [2] - 194:2, 195:21
**assault** [3] - 210:21, 294:24
**assaulted** [2] - 291:12, 295:18
**assaults** [1] - 295:7
**asserting** [1] - 256:8
**assertion** [1] - 209:19
**assess** [6] - 230:9, 231:7, 231:20, 259:11, 259:17, 259:22
**assessed** [2] - 260:8, 301:18
**assessing** [2] - 262:20, 301:16
**assessment** [4] - 194:2, 202:11, 202:12, 302:13
**assist** [3] - 225:16, 239:6, 241:23
**assisted** [1] - 241:21
**associated** [6] - 195:4, 195:17, 200:16, 209:8, 221:9, 256:21
**Associates** [1] - 188:15
**assume** [1] - 281:18
**assuming** [1] - 281:4
**attached** [1] - 253:8
**attempt** [2] - 197:10, 233:24
**attempted** [4] - 197:14, 292:22, 293:12, 295:8

**attempts** [1] - 234:17
**attended** [1] - 261:2
**attention** [1] - 191:10
**attorney** [15] - 203:12, 204:17, 204:18, 212:15, 212:16, 226:7, 248:11, 255:19, 263:21, 265:12, 267:23, 268:1, 268:5, 268:7
**Attorney** [1] - 188:18
**attorneys** [16] - 204:19, 204:22, 212:20, 212:22, 213:3, 213:16, 225:16, 226:14, 248:9, 248:20, 265:9, 265:13, 265:14, 266:21, 267:17, 273:7
**atypical** [3] - 194:24, 219:9, 221:6
**auditory** [12] - 199:1, 200:20, 200:24, 200:25, 223:24, 256:19, 256:24, 257:3, 257:7, 257:12, 291:17, 291:24
**August** [3] - 251:20, 266:5, 276:12
**Austin** [2] - 188:19, 303:15
**authorities** [1] - 285:7
**auto** [1] - 294:19
**automobile** [1] - 233:21
**available** [8] - 196:9, 222:2, 259:18, 259:25, 261:25, 299:22, 302:2, 302:12
**aware** [23] - 194:23, 222:14, 243:3, 243:5, 243:9, 260:23, 266:3, 266:7, 266:10, 268:17, 269:5, 273:16, 276:7, 276:9, 276:17, 276:20, 276:23, 276:25, 277:2, 294:4, 294:7, 295:12
**awareness** [3] - 229:6, 229:10, 287:9
**Axelrad** [1] - 244:1
**AXELRAD** [1] - 244:1

## B

**B-I-R-D-S-E-L-L** [1] - 242:11
**bachelor** [2] - 240:24, 241:7
**bachelors** [3] - 240:21, 240:22, 241:11
**based** [10] - 195:25, 209:3, 216:8, 216:9, 287:7, 291:1, 292:7, 292:16, 301:1, 301:4
**baseline** [1] - 227:15
**basic** [1] - 240:14
**basis** [2] - 194:11, 197:22
**Bates** [6] - 196:7, 208:11, 208:15, 211:7, 213:4, 222:23
**Bates'** [1] - 213:8
**bathe** [1] - 232:25
**battery** [3] - 258:20, 258:23, 260:6
**Baylor** [1] - 242:1
**beaten** [1] - 226:9
**beating** [2] - 226:21, 226:25
**become** [4] - 228:13, 290:7, 298:25, 299:1
**becoming** [2] - 296:20
**bed** [1] - 299:2
**BEFORE** [1] - 188:10
**beforehand** [1] - 207:19
**begin** [1] - 235:9
**beginning** [6] - 209:14, 210:2, 247:19, 270:22, 288:12, 297:25
**behavior** [7] - 218:20, 218:22, 219:9, 220:6, 221:7, 285:25, 300:9
**behavioral** [1] - 246:21
**behind** [1] - 287:18
**belief** [5] - 202:4, 214:3, 226:16, 226:17, 226:20
**beliefs** [2] - 234:15, 298:4
**believes** [4] - 203:2, 217:25, 224:5, 247:14
**benefit** [1] - 248:24
**best** [2] - 210:11, 306:11

**better** [1] - 299:14
**between** [8] - 214:20, 224:10, 228:17, 229:4, 232:4, 240:4, 240:9, 269:6
**beyond** [1] - 198:25
**bias** [3] - 213:25, 239:15, 239:24
**bicycle** [2] - 234:20, 234:23
**big** [1] - 245:21
**bike** [1] - 234:7
**bilateral** [2] - 214:24, 215:12
**biological** [1] - 214:21
**biologically** [1] - 216:9
**biologically-based** [1] - 216:9
**Birdsell** [1] - 242:9
**bit** [14] - 194:23, 195:9, 198:5, 200:5, 214:10, 215:5, 215:6, 240:3, 240:8, 252:17, 268:22, 285:1, 289:24, 289:25
**bizarre** [3] - 219:5, 220:6, 300:10
**black** [3] - 275:25, 296:1, 299:10
**blacking** [2] - 216:22, 276:2
**blackout** [1] - 216:18
**blah** [3] - 274:23
**blocking** [1] - 199:13
**blown** [2] - 209:21, 209:22
**body** [2] - 200:15, 275:14
**bona** [1] - 221:21
**books** [3] - 239:2, 239:7
**bottom** [1] - 290:5
**bought** [1] - 286:6
**Boulevard** [1] - 188:15
**box** [2] - 305:20, 305:21
**Box** [1] - 188:18
**boxes** [5] - 305:18, 305:19, 305:23, 305:24, 306:6
**Boys** [1] - 294:22
**brain** [15] - 198:8, 198:11, 198:14, 198:18, 209:12, 213:24, 214:7,

214:9, 214:13, 214:17, 214:19, 214:25, 215:15, 229:3, 229:6
**brains** [2] - 215:14, 237:3
**Break** [1] - 250:5
**break** [14] - 235:7, 236:2, 250:1, 250:3, 250:7, 271:5, 271:6, 294:3, 296:19, 299:7, 302:23, 304:19
**breaking** [2] - 233:12, 294:14
**Brenda** [4] - 191:12, 191:16, 213:11, 220:4
**Brian** [1] - 278:11
**bricks** [1] - 219:20
**brief** [3] - 202:12, 232:7, 292:14
**briefly** [3] - 192:21, 193:12, 252:19
**bring** [2] - 252:20, 268:1
**broke** [1] - 210:7
**broken** [2] - 272:22, 272:25
**brother** [2] - 221:12, 276:22
**brother-in-law** [1] - 276:22
**brought** [2] - 191:9, 265:1
**Brown** [8] - 196:14, 196:20, 197:4, 206:3, 206:14, 228:6, 246:11, 247:4
**bulk** [1] - 299:2
**bump** [1] - 200:18
**burglaries** [1] - 295:7
**burglary** [3] - 294:8, 294:11, 294:23
**Bush** [1] - 264:25
**bushes** [1] - 287:18
**buy** [1] - 286:7
**BY** [30] - 192:16, 205:6, 223:7, 223:13, 235:13, 236:6, 241:6, 250:6, 250:14, 252:15, 253:1, 253:21, 261:22, 263:10, 266:2, 266:19, 273:5, 277:14, 278:3, 278:23, 279:18, 281:13, 281:24, 282:6,

214:9, 214:13, 214:17, 214:19, 214:25, 215:15, 282:15, 289:4, 290:3, 293:6, 294:2, 298:17

## C

**cab** [1] - 303:22
**California** [1] - 260:1
**cannot** [4] - 216:2, 216:3, 291:1, 292:16
**capable** [2] - 286:19, 286:25
**capacity** [2] - 242:23, 249:16
**capital** [13] - 203:25, 204:2, 204:4, 225:7, 247:11, 268:18, 270:9, 274:19, 274:21, 275:1, 275:9, 275:19
**car** [5] - 235:19, 250:13, 250:19, 250:20, 288:11
**care** [2] - 194:14, 233:19
**Carlisle** [1] - 306:14
**CARLISLE** [1] - 189:3
**Carlisle-Neisser** [1] - 306:14
**CARLISLE-NEISSER** [1] - 189:3
**case** [41] - 192:22, 194:20, 194:23, 195:22, 196:11, 197:10, 197:23, 200:1, 200:21, 201:17, 208:23, 212:6, 214:11, 217:23, 221:20, 225:11, 227:10, 228:4, 228:22, 233:22, 241:2, 241:10, 241:20, 241:22, 242:18, 243:4, 243:10, 243:25, 244:5, 244:15, 245:22, 254:21, 262:2, 262:4, 262:19, 262:22, 264:16, 265:1, 284:20, 302:9
**cases** [7] - 194:5, 194:10, 194:12, 212:22, 238:16, 241:17, 241:19
**catches** [1] - 287:5
**categorizations** [1] - 198:21

**category** [1] - 199:7
**causal** [2] - 216:25, 240:19
**causation** [2] - 240:4, 240:9
**Causation** [1] - 240:10
**caused** [2] - 240:10, 240:13
**causing** [3] - 217:21, 275:25, 296:1
**celebrities** [1] - 217:13
**center** [1] - 214:25
**certain** [5] - 199:4, 205:10, 217:3, 229:19, 240:16
**Certainly** [6] - 193:1, 219:3, 226:23, 240:10, 249:1, 299:13
**certainly** [6] - 210:3, 222:6, 245:23, 252:11, 277:4, 277:12
**certify** [1] - 306:11
**cetera** [3] - 254:16, 268:20, 275:3
**chair** [1] - 192:14
**challenges** [1] - 264:23
**chance** [1] - 292:10
**change** [2] - 219:5, 295:24
**characteristic** [1] - 198:20
**characteristics** [1] - 259:2
**characterize** [1] - 201:7
**charge** [2] - 274:18, 275:19
**charges** [6] - 248:6, 248:7, 248:8, 261:18, 268:17, 273:22
**Cheryl** [4] - 191:12, 191:17, 220:1, 234:8
**Chicago** [2] - 193:2, 193:3
**children** [2] - 219:13
**choice** [1] - 256:4
**choose** [2] - 259:13, 291:7
**chose** [1] - 301:13
**chronic** [2] - 298:5, 298:6
**chronology** [1] - 304:8
**cigarettes** [1] -

236:12
**circumstance** [1] - 274:9
**circumstances** [5] - 224:19, 247:8, 262:4, 277:8, 295:9
**cites** [1] - 264:21
**city** [1] - 226:9
**Civil** [1] - 188:3
**clarification** [1] - 251:24
**classes** [1] - 193:22
**clear** [4] - 209:20, 255:20, 256:10, 305:22
**clearly** [1] - 234:14
**client** [7] - 205:9, 211:11, 211:12, 213:14, 247:7, 275:6
**client's** [2] - 261:17, 261:19
**clinical** [30] - 193:6, 193:8, 194:2, 194:12, 195:14, 202:13, 202:15, 205:20, 207:3, 207:4, 207:7, 223:3, 223:12, 224:8, 227:4, 238:14, 242:7, 242:20, 246:20, 249:22, 249:23, 258:5, 260:18, 263:13, 267:18, 267:25, 268:8, 268:13, 273:8, 273:11
**clinically** [1] - 216:21
**clinician** [1] - 222:11
**closely** [1] - 230:16
**clothes** [3] - 232:24, 287:4, 287:13
**Code** [2] - 260:23, 261:15
**code** [1] - 261:11
**codes** [1] - 260:24
**cognition** [2] - 236:8, 236:15
**cognitive** [24] - 195:4, 195:17, 202:18, 202:19, 209:8, 224:14, 225:3, 230:12, 230:16, 230:24, 231:8, 231:12, 257:18, 257:19, 258:6, 258:9, 258:12, 259:7, 259:8, 259:16, 271:14, 271:17, 271:23, 302:11

**cognizant** [1] - 258:20
**Colburn** [4] - 242:7, 243:10, 244:10, 244:17
**College** [1] - 242:1
**colored** [3] - 206:11, 297:15, 297:20
**combination** [2] - 302:10, 302:12
**coming** [8] - 201:10, 214:14, 217:12, 229:5, 256:14, 256:22, 257:16, 283:8
**command** [5] - 201:3, 216:20, 223:24, 290:22, 292:23
**commanded** [1] - 275:14
**commanding** [2] - 201:5, 275:25
**commands** [1] - 223:25
**comment** [1] - 280:20
**commenting** [1] - 290:21
**comments** [1] - 292:12
**Commission** [1] - 305:3
**commit** [6] - 204:3, 216:25, 218:4, 247:14, 275:10, 290:21
**committed** [13] - 204:7, 216:23, 247:13, 249:7, 275:2, 275:13, 293:10, 293:11, 293:13, 293:19, 294:21, 296:11, 300:23
**committing** [2] - 292:22, 295:7
**common** [1] - 221:4
**communicate** [1] - 217:10
**communicating** [3] - 211:8, 217:14, 219:11
**compare** [1] - 249:21
**competence** [1] - 239:6
**competency** [49] - 192:24, 194:2, 194:11, 194:13, 195:12, 195:24,

196:12, 196:14, 197:2, 202:23, 203:5, 203:10, 203:22, 221:22, 231:5, 231:11, 239:1, 242:18, 243:11, 249:6, 253:25, 254:8, 254:14, 255:14, 255:25, 260:21, 262:5, 266:24, 267:1, 267:2, 267:3, 267:5, 267:6, 268:9, 271:2, 271:12, 271:20, 271:22, 272:5, 272:10, 273:11, 274:1, 274:7, 281:2, 301:12, 301:13, 301:14, 301:21, 301:25
**competent** [10] - 222:5, 225:14, 243:17, 246:15, 267:7, 267:10, 274:11, 274:14, 302:5, 302:14
**complaint** [1] - 280:21
**complete** [8] - 194:3, 199:16, 249:2, 254:20, 280:21, 292:12, 301:9, 304:8
**completed** [6] - 193:1, 193:5, 196:14, 196:15, 196:17, 292:22
**completely** [6] - 206:11, 258:5, 265:4, 277:9, 293:15, 305:5
**comprehend** [1] - 247:12
**comprised** [1] - 201:1
**computer** [1] - 188:25
**computer-aided** [1] - 188:25
**computerized** [1] - 259:10
**concentration** [2] - 215:24, 224:2
**concept** [2] - 229:18, 240:20
**concern** [1] - 290:22
**conclusion** [6] - 205:15, 206:6, 208:16, 211:5, 225:13, 227:9

**conclusions** [2] - 212:19, 283:8
**condition** [1] - 224:14
**conduct** [4] - 219:2, 220:7, 254:14, 260:21
**conducted** [3] - 195:7, 196:13, 213:22
**conferences** [7] - 193:17, 193:24, 194:1, 238:21, 238:22, 238:24, 261:2
**confident** [1] - 217:22
**confirm** [1] - 225:13
**confirmation** [1] - 239:24
**confront** [1] - 213:19
**confused** [2] - 267:10, 285:2
**confusing** [1] - 226:9
**confusion** [1] - 285:8
**connection** [2] - 214:22, 241:2
**connotations** [1] - 221:9
**Conroy** [1] - 243:19
**consent** [5] - 265:16, 265:23, 266:20, 267:19, 267:22
**consequences** [2] - 248:8, 261:19
**consider** [3] - 217:6, 217:7, 230:4
**consideration** [1] - 277:11
**considered** [2] - 214:25, 218:22
**considering** [1] - 208:14
**consistency** [1] - 233:18
**consistent** [9] - 206:21, 210:15, 224:7, 226:2, 232:12, 260:7, 282:24, 287:20, 296:22
**conspiracy** [4] - 204:20, 212:17, 213:16, 268:6
**constitutional** [1] - 264:22
**construction** [1] - 258:11
**consult** [1] - 203:12
**contact** [1] - 197:14

**contacts** [1] - 199:5
**contemporaneous** [1] - 205:19
**content** [7] - 199:19, 199:22, 201:7, 201:16, 206:20, 211:23, 219:5
**contest** [1] - 258:25
**context** [7] - 227:3, 230:2, 236:25, 237:17, 240:5, 240:6, 277:3
**contexts** [1] - 194:13
**continue** [1] - 266:8
**Continued** [1] - 189:1
**continued** [1] - 219:17
**continuing** [1] - 194:3
**continuous** [1] - 227:19
**contracts** [1] - 194:15
**contradict** [2] - 226:11, 226:15
**contradictory** [1] - 214:4
**contrary** [2] - 213:19, 219:15
**contributed** [1] - 240:11
**contributing** [2] - 222:10, 285:21
**control** [2] - 200:10, 224:3
**conversations** [1] - 200:23
**conversing** [1] - 201:1
**convey** [1] - 247:12
**convicted** [4] - 294:8, 294:10, 294:13, 294:16
**conviction** [2] - 205:10, 247:9
**convince** [1] - 213:16
**cooperate** [1] - 248:11
**copies** [1] - 252:5
**copy** [6] - 191:20, 191:25, 204:25, 252:20, 265:24, 278:24
**corpus** [2] - 264:14, 270:7
**correct** [56] - 196:21, 196:22, 196:24, 196:25, 197:5,

203:20, 206:7, 206:8, 206:12, 206:25, 207:17, 211:21, 214:8, 216:7, 216:10, 228:1, 230:4, 234:9, 235:1, 236:8, 236:20, 236:23, 236:25, 237:1, 237:18, 237:21, 237:23, 239:1, 241:8, 241:12, 242:24, 243:12, 243:18, 243:19, 245:8, 248:18, 251:1, 252:1, 253:17, 253:18, 254:17, 272:16, 272:20, 272:23, 273:1, 284:1, 288:6, 295:22, 297:3, 297:9, 299:7, 300:14, 301:6, 302:9, 302:17, 306:11
**Correct** [7] - 251:13, 262:9, 271:15, 271:21, 272:1, 274:7, 284:3
**correctional** [1] - 223:16
**correctly** [4] - 257:2, 273:7, 274:25, 298:18
**correlate** [1] - 230:22
**correlated** [4] - 230:22, 230:24, 230:25, 240:17
**correlation** [2] - 240:4, 240:9
**Correlation** [1] - 240:14
**correspond** [1] - 263:13
**corroborate** [1] - 231:9
**corroborated** [1] - 231:3
**cortex** [1] - 215:15
**cortices** [2] - 215:2, 215:16
**CORTICES** [1] - 215:16
**Counsel** [1] - 302:18
**counsel** [5] - 191:11, 222:12, 226:6, 305:11, 305:24
**counseling** [1] - 220:18
**country** [2] - 285:13

**county** [1] - 226:10
**couple** [6] - 198:21, 201:1, 215:5, 244:16, 285:19, 286:6
**course** [10] - 195:22, 200:8, 202:13, 207:16, 238:20, 248:6, 248:16, 260:22, 284:3, 295:11
**courses** [2] - 237:19, 238:8
**COURT** [71] - 188:1, 189:3, 191:3, 191:6, 191:13, 191:19, 191:21, 191:24, 192:5, 192:7, 192:9, 192:13, 205:4, 215:4, 223:6, 235:5, 236:3, 241:4, 249:25, 250:11, 252:14, 252:25, 253:7, 253:10, 253:12, 253:16, 253:19, 263:9, 270:21, 271:10, 272:2, 272:8, 272:21, 272:24, 277:13, 277:22, 278:2, 279:13, 279:15, 280:3, 280:11, 280:14, 281:3, 281:12, 290:2, 293:4, 293:22, 293:24, 298:15, 302:18, 302:22, 303:2, 303:4, 303:7, 303:10, 303:17, 303:23, 303:25, 304:2, 304:5, 304:10, 304:12, 304:17, 304:23, 305:1, 305:4, 305:6, 305:13, 305:15, 306:4, 306:7
**court** [15] - 204:10, 207:14, 208:11, 221:20, 225:12, 242:9, 242:25, 247:24, 248:21, 262:19, 264:14, 264:19, 268:24, 270:3, 270:5
**Court** [11] - 189:3, 192:17, 198:5, 198:7, 244:13, 248:24, 254:20, 269:16, 270:1,

304:18, 306:15
**Court's** [1] - 191:9
**courtroom** [1] - 254:16
**courts** [3] - 264:22, 269:3, 275:18
**cover** [3] - 248:14, 260:25, 261:24
**covered** [2] - 260:25, 261:10
**credits** [1] - 194:3
**crime** [42] - 205:19, 205:23, 205:24, 207:12, 207:13, 216:15, 244:23, 245:7, 247:13, 249:7, 254:3, 254:12, 255:2, 255:3, 255:4, 255:11, 255:15, 256:6, 276:20, 278:15, 278:16, 282:17, 282:19, 283:4, 284:22, 285:1, 291:8, 291:15, 292:9, 292:20, 293:18, 296:6, 296:8, 296:9, 297:2, 299:17, 299:20, 299:23, 300:24, 301:4, 301:24
**Criminal** [3] - 222:18, 223:4, 260:23
**criminal** [7] - 194:10, 236:24, 237:17, 238:10, 238:16, 241:17, 294:5
**criteria** [5] - 195:15, 195:18, 195:20, 209:5, 229:23
**criterion** [1] - 298:23
**critique** [4] - 249:5, 254:13, 255:23, 256:4
**critiqued** [1] - 248:16
**cross** [4] - 235:10, 270:15, 277:6, 302:20
**Cross** [1] - 190:6
**CROSS** [1] - 235:12
**Cross-Examination** [1] - 190:6
**cross-examination** [2] - 235:10, 270:15
**CROSS-EXAMINATION** [1] - 235:12
**cross-examine** [1] -

277:6
**crossing** [1] - 236:1
**CSR** [1] - 306:14
**current** [11] - 239:16, 246:20, 247:20, 262:18, 262:24, 264:16, 264:17, 265:7, 267:14, 268:15, 273:12
**curriculum** [1] - 192:4
**cut** [2] - 200:18, 278:25

## D

**daily** [4] - 230:4, 230:11, 232:2, 233:20
**Daniel** [2] - 242:15, 242:18
**data** [3] - 202:3, 205:16, 208:10, 260:13, 262:12, 265:25, 266:4, 271:13, 274:13
**date** [5] - 222:25, 282:4, 282:7, 282:8, 282:11
**Date** [1] - 306:14
**dates** [1] - 243:14
**dating** [1] - 199:6
**Davis** [6] - 197:11, 211:10, 213:3, 221:20, 222:1, 222:2
**day-to-day** [2] - 249:18, 249:23
**days** [3] - 224:19, 227:23, 286:6
**deal** [3] - 199:21, 237:2, 271:12
**deals** [1] - 278:14
**dealt** [2] - 236:21, 238:10
**death** [10] - 203:25, 204:2, 204:6, 244:16, 247:11, 268:18, 274:21, 275:1, 275:9
**decide** [2] - 260:18, 283:25
**decision** [2] - 248:12, 262:11
**decisions** [2] - 194:14
**decrease** [1] - 224:25
**defense** [18] - 210:19, 210:20,

210:25, 211:1, 211:3, 211:9, 211:17, 241:25, 242:5, 248:4, 273:20, 276:15, 283:4, 283:12, 283:20, 295:21, 296:9, 305:11
**defenses** [1] - 248:9
**deficit** [2] - 257:18, 257:20
**deficits** [8] - 202:18, 209:18, 225:3, 258:7, 258:18, 258:19, 297:24
**define** [1] - 240:1
**definition** [2] - 209:5, 227:11
**deformity** [1] - 200:15
**degree** [6] - 203:2, 203:12, 206:22, 225:17, 258:12, 286:12
**delusion** [3] - 212:6, 257:7, 290:18
**delusional** [41] - 200:9, 201:14, 201:15, 201:16, 201:22, 202:25, 203:1, 204:1, 204:5, 204:24, 205:11, 205:22, 206:12, 206:20, 207:8, 211:16, 212:10, 213:4, 214:22, 215:25, 222:8, 222:11, 222:25, 225:8, 226:2, 226:16, 226:20, 234:15, 247:9, 263:18, 265:4, 274:20, 274:24, 283:17, 290:16, 291:7, 291:15, 292:9, 295:25, 296:13, 298:4
**delusionally** [1] - 285:1
**delusions** [35] - 195:3, 199:1, 200:10, 200:11, 200:12, 200:13, 201:17, 201:19, 206:20, 206:23, 207:10, 207:11, 209:8, 211:24, 211:25, 213:23, 214:2, 215:21, 218:21, 225:6,

225:11, 228:15, 228:19, 256:12, 256:13, 287:8, 287:20, 292:3, 296:18, 296:22, 298:5, 300:10
**dementia** [1] - 209:11
**demonstrated** [1] - 200:9
**Department** [9] - 222:18, 223:4, 244:22, 245:7, 250:16, 251:18, 276:11, 277:16, 284:17
**depositions** [1] - 197:6
**describe** [10] - 192:25, 193:12, 198:5, 200:5, 201:21, 201:24, 207:5, 219:2, 219:5, 220:6
**described** [4] - 199:7, 201:9, 210:19, 247:14
**describes** [2] - 207:8, 222:7
**describing** [1] - 258:1
**descriptions** [1] - 234:14
**designated** [1] - 193:24
**designed** [9] - 238:17, 239:5, 258:14, 258:22, 259:17, 259:19, 261:1, 275:16, 301:12
**despite** [5] - 211:10, 219:14, 226:10, 226:14, 226:18
**detail** [2] - 195:10, 200:5
**details** [1] - 283:15
**detect** [2] - 249:20, 258:15
**detecting** [1] - 239:8
**detection** [1] - 285:7
**detectives** [1] - 278:15
**deteriorate** [1] - 194:17
**deterioration** [1] - 232:22
**determination** [1] - 210:6
**determine** [14] -

195:15, 195:16, 195:18, 202:7, 203:21, 246:14, 259:21, 260:3, 262:6, 267:7, 274:10, 274:12, 292:17, 302:8
**determined** [1] - 250:18
**determining** [3] - 194:12, 259:3, 261:20
**diabetes** [1] - 216:6
**diagnosed** [3] - 195:19, 228:7, 292:2
**diagnosis** [15] - 194:7, 194:25, 195:16, 195:19, 195:20, 197:25, 198:2, 202:7, 207:7, 209:1, 209:5, 211:19, 221:11, 227:14, 302:10
**diagnostic** [4] - 192:23, 195:14, 298:7, 298:10
**DIANE** [3] - 190:5, 192:12, 192:19
**Diane** [2] - 191:7, 192:19
**die** [1] - 285:13
**difference** [2] - 240:4, 240:8
**different** [21] - 208:24, 214:5, 230:10, 232:10, 248:8, 254:16, 258:5, 262:4, 264:20, 265:24, 266:15, 275:8, 277:17, 278:18, 282:18, 285:19, 285:21, 295:22, 301:8, 301:10, 305:24
**differentiate** [2] - 204:15, 275:6
**difficult** [4] - 271:5, 271:9, 271:11, 279:24
**difficulty** [2] - 198:15, 211:8
**diminished** [2] - 242:18, 242:23
**direct** [5] - 202:15, 226:5, 233:11, 256:11, 257:23
**Direct** [1] - 190:6
**DIRECT** [1] - 192:15
**directing** [1] - 285:25

**directly** [4] - 201:4, 219:23, 240:13, 290:25
**disabuse** [1] - 215:24
**disagree** [1] - 249:3
**disagreed** [6] - 243:19, 243:21, 243:23, 244:2, 244:7, 244:13
**disagreement** [1] - 299:8
**disagrees** [1] - 298:7
**disasters** [1] - 217:9
**discipline** [1] - 224:3
**disconfirm** [1] - 202:4
**disconfirmatory** [2] - 214:1, 226:10
**discount** [2] - 286:5, 286:11
**discounted** [1] - 286:9
**discovery** [2] - 305:9, 305:10
**discriminate** [3] - 214:13, 214:20, 229:4
**discuss** [3] - 205:9, 247:8, 267:23
**discussed** [2] - 248:9, 252:19
**discussing** [1] - 273:19
**discussion** [5] - 223:20, 223:22, 223:23, 225:19, 227:7
**disease** [12] - 195:2, 209:10, 209:13, 209:14, 210:7, 210:16, 227:17, 237:8, 298:4, 298:5, 298:6
**disorder** [13] - 195:6, 198:8, 198:9, 198:10, 199:2, 199:9, 202:24, 209:6, 209:9, 224:17, 228:8, 228:19, 229:9
**disordered** [2] - 199:8, 200:2
**disorganized** [1] - 198:4
**disposal** [1] - 207:25
**dissertation** [1] - 193:3
**distinction** [2] - 269:6, 296:5

**distraught** [1] - 219:21
**District** [1] - 189:3
**DISTRICT** [3] - 188:1, 188:1, 188:11
**distrust** [1] - 221:8
**DIVISION** [1] - 188:2
**Doctor** [15] - 192:11, 250:7, 252:16, 254:5, 255:20, 266:3, 271:11, 278:4, 281:14, 282:16, 289:19, 289:23, 293:7, 294:4, 299:9
**doctorate** [1] - 238:13
**document** [4] - 209:7, 253:3, 253:23, 279:4
**documents** [10] - 250:8, 250:21, 250:24, 264:9, 264:20, 266:9, 266:12, 270:6, 277:11, 277:20
**domain** [2] - 204:11, 259:12
**domains** [1] - 231:7
**done** [5] - 251:14, 258:1, 280:24, 293:19, 303:5
**dorsal** [2] - 215:1, 215:16
**doubt** [1] - 221:21
**Doug** [2] - 213:3, 221:20
**Douglas** [1] - 197:11
**down** [21] - 215:3, 215:4, 223:8, 233:12, 263:15, 263:22, 264:5, 264:12, 265:15, 268:11, 269:11, 269:19, 272:15, 272:16, 272:22, 272:25, 273:1, 294:3, 298:23, 305:10
**downtown** [1] - 197:12
**Dr** [77] - 192:4, 192:17, 194:20, 196:13, 196:14, 196:15, 196:20, 197:4, 197:7, 198:9, 205:8, 205:17, 206:3, 206:14, 206:24, 207:3, 207:8, 207:15,

207:24, 208:8, 208:14, 208:15, 209:20, 210:19, 213:9, 216:17, 218:16, 218:17, 222:7, 224:7, 224:11, 225:20, 227:2, 227:9, 228:6, 228:7, 229:14, 233:11, 235:14, 241:24, 242:2, 242:4, 242:15, 243:19, 243:21, 243:23, 244:1, 244:5, 244:15, 247:3, 247:4, 248:15, 249:5, 252:17, 254:14, 255:13, 255:22, 255:24, 256:3, 260:12, 262:13, 262:15, 262:23, 270:8, 270:10, 272:13, 273:3, 274:5, 276:10, 280:5, 298:1, 298:3, 301:24
**DR** [1] - 190:5
**drive** [1] - 294:11
**drive-in** [1] - 294:11
**Drs** [1] - 246:11
**due** [1] - 234:25
**during** [32] - 195:5, 196:6, 200:6, 202:13, 202:15, 205:20, 207:3, 207:12, 211:7, 212:11, 216:16, 222:13, 222:23, 225:20, 227:4, 228:16, 229:16, 236:2, 250:7, 256:11, 257:23, 258:14, 260:18, 264:6, 273:10, 274:17, 282:19, 283:6, 283:22, 297:2, 299:6
**During** [3] - 213:12, 220:20, 268:13
**duties** [1] - 231:23
**dysfunction** [3] - 195:4, 195:17, 209:12
**dysfunctional** [2] - 215:17, 237:10
**dyskinesia** [1] - 236:18

# E

E-L-S-I-E [1] - 242:11
ear [6] - 256:14, 256:15, 256:21, 256:23, 257:4, 291:12
ears [1] - 214:18
easier [2] - 289:24, 289:25
eating [1] - 233:16
ECST [1] - 239:5
Eddie [3] - 283:2, 284:9, 284:11
Eddie's [1] - 285:18
education [2] - 193:19, 194:3
Edward [4] - 197:2, 276:22, 279:3, 283:23
effect [2] - 225:2, 236:15
effects [3] - 236:7, 236:9, 236:17
Either [1] - 296:6
either [8] - 203:17, 203:22, 219:24, 232:12, 233:16, 237:16, 244:8, 295:17
elaborately [1] - 207:8
elevation [1] - 260:9
elicit [1] - 258:17
Elsie [2] - 242:9, 242:11
emotional [1] - 199:5
emptied [1] - 276:16
end [3] - 252:10, 252:11, 303:5
ended [4] - 229:21, 270:16, 272:18, 273:17
ends [1] - 252:11
enemies [3] - 287:19, 287:21, 296:16
energies [1] - 239:5
engage [2] - 194:15, 218:4
engaged [1] - 221:6
engine [2] - 234:3, 234:4
entering [1] - 294:14
entire [5] - 204:14, 223:19, 258:23, 260:6, 260:8
entitled [3] - 252:4, 277:12, 306:11

entity [1] - 200:16
entries [1] - 278:16
entry [1] - 278:14
environment [2] - 198:13, 229:5
environmental [5] - 214:15, 222:10, 224:20, 224:24, 225:3
episodes [1] - 228:17
escape [3] - 285:6, 285:7, 286:4
especially [1] - 200:21
essentially [1] - 205:21
establish [1] - 209:4
established [1] - 296:18
establishes [1] - 227:25
estimations [1] - 210:15
et [3] - 254:16, 268:20, 275:3
evaluate [3] - 238:25, 258:18, 260:13
evaluated [1] - 243:13
evaluating [4] - 241:21, 243:11, 249:16, 267:2
evaluation [31] - 192:23, 192:24, 194:24, 195:6, 195:15, 196:12, 196:15, 196:20, 196:24, 197:2, 197:4, 202:17, 208:10, 229:16, 231:6, 242:20, 243:22, 248:16, 249:6, 254:14, 255:14, 258:14, 260:21, 262:5, 262:6, 262:7, 262:13, 265:11, 274:13, 274:17, 302:1
evaluations [7] - 194:3, 194:11, 196:14, 196:19, 237:20, 238:16, 246:10
events [6] - 205:10, 205:18, 205:23, 207:12, 222:6, 262:20

Eventually [1] - 244:14
eventually [2] - 197:14, 225:1
evidence [41] - 195:1, 207:15, 207:23, 207:24, 208:7, 208:19, 211:2, 211:4, 212:8, 213:2, 213:10, 213:19, 214:1, 218:1, 219:15, 221:17, 221:18, 221:19, 221:24, 221:25, 226:10, 226:11, 226:15, 226:16, 226:18, 227:22, 227:24, 232:11, 233:2, 251:22, 262:11, 286:16, 286:17, 292:6, 292:7, 297:12, 299:21, 299:24, 300:3, 300:4, 300:9
evident [1] - 256:18
evolution [1] - 240:12
exacerbation [1] - 228:12
exacerbations [1] - 299:13
exact [1] - 243:14
exactly [1] - 261:23
exaggerating [3] - 228:22, 228:23, 249:21
exam [1] - 271:23
examination [5] - 235:10, 256:11, 257:23, 270:15, 274:8
Examination [2] - 190:6, 190:6
EXAMINATION [2] - 192:15, 235:12
examine [1] - 277:6
examined [2] - 200:19, 244:16
examiner [1] - 224:12
example [7] - 216:14, 232:17, 239:8, 240:20, 251:9, 260:19, 285:6
except [1] - 299:24
exclude [1] - 296:13
excluding [1] - 255:10
excruciating [3] -

256:15, 256:21, 256:22
Excuse [1] - 265:16
executed [3] - 243:11, 243:17, 244:10
executive [1] - 258:10
exercise [1] - 217:1
exhibit [8] - 223:11, 223:14, 253:7, 253:13, 277:23, 304:6, 304:7, 305:2
Exhibit [24] - 191:15, 191:16, 191:17, 191:18, 192:3, 192:8, 205:7, 223:3, 253:11, 263:11, 269:24, 270:22, 276:19, 276:24, 277:25, 278:4, 279:2, 279:19, 281:14, 290:4, 304:8, 304:24, 305:3
exhibited [1] - 218:10
Exhibits [2] - 192:2, 219:1
exhibits [6] - 191:8, 191:9, 191:22, 304:3, 304:19, 304:20
exist [1] - 200:19
existed [1] - 221:25
expect [1] - 216:25
experience [13] - 194:5, 199:18, 200:24, 207:11, 220:21, 225:9, 229:8, 234:11, 237:19, 241:14, 256:19, 291:25, 299:5
experienced [1] - 256:16
experiences [1] - 224:6
experiencing [7] - 199:14, 229:7, 229:12, 257:2, 257:9, 257:11, 273:15
expert [3] - 277:10, 280:20, 281:1
expertise [1] - 194:22
explain [4] - 198:6, 205:18, 214:10, 248:24
explained [1] -

267:22
explaining [1] - 283:15
explanation [9] - 204:1, 204:24, 205:11, 205:12, 205:22, 247:10, 291:8, 293:18, 296:3
explanations [1] - 296:9
expound [1] - 205:14
express [2] - 291:7, 291:10
expressed [1] - 207:9
expressive [1] - 199:11
extended [1] - 293:24
extensive [4] - 196:4, 209:6, 214:23, 215:9
extensively [2] - 197:20, 221:15
extent [1] - 206:20

# F

face [3] - 214:4, 256:17, 297:12
faced [1] - 274:6
facility [1] - 223:16
facing [1] - 301:20
fact [22] - 204:16, 209:16, 212:12, 212:16, 212:18, 213:22, 216:19, 218:5, 219:18, 222:25, 225:1, 225:5, 226:9, 229:11, 248:19, 284:8, 286:5, 293:8, 297:15, 297:20, 297:23, 301:25
factors [2] - 259:5, 277:17
factual [6] - 195:23, 203:14, 207:13, 226:11, 229:22, 231:1
fair [5] - 211:16, 216:6, 216:9, 218:9, 225:9
fairly [1] - 210:1
falsified [4] - 264:19, 264:20, 270:5, 270:6
familiar [9] - 202:21, 203:5, 239:24, 240:1, 278:8,

282:22, 283:21, 294:22, 295:1
**family** [11] - 221:4, 221:6, 221:12, 222:22, 226:23, 232:15, 282:16, 293:18, 297:6, 299:3, 300:8
**Family** [1] - 299:4
**fanciful** [1] - 243:6
**Fantastic** [1] - 252:13
**far** [2] - 280:14, 281:2
**father's** [3] - 219:18, 219:19, 232:4
**features** [3] - 198:3, 232:21, 233:1
**February** [4] - 188:8, 191:2, 242:19, 243:13
**federal** [2] - 264:23, 269:3
**Federal** [1] - 264:22
**feed** [1] - 233:19
**fellows** [2] - 238:13
**fellowship** [1] - 193:5
**felony** [1] - 286:14
**felt** [8] - 216:24, 226:2, 254:25, 255:25, 256:3, 267:9, 275:2, 287:20
**fetal** [1] - 237:4
**few** [2] - 232:9, 303:24
**fide** [1] - 221:21
**field** [3] - 193:7, 202:10, 259:16
**fields** [1] - 197:21
**fifth** [1] - 280:12
**fight** [2] - 288:22, 291:9
**fighting** [1] - 289:22
**figure** [2] - 284:6, 285:6
**file** [5] - 266:22, 280:8, 284:17, 304:19, 305:23
**filed** [10] - 248:19, 248:20, 253:15, 264:15, 264:19, 264:20, 270:6, 304:7, 304:14, 304:20
**filled** [1] - 248:16
**Finally** [1] - 192:3
**finally** [1] - 233:11
**financial** [1] - 194:14
**Finch** [1] - 193:1

**findings** [9] - 206:14, 207:2, 207:16, 223:18, 224:7, 224:12, 233:22, 240:15, 259:25
**fine** [3] - 236:3, 263:7, 270:1
**finished** [1] - 303:7
**firing** [1] - 214:12
**firmly** [4] - 202:3, 217:25, 247:14
**First** [1] - 242:11
**first** [19] - 197:18, 202:7, 210:7, 223:11, 240:18, 264:10, 265:3, 265:10, 267:13, 267:16, 267:21, 268:14, 272:3, 278:25, 293:9, 297:4, 297:8, 299:3
**five** [3] - 263:14, 270:17, 270:18
**five-hour** [2] - 270:17, 270:18
**fixed** [7] - 201:24, 206:21, 214:2, 222:8, 226:16, 292:3, 298:4
**Fixed** [1] - 202:2
**fleeing** [1] - 293:17
**flight** [1] - 303:21
**florid** [1] - 291:11
**floridly** [2] - 299:16, 299:19
**fluently** [1] - 199:21
**flying** [1] - 303:15
**focus** [1] - 193:6
**follow** [2] - 222:9, 298:20
**followed** [1] - 270:7
**following** [5] - 219:7, 223:23, 229:20, 239:21, 296:19
**FOR** [2] - 188:14, 188:17
**forced** [1] - 217:3
**Ford** [3] - 276:22, 279:3, 283:2
**Ford's** [1] - 283:23
**foregoing** [1] - 306:11
**forensic** [17] - 193:19, 193:21, 193:25, 194:2, 194:4, 194:7, 195:21, 196:23, 236:24, 237:17, 238:10, 238:16,

238:19, 239:3, 239:11, 241:13, 258:25
**forethought** [1] - 286:17
**form** [17] - 195:11, 199:13, 201:9, 214:22, 228:24, 229:17, 251:15, 264:24, 265:17, 265:23, 266:20, 271:6, 277:1, 286:7, 292:25, 293:20, 301:12
**forma** [1] - 264:24
**formal** [2] - 199:2, 199:9
**formed** [2] - 226:20, 245:5
**forming** [1] - 245:3
**forms** [1] - 298:22
**formulated** [1] - 244:21
**forth** [3] - 232:4, 285:12, 285:18
**Foster** [1] - 278:12
**foundation** [1] - 219:20
**four** [4] - 280:12, 285:20, 294:10, 294:24
**frame** [2] - 205:18, 302:2
**framed** [1] - 275:3
**free** [1] - 231:25
**freewill** [1] - 216:3
**frequently** [2] - 212:12, 226:25
**friends** [1] - 199:6
**frightened** [1] - 220:12
**front** [1] - 289:12
**frontal** [2] - 215:1, 215:15
**full** [6] - 205:8, 209:21, 209:22, 211:10, 258:20, 270:9
**full-blown** [2] - 209:21, 209:22
**fuller** [1] - 254:20
**fully** [1] - 248:24
**function** [7] - 198:12, 229:25, 231:8, 232:14, 234:5
**Functional** [1] - 237:12
**functional** [1] - 198:18
**functionality** [4] -

229:15, 230:1, 230:3, 230:15
**functioning** [24] - 227:15, 230:1, 230:7, 230:10, 230:11, 230:12, 230:13, 230:15, 230:17, 230:20, 230:25, 231:1, 231:2, 231:7, 231:12, 231:14, 231:15, 231:25, 249:18, 258:10, 258:11, 258:12, 259:7
**functions** [2] - 199:4, 209:8
**funded** [1] - 193:14
**future** [1] - 286:24

## G

**Garfield** [9] - 283:24, 284:6, 284:22, 288:7, 288:21, 289:14, 289:20, 290:9, 290:13
**Garfield's** [1] - 284:3
**Garrett** [3] - 191:12, 213:11, 220:4
**Garrett's** [1] - 191:16
**Gatesville** [1] - 294:21
**Gehrig's** [1] - 237:8
**General** [1] - 188:18
**general** [6] - 228:25, 254:1, 258:9, 260:25, 267:13, 268:15
**generally** [2] - 199:7, 265:8
**generate** [1] - 229:12
**generation** [1] - 240:12
**gentleman** [1] - 270:5
**George** [1] - 241:24
**Georgette** [1] - 303:14
**GEORGETTE** [1] - 188:17
**given** [6] - 194:21, 194:25, 260:13, 262:12, 280:10
**Gladys** [14] - 218:24, 219:13, 220:17, 233:15, 235:22, 235:25, 280:8, 281:16, 282:22,

283:22, 285:15, 287:18, 288:12, 296:16
**Gladys'** [3] - 219:8, 246:9, 285:18
**goal** [2] - 285:11, 285:12
**God** [1] - 217:8
**godmother** [2] - 232:5, 232:6
**govern** [1] - 234:23
**government** [1] - 212:17
**gowns** [1] - 219:9
**grab** [1] - 303:21
**gradually** [1] - 299:5
**graduate** [3] - 193:13, 193:22, 238:20
**grandiose** [5] - 200:11, 201:18, 207:10, 224:4, 298:5
**grants** [2] - 193:10, 193:15, 236:21
**GRAY** [1] - 188:10
**Great** [2] - 252:6, 252:8
**great** [2] - 199:21, 236:1
**greater** [2] - 198:24, 258:12
**Green** [2] - 242:7, 244:17
**GREGORY** [1] - 188:14
**grocery** [1] - 294:11
**grooming** [1] - 232:17
**groups** [1] - 212:1
**guards** [4] - 226:20, 226:21, 226:25
**guess** [9] - 217:7, 217:15, 223:15, 230:3, 230:20, 239:16, 239:18, 239:20, 301:1
**guidance** [1] - 260:20
**guilty** [6] - 248:12, 248:13, 261:20, 270:8
**gun** [15] - 283:24, 283:25, 284:7, 284:8, 284:11, 284:14, 284:15, 284:23, 284:24, 286:6, 286:7, 286:13, 286:20, 286:25
**guy** [1] - 275:10

# H

265:21, 279:9, 279:14, 303:1, 303:3, 303:5, 303:9, 303:13, 303:20, 303:24, 304:1, 304:3, 304:6, 304:11, 304:14, 304:18, 304:24, 305:2, 305:5, 305:16, 305:21, 305:25, 306:5

**H-05-608** [1] - 188:4
**habeas** [4] - 264:14, 270:7, 305:23, 305:24
**haircut** [1] - 232:23
**half** [2] - 197:13, 303:13
**hallucinate** [1] - 300:13
**hallucinating** [9] - 283:16, 291:6, 291:15, 292:8, 300:13, 300:18, 300:21, 300:24, 301:4
**hallucination** [11] - 199:1, 216:20, 256:24, 256:25, 257:3, 257:8, 257:12, 291:11, 291:17, 292:23, 293:14
**hallucinations** [20] - 195:3, 199:1, 200:20, 200:24, 200:25, 201:3, 201:6, 218:22, 223:24, 223:25, 224:1, 224:4, 228:15, 228:18, 256:20, 290:22, 291:24, 300:15
**hallucinatory** [2] - 201:11, 225:9
**hand** [2] - 192:11, 235:25
**handbook** [1] - 239:13
**handful** [2] - 194:10, 241:17
**handwriting** [3] - 263:23, 271:9, 271:10
**handwritten** [3] - 270:21, 271:24, 272:3
**hang** [1] - 240:15
**haphazard** [1] - 285:20
**hard** [2] - 263:23, 282:10
**HARLAN** [1] - 188:14
**harm** [1] - 212:2
**Harmon** [1] - 243:3
**Harmon's** [1] - 242:25
**HAYES** [24] - 188:17,

**head** [4] - 211:13, 257:14, 257:15, 257:16
**health** [1] - 223:16
**Health** [2] - 193:2, 250:16
**hear** [5] - 200:22, 201:2, 214:16, 217:16, 265:18
**heard** [4] - 206:4, 206:24, 230:2, 257:14
**hearing** [6] - 200:22, 214:17, 257:14, 304:4, 306:2, 306:5
**hearings** [1] - 239:1
**hearsay** [1] - 277:3
**held** [1] - 202:3
**help** [13] - 204:25, 212:4, 212:18, 220:18, 252:3, 254:19, 263:3, 263:23, 264:5, 269:15, 269:16, 276:21, 301:12
**helped** [1] - 251:15
**helpful** [1] - 204:20
**helping** [1] - 241:21
**hid** [1] - 287:22
**hide** [3] - 287:4, 287:17, 287:23
**highlight** [1] - 278:6
**highly** [1] - 225:7
**HILDER** [1] - 188:14
**Hilder** [1] - 188:15
**himself** [7] - 210:12, 215:24, 219:11, 223:25, 224:5, 250:25, 298:3
**hindsight** [1] - 239:15
**history** [6] - 218:19, 219:2, 220:6, 286:14, 294:5, 302:11
**hit** [3] - 234:16, 234:17, 293:19
**Hobby** [1] - 303:21
**Hold** [1] - 254:4

**holding** [1] - 279:7
**holds** [1] - 226:17
**home** [6] - 219:8, 219:19, 219:22, 219:23, 221:7, 232:4
**homes** [1] - 232:4
**Honor** [16] - 191:5, 191:23, 235:4, 235:11, 250:10, 252:24, 263:8, 270:13, 270:19, 272:7, 277:24, 279:9, 280:2, 280:17, 290:1, 298:14
**HONORABLE** [1] - 188:10
**hoping** [1] - 271:7
**hotel** [5] - 288:8, 288:9, 288:16
**hotels** [1] - 285:19
**hour** [4] - 197:13, 270:17, 270:18, 303:14
**hours** [3] - 224:19, 227:23, 263:14
**house** [2] - 219:18, 220:16
**HOUSTON** [2] - 188:2, 188:9
**Houston** [10] - 188:16, 189:4, 197:12, 244:22, 245:6, 276:11, 277:16, 278:10, 284:17, 295:4
**HPD** [1] - 304:25
**human** [1] - 201:9
**hurt** [1] - 223:25
**hurting** [1] - 220:13
**hygiene** [2] - 232:23, 233:1
**hypometabolism** [1] - 215:19

# I

**I.D** [6] - 288:8, 288:9, 288:13, 288:17, 288:19, 288:20
**i.e** [1] - 291:8
**idea** [2] - 240:21, 280:4
**ideas** [3] - 205:11, 247:9, 248:14
**ideation** [1] - 226:2
**identify** [2] - 192:17, 201:6
**Identify** [1] - 277:23

**identifying** [1] - 218:3
**ignore** [3] - 264:25, 293:8, 293:12
**II** [3] - 260:10, 260:11, 260:16
**illegal** [1] - 264:22
**Illinois** [1] - 193:3
**illness** [7] - 198:6, 200:15, 202:8, 202:22, 206:11, 235:1, 297:25
**illogical** [2] - 199:24, 214:3
**Illogicality** [1] - 199:23
**illusion** [1] - 247:15
**immediate** [1] - 267:21
**immediately** [2] - 276:20, 293:17
**impaired** [3] - 198:10, 218:6, 258:11
**impairment** [1] - 302:11
**impeach** [1] - 277:12
**impeachment** [3] - 280:18, 280:21, 280:24
**implying** [1] - 240:11
**important** [2] - 246:25, 249:17
**improvement** [1] - 224:13
**inability** [4] - 198:11, 213:24, 213:25, 234:25
**inaccurate** [1] - 262:21
**incarcerated** [1] - 293:3
**incarceration** [2] - 233:7, 264:23
**incident** [1] - 293:2
**incidents** [1] - 293:3
**include** [4] - 199:10, 208:3, 208:5, 261:17
**included** [8] - 199:22, 207:13, 208:6, 238:16, 255:19, 258:17, 258:19, 279:11
**Including** [1] - 279:6
**including** [7] - 196:4, 196:6, 208:24, 212:4, 223:25, 224:19, 229:2
**inclusive** [2] - 254:22, 254:23

**incoming** [1] - 198:12
**incompetency** [1] - 209:3
**incompetent** [4] - 208:16, 208:21, 221:18, 222:15
**inconsistencies** [1] - 232:1
**inconsistent** [1] - 259:5
**incorporate** [3] - 213:25, 225:11, 262:13
**incorporated** [3] - 196:16, 234:14, 247:1
**incorporating** [2] - 212:9, 213:3
**incorporation** [3] - 201:15, 201:17, 214:1
**increase** [4] - 224:22, 225:1, 225:8, 228:14
**increased** [3] - 222:10, 224:20, 224:24
**increasingly** [1] - 219:5
**independent** [3] - 193:14, 231:9, 274:24
**independently** [4] - 193:14, 225:6, 232:7, 232:13
**indicate** [7] - 222:24, 226:1, 232:11, 245:13, 284:24, 298:1, 302:5
**indicated** [6] - 208:20, 222:18, 241:13, 284:21, 285:5, 301:21
**indicates** [3] - 286:12, 299:23, 301:1
**indicating** [2] - 276:12, 286:17
**indication** [13] - 216:24, 220:22, 220:24, 221:1, 224:22, 232:8, 232:16, 256:23, 257:2, 259:15, 284:6, 287:6, 290:14
**indications** [3] - 226:19, 231:18, 250:20
**individual** [7] -

198:10, 199:13, 203:11, 211:25, 228:8, 259:1, 299:5
**individuals** [4] - 194:13, 201:10, 228:13, 283:3
**Individuals** [1] - 298:24
**individuals'** [1] - 282:21
**influenced** [1] - 239:18
**influences** [1] - 239:22
**inform** [1] - 222:12
**information** [26] - 198:13, 204:23, 209:6, 210:11, 214:4, 214:13, 214:14, 222:9, 222:14, 231:10, 235:21, 239:19, 249:19, 250:13, 252:7, 277:9, 278:9, 278:11, 278:18, 292:16, 293:1, 298:11, 299:22, 300:7, 302:1, 304:22
**initial** [3] - 192:19, 196:12, 209:9
**input** [1] - 229:4
**inquisitive** [1] - 299:2
**insanity** [1] - 248:13
**inserted** [1] - 199:18
**insertion** [1] - 199:17
**inside** [2] - 229:6, 257:14
**insight** [1] - 229:2
**insists** [1] - 226:7
**instill** [1] - 224:2
**instrument** [1] - 259:20
**intellectual** [1] - 230:13
**intent** [1] - 255:1
**intention** [2] - 270:23, 305:25
**interaction** [1] - 254:7
**interactions** [1] - 253:24
**interest** [1] - 298:25
**interested** [1] - 281:3
**interfering** [1] - 224:1
**internal** [1] - 214:14
**interns** [1] - 238:13
**internship** [1] - 193:5

**Interpersonal** [1] - 237:22
**interpret** [4] - 238:25, 285:7, 286:16, 287:7
**interpretation** [4] - 214:19, 285:24, 292:19, 293:8
**interpretations** [2] - 295:17, 295:23
**interpreted** [1] - 214:15
**intertwined** [1] - 206:11, 207:11, 263:18
**interview** [33] - 197:10, 200:7, 201:12, 202:13, 202:15, 203:19, 205:20, 207:3, 207:4, 212:11, 216:16, 216:17, 218:12, 223:17, 224:8, 224:11, 227:4, 230:15, 247:23, 260:18, 262:21, 263:13, 264:2, 264:6, 267:12, 267:18, 267:25, 268:13, 269:8, 270:17, 271:19, 273:8, 273:11
**interviewed** [8] - 200:3, 202:14, 216:14, 223:1, 249:22, 254:12, 274:6, 301:11
**interviews** [2] - 284:18, 300:5
**interwoven** [1] - 201:19
**introduced** [1] - 208:4
**investigating** [1] - 278:16
**investigation** [5] - 195:13, 244:23, 245:7, 278:15, 278:17
**involved** [20] - 210:20, 212:5, 212:22, 212:23, 215:2, 229:24, 237:16, 241:16, 241:20, 243:24, 244:4, 244:5, 264:25, 265:2, 275:18, 276:14, 286:2, 288:5, 290:8,

295:9
**involvement** [3] - 214:24, 215:13, 265:7
**irrational** [3] - 211:1, 218:20, 218:22
**issue** [7] - 202:22, 217:20, 217:21, 241:1, 242:23, 281:2, 303:1
**issues** [7] - 195:24, 235:16, 238:11, 254:25, 255:7, 255:12, 256:9
**itself** [1] - 286:18

## J

**jail** [1] - 226:10
**jam** [1] - 276:21
**JAMES** [1] - 188:14
**James** [29] - 242:7, 243:10, 244:17, 252:22, 253:17, 265:14, 265:24, 276:13, 276:14, 279:20, 282:22, 288:4, 288:5, 288:7, 288:11, 288:12, 288:19, 288:20, 290:7, 290:10, 290:13, 291:2, 291:3, 291:16, 291:18, 292:8, 292:10, 292:15
**James'** [4] - 288:9, 288:13, 288:21, 289:14
**James's** [1] - 289:6
**January** [2] - 197:2, 197:3
**Jerome** [2] - 196:20, 197:4
**Judge** [3] - 223:5, 242:25, 243:3
**judge** [2] - 265:1, 269:2
**JUDGE** [1] - 188:11
**judges** [3] - 212:5, 212:10, 212:22
**judgment** [1] - 194:16
**judicial** [1] - 212:4
**Judy** [2] - 246:1, 246:6
**June** [1] - 224:12
**jury** [1] - 303:11
**Justice** [2] - 222:18, 223:4

**juvenile** [2] - 196:5, 294:5

## K

**KATHERINE** [1] - 188:17
**Kathy** [1] - 235:25
**Kay** [1] - 306:14
**KAY** [1] - 189:3
**keep** [2] - 219:24, 284:23
**kept** [4] - 221:5, 221:7, 236:12, 287:19
**kicking** [1] - 226:21
**kill** [8] - 274:22, 275:20, 276:3, 283:5, 290:9, 290:10, 291:9
**killed** [7] - 274:22, 276:15, 283:6, 288:22, 289:15, 291:11, 296:11
**kind** [6] - 220:15, 236:24, 247:22, 265:11, 274:7, 296:8
**kinds** [1] - 253:24
**knowing** [1] - 303:21
**knowledge** [1] - 239:22
**known** [2] - 213:25, 280:9
**knows** [1] - 288:8

## L

**L-scale** [1] - 260:9
**L.P.C** [1] - 223:15
**laid** [1] - 285:11
**land** [1] - 285:13
**lands** [2] - 303:15, 303:21
**language** [1] - 199:11
**last** [8] - 192:19, 227:23, 242:10, 278:5, 279:7, 280:16, 281:7, 304:18
**lateral** [1] - 236:22
**latitude** [1] - 241:5
**law** [1] - 276:22
**lawyer** [4] - 247:20, 263:2, 269:2
**lawyers** [2] - 212:10, 259:22
**layperson** [1] -

221:10
**lead** [1] - 273:17
**leading** [2] - 205:23, 207:12
**learned** [3] - 239:2, 239:7, 239:9
**Learning** [2] - 260:1, 260:2
**least** [4] - 224:6, 224:8, 226:20, 306:2
**leave** [1] - 219:17
**lecture** [1] - 238:3
**led** [2] - 205:10, 247:8
**Lee** [2] - 191:11, 191:16
**left** [6] - 215:19, 215:20, 246:9, 256:15, 256:23, 291:12
**legal** [23] - 194:1, 194:15, 195:23, 206:10, 212:9, 222:12, 229:23, 229:24, 248:6, 261:18, 262:18, 262:25, 265:7, 265:8, 267:14, 268:9, 268:14, 268:16, 268:25, 273:12, 301:20
**less** [2] - 285:1, 299:1
**letter** [4] - 250:15, 250:17, 251:18, 278:25
**letters** [3] - 196:8, 219:6, 300:8
**letting** [1] - 219:13
**level** [4] - 194:17, 195:17, 227:16, 231:11
**license** [1] - 193:23
**licensed** [1] - 193:8
**lied** [2] - 286:6, 286:14
**life** [1] - 203:3
**lifelong** [3] - 228:8, 292:21, 293:1
**light** [1] - 259:4
**lightens** [1] - 226:12
**likely** [5] - 225:7, 234:19, 234:24, 297:16, 302:14
**limited** [1] - 241:13
**line** [4] - 208:25, 229:20, 240:25, 254:11
**list** [13] - 245:1, 245:16, 245:17,

247:2, 247:4,
247:22, 250:22,
254:25, 260:24,
261:9, 304:7
**listed** [1] - 251:4
**literally** [2] - 214:7,
214:17
**literature** [11] -
195:1, 197:17,
197:20, 209:7,
218:1, 218:5, 222:9,
225:2, 227:18,
259:18, 259:25
**litigation** [1] - 242:3
**living** [10] - 219:22,
230:4, 230:12,
231:25, 232:2,
232:5, 232:6,
232:12, 233:20,
249:23
**loading** [1] - 236:18
**lobes** [2] - 215:1,
215:20
**local** [1] - 217:13
**location** [1] - 270:20
**locations** [1] - 226:9
**logical** [1] - 240:23
**longstanding** [1] -
298:6
**look** [20] - 226:4,
231:10, 249:17,
249:18, 259:20,
263:3, 264:2, 264:7,
270:2, 276:13,
276:16, 283:6,
283:13, 283:20,
288:23, 289:15,
290:11, 291:9,
295:21, 296:10
**looking** [3] - 202:18,
239:17, 261:24
**looks** [2] - 264:9,
282:8
**lose** [2] - 199:15,
298:25
**loss** [5] - 199:3,
199:4, 199:5, 199:16
**Lou** [1] - 237:8
**louder** [1] - 215:6
**Lovett** [1] - 188:15
**low** [1] - 227:16
**lowering** [1] - 258:9

**M**

**M-O-S-N-I-K** [1] -
192:20
**M.D** [1] - 192:12
**M.R.I.s** [1] - 237:3

**MacArthur** [2] -
239:5, 262:1
**maintain** [5] - 226:6,
231:22, 232:1,
232:2, 233:1
**maintaining** [1] -
233:18
**major** [1] - 248:5
**majority** [1] - 229:1
**male** [2] - 240:23,
241:8
**males** [1] - 241:10
**malingering** [14] -
239:9, 249:20,
258:22, 258:24,
259:6, 259:8,
259:10, 259:12,
259:15, 259:18,
259:21, 259:23,
260:4, 260:8
**man** [2] - 290:10,
295:19
**manager** [7] -
276:15, 288:22,
289:15, 289:20,
290:8, 295:18,
295:20
**manual** [2] - 298:7,
298:10
**March** [4] - 196:13,
196:19, 207:22,
244:11
**Marcus** [2] - 242:7,
244:17
**marked** [3] - 191:13,
191:15, 253:12
**Massey** [1] - 243:21
**Master's** [3] - 193:3,
236:17, 238:3
**material** [5] - 200:9,
238:12, 280:5,
280:19, 282:23
**materials** [1] -
265:21
**matter** [1] - 264:24
**McDonald's** [3] -
232:10, 232:11,
290:8
**mean** [25] - 202:1,
208:10, 211:22,
217:2, 218:15,
218:21, 222:6,
230:8, 231:20,
239:4, 239:7, 241:7,
244:3, 254:22,
260:22, 263:7,
264:25, 265:3,
267:7, 269:14,
270:19, 278:12,
292:3, 293:2, 295:24

**meaning** [3] -
199:22, 199:25,
255:2
**meaningful** [1] -
230:23
**means** [2] - 202:2,
229:20
**meant** [1] - 217:18
**measure** [1] - 199:12
**measures** [1] -
202:18
**meat** [1] - 295:3
**mechanical** [1] -
188:24
**Medical** [1] - 193:2
**medical** [4] - 194:14,
200:16, 227:13,
238:14
**medication** [2] -
227:20, 236:21
**medications** [1] -
228:10
**Medicine** [1] - 242:1
**medicine** [2] - 238:5,
238:6
**medicines** [1] -
227:21
**meet** [1] - 195:20
**meeting** [3] - 197:11,
197:13, 197:16
**meets** [1] - 209:4
**Melinda** [2] - 242:25,
243:3
**member** [1] - 221:12
**members** [9] - 221:4,
221:6, 222:22,
226:23, 232:15,
282:16, 293:18,
297:6, 299:4
**Memory** [1] - 259:11
**memory** [7] - 243:24,
258:10, 259:9,
259:10, 262:20,
301:16, 301:22
**men** [2] - 240:21
**mental** [7] - 202:8,
202:22, 206:11,
223:16, 234:25,
249:16, 298:4
**mentation** [1] -
194:17
**mention** [5] - 238:19,
245:2, 245:20,
246:13, 287:12
**mentioned** [9] -
198:9, 228:6, 229:3,
235:18, 243:10,
244:15, 256:11,
257:17, 268:25
**mesial** [2] - 215:1,

215:16
**messages** [3] -
217:12, 217:15,
217:18
**messiah** [1] - 275:17
**met** [2] - 195:15,
195:18
**methods** [1] - 202:6
**middle** [1] - 192:19
**might** [9] - 202:4,
209:21, 209:24,
248:12, 261:24,
277:18, 278:25,
302:18, 303:24
**mild** [2] - 209:11,
298:21
**military** [1] - 282:10
**MILLER** [1] - 188:10
**mind** [4] - 284:25,
292:1, 292:23,
293:15
**minutes** [6] - 224:19,
227:23, 235:7,
250:1, 302:21,
303:24
**miroimaging** [1] -
215:17
**mischaracterizing**
[1] - 254:2
**misinterpreting** [1] -
270:10
**misperceives** [1] -
198:11
**missing** [5] - 255:25,
256:3, 266:9,
279:10, 284:8
**misspoke** [1] -
260:12
**mistake** [1] - 258:4
**MMPI** [5] - 259:2,
260:10, 260:11,
260:13, 260:16
**MMPI-II** [3] - 260:10,
260:11, 260:16
**mode** [1] - 234:11
**modified** [1] - 274:7
**molested** [1] -
211:12
**molesting** [3] -
212:3, 227:1, 290:23
**moment** [2] - 208:25,
291:17
**Monday** [11] -
302:23, 302:24,
303:6, 303:11,
303:12, 303:14,
303:17, 306:3,
306:5, 306:8, 306:9
**money** [7] - 283:7,
288:23, 289:15,

290:10, 291:9,
295:21, 296:10
**monitored** [1] -
238:7
**month** [4] - 194:12,
197:22, 207:19,
294:13
**monthly** [1] - 197:21
**months** [5] - 216:20,
227:19, 227:22,
232:9, 294:10
**morning** [6] -
235:14, 235:15,
302:23, 302:24,
303:14, 303:17
**MOSNIK** [2] - 190:5,
192:12
**Mosnik** [9] - 191:7,
192:17, 192:20,
194:20, 205:8,
235:14, 272:13,
273:3, 280:5
**Mosnik's** [1] - 192:4
**most** [4] - 206:17,
207:5, 228:11,
231:11
**Motor** [1] - 251:19
**mouth** [1] - 286:10
**MR** [39] - 188:14,
188:14, 188:17,
188:17, 191:5,
191:7, 191:15,
192:3, 192:16,
205:3, 205:6, 223:5,
223:7, 223:11,
223:13, 235:4,
240:25, 251:24,
252:5, 252:7, 252:9,
252:23, 253:18,
266:17, 270:13,
277:1, 277:19,
280:2, 280:4,
280:17, 289:3,
292:25, 293:20,
293:23, 304:15,
305:12, 305:14,
305:20, 305:22
**MS** [95] - 189:3,
191:20, 191:23,
192:6, 223:10,
235:11, 235:13,
235:24, 236:5,
236:6, 241:3, 241:6,
250:6, 250:10,
250:14, 252:2,
252:6, 252:8,
252:13, 252:15,
252:21, 252:24,
253:1, 253:8,
253:11, 253:14,

253:17, 253:20, 253:21, 261:22, 263:8, 263:10, 265:21, 265:24, 266:2, 266:15, 266:18, 266:19, 270:25, 271:5, 271:15, 271:18, 271:21, 272:1, 272:6, 272:12, 273:3, 273:5, 277:10, 277:14, 277:21, 277:24, 278:3, 278:23, 279:9, 279:14, 279:18, 280:7, 280:12, 281:8, 281:11, 281:13, 281:24, 282:6, 282:15, 289:4, 290:1, 290:3, 293:6, 294:1, 294:2, 298:14, 298:16, 298:17, 302:21, 303:1, 303:3, 303:5, 303:9, 303:13, 303:20, 303:24, 304:1, 304:3, 304:6, 304:11, 304:14, 304:18, 304:24, 305:2, 305:5, 305:16, 305:21, 305:25, 306:5

**multiple** [1] - 201:4
**murder** [27] - 203:25, 204:3, 204:4, 212:2, 212:24, 220:14, 247:11, 268:18, 268:19, 270:9, 274:19, 274:21, 275:1, 275:10, 275:11, 275:13, 275:17, 275:19, 276:2, 290:21, 290:23, 293:12, 293:13, 294:25, 295:8
**murdered** [1] - 204:3
**murdering** [2] - 274:23, 275:20
**murders** [2] - 204:3, 292:22
**Muslim** [3] - 275:17, 285:13
**must** [2] - 227:19, 245:21
**mystic** [2] - 275:14, 275:16
**mystics** [2] - 212:23, 268:20

# N

**name** [7] - 192:19, 192:20, 212:21, 242:8, 242:10, 242:11, 263:21
**names** [2] - 243:24, 244:4
**NATHANIEL** [1] - 188:7
**national** [2] - 193:17, 217:14
**natural** [1] - 217:9
**nature** [17] - 195:16, 198:6, 202:25, 204:11, 206:21, 211:23, 214:2, 215:21, 215:22, 224:17, 225:12, 247:25, 248:2, 248:5, 261:18, 268:25
**Nazis** [6] - 212:23, 219:13, 219:22, 226:25, 268:20, 275:15
**neat** [1] - 232:23
**necessarily** [1] - 241:10
**necessary** [2] - 250:3, 284:16
**need** [8] - 251:24, 260:25, 261:9, 261:16, 276:21, 287:3, 306:2
**needed** [2] - 255:12, 283:5
**negative** [9] - 198:22, 199:3, 200:2, 202:12, 210:4, 221:8, 228:19, 299:4, 299:3
**Neisser** [1] - 306:14
**NEISSER** [1] - 189:3
**nephew** [2] - 276:13, 288:4
**network** [11] - 202:25, 204:5, 205:22, 206:20, 207:9, 212:23, 213:4, 222:8, 263:18, 274:20, 274:24
**neuro** [1] - 214:25
**neurobiological** [1] - 198:17
**neurodegeneration** [1] - 209:10
**neuroimaging** [1] -

193:16, 215:19, 237:10, 237:12
**neurology** [1] - 238:15
**neuropsychologica l** [5] - 195:14, 202:17, 258:2, 259:19, 260:2
**neuropsychologist** [2] - 193:8, 238:1
**neuropsychology** [4] - 193:6, 193:18, 238:14, 259:16
**never** [12] - 203:25, 204:6, 204:21, 226:12, 230:2, 270:7, 274:23, 282:25, 283:1, 286:9, 303:9
**nevertheless** [1] - 293:16
**new** [3] - 270:8, 270:11, 283:2
**next** [3] - 191:6, 191:7, 267:11
**night** [2] - 219:10, 223:24
**Nobody** [1] - 284:14
**nobody** [2] - 287:4, 290:24
**noise** [1] - 256:14
**non** [1] - 279:10
**non-redacted** [1] - 279:10
**None** [1] - 236:12
**none** [5] - 236:24, 237:16, 238:10, 238:17, 256:18
**normal** [2] - 198:24, 198:25
**north** [1] - 193:2
**note** [3] - 223:3, 247:1, 305:7
**noted** [2] - 266:21, 304:13
**notes** [18] - 223:12, 263:4, 263:12, 263:22, 264:1, 264:2, 265:25, 266:4, 269:8, 269:22, 269:25, 270:18, 270:20, 270:21, 270:24, 271:1, 271:7, 271:25
**nothing** [2] - 224:24, 275:23
**Nothing** [1] - 251:18
**notice** [1] - 260:9
**noticed** [1] - 216:12
**noting** [1] - 278:18
**nowhere** [2] -

283:15, 285:15
**nuclei** [1] - 215:13
**number** [14] - 193:16, 196:16, 200:9, 201:2, 202:9, 202:10, 202:17, 232:10, 259:17, 277:23, 289:2, 289:6, 289:11, 295:9
**numerous** [1] - 234:16

# O

**o'clock** [5] - 250:3, 302:24, 303:8, 303:25, 306:8
**object** [5] - 240:25, 270:13, 277:1, 292:25, 293:20
**objection** [4] - 191:21, 192:5, 304:12, 304:15
**objections** [1] - 304:16
**observation** [1] - 200:16
**observations** [1] - 246:21
**observed** [1] - 229:16
**obtained** [1] - 193:14
**obtaining** [1] - 193:23
**obviously** [1] - 222:25
**occipital** [1] - 215:20
**occupation** [1] - 238:5
**Occupational** [2] - 237:24, 238:6
**occupational** [2] - 237:25, 238:3
**occupied** [1] - 234:21
**occur** [1] - 240:13
**occurring** [1] - 198:14
**October** [1] - 266:7
**odd** [4] - 219:2, 219:8, 221:6, 221:12
**ODEN** [72] - 188:17, 191:20, 191:23, 192:6, 223:10, 235:11, 235:13, 235:24, 236:5, 236:6, 241:3, 241:6, 250:6, 250:10, 250:14, 252:2,

252:6, 252:8, 252:13, 252:15, 252:21, 252:24, 253:1, 253:8, 253:11, 253:14, 253:17, 253:20, 253:21, 261:22, 263:8, 263:10, 265:24, 266:2, 266:15, 266:18, 266:19, 270:25, 271:5, 271:15, 271:18, 271:21, 272:1, 272:6, 272:12, 273:3, 273:5, 277:10, 277:14, 277:21, 277:24, 278:3, 278:23, 279:18, 280:7, 280:12, 281:8, 281:11, 281:13, 281:24, 282:6, 282:15, 289:4, 290:1, 290:3, 293:6, 294:1, 294:2, 298:14, 298:16, 298:17, 302:21
**Oden.............235** [1] - 190:6
**odor** [1] - 237:3
**OF** [1] - 188:1
**offense** [4] - 247:14, 287:2, 290:15, 295:16
**offer** [1] - 270:11
**offered** [1] - 270:8
**Office** [1] - 188:18
**office** [1] - 197:12
**officers** [1] - 226:9
**OFFICIAL** [1] - 189:3
**Official** [1] - 306:15
**Often** [1] - 221:4
**often** [3] - 221:11, 298:19, 299:3
**old** [2] - 293:9
**once** [2] - 228:7, 291:24
**Once** [1] - 292:1
**one** [41] - 209:10, 209:15, 211:10, 211:13, 229:5, 230:9, 231:8, 232:8, 232:21, 240:18, 241:12, 246:8, 249:19, 249:20, 250:8, 251:18, 254:4, 254:11, 255:11, 255:12, 255:17, 262:1, 262:2, 262:6,

265:14, 276:4, 278:15, 279:10, 280:7, 282:1, 282:9, 287:8, 288:5, 293:2, 294:24, 295:9, 296:2, 296:3, 303:1, 305:20, 305:21
**One** [9] - 230:10, 230:11, 233:25, 250:20, 259:15, 291:2, 291:14, 292:7, 292:10
**ones** [2] - 282:25, 285:24
**ongoing** [2] - 205:24, 222:24
**onset** [4] - 209:9, 210:7, 210:16, 295:14
**onward** [1] - 295:7
**open** [3] - 270:10, 272:18, 273:17
**open-ended** [3] - 270:16, 272:18, 273:17
**operating** [1] - 284:25
**opinion** [31] - 195:12, 200:6, 201:12, 201:22, 203:16, 217:22, 218:9, 221:19, 222:15, 224:10, 225:25, 227:8, 228:3, 228:24, 229:17, 229:25, 230:17, 231:4, 231:15, 241:22, 244:21, 245:3, 245:5, 245:21, 251:16, 252:3, 254:21, 277:12, 277:18, 281:1, 301:13
**opportunity** [2] - 225:23, 245:6
**opposed** [1] - 239:8
**opposing** [1] - 191:11
**options** [2] - 248:10
**order** [3] - 262:11, 292:19, 293:7
**ordinary** [3] - 217:4, 291:8, 296:8
**organic** [1] - 216:8
**organizations** [1] - 212:1
**organized** [1] - 286:3
**original** [3] - 245:4, 279:10, 302:13

**outline** [1] - 261:15
**outside** [4] - 257:15, 257:16, 273:24, 274:20
**overall** [1] - 258:9
**overnight** [1] - 279:12
**overriding** [1] - 201:16
**Overruled** [1] - 277:13
**overruled** [1] - 304:16
**overtake** [1] - 203:3
**own** [8] - 198:16, 199:18, 216:3, 218:7, 218:8, 226:24, 233:24
**owned** [1] - 233:21
**owning** [1] - 198:16

## P

**P.O** [1] - 188:18
**packing** [1] - 295:4
**Page** [2] - 279:19, 289:3
**page** [48] - 205:8, 223:8, 223:10, 223:11, 246:19, 246:22, 246:23, 247:6, 252:20, 253:2, 253:6, 255:18, 263:25, 264:10, 269:21, 269:22, 269:23, 269:25, 270:23, 272:24, 276:19, 276:24, 278:4, 278:5, 278:6, 279:7, 279:10, 280:16, 281:14, 281:22, 281:23, 282:1, 288:23, 289:2, 289:6, 289:9, 289:11, 290:4, 290:5, 294:7, 294:10, 294:13, 294:23, 298:16
**PAGE** [1] - 190:2
**pages** [6] - 263:12, 265:3, 272:3, 279:2, 280:11, 280:12
**PAI** [1] - 259:2
**pain** [9] - 200:15, 256:14, 256:15, 256:21, 256:22, 257:3, 257:9, 257:11, 279:25

**papers** [3] - 235:21, 235:24, 237:2
**paragraph** [8] - 205:9, 247:5, 247:6, 253:5, 253:22, 255:18, 278:5, 281:7
**paranoia** [1] - 212:10
**paranoid** [5] - 198:3, 211:19, 213:15, 213:24, 215:22
**Paranoid** [1] - 211:22
**pardon** [1] - 208:6
**part** [19] - 193:22, 194:19, 204:20, 206:1, 211:22, 212:6, 212:16, 223:8, 224:2, 238:12, 247:22, 251:8, 251:9, 253:23, 254:6, 254:24, 268:6, 269:9, 284:25
**participate** [1] - 261:20
**participated** [2] - 193:21, 193:24
**particular** [5] - 194:9, 197:23, 222:1, 222:21, 228:22
**particularly** [7] - 205:16, 213:23, 215:21, 221:5, 234:16, 246:25, 270:14
**parts** [1] - 271:7
**pass** [1] - 235:4
**passed** [1] - 301:23
**passport** [3] - 287:4, 287:12, 287:16
**past** [3] - 194:18, 212:20, 244:15
**patient** [8] - 202:14, 202:16, 209:4, 211:9, 242:8, 259:8, 259:21, 299:9
**patient's** [3] - 195:7, 205:17, 260:7
**patients** [13] - 200:17, 202:19, 213:23, 215:20, 229:1, 232:21, 236:8, 236:16, 236:19, 242:8, 258:8, 259:23, 290:24
**pattern** [15] - 195:18, 202:18, 226:4, 257:17, 257:18,

257:19, 258:6, 259:20, 260:5, 286:22, 292:21, 293:2, 293:12, 295:6, 297:23
**patterns** [1] - 258:15
**patterns'** [1] - 260:3
**Pause** [8] - 235:3, 278:21, 279:16, 280:1, 281:9, 281:21, 282:3, 282:13
**pay** [2] - 234:1, 234:5
**PC** [1] - 188:15
**People** [3] - 237:6, 237:8, 275:25
**people** [24] - 204:15, 212:9, 216:25, 218:1, 220:13, 221:8, 225:4, 228:25, 229:24, 234:15, 234:17, 234:18, 237:3, 244:16, 275:17, 277:3, 285:20, 286:2, 287:19, 287:21, 288:5, 290:22, 299:11
**people's** [1] - 284:22
**Per** [1] - 223:23
**perceive** [4] - 198:12, 198:13, 217:18, 299:12
**perceived** [1] - 227:21
**perceiving** [1] - 201:8
**perception** [7] - 198:10, 198:25, 201:20, 203:4, 206:10, 211:18, 239:23
**perceptive** [1] - 217:16
**perform** [1] - 249:5
**performance** [2] - 259:9, 260:4
**performed** [1] - 242:20
**performs** [1] - 260:5
**perhaps** [2] - 251:14, 284:24
**period** [5] - 216:20, 227:19, 231:20, 231:24, 234:1
**periods** [5] - 227:20, 228:12, 228:15, 232:7, 299:14
**permanent** [1] - 202:2

**persecution** [1] - 200:11
**persecutory** [8] - 201:19, 205:11, 207:10, 211:25, 212:6, 224:4, 225:12, 247:10
**persisted** [2] - 211:2, 211:16
**persistent** [1] - 222:19
**person** [11] - 199:19, 221:13, 228:7, 249:20, 251:2, 259:3, 274:22, 275:8, 283:6, 295:25, 300:12
**person's** [3] - 199:12, 201:20, 231:11
**personal** [3] - 232:23, 233:1, 304:22
**personality** [1] - 259:1
**perspectives** [1] - 282:21
**pervasive** [7] - 210:2, 210:4, 212:11, 222:8, 291:19, 291:24, 292:3
**pervasiveness** [4] - 203:2, 203:3, 206:23, 228:14
**Petitioner** [1] - 188:4
**PETITIONER** [1] - 188:14
**Petitioner's** [8] - 191:17, 192:12, 196:19, 196:23, 197:1, 205:7, 219:1, 223:3
**petitioner's** [1] - 253:8
**petitioners** [1] - 304:13
**Petvold** [1] - 243:23
**PETVOLD** [1] - 243:23
**Ph.D** [2] - 193:1, 236:7
**pharmacological** [1] - 228:10
**phase** [10] - 195:5, 196:7, 209:24, 210:1, 210:3, 210:4, 211:7, 225:20, 298:20, 299:6
**phenomena** [1] -

198:15
**phenylalanine** [1] - 236:18
**PHILIP** [1] - 188:14
**phone** [1] - 197:14
**photocopied** [1] - 266:13
**physical** [2] - 200:14, 216:8
**physically** [5] - 200:17, 212:3, 216:8, 226:8, 227:1
**physically-based** [1] - 216:8
**physician** [1] - 200:19
**pick** [2] - 288:4, 288:7
**picked** [1] - 288:6
**piece** [1] - 286:16
**pieces** [1] - 249:19
**piercing** [1] - 256:22
**pink** [1] - 278:5
**place** [2] - 232:9, 246:9
**placement** [1] - 232:12
**places** [1] - 232:3
**plan** [6] - 235:6, 250:2, 285:3, 285:10, 285:17, 286:4
**planned** [1] - 286:8
**planning** [4] - 286:12, 286:17, 286:19, 286:24
**plant** [1] - 295:4
**played** [1] - 245:21
**players** [2] - 248:5, 254:16
**plays** [1] - 303:9
**plead** [2] - 248:10, 248:12
**pleading** [1] - 253:15
**pleasurable** [1] - 299:1
**ploy** [1] - 212:17
**plus** [1] - 224:23
**point** [10] - 219:16, 241:12, 245:19, 263:12, 267:23, 268:16, 272:6, 275:7, 285:22, 302:19
**Police** [6] - 244:22, 245:6, 276:11, 277:16, 278:10, 284:17
**police** [7] - 278:14, 280:8, 280:23,

287:24, 289:1, 289:5, 289:24
**poor** [1] - 224:1
**population** [1] - 198:24
**populations** [1] - 240:17
**portion** [4] - 211:24, 268:8, 271:19, 271:22
**portions** [1] - 238:15
**position** [1] - 248:24
**positive** [8] - 198:22, 198:23, 200:1, 200:8, 202:11, 210:4, 259:4, 298:22
**possess** [1] - 224:5
**possibility** [6] - 224:5, 224:10, 224:15, 228:21, 296:13, 303:6
**possible** [13] - 213:15, 230:22, 257:1, 280:4, 297:10, 297:14, 297:19, 299:9, 299:15, 299:19, 300:20, 300:23, 303:13
**possibly** [1] - 224:2
**post** [8] - 238:13, 296:6, 296:7, 296:8, 297:2, 300:5, 301:5, 301:18
**post-arrest** [1] - 300:5
**post-crime** [1] - 297:2
**post-doctorate** [1] - 238:13
**Poverty** [1] - 199:18
**poverty** [1] - 199:19
**power** [1] - 217:6
**powers** [4] - 216:25, 217:5, 217:8, 224:5
**practice** [5] - 194:12, 194:19, 197:21, 221:4, 221:14
**practicing** [2] - 193:7, 193:13
**pre** [2] - 297:2, 301:7
**pre-arrest** [2] - 297:2, 301:7
**prefrontal** [2] - 215:2, 215:16
**preparation** [4] - 197:6, 197:17, 197:18, 284:19
**preparing** [3] - 195:11, 197:19

**presence** [9] - 216:17, 218:21, 219:12, 222:24, 224:25, 228:18, 229:2, 300:2, 302:10
**PRESENT** [1] - 188:22
**present** [24] - 195:5, 197:13, 200:2, 201:12, 202:4, 202:14, 203:11, 209:9, 209:13, 209:15, 209:19, 216:2, 216:19, 216:21, 221:23, 222:25, 227:17, 228:20, 285:12, 296:19, 297:25, 298:19, 300:11
**presentation** [4] - 195:8, 205:22, 222:11, 298:2
**Presentations** [1] - 238:24
**presentations** [1] - 193:16
**presented** [3] - 222:7, 226:7, 297:13
**presenting** [2] - 211:9, 259:3
**presents** [2] - 226:13, 261:15
**presumably** [2] - 249:2, 297:21
**pretty** [1] - 285:19
**prevailing** [1] - 227:18
**prevalent** [1] - 228:11
**previous** [2] - 233:13, 246:4
**previously** [2] - 239:23, 298:25
**principal** [1] - 223:18
**priors** [1] - 294:23
**prison** [12] - 212:25, 213:12, 217:13, 219:4, 219:7, 231:16, 231:21, 276:1, 293:11, 296:20, 300:7
**prisoners** [1] - 212:24
**private** [1] - 221:7
**pro** [1] - 264:23
**problem** [9] - 218:9, 220:23, 221:2, 272:21, 277:24, 281:8, 285:8, 287:6, 290:15

**problems** [4] - 216:11, 218:2, 231:15, 234:11
**Procedure** [1] - 260:23
**proceed** [2] - 191:4, 191:8
**proceeding** [3] - 252:10, 268:10, 278:17
**proceedings** [33] - 195:22, 195:24, 203:14, 203:24, 207:14, 229:24, 235:3, 247:25, 248:2, 248:6, 255:7, 255:16, 256:2, 261:18, 262:18, 262:25, 264:15, 265:7, 267:14, 268:14, 268:16, 268:25, 273:13, 274:11, 278:21, 279:16, 280:1, 281:9, 281:21, 282:3, 282:13, 306:11
**PROCEEDINGS** [1] - 188:10
**Proceedings** [1] - 188:24
**process** [2] - 228:6, 301:20
**processing** [1] - 199:5
**prodromal** [3] - 195:5, 298:21, 299:6
**Prodromal** [1] - 298:19
**produce** [2] - 195:25, 305:14
**produced** [1] - 188:25
**professionals** [1] - 260:20
**profile** [1] - 260:8
**profound** [1] - 293:14
**program** [2] - 193:22, 238:3
**progressively** [1] - 209:12
**prohibit** [1] - 292:4
**projections** [2] - 215:1, 215:14
**prongs** [2] - 203:10, 203:17
**pronounced** [1] - 218:20
**proof** [1] - 218:12

**proper** [1] - 280:18
**properly** [1] - 232:17
**propose** [1] - 280:17
**prosecute** [1] - 269:7
**prosecution** [2] - 248:4, 273:19
**provide** [1] - 191:25
**provided** [5] - 208:8, 209:6, 232:15, 276:12, 277:11
**provision** [1] - 223:16
**psychiatric** [2] - 202:12, 221:2
**psychiatrist** [1] - 221:9
**psychiatrists** [1] - 221:8
**psychiatry** [2] - 238:15, 239:11
**psychological** [8] - 196:18, 196:20, 196:24, 197:3, 220:18, 220:23, 229:16, 260:20
**psychologists** [3] - 193:25, 196:10, 210:17
**psychology** [9] - 193:20, 193:21, 194:4, 238:14, 238:20, 239:3, 239:13, 240:6, 240:15
**psychometric** [1] - 237:20
**psychosis** [1] - 300:2
**psychotic** [4] - 209:23, 228:11, 296:20, 299:7
**publications** [4] - 193:10, 193:17, 239:2, 239:8
**published** [1] - 207:25
**punished** [1] - 247:13
**punishment** [3] - 196:7, 211:7, 225:20
**purchased** [2] - 234:2, 286:13
**purchasing** [2] - 286:19, 286:25
**purposes** [1] - 223:21
**pushed** [1] - 303:12
**put** [6] - 210:11, 210:20, 217:2, 234:3, 254:1, 286:4

**putting** [1] - 286:10

## Q

**qualifications** [1] - 192:25
**QUARTERMAN** [1] - 188:7
**queried** [4] - 291:1, 296:23, 297:5, 297:8
**query** [2] - 202:16, 292:11
**questioned** [2] - 254:2, 262:17
**questioning** [7] - 208:25, 226:5, 229:21, 233:11, 241:1, 255:25, 256:1
**questions** [54] - 203:23, 204:9, 205:20, 226:7, 226:14, 246:14, 246:16, 247:2, 247:4, 247:17, 247:21, 248:13, 249:7, 253:24, 255:1, 255:2, 255:14, 255:15, 256:6, 256:8, 260:17, 260:19, 261:24, 262:10, 262:15, 262:23, 264:12, 265:6, 266:23, 267:4, 268:9, 269:11, 271:1, 271:4, 271:8, 271:12, 272:4, 272:17, 272:18, 272:19, 273:6, 273:10, 273:17, 273:23, 274:4, 274:8, 292:15, 296:25, 301:11, 301:12, 301:13, 302:4, 302:6
**quick** [3] - 303:1, 303:3, 304:1
**quietly** [1] - 220:16
**Quijano** [24] - 196:13, 196:24, 197:7, 198:9, 206:24, 207:3, 207:8, 207:15, 207:24, 208:8, 208:14, 218:16, 218:17, 227:2, 228:7, 229:14, 229:17, 233:11, 244:5, 247:3, 260:12, 274:5,

298:3, 301:24
**Quijano's** [14] - 205:17, 208:15, 209:20, 210:19, 213:9, 216:17, 222:7, 224:7, 224:11, 227:9, 262:13, 262:15, 276:10, 298:1
**quitting** [3] - 236:7, 236:9, 236:13

## R

**radio** [1] - 217:12
**raise** [2] - 192:11, 222:3
**Randolph** [1] - 213:4
**randomly** [1] - 264:21
**rather** [1] - 199:15
**rating** [2] - 202:9, 202:12
**rational** [9] - 203:13, 225:17, 285:8, 287:6, 290:14, 290:15, 291:2, 292:17
**rationally** [1] - 284:25
**raw** [3] - 260:13, 265:25, 266:4
**reacts** [1] - 214:17
**read** [39] - 206:3, 206:24, 215:10, 222:17, 223:19, 235:20, 254:6, 263:23, 269:3, 269:15, 269:16, 269:22, 270:2, 270:12, 270:24, 271:9, 271:11, 276:11, 279:24, 280:19, 280:22, 281:5, 282:10, 282:16, 282:25, 283:23, 284:16, 284:21, 285:5, 287:9, 287:11, 288:14, 288:21, 289:17, 289:25, 290:6
**reading** [5] - 197:20, 283:8, 284:10, 290:5, 298:18
**ready** [5] - 191:3, 192:9, 306:2
**real** [4] - 214:16, 222:3, 229:7, 303:3

**really** [5] - 206:21, 211:23, 219:21, 269:15, 293:22
**reason** [4] - 194:24, 224:21, 234:25, 248:13
**reasonable** [3] - 195:6, 203:12, 248:8
**reasoning** [1] - 243:4
**recalled** [1] - 211:14
**receive** [2] - 217:19, 252:4
**received** [2] - 265:22, 266:7
**receiving** [1] - 278:18
**recently** [6] - 197:9, 197:24, 251:5, 251:11, 251:12, 251:15
**Recessed** [1] - 306:9
**recitation** [1] - 270:18
**recognize** [5] - 204:6, 218:7, 239:2, 268:5, 268:6
**recognized** [1] - 212:14
**recognizes** [1] - 284:8
**recollection** [6] - 211:11, 219:19, 231:3, 243:22, 244:9, 289:17
**record** [20] - 192:18, 196:18, 208:20, 212:8, 218:13, 218:15, 219:1, 232:8, 232:16, 244:3, 251:8, 251:10, 251:17, 251:22, 270:1, 280:21, 286:13, 287:15, 289:23, 306:11
**recorded** [2] - 188:24, 271:1
**records** [38] - 196:3, 196:4, 196:5, 196:9, 208:11, 208:23, 210:13, 210:16, 222:17, 222:23, 232:18, 233:6, 233:22, 233:23, 244:22, 244:25, 245:7, 245:9, 245:24, 251:5, 251:17, 251:25, 276:11, 276:12, 277:16, 279:11,

280:22, 294:5, 294:7, 295:23, 300:7, 301:1, 302:12, 304:25, 305:3, 305:11
**recused** [2] - 212:15, 268:5
**redact** [1] - 304:21
**redacted** [2] - 279:10, 305:5
**refer** [3] - 228:5, 250:12, 253:24
**reference** [3] - 205:11, 226:24, 247:9
**references** [1] - 233:23
**referred** [5] - 198:22, 228:16, 250:8, 250:9, 304:6
**referring** [13] - 218:24, 230:19, 247:6, 247:7, 247:15, 250:18, 251:20, 252:20, 253:5, 253:22, 257:21, 277:20, 279:2
**refers** [3] - 211:23, 227:14, 234:17
**reflect** [1] - 301:3
**reflected** [1] - 269:8
**refusing** [1] - 233:2
**Refusing** [1] - 233:4
**refute** [1] - 300:1
**regard** [1] - 269:6
**regarding** [4] - 202:16, 253:25, 254:7, 272:4
**regardless** [1] - 202:3
**regards** [3] - 200:8, 259:6
**regions** [1] - 215:15
**regular** [2] - 194:11, 194:19
**regularly** [1] - 233:16
**related** [15] - 195:24, 197:21, 202:24, 205:16, 225:6, 229:21, 240:13, 240:19, 255:15, 268:9, 284:7, 292:5, 301:14, 302:1
**relates** [3] - 227:12, 227:13, 272:4
**relating** [4] - 203:23, 255:7, 256:9
**relation** [2] - 222:6, 268:21

**relationship** [2] - 202:22, 240:19
**relationships** [1] - 199:6
**relative** [2] - 228:17, 258:11
**relatively** [2] - 202:2, 298:21
**relay** [1] - 214:25
**release** [2] - 212:24, 219:7
**released** [2] - 219:4, 276:1
**relevance** [2] - 228:3, 240:25
**relevant** [6] - 209:2, 231:10, 231:11, 256:8, 262:17, 274:9
**reliability** [1] - 277:6
**reliable** [1] - 298:11
**relied** [1] - 208:8
**religious** [5] - 200:12, 201:18, 207:10, 215:21, 298:4
**relook** [1] - 264:1
**relying** [1] - 252:3
**remember** [7] - 242:8, 243:6, 244:1, 244:4, 244:5, 244:7, 265:17
**remembers** [1] - 211:10
**remission** [9] - 227:3, 227:4, 227:9, 227:12, 227:14, 227:22, 228:9
**rendering** [1] - 207:14
**repeat** [4] - 240:7, 246:5, 261:5, 297:18
**repeatedly** [1] - 211:12
**Rephrase** [1] - 293:5
**reply** [14] - 246:18, 248:19, 248:23, 249:4, 252:17, 252:21, 253:2, 253:8, 253:9, 254:6, 254:18, 254:23
**report** [63] - 195:25, 197:8, 197:19, 200:14, 200:18, 204:23, 204:25, 205:7, 205:17, 206:25, 207:25, 208:14, 209:3, 209:20, 210:12, 210:19, 213:9, 217:5, 218:17,

222:7, 229:22, 234:3, 244:21, 245:1, 245:2, 245:5, 245:10, 245:14, 245:16, 245:20, 246:2, 246:9, 246:13, 246:19, 247:3, 247:19, 248:15, 248:17, 250:9, 250:12, 250:22, 251:4, 251:25, 254:23, 255:17, 255:19, 255:22, 256:13, 257:14, 257:25, 259:6, 260:14, 276:10, 278:10, 278:14, 281:5, 289:1, 289:5, 289:24, 298:1, 299:4
**reported** [2] - 213:13, 225:2
**reportedly** [1] - 296:6
**REPORTER** [11] - 189:3, 215:3, 215:6, 215:8, 215:12, 261:3, 261:7, 261:9, 261:12, 261:14, 268:11
**Reporter** [1] - 306:15
**reporting** [4] - 200:17, 219:11, 277:7, 300:15
**reports** [18] - 196:10, 206:3, 210:17, 211:8, 233:15, 234:16, 235:17, 235:19, 277:3, 277:7, 280:23, 281:2, 287:8, 297:25, 299:25, 300:4, 300:10, 301:3
**repossessed** [1] - 233:25
**requested** [1] - 266:3
**requests** [1] - 266:8
**reschedule** [1] - 197:16
**research** [3] - 213:22, 227:25, 236:21
**resided** [1] - 232:3
**residence** [2] - 294:8, 294:14
**resident** [1] - 238:8
**residents** [2] - 238:14, 238:15
**residual** [2] - 298:20, 298:21

**respectively** [1] - 197:1
**respond** [3] - 255:13, 256:4, 259:23
**Respondent** [2] - 188:8, 279:2
**respondent** [3] - 250:23, 277:19, 280:5
**RESPONDENT** [1] - 188:17
**Respondent's** [10] - 263:11, 269:23, 270:22, 276:19, 276:24, 277:25, 278:4, 279:19, 281:14, 290:4
**respondent's** [1] - 253:9
**Respondents** [1] - 191:21
**responding** [1] - 259:5
**response** [7] - 226:5, 247:17, 254:13, 254:24, 262:15, 263:20, 265:6
**responses** [5] - 260:3, 262:14, 264:12, 269:12, 269:13
**responsibility** [1] - 231:22
**responsivity** [1] - 199:4
**rest** [1] - 284:19
**restricted** [1] - 231:20
**result** [3] - 257:9, 257:11, 270:16
**results** [1] - 249:17
**resume** [1] - 302:24
**retained** [2] - 192:21, 242:3
**retrospective** [2] - 194:24, 274:13
**return** [3] - 227:15, 228:11, 306:6
**returned** [1] - 234:6
**review** [23] - 196:2, 196:10, 197:6, 197:17, 207:15, 207:23, 208:7, 208:23, 223:15, 225:23, 233:22, 244:25, 245:6, 245:24, 246:6, 246:8, 248:11, 248:15, 261:17, 277:16, 278:6,

279:6, 279:23
**reviewed** [32] - 196:4, 196:5, 196:12, 196:13, 196:16, 205:17, 209:20, 219:25, 222:23, 223:23, 244:22, 245:9, 245:10, 245:13, 245:15, 245:18, 245:19, 246:10, 250:18, 250:22, 251:2, 251:4, 251:5, 251:11, 251:12, 251:15, 251:25, 252:2, 252:12, 261:16, 294:4, 299:24
**revolve** [1] - 211:25
**Rey** [1] - 260:2
**Rhonda** [1] - 305:7
**rid** [3] - 284:14, 284:15, 284:23
**riding** [2] - 234:18, 234:20
**rights** [1] - 264:22
**Ringholz** [3] - 241:24, 242:2, 242:4
**road** [2] - 234:19, 234:23
**roadways** [1] - 234:21
**robberies** [4] - 292:22, 293:10, 294:24, 295:7
**robbery** [18] - 276:16, 283:5, 283:7, 283:13, 283:20, 286:6, 288:23, 289:16, 290:11, 291:10, 293:9, 293:11, 293:13, 293:19, 295:3, 295:22, 296:10, 296:11
**rode** [1] - 234:7
**role** [3] - 245:21, 254:15, 273:19
**roles** [1] - 229:23
**romantic** [1] - 199:6
**roof** [3] - 275:25, 295:19, 296:1
**room** [3] - 219:14, 288:8, 288:9
**row** [10] - 203:25, 204:2, 204:7, 244:16, 247:11, 268:18, 274:21, 275:1, 275:9
**RPR** [1] - 306:14

**rule** [1] - 283:16
**rules** [3] - 234:20, 234:22, 264:23
**RULFORD** [1] - 188:3
**Rulford** [1] - 188:22
**run** [1] - 234:17
**running** [3] - 285:17, 287:1, 288:3
**Rusk** [1] - 189:4
**Rytting** [4] - 212:12, 265:14, 266:12, 266:16
**RYTTING** [36] - 188:14, 191:5, 191:7, 191:15, 192:3, 192:16, 205:3, 205:6, 223:5, 223:7, 223:11, 223:13, 235:4, 240:25, 251:24, 252:5, 252:7, 252:9, 252:23, 253:18, 266:17, 270:13, 277:1, 277:19, 280:2, 280:4, 280:17, 289:3, 292:25, 293:20, 293:23, 304:15, 305:12, 305:14, 305:20, 305:22
**Rytting..........192** [1] - 190:6

**S**

**safe** [2] - 276:16, 290:11
**salient** [2] - 254:25, 255:12
**sample** [1] - 260:19
**satisfied** [1] - 203:21
**satisfy** [1] - 203:16
**saw** [6] - 209:17, 209:18, 216:14, 283:1, 299:25, 300:4
**scale** [5] - 202:10, 202:11, 202:13, 260:9, 262:3
**scales** [6] - 202:9, 239:4, 259:2, 260:16, 261:1, 261:25
**scars** [1] - 256:17
**scene** [1] - 293:17
**scheduled** [1] - 197:11
**schizoid** [2] - 257:17, 258:3

**Schizophrenia** [1] - 198:3
**schizophrenia** [67] - 193:4, 193:7, 193:15, 193:18, 194:22, 195:1, 195:4, 195:16, 195:19, 195:21, 197:21, 197:22, 198:7, 198:8, 198:11, 198:20, 198:23, 202:10, 202:20, 206:7, 209:2, 209:5, 209:17, 209:22, 211:20, 213:15, 213:23, 213:24, 215:20, 217:10, 218:2, 221:11, 225:4, 227:3, 227:13, 228:6, 228:8, 228:20, 228:25, 229:1, 229:9, 232:21, 232:22, 236:8, 236:16, 236:18, 236:22, 237:10, 237:11, 237:14, 257:19, 257:20, 258:7, 258:8, 258:16, 260:7, 290:24, 295:15, 297:15, 297:20, 297:21, 297:23, 298:11, 299:10, 300:18, 302:12
**schizophrenias** [1] - 215:14
**schizophrenic** [5] - 243:16, 291:6, 296:20, 299:16, 299:20
**schizophrenics** [2] - 236:15, 258:15
**school** [1] - 193:14
**School** [2] - 193:2, 294:21
**science** [2] - 240:14, 243:8
**Sciences/The** [1] - 193:2
**scientific** [2] - 197:17, 209:7
**sclerosis** [1] - 236:22
**screening** [1] - 223:17
**scuffle** [4] - 276:14, 283:6, 295:20, 296:10

**seal** [2] - 304:21, 305:8

**seat** [1] - 192:13

**second** [13] - 205:8, 240:18, 247:6, 253:5, 253:22, 254:4, 255:18, 264:10, 275:16, 281:25, 291:25, 292:1, 300:19

**section** [4] - 263:13, 268:13, 274:1, 289:18

**see** [24] - 202:14, 202:19, 204:21, 213:12, 220:15, 223:8, 233:23, 235:24, 241:2, 249:8, 258:19, 260:16, 264:11, 266:1, 270:21, 282:18, 283:3, 283:11, 283:12, 283:19, 287:25, 297:24, 300:3, 306:8

**seem** [9] - 214:3, 240:15, 240:16, 240:17, 240:19, 284:7, 285:10, 286:3

**self** [6] - 224:3, 276:15, 283:4, 283:12, 283:20, 295:21

**Self** [1] - 296:9

**self-defense** [5] - 276:15, 283:4, 283:12, 283:20, 295:21

**Self-defense** [1] - 296:9

**semantic** [2] - 200:11, 200:13

**sending** [1] - 217:11

**sensation** [1] - 237:3

**sense** [5] - 212:13, 212:14, 217:7, 230:1, 243:8

**sensorally** [1] - 217:16

**sensory** [6] - 198:12, 198:14, 214:19, 215:15, 229:4

**sent** [4] - 266:6, 266:13, 279:11, 293:11

**sentence** [2] - 247:5, 247:7

**separate** [5] - 204:23, 231:6, 257:5, 257:7, 275:7

**separately** [1] - 231:8

**September** [1] - 242:22

**sequence** [2] - 199:24, 205:18

**Sergeant** [1] - 278:11

**series** [1] - 238:3

**set** [2] - 275:18, 303:11

**setting** [3] - 204:4, 249:22, 249:23

**setup** [1] - 278:8

**seven** [2] - 305:18, 305:19

**several** [7] - 191:8, 191:9, 193:25, 194:12, 200:21, 201:17, 293:10

**severe** [5] - 209:16, 210:2, 222:7, 258:20, 298:3

**severity** [12] - 195:2, 195:16, 202:25, 203:1, 206:19, 222:11, 224:18, 225:6, 225:8, 228:14, 248:7, 298:2

**sexual** [1] - 210:21

**sexually** [3] - 211:12, 291:12, 295:18

**shared** [1] - 305:15

**shave** [2] - 232:25, 233:4

**shoot** [1] - 289:21

**short** [1] - 234:1

**shorter** [1] - 227:20

**Show** [1] - 269:13

**show** [14] - 191:10, 223:2, 240:16, 251:14, 256:16, 257:21, 257:22, 260:1, 264:6, 269:10, 277:19, 288:2, 301:7, 301:10

**showed** [4] - 219:8, 222:15, 231:23, 232:1

**shower** [2] - 232:24, 233:2

**showing** [7] - 231:23, 250:15, 253:2, 278:4, 279:19, 281:14, 298:16

**shown** [5] - 214:23, 215:12, 215:17, 215:18, 280:9

**shows** [2] - 213:22,

286:24

**sic]** [2] - 211:13, 229:17

**side** [10] - 191:25, 204:12, 204:13, 234:19, 242:3, 248:3, 248:4, 268:23, 268:24, 278:25

**sign** [1] - 299:3

**signature** [2] - 280:13, 281:23

**signed** [1] - 266:21

**significance** [4] - 231:4, 280:20, 281:2, 281:4

**significant** [10] - 200:12, 206:17, 207:6, 210:2, 211:24, 222:14, 228:14, 232:14, 232:19, 233:17

**significantly** [3] - 218:6, 219:8, 219:16

**signs** [1] - 227:17

**Silverman** [7] - 196:15, 197:3, 246:11, 247:3, 270:8, 270:10

**similar** [6] - 195:7, 206:14, 207:2, 207:6, 240:20, 298:1

**simplify** [1] - 293:25

**simply** [2] - 214:5, 275:22

**single** [4] - 201:4, 263:15, 292:13

**sister** [4] - 235:22, 235:24, 246:1, 246:7

**sister's** [1] - 210:12

**sisters** [4] - 196:8, 218:25, 219:12, 234:8

**sisters'** [1] - 232:4

**sit** [1] - 305:10

**situation** [5] - 205:12, 206:10, 232:13, 247:10

**six** [4] - 227:19, 227:22, 305:19, 305:21

**Sixteen** [1] - 301:23

**skin** [1] - 256:17

**skipping** [1] - 298:23

**sleep** [2] - 224:1, 233:19

**sleeping** [1] - 233:16

**slipping** [1] - 299:5

**slow** [3] - 215:3, 215:4, 268:11

**smocking** [1] - 236:9

**smoked** [1] - 236:16

**smokers** [1] - 236:14

**smoking** [6] - 236:7, 236:10, 236:11, 236:13, 236:15

**sneaking** [1] - 220:15

**So-and-So** [1] - 221:12

**social** [4] - 199:5, 224:23, 230:10, 231:7

**socially** [1] - 298:24

**society** [1] - 232:14

**solely** [1] - 238:18

**solving** [3] - 285:8, 287:6, 290:15

**somatic** [3] - 256:12, 256:13, 257:7

**someone** [1] - 300:17

**sometimes** [7] - 200:22, 217:9, 227:20, 300:13, 300:14, 300:15, 300:16

**sorry** [15] - 215:3, 232:5, 238:2, 239:20, 246:4, 255:20, 258:1, 260:12, 261:3, 267:16, 268:11, 268:12, 279:6, 289:1, 294:1

**sort** [11] - 194:15, 199:6, 201:8, 201:15, 214:21, 220:16, 221:13, 232:25, 259:5, 264:21, 295:24

**sought** [1] - 220:18

**sound** [3] - 256:22, 257:10

**sounding** [1] - 291:8

**sounds** [2] - 234:7, 243:14

**source** [3] - 214:14, 214:15, 298:11

**sources** [2] - 231:9, 278:19

**SOUTHERN** [1] - 188:1

**speaking** [3] - 199:13, 201:3, 201:4

**speaks** [1] - 218:5

**special** [5] - 193:6, 217:5, 217:6, 217:7, 224:5

**specific** [17] -

202:18, 226:4, 247:2, 247:4, 256:13, 259:19, 261:1, 261:25, 262:3, 270:20, 271:8, 272:8, 272:9, 272:14, 272:17, 286:23

**Specifically** [1] - 200:10

**specifically** [18] - 193:24, 194:21, 197:22, 202:24, 204:10, 212:15, 218:5, 218:24, 225:5, 225:10, 238:17, 246:16, 248:1, 252:19, 258:22, 258:25, 259:17, 267:14

**specifics** [1] - 276:13

**specified** [1] - 298:22

**speech** [5] - 199:19, 199:23, 199:24, 292:4

**speed** [1] - 265:1

**spell** [2] - 215:5, 242:10

**spend** [3] - 284:16, 299:2, 305:25

**spending** [1] - 305:18

**spent** [1] - 263:14

**spirits** [13] - 201:8, 201:9, 210:21, 212:1, 213:1, 217:20, 219:12, 219:14, 219:22, 220:12, 220:15, 268:20, 300:10

**spoken** [1] - 212:12

**stability** [2] - 228:16, 228:18

**stage** [1] - 297:2

**stand** [10] - 203:6, 203:10, 208:16, 221:18, 225:14, 246:15, 253:25, 254:8, 274:14, 302:15

**standards** [3] - 203:5, 203:8, 203:22

**standing** [2] - 262:7, 262:10

**stapled** [1] - 250:16

**start** [12] - 215:8, 223:9, 223:20, 223:21, 261:8,

263:11, 264:17, 303:13, 303:17, 303:19, 303:20, 304:4
**started** [3] - 194:17, 224:6, 235:16
**starting** [1] - 269:22
**starts** [2] - 209:11, 270:3
**state** [15] - 192:21, 204:1, 204:6, 227:15, 247:11, 260:24, 264:14, 264:19, 269:3, 269:5, 270:3, 270:5, 274:24, 305:23, 305:24
**State** [3] - 241:25, 261:15, 299:18
**statement** [29] - 208:8, 213:11, 214:3, 218:25, 223:9, 226:8, 226:13, 246:1, 246:6, 249:8, 249:9, 249:12, 254:1, 254:22, 279:20, 280:7, 281:15, 281:25, 282:11, 283:24, 284:4, 284:13, 288:21, 289:12, 289:14, 291:2, 292:8
**statements** [24] - 196:7, 226:4, 226:11, 226:23, 234:8, 277:8, 277:18, 280:23, 281:15, 282:16, 282:22, 282:24, 283:23, 284:2, 284:5, 284:7, 284:10, 287:18, 296:6, 296:7, 296:21, 300:5, 301:5, 301:7
**STATES** [2] - 188:1, 188:11
**States** [1] - 242:21
**states** [1] - 193:8
**statistical** [2] - 298:7, 298:10
**status** [2] - 222:13, 265:9
**statutes** [1] - 264:23
**stay** [1] - 232:8
**stealing** [1] - 283:7
**stenography** [1] - 188:24
**Stephanie** [1] -

306:14
**STEPHANIE** [1] - 189:3
**stepmother** [2] - 232:5, 232:6
**steps** [1] - 285:11
**stick** [2] - 214:1, 214:2
**sticks** [1] - 226:8
**still** [2] - 228:20, 246:4
**stimulation** [1] - 214:19
**stole** [6] - 288:22, 289:14, 290:10, 291:9, 295:21, 296:10
**stood** [1] - 211:13
**stop** [5] - 199:14, 216:2, 216:3, 267:16, 289:23
**stopped** [1] - 228:10
**stopping** [1] - 302:19
**story** [1] - 276:9
**straight** [1] - 303:22
**strategies** [1] - 211:9
**stress** [4] - 222:10, 224:20, 224:24, 225:3
**strike** [2] - 196:1, 208:24
**strong** [2] - 293:14, 293:16
**strongly** [1] - 226:13
**structural** [1] - 198:17
**structurally** [1] - 215:18
**structure** [2] - 247:22, 260:17
**structured** [1] - 262:21
**struggle** [1] - 290:8
**stubborn** [1] - 214:5
**studies** [2] - 215:17, 215:19
**study** [1] - 193:15
**stuff** [1] - 271:20
**subject** [1] - 238:12
**subjects** [1] - 292:4
**submission** [1] - 197:8
**subsequent** [1] - 245:12
**Subsequent** [1] - 197:8
**substantial** [2] - 221:17, 222:4
**subthreshold** [1] - 298:22

**subtraits** [1] - 198:17
**subtypes** [1] - 201:1
**suddenly** [2] - 199:14, 299:10
**suffer** [4] - 218:2, 225:4, 228:25, 232:22
**suffering** [3] - 200:6, 206:7, 213:14
**suffers** [1] - 256:12
**sufficient** [1] - 203:11
**Sufi** [7] - 212:23, 274:22, 275:14, 275:16, 291:12, 295:18, 296:3
**Sufis** [2] - 268:19, 290:19
**suggested** [1] - 229:14
**suggestion** [2] - 224:3, 228:21
**suggests** [2] - 195:2, 299:21
**Suite** [1] - 189:4
**sum** [1] - 263:20
**summary** [1] - 275:3
**summations** [1] - 196:17
**support** [6] - 224:23, 224:25, 225:1, 232:14, 252:3, 269:6
**supports** [1] - 211:4
**suppose** [1] - 251:1
**supposed** [2] - 204:17, 277:8
**supposedly** [1] - 207:13
**surrounding** [1] - 244:23, 245:7
**suspect** [1] - 290:7
**sustain** [2] - 232:12, 293:4
**sworn** [8] - 192:11, 279:3, 279:20, 280:7, 281:15, 289:6, 289:12
**Sworn** [1] - 192:12
**symptom** [4] - 202:9, 218:10, 257:5, 259:6
**symptoms** [54] - 195:3, 195:17, 195:20, 198:19, 198:22, 198:23, 199:3, 200:1, 200:2, 200:6, 200:8, 200:14, 201:11, 202:11, 202:12, 202:14, 202:16, 203:1, 209:8,

209:13, 210:1, 210:5, 224:18, 224:21, 224:25, 225:3, 227:16, 228:3, 228:11, 228:13, 228:16, 228:18, 228:19, 228:22, 228:23, 229:3, 229:10, 229:11, 229:13, 249:21, 292:2, 297:12, 298:3, 298:19, 298:20, 298:21, 298:22, 299:3, 299:11, 299:14, 302:11
**synapses** [1] - 214:12
**syndrome** [1] - 237:4
**system** [14] - 201:14, 201:15, 201:22, 202:4, 204:10, 204:14, 206:12, 212:5, 212:9, 212:10, 214:22, 215:25, 225:12

**T**

**T.D.C** [5] - 196:9, 222:23, 223:15, 224:12, 232:18
**T.D.C.J** [2] - 196:4, 245:24
**T.Y.C** [2] - 294:5, 294:7
**talkative** [1] - 299:1
**talks** [3] - 213:8, 222:9, 254:7
**tangible** [1] - 214:15
**tardive** [1] - 236:18
**taught** [2] - 237:19, 238:7
**teaching** [2] - 237:9, 237:19
**team** [1] - 241:21
**tease** [1] - 275:5
**teased** [1] - 275:5
**techniques** [1] - 202:6
**television** [2] - 217:11
**temporal** [1] - 215:19
**ten** [2] - 272:3, 293:23
**term** [8] - 216:21, 227:14, 228:5, 229:15, 229:19, 229:20, 239:25,

258:5
**terms** [16] - 195:3, 196:2, 205:17, 207:7, 215:17, 229:8, 230:15, 231:10, 231:23, 239:5, 259:1, 259:7, 259:8, 286:24, 298:2, 300:9
**Test** [3] - 259:11, 260:1, 260:2
**test** [5] - 249:17, 258:22, 258:24, 271:14, 271:17
**tested** [2] - 249:22, 254:12
**testified** [5] - 227:2, 241:16, 242:21, 242:22, 301:25
**testify** [4] - 205:1, 206:24, 252:3, 264:3
**testimony** [27] - 191:11, 191:17, 196:6, 197:18, 206:4, 208:11, 208:15, 211:7, 213:8, 218:24, 219:25, 220:3, 220:4, 220:10, 220:20, 222:22, 225:19, 225:23, 226:1, 233:21, 257:23, 272:4, 282:23, 283:22, 284:20, 287:10
**testing** [6] - 202:19, 258:2, 259:9, 259:16, 266:4, 271:23
**tests** [17] - 238:25, 239:8, 258:13, 258:17, 258:19, 258:20, 258:21, 259:9, 259:10, 259:14, 259:17, 259:19, 259:20, 259:22, 260:1, 260:3, 260:6
**TEXAS** [2] - 188:1, 188:9
**Texas** [14] - 188:16, 188:18, 188:19, 189:4, 193:8, 222:17, 223:4, 242:12, 250:16, 260:22, 260:23, 261:15, 305:2
**thalami** [2] - 214:24
**thalamic** [1] - 215:13
**THALAMIC** [1] -

215:13
**THE** [97] - 188:10, 191:3, 191:6, 191:13, 191:19, 191:21, 191:24, 192:5, 192:7, 192:9, 192:13, 205:4, 215:3, 215:4, 215:6, 215:7, 215:8, 215:10, 215:12, 223:6, 235:5, 236:3, 241:4, 249:25, 250:11, 252:14, 252:25, 253:7, 253:10, 253:12, 253:16, 253:19, 261:3, 261:5, 261:7, 261:8, 261:9, 261:11, 261:12, 261:13, 261:14, 263:9, 268:11, 268:12, 270:19, 270:21, 271:10, 271:13, 271:16, 271:19, 271:24, 272:2, 272:8, 272:17, 272:21, 272:23, 272:24, 273:1, 277:13, 277:22, 278:2, 279:13, 279:15, 280:3, 280:11, 280:14, 280:16, 281:3, 281:7, 281:12, 290:2, 293:4, 293:22, 293:24, 298:15, 302:18, 302:22, 303:2, 303:4, 303:7, 303:10, 303:17, 303:23, 303:25, 304:2, 304:5, 304:10, 304:12, 304:17, 304:23, 305:1, 305:4, 305:6, 305:13, 305:15, 306:4, 306:7
**theft** [1] - 294:19
**theme** [1] - 201:16
**themselves** [6] - 194:15, 202:15, 218:3, 218:7, 256:2, 259:3
**theory** [1] - 202:5
**therapist** [2] - 221:10, 237:25
**therapy** [3] - 237:22, 237:24, 238:4
**therefore** [1] - 243:16

**thesis** [2] - 236:7, 236:17
**They've** [1] - 264:24
**thinking** [7] - 198:9, 199:8, 200:2, 229:7, 246:4, 286:23, 303:16
**thinks** [2] - 281:4, 284:9
**third** [1] - 274:16
**Thomas** [2] - 197:7, 279:20
**thoughts** [4] - 198:13, 199:12, 199:14, 199:17
**thread** [1] - 226:6
**three** [13] - 191:9, 193:14, 234:16, 265:3, 272:19, 273:6, 273:10, 273:24, 274:8, 283:24, 286:1, 299:24, 300:4
**throughout** [3] - 201:12, 211:3, 211:17
**tie** [1] - 241:3
**tied** [1] - 198:17
**today** [4] - 197:18, 252:11, 264:3, 303:8
**together** [5] - 210:11, 240:16, 241:3, 287:13
**Tom** [1] - 281:1
**took** [3] - 230:8, 246:9, 284:9
**top** [1] - 295:25
**topic** [3] - 193:3, 238:18, 239:3
**torture** [1] - 212:25
**torturing** [3] - 212:2, 212:25, 275:15
**tracking** [1] - 226:17
**train** [2] - 199:15, 199:16
**trained** [4] - 194:1, 238:24, 259:23, 261:1
**Training** [1] - 238:22
**training** [5] - 193:19, 193:22, 193:25, 238:8, 238:19
**TRANSCRIPT** [1] - 188:10
**transcript** [3] - 188:24, 257:22, 306:11
**transcription** [1] - 188:25
**transmitted** [1] -

214:18
**transportation** [2] - 234:12, 234:23
**treated** [1] - 227:17
**treatise** [1] - 239:9
**treatises** [2] - 239:3, 239:7
**treatment** [3] - 224:23, 227:20, 228:9
**trial** [59] - 191:11, 195:8, 196:6, 203:6, 203:10, 207:16, 208:4, 208:16, 208:17, 208:21, 209:3, 209:19, 211:3, 211:8, 211:11, 211:14, 211:17, 213:5, 220:3, 221:17, 221:18, 221:20, 221:25, 222:13, 222:15, 222:23, 224:13, 224:20, 225:7, 225:14, 225:21, 226:22, 234:8, 234:9, 246:15, 253:13, 253:25, 254:8, 262:8, 262:10, 270:8, 270:9, 270:11, 274:5, 274:6, 274:14, 274:15, 277:4, 277:5, 280:23, 301:14, 301:20, 301:22, 302:3, 302:7, 302:13, 302:15, 303:11
**troubles** [1] - 234:3
**true** [3] - 281:5, 284:5, 297:11
**try** [4] - 230:25, 245:17, 248:14, 252:9
**trying** [20] - 204:4, 220:14, 234:15, 246:20, 248:2, 256:16, 268:19, 268:24, 271:6, 272:11, 272:12, 275:4, 275:17, 283:25, 284:6, 284:10, 284:13, 284:15, 285:6, 290:23
**Tuesday** [1] - 303:12
**turbines** [1] - 219:9
**turn** [2] - 205:8, 208:24

**turned** [3] - 250:23, 251:2, 251:7
**Turner** [2] - 246:1, 246:6
**Turning** [1] - 231:13
**two** [16] - 196:13, 197:1, 203:10, 203:13, 214:20, 230:21, 230:22, 233:24, 238:20, 240:15, 275:6, 275:7, 281:15, 292:7, 293:2, 304:20
**type** [1] - 195:2, 195:12, 198:3, 198:4, 210:25, 213:14, 226:20, 238:16
**types** [5] - 200:21, 201:17, 260:19, 261:21, 298:2
**typical** [5] - 198:19, 257:19, 257:20, 258:7, 258:15
**typically** [7] - 198:21, 227:21, 228:9, 232:23, 232:24, 258:9, 262:4

**U**

**U.S** [1] - 189:3
**ultimately** [1] - 299:4
**unable** [2] - 205:9, 247:7
**under** [5] - 246:20, 277:8, 282:11, 304:20, 305:8
**undergoing** [1] - 273:15
**undergraduate** [2] - 193:23, 238:20
**underneath** [1] - 219:22
**understood** [5] - 195:22, 204:13, 268:23, 274:19, 275:1
**UNITED** [2] - 188:1, 188:11
**United** [1] - 242:21
**University** [1] - 193:1
**unreliable** [1] - 277:9
**untreated** [2] - 297:15, 297:20
**unusual** [2] - 218:22, 221:6
**up** [23] - 204:4, 205:23, 207:12,

215:6, 219:8, 219:19, 226:12, 226:15, 229:13, 229:21, 231:23, 240:16, 261:4, 261:14, 265:1, 268:1, 270:7, 271:6, 275:19, 288:4, 288:6, 288:7
**updated** [1] - 192:4
**urging** [1] - 216:22
**useful** [3] - 192:1, 245:3, 277:22
**usual** [1] - 259:4
**utilize** [1] - 274:4

**V**

**vague** [1] - 201:9
**valid** [1] - 227:12
**validity** [1] - 227:8
**variable** [1] - 224:2
**varies** [1] - 226:12
**variety** [3] - 194:13, 217:13, 259:18
**various** [2] - 232:4, 295:17
**variously** [1] - 283:4
**vehicle** [8] - 233:24, 234:2, 234:6, 235:17, 235:19, 235:20, 250:9, 250:12
**Vehicles** [1] - 251:19
**vehicles** [2] - 233:25, 234:21
**Verbal** [2] - 260:1, 260:2
**verbal** [1] - 258:10
**verbally** [1] - 291:7
**verbatim** [1] - 270:4
**verbose** [2] - 270:5, 272:19
**verdict** [1] - 270:8
**version** [8] - 266:15, 289:5, 289:25, 290:18, 297:10, 297:11, 297:14, 297:19
**versions** [6] - 276:4, 276:5, 276:7, 276:8, 276:9, 282:19
**versus** [4] - 214:14, 226:10, 229:5, 242:21
**via** [1] - 224:3
**victim** [1] - 210:21
**Victoria** [1] - 259:11
**view** [6] - 201:20,

210:25, 214:8, 222:3, 239:18, 239:22
**Virginia** [4] - 191:11, 191:16, 219:25, 234:8
**visibly** [1] - 256:18
**visits** [1] - 213:12
**visual** [8] - 199:1, 200:25, 201:6, 201:9, 223:24, 256:20, 256:24, 258:11
**visually** [1] - 201:8
**vitae** [1] - 192:4
**voice** [7] - 200:22, 201:4, 214:16, 214:18, 216:21, 275:24, 295:25
**Voices** [1] - 201:1
**voices** [7] - 201:2, 201:4, 217:17, 257:13, 276:2, 290:21, 291:5
**volitionally** [2] - 290:25, 291:10
**volunteer** [1] - 290:25
**VS** [1] - 188:6

# W

**wait** [1] - 281:22
**waited** [1] - 197:12
**walking** [2] - 219:10, 220:15
**walls** [1] - 217:13
**Walter** [2] - 196:24, 197:7
**wane** [1] - 291:22
**waning** [2] - 228:2, 228:5
**wants** [3] - 284:9, 288:7, 288:9
**watching** [1] - 201:10
**wax** [1] - 291:22
**waxing** [2] - 228:2, 228:5
**ways** [8] - 206:17, 206:18, 207:5, 207:6, 217:3, 217:4, 220:9
**wear** [1] - 232:24
**wearing** [1] - 219:9
**weekend** [2] - 305:18, 305:25
**whereas** [1] - 212:5
**white** [2] - 219:9,

299:10
**whole** [3] - 278:6, 284:17, 303:18
**Wisconsin** [3] - 193:9, 242:9, 242:13
**wish** [1] - 280:19
**wishes** [1] - 280:5
**withdrawal** [1] - 236:11
**withdrawals** [1] - 236:10
**withdrawn** [1] - 298:25
**witness** [10] - 191:6, 191:7, 192:10, 192:12, 192:14, 235:4, 280:25, 281:4, 283:5, 296:11
**Witness** [1] - 264:9
**WITNESS** [17] - 215:7, 215:10, 261:5, 261:8, 261:11, 261:13, 268:12, 270:19, 271:13, 271:16, 271:19, 271:24, 272:17, 272:23, 273:1, 280:16, 281:7
**WITNESSES** [1] - 190:4
**witnesses** [4] - 221:16, 277:5, 277:6, 280:23
**wondering** [1] - 235:17
**Wonderland** [1] - 243:4
**word** [3] - 227:11, 227:12, 258:3
**Word** [1] - 259:11
**words** [3] - 225:7, 234:22, 286:10
**workplace** [1] - 232:9
**world** [8] - 201:20, 201:21, 203:4, 229:8, 231:1, 231:2, 231:25, 275:17
**worry** [1] - 296:11
**worse** [5] - 209:12, 297:16, 297:21, 297:24, 299:12
**worsened** [1] - 219:18
**worsening** [2] - 299:11, 299:13
**wounds** [2] - 256:16, 256:17
**write** [7] - 246:16, 263:15, 263:22,

264:12, 265:15, 270:4, 273:1
**writing** [5] - 251:9, 254:13, 264:11, 269:15, 271:3
**writings** [17] - 196:16, 208:3, 210:12, 219:6, 226:24, 234:13, 234:18, 235:21, 250:24, 251:3, 251:7, 251:15, 251:20, 251:21, 264:25, 269:4, 269:17
**Writings** [1] - 269:11
**written** [4] - 237:2, 264:11, 265:16, 269:11
**wrote** [14] - 219:6, 245:5, 245:14, 248:19, 248:23, 249:4, 249:8, 249:10, 252:17, 254:18, 264:5, 269:19, 272:15, 272:16

# X

**Xerox** [1] - 278:24

# Y

**y'all** [3] - 236:2, 287:3, 306:6
**Y-E-H** [1] - 242:17
**Yates** [1] - 241:20
**year** [1] - 244:11
**years** [9] - 202:10, 221:5, 224:6, 293:9, 297:16, 297:21, 301:18, 301:23
**Yeh** [2] - 242:15, 242:22
**Yeh's** [2] - 242:18, 244:15
**yelling** [1] - 234:18
**Yesterday** [1] - 227:2
**yesterday** [6] - 191:10, 206:4, 220:20, 221:16, 225:19, 280:10
**yourself** [3] - 192:17, 233:19
**Youth** [1] - 305:3
**youth** [1] - 294:5