1               UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF TEXAS
2                   HOUSTON DIVISION

3

RULFORD G. ALDRIDGE,        .  Civil Action
4                               .  No. H-05-608
           Petitioner,      .
5                               .
                               .
6    VS.                        .
                               .
7                               .
NATHANIEL QUARTERMAN,       .
8                               .  March 2, 2009
           Respondent.      .  9:00 A.M.
9                               .  HOUSTON, TEXAS

10               TRANSCRIPT of PROCEEDINGS
         BEFORE THE HONORABLE GRAY H. MILLER
11             UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13

14   FOR PETITIONER:          MR. JAMES GREGORY RYTTING
                             MR. PHILIP HARLAN HILDER
15                            Hilder & Associates, PC
                             819 Lovett Boulevard
16                            Houston, Texas 77006

17   FOR RESPONDENT:          MR. KATHERINE D. HAYES
                             MR. GEORGETTE P. ODEN
18                            Office of Texas Attorney General
                             P.O. Box 12548
19                            Austin, Texas 78711

20

21

22   ALSO PRESENT:            Mr. Rulford G. Aldridge

23

24

Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.

1   **APPEARANCES (Continued):**

2

3   OFFICIAL COURT REPORTER: MS. STEPHANIE KAY CARLISLE-NEISSER
                              U.S. District Court
4                            515 Rusk, Suite 8016
                              Houston, Texas 77002
5                            713.250.5157

6

7

8

9

10

11                              *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2                                                          <u>PAGE</u>

3

4  WITNESSES:

5  DOUG DAVIS

6        Direct Examination by Ms. Hayes............310
          Cross-Examination by Mr. Rytting..........343
7         Redirect Examination by Ms. Hayes.........353

8  DIANE MOSNIK, M.D.

9        Cross-Examination (Continued)..............360
          Redirect Examination by Mr. Rytting........411
10        Recross-Examination by Ms. Oden............430

11  THOMAS G. ALLEN

12       Direct Examination by Ms. Oden.............451
          Cross-Examination by Mr. Rytting...........490
13        Redirect Examination by Ms. Oden...........523
          Recross-Examination by Mr. Rytting.........533
14        Further Redirect Examination by Ms. Oden....536
          Further Recross-Examination by Mr. Rytting..538

15

16  REBUTTAL WITNESSES:

17  DIANE MOSNIK, M.D.

18       Direct Examination by Mr. Rytting..........539
          Cross-Examination by Ms. Oden..............541

19

20                              * * *

21

22

23

24

25

P R O C E E D I N G S

(March 2, 2009)

THE COURT:  All right.  I understand that by agreement we are going to interrupt the cross-examination of Dr. Mosnik and put Mr. Davis on the stand; is that correct?

MS. HAYES:  That is correct, Your Honor.

THE COURT:  All right.  Mr. Davis, come forward and recall that you are still under oath and have a seat in the witness chair.

THE WITNESS:  Yes, sir.

THE COURT:  Thank you.

(**DOUG DAVIS**, witness, previously sworn.)

**DIRECT EXAMINATION**

**BY MS. HAYES:**

Q.  Good morning, Mr. Davis.

A.  Good morning.

Q.  Would you explain for the Court a little bit about your professional experience?

A.  I initially started at the district attorney's office in Harris County back in 1980, and I left that office in approximately mid-1987.  During that time I had occasion to try everything from traffic tickets up to capital murders.  I tried -- oh, at the time I probably had a hundred or better jury trials.  Those included murders, robberies, sexual assaults, thefts, pretty much run the gambit of almost any

1  type of crime.

2          After that I went to a civil firm for

3  approximately nine months.  And after being ready to shoot

4  myself, I left the civil practice.  And I hooked up with a

09:06:48AM  5  friend of mine who also had been at the district attorney's

6  office; and we practiced together, I guess, for, I don't know,

7  four or five years.

8          And then I decided to apply at the

9  U.S. Attorney's Office in 1992; and I have been there ever

09:07:06AM 10  since, which is -- will be 17 years next month.

11  Q.  Now, in your experience from -- say, from '80 through

12  '90, when the trial was, what specific experience did you have

13  with mentally ill defendants?

14  A.  It had mostly been through my time at the district

09:07:30AM 15  attorney's office.  Generally, as I think I stated earlier, a

16  defense lawyer would approach me and say that he thought that

17  there were possible problems with the competency of his client

18  or sometimes sanity.  So, generally, what we would do was to

19  have an eval --

09:07:54AM 20          MR. RYTTING:  Your Honor, can I have a time frame or

21  maybe a specific case, rather than --

22  A.  I have no idea what the specific dates would have been on

23  those.  That would have been, you know, 30 years ago.  But

24  there were a number of them.

09:08:12AM 25          And, generally, what would happen is after the

1   defense lawyer indicated there was some difficulty or problem

2   with his client's competency, we'd have an eval --

3           MR. RYTTING:  I have an objection to the hearsay, as

4   well.

09:08:25AM  5           THE COURT:  Overruled.

6   A.   We would have an evaluation done generally by a member --

7   usually it would be a member of the -- I guess it would be

8   someone employed by the county, a psychiatrist or

9   psychologist.

09:08:44AM  10          And if the doctor indicated that he thought

11  that the individual was incompetent, usually what we would do

12  would be to convene a jury -- it would be six people -- and we

13  would voir dire the jury as to their ability to consider that

14  type of evidence.

09:09:06AM  15          Sometimes we would have the doctor testify.

16  Generally, what would happen would be we would present the

17  report of the doctor.  At that point the defense would

18  indicate that -- and ask the jury to find the client -- his

19  client incompetent.

09:09:24AM  20          Usually, what I would do would be to agree to

21  that and tell the jury the same thing, that we were in

22  agreement on it, and that I felt based on the evidence that

23  the person should be found incompetent.  And that was usually

24  the way it went.

09:09:42AM  25  BY MS. HAYES:

1   Q.   So, in that role with you in the district attorney's
2   office, it is not -- you wouldn't have a State's expert that's
3   your own, would you?  Or would it be a Court-appointed expert?
4   A.   It wasn't someone generally that I had anything to do
09:09:57AM 5   with.  It would be -- the doctor would be appointed by the
6   Court.
7   Q.   If there were -- and would you be able to ask questions
8   of the expert in advance of the hearing; or would that be
9   something that, as the Court's expert, they're off limits?
09:10:17AM 10   A.   No.  You could speak --
11        MR. RYTTING:  Your Honor, I have an objection to the
12   relevance of this line of questioning to this case.
13        MS. HAYES:  Well, Your Honor, I'm trying to
14   establish any kind of mental health experience that Doug Davis
09:10:29AM 15   has coming into the defense on this case.
16        THE COURT:  All right.  Overruled.
17   A.   Certainly you could speak to the doctor about it, if the
18   need arose.
19   BY MS. HAYES:
09:10:42AM 20   Q.   Do you remember whether you ever had an opportunity to
21   speak with any of those doctors?
22   A.   I can't recall any, but I'm sure that I did.
23   Q.   Now, of the cases that you had with the mentally ill
24   defendants, how many would you guess that you handled while
09:11:00AM 25   you were at the district attorney's office?

```
              1        MR. RYTTING:  I object to the guessing, Your Honor.

              2        THE COURT:  Estimate.

              3        MS. HAYES:  Yes.

              4        THE COURT:  If you can.

09:11:09AM    5   A.   I would estimate 15 to 20.

              6   BY MS. HAYES:

              7   Q.   Now, when you left there and went to the civil firm, did

              8   you have any dealings with mentally ill individuals?

              9   A.   No.

09:11:26AM   10   Q.   How about when you started the defense practice with your

             11   partner, that would be -- you were together four or

             12   five years, what about experience with mentally ill defendants

             13   at that point?

             14   A.   Again, I can't recall any specifics; but I feel sure that

09:11:47AM   15   I would have some clients who were mentally ill.

             16   Q.   Do you recall any that -- besides Mr. Aldridge, do you

             17   recall any where you've had -- you've tried to get a

             18   psychiatrist to assess someone, or a psychologist?

             19   A.   I'm positive that I did; but, again, I couldn't put a

09:12:09AM   20   finger on a particular case.

             21   Q.   And then now, the U.S. Attorney's Office, do you have

             22   opportunity to have dealings with mentally ill defendants

             23   there?

             24   A.   Not personally; but through the defense lawyer, yes.

09:12:29AM   25   Q.   When -- you testified last Thursday that you had hired
```

1 Randy Bates -- or Randolph Bates as co-counsel, and I believe

2 you said that it was because of possible animosity with the

3 defendant.  Could you explain what you mean?

4 A.   Well, my understanding was that Mr. Aldridge was a black

09:12:58AM 5 Muslim.  My feeling was -- is that the majority of folks who

6 practice that particular, I guess, religion were somewhat

7 hostile to white people.  And, again, I think the reason that

8 I -- one of the reasons that I got Randy Bates was he is

9 African American, and I thought that he would be a good bridge

09:13:27AM 10 of conduit and could assist in communicating with Mr. Aldridge

11 where there would be less hostility.

12 Q.   Do you remember whether there was any hostility with

13 Mr. Aldridge?

14 A.   No.  There really was not much that I could see.  No

09:13:47AM 15 overt hostility.  He never seemed to lose his temper with me

16 that I can recall.  So, I guess things went fairly well along

17 those lines.

18 Q.   Okay.  Now, if Mr. Bates is the bridge, sort of, to

19 assisting with Mr. Aldridge, were you -- did one or the other

09:14:16AM 20 of you then have the lead role in working with Mr. Aldridge,

21 or was it still the same --

22          MR. RYTTING:  I will have to object to the leading

23 question.

24          MS. HAYES:  I guess I could rephrase that.

09:14:26AM 25          THE COURT:  All right.  Very good.  Thank you.

1  BY MS. HAYES:

2  Q.   How would you describe the roles that both you and

3  Mr. Bates had in working with Mr. Aldridge?

4  A.   Generally, we would both go see Mr. Aldridge.  And I

09:14:44AM  5  don't remember for sure but I would think that Randy probably

6  began speaking to Mr. Aldridge initially and then I would --

7  would be there to chime in or speak to him.  But it was both

8  of us for the most part, but I suspect at least early on that

9  Randy took the lead.

09:15:11AM 10  Q.   How in particular -- besides the fact that Mr. Aldridge

11  being a Muslim, how in particular did you decide on Randy

12  Bates?  I mean, had you -- did you -- how did you know him

13  before this, or was he just appointed?

14          MR. RYTTING:  I'll have to object to the statement

09:15:31AM 15  that Mr. Aldridge is a Muslim.  That's not -- it is not clear

16  that he is practicing any particular religion.

17          THE COURT:  Well, I think Mr. Davis is expressing

18  his opinion about that.  So, I'm going to overrule that.

19              Do you remember the question?

09:15:50AM 20          THE WITNESS:  Yes, I do, Judge.  It took me a

21  second.

22  A.   I knew Randy through contacts with him during my work

23  with the district attorney's office.  He would represent a

24  number of clients.  We had a number of dealings with each

09:16:07AM 25  other in court.

BY MS. HAYES:

*Q.*   So, would it be fair that you had an opportunity to see how he performed in court?

*A.*   Yes.

09:16:17AM   *Q.*   And would you give your opinion of how qualified you think Mr. Bates is?  Or unqualified?

*A.*   I certainly thought he was qualified, or I wouldn't have requested that the judge appoint him as co-counsel.  He is a smart guy.  He's a likeable guy.  I thought he would be a good

09:16:41AM   man to work with in that his personality would certainly help with Mr. Aldridge.

*Q.*   Now, do you remember whether, in the course of defending Mr. Aldridge, whether you and Mr. Bates conferred throughout; or were -- I guess another way -- were some tasks that just

09:17:09AM   you were going to do, you didn't have to correspond or talk with Mr. Bates?

*A.*   I think we pretty well corresponded throughout the trial. I'm sure that there were some witnesses that he would have taken to interview and to examine on the stand, that type of

09:17:33AM   thing.

*Q.*   Well, from what you -- do you remember whether Mr. Bates had any experience handling mentally ill defendants before his appointment to this case?

*A.*   That I couldn't tell you.  So, I would assume that he

09:17:53AM   did; but I don't -- I can't say that for sure.

```
 1   Q.   From your assessment of Mr. Bates' experience and

 2   performance, if a problem arose when you were dealing with

 3   Mr. Aldridge --

 4            MR. RYTTING:  I'll object to the leading question.

 5            THE COURT:  All right.  Rephrase.

 6   BY MS. HAYES:

 7   Q.   Assuming a problem arose in dealing with Mr. Aldridge,

 8   how comfortable are you that Randy Bates would let you know?

 9   A.   Very comfortable.

10            MR. RYTTING:  Speculation, Your Honor.

11            THE COURT:  All right.  Overruled.

12   BY MS. HAYES:

13   Q.   Would you explain?

14   A.   Well, as I say, Randy and I got along pretty well.  I

15   don't think there was any professional one upsmanship.  We

16   were working this as a team.  And if there had been a problem,

17   that would have been the approach that we would have taken as

18   a team.  We would have consulted each other.

19   Q.   If a problem had arisen in Mr. Aldridge's case -- if --

20   for example, if you weren't able to communicate with him, what

21   steps would you take?

22   A.   If we had had difficulty in communicating with

23   Mr. Aldridge to --

24            MR. RYTTING:  Calls for a speculation, Your Honor.

25            THE COURT:  Overruled.
```

09:18:15AM (line 5)
09:18:31AM (line 10)
09:18:43AM (line 15)
09:19:11AM (line 20)
09:19:23AM (line 25)

```
 1  A.   -- to the extent that it really affected our ability to

 2  represent him, then I certainly would have approached the

 3  judge.  If it had to do with his competency, I would have

 4  requested a competency hearing from the Court; or if it was

 5  just some type of hostility or animosity where he refused to

 6  speak to us, I would have approached the judge and let him

 7  know that.

 8            MR. RYTTING:  Your Honor, we -- I'll have to object.

 9  This has been asked and answered.  We went over this during

10  the first session with Mr. Davis.

11            THE COURT:  All right.  I am going to give her some

12  latitude on the direct.  Overruled.

13  BY MS. HAYES:

14  Q.   From your recollection of your entire defense of

15  Mr. Aldridge's case, did the opportunity ever arise that you

16  had to apprise the Court of any problems?

17  A.   No.

18  Q.   How often was -- throughout the course of the defense,

19  how often did you have direct contact with Mr. Aldridge?

20  A.   Pretty often.  Again, I couldn't give you an exact number

21  of times that we just went over to interview him at the jail

22  or during the course of our representation of him in court;

23  but it would have been a fair number of times.

24  Q.   Throughout the entire period of representation, did you

25  see -- or were you able to tell any differences in
```

09:19:45AM  (line 5)
09:20:00AM  (line 10)
09:20:18AM  (line 15)
09:20:44AM  (line 20)
09:21:15AM  (line 25)

1   Mr. Aldridge's behavior?

2   A.   During the course of the time that I have dealt with him,

3   he appeared to be -- again, having the mental problems, he

4   appeared to be on an even keel.  There was no change in his

09:21:36AM 5   attitude or the way he approached things that I noticed.

6   Q.   Well, in addition to just his behavior, were you ever

7   made aware of different thoughts or different beliefs that had

8   changed radically or changed dramatically --

9          MR. RYTTING:  Your Honor, this has been asked and

09:21:59AM 10   answered.  He testified that he doesn't remember anything

11   except that the defendant said he had been sexually assaulted

12   and raped by the victim.

13          THE COURT:  All right.  Overruled.

14   A.   He, again, had these odd beliefs.  He pretty much

09:22:18AM 15   continued to hold those odd beliefs throughout.

16   BY MS. HAYES:

17   Q.   I guess what I'm -- what I want you to focus on, too, is

18   as the trial progressed -- or as it was getting closer to

19   trial, do you remember whether any of this got more overblown,

09:22:41AM 20   more dramatic, more bizarre?

21   A.   No.  It didn't appear to.

22   Q.   In your opinion, how well did Mr. Aldridge understand

23   what y'all were telling him?

24   A.   He appeared to understand fine.

09:23:06AM 25   Q.   How did you assess if he was able to understand what

1  y'all were talking about?

2  A.   Well, just his ability to speak to us, ask questions,

3  just as you would with anybody.

4  Q.   Was he -- was he capable of expressing his needs, or do

09:23:36AM 5  you remember?

6  A.   I don't really recall.

7  Q.   Now, last year, if you remember, I had asked for a

8  subpoena about -- I was trying to find records, some trial

9  records.  Did you have an opportunity to look and check where

09:24:00AM 10  any of your trial records and trial notes may have been?

11  A.   I don't have any of them anymore.

12  Q.   Even if specific -- I know 19 years, almost 20 years

13  after the fact, it's probably difficult to recall specific

14  conversations and dates; but what I want instead is to think

09:24:30AM 15  about what your expectations are about what the defense should

16  be able to do to assist you with your defense.

17           So, as your understanding in your defense

18  attorney's capacity, what kinds of things did you expect that

19  Mr. Aldridge would have to be able to do to help you?

09:24:52AM 20  A.   Well, initially what I would do would be to review all of

21  the Houston Police Department reports, any reports that were

22  out there, take notes from those; and then we would go over

23  and discuss that with the defendant, basically, letting him

24  know what type of evidence there was against him.

09:25:19AM 25           I would usually tell a defendant that he was at

1    liberty to tell me his side of the story if he wanted to; if

2    he didn't want to do that, he didn't have to; but that there

3    was an attorney/client privilege and he could speak to me

4    about that.

09:25:41AM  5         If I determined -- and, again, this was

6    something I did with all defendants.  If I determined that

7    his -- that he did tell me what happened and that radically

8    changed, that I would inform the Court that we have a conflict

9    of interest without going into why; and I would ask to be

09:26:01AM 10   taken off the case.

11   Q.   And that last one, can you -- I'm not quite sure how you

12   made --

13   A.   Well, I'd ask to be -- I'd just say that we had a

14   conflict of interest.  Because in my mind if a defendant is

09:26:16AM 15   about to -- is committing perjury, I've got a problem with

16   that.  So, I would -- normally would have asked the judge to

17   be allowed to withdraw from the case without going into

18   specifics.  We would listen to the defendant's side of the

19   story, decide what approach we wanted to take --

09:26:45AM 20         MR. RYTTING:  Your Honor, I'd have to object to the

21   relevance.  I would like to know what he did in this case,

22   rather than what he would do in cases in general.

23         THE COURT:  Okay.  You can ask him on cross.

24   A.   And then we would decide on a strategy.  I would explain

09:27:05AM 25   to a defendant about his right to testify or not.  I would

1  give him my opinion as to whether I thought it was a good idea

2  for him to testify or not, and I would let a defendant know

3  that that was his choice as to what to do.

4            During the course of the trial, if certain

09:27:28AM 5  things came up, we probably would have questions for the

6  defendant, just to double-check as things arise during the

7  course of a trial.  So, if there were any plea bargain offers,

8  those would be communicated to the defendant.  I would have

9  given him my opinion as to what the pro's and con's were as

09:27:53AM 10  far as accepting or rejecting a plea agreement.

11            There was no plea agreement offered in this

12  case because if the prosecution had offered to, say, reduce it

13  to murder and give him a life sentence, I think I would have

14  recommended that Mr. Aldridge take that.  But that was not

09:28:15AM 15  communicated to me.  So, we had to go to trial.

16  Q.    Okay.  So, as far as being able to talk with Mr. Aldridge

17  about understanding his plea options, that wasn't something

18  that ever arose here?

19  A.    It was not.

09:28:34AM 20  Q.    Okay.

21  A.    And, of course, I would have to explain to him about the

22  differences -- or what was required during the course of the

23  death penalty prosecution.  There were certain questions that

24  had to be answered by the jury because the jury just doesn't

09:28:54AM 25  come in and say we give death or we give life.  There are two

1    or sometimes three questions that -- at that time that the

2    jury had to answer; and if they answered all of them "yes,"

3    then that resulted in a death penalty.

4    Q.    Based on your interaction with Mr. Aldridge and your

09:29:18AM  5    dealing with him, would he -- in your opinion, would he have

6    been able to understand the plea options, if you were

7    explaining it to him?

8    A.    Yes.

9          MR. RYTTING:  I have to object to the speculation in

09:29:33AM 10    that -- in this case.  I believe the question was -- he has

11    already answered that -- already stated that there were no

12    plea bargains, and now she is asking him if you were to ask --

13    question him about a plea bargain, what would he say?

14          THE COURT:  I don't think that was the question.

09:29:49AM 15          MR. RYTTING:  Well, maybe she should rephrase the

16    question.

17          THE COURT:  All right.  Ask it again.

18    BY MS. HAYES:

19    Q.    I'll do it in reverse order because I think the next

09:29:59AM 20    question will help tie it in a little bit better.

21          Were you aware that Dr. Quijano in his report

22    had stated that Mr. Aldridge was able to explain and

23    understood his plea options?

24    A.    Yes.

09:30:11AM 25    Q.    Now, regarding Mr. Aldridge's ability to testify, what --

1  as a defense attorney, what would you be explaining to a

2  defendant regarding his right?

3  A.   Well, I would explain to him that the law was that if he

4  chose to testify, he could; that if he chose not to testify,

09:30:45AM  5  the jury would be instructed that they were not to hold that

6  against him in any way, that that was his right, and that the

7  judge would explain that to the jury.

8  Q.   Now, in this case, Mr. Aldridge didn't testify at

9  guilt/innocence; but he did testify at punishment.  So, did

09:31:08AM 10  there come a time, then, when you did have to explain to him

11  about his rights to testifying?

12  A.   I know I probably explained it to him multiple times.

13  Q.   If he had --

14          MR. RYTTING:  Pardon me.  Your Honor, I believe that

09:31:23AM 15  when he testified, it was in his statement in a *Jackson versus*

16  *Denno* hearing about the --

17          THE REPORTER:  I'm sorry.  Say that again.

18          MR. RYTTING:  -- admissibility of his confession.

19          THE REPORTER:  I believe that when he testified?

09:31:33AM 20          MR. RYTTING:  He said that it was in a hearing that

21  was outside the presence of the jury, as I recall, and that

22  the issue was admissibility of his confession.  So, it was --

23  the State was opening up a *Jackson versus Denno* hearing, in

24  which case you do not explain or need to explain the Fifth

09:31:53AM 25  Amendment right.

1    *A.*   Well, I would have explained those in any case in the

2    guilt or innocence phase.  You're right, in a *Jackson v. Denno*

3    hearing, I probably wouldn't have covered that; but I would

4    have covered his testimony as far as guilt or innocence or in

09:32:15AM  5    punishment to the jury later.  I would have discussed that

6    with him.

7            MS. HAYES:   I guess I will clarify.  I wasn't

8    trying to mislead the Court.  But it is in Volume 20 of the

9    punishment phase record.  It is a short hearing that was

09:32:31AM 10    outside the presence of the jury, and it involved a challenge

11    to the admissibility of all the 1972 confessions.  So, right,

12    it wasn't in front of the jury.  And I was thinking there

13    might have been some warning there, as well.

14            THE COURT:  All right.

09:32:46AM 15    BY MS. HAYES:

16    *Q.*   If -- do you recall whether Mr. Aldridge wanted to

17    testify at guilt/innocence?

18    *A.*   I don't recall; but if he had wanted to testify, I think

19    I stated earlier that he certainly had that right.

09:33:10AM 20    *Q.*   If -- since the record -- since Mr. Aldridge did not

21    testify at guilt/innocence, can we -- can we make any

22    conclusion based on the fact that he doesn't testify at

23    guilt/innocence that -- I'm trying to see if you remember

24    whether he even wanted to testify or whether you may have

09:33:41AM 25    advised not to testify or there's -- after this long, do you

1  remember?

2  　　　　MR. RYTTING:  Speculation, Your Honor.

3  　　　　THE COURT:  I think he's going to say he doesn't

4  remember.

09:33:51AM 5  　　　　THE WITNESS:  I think you're absolutely right.

6  A.   I don't -- I don't remember.

7  BY MS. HAYES:

8  Q.   As far as the defendant's ability to communicate

9  information to the counsel, could he communicate the pertinent

09:34:15AM 10  information about the crime?

11  A.   Yes.

12  　　　　MR. RYTTING:  Your Honor, this is leading; and I'll

13  object.

14  　　　　THE COURT:  Sustained.  Just rephrase it, please.

09:34:23AM 15  　　　　MS. HAYES:  Okay.

16  BY MS. HAYES:

17  Q.   How would you characterize the information that

18  Mr. Aldridge was able to inform you about the crime -- or the

19  facts of the crime?

09:34:37AM 20  A.   I don't remember specifically --

21  　　　　MR. RYTTING:  This has been asked and answered.

22  　　　　THE COURT:  All right.  I'm going to give her some

23  latitude.

24  A.   I don't remember specifically what -- I know he said that

09:34:52AM 25  he was raped; and I imagine that we went over the facts of the

1  crime with him, how it occurred.  I think I do recall that he

2  did admit, you know, shooting the complainant.

3  BY MS. HAYES:

4  *Q.*   Do you remember if he admitted having bought a gun a few

09:35:20AM 5  days before the crime?

6  *A.*   I -- I couldn't tell you.  I don't remember.

7  *Q.*   Do you remember whether you found out that he had

8  answered on the forms when he purchased the weapon that he was

9  not a felon?

09:35:32AM 10  *A.*   Right.  I knew from the forms that he had lied on that

11  form.

12  *Q.*   Do you recall whether he actually told you that he had

13  shot the victim?

14  *A.*   I don't recall specifically, but I'm sure he did.

09:35:54AM 15  *Q.*   When you -- when you were able to talk with

16  Dr. Quijano -- or when you actually even had Dr. Quijano's

17  written report and he describes the version of the offense

18  that Mr. Aldridge related, do you recall whether that met --

19  whether that agreed with pretty much the story that y'all were

09:36:18AM 20  hearing?

21  *A.*   I couldn't tell you.  I would -- again, I would assume

22  that it likely did.

23  *Q.*   When Mr. Aldridge was responding -- or when he was

24  answering questions, was it always the question that it was

09:36:49AM 25  going to be tied up with delusions or -- I mean, how would you

1  characterize how often delusions and other things interfered

2  with his communication?

3  A.   I don't really remember.  I know that he had, again,

4  these odd beliefs and odd writings and things like that.  But

09:37:15AM  5  I think if I had thought that he was really delusional in

6  speaking to us, then I would have done something about it.

7  Q.   From your recollection, did Mr. Aldridge have sufficient

8  memory to at least respond and answer some of the questions?

9  A.   Yes.

09:37:47AM  10  Q.   In dealing with Mr. Aldridge and explaining the role of

11  what defense needed to do to assist, would -- how do you

12  explain to him about the right to cross-examine witnesses?  Is

13  that something you explained or something that you remember

14  explaining in this case?

09:38:18AM  15  A.   I don't remember explaining that to him.  I couldn't tell

16  you.  I likely did, but I couldn't tell you.

17  Q.   Can you recall any -- or -- or how was your ability --

18  your ability to cross-examine witnesses impacted or affected

19  at all as a result of Mr. Aldridge's mental illness?

09:38:44AM  20  A.   Well, I don't think it would have had much affect mainly

21  because I knew the facts of the crime from the Houston Police

22  Department reports, the autopsy reports, those types of

23  things; and your ability to cross-examine would largely depend

24  on those, I think.

09:39:10AM  25  Q.   Was it possible that -- in the course of investigating

1   this case, were you and Mr. Bates able to put together enough

2   of the facts to -- to have an understanding of what all took

3   place?

4   A.   Oh, yeah.   The police -- the HPD homicide detectives

09:39:43AM  5   are -- they're the best.   I mean, they write tremendous

6   reports.   They will write down everything that happens, good

7   or bad.

8            MR. RYTTING:   I object to this line of testimony.   I

9   don't believe that he has personal knowledge of how HPD does

09:40:03AM  10  this, and we're not talking about this particular case.   We're

11  talking in generality.

12           THE COURT:   All right.   Overruled.

13  A.   Well, I dealt with the Houston Police Department on a

14  regular basis for years; and I found that the homicide

09:40:23AM  15  detectives were extremely thorough.   And it was -- you could

16  rely on their reports to have a pretty clear idea of what

17  happened.

18  BY MS. HAYES:

19  Q.   So, would it be a fair characterization to say that even

09:40:46AM  20  if Mr. Aldridge had delusional beliefs, you could still get

21  to -- an understanding of the operative facts of the crime?

22  A.   Yes.   His belief, I think, that he was raped just defied

23  belief.   I mean, it is a -- I guess anything is possible, but

24  that would have been extremely unlikely to have occurred.   And

09:41:17AM  25  I just frankly didn't believe that it had occurred.

1   Q.   Is the -- the crime itself here is actually murder during

2   the course of a robbery.  So, how -- in that defense, do you

3   recall how he explained how the robbery fits in with the rape

4   delusion?

09:41:43AM 5          MR. RYTTING:  This -- Your Honor, this has been

6   asked and answered.

7          THE COURT:  Overruled.

8   A.   I don't remember.  But that would be something that would

9   take away, again, from the rape defense.

09:42:03AM 10  BY MS. HAYES:

11  Q.   We're just talking about how -- about Mr. Aldridge being

12  able -- whether you explained about his rights or whether he

13  wanted to testify.  Do you recall that -- that Mr. Aldridge

14  testified to challenge his 1972 confessions out of the

09:42:22AM 15  presence of the jury but he did that during punishment?

16  A.   I didn't recall that.  I'm assuming if it is in the

17  record, that it did occur.

18  Q.   Do you recall -- do you recall at all -- I guess -- who

19  do you recall had the role between you and Mr. Bates of

09:42:44AM 20  challenging the 1972 convictions?

21  A.   I'm sorry.  I don't remember.

22  Q.   Did there ever come a point where Mr. Aldridge decided

23  that he wanted to represent himself at trial?  Do you recall

24  that?

09:43:00AM 25  A.   Not that I recall.

1  Q.   If Mr. Aldridge had informed you that he wanted to

2  represent himself, what steps would you take?

3  A.   I would have to approach Judge Raines and let him know

4  about that and have the Court speak to him, speak to

09:43:24AM  5  Mr. Aldridge.

6  Q.   If the record reflects that none of those steps were

7  taken, would it be fair to assume then that he did not ever

8  want to represent himself during the trial proceedings?

9  A.   That would be fair.

09:43:42AM 10  Q.   Thinking in terms of your defense, your ability to

11  present his case either at guilt/innocence or punishment, what

12  did the fact of his having a mental illness possibly prevent

13  you from being able to accomplish on behalf of his defense?

14  A.   I think at least as far as the capital murder and the way

09:44:11AM 15  it happened, I don't know that that would have had any great

16  effect on the defense that we put forward.  His -- I don't

17  know if this was his mental illness or not but just the fact

18  that he claimed that he was raped, I thought, was not

19  consistent with the facts and, therefore, I would have

09:44:45AM 20  recommended that he not testify.  I guess in that sense there

21  may have been some effect that way.

22  Q.   So, at this stage, thinking back about the presentation

23  of evidence and calling of witnesses, the only thing that you

24  would do on the defense -- I want to make sure I've got this

09:45:17AM 25  clear.  Are you saying the only thing that you can think of

1 that might have been affected was just whether he testified or

2 not?

3 A.   Likely.  I would think that's probably a fair statement

4 to make.

09:45:36AM 5 Q.   Mental illness aside, what's the likelihood that you are

6 going to recommend that he even testify at guilt/innocence

7 considering the State's case against him?

8            MR. RYTTING:  Speculation.

9            THE COURT:  Overruled.

09:45:50AM 10 A.   Well, given his insistence about this rape, I just

11 thought that there was -- it just wasn't consistent with the

12 facts, and I would have recommended to any defendant that they

13 not testify.  And something like that, I don't think the jury

14 would believe that at all; and I think it would have hurt --

09:46:14AM 15 hurt him worse to testify than it would not to.

16 BY MS. HAYES:

17 Q.   Was Mr. Aldridge -- since he testified at least at

18 punishment, was he able to take the stand on relevant matters?

19 A.   Apparently so.  Again, I don't remember the specifics.

09:46:40AM 20            MR. RYTTING:  I object to the leading, the relevant

21 matters in particular.

22            THE COURT:  All right.  Would you rephrase that

23 question?

24 BY MS. HAYES:

09:47:09AM 25 Q.   Could you give your opinion on Mr. Aldridge's ability to

1    testify regarding the 1972 confessions?

2    A.   I guess if we put him on the stand, we felt that he was

3    able to assist in that regard.

4    Q.   Do you recall whether he was able to answer -- do you

09:47:42AM 5    recall what his defense was about the '72 confessions?

6    A.   I think he said something about that the police had

7    beaten him up.

8    Q.   In your dealing both as a prosecutor and as a defense

9    attorney, have you had occasions on few or many times to have

09:48:08AM 10   defendants who have raised that same sort of defense?

11   A.   Many times.

12   Q.   And how often in your -- in -- both as a prosecutor and

13   as a defense attorney, has the Court actually found that a

14   defendant was -- was actually beaten or that the confession

09:48:28AM 15   was involuntary?

16   A.   Not very often.

17   Q.   Do you recall whether Mr. Aldridge had any other kind of

18   condition or anything that might hinder his ability to

19   participate in his defense?

09:48:43AM 20   A.   Nothing other than what I had mentioned earlier.

21   Q.   Is there any chance that a continuance would have

22   improved the chances of him having an even more fair trial, or

23   was that something that -- was there a reason to delay the

24   trial?

09:49:04AM 25   A.   Not that I was aware of, or I would have moved for a

1  continuance.

2  Q.  Now, I believe -- maybe it was last Thursday -- you said

3  that the district attorney has an open file policy.

4  A.  Yes.

09:49:29AM  5  Q.  And it has an open file policy in this case.

6  A.  Yes.

7  Q.  Was it the policy then at the DA's office that you just

8  take notes, you don't get copies of documents?

9  A.  That's what I recall.  I know that was the policy when I

09:49:49AM 10  was there; and, yeah, that would have been the policy that we

11  didn't get copies of any police reports.  We were allowed to

12  look at them all we wanted to.  We could take notes, but you

13  couldn't take them with you or get copies of them.

14  Q.  And I probably did ask this, but the police files that

09:50:14AM 15  you would see at the DA office would also include witness

16  statements; or would those be separate?

17  A.  They would all be included in the police report.

18  Sometimes if they were, say, maybe a written sworn statement,

19  there would be a mention of that in the police report; and you

09:50:32AM 20  could actually look at the written sworn statement that would

21  be, you know, separate from the report itself.

22  Q.  From your recollection in dealing with Mr. Aldridge, was

23  he able to understand the charges against him?

24  A.  Yes.

09:50:52AM 25  Q.  And how would you know that?  How would you assess that?

1  A.   Well, just through general conversation with him, I think

2  you can get a feel for whether somebody is picking up on what

3  you're saying or not.

4  Q.   He was aware -- or did he grasp that he was actually in a

09:51:09AM 5  court of justice?

6  A.   Yes.

7  Q.   And that he was charged with a criminal offense?

8  A.   Yes.

9  Q.   And did he, in your opinion, understand the severity of

09:51:18AM 10  what he faced?

11         MR. RYTTING:  This is leading, Your Honor.

12         THE COURT:  Sustained.

13  BY MS. HAYES:

14  Q.   How would you assess Mr. Aldridge's understanding of the

09:51:34AM 15  severity of the offense or the punishment that he faced?

16  A.   He understood that he was facing a very serious offense

17  that might result in a death penalty.

18  Q.   And --

19         MR. RYTTING:  That's unresponsive.  The question

09:51:53AM 20  was:  How would you assess?

21         THE COURT:  Read the answer back, please.

22         MR. RYTTING:  We object to speculation.  He can say

23  how he did assess, that would be, I think, relevant.

24      (The requested testimony was read back.)

09:52:21AM 25         THE COURT:  All right.  Overruled.

BY MS. HAYES:

Q.   Earlier you had said that Mr. Aldridge had not -- there wasn't overt hostility or anything, you felt, correct?

A.   Correct.

Q.   Was there ever a time that he tried to assault you or Mr. Bates?

A.   No.

Q.   Do you recall how well or how he acted when he was in jail awaiting trial?

A.   You mean with us?

Q.   How well did he get along with guards and maybe other inmates and staff at the jail while he was awaiting trial?

A.   That, I don't recall.

Q.   Do you recall whether -- what kind of life Mr. Aldridge was leading and what he was doing in life leading up to right before the crime?

A.   Well, I think, as I said the other day, he was -- had a responsible job.  He worked at a fast-food place.  I don't recall what the name of it was.  And I believe he was living on his own.  Other than that, I don't recall anything too much.

Q.   Do you recall whether during the punishment phase -- the kinds of testimony that y'all tried to present at punishment?

A.   We were trying to present, as best we could, some indicator of the mental illness that he suffered from in an

1  attempt to mitigate the punishment.  That was our main focus

2  with the family and with the testimony of Randy Bates.

3          Again, I was hampered by the fact that I didn't

4  feel I could use Dr. Quijano to present that because of the

09:54:34AM 5  problem with the disciplinary records.  So, I tried to do an

6  end run and present it in a different fashion.  So, we

7  presented writings, testimony from Randy Bates about basically

8  sort of the odd beliefs that Mr. Aldridge had that were

9  reflected in the writings that he had and then to present

09:55:01AM 10  family members, as well, along the same lines.

11  Q.   What is the -- what is your goal at punishment and in

12  portraying the defendant?

13  A.   We were trying to portray him in a more -- somewhat more

14  sympathetic light, that he had a -- some mental problems that

09:55:24AM 15  perhaps the jury should consider and that possibly the jurors

16  might say:  Well, this doesn't rise to the level of a

17  death-penalty type of situation that maybe perhaps they might

18  consider answering one of the questions "no" and give him a

19  life sentence.  Obviously, it didn't work out that way.

09:55:53AM 20  Q.   Now, when Randy Bates was questioned during punishment,

21  in Volume 20 of the record, there was questioning about

22  whether -- he was asked if Mr. Aldridge talked about spirits,

23  and he answered there's quite a bit of --

24  something like "quite a bit of talk about spirits."

09:56:12AM 25  A.   Yeah.

```
 1  Q.   And the same with conspiracies.  Can you describe what
 2  Mr. Bates is talking about?  Is quite a bit all the time?  Is
 3  it quite a bit of certain topics.  Can you shed some sort of
 4  light on what Mr. Bates means by quite a bit of talk about
 5  spirits and conspiracies?
 6  A.   Well, it wouldn't have been all the time because we were
 7  able to communicate with him; but his beliefs, I think, are
 8  pretty well reflected in those writings that we presented to
 9  the jury, as I recall.
10  Q.   You said it was not all the time because you --
11          MR. RYTTING:  This has been asked and answered.
12  Your Honor, this has been asked and answered.  He answered
13  that question.
14          THE COURT:  Your question is?
15          MS. HAYES:  I was going to ask him more specifics
16  about what he means on this because, I mean, it sort of gets
17  down to the main part of Mr. Bates' testimony.
18  BY MS. HAYES:
19  Q.   You had said not all the time because you could
20  communicate with him.  Is it because -- I guess not -- I guess
21  I'm now asking:  What does not all the time mean?  Not -- I
22  mean, not all the time on a certain topic, not all the time
23  overall?  I mean, what else can you shed light on about his --
24  your communication?
25  A.   To be honest with you, I --
```

1          THE COURT:  I am going to let him answer that.

2    Overruled.

3    A.   I don't remember specifics of my communicating with him.

4    If there had been a serious problem where I thought that that

09:58:01AM  5    was affecting his overall thought process, I would have

6    brought that to the Court's attention.  He had what I consider

7    to be odd beliefs that he did discuss at times.

8    Q.   And also during Mr. Bates' questioning, it was asked

9    about -- I believe it is on the second cross-examination --

09:58:31AM 10    and when he responds that sometimes he was able to communicate

11    with Mr. Aldridge and sometimes not.

12          Does that sound consistent with your

13    remembrance of communicating with Mr. Aldridge?

14    A.   Again, I don't remember any specifics about my

09:58:54AM 15    communication with Mr. Aldridge.  I thought that

16    communications about his beliefs were pretty strange.  I don't

17    know if you consider that really communicating with him other

18    than having him tell you about it.  I didn't understand them.

19    Q.   One of the questions before the Court is about the

09:59:21AM 20    assessment on the sanity.  And would you explain what your

21    understanding is of what the -- what you're looking for to

22    decide if the defendant is insane or not?

23    A.   Well, as I recall, if you are insane, that would mean

24    that you didn't know what you did was wrong, that -- say, for

09:59:45AM 25    instance, that I might walk up and shoot somebody in here and

1  kill them and think that I was justified in that when I

2  wasn't.

3          I didn't feel that the insanity defense was

4  there in any case because of the fact that he -- the way he

10:00:09AM  5  bought the gun, he lied about being a felon.  That takes away

6  from not knowing what you are doing is wrong.  The fact that

7  he robbed the complainant of a -- I think it was a fair amount

8  of money.  I don't remember how much it was -- and, also, the

9  fact that he fled subsequent to killing the complainant, I

10:00:37AM 10  think, doesn't amount to -- or an insanity defense is just not

11  going to work based on those facts.

12 Q.   Would you have been aware of those facts before you

13 requested Dr. Quijano's evaluation?

14 A.   Yes.

10:00:51AM 15 Q.   And so, the purpose of asking Dr. Quijano to still assess

16 sanity is for what reason?

17 A.   Well, so we could have a professional opinion as to

18 whether or not he was insane or was incompetent.  I felt that

19 was important, again, based on the fact that his beliefs were

10:01:24AM 20 very different; and I thought that he needed to be looked at

21 by a professional before we proceeded any further for the

22 trial.

23          MS. HAYES:  If I can have one second.

24     (Pause)

10:02:30AM 25 BY MS. HAYES:

1  *Q.*   Is there anything that I haven't asked you that you could

2  explain to help the Court get an understanding of -- a better

3  understanding of Mr. Aldridge of what you were dealing with?

4  *A.*   No, I don't think so.

10:02:47AM  5          MS. HAYES:  Pass the witness.

6          THE COURT:  All right.  Do you need to take a break

7  at this point?

8          MS. HAYES:  That would be good.

9          MR. RYTTING:  Yes, Your Honor.

10:02:53AM 10          THE COURT:  All right.  Let's take 15 minutes.

11      (Break)

12          THE COURT:  All right.  Are you ready for

13  cross-examination?

14          MR. RYTTING:  Yes, Your Honor.

10:27:23AM 15          THE COURT:  I didn't ask before we got started, but

16  I assume we are going to be finished today.

17          MR. RYTTING:  I intend to be finished today.

18          THE COURT:  I intend to be finished, too.

19          MS. HAYES:  During the break I did talk to Ms. Oden

10:27:35AM 20  and she is on the ground and she should be in a cab on her way

21  here already.

22          THE COURT:  All right.

23          MS. HAYES:  So, it shouldn't be too much longer.

24          THE COURT:  Okay.

10:27:42AM 25              All right.  Mr. Rytting.

1                               **CROSS-EXAMINATION**

2    **BY MR. RYTTING:**

3    *Q.*   Ms. Davis, you alluded to your experience as a DA in

4    1980 -- after 1987 with defendants that were mentally ill,

10:28:00AM  5    correct?

6    *A.*   Correct.

7    *Q.*   But you weren't the one that was talking with those

8    defendants or bringing the mental health problems to the

9    attention of the Court, were you?

10:28:07AM  10   *A.*   No, I was not.

11   *Q.*   That was the defense attorney's job?

12   *A.*   That's right.

13   *Q.*   So, you didn't assess their mental status.  You didn't --

14   *A.*   No.  I guess the only occasions I would have done

10:28:27AM  15   something like that was if there was something that I saw in

16   open court.  But, no, generally not.

17   *Q.*   And you don't recall any incident or any particular

18   defendant in which you were called to make an assessment or

19   did make an assessment in open court, do you?

10:28:46AM  20   *A.*   No.  Not in particular, no.

21   *Q.*   You spoke about certain conversations that you believe

22   you've had with Mr. Aldridge, for example, about the

23   seriousness of the charge; is that correct?

24   *A.*   Yeah.  Again, I can't say specifically.  But I know just

10:29:18AM  25   in the general course of practicing law and doing business, I

1    would have discussed those things with him.

2    Q.   You don't recall how you discussed it, the types of

3    questions you asked, correct?

4    A.   No.  Correct.

10:29:32AM 5    Q.   So, you don't know if you just asked him a single yes or

6    no question, do you understand the nature of the charges

7    against you, do you -- and are they -- do you understand that

8    they're serious?  Those may have been the type of questions

9    you asked him, correct?

10:29:44AM 10   A.   Probably what I would have done was explained it and had

11   a give and take with him.  I don't think I would have made it

12   a -- you know, like a one answer, yes or no type of thing.  It

13   would just be a general sense in speaking to him and

14   discussing things with him as to whether or not he understood

10:30:02AM 15   it.

16   Q.   You don't recollect how he responded in particular, do

17   you?

18   A.   No, I don't.

19   Q.   He may have just nodded his head, as far as you can

10:30:10AM 20   remember, correct?

21   A.   Possibly.

22   Q.   And you mentioned you thought Mr. Aldridge was a black

23   Muslim; is that right?

24   A.   That was my understanding, yes.

10:30:28AM 25   Q.   At some point during the course of your representation,

1  did it -- did you come to the conclusion that he was not a

2  black Muslim and did not have standard religious beliefs?

3  *A.*   Well, to be honest with you, I don't really know what all

4  the beliefs of the black Muslim religion are.  I know that he

10:30:48AM  5  had some Islamic-related beliefs and some other things thrown

6  in there.  I guess it was sort of his own little personal

7  potpourri of religious beliefs.

8          MR. RYTTING:  Your Honor, I have an exhibit.  I'm

9  not sure what we are up to in the record.  Mine goes up to 37,

10:31:18AM  10  but I think we are up in the 40s.

11          CASE MANAGER:  42.

12          MR. RYTTING:  Okay.  I will mark as Exhibit 42.  I

13  have provided a copy to opposing counsel.

14          THE COURT:  All right.

10:31:32AM  15          MR. RYTTING:  The exhibit is a letter that was

16  introduced at trial during the punishment phase, written by

17  Mr. Aldridge and dated October 2nd, 1989, which would have

18  been approximately 10 months before trial.

19          THE COURT:  Okay.

10:32:06AM  20  BY MR. RYTTING:

21  *Q.*   You recall introducing several letters at trial of

22  Mr. Aldridge, correct?

23  *A.*   We did.

24  *Q.*   And one of them was -- I'm handing you what was marked at

10:32:22AM  25  trial as Defendant's Exhibit 2.  Do you recall that letter?

1  *A.*   I don't -- again, I don't specifically recall it; but I'm

2  sure that if we introduced it, I've read it.

3  *Q.*   You believe you've read this letter previously?

4  *A.*   I'm sure I must have.

10:33:17AM 5  *Q.*   So, that would mean that you read this following passage

6  from this letter -- it starts, "Even though no physical person

7  has touched me sexually, I feel the pains of" --

8              MS. HAYES:  What page?

9              THE COURT:  What page are you on?

10:33:33AM 10              MR. RYTTING:  This would be the second page -- or

11  the third page of this exhibit, Page 3, as numbered by

12  Mr. Aldridge.

13  BY MR. RYTTING:

14  *Q.*   He goes on "...I feel the pains of anal or rectal entry.

10:33:51AM 15  Men and women molest me anally even with" -- it is difficult

16  to read, but it says "even with their eyes."

17              And it goes on to say even children molest him.

18  And it continues, "...and they molest me as they molested the

19  profits of Islam."

10:34:22AM 20              So, isn't it clear that that is not a -- an

21  expression of any religious belief that you are aware of,

22  correct?

23  *A.*   As I said, I think he had his own personal beliefs; and I

24  guess he incorporated a number of different things in coming

10:34:43AM 25  to those.

1          THE COURT:  Are you offering this exhibit,

2    Mr. Rytting?

3          MR. RYTTING:  Yes, I am offering it.

4          THE COURT:  Okay.  Is there any objection?

10:34:52AM 5          MS. HAYES:  No, Your Honor.

6          THE COURT:  All right.  Petitioner's 42 is admitted.

7       (Admitted)

8    BY MR. RYTTING:

9    Q.   And he expressed beliefs similar to this throughout your

10:35:04AM 10   representation, did he not?

11   A.   Yes, he did.

12   Q.   Opposing counsel asked you if Mr. Aldridge was a

13   hindrance in your representation.

14   A.   He was a what?

10:35:27AM 15   Q.   Whether he hindered your representation in any way?

16          MS. HAYES:  I object, Your Honor.  I don't believe I

17   ever used "hinder."

18          MR. RYTTING:  Okay.  I'm sorry.

19   BY MR. RYTTING:

10:35:35AM 20   Q.   I believe she asked you whether you could defend

21   Mr. Aldridge despite his mental illness.

22   A.   Right.

23   Q.   And you said that you could.

24   A.   I believe so.

10:35:48AM 25   Q.   And that -- right.  And you were able to cross-examine

1  witnesses without his -- without interference or without

2  problems caused by his mental illness; is that correct?

3  A.   As best I recall, I think we were able to do that.

4  Q.   In fact, you didn't rely on him at all when it came to

10:36:07AM 5  cross-examining witnesses or need to, did you?

6  A.   You know, frankly, I don't recall if we discussed that

7  with him or not.  Chances are -- I mean, I think I could

8  conduct a cross-examination without his input; but we may have

9  gotten some input from him.  I just don't remember.

10:36:29AM 10  Q.   And you were cross-examining his own family members,

11  correct?

12  A.   That's correct.

13  Q.   People that ordinarily affected --

14  A.   Well, I wasn't cross-examining them.  I think I put them

10:36:39AM 15  on myself.

16  Q.   And during the guilt/innocence, did the State call

17  several of his family members?

18  A.   I don't remember if they did.  I know we put some on in

19  punishment to try to show some mentally disabilities, but I

10:36:56AM 20  don't remember if the State put them on or not.

21  Q.   You don't recall that the State -- if the record reflects

22  they called James Anthony Aldridge, for example, to testify,

23  you wouldn't disagree with that if --

24  A.   Well, I wouldn't -- obviously I wouldn't argue with that,

10:37:08AM 25  no.

1    *Q.*   And ordinarily the defense would know something about his

2    family members, and you could rely on him heavily to

3    cross-examine them.  Isn't that fair to say?

4    *A.*   It's possible, depending on what was said.  Again, I'm

10:37:25AM   5    not saying that we didn't rely on him to some extent.  I just

6    don't recall.

7    *Q.*   But all you do recall is his expression of odd beliefs

8    and the defense of being raped by the victim, correct?

9    *A.*   Pretty much.

10:37:46AM  10    *Q.*   Now, I believe you stated on direct examination that if

11    you thought you were -- that Mr. Aldridge was delusional

12    during trial, you would have done something about it, correct?

13    *A.*   Well, yeah, I think I did.  I got a psychiatrist.  That

14    was my concern.  And then once the psychiatrist indicated that

10:38:14AM  15    he appeared to be competent and sane, I didn't notice any

16    major changes after that.  If I had, I would have taken some

17    action.

18    *Q.*   Did you think he was delusional during trial?

19    *A.*   I don't know if you would call them delusions.  It's just

10:38:30AM  20    those beliefs that he has, like those that are reflected in

21    the -- in those writings that he had.  That was pretty much

22    what it was.  In my mind -- I don't know.  I guess you could

23    look at those as delusions.  I mean, there are other religions

24    out there that are established religions that I think are --

10:38:50AM  25    have some mighty odd beliefs.

1  *Q.*   But you didn't know if he was delusional or not during

2  the trial or whether --

3  *A.*   Well, that's why I got the psychiatrist.

4  *Q.*   I'm talking about during the trial.  You got a

10:39:03AM  5  psychiatrist to interview, did you not, on March 29th, 1990.

6  Didn't we establish that?

7  *A.*   Right.  And as I said, there was no major change in

8  Mr. Aldridge that I observed subsequent to that.

9  *Q.*   And do you realize that Mr. Quijano -- well, did you ask

10:39:18AM  10  Dr. Quijano -- I assume you did not ask Dr. Quijano at the

11  time of trial whether your client was delusional, did you?

12  *A.*   I relied on what Dr. Quijano told me in his report, and

13  that was -- you know, I don't know what else to tell you.

14  *Q.*   Do you realize that Dr. Quijano has testified that

10:39:43AM  15  Mr. Aldridge suffers from affixed -- from a disease that

16  results in a fixed delusional system that persisted through

17  trial?

18  *A.*   I was not aware of that.

19  *Q.*   You said that you -- you were praising the HPD reports,

10:41:10AM  20  correct?

21  *A.*   Right.  And, again, I don't remember them specifically.

22  But, yeah, HPD homicide detectives do -- they do and -- or did

23  a good job.

24  *Q.*   And you understand that, as a defense attorney and a

10:41:25AM  25  former DA, that those reports aren't allowed into evidence,

1  correct?

2  A.   I know that.

3  Q.   Because they're hearsay reports, correct?  That's the

4  objection, they're hearsay, isn't it?

10:41:38AM  5  A.   Yes.

6  Q.   And as such they are unreliable.  The statements in there

7  haven't been tested by cross-examination; is that correct?

8  A.   That's correct.

9  Q.   That's the argument that is made?

10:41:47AM  10  A.   That's correct.

11  Q.   So, they are routinely left kept out?

12  A.   Right.

13  Q.   And as a defense attorney, you would try to keep those

14  reports out?

10:41:53AM  15  A.   Certainly.

16  Q.   But this is the evidence that you relied on to get the

17  facts of the case?

18  A.   Right.  Because the HPD homicide detectives do a good job

19  of marshaling the evidence in a case, taking witness

10:42:08AM  20  statements.  I find them to be pretty reliable.  But for

21  purposes of court, obviously, like you say, they are subject

22  to cross-examination; and you can use those reports in your

23  cross-examination.

24  Q.   As opposed to Mr. Aldridge, who was not reliable,

10:42:24AM  25  correct?

1  A.   I didn't think -- well, no, he wasn't.  He was -- there

2  are lots of defendants who tell stories that are not

3  believable.  This was another story that was not believable.

4  Q.   And, again, you said that -- as you described it,

10:42:50AM  5  Mr. Aldridge is on an even keel, correct?  That was the word

6  you used, "even keel."

7  A.   Well, I mean, given his situation, there wasn't any big

8  change from the first time I met him through the end.  There

9  was -- you know, when Dr. Quijano interviewed him after that,

10:43:10AM  10  there wasn't any major change in him, other than what I've

11  already described, the symptoms that he had.  That didn't

12  change either.

13  Q.   His beliefs didn't change over the course of your

14  representation, correct?

10:43:23AM  15  A.   Not -- not that I was aware of, no.

16  Q.   And his -- the way that he interacted with Mr. Bates and

17  yourself, it didn't change over the course of your

18  representation, did it?

19  A.   No.  Not in a major way, no.

10:43:34AM  20  Q.   And so, when Mr. Bates testified that Mr. -- that the

21  conversations with Mr. Aldridge were irrational --

22  A.   Yeah.  I mean, let's look at the writings that he has.

23  To me, those are somewhat irrational, in my mind.

24  Q.   That reflects the way he was throughout your

10:43:55AM  25  representation; is that correct?

1  A.   Yes.

2  Q.   And so, just to clarify, you believe that when

3  Randy Bates took the stand, he was testifying truthfully,

4  correct?

10:44:43AM  5  A.   Yes.

6  Q.   And you trusted his judgment, correct?

7  A.   Yes.

8        MR. RYTTING:  I'll pass the witness, Your Honor.

9        THE COURT:  All right.  Thank you, sir.

10:44:56AM  10        Any redirect?

11        MS. HAYES:  Yes, Your Honor.

12              **REDIRECT EXAMINATION**

13  **BY MS. HAYES:**

14  Q.   You were asked about Mr. Aldridge's belief about being

10:45:12AM  15  molested by a child, if you'll refer to that newest

16  plaintiff's exhibit where they read the passage.  And I

17  believe your response was that he had his own personal

18  potpourri of religious beliefs?

19  A.   Yes.

10:45:28AM  20  Q.   Would you explain what you mean?

21  A.   Well, it just seemed to be kind of a mishmash of

22  different beliefs, interspersed with, I guess, some of his own

23  personal beliefs.

24  Q.   And if some of those beliefs, like being molested by a

10:45:47AM  25  child is wrong, does that somehow mean that he is not actually

1  a Muslim or consider himself a Muslim?

2  A.   I wouldn't think so.

3  Q.   But could his -- do you know whether -- that he had

4  converted to becoming a Muslim when he was in prison

10:46:10AM  5  originally for all the robberies?

6  A.   I couldn't remember.  I know I did have it in my mind

7  that he was a Muslim.

8           MR. RYTTING:  Objection -- hang on a minute.

9           THE WITNESS:  I'm sorry.

10:46:18AM 10           MR. RYTTING:  Just the question -- the relevance of

11  this line of questioning.

12           THE COURT:  I'm going to allow it.  Overruled.

13  A.   I know I had it in my mind that he was a black Muslim.

14  I'm not sure where I got that, but that was in my mind.  I

10:46:42AM 15  probably heard it or saw it somewhere.

16  BY MS. HAYES:

17  Q.   So, could part of his -- the training or what he learned

18  about the Muslim faith, since he is learning and converting in

19  prison, could it be somewhat colored by the instruction

10:46:54AM 20  from --

21           MR. RYTTING:  Objection, leading.

22           THE COURT:  Let her finish the question.

23  BY MS. HAYES:

24  Q.   -- couldn't it be somewhat colored by the fact that he's

10:47:03AM 25  learning and converting about that from a prison group?

1          MR. RYTTING:  Objection, leading, Your Honor.

2          THE COURT:  All right.  I'm going to sustain it.

3    BY MS. HAYES:

4    Q.   You were asked whether you -- you didn't rely at all on

10:47:25AM  5    the defendant in cross-examining witnesses.  You agreed with

6    that statement that you didn't rely on him when you were

7    figuring out your cross-examination?

8    A.   No, I don't agree with that.  The chances are -- and,

9    again, I don't have a memory of it; but I'm sure we consulted

10:47:41AM 10    with him.  I don't know to what extent we used it.  I just

11   don't remember.

12   Q.   If the defendant -- if you present the defendant at

13   punishment to challenge the 1972 confessions, would it be fair

14   to say that you relied on him for some of the information

10:48:05AM 15   about challenging the 1972 confessions?

16   A.   Yes, we would have had to.

17   Q.   You were asked about whether the State had called family

18   members to testify.  There's some comment about whether you

19   had crossed family members and whether you would have relied

10:48:19AM 20   on Mr. Aldridge for information about the family.  The family

21   members --

22          MS. HAYES:  For the record, Your Honor, James

23   Anthony Thomas and Anthony Aldridge are two of the nephews

24   that testified at guilt/innocence.

25   BY MS. HAYES:

1 Q.   So, if -- is it James Anthony -- or James and Anthony are

2 two of the family members that helped Mr. Aldridge and they

3 were involved in his whereabouts immediately after the crime,

4 which is represented at guilt/innocence.  If those are the

10:48:51AM 5 witnesses that you are having to testify, are you having to

6 rely -- or having to question, are you relying on Mr. Aldridge

7 to give you the details about the crime; or what else were you

8 relying on to be able to question those witnesses?

9         THE COURT:  If you remember.

10:49:05AM 10 A.   Again, I don't remember a particular conversation I had

11 with him.  I suspect we would have asked him, you know, if

12 there was anything about the family members, if there was an

13 ax to grind or a little bit about the family member --

14         MR. RYTTING:  Your Honor, I will object and move to

10:49:20AM 15 strike since he said he doesn't remember.

16         THE COURT:  I think we'll go with he doesn't

17 remember.

18         THE WITNESS:  All right, sir.

19         THE COURT:  All right.  Sustained.

10:49:27AM 20 BY MS. HAYES:

21 Q.   You have testified previously that your review of all the

22 HPD records included the police statements; is that correct?

23 A.   Yes.

24 Q.   Okay.  And if statements were in there from James and

10:49:38AM 25 from Anthony, then you would have had an opportunity to review

1  those for details about what their version after the crime

2  was?

3  A.   Yes.

4  Q.   You were asked about whether you inquired of Dr. Quijano

10:50:03AM  5  whether the defendant was delusional at trial.  Is it also

6  true that what Dr. Quijano reports in his descriptions about

7  the delusions and all the things that Aldridge purports are

8  basically what y'all saw, as well, when you were dealing with

9  Mr. Aldridge?

10:50:21AM 10  A.   Yes.

11  Q.   From your recollections of dealing with Mr. Aldridge,

12  though, was that how it was all the time, on all the topics?

13          MR. RYTTING:  Asked and answered, Your Honor.

14          THE COURT:  Sustained.  I agree.

10:50:41AM 15  BY MS. HAYES:

16  Q.   Some of the questioning involved about your -- that your

17  conversations about Mr. Bates' testimony, talking about the

18  conversations being irrational, and that reflected how your

19  interactions were with the defendant?

10:51:14AM 20  A.   That would be correct.

21  Q.   When he was describing all the events and the details,

22  that was when he was giving his version of the crime, correct?

23  A.   Yes.

24          MR. RYTTING:  I will have to object to asking

10:51:33AM 25  about -- what was it -- the events and details.  I don't see

1  any recollection of that.

2         THE COURT:  Are we talking about Mr. Bates'

3  testimony?

4         MS. HAYES:  I'm talking about when Mr. Aldridge has

10:51:47AM  5  related the facts of the crime and the events and things that

6  occurred.

7         MR. RYTTING:  I will object.  He stated he doesn't

8  remember anything about the fact -- what he was saying in

9  particular about the facts of the crime and events that

10:51:59AM 10  occurred, other than that he said he was raped and sexually

11  assaulted.  Asked and answered.

12         THE COURT:  All right.  I'm not clear on the

13  question.  Would you ask the question one more time?

14         MS. HAYES:  I will ask it a different way.

10:52:09AM 15         THE COURT:  Okay.  That would be good.

16  BY MS. HAYES:

17  Q.   You've testified that Mr. Aldridge -- that you remember

18  Mr. Aldridge talking about the rape and about the rape

19  being -- you know, he explains that was what was going on when

10:52:21AM 20  the crime happened.

21              Would you agree that that's -- did he explain

22  what his motive is or what his reasoning was going into the

23  crime?

24  A.   That was his explanation.

10:52:35AM 25  Q.   Okay.  And that's -- and that's separate from the facts

                 Stephanie Kay Carlisle-Neisser, CSR, RPR   713.250.5157

1    of him being able to report whether he buys a gun --

2            MR. RYTTING:  I object --

3    BY MS. HAYES:

4    Q.   -- or whether he shoots the victim or whether his --

10:52:49AM  5    as -- I'm trying to see if you agree that there's a difference

6    between him saying the why in doing it and the what he did?

7            MR. RYTTING:  I will object on the basis of leading

8    and on the fact that this has been asked and answered several

9    times about what he specifically said -- or what he remembers

10:53:07AM 10    he specifically said.

11            THE COURT:  All right.  Sustained on both grounds.

12            MS. HAYES:  Nothing further.

13            THE COURT:  Okay.  Thank you.

14                Any recross?

10:53:20AM 15            MR. RYTTING:  Nothing further, Your Honor.

16            THE COURT:  All right.  Thank you.

17                You may step down, Mr. Davis.  Thank you.

18            THE WITNESS:  Thank you.

19        (Witness released)

10:53:26AM 20            THE COURT:  All right.  Are we ready to take up the

21    cross-examination of Dr. Mosnik?

22            MS. ODEN:  Judge, if I could have just two minutes

23    to consult with co-counsel --

24            THE COURT:  Sure.

25            MS. ODEN:  -- to see if there's anything she needs

1  me to handle.

2      (Pause)

3          THE COURT:  All right.  Dr. Mosnik, come up and

4  resume the witness stand and remember that you are still under

10:54:25AM  5  oath.

6      (**DIANE MOSNIK, M.D.,** witness, previously sworn)

7          **CROSS-EXAMINATION (CONTINUED)**

8  **BY MS. ODEN:**

9  Q.   Good morning, Dr. Mosnik.

10:54:33AM 10  A.   Good morning.

11  Q.   Now, I think perhaps that one or two of the questions

12  that I have for you might be repetitive from the other day;

13  but I just want to make sure we are on the same page about a

14  few things.  You would consider yourself to be a scientist; is

10:54:51AM 15  that right?

16  A.   I would, yes.

17  Q.   And so, what you seek to do is to accumulate data and

18  test a hypothesis before you come to a conclusion; is that

19  right?

10:55:03AM 20  A.   Yes.  That is correct.

21  Q.   Do you follow the scientific method, then, in coming to

22  conclusions?

23  A.   I do.

24  Q.   And do you feel that you did that in this case?

10:55:10AM 25  A.   I do, yes.

1    Q.   Okay.  So, what was the hypotheses -- what were the

2    hypotheses you were testing?

3    A.   As to whether or not the patient had schizophrenia and on

4    whether or not he was competent to stand trial.

10:55:23AM  5    Q.   Those were the two hypotheses you were testing?

6    A.   Those were the two main ones, two of the main ones, yes.

7    Q.   Okay.  Go ahead and tell us all of the hypotheses you

8    were testing to come up with your opinion in this case.

9    A.   Okay.  So, whether or not the patient had a diagnosis of

10:55:39AM 10    schizophrenia; then if he did, what his symptoms were; the

11   severity and nature of those symptoms.

12   Q.   Okay.  Let me stop you for a second.  A hypothesis would

13   be something like this person has schizophrenia or this person

14   was not competent to stand trial in 1990.

15   A.   Right.

16   Q.   So, something like what are his symptoms is not a

17   hypothesis.

18   A.   It is in the nature of a schizophrenia patient who

19   presents with a number of different symptoms.  So, different

10:56:07AM 20   type of symptoms, different severity of symptoms.  The

21   question is whether or not he had delusions.

22   Q.   Okay.  So --

23   A.   If he did have, how severe were those delusions, were

24   they severe, were they not severe.

25   Q.   Okay.

1   A.   Those were all relevant to determining whether or not

2   they had an impact on his competency.

3   Q.   Okay.  So, maybe we are not talking about the same thing

4   when we say "testing a hypothesis."  When I say "testing a

10:56:27AM  5   hypothesis," your hypothesis would have been he has

6   schizophrenia and he has severe delusions of the type that

7   would impair his competency back in 1990.  Is that fair to

8   say?

9   A.   I'm not sure what you mean by "We're not testing the same

10:56:43AM  10   hypothesis."

11   Q.   Well, actually what I said was we are not talking about

12   the same thing when we say we are testing a hypothesis.  If I

13   understand correctly, what you mean by testing a hypothesis is

14   answering an open-ended question, not coming up with --

10:56:55AM  15   A.   It's not an open question.  It's whether or not it

16   exists.

17   Q.   Okay.  So, go ahead and tell us the rest of the

18   hypotheses you were testing.

19   A.   And then whether or not the person -- the symptoms that

10:57:09AM  20   the person has affect their ability to engage in a rational

21   discussion with their attorneys.  And then --

22   Q.   At what point in time?

23   A.   I did two points in time; one at the current time that I

24   did my assessment and then based on the evidence in the record

10:57:27AM  25   that I had available to me, whether or not that influenced his

1  ability at the time of the original trial in 1990.

2  Q.   Okay.  And were there any other hypotheses that you

3  tested?

4  A.   I'm sure there were.

10:57:41AM 5  Q.   Maybe dealing with insanity at the time of the crime?

6  A.   The other questions posed to me, yes; whether or not he

7  was competent to be executed, whether he was sane at the time

8  of the trial.  That's correct.

9  Q.   Okay.  And, generally, as a scientist, you would look for

10:57:58AM 10  the explanation that accounts for the facts or the data that

11  you observe most accurately; is that right?

12  A.   Say that again.

13  Q.   As a scientist, when you are coming to a conclusion, the

14  conclusion that you draw is the answer or the explanation that

10:58:20AM 15  ties together all the data in the most accurate way; is that

16  correct?

17          THE COURT:  Just a minute, Doctor.

18              Do you have an objection?

19          MR. RYTTING:  Your Honor, I would object to the

10:58:27AM 20  relevancy of this line of questioning.  It sounds like it is

21  something like a 702 objection, but I can't see where it is

22  going.

23          THE COURT:  Relevance?

24          MS. ODEN:  I will tie it together, Judge.  It's not

10:58:43AM 25  a 702 objection.

```
 1              THE COURT:  I will give her some latitude.
 2    Overruled.
 3    A.   Okay.  I'm sorry.  You're going to have to repeat that.
 4    BY MS. ODEN:
 5    Q.   Okay.  So, my question to you is:  As a scientist, when
 6    you are coming to a conclusion, are you looking for an
 7    explanation for the data that you observe that accounts for
 8    all the data in the most accurate way possible?
 9    A.   Am I looking for an explanation?  So, I'm not looking for
10    an explanation.  I am looking for data that supports or
11    refutes my hypothesis that the patient has schizophrenia.
12    Q.   Okay.
13    A.   So, I look for evidence for and against that --
14    Q.   Okay.
15    A.   -- and whether or not it fits with all the knowledge that
16    I have about schizophrenia.
17    Q.   Okay.  And, likewise, you would be looking for data that
18    supports or refutes your hypothesis that he was not competent
19    at the time of trial?
20    A.   That's correct.
21    Q.   Okay.  And at some point, if you have enough data on one
22    side or the other of the line, that tells you which conclusion
23    to draw?
24    A.   Yes.
25    Q.   And you are looking for a conclusion that accounts --
```

10:58:48AM (line 5)
10:59:11AM (line 10)
10:59:21AM (line 15)
10:59:34AM (line 20)
10:59:43AM (line 25)

1   that makes use of that data accurately; is that right?

2   A.   I'm coming to a conclusion about that.

3   Q.   Okay.

4   A.   I'm not looking for a conclusion.  I'm coming to a

11:00:01AM  5   conclusion based on the data.

6   Q.   Okay.  And you would look for inconsistencies in the data

7   that might affect the conclusion you draw.  You are paying

8   attention to the inconsistencies, if there are any; and those

9   affect the conclusions that you draw.

11:00:18AM  10   A.   I look for data that both supports and refutes my

11   hypothesis, yes.

12   Q.   And just one more time.  You did not review the Houston

13   Police Department file at any point in preparing to either

14   form an opinion for your report or preparing to testify in

11:00:34AM  15   this hearing?

16   A.   That is correct.  I did not.

17   Q.   Have you reviewed it since our last conversation last

18   week?

19   A.   No.  Only you showing it to me on the stand.

11:00:44AM  20   Q.   Okay.  Did the attorneys make that available to you to

21   potentially review, or have you chose not to review?

22   A.   That is not something that I review in coming to my

23   conclusions.

24   Q.   Okay.  You mention that you were not able to reach

11:00:57AM  25   Mr. Davis in person for an interview.  Did you ever speak to

1  him over the phone regarding his actions in this case before

2  you performed your conclusions?

3  A.   I attempted to, yes.  We had a meeting scheduled that I

4  showed up for and waited in his office for an hour and a half.

11:01:12AM  5  Q.   I understand that.  My question is:  Did you speak to him

6  on the phone?

7  A.   I did speak to him on the phone, and he told me

8  repeatedly that he doesn't remember anything and would not

9  have an opportunity to meet with me again.

11:01:21AM  10  Q.   Okay.  How about Mr. Bates?

11  A.   I did not.

12  Q.   Did you try to make an appointment with him?

13  A.   I did not.

14  Q.   Did you speak with him on the phone?

11:01:28AM  15  A.   Not that I recall, no.

16  Q.   Any particular reason?

17  A.   Not that I recall.

18  Q.   Would that have been helpful information for you?

19  A.   It certainly would have.

11:01:39AM  20  Q.   But you don't remember why you chose not to pursue that?

21  A.   I don't know if I did or not, no.  I only remember the

22  meeting with Mr. Bates because -- excuse me -- Mr. Davis

23  because I sat in his office for an hour and a half.

24  Q.   Uh-huh.  And did you review James and Anthony's testimony

11:01:57AM  25  at guilt/innocence in forming your opinion?

1  *A.*   I did, yes.

2  *Q.*   And how about Virginia's testimony at trial?

3  *A.*   I did, yes.

4  *Q.*   And when you were asking Mr. Aldridge questions about

11:02:09AM  5  competency, if I understand correctly, the three basic

6  questions or areas that you asked him about were:  Who are his

7  attorneys, at the very beginning of the session?

8  *A.*   Yeah.

9  *Q.*   What is his understanding of the current legal

11:02:22AM 10  proceedings?

11  *A.*   Uh-huh.

12  *Q.*   And who, if anyone, was on his side?

13  *A.*   No.  I asked the initial question about the attorney.

14  Then I asked three additional questions during my interview

11:02:34AM 15  that I stated to you yesterday -- excuse me -- on Friday.

16  *Q.*   Okay.  So, that's why I'm asking you again because I

17  obviously got it wrong.

18  *A.*   But you said -- right.

19  *Q.*   If you will correct me, please.  What were the three

11:02:43AM 20  questions that you asked?

21  *A.*   I asked initially during the consent process as I was

22  telling him about what the intent of my interview and the

23  proceedings would be, about knowledge of his attorneys.  I

24  asked him, then, during the interview portion of my

11:03:00AM 25  evaluation, what his understanding of the legal proceedings

1  against him currently were, about the adversarial nature of

2  the proceedings, and if he understood the nature of the

3  charges against him.

4  Q.   Who was in control of that interview?  Would you describe

11:03:29AM  5  yourself as being in control of the interview, directing the

6  questions and directing his answers; or would you say

7  Mr. Aldridge was more in control of that interview?

8  A.   I would say that neither one of us was in control of the

9  interview.  I asked questions.  He responded.  He also asked

11:03:44AM  10  some questions of me.

11  Q.   What questions did he ask of you?

12  A.   He asked questions about what my role was, what kind of

13  testing we would be doing, that sort of thing.

14  Q.   And what did you tell him your role was?

11:03:59AM  15  A.   That I was hired by his defense attorney to provide

16  information about whether or not he had a diagnosis of a

17  mental illness, whether or not that diagnosis contributed to

18  his ability to be competent to understand the proceedings

19  against him and his participation in the trial.

11:04:20AM  20  Q.   In the trial in 1990?

21  A.   That's correct.

22  Q.   And how did he respond to you?

23  A.   He was happy to do the cognitive testing because it

24  would -- he felt that it would show how intelligent he was.

11:04:33AM  25  He was interested to participate in the testing to do the

1  cognitive tasks.

2  Q.   And what did he tell you about his attorneys' role in

3  this proceeding?  Did he believe that they were his attorneys?

4  A.   No.  He believed that they had been recused, that he

11:04:53AM 5  had -- said that they were no longer active on his case.

6  Q.   And did it appear to you that Mr. Aldridge was

7  understanding your role and the current legal proceedings and

8  the reasons for the testing?

9  A.   No.  He assumed his own understanding of the testing;

11:05:14AM 10  that I was there, in fact, to help him promote his view of

11  what was going on in the case and that I was there to

12  demonstrate to everybody these spirits, if you will, that were

13  communicating with him and his belief.  He saw me as an avenue

14  to get that presented to the Court.  So, he chose to see me

11:05:36AM 15  despite the fact that I was working for his attorney.

16  Q.   Why did you have him sign a consent form, then?

17  A.   As a matter of form, that is what we are required to do.

18  Q.   Even if you believe -- I assume that the consent is not

19  valid.  Or did you believe that it was a valid consent?

11:05:54AM 20  A.   I believed that he had a confused understanding of what

21  the procedures were, yes.  So, in that sense, no, it is not a

22  valid consent.

23  Q.   You understand that -- do I understand correctly that he

24  did not understand your question about the adversarial nature

11:06:13AM 25  of this proceeding in the sense that he thought everyone was

1  against him?

2  A.   That is correct.

3  Q.   Do you find that that is consistent with his willingness

4  to cooperate with you but his unwillingness to cooperate with

5  our expert?

6  A.   Say that again.

7  Q.   Do you believe that his opinion that everyone in this

8  proceeding is against him is consistent with his willingness

9  to cooperate with you, yet his unwillingness to cooperate with

10  our expert?

11  A.   Would that be consistent with his understanding of the

12  adversarial nature?

13  Q.   Would that be consistent with his belief that everyone is

14  against him?

15  A.   Well, he didn't believe that I was against him.  He --

16  Q.   Okay.  So, he believed you were the only person that was

17  not against him?

18  A.   No.  He -- at times he felt that people were for him,

19  some of his attorneys; and then eventually they become someone

20  that turns against him.

21  Q.   Don't you find it inconsistent that on one hand he thinks

22  in this proceeding both sides -- the Attorney General's

23  Office, the respondent, and the petitioner's attorneys -- are

24  against him; and, yet, he is willing to cooperate with the

25  petitioner's expert and unwilling to cooperate with the

1    respondent's expert?

2    A.   I'm not sure what the circumstances were at the time that

3    he refused to see your person.   It may have had something to

4    do with the fact that I was a woman.   I don't know.

11:07:47AM  5    Q.   There are two aspects of competency that we're looking

6    at, understanding the proceedings and the ability to assist

7    counsel.

8             Do you think that understanding the nature of

9    federal habeas proceedings is the same level of understanding

11:08:03AM 10   required to understand a trial?

11   A.   I think that understanding the nature of habeas

12   proceedings certainly indicates some level of understanding.

13   Whether it is at the same level as a trial, that I couldn't

14   speak to.

11:08:24AM 15   Q.   Does Mr. Aldridge -- in general would a person need to

16   have legal training in order to compensate to meet that

17   standard of understanding the legal proceedings against them?

18   A.   State that again, please.

19   Q.   Does a person who is being evaluated for competency need

11:08:42AM 20   to have some level of legal training in order to be able to

21   adequately understand the legal proceedings against them?

22   A.   No.   I don't believe that they have to have some legal

23   training.

24   Q.   Okay.   And I'm kind of backtracking a little bit here.

11:08:59AM 25   In your prior experience evaluating people in the criminal

1  justice system, none of those evaluations were for sanity; is

2  that right?

3  *A.*   Yes.  That is correct.

4  *Q.*   And of those evaluations, which ones were pro se inmates?

11:09:17AM  5  *A.*   I don't remember the details of any of the previous

6  evaluations.

7  *Q.*   You don't remember James Colburn or Marcus Green?

8  *A.*   I remember the names and some basic things, but I don't

9  remember any of the details at this point.  No, I have not

11:09:33AM 10  reviewed of any of them.

11  *Q.*   Okay.  Weren't you both -- in both of those cases

12  assisting their attorneys, providing a report to attorneys

13  that were representing those inmates?

14  *A.*   Yes.

11:09:45AM 15  *Q.*   Okay.  And Andrea Yates obviously had counsel because you

16  were providing assistance to an expert who was providing a

17  report to her counsel.  Have you ever been assisting a pro se

18  inmate, pro se meaning an inmate who does not believe they

19  have counsel or does not have counsel?

11:10:05AM 20         MR. RYTTING:  Your Honor, I object to the relevancy

21  of this line of questioning.

22         THE COURT:  I am going to allow it.  Overruled.

23  *A.*   I'm sorry.  State it again.

24  BY MS. ODEN:

11:10:14AM 25  *Q.*   Have you ever been in contact with a pro se inmate, an

1  inmate who is not represented by an attorney?

2  *A.*   No.   I mean, the closest thing is Mr. Aldridge, who

3  doesn't believe that he has an attorney.

4  *Q.*   How much emphasis did you place on Mr. Aldridge's answers

11:10:39AM 5  to the same kinds of competency questions that he made in

6  1990?

7  *A.*   I'm sorry.   The same kinds?

8  *Q.*   Yes.   The questions about the nature of the proceedings

9  and his understanding of the charges against him and the roles

11:10:52AM 10  of the different players in the trial?

11  *A.*   Same kind as what?   What are you comparing that to?

12  *Q.*   How much emphasis did you place on Mr. Aldridge's answers

13  to competency evaluation questions that he gave in 1990 when

14  you were forming your opinion?

11:11:08AM 15  *A.*   I did place weight on those.

16  *Q.*   How much weight?

17  *A.*   I don't know that I can say how much weight.   I did

18  review those and did place weight on that and felt that he did

19  not express a clear understanding of those factual

11:11:24AM 20  understandings of legal proceedings that Dr. Quijano reported.

21  Are you talking about what is in Dr. Quijano's report?

22  *Q.*   Yes.

23  *A.*   Yes.

24          MR. RYTTING:   Could I ask her for some

11:11:36AM 25  clarification, what part of the report?   And maybe show the

1  witness what you are talking about.

2          MS. ODEN:  I don't think I need to.  She already

3  answered the question.

4          THE COURT:  And you can ask her on cross.

11:11:45AM 5  BY MS. ODEN:

6  Q.   Are you aware that -- okay.  Let me back up.

7          The reason that Mr. Aldridge told you he killed

8  his manager, Ben Stone, was that Ben Stone was -- had been

9  sexually assaulting him; is that right?

11:12:01AM 10  A.   That wasn't the specific reason, no.  That was

11  intertwined in part of it, yes.

12  Q.   Right.  There was a voice in his ear.  There was a man on

13  the roof; and the voice was telling him that if he didn't kill

14  that person, the sexual assault would continue.  Is that

11:12:16AM 15  right?

16  A.   Right.  He wasn't the only one that was molesting him.

17  There were numerous people that were molesting him and Nazis

18  and police and people from the prison were all intertwined in

19  that.  So, it was pretty in-depth in terms of the

11:12:31AM 20  hallucinations and delusional belief.  But, yes, that was a

21  piece of it.

22  Q.   Okay.  So, I guess, then, the fact that there was a

23  last-minute, night before the offense, shift change so that

24  the manager that was supposed to be at work that morning was

11:12:45AM 25  not there wouldn't have made any difference because

```
 1  Mr. Aldridge was imagining that all the managers were sexually
 2  assaulting him then?
 3  A.   It wasn't just Ben Stone.  That's correct.  There were a
 4  number of people involved in his delusion beliefs.
 5  Q.   Okay.  Actually, if Mr. Aldridge was thinking it was his
 6  manager that was going to be on duty that morning that he was
 7  going to kill, he would have been thinking of killing Al
 8  Collins; but Al Collins switched with Ben Stone.  This is at
 9  Respondent's Exhibit 17, Page 15 and 18.
10            So, if Mr. Aldridge had been planning on
11  killing his manager or had been -- you know, had this idea
12  that his manager had been sexually assaulting him and needed
13  to be killed, he would have been thinking about Al Collins;
14  but the last-minute shift change put Ben Stone in place.  But
15  your explanation is that he thought both Mr. Collins and
16  Mr. Stone were sexually assaulting him?
17  A.   My understanding was that he didn't name any people prior
18  to that, that he wasn't intending to kill anybody, but that
19  the spirits and his -- these hallucinations were telling him
20  that many people were molesting him.  He felt eyes of other
21  employees, of managers, of individuals, standing behind him in
22  the McDonald's, by them standing behind him, that their eyes
23  were molesting him.
24  Q.   Okay.
25  A.   So, he did not indicate an individual person.  He
```

11:13:00AM (line 5), 11:13:20AM (line 10), 11:13:39AM (line 15), 11:13:56AM (line 20), 11:14:09AM (line 25)

1    indicated numerous people.

2    Q.   Okay.   Now, when Dr. Quijano asked Mr. Aldridge about his

3    factual and rational understanding, he got different answers

4    about his understanding of the crime than you did when you

11:14:25AM  5   asked similar questions of Mr. Aldridge; is that correct?

6    A.   Somewhat different under the factual, but he asked more

7    factual questions about the individuals than I did.

8    Q.   Uh-huh.   And, in fact, Mr. Aldridge had some different

9    accounts to his family before he was arrested.   We started

11:14:43AM  10   talking about that on Friday.   Do you recall that?

11   A.   That is your statement.   Yes.

12   Q.   Those are actually the sworn statements of other people

13   involved in this case, wasn't that right?

14   A.   Are you speaking about the Houston records -- the police

11:14:56AM  15   department records?

16   Q.   Yes.   Uh-huh.

17   A.   Yes, that was the case.

18   Q.   Okay.

19          MS. ODEN:   May I approach, Your Honor?

11:15:02AM  20          THE COURT:   You may.

21          MS. ODEN:   For counsel's reference, I'm referring to

22   Respondent's Exhibit 17.   We're starting at Page 44.

23          MR. RYTTING:   Do you have an extra copy of that?

24          MS. ODEN:   Kathy, I have our copy in my hand, unless

11:15:41AM  25   you have a spare.

1          MS. HAYES:  I might.  Unless you pulled these.  Did

2    your copies come from the notebook?

3          MS. ODEN:  Huh-uh.  My copies came from my binder.

4          THE COURT:  Chris, do you have a copy over there?

11:16:09AM 5    No?  Okay.

6          MS. ODEN:  Don't pull the page, Kathy, because

7    there's going to be a lot of pages.

8          MS. HAYES:  Your Honor, they can have this.

9          MR. RYTTING:  Is that it?

11:16:28AM 10          MS. HAYES:  I need it back.

11          MS. ODEN:  Kathy, it looks like they have a copy.

12          MS. HAYES:  That is the Judge's only copy.

13          MR. RYTTING:  And, again, I'm sorry, what page were

14    you on?

11:16:42AM 15          MS. ODEN:  44.

16    BY MS. ODEN:

17    Q.   Dr. Mosnik, I'm referring to the Houston Police

18    Department records.  And I understand that you are not

19    familiar with these, but I want to see if some of the

11:16:56AM 20    information in here changes your opinion or influences your

21    opinion in any way.  Okay?

22    A.   This is the same sheet that you showed me on Friday.

23    Q.   It might be.  It is from the same police report.

24    A.   It is the same sheet.

11:17:08AM 25    Q.   So, on Page 44 we're reading the police offense report

1    from Sergeant Brian Foster.  And here it indicates that

2    "Ford," that would be the brother-in-law, "told him that he

3    has a nephew named Garfield Aldridge.  According to Ford,

4    Garfield called him the day before his picture turned up in

5    the paper.  Garfield told him that he was in a big jam and

6    that he needed some help."  Okay.  That's one piece of

7    information.

8              Now I'm referring to Page 54.  "Ford said" --

9    I'm reading about -- maybe the start of the third paragraph

10   from the top.  "Ford said that Garfield took the money and the

11   gym bag and got out of the car and hid in some bushes behind

12   the stores.  Garfield told Ford and Gladys to be sure and get

13   his passport and his clothes."

14             And I'm skipping down to the fifth paragraph on

15   the page.  "Ford said that Garfield told him they would take

16   him home after he helped Garfield get a room in a motel.  Ford

17   said that he told Garfield that he didn't have identification

18   and could not get the room.  Garfield then decided to go by

19   Ford's nephew's house and get the nephew.  Ford stated that

20   the nephew is named James Thomas, and they took Thomas to the

21   Olympic Motel on I-45 off Tidwell.  Ford said that the room is

22   in Thomas' name."

23             And then the last paragraph on the page, "Ford

24   stated while they were in the motel room, Garfield was asking

25   Gladys' advice about the gun.  Ford added that Garfield was

1  wondering whether or not they should keep the gun or if he

2  should get rid of it.  Ford stated that Gladys told Garfield

3  to give her the gun and she would give it to their other

4  brother Terrol Aldridge.  Ford said that Terrol takes in

11:18:41AM  5  property and is a gun nut.  Garfield gave the gun to Gladys so

6  that she could give it to Terrol."  And that's all I need from

7  that page.

8           Another account from Garfield is found on

9  Page 78 from the same exhibit.  I'm looking at the second full

11:19:01AM  10  paragraph on the page.  "Ford stated that around 6:30 to 7:00

11  p.m. Wednesday a week ago, Garfield had called him at his

12  store.  Garfield asked him if he had any cars around to sell.

13  Ford explained he often buys and sales things if he can make

14  money off of them and he often has extra cars.  He told

11:19:16AM  15  Garfield he did not have any at this time.  It sounded to Ford

16  like something was wrong with Garfield and asked him what was

17  going on.  Garfield told him that something was going on but

18  he could not talk about it on the phone.  Garfield asked Ford

19  what time he got off, and Garfield told him around midnight.

11:19:35AM  20  Garfield told him maybe he would get with him after that."

21           THE REPORTER:  I'm sorry.  Can you slow down,

22  please?

23           THE COURT:  A little slower.

24           MS. ODEN:  I'm sorry.

25           THE REPORTER:  "Garfield asked Ford what time"?

BY MS. ODEN:

Q.    -- "what time he got off, and Ford told him around midnight.  Garfield told him that maybe he would get with him after that."

11:19:44AM  A.    And what is the time of that?  What is the date of this?

Q.    This is dated the 17th.

Now I am looking at Houston police report, Page 274 and 275.  This is back to the sworn statement of James Thomas that you read on Friday.

11:20:01AM  A.    Uh-huh.

Q.    So, I'm just pointing out the last paragraphs on this page and the first on the next.

"Garfield said that him and his manager had gotten into a struggle and that he had to shoot him.  He did

11:20:16AM  not say why they had been fighting.  Then he said that he had to take the money out of the safe to make it look like a robbery.  Maxey has asked me" -- and for the record Sergeant Maxey is one of the officers who is doing the investigation on the case.

11:20:29AM  "Sergeant Maxey has asked me and I do not remember Garfield saying anything about anyone or any enemies being after him.  He said that he wanted to leave the country. He said something about wanting to go to some embassy because he is a Muslim, and they have a lot of power in some

11:20:47AM  countries."  Okay.

1          Now I am going back to Page 55.  "Ford said he
2    got the impression that Gladys was a partner to the robbery.
3    He said she never actually admitted taking part but Garfield
4    told her that he needed to keep the money and she could have
5    his pulse card, the money in his bank account, about $40, and
6    all the furniture in his apartment for her cut.  Ford said
7    that Gladys acted like she was going to go back to the
8    apartment and get Garfield's property later in the afternoon."
9          I'm now looking at Page 68 of the police
10   report.  I'm at the fourth paragraph from the top, about
11   halfway through it.  "Anthony asked his mother what the deal
12   was.  She then told him that the suspect had become involved
13   in some kind of scuffle with the manager of the McDonald's
14   where he worked and had to kill him in self-defense.  Anthony
15   said he had no reason to doubt the self-defense story until
16   the sergeant showed up at his brother's house the next day and
17   he realized what had happened, but he did not call the police
18   in regards to this incident."
19          And then a little further down is the interview
20   with James Thomas.  "The suspect told James that he had become
21   involved in a struggle with the manager of the McDonald's
22   where he worked and he had to kill him.  Garfield also told
23   James since he had to kill the man, that he stole the money
24   out of the safe to make it look like a robbery."
25          We are hearing a lot of different explanations

11:21:05AM (line 5)
11:21:23AM (line 10)
11:21:41AM (line 15)
11:21:53AM (line 20)
11:22:08AM (line 25)

1  or articulations of what was going on around the time of the

2  crime from Garfield to his family members before he was

3  arrested; is that right?

4  A.   I don't think that you are hearing a lot of different

11:22:25AM  5  alternatives, no.  I think you are hearing one.

6  Q.   Well, it is different from the explanation he gave to

7  you; is that right?

8  A.   Not necessarily, no; but that could incorporate that.

9  Nobody is asking about delusions.  There's no timing about

11:22:37AM 10  that.  That doesn't mean they didn't exist.

11  Q.   Well, this is different from what he told you because he

12  is not talking about the delusions in these explanations, is

13  he?

14  A.   That is correct.

11:22:47AM 15  Q.   Okay.  You already read Gladys Aldridge's account, which

16  is found on Page 282 of the same respondent's exhibit.  I'm

17  looking at the second full paragraph after he is Mirandized.

18         "Garfield first told me he did not want any of

19  the family to know anything about what he had done because it

11:23:10AM 20  would be better for us.  Garfield said, 'I had to do

21  something, and they deserved it.'  He would also not let me

22  turn on the radio because he did not want me to hear the news.

23  At one point Garfield told me he was supposed to be at work at

24  the McDonald's that morning.  I asked him if he hurt anybody.

11:23:26AM 25  He said that he did what he had to do.  I asked him what he

1    got into, and he said that he got into a squabble with the

2    manager of the McDonald's where he worked.  He said, again,

3    that he had to do something.  I asked him if it could be

4    undone and he said that it could not."

11:23:42AM 5              And the last paragraph on the page, "Also, I

6    forgot to tell about Garfield's gun.  After we let Garfield

7    out at the Olympic Motel, I called him later that day.  He

8    told me he was looking for Edward, Jr. because Edward, Jr. had

9    taken his gun out of his gym bag.  I then went over to my

11:23:59AM 10   mother's apartment to talk to Edward, Jr.  I was going to

11   prove that Garfield was wrong and that Edward would not steal

12   from him.  I went to my mother's apartment to talk to Edward,

13   Jr.; but he was not there.  I talked to his girlfriend,

14   Joyce Gamble.  She first denied that Edward had taken

11:24:12AM 15   anything, but she finally gave me the gun.  Joyce gave me the

16   gun in a box.  I did not look at it.  I gave the gun wrapped

17   up inside my coat to James.  I guess he gave it to Garfield."

18              So, what we are hearing about is that family

19   members are questioning Garfield --

11:24:33AM 20              MR. RYTTING:  Your Honor, can I -- I have yet to

21   hear a question.

22              MS. ODEN:  I was just starting a question.

23              THE COURT:  All right.  Let her finish the question.

24   BY MS. ODEN:

11:24:41AM 25   Q.   So, what we are hearing is that family members are

1  questioning Garfield about the crime; and Garfield's

2  explanation is rather vague, isn't it?

3  A.   Yes.

4  Q.   He's not saying anything about sexual assaults, is he?

11:24:58AM 5  A.   No.

6  Q.   He is not saying anything about Sufi Mystics?

7  A.   No.

8  Q.   He's not saying anything about Nazis?

9  A.   No.  But he is saying that he's, you know, withholding

11:25:07AM 10  information to protect them and that enemies are after him.

11  So, he is implying that potentially there is something more

12  there.

13  Q.   And from that you take that he is hiding the Sufi Mystics

14  from his family?

11:25:19AM 15  A.   I'm saying that that is certainly potential, yes.

16  Q.   Okay.  And his family is getting the impression from him

17  that he committed a murder in self-defense, made it look like

18  a robbery, and is going through this process of escaping,

19  getting clothes, getting passport, et cetera; is that right?

11:25:37AM 20  A.   I can't presume to know what the family is assuming is

21  going on.

22  Q.   But they are acting on his requests, aren't they?

23  A.   They are.

24  Q.   They are helping him by going to his apartment?

11:25:51AM 25  A.   I would clearly say that they are helping him, yes.

1  Q.   They are letting him out of the car to hide so that he

2  doesn't get caught at his apartment?

3  A.   Why they are letting him out of the car to hide, I don't

4  know.

11:26:02AM 5  Q.   I'm not asking you why.  I'm just asking is that your

6  understanding of what they did.

7  A.   (No response.)

8  Q.   Is that your understanding of what they did?

9  A.   I just told you, I said, I don't know why they let him

11:26:09AM 10  out of the car; but they let him out of the car and he hid.

11  Q.   And they, as he requested, got clothing and a passport

12  for him?

13  A.   Yes.

14  Q.   Okay.  And, in fact, they even went back and made sure

11:26:19AM 15  that he still had his gun?

16  A.   He asked them to go back, yes, to check on the gun.

17  Q.   So, they made sure that he got his gun back?

18  A.   Yes.

19  Q.   Actually, there is some documentary evidence of why they

11:26:37AM 20  let Garfield out.  Page 271 and 272, which is part of

21  Mr. Ford's sworn statement, the second paragraph starts with

22  "While we were driving, Garfield said, 'What I want to tell

23  you, brother, is I made a hit this morning; but it is nothing

24  to panic about because everything is cool.'  When Garfield

11:26:58AM 25  told me this, I knew he did a robbery."

1          And I'm moving down a little bit.  "Then I
2  remembered that Garfield worked at McDonald's.  And I told
3  him, 'You work at McDonald's.  Did you rob that McDonald's
4  that you work at?'

11:27:10AM  5          Garfield told me, 'Yes.  But there's no need to
6  worry because I killed the guy.'

7          I said, 'How do you know you killed the guy?'

8          Garfield said, 'I shot him twice in the head.'
9  Garfield said, 'The gun is on the floor right there.'"

11:27:22AM 10          And then at the end of the page.  "By the time
11  we were on Garfield's side of town, we got on West Bellfort
12  and dropped Garfield off behind a store in a small strip
13  center across from his apartment complex.  Garfield hid in the
14  bushes and me and Gladys went to Garfield's apartment.  He
11:27:41AM 15  made Gladys let him out because he was afraid the police would
16  be at his apartment."

17          Then I'm reading in the middle of the second
18  paragraph on 272, "While we were at the motel, Garfield asked
19  what to do with the pistol.  He said the pistol was in his
11:27:54AM 20  name and he was afraid the police would trace it back to him.
21  Gladys said to give the pistol to Terrol Aldridge and that he
22  would know what to do with it."

23          So, we actually have some account of Garfield
24  seeking rather rationally to solve the problem of how to get
11:28:11AM 25  away without getting caught; isn't that right?

1  A.   Yes.  Eddie Ford's account, that's correct.

2  Q.   Correct.  Garfield actually gave quite a different

3  account to the police after he was arrested, didn't he?  Or

4  are you aware of his account after the arrest?

11:28:29AM 5  A.   According to Eddie Ford, that's correct.

6  Q.   Okay.  This is the same exhibit, Page 60.  This is the

7  interview with Garfield Aldridge.  "Garfield was read his

8  legal rights again, and he stated that he understood.

9  Aldridge was very calm and collected and was furnished several

11:28:47AM 10  cups of coffee at his request."  The subject -- excuse me.

11  "The suspect was asked about the murder and robbery at the

12  McDonald's.  Garfield then went into a lengthy speech about

13  his duty to Allah and his holy journey of which he needed to

14  make.  He admitted being present when Ben Stone was killed but

11:29:05AM 15  would not admit to actually doing the killing.  He stated that

16  since Stone was an infidel, non-Muslim, that it was

17  permissible to kill him and steal the money to achieve his

18  goal.  Garfield's goal was to make contact with the Iranian

19  embassy in Mexico City and then" -- it is not clear what the

11:29:23AM 20  word is -- "to Iran to live in peace as a good Muslim.  Again,

21  he stated that whatever he had to do to get there did not

22  really matter.  It should be noted that while Garfield would

23  liked to have put this entire bad experience off on his

24  religion, he was also very concerned with the evidence against

11:29:42AM 25  him; i.e., fingerprints, witnesses, et cetera.  After a while

1  Garfield decided that he really needed a lawyer more than he

2  needed Allah and ended the interview.  Garfield had been

3  advised that he was under arrest for capital murder and had

4  been filed on for carrying a firearm.  After he ended the

11:29:58AM  5  interview, he was placed in the city jail.  Before leaving,

6  Garfield said that he trusted lawyers even less than he

7  trusted the police and said that he might want to talk in the

8  future."

9               So, once he is arrested, Garfield no longer

11:30:13AM 10  sticks to the plain self-defense story, took the money to make

11  it look like a robbery, does he?  He doesn't say anything

12  about self-defense to the police, does he?

13  *A.*   Not in that passage, no.

14  *Q.*   No.  And, in fact, what he says is that he needs to go to

11:30:30AM 15  an Iranian -- he needs to go to a Muslim country and he stole

16  the money because he needed to fulfill his religious -- his

17  religious destiny, I suppose.  He doesn't use the word

18  "destiny," does he?

19  *A.*   Not in that passage, no.

11:30:45AM 20  *Q.*   And he says that it is okay that he killed the manager --

21  or that it is okay that the manager was killed because the

22  manager was not a Muslim?

23  *A.*   That's implying.  I don't know that he said that

24  specifically, but he said that he would do whatever it took to

11:31:01AM 25  achieve his goal.

1 *Q.* And he does not admit to committing the murder himself?

2 *A.* Right.

3 *Q.* So, that's another different version from what he told

4 Dr. Quijano. Didn't he tell Dr. Quijano that he did commit

11:31:14AM 5 the murder but it was because he had to prevent the sexual

6 assault from happening in the future?

7 *A.* No. My understanding is that -- reading his report, is

8 that he didn't commit the murder, that the murder was

9 committed through him.

11:31:27AM 10 *Q.* Well, that's what he told you. That's not what he told

11 Dr. Quijano. What he told Dr. Quijano is that he committed --

12 *A.* Could I refer to Dr. Quijano's report? Can I have that

13 in front of me?

14 *Q.* Sure.

11:31:44AM 15 I'm not sure which exhibit number Dr. Quijano's

16 report is.

17 MS. HAYES: 12 for us, 8 for them.

18 BY MS. ODEN:

19 *Q.* Respondent's Exhibit 12, Petitioner's Exhibit 8. I'm

20 showing you pages -- and there's some faxed pages numbered at

21 the top. I'm referring to the page numbers that are at the

22 bottom of his report. I'm looking at Pages 4, 7, and 8. If

23 you need to see the whole report, you can; but I have

24 underlined some portions.

11:32:10AM 25 Under "rational understanding" what I have

1  underlined is that "because he violated written laws by taking

2  a life for which he will be judged."

3  A.   But that's Dr. Quijano's interpretation and rewording.

4  Those also weren't the words by Mr. Aldridge.

11:32:24AM  5  Q.   You're right.  And we don't have Mr. Aldridge's words, do

6  we?

7  A.   Yes, he did, in the statement where he is talking.

8  Q.   What I am saying is we don't have an audio recording or a

9  video recording of that interview, do we?

11:32:37AM 10  A.   No.  But I am saying that this line that you're

11  underlining in that paragraph, there is a summary statement by

12  Dr. Quijano.

13  Q.   Correct.  And we don't know for sure that any of these

14  words are exactly what Mr. Aldridge spoke.  This is all what

11:32:50AM 15  Mr. -- what Dr. Quijano wrote down as coming from

16  Mr. Aldridge.

17  A.   Right.  Right.

18  Q.   Right.

19  A.   But there's a difference between what is written down and

11:32:58AM 20  what he is attempting to quote that Mr. Aldridge is saying

21  versus something that he is saying.

22  Q.   So, on Page 7, we see, "Rulford was about to blow off the

23  killing when the victim and the spirits took control and

24  repeated that he, the victim, would not stop sexually

11:33:12AM 25  assaulting him until he was killed.  That built Rulford's

1  anger up; and with the guy's control of Rulford by blackout,

2  Rulford became even more angry and asked himself what kind of

3  God has he surrendered himself to.  Rulford drew the pistol

4  and called the victim who had previously told him not to

11:33:29AM 5  prepare the grill.  The victim asked him not to shoot.  And he

6  told him to open the safe because he would not touch it

7  because he was not a thief since he was a part owner as a

8  shareholder.  The victim loosened his tie and assumed a

9  running position and asked the guy to make Rulford to drop his

11:33:45AM 10  gun.  Rulford then asked himself how he could get out of the

11  situation and thought he could not back off then since he was

12  in deep.  Rulford then told the victim to lay down on the

13  floor.  He walked to the office, still not wanting to touch

14  the safe, walked back to the victim and shot him once, backed

11:34:02AM 15  off and looked down on him.  He said to the victim, 'Tell me

16  this is not blood, Ben, and you are not dead.'  A strange

17  feeling fell all over him and he thought of walking away, but

18  the guy told him to get the safe and money and he did and

19  turned to walk away.  A spirit from the victim's body or an

11:34:20AM 20  imitation of him said that he was not dead and for Rulford to

21  come back and finish the job.  Otherwise, he would call the

22  authorities on him.  Rulford resisted because he was not

23  barbaric and criminal.  At this time Rulford interrupted his

24  narration because the guy told him in his left ear that before

11:34:37AM 25  he put the gun to the victim's head, he should think of a way

1   to get out of this.  But then the victim told him to do it

2   right and pull the trigger.  Rulford then knelt down and shot

3   the victim again."

4           So, in Rulford's words, as recorded by

11:34:52AM 5   Dr. Quijano, Rulford committed the murder.  He was being told

6   to do it by the spirit and by the spirit in the victim's body,

7   but Rulford pulled the trigger; is that right?

8   *A.*  But it seems to be that he is having an argument with

9   this voice, that this voice is urging him to do things that go

11:35:13AM 10  against what he wants to do.

11   *Q.*  He's definitely -- the story that he is pitching to

12   Dr. Quijano is definitely that he is doing it at the urging of

13   the spirits?

14   *A.*  Right.  That he's not doing it intentionally.  The

11:35:22AM 15  purpose and the intention of the act is not his.  It is the

16   commands and the hallucinations.  He is doing it because he

17   cannot stop doing it from this voice.  So, he appears to be

18   fighting with it and losing the fight.

19   *Q.*  That's what you got out of that?

11:35:35AM 20  *A.*  Yes.

21   *Q.*  But nowhere in there does it say Rulford didn't do it,

22   the spirit did it in him, did it?

23   *A.*  Yes, it did on the top line of the second paragraph.

24   *Q.*  Okay.  Would you say speaking -- looking at this case

11:35:53AM 25  chronologically, that Mr. Aldridge's symptoms are worsening

1  over time?

2  A.    I think it seems that he has a severe delusional network

3  that has been severe throughout the case and prior to the

4  case, during the case, and after the case.

11:36:17AM  5  Q.    So, that's a no, it is not getting worse?

6  A.    Yes.  I don't know that it appears to be getting worse.

7  Q.    Do you think his symptoms have been as bad throughout

8  time as they are now?

9  A.    Yes.  I think there are indications that that is true,

11:36:37AM 10  yes.

11  Q.    Is it possible to be -- to have schizophrenia and still

12  be competent?

13  A.    That's a debatable question.

14  Q.    Okay.  But I would like to know your opinion.

11:36:49AM 15  A.    I think if a patient with schizophrenia is treated and on

16  medication, yes, that it is likely they can be competent,

17  although it is not always the case.  If they're treated on

18  medications, they are competent.  And I think there may be

19  some cases, depending on the type of symptomatology that a

11:37:05AM 20  patient with schizophrenia has; but I believe most patients

21  who are untreated for schizophrenia would likely be

22  incompetent.

23  Q.    Okay.  What is -- are you familiar with the literature

24  that addresses the relationship between patients with

11:37:21AM 25  schizophrenia and their competence to stand trial?

A.   Some of it, yes.  I'm sure not all of it.

Q.   What is the correlation between having schizophrenia and being competent to stand trial?

A.   The actual number?

11:37:34AM  Q.   Yes.

A.   That I don't know.

Q.   You are not familiar with the range?

A.   No.

Q.   Let's talk about the time line of the development of

11:37:44AM  Mr. Aldridge's schizophrenia.  Did I understand correctly that you said 1980 is when -- how did you describe what happened in 1980?

A.   Yeah.  There seems to be an indication from reports that there was some change in his behavior and a change in his

11:37:59AM  writings during that period when he was in prison in the early 1980s.

Q.   Okay.  That's also based on the defendant's account, on Mr. Aldridge's own account, in 1990, looking backwards; is that right?

11:38:14AM  A.   Some of that, yes.

Q.   Okay.  So, we're looking basically at two kinds of evidence to support that, what the family says about his letters coming out of prison --

A.   Right.

11:38:23AM  Q.   -- and his own accounts from 1990, after he's been

1  arrested, convicted, and sent to death row.

2  A.   Right.  And the LPC's evaluation, also, in T.D.C. in June

3  of 1990 also states that there could be a 10-year history.

4  Q.   Right.  And that's based on Mr. Aldridge's self report?

11:38:47AM  5  A.   In part.  And I don't know what records she had to

6  review, as well.

7  Q.   Did you make any effort to find those records?

8  A.   I wasn't able to contact that person.

9  Q.   Okay.  Did you try to contact that person?

11:38:58AM 10  A.   I did not.

11  Q.   Okay.  You are aware that in 1975, Mr. Aldridge was

12  telling people in prison that he saw bugs on the bread and was

13  picking through the bread?

14  A.   Yes, I did read that.

11:39:10AM 15  Q.   Did you -- what kind of data did you believe that to be,

16  evidence of delusions or a reasonable reaction to literally

17  seeing bugs on the bread?

18  A.   Well, in the reports there were other people there who

19  were writing in that -- the writings that I saw that there

11:39:28AM 20  were no bugs, that the individual who had just set them out on

21  the food tray had just opened a new pack and there were no

22  bugs.  So, that certainly could be an indication of a visual

23  hallucination.

24  Q.   Okay.  So, maybe his schizophrenia didn't start in 1980?

11:39:46AM 25  A.   That's possible.  I mean, there are some reports that it

1  was as far back as childhood.

2  Q.   Okay.  But he was able to successfully complete his GED,

3  which happened in February of 1980?

4  A.   In prison, yes.

11:39:55AM 5  Q.   In prison, correct.

6  A.   That's my understanding.

7  Q.   And the notes in his medical records from T.D.C.J. on his

8  prior incarcerations, 1990 -- 1981, excuse me, indicate that

9  his neuropsych status is normal.  Are you familiar with those?

11:40:13AM 10  A.   I am not.

11  Q.   Did you see his records from his prior incarcerations?

12  A.   From T.D.C.J.?

13  Q.   Uh-huh.

14  A.   Yes, I did see them.  I looked through those, yes.

11:40:24AM 15  Q.   Okay.  So, you didn't notice that in his medical records

16  from those prior incarcerations, for example, on

17  December 27th, 1981, which is found at prior medical records

18  T.D.C.J., Page 33, that his neuropsych status was normal?

19  A.   No.  I do not recall seeing that.

11:40:42AM 20  Q.   Okay.  Or on Page 36, which was from March 5th, 1982,

21  that his neuropsych status is good?

22  A.   Is it neuropsychology or neuropsychiatric?

23  Q.   Neuropsychological.

24  A.   And was there a neuropsychological report or data present

11:41:00AM 25  there?

1  Q.   Those are the notes in his medical records.

2  A.   No.  I am not familiar with those.

3  Q.   Are you familiar that April 8th, 1983, that he is noted

4  to be -- I'm sorry -- November 14th, 1983, he is noted to be

11:41:13AM  5  very coherent and concise.  This is from his prior records,

6  Page 120, and classification records, Page 177.

7  A.   I would believe you if that's what they say.

8  Q.   Okay.  In fact, I could give you a list of dates

9  throughout 1983 and 1984 in the records where he's noted to

11:41:32AM 10  have normal neuropsychological status.  Would that affect your

11  opinion at all?

12  A.   I would have to see the data that goes along with that.

13  If that's just the -- the records that I reviewed from his

14  medical status in the mental health visits to his jail cell

11:41:45AM 15  have no data.  They weren't able to conduct interviews.  No

16  assessments were done, as far as I'm aware.  There's no data

17  to back up any of those statements.  They would come by and,

18  you know, ask a question:  Are you doing okay?  You know, the

19  patient says he is doing fine.  He refuses, you know, an

11:42:00AM 20  evaluation.  So, there was no data.

21  Q.   Okay.  One of the things that you pointed out as evidence

22  or an indication that he was schizophrenic and not in touch

23  with reality was that his hygiene was declining?

24  A.   Uh-huh.  That can be a sign, yes.

11:42:15AM 25  Q.   But we know, at least from his own statements, that he

1  wasn't shaving in prison because he was a Muslim; isn't that

2  right?

3  A.   Yes.

4  Q.   And at one point he even says he is not shaving because

11:42:26AM  5  he wants to see a skin specialist.  Are you aware of that?

6  A.   He had complaints about his skin, yes.

7  Q.   Are you aware that often African American men, when they

8  shave, get a dermatitis?

9  A.   Yes.

11:42:38AM 10  Q.   Okay.

11  A.   It wasn't just the shaving.  It was the bathing,

12  showering.

13  Q.   Okay.  And are you aware that in, again, his prior

14  incarceration medical records, May 23rd, 1986, which is

11:42:50AM 15  Pages 54 and 55, that the prison staff noted that he is

16  exhibiting manipulative behavior?

17  A.   I'm aware of those reports, yes.

18  Q.   But that doesn't affect your opinion, or does it?

19  A.   That doesn't.  That's their interpretation of his

11:43:05AM 20  behavior, yes.

21  Q.   Okay.  Let's talk a little bit about his ability to

22  communicate with counsel.  Unfortunately, I wasn't present for

23  Mr. Davis' testimony this morning.  But one of the primary

24  things that you relied on is Mr. Bates' testimony at trial in

11:43:23AM 25  the punishment phase; is that right?

1  *A.*   Yes.

2  *Q.*   Where he says that sometimes he wasn't able to

3  communicate with him?

4  *A.*   Uh-huh.

11:43:28AM  5  *Q.*   And he answered "yes" when he was asked one question

6  about a conversation, whether or not it was rational.  He said

7  it was not rational.

8  *A.*   Okay.

9  *Q.*   I mean, that was something you were relying upon, right?

11:43:40AM  10  *A.*   I did rely on Mr. Bates' testimony, yes.

11  *Q.*   Okay.  So, again, you didn't make any effort to talk with

12  Mr. Bates about what that meant?

13  *A.*   I said I don't recall if I did or not.

14  *Q.*   Well, if you had, you would have made note of it, right,

11:43:53AM  15  because that would be important information in this kind of

16  case?

17  *A.*   Well, I didn't have it noted in my report that I had

18  attempted to meet with Mr. Davis; and I had.

19  *Q.*   Okay.  So, do you think you would have remembered getting

11:44:05AM  20  in contact with Mr. Bates?

21  *A.*   If I would have gotten into contact with him, I would

22  have remembered that.

23  *Q.*   Okay.  Dr. Quijano actually said -- not that Mr. Aldridge

24  was not competent; but he said, hypothetically, Mr. Aldridge

11:44:21AM  25  wouldn't be competent if Mr. Bates' testimony was accurate and

1  reflected the majority of his interactions.  Do you recall

2  that?

3  A.   He said -- Dr. Quijano said most, yes.

4  Q.   Have you taken into account the motive behind Mr. Bates'

11:44:38AM  5  testimony in evaluating whether or not his testimony was

6  accurate?

7  A.   Yes, I did.

8  Q.   What do you believe Mr. Bates' motivation was for

9  testifying the way he did?

11:44:48AM 10  A.   Well, I think they used that during the punishment phase,

11  as Mr. Davis suggested, to try to get some sympathy from the

12  jury so that they wouldn't inflict the death penalty.

13  Q.   And what effect does that have on your evaluation of

14  whether Mr. Bates' testimony is accurate?

11:45:02AM 15  A.   That I don't doubt at all the accuracy of his report.

16  That doesn't change my ability to assert that he was accurate

17  and would testify truthfully.

18  Q.   Okay.

19  A.   He was under oath.

11:45:15AM 20  Q.   Mr. Davis was under oath when he said that Mr. Aldridge

21  was able to communicate and was able to understand what was

22  going on?

23  A.   Are you talking about his testimony today and on Friday?

24  Q.   Yes.

11:45:26AM 25  A.   He testified that he doesn't remember much about that,

1   and he was estimating and trying to come up with answers to

2   questions that he primarily testified that he does not

3   remember any of those interactions.

4   Q.   Since I wasn't present for today's testimony, I can only

11:45:38AM  5   speak about Friday.  But on Friday didn't he testify that he

6   didn't remember specific questions or answers or conversations

7   but that Mr. Aldridge was able to communicate rationally with

8   him?

9   A.   He's surmising that he was able to, yes; but he has no

11:45:54AM 10   evidence to back that up.

11   Q.   And didn't he, in fact, testify that he never felt

12   hostility from Mr. Aldridge and never felt that Aldridge

13   thought he was part of a conspiracy?  Do you recall that on

14   Friday?

11:46:08AM 15   A.   He stated that he never felt like he was hostile towards

16   him at all.  Yes, that is correct.

17   Q.   Do you recall him also testifying that he did not get the

18   impression from Mr. Aldridge that Aldridge thought he was part

19   of a conspiracy?

11:46:20AM 20   A.   He stated that he does not recall Aldridge ever saying to

21   him directly that he was part of a conspiracy because he said

22   that if he did, he would have said something to the Court but

23   he does not recall that specifically.

24   Q.   And you recall that what Mr. Aldridge said to Dr. Quijano

11:46:35AM 25   about his own attorneys was that he wasn't sure and he was

1  going to wait and see if he could trust them?

2  A.   Right.  At that point, yes.

3  Q.   And do you recall --

4  A.   That was prior to the trial is my understanding.

11:46:47AM 5  Q.   I'm sorry?

6  A.   That information that Dr. Quijano got was prior to the

7  trial.

8  Q.   Correct.  It was.

9           And you recall that Mr. Davis testified that he

11:46:55AM 10  was always able to redirect Mr. Aldridge when they were

11  starting to ramble in their communications?

12  A.   He may have said that on testimony, yes.

13  Q.   But you don't find that to be inconsistent with your

14  conclusion?

11:47:09AM 15  A.   Of incompetence?

16  Q.   Yes.

17  A.   No, I don't find that inconsistent.

18  Q.   So, you are capable of concluding with a reasonable

19  degree of scientific certainty that Mr. Aldridge was not

11:47:21AM 20  competent even though his own attorney testified that he was

21  able to communicate with him and that he was able to redirect

22  him and get rational information from him?

23  A.   From the information that was available from the time of

24  the trial -- around the time of the trail, which is the

11:47:38AM 25  testimony of Mr. Bates, that does not appear to be case.  And

1  in Mr. Davis' testimony now, he continually asserts that he

2  does not remember any of those direct conversations; and he

3  himself admits in his affidavit that the testimony and

4  information available closer to the time of trial would be

11:47:55AM  5  more accurate than his recollection at this time.

6  Q.   So, the competency case then hangs on those sentences of

7  Mr. Bates in the punishment phrase.  That is what you hang

8  your conclusion on.

9  A.   That is a part of the data that I utilized, yes.

11:48:13AM  10  Q.   And the rest of the data that you utilized is how

11  incompetent Mr. Aldridge is right now?

12  A.   Yes.  And all the evidence that was present, in terms

13  of -- for describing his mental illness or pertaining to his

14  mental illness prior to the time of the crime, during the

11:48:30AM  15  crime, and subsequent to that is the other information I used.

16  Q.   There are some other inconsistencies between what data we

17  can observe and things that are reported.  You mention that

18  Mr. Aldridge says he has experienced command hallucinations to

19  hurt himself; is that right?

11:48:47AM  20  A.   To hurt himself?

21  Q.   Yes.  That was your testimony on direct examination on

22  Friday.

23  A.   I don't recall saying that he has command hallucinations

24  to hurt himself.

11:49:00AM  25  Q.   Okay.  So, do you recall him ever expressing that to you?

1   *A.*   Can you give me the context of that?

2   *Q.*   You were describing some of his command hallucinations.

3 Has he ever told you that he had command hallucinations to

4 hurt himself?

11:49:18AM 5   *A.*   I don't recall any command hallucinations to hurt

6 himself.

7   *Q.*   Okay.  So, if I misheard that, I apologize.

8            You also stated that an increase in

9 environmental stress would cause an increase in the expression

11:49:38AM 10 of his symptoms; is that right?

11   *A.*   They would cause an increase in the severity of his

12 delusions.

13   *Q.*   Okay.  Reentry into the department of criminal justice

14 going on to death row should have made him a lot worse, right?

11:49:53AM 15   *A.*   It potentially could have.

16   *Q.*   Why would it maybe not have?  He's not getting treated,

17 right?

18   *A.*   Right.  He's not get treated.

19   *Q.*   He's not getting medication.  He's not getting therapy or

11:50:09AM 20 counseling.

21   *A.*   He was already familiar because of the years he spent in

22 the criminal justice system during his prior incarceration.

23   *Q.*   Okay.  You mention that he stuck with his story of being

24 beaten in jail despite all the evidence to the contrary, and

11:50:24AM 25 that is evidence that he was -- that that was part of his

1  fixed delusional system; is that right?

2  A.   Are you talking about his testimony in regards to his

3  confession?

4  Q.   Correct.

11:50:34AM  5  A.   Yes.

6  Q.   But he does change his story when confronted with the

7  photographic evidence, correct?  He changes where he says the

8  beating took place?

9  A.   Right.  He goes back and forth between the county and the

11:50:47AM 10  city jail.

11  Q.   And then they are showing him a picture of when he was in

12  the city; and he says, "No.  It was in the county that I was

13  beaten."

14  A.   Uh-huh.

11:51:00AM 15  Q.   If schizophrenia is a permanent condition, why does the

16  DSM talk about partial remission?

17  A.   What do you mean?  Partial remission is not a complete

18  removal or absence of symptoms.  It is a significant decrease

19  in the presence of symptoms so that the person can be more

11:51:25AM 20  functional, and that's typically with medication.

21  Q.   Okay.  So, it is possible --

22  A.   That doesn't argue against a life-long chronic condition,

23  as it says.

24  Q.   Sure.  Kind of the way that a person might always be an

11:51:38AM 25  alcoholic but they may not drink for years, correct?

1  A.   No.  I would not argue that's the same as that.

2  Q.   Okay.  But it is similar, isn't it?

3  A.   Perhaps the concept is similar.

4  Q.   Okay.  Mr. Aldridge was not floridly psychotic in intake

11:51:57AM  5  on death row, was he?

6  A.   I'm sorry?

7  Q.   Mr. Aldridge was not floridly psychotic, actively

8  experiencing hallucinations, when he was taken into death row,

9  was he?

11:52:08AM 10  A.   I don't know.

11  Q.   Well, if you read in the T.D.C.J. clinic notes on his

12  intake that he said:  My attorneys didn't do a good job

13  representing me.  They didn't even bother to let me testify.

14  I have great grounds for an appeal, that would indicate some

11:52:24AM 15  rational thoughts going on, wouldn't it?

16  A.   Not necessarily.  Again, it depends on what his

17  delusional thinking is at the time; and nobody questioned him

18  about that.

19  Q.   Okay.  So, he might have had delusions when he was being

11:52:36AM 20  taken into death row and just not talking about them?

21  A.   That could certainly be.

22  Q.   Okay.  So, he might be able to express himself rationally

23  and understand the legal situation and not be capable of

24  expressing his hallucinations at the same time?

11:52:56AM 25  A.   He could certainly present himself in what would appear

1  to be a rational manner.

2  Q.   Okay.

3           THE REPORTER:  I didn't hear that.  I'm sorry.

4           THE WITNESS:  I said he could certainly appear to be

11:53:01AM  5  expressing himself in what would appear to be a rational

6  manner.

7  BY MS. ODEN:

8  Q.   One of the things that you emphasize was that

9  Mr. Aldridge has poorly adopted to life inside the prison.

11:53:41AM 10  You mentioned that there were many times that he refused to

11  work.  He demonstrated apathy, et cetera; is that right?

12  A.   Yes.

13  Q.   And to you that is an indication of his continuing

14  schizophrenia?

11:53:53AM 15  A.   It can be.

16  Q.   Okay.  It could also be symptoms of being an antisocial

17  personality, couldn't it?

18  A.   Yes.

19  Q.   You mention that when he was in the real world, he had a

11:54:06AM 20  hard time holding down a consistent job; is that right?

21  A.   Right.  So, it appears that we have to assess that, yes.

22  Q.   Right.  And many of those jobs were menial jobs?

23  A.   (Witness nods head.)

24  Q.   She can't take down a nod.  So, if you'll --

11:54:21AM 25  A.   Oh, yes.  Sorry.

1  Q.   And he moved around to a lot of different residences?

2  A.   Yes.  That's correct.

3  Q.   Lived with some family members for brief periods and

4  other family members; is that right?

11:54:32AM 5  A.   That's correct.

6  Q.   Okay.  But that also could be a result of an antisocial

7  personality?

8  A.   Potentially, yes.

9  Q.   I mean, he was in prison from the time he was 17, for

11:54:43AM 10  14 years.

11  A.   Uh-huh.

12  Q.   So, he really didn't have much work history?

13  A.   Right.

14  Q.   Didn't really have a whole lot of life skills from living

11:54:51AM 15  on his own?

16  A.   Right.

17  Q.   But he was able to get a GED while he was in prison?

18  A.   In prison, yes.

19  Q.   And while he was in prison, he was able to get an AAS

11:55:00AM 20  degree, some kind of Associate's degree; is that right?

21  A.   I could find no evidence for that.  That was mentioned in

22  somebody's statement, Dr. Allen's, I believe; but I found no

23  evidence for that.

24  Q.   Did you find the records that indicated he was studying

11:55:15AM 25  welding and some kind of plumbing while he was in prison?

```
 1   A.   Nothing on welding but plumbing, yes.
 2   Q.   Okay.  So, you did find records indicating he was
 3   studying -- I think it was to be a plumber's helper.  I'm not
 4   really sure.
 5            MR. RYTTING:  Can I get a time frame?
 6            MS. ODEN:  While he was in prison.  They don't train
 7   people on death row.  They don't give them education on death
 8   row.
 9            MR. RYTTING:  What period are we talking about?
10            MS. ODEN:  Sometime between when he was 17 and when
11   he was released from prison.  I don't have a date off the top
12   of my head.  I'm sorry.
13   BY MS. ODEN:
14   Q.   Ultimately, we all agree that Mr. Aldridge is
15   schizophrenic right now; is that right?
16   A.   Yes, I believe so.
17   Q.   The real question this Court is going to have to figure
18   out is how schizophrenic was he at the time of trial; is that
19   right?
20   A.   I think the Court -- did you say how schizophrenic he
21   was?
22   Q.   Right.
23   A.   A person is either schizophrenic, or they're not.  Either
24   have schizophrenia, or they don't.
25   Q.   Well, how severely his symptoms were affecting him at the
```

11:55:28AM (line 5)
11:55:38AM (line 10)
11:55:51AM (line 15)
11:56:04AM (line 20)
11:56:12AM (line 25)

1  time of trial and at the time of the crime?

2  A.   That's correct.

3  Q.   Who was in the best position to make those observations,

4  you or the people that were around him at that time?

11:56:33AM 5  A.   What do you mean by "the people that were around him at

6  the time"?  Which people are you referring to?

7  Q.   Family, his attorneys, Dr. Quijano.  Who was in the best

8  position to --

9  A.   Dr. Quijano.  He's a professional.

11:56:48AM 10  Q.   Well, who was in the best position to make observations

11  of how Mr. Aldridge was at that time?

12  A.   Family members who were -- saw him on a day-to-day basis

13  from 1986 to 1990.

14  Q.   Well, we're talking about at the time of the crime and at

11:57:00AM 15  the time of the trial.

16  A.   Uh-huh.

17  Q.   So, people who were around him back then were in a better

18  position to make those observations than you are; is that

19  right?

11:57:10AM 20  A.   Well, I think my observations aren't relevant because of

21  the diagnosis of schizophrenia that he was given prior to the

22  trial.  But, yes, the people around at the time would have the

23  best observations of his behavior.

24        MR. ODEN:  For the record, James, the plumbing

11:57:26AM 25  certificate is found in the educational records, Page 9 to 15;

1   and it is dated August 20th, 1974.

2           MR. RYTTING:  Thank you.

3           MS. ODEN:  No other questions at this time, Your

4   Honor.  Thank you.  Thank you, Doctor.

11:57:54AM  5           THE COURT:  All right.  Thank you.  This might be a

6   good opportunity to take our lunch break.  Why don't we

7   reconvene at 1:00 o'clock?  Thank you.

8           (Lunch break)

9           THE COURT:  All right.  Doctor, do you want to come

01:06:26PM 10   back on the witness stand, please?

11           All right.  Mr. Rytting.

12                   **REDIRECT EXAMINATION**

13   **BY MR. RYTTING:**

14   Q.   Dr. Mosnik, we started your redirect with a couple of

01:06:49PM 15   questions about the investigation and the people that you

16   talked to and, more particular, the person you didn't talk to,

17   which was Mr. Randolph Bates the second chair in this trial.

18           Is it possible that the reason why you didn't

19   contact Mr. Bates or -- is that you were informed by counsel

01:07:10PM 20   that he didn't have anything to say in this case and doesn't

21   remember anything about Mr. --

22           MS. ODEN:  Objection, leading.

23           THE COURT:  Sustained.

24   BY MR. RYTTING:

01:07:19PM 25   Q.   What have you learned since that Mr. Bates has filed

1 regarding -- filed in response to a subpoena from respondent

2 regarding his knowledge of anything in this case?

3 A.   I was informed by defense counsel -- by you,

4 Mr. Rytting -- that he had filed an affidavit stated that he

01:07:38PM 5 did not have any records and had no recollection whatsoever of

6 the events surrounding the trial.

7 Q.   And on cross-examination respondent asked you questions

8 about a proceeding in Judge Harmon's court involving a

9 defendant named Daniel Yeh, I believe.

01:08:04PM 10 A.   Yes, that's correct.

11 Q.   And in what state of the proceedings were you providing

12 an expert opinion?

13 A.   During sentencing.

14 Q.   And was -- were you -- did you provide a -- were you the

01:08:23PM 15 only expert that provided an opinion, or were you part of a

16 team?

17 A.   No.  I was part of a team.

18 Q.   And what was the -- what was the opinion of the team

19 members?  Was it consistent with yours?

01:08:42PM 20 A.   Yes.  We all shared the same opinion.

21 Q.   And who was on that team?

22 A.   Dr. Robert Grossman, who is the chair of neurosurgery at

23 Baylor, had been for many years the neurosurgeon on the case;

24 Dr. Eugene Lai, a neurologist in the department of neurology

01:09:00PM 25 at Baylor College of Medicine here in Houston; and

1    Dr. Victor Serrano, a forensic expert.

2    Q.    And in Mr. Colburn's case, the government also indicated

3    that there was some disagreement between your position about

4    his competency to stand trial, I believe, and that of several

01:09:30PM  5    other experts, Dr. Axelrod and Dr. Carmen Pesell and

6    Dr. Quijano.

7    A.    She did state that, yes.

8    Q.    And how accurate of a statement was it, given your review

9    of an affidavit of Dr. Axelrod?

01:09:55PM  10    A.    In reviewing the documentation since that questioning by

11    counsel, I have come across that affidavit where, in fact, it

12    suggests -- it, in fact, states that Dr. Axelrod agreed with

13    my finding.

14    Q.    Of incompetency?

01:10:11PM  15    A.    Of incompetency, that's correct.

16    Q.    And when it came to the -- and so to with Dr. Quijano?

17    A.    That is correct.

18    Q.    And was -- there was also a statement about whether

19    she -- there was a disagreement about your finding of

01:10:30PM  20    incompetent or incompetence to be executed, and the suggestion

21    was that these experts disagreed.  Did any of them formulate

22    an opinion about his competency after the execution date --

23    I'm talking about Axelrod, Dr. Quijano, or Dr. Pesell.

24    A.    They did an evaluation for a competency to stand trial.

01:10:59PM  25    Q.    Let me ask you, was there a -- did they come to any sort

1  of opinion after that execution date was set in Mr. Colburn's

2  case about his competency?

3  A.   No, not that I am aware of.

4  Q.   Is it your understanding that that is when the issue was

01:11:14PM  5  appropriately addressed as when there is an execution date?

6  A.   That is correct.

7  Q.   Now, opposing counsel has suggested that Mr. Aldridge has

8  been changing his story in response to what stage of the

9  proceedings he's in; that prior to his arrest, he -- well --

01:11:53PM 10  that prior to his arrest, he had one story and afterwards he

11  changed his story.

12          What have you seen in the record that indicates

13  that he's had a consistent -- expressed consistent thoughts

14  and accounts of what happened on the day of the crime?

01:12:17PM 15  A.   I would say that his story has been consistent, that the

16  presence of delusions and the content and type of delusions in

17  his presentation has been consistent prior to, during, and

18  following the crime.

19  Q.   And what is the basis -- what in particular is the basis

01:12:37PM 20  of this conclusion?

21  A.   I'm sorry.  I'm not understanding the question.

22  Q.   Are his writings an indication that -- one of the things

23  you reviewed?

24  A.   Yes, I did review his writings extensively.

01:12:54PM 25  Q.   And were there any in particular that showed a consistent

1  pattern?

2  *A.*   Yes.   He had writings in August of 1989.   He had writings

3  in possession on January 6th of 1990 prior to his arrest.   He

4  had writings throughout 1990 following his arrest and the

01:13:16PM  5  trial.

6  *Q.*   And what do you recall about, in particular, the writing

7  dated January 1, 1990 -- January 6th, 1990, that supports the

8  conclusion that he's had a consistent story -- a consistent

9  and delusional story about the circumstances of the murder and

01:13:43PM  10  his legal situation?

11  *A.*   The themes, the content inherent in that letter were very

12  consistent with those reported in the 1989 letter that he

13  wrote to Dubai, talking about Nazis and blacks, some prisoners

14  being released from the prison; support of the guards and

01:14:06PM  15  people releasing these prisoners to harm him, to physically

16  abuse him, to molest him, inflict pain upon him, torture him.

17  Those were consistent themes throughout his writings and

18  present in the January 6th, 1990 letter, as well.

19  *Q.*   And the January 1, 1990, letter, if I -- is it correct to

01:14:32PM  20  say that that was written during -- during the course of his

21  flight?

22  *A.*   Right.   That is correct.

23  *Q.*   And what did it tell you, if anything, about the --

24  whether his flight was pursuant to a rational plan?

01:14:52PM  25  *A.*   Right.   He was making statements that these voices were

1  continuing to talk to him; that he was receiving command

2  hallucinations that were guiding his behavior; that he was

3  being forced to return back to Houston, which he did.

4           MR. RYTTING:  May I approach?

01:15:22PM 5           THE COURT:  You may.

6  BY MR. RYTTING:

7  Q.   Would it help you to look at this writing?

8  A.   Yes, it would.  Thank you.

9      (Pause)

10  BY MR. RYTTING:

11  Q.   Dr. Mosnik, while I'm looking for my version of that

12  writing, is there any particular passages within the

13  Defendant's Exhibit No. 3 that reflects disorganized thinking

14  regarding his flight and the situation in this exhibit, in

15  Exhibit 3?

16  A.   Yes, I would say it does.  In addition to the delusional

17  content in that letter, he has some specific episodes where he

18  endorses thought blocking, that he's having difficulty

19  continuing, that thoughts are being blocked from his mind,

01:17:16PM 20  that he's not able to go on, that the spirits are causing

21  great pain for him to continue so that his thoughts are

22  actually being blocked, that he's being influenced by the eyes

23  of many spirits that are leading him into great pains and

24  suffering.

01:17:36PM 25           So, there's numerous references to a variety of

1   different types of psychotic symptoms and influence over his

2   thoughts and actions.

3   Q.   And are these -- the expressions that you find in this

4   writing, in Petitioner's Exhibit No. 3, are they consistent

01:17:56PM 5   with what Dr. Quijano found when he interviewed him on

6   March 26, 1990?

7   A.   Yes, they are.

8   Q.   And in what way are they consistent?

9   A.   The themes of his delusion are the same; the content in

01:18:17PM 10   terms of being influenced by spirits, hallucinations, telling

11   him to do things; the pain in his ear caused by these

12   symptoms, these influences, the hallucinations, and the

13   delusions; the belief about being sexually assaulted,

14   molested.

01:18:44PM 15   Q.   And you are aware, too, that on cross-examination the

16   respondent suggested that Mr. Aldridge, when he went into the

17   Texas Department of Criminal Justice, gave -- suggested that

18   some of his statements indicated he had an understanding of

19   the appellate process and appreciated what he might raise on

01:19:12PM 20   appeal?  Do you recall that testimony?

21   A.   I do.

22   Q.   And have you had opportunity to review a writing dated

23   August 30th, 1990, that called some of that into question?

24   A.   Yes.

01:19:23PM 25   Q.   Okay.  And what was --

1          MS. ODEN:  What was the date, again, Mr. Rytting?

2          MR. RYTTING:  I believe it's August 30th.

3    BY MR. RYTTING:

4    Q.   That would be our Exhibit -- our Exhibit 30.  It is

01:19:43PM  5    referred to by Mr. Aldridge as the contempt motion, Motion for

6    a Contempt Judgment.

7    A.   Yes.

8          MS. ODEN:  I'm sorry.  What year was that?

9          MR. RYTTING:  I believe it was 8/30/1990, is the

01:20:05PM  10   date on this.

11   BY MR. RYTTING:

12   Q.   And so, that was --

13         MR. RYTTING:  If I may approach.

14         THE COURT:  Yes.

15   BY MR. RYTTING:

16   Q.   And how, in general, do you describe this document, the

17   contempt motion?

18   A.   Well, I think that he did an excellent job of copying the

19   format.  I mean, he copied down to the exact -- the intricate

01:20:36PM  20   details of the little designs that are used on legal

21   documents, the symbols, the title page, everything he has

22   tried to lay out exactly like he saw in the medical records

23   that he was reviewing -- excuse me, not the medical records --

24   the legal documents that he was reviewing.  So, he did an

01:20:55PM  25   excellent job of copying it and trying to present it in the

1  same format as legal documents that he has reviewed.

2            However, his argument, as he goes on -- and you

3  can see it is rather extensive -- he is not able to maintain a

4  coherent line of thought.  It is not logical and rational but

01:21:17PM  5  incorporates significant delusional ideation and, as I said,

6  does not portray a consistent and logical sequencing of events

7  and thoughts coming to a rational conclusion and request.

8  Q.   Is it fair to characterize the content of this document

9  as replete with delusions and hallucinatory experiences?

01:21:40PM 10  A.   Absolutely.  As well as thought blocking, yes.

11  Q.   And have you had an opportunity to review some other

12  documents drafted by Mr. Aldridge in this case that he

13  submitted as pleadings?

14  A.   Yes, numerous other documents.

01:22:02PM 15  Q.   And some of which are contained in the boxes back here?

16  A.   Yes, that's correct.

17  Q.   What is a consistent pattern that you see in the

18  documents that Mr. Aldridge has filed or -- especially the

19  ones in which he attempts to explain his legal problems and

01:22:24PM 20  his legal situation?

21  A.   The delusional content of -- that he has a belief that

22  these prisoners have been released, that they are torturing

23  him, that legal representatives -- including guards, lawyers,

24  judges -- are incorporated into this schema and are a part of

01:22:48PM 25  this entity, I guess, if you will, working against him,

1  collaborating against him; that his information and evidence

2  isn't being presented in court; that there's no consistent

3  help with him in the legal proceedings; that hallucinations

4  influence his behavior; that he is not able to think clearly

01:23:11PM  5  because of these thoughts that he's fighting off and the pains

6  that he is experiencing; the auditory hallucinations that are

7  communicating to him; their attempt to make him forget

8  information that he has as well as their attempts to block his

9  thoughts and prevent him from expressing those clearly in his

01:23:30PM  10  writings to the courts and to his attorneys and to the judges.

11  Q.   Now, respondent also called your attention to several

12  Houston Police Department reports and the statements of

13  witnesses that were taken by HPD officers.  What value do you

14  ordinarily put on reports such as this?

01:24:02PM  15  A.   Well, I don't use police department reports in my

16  assessments.

17  Q.   And turning in particular to the issue of Eddie Ford.

18  What do you know about Eddie Ford, the voracity of some of his

19  statements?

01:24:23PM  20  A.   Well, from the information that I was allowed to read

21  here on the stand, there appeared to be some discrepancies

22  from being -- what I do review in the course of my evaluation,

23  my assessments in order to make determinations, are testimony

24  that's available to me.  And I did review the testimony in

01:24:40PM  25  this case that was available, and there appeared to be

1 contradictions in what Mr. Eddie Ford was saying in his

2 statement compared to what was given on the stand as

3 testimony.

4 Q.   Do you know whether Eddie Ford testified in this case or

01:24:54PM 5 not?

6 A.   It is my understanding that he did not, and I certainly

7 didn't review any testimony by him.  He was not included in

8 the records that I had.

9 Q.   Can you understand why?  Did you come to understand why

01:25:04PM 10 he did not testify?

11 A.   No.  I don't know for certain why he didn't testify.

12 Q.   Was it because he was --

13        MS. ODEN:  Objection, Your Honor, leading,

14 speculation.

01:25:16PM 15        THE COURT:  Sustained.

16 BY MR. RYTTING:

17 Q.   What if the record reflected that he was a suspect in

18 this case?

19 A.   Then I wouldn't be surprised that he wouldn't be allowed

01:25:39PM 20 to --

21        MS. ODEN:  Your Honor, her emotional reaction is

22 irrelevant in this case.

23        THE COURT:  Sustained.

24 BY MR. RYTTING:

01:25:56PM 25 Q.   Respondent also mentioned the possibility of antisocial

1  personality disorder and -- which may explain Mr. Colburn --

2  which might explain Mr. Aldridge's conflict.

3  A.   She did.

4  Q.   What have you reviewed that permits you to exclude

01:26:25PM 5  antisocial personality disorder in this case?

6  A.   Well, all of the symptoms and then the subsequent

7  diagnosis of Mr. Aldridge, that he's given a diagnosis of

8  schizophrenia by myself in addition to Dr. Quijano and

9  Dr. Silverman and Dr. Brown.  So, having a diagnosis on Axis I

01:26:41PM 10  of schizophrenia disorder eliminates the possibility of being

11  given a diagnosis of antisocial personality disorder.

12          A diagnosis cannot be made in the presence of a

13  diagnosis of schizophrenia.  So, a person could perhaps engage

14  in antisocial behaviors but does not have a diagnosis of an

01:27:00PM 15  antisocial personality disorder.

16  Q.   And the antisocial behaviors that you are talking about

17  would be from the perspective of whom?

18  A.   Those are criminal acts in the legal system.

19  Q.   And what in your testing allowed you to exclude

01:27:25PM 20  antisocial personality disorder?

21  A.   Yes.  The cognitive profile from the battery of tests

22  that I administered to Mr. Aldridge, the pattern is not

23  consistent with what is seen in antisocial personality

24  disorder, which they usually have intact cognitive

01:27:43PM 25  functioning.  But the pattern, in fact, supports a diagnosis

1    of schizophrenia.  So, showing the deficits in executive

2    functioning, verbal memory...

3    *Q.*    And what is executive functioning, again?  You may have

4    defined it already, but one more time what is that?

01:28:00PM  5    *A.*    It is a general term used to describe how the frontal

6    lobe and interactions, connections, between the frontal lobe

7    and other areas of the brain come together to engage in

8    cognitive abilities, specifically abstract, reasoning, problem

9    solving, both in the verbal and the non-verbal domains;

01:28:24PM  10    logical sequencing of events; rational and creative thoughts,

11    if you will.

12    *Q.*    Respondent also queried you extensively about

13    Dr. Quijano's test for competency, a certain section of his

14    report, which is our Exhibit 8.  Do you recall that?

01:29:09PM  15    *A.*    I'm sorry.  Could you repeat that?

16    *Q.*    The respondent questioned you extensively about a certain

17    section of the report, which I think Dr. Quijano characterized

18    as his competency exam as opposed to his clinical review.

19    *A.*    Oh, yes.  Yes, she did.

01:29:25PM  20    *Q.*    Do you recall that?

21    *A.*    I do, yes.

22            MR. RYTTING:  May I approach?

23            THE COURT:  Yes.

24    BY MR. RYTTING:

01:29:41PM  25    *Q.*    And my understanding of this section -- of the results of

1    this section is that they appear on Page 9 of our Exhibit 8,

2    starting underneath the section that reads "The defendant

3    related these events to the charges he is facing."

4                    Is that your understanding of what Dr. Quijano

01:30:03PM  5    is talking about?

6    A.    Yes.

7    Q.    And relative to the receipt of his report -- that is, the

8    psychological interview -- what importance do you place on

9    those findings?

01:30:23PM 10    A.    Well, there seems to be a difference in the way that he

11    is -- is asking the questions of the client.

12    Q.    Was -- do you recall his testimony where he said he had

13    a -- he was using a direct method in operationalizing the

14    questions in this section?

01:30:42PM 15    A.    I do recall him saying that, yes.

16    Q.    And what is, in your opinion, the problem with this type

17    of procedure?

18    A.    Well, in interviewing patients or clients, as basic

19    interviewing skills we are told not to lead or direct the

01:31:03PM 20    questions to the client or the patient; that, in fact, we are

21    there to assess whether or not they have an independent

22    understanding of the facts and of the questions.  So, we are

23    not to give them the answer in the question; that every

24    patient or client that we interview, we should ask the

01:31:25PM 25    questions in the same format.  We should not change the format

1  of the question, depending on the diagnosis of the patient.

2  We are there to assess whether or not their diagnosis is

3  potentially having an impact on their understanding.  So, we

4  cannot change the format of our questions based on that

01:31:44PM  5  diagnosis.

6  Q.   Looking at this section of the report, how do we know --

7  what do we know about Mr. Aldridge's response or the way he

8  made his response?  What can we tell?

9  A.   We don't know.  I don't know for certain if these are

01:32:02PM 10  quotes from Mr. Aldridge.  I don't know if this is a

11  rephrasing by Dr. Quijano.  I don't know if he nodded yes or

12  said yes.  I don't know.

13  Q.   And would it be possible to ask questions of, say,

14  Mr. Aldridge about another subject -- let's call it thermal

01:32:18PM 15  dynamics -- in a yes or no pattern --

16  A.   Sure.

17  Q.   -- and get a series of "yes" answers?

18  A.   Certainly.

19  Q.   That would not reflect his knowledge of thermal dynamics,

01:32:31PM 20  would it?

21  A.   That is correct.

22  Q.   There are some passages in there that are in quotations,

23  correct?

24  A.   One, just in his words -- no.  There are a couple, yes.

01:32:45PM 25  That's correct.

1  Q.   And what do they say?

2  A.   One in his words he states "constitutional protections."

3  Then at the end, "Let's seek recourse through other sources in

4  court."  There are some other statements that he does not have

01:33:01PM 5  in quotes that says that he's saying that this is what

6  Mr. Aldridge is saying.

7  Q.   And there's -- we don't have -- again, would you describe

8  this information as thin or insubstantial?

9  A.   I would certainly say it would bring into question his

01:33:27PM 10  factual and rational understanding of the legal proceedings,

11  given the format of the questions that was asked.

12  Q.   There was some suggestion on cross-examination, questions

13  about whether, I guess, a part of Mr. Aldridge's thinking was

14  rational or a part of his brain operated normally.  Do you

01:34:36PM 15  recall those questions?

16  A.   Yes.

17  Q.   And what is your -- what is -- why do you disagree, if

18  you do so, about whether this is a possible explanation for

19  his conduct and actions?

01:34:58PM 20  A.   I do disagree with that statement.  There are parts, if

21  you will, of the brain that are functioning better than other

22  parts.  But the disease as a whole -- what it affects is the

23  interconnections between the various regions of the brain.

24  So, specifically, the projections from the sensory areas of

01:35:19PM 25  the brain where a patient's brain receives input from its

1  environment through the tactile auditory and visual domains,

2  they process through the primary sensory regions through the

3  thalamus and are projected to the frontal lobe.

4                  There's evidence of temporal dysfunction and

01:35:35PM  5  frontal lobe dysfunction in patients with schizophrenia; and

6  what, in fact, that affects is their rational side.  What is

7  consistently affected and overridingly affected in

8  schizophrenia is the patient's ability to accurately perceive

9  and comprehend the environment around them.  Their sensory

01:35:58PM 10  information is distorted.  So, it is their rational thought

11  that's affected.

12  *Q.*   And patients who are in this condition may have some

13  verbal memory, correct?

14  *A.*   Absolutely.

01:36:12PM 15  *Q.*   And visual memory?

16  *A.*   Yes.

17  *Q.*   And they may be able to perform certain intellectual

18  tasks like add and subtract numbers, correct?

19  *A.*   Yes, that's correct.

01:36:22PM 20  *Q.*   Nonetheless, still have severe deficits in rational

21  thinking?

22  *A.*   Yes.  That's right.

23                  MS. ODEN:  I know this isn't in front of the jury,

24  Your Honor; but if we could just limit the leading questions

01:36:37PM 25  to --

1          MR. RYTTING:  I have no further questions along that

2     line.

3          THE COURT:  All right.

4          MS. ODEN:  Dr. Mosnik --

01:36:45PM  5          THE COURT:  Wait a second.  Along that line, he

6     said.

7     BY MR. RYTTING:

8     Q.   There's also some questions about whether Mr. Aldridge

9     was mentally ill 24/7.  Do you recall those questions?

01:37:04PM  10    A.   Yes.

11    Q.   And is it the case that he is mentally ill constantly?

12    A.   Well, yes, he is mentally ill constantly.  That doesn't

13    mean every single one of his symptoms is present constantly;

14    but, yes, he is mentally ill constantly.

01:37:19PM  15    Q.   What sort of -- what symptoms, however, are fixed or if

16    any, are fixed and relatively stable and constant in

17    Mr. Aldridge?

18    A.   His brain's ability to interpret sensory information that

19    comes through his brain, his delusion system.  Those are

01:37:44PM  20    fixed.  Hallucinations can be constant.  They may not be

21    constant; but they can even, if a person is not attending them

22    or talking about them, can be present continually in the back

23    of their mind, if you will, constantly.  But the negative

24    symptoms of schizophrenia or the loss of things are

01:38:03PM  25    continually present.  Formal thought disorder is often

1  continually present.  And this -- I'm speaking in an

2  unmedicated state.

3  Q.   And you heard Doug Davis on redirect, correct?

4  A.   Yes, I did.

01:38:38PM  5  Q.   And one of things that Mr. Davis confirmed is that

6  Randolph Bates' testimony represented the way that

7  Mr. Aldridge was throughout the period that they represented

8  him?

9  A.   Yes.  That's correct.

01:38:53PM  10  Q.   And would you agree, then -- and you will remember

11  Dr. Quijano saying that if Randolph Bates' testimony

12  represents the way that Mr. Aldridge was throughout their --

13  his attorney's representation of him, that this is a -- that

14  his testimony is reflective of the attorney/client

01:39:21PM  15  relationships and conversations, communications that he had,

16  that he would find that Mr. Aldridge was incompetent to stand

17  trial.  Do you recall that?

18  A.   I do recall that, yes.

19  Q.   And would you -- what is your opinion of Mr. Aldridge's

01:39:38PM  20  competency to stand trial, given the information from

21  Dr. Quijano's report and Doug Davis' testimony this morning?

22  A.   I do not believe that he was able to rationally engage in

23  discussions and defense options with his attorneys or engage

24  in any participating in his defense.  So, I believe that he

01:40:04PM  25  was incompetent to stand trial.

1  Q.   And how confident are you, based on the evidence that

2  you've heard in these proceedings and the records that you

3  reviewed, in your conclusion that he is incompetent to stand

4  trial?

01:40:19PM 5  A.   I am very confident.

6              MR. RYTTING:  I will pass the witness.

7              THE COURT:  Thank you.

8                  Any recross?

9              MS. ODEN:  Yes.

01:40:57PM 10                    **RECROSS-EXAMINATION**

11  **BY MS. ODEN:**

12  Q.   Dr. Mosnik, not to belabor the point; but your testimony

13  and your work on the case of Daniel Yeh had nothing to do with

14  his competency to stand trial; is that right?  It was

01:41:05PM 15  diminished capacity --

16  A.   That's correct.

17  Q.   -- for criminal liability.

18                  And in the case of James Colburn, again, you

19  were not evaluating him for competency to stand trial.  You

01:41:13PM 20  were evaluating him for competency to be executed.

21  A.   That's correct.

22  Q.   And your opinion was that further neuropsychological

23  testing needed to be done in order to determine whether

24  Colburn was competent to be executed; isn't that right?

01:41:30PM 25  A.   If that's what I said in my report, yes.  That's correct.

1  *Q.*   And those five doctors that I listed on Friday all

2  disagreed with you that further testing needed to be done;

3  isn't that right?

4  *A.*   As I told you in my previous testimony Friday, I have no

01:41:43PM  5  recollection of that.  The only thing I can testify to is the

6  affidavit that I have read since.

7  *Q.*   The affidavit of?

8  *A.*   Dr. Axelrod.

9  *Q.*   And in that affidavit, did Dr. Axelrod agree with you

01:41:56PM 10  that more psychological testing needed to be done on Colburn

11  to determine his competency to be executed?

12  *A.*   No.  I didn't read anything about that.

13  *Q.*   No.  So, his affidavit didn't indicate anything about

14  agreeing with you on that, did it?

01:42:11PM 15  *A.*   On that comment, no.

16  *Q.*   Correct.  Neither did Dr. --

17          MR. RYTTING:  I would like to ask for some

18  clarification.  I don't even know if Dr. Axelrod or any other

19  psychologist ever replied, ever controverted Dr. Mosnik's

01:42:27PM 20  findings.  Their findings were prior to her examination and

21  competency finding.

22          MS. ODEN:  Then, Your Honor, I would ask that her

23  testimony regarding whether or not those doctors actually

24  agreed or disagreed with her be stricken, because the point

01:42:39PM 25  that I was arguing they disagreed with her on was her opinion

1  that further testing needed to be done to determine whether

2  Mr. Colburn was competent to be executed.

3          THE COURT:  All right.  I will take it under

4  advisement with all the other evidence.

01:42:53PM 5  BY MS. ODEN:

6  Q.  You maintain that Mr. Aldridge has consistently presented

7  the same type and content of delusions.  Could you briefly

8  give us a list of his symptoms that you are using to base that

9  conclusion on?

01:43:10PM 10  A.  Yes.  I think that he has delusions.  I think that he has

11  religious delusions, delusions of control and influence, and

12  somatic delusions, and grandiose delusions.  I also believe

13  that he has auditory hallucinations, specifically voices

14  conversing and command hallucinations of voices talking

01:43:34PM 15  directly to him.

16          I believe that he has formal thought disorder.

17  Specific examples of poverty of content of speech, thought

18  blocking, and illogicality of thoughts.  I also believe that

19  he has significant negative symptoms of schizophrenia,

01:43:52PM 20  including alogia and asociality and anhedonia.  I also believe

21  that he has visual hallucinations.

22  Q.  Anything else?

23  A.  There may be.

24          Impairment in social functioning and failure to

01:44:19PM 25  achieve his pre-morbid level of functioning based on the

1  evidence of his pre-morbid functioning.

2  Q.   Somatic hallucinations?

3  A.   I said somatic delusions, not somatic hallucinations.  I

4  already said that.

01:44:37PM 5  Q.   Anything else?

6  A.   There may be.  I don't know if that's an exhaustive list.

7  Q.   The writings that you referenced, January 6th, 1990, he

8  wrote that after the offense was committed; is that right?

9  A.   Apparently so, yes.

01:44:53PM 10  Q.   It was written during his flight?

11  A.   Yes.  That's my understanding.

12  Q.   And you mention some of the reports, that he saw the same

13  spirits, that there was a consistent report of the pain in his

14  ear, consistent reports of blackouts.  He reports those

01:45:14PM 15  blackouts to Dr. Quijano, doesn't he?

16  A.   I didn't say there was consistent reports of blackouts.

17  He does report blackouts to Dr. Quijano in his report, yes.

18  Q.   But then he is able to report events that occurred during

19  his blackouts, right?

01:45:29PM 20  A.   I don't know that.

21  Q.   I mean --

22  A.   He is reporting events.  I don't know if those were

23  during his blackouts or surrounding the time of his blackouts.

24  Q.   Well, for example, in Dr. Quijano's report, he mentions

01:45:38PM 25  that Aldridge says he had a blackout during the crime; but

1 then Aldridge goes on to describe how he forces Ben Stone to

2 open the safe, forces him to lay down, shoots him in the head,

3 shoots him again.  So, there's apparently no lack of memory

4 there, correct?

01:45:54PM 5 A. Again, it is unclear.  I don't know that.

6 Q. The contempt motion from August 30th, 1990.  Have you

7 seen the cover sheet for that?

8   MS. ODEN:  May I approach, Your Honor?

9   THE COURT:  Yes.

01:46:20PM 10 BY MS. ODEN:

11 Q. This is the contempt motion that you were shown,

12 Plaintiff's Exhibit 30, right?

13 A. All right.

14 Q. Have you seen this cover sheet that came with it?

01:46:28PM 15 A. No.

16 Q. Okay.  This was in the defense attorney's files, and it

17 apparently reflects that this was sent to the court on

18 October 1st, 1990; is that correct.

19 A. It says October 1st, 1990, on there.

01:46:41PM 20 Q. And there's no date in Plaintiff's 30, is there?

21 A. There was a date on here, I believe.

22 Q. Feel free to take...

23   (Discussion held off the record.)

24 A. Do you need to see that cover sheet?

01:47:33PM 25   MR. RYTTING:  Well, I would just make a

1  clarification.  We have a copy of the Motion for Contempt that

2  doesn't -- it has a date on it.

3          MS. ODEN:  Not the copy we got.

4          MR. RYTTING:  October 1, 1990.  I think I said

01:47:50PM 5  August 30, 1990; and I was mistaken.

6          MS. ODEN:  Correct.

7          MR. RYTTING:  I need to correct that.

8          MS. ODEN:  Okay.

9  BY MS. ODEN:

01:47:54PM 10  Q.  So, was there another date in there that you saw,

11  September 30th, Doctor?

12  A.  I would have to look through the entire thing.

13  Q.  If Mr. Rytting says that it was a mistake and the date

14  was actually October 1st, 1990, would you agree with him?

01:48:04PM 15  A.  I don't know.  I said I would have to look through the

16  whole thing.

17  Q.  Okay.  Well, I'm sure we'll have time to do that later.

18  A.  Okay.

19  Q.  In any case that was also after the crime, wasn't it?

01:48:14PM 20  Well after the crime.

21  A.  Yes.

22  Q.  After his admission onto death row?

23  A.  Yes.

24  Q.  So, it would be a consistent presentation of his symptoms

01:48:27PM 25  with other presentations that also occurred after arrest,

1  wouldn't it?

2  A.  It would be a consistent presentation of his, yes.

3  Q.  You said that in your practice you don't use police

4  department reports --

01:48:50PM  5  A.  I do not.

6  Q.  -- as a source of information?

7  A.  I do not.

8  Q.  I understand that that makes sense in your elder care

9  cases in Wisconsin or perhaps your clinical practice; but you

01:49:04PM  10  don't use them in your forensic practice, those three cases

11  that you've done?

12  A.  I have not, no.

13  Q.  You don't consider them to be a source of information?

14  A.  There's no way to question or refute that information.

01:49:19PM  15  It is one person saying -- another or two other people

16  substantive to a second or third person.  So, I have no way to

17  verify that.  In fact, in the Houston Police Department

18  records that you showed me, there are contradictions to what

19  was evident in the testimony.

01:49:34PM  20  Q.  Well, there's going to be contradictions in data anytime

21  you are evaluating data to come to a conclusion, right?

22  There's going to be data in support of and data refuting a

23  hypothesis?

24  A.  Right.  I --

01:49:45PM  25  Q.  And your job is to sort through conflicting data, right?

1  A.   Yes.

2  Q.   Wouldn't you agree that the best conclusion comes from

3  considering the most available data?

4  A.   Someone could argue that, yes.

01:49:57PM  5  Q.   In fact, you argued it against Dr. Allen in your reply,

6  didn't you?  You believed that he didn't consider enough data;

7  is that right?

8  A.   I said that he didn't interview.  He didn't meet the

9  client personally.

01:50:10PM  10  Q.   And if the problem was considering someone's report of

11  what someone else said means you shouldn't consider it at all,

12  then you shouldn't have considered Dr. Quijano's report at

13  all, right, because he was recounting what --

14  A.   I didn't say anything about including or considering

01:50:25PM  15  anybody else's report.  I said the Houston Police Department

16  records, I consistently don't use them in my evaluations.

17  Police department records.

18  Q.   Because they report conflicting data?

19  A.   No, that's not why I don't use them.  I don't use them

01:50:38PM  20  because I have no way to -- I can't interview those patients.

21  So, I can't question the way in which that information was

22  obtained.  I have no way to question that or talk to them or

23  find out those statements.  So, I use evidence that was given

24  in testimony, statements that are made by people under oath or

01:50:56PM  25  if I have an opportunity to interview those individuals myself

1    personally.

2    Q.   Okay.  So, you're going to discount all the data that you

3    find in the Texas Youth Commission records, then, right?  And

4    you are going to discount all the data that you find in the

01:51:09PM  5    T.D.C. records, right?

6    A.   No.  I didn't discount any of that.  I looked through all

7    of that.

8    Q.   But you shouldn't because you didn't have the opportunity

9    to question the people that obtained that data and find out

01:51:20PM  10   how they got it, right?

11   A.   Well, that's what I said to you about the two neuropsych

12   reports that you said are available.  I can't assume that --

13   what the meaning of those are.  I have seen no data to support

14   those findings.  I don't even know if the neuropsych means

01:51:33PM  15   neuropsychiatric information, if it means neuropsychological

16   information.  There was no additional information in those

17   notes to provide me any data to verify.

18   Q.   And that's what you say against comments that are

19   contrary to your conclusion, but what about data that would

01:51:47PM  20   apparently support your conclusion?  You are more than willing

21   to accept that without questioning, right?

22   A.   I looked at all of the data, whether they accepted or

23   refuted, except for the police department records.

24   Q.   Actually, though, it's not like we're just looking at

01:52:01PM  25   police department notes from some random police officer.  We

1  also have sworn affidavits in the police file; but you didn't

2  consider that until you got a chance to read it on the stand,

3  correct?

4  A.   That's correct.

01:52:11PM 5  Q.   And you would agree that a sworn statement might be more

6  reliable than an unsworn statement, correct?

7  A.   I looked at their sworn affidavits.

8  Q.   And we also know that the police department report is, at

9  least to some degree, corroborated by what was in those sworn

01:52:30PM 10  affidavits.  When Sergeant Maxey writes down that Mr. Ford

11  says such and such, sure enough, we look at Mr. Ford's sworn

12  affidavit; and it says that same thing.  So, doesn't that

13  corroborate the reliability of some of the things in the

14  police report?

01:52:43PM 15  A.   Sure.  It may, yes.

16  Q.   But you still didn't consider that?

17  A.   I did not.

18  Q.   And you still consider it appropriate practice for

19  someone proclaiming that they are practicing forensic

01:52:53PM 20  psychology to discount those sources of information?

21  A.   Yes.

22  Q.   Doctor, did you know that Mr. Ford was presented as an

23  alternative suspect by the defense at trial but that his work

24  records provided the alibi for his whereabouts at the time of

01:53:15PM 25  the crime?

*A.* No, I did not know that.

*Q.* So, you weren't informed of that either?

*A.* No.

*Q.* Do you find Gladys to be a credible informant in this case?

01:53:27PM

*A.* As much as the others, I guess.

*Q.* So, is that a, yes, I find her to be a credible informant; and I am basing my conclusions on the data she provided?

01:53:41PM

*A.* I didn't base my evidence solely on her statements. I used the statements of herself and all of her sisters.

*Q.* Okay.

*A.* All of the affidavits in the record.

*Q.* But you did reply in part on the statements that Gladys made?

01:53:51PM

*A.* Yes, I did.

*Q.* Even though the statements that she made were contradicted by her own statements earlier in time?

*A.* Which statements? Are you talking about what was in the police record or her statements about his behavior?

01:54:02PM

*Q.* Her sworn statement to the police admitting that she had lied and given an incomplete account in her first sworn statement, for example?

*A.* That may have been the case.

01:54:13PM

*Q.* It was the case, wasn't it? You read those sworn

1  statements here in court on Friday?

2  A.   I read that she made two statements, yes.

3  Q.   And you read that she said, "I didn't give the whole

4  story the first time I made a sworn statement."

01:54:25PM 5  A.   Right.  She stated that she left some things out.  That's

6  correct.

7  Q.   And she was actually impeached while she was testifying

8  here on Friday, wasn't she?

9  A.   (No response.)

01:54:39PM 10  Q.   She was impeached by some of the documents that we read

11  here on the stand today.  She tried to act like she had no

12  idea what was in the box and she didn't give any gun and she

13  didn't have any idea about the gun, but she did, didn't she?

14  A.   I'm not sure.

01:54:54PM 15  Q.   So, if you are not sure, how do you know how much weight

16  to give the data that she provided to your conclusion?

17  A.   I utilized the information describing not the events

18  surrounding the commission of the crime but Mr. Aldridge's

19  behavior that was corroborated by her sisters and other

01:55:11PM 20  individuals in terms of his delusions, his speaking about

21  spirits, the way that he behaved, whether or not he associated

22  with others, did he have friends, did he date.  So, that's the

23  information that I used from the sisters that corroborated his

24  diagnosis.

01:55:25PM 25  Q.   Was Mr. Aldridge a conduct disorder in youth?

1  A.   By legal definition?  Yes.

2  Q.   How about by the DSM?  He met the categories in the DSM

3  for being a conduct disorder youth, didn't he?

4  A.   Yes, he does.

01:55:39PM 5  Q.   And prior to whenever he developed his full-blown

6  schizophrenia, he was also an antisocial personality, wasn't

7  he?

8  A.   No.  A conduct disorder can lead to an antisocial

9  personality disorder, but then the diagnosis of schizophrenia

01:55:54PM 10  subsumes that.  So, he cannot have a diagnosis of antisocial

11  personality disorder.

12  Q.   But I'm talking about if we look at the portion of his

13  life leading up to him becoming a full-blown schizophrenic.

14  A.   Right.  I would say that --

01:56:07PM 15       MR. RYTTING:  I'll object to relevance.

16       THE COURT:  Overruled.

17  A.   I would say that he meets the criteria for conduct

18  disorder, but the diagnosis of antisocial personality

19  disorder --

20       THE REPORTER:  I'm sorry.  You'll have to start over

21  and slow down, please.  Meets the criteria?

22  A.   Yes.  I would agree that he meets the criteria for a

23  diagnosis of conduct disorder in his adolescence.  The

24  diagnosis of antisocial personality disorder is typically

01:56:27PM 25  given to an adult after the age of 18.

BY MS. ODEN:

Q.   Correct.  And if we are talking about his life up until but not including -- and I don't know how you want to phrase it -- when he had a break with reality or when he became a full-blown schizophrenic, prior to that, after the time --

A.   It's my understanding that he entered prison at the age of 17 or 18.

Q.   Please let me finish my question to make it easier on the court reporter.  Okay?

So, I am talking about the portion of his life up to but not including when he had the full break with reality.  You're saying the reason that you would not consider him to qualify for a diagnosis of antisocial personality is because he went to prison at the age of 17, as though that stops his personality development at that point in time?

A.   I didn't say that stops his personality development.

Q.   Okay.  So, don't you think given the pattern of his criminal history and the pattern of his behavior, that once he turned 18, even though he turned 18 in T.D.C.J. custody, don't you think he met the diagnostic criteria for antisocial personality?

A.   No.  I told you up to that point he met the criteria for a diagnosis of conduct disorder.  When you are in prison, you aren't engaging in antisocial person -- you are in prison. How can you evaluate at that point in time whether he's

1  engaging in other acts?

2  Q.   Is it, then, your position that you have to be engaging

3  in the acts actively, currently engaging in the acts to

4  qualify for the diagnosis of antisocial personality?

01:58:03PM 5  A.   No.  You have to have a history of doing that.  So,

6  conduct disorder can lead into adulthood; but it has to lead

7  into adulthood to then make the diagnosis of antisocial

8  personality disorder.

9  Q.   So, the fact that they got him behind bars by the time he

01:58:17PM 10  was 17 is the only thing that kept him from becoming an

11  antisocial personality.  What about sticking another inmate in

12  the face with a fork, you don't think that's a display of a

13  pervasive disregard for the rights of others?

14  A.   It could be.  It could also be related to delusional

01:58:36PM 15  behavior.

16  Q.   Okay.  So, all of his disciplinary problems while he was

17  in prison, you would -- you would account for that data not by

18  saying it was an example of antisocial behavior.  You would

19  account for that data by surmising that it was a result of

01:59:04PM 20  delusions?

21  A.   No.  I can't argue that all of those things are related

22  to delusions.  He has a history of conduct disorder as a

23  youth.

24  Q.   Uh-huh.  And what about --

01:59:14PM 25  A.   That's irrefutable.  I am not refuting that.

1  *Q.*   And what about after he turned 18?  What about his

2  disciplinary behavior in prison after he turned 18?

3  *A.*   Yes.  He has received disciplines for a number of reasons

4  while he was in prison.

01:59:27PM 5  *Q.*   And would you account for that data as a symptom of

6  antisocial personality disorder or as a symptom of delusions?

7  *A.*   I would not count it as a symptom of antisocial

8  personality disorder because he doesn't have a diagnosis of

9  antisocial personality disorder.  I would say those could

01:59:41PM 10  potentially be antisocial behaviors or behaviors that could

11  result from delusional behavior.

12  *Q.*   Okay.  Is Mr. Aldridge a patient of yours?

13  *A.*   No, he is not.

14  *Q.*   And in your experience receiving training on forensic

02:00:02PM 15  issues at the seminar, did they explain why it is important to

16  distinguish between a forensic examinee such as Mr. Aldridge

17  versus a patient in a clinical setting?

18  *A.*   Yes.

19  *Q.*   And why is it that important?

02:00:18PM 20  *A.*   Because I am not there to treat him or provide him with

21  information about his diagnosis.  I am there for legal

22  purposes to help his attorney understand his presentation and

23  how that relates to his case and that the information is not

24  confidential, that it will be released to others involved in

02:00:36PM 25  the legal proceedings; and so, it will not be protected

1  information as it would if I saw a patient in a clinic or

2  hospital setting.

3  Q.   So, it is important in some ways to change your

4  presentation and your conduct or your examination based on

02:00:52PM  5  whether the person is a patient or an examinee for a forensic

6  setting?

7  A.   I'm not sure what you mean by "change my conduct."

8  Q.   It is important that you say different things to them and

9  ask them different sorts of questions?

02:01:07PM  10  A.   I have to inform them of the difference in the

11  assessment, who the records will be released to, the

12  difference in the confidentiality of the data that pertains to

13  the case; but I don't change the format in which I ask

14  questions.

02:01:21PM  15  Q.   Dr. Quijano, we don't actually know the wording of the

16  questions that Dr. Quijano used, do we?

17  A.   No.  I only have his testimony that speaks towards that.

18  Q.   And his testimony indicated that he did not ask questions

19  that started with "why."

02:01:39PM  20  A.   Yes.

21  Q.   And he asked directed questions to keep Mr. Aldridge on

22  track.

23  A.   Yes.

24  Q.   And from that you gather that they were leading

02:01:48PM  25  questions; is that right?

*447*

A.   He gave specific examples -- two specific examples during

testimony of the questions that he asked to Mr. Aldridge.

Q.   And what are those examples that you are focused on?

A.   He said, "Do you understand that the DA is against you?"

02:02:04PM            And he said Mr. Aldridge said "yes."

He said, "Do you understand that your attorney

is for you?"

So, the answer to the question is inherent in

the question.   That is a leading question.

02:02:15PM  Q.   And those are the examples that you are focused on when

you decide that Dr. Quijano is asking leading questions?

A.   Those are the questions that Dr. Quijano offered as how

he interviews a patient with schizophrenia, namely,

Mr. Aldridge, during his evaluation of competency to stand

02:02:34PM  trial.

Q.   Is that a "yes," Doctor?

A.   Can you ask the question again?

Q.   I don't need to.   Thanks.

Who is the best judge of what Mr. Aldridge was

02:02:46PM  saying during Dr. Quijano's evaluation, Dr. Quijano or you?

A.   Dr. Quijano.

Q.   And why is that?

A.   He was present during the interview.

Q.   You mentioned that -- that Mr. Aldridge is mentally ill

02:03:17PM  constantly but his symptoms are not necessarily constantly

         1   present.

         2   A.   All of them, yes.

         3   Q.   Right.  Is a person with schizophrenia incompetent

         4   because they are always irrational?

02:03:45PM  5   A.   I believe that the disease affects their rational

         6   thought.  In this case the severity of delusions does appear

         7   to affect his rational thought.

         8   Q.   I'm not talking about this case.  I'm asking you from

         9   your psychological professional opinion.

02:04:02PM 10   A.   Uh-huh.

        11   Q.   Is a schizophrenic always going to be incompetent because

        12   they are always irrational?

        13   A.   Again, I can't say always.  So, no, I don't think that

        14   every patient with schizophrenia is incompetent.  It depends

02:04:22PM 15   on the specific type of their symptoms --

        16   Q.   Okay.  And is every schizo --

        17   A.   -- the nature of those symptoms and whether that affects

        18   their rational thought.

        19   Q.   Is every schizophrenic always irrational?

02:04:33PM 20   A.   No.

        21   Q.   So, some people with schizophrenia are not always

        22   irrational?

        23   A.   I guess it depends on the degree to what you mean

        24   irrational.  Because the deficits they have in the disease,

02:04:48PM 25   their brain dysfunction causes impairment in their rational

1   thoughts and the functioning of their frontal lobe.  And it

2   depends on the severity of those deficits what severe rational

3   thought is impaired.

4   Q.   So, it depends on a case-by-case analysis, then?

02:05:02PM  5   A.   Yes.  And whether or not the patient has been medicated.

6   Q.   So, is it your opinion that if a patient has not been

7   medicated, then they are necessarily incompetent?

8   A.   No.  But the odds go up tremendously.

9   Q.   What are those odds?  What is that correlation?  I think

02:05:17PM 10   I asked you this earlier.  Have you had a chance to look into

11   that?

12   A.   No, I have not.

13   Q.   Are you aware whether or not the literature distinguishes

14   between a correlation between untreated schizophrenia and

02:05:29PM 15   competency versus treated schizophrenia and competency?

16   A.   I don't know the correlations.

17   Q.   Okay.  Prior to the crime, is there any evidence in the

18   record that Mr. Aldridge was paranoid about sexual assault by

19   a manager at the McDonald's?

02:05:49PM 20   A.   State that again, please.

21   Q.   Prior to the crime, is there any evidence in the record

22   that Mr. Aldridge was paranoid about sexual assault by

23   anybody, the manager or whatever, working at the McDonald's?

24   A.   In his letter in 1989, there are statements of being

02:06:08PM 25   molested; but he does not specifically name anybody at

 1  McDonald's.

 2  Q.   And I guess, last, what is your understanding of the

 3  meaning rationally able to assist in their own defense?  Is it

 4  that -- is it the question -- is the question can the

02:06:33PM  5  defendant assist his attorneys; or is the question can the

 6  attorneys assist the defendant, help him to understand, help

 7  him to see the light, see their way of thinking on the case?

 8  A.   My understanding is that the client has to have an

 9  ability to assist his attorneys in his own defense.

02:06:55PM 10  Q.   Okay.  So, if I understand what your perspective is, it's

11  not whether or not his attorneys can change his way of

12  thinking or help him see their perspective on the case.  The

13  question is whether or not he is able to assist them in

14  preparing for his own defense?

02:07:18PM 15  A.   Well, that would be part of it.  The first prong on

16  competency is whether he has sufficient present ability to

17  consult with his attorneys to a reasonable degree of rational

18  understanding.  So, "consult with" implies by directionality.

19          MS. ODEN:  That's all for now.  Thank you, Your

02:07:49PM 20  Honor.

21          THE COURT:  All right.  Thank you.

22          Mr. Rytting, anything else for this witness?

23          MR. RYTTING:  Your Honor, I have no further

24  questions.

02:08:06PM 25          THE COURT:  All right.  You may step down, Doctor.

1  Thank you.

2          THE WITNESS:  Do I just take these with me, all of

3  these?

4          THE COURT:  I think they need to go back to whoever

5  gave them to you.

6      (Witness released)

7          THE COURT:  All right.  Mr. Rytting, do you have any

8  other witnesses?

9          MR. RYTTING:  Your Honor, I am finished with my case

02:08:26PM 10  in this evidentiary hearing.

11          THE COURT:  All right.  Thank you.

12          MR. RYTTING:  Except unless we need Dr. Mosnik for a

13  brief rebuttal.

14          THE COURT:  All right.  Okay.

02:08:40PM 15          Respondents, who is your first witness?

16          MS. HAYES:  Dr. Allen.

17          THE COURT:  All right.

18          MS. HAYES:  Our second witness.

19          THE COURT:  Dr. Allen, would you come forward,

02:08:47PM 20  please, and be sworn in.

21              (**THOMAS G. ALLEN**, witness, sworn.)

22          THE COURT:  All right.  Have a seat in the witness

23  chair, please.

24                    **DIRECT EXAMINATION**

02:08:53PM 25  **BY MS. ODEN:**

1   *Q.*   Go ahead and introduce yourself to the Court and tell us

2   what you do.

3   *A.*   Thomas G. Allen, A-L-L-E-N.  I'm a psychologist, and I

4   practice forensic psychology.

02:09:25PM 5   *Q.*   Could you tell us briefly about your background and your

6   education, starting with that?

7   *A.*   I have a Bachelor's degree in psychology from Western New

8   Mexico University.  My Master's degree in psychology is from

9   Texas A&M University.  My Ph.D. is in psychology from Texas

02:09:44PM 10   A&M at Commerce.

11   *Q.*   And outside of your formal educational training, what

12   other types of training have you had in the field of forensic

13   psychology?

14   *A.*   Well, as a part of getting a license, I have a year of

02:09:56PM 15   pre-doctoral internship through the forensic psychiatric unit

16   at Rusk State Hospital, a year of post-doctoral internship

17   that was through University Park Hospital in Tyler.  And,

18   actually, that focused on neuropsychology.  I took the

19   licensing exam and passed it and went into private practice in

02:10:20PM 20   1985.  And, of course, I routinely keep up with continuing

21   education as required by the board of examiners.

22   *Q.*   Does it matter if someone in your field has published

23   their own writings, been published in academic journals, et

24   cetera?  Is that --

02:10:37PM 25   *A.*   It is just a matter of personal preference in career

1   goals.  Actually, most psychologists work in institutions;

2   prisons, universities, et cetera, drug companies, medical

3   schools.  And most research is done by academic psychologists

4   in facilities like universities, prisons.  My practice has

02:11:03PM  5   been always clinically directed.

6   Q.  Have you been published?

7   A.  I participated with a psychologist out of Rutgers and a

8   physician in Tyler on one publication that had to do with

9   nicotine some time ago.  And I published my dissertation.

02:11:24PM  10   That's it.

11   Q.  Do you -- as a forensic psychologist, do you routinely

12   take cases for the defense or for the State or both?

13   A.  My forensic practice since -- well, I guess since the

14   beginning, I mean, in criminal cases I'm often court-appointed

02:11:51PM  15   to do competency exams, sanity exams, risk assessments even.

16   And then sometimes I'm hired by prosecutors or defense

17   attorneys in cases to do various things; to consult, to

18   provide opinions, things like that.

19   Q.  And, again, how long have you been practicing as a

02:12:11PM  20   forensic psychologist?

21   A.  Really since the beginning in '85.  A lot of my practice

22   then was focused on behavioral medicine.  I saw a lot of

23   medical consults with consultations for various -- mainly

24   surgeons, neurosurgeons, orthopedic surgeons.  But I would get

02:12:28PM  25   involved because of that in personal injury litigation.  But I

1  started seeing probably criminal cases by '87.

2  Q.    Is it important to be able to cite textbooks that you

3  rely on on a regular basis?

4  A.    Yeah, either primary or secondary sources.  I think it is

02:12:51PM 5  good to know a lot of the research foundations, you know, for

6  what you are doing.

7  Q.    Off the top of your head, do any textbooks come to mind

8  that you think are influential or reliable in this field?

9  A.    Well, yeah, there's quite a few.  I mean, there's a lot

02:13:08PM 10  of research articles that I read to keep up with the field;

11  research on various topics, whether it's risk assessment,

12  competency, sanity issues.

13          I brought some secondary sources with me, like

14  the work by Richard Rogers on malingering and deception,

02:13:26PM 15  Handbook of Forensic Psychology, is an important source.

16  Actually, the little textbook that Dr. Quijano wrote a chapter

17  in is very handy.  I believe it was called Forensic Psychology

18  For the Journeyman Clinician.  He mentioned it in his

19  testimony.

02:13:44PM 20  Q.    What is forensic psychology?

21  A.    Simply the application of behavioral science, the

22  knowledge and the behavioral science of psychology within the

23  legal system.

24  Q.    Do you rely on scientific principles when forming your

02:14:00PM 25  opinions?

1  A.   Yes, ma'am.  That's what we are supposed to do wherever

2  you can.  There's some arenas where science doesn't fit very

3  well.  For example, I still don't know of a good scientific

4  definition for what a good parent is.

02:14:15PM  5  Q.   Sure.  Did you agree with Dr. Mosnik's brief description

6  of data and hypotheses and conclusions?

7  A.   Well, not really.

8  Q.   How so?

9  A.   Well, I would give a much more crisp explanation.

02:14:36PM  10  Q.   Go ahead and explain how you use scientific principles to

11  reach a conclusion.

12  A.   Any time you are evaluating someone, whether you're a

13  behavioral scientist or a rocket scientist, it is about

14  forming preliminary hypotheses, collecting data to see what is

02:14:52PM  15  supported and what is not supported.  And you often have to be

16  willing to readjust your hypotheses given this new

17  information, and you keep refining it until you get to

18  something that you can have some confidence in your

19  conclusions.  So, it is a very systematic process.

02:15:11PM  20  Q.   And is it important to end up with a conclusion that

21  accounts for as much of the data as possible as simply as

22  possible?

23  A.   That's the idea.  You want to account, when you come to a

24  conclusion, for as much of the data as you can but in the most

02:15:31PM  25  parsimonious fashion that you can with the simplest

1 explanation that accounts for the most data.

2 Q.   Okay.  Can you tell us what is meant by "hindsight bias"?

3 A.   In the field of behavioral science, there have been

4 several forms -- I'll call it numerous forms of human

02:15:56PM 5 perception that tend to be biased that interfere with that

6 process of a scientific systematic approach that will lead to

7 a nice, clean, reliable conclusion.

8          Hindsight bias is, I guess in a word,

9 Monday-morning quarterbacking where, you know, by -- you know,

02:16:16PM 10 Friday comes along and everybody is looking for the Cowboy

11 game; and they are really going to kick it in the playoffs.

12 And then Monday morning when they've lost 30 to nothing

13 because of some Pacman Jones stuff, you are claiming:  I knew

14 all along that they were going to lose, you know, in

02:16:34PM 15 hindsight.

16          So, any time you are looking through data, when

17 you are looking, I guess, backwards in a sense and you are not

18 really clear on what your original hypothesis was, which is

19 the Cowboys are going to win 20 to nothing and they get beat

02:16:53PM 20 20 to nothing, rather than accept your original hypothesis

21 which was wrong, you claim you're right.

22 Q.   Okay.

23 A.   That's hindsight bias.

24 Q.   And are you familiar with the concept of confirmation

02:17:06PM 25 bias?

```
 1  A.   Yes.
 2  Q.   Is that related?  How is --
 3  A.   In a sense all biases are related because they mess that
 4  process of data collection and clean hypotheses testing.  With
 5  confirmation bias, you fall into a habit of making a
 6  presumption, making an assumption, accepting it as true and
 7  then you don't question that original assumption and you spend
 8  all of your time collecting data to prove your original
 9  assumption, which was false to begin with.
10            I use the same stupid analogy where, you know,
11  I am convinced the Cowboys are going to the Super Bowl; and I
12  list all of these reasons.  I look for all of the evidence
13  possible that they are going to go to the Super Bowl; and I
14  never look at the reasons they can't make it, like Pacman
15  Jones.  I ignore that.
16  Q.   Okay.  And are these concepts -- hindsight bias,
17  confirmation bias -- discussed in the literature of your
18  field?
19  A.   Yes, ma'am.  There's a huge article on it, and I can't
20  remember the name of the author.  But in a great secondary
21  text is a three-volume work by Ziskin & Faust -- that's
22  Z-I-S-K-I-N and Faust, F-A-U-S-T -- where the original
23  research is reviewed and critiqued, and it is one of the best
24  secondary sources of information on the topic.
25  Q.   What was your role in this case, in Mr. Aldridge's case?
```

02:17:19PM 5
02:17:42PM 10
02:18:02PM 15
02:18:12PM 20
02:18:38PM 25

1  *A.*   I was hired by Kathryn Hayes with the AG's office, and in

2  summary she said -- laid out the legal issues for me, which in

3  a sense I don't remember the technical/legal terminology.  But

4  she wanted me to look at Dr. Quijano's work and basically

02:19:06PM  5  grade his paper.

6          She wanted me to look at Dr. Mosnik's work and

7  help her understand it because she said frankly she was

8  confused by what it was all about.

9          She wanted me to evaluate Mr. Aldridge, the

02:19:22PM  10  petitioner, to see if I could make sense of issues, possibly a

11  variety of them -- competency in 1990, for example; sanity in

12  1990 -- and whatever insights I could provide her about his

13  current mental function at that time.

14  *Q.*   Are you aware of what schizophrenia is?

02:19:45PM  15  *A.*   Yes, ma'am, I am.

16  *Q.*   Okay.  And based on what you've already said, you are

17  well aware of competency to stand trial and sanity?

18  *A.*   Yes, ma'am.

19  *Q.*   Are those evaluations you do frequently or infrequently?

02:19:56PM  20  *A.*   Very frequently.

21  *Q.*   And in your training and your experience, have you come

22  across people with schizophrenia frequently or infrequently?

23  *A.*   Yes, ma'am.  I really think I should point out I was

24  the -- I worked at Rusk State Hospital for a total of

02:20:13PM  25  seven years.  At one point I was the director of the chronic

1  psychiatric unit that was 150, 200 patients, all

2  schizophrenics, chronic schizophrenics.

3              I was the admitting psychologist on the

4  admissions and diagnosis -- the admissions and diagnostic unit

02:20:32PM  5  for several years where everyone admitted civilly to include

6  voluntarily to the hospital.  After the admissions nurse dealt

7  with them, I did the initial examination, the initial

8  diagnostic interview with them; and I, in a year, saw hundreds

9  of psychotics.

02:20:52PM  10             And, of course, in my work at the maximum

11  security unit, we probably processed -- and I was a part of

12  processing, the year that I was up there, at least 800

13  patients who had been criminally committed for one process or

14  another.

02:21:06PM  15  Q.   Did you -- were you able to review all of the

16  respondent's exhibits in this case?

17  A.   Yes, ma'am, except the ones that were learned about

18  Friday.  I haven't seen any new material since then.

19  Q.   Okay.  Did you get a chance to examine Mr. Aldridge

02:21:30PM  20  preparing to come to testify in this case?

21  A.   No, ma'am.

22  Q.   And why not?

23  A.   Well, he was informed that I was going to go to evaluate

24  him.  The assistant warden -- I can't remember his name --

02:21:47PM  25  told me that a document had been delivered to him regarding

1  that.  But he wouldn't cooperate with my evaluation, so I

2  couldn't evaluate him.

3  Q.   When you say he wouldn't cooperate with your evaluation,

4  did you have any interaction with him at all?  Did you --

02:22:02PM  5  A.   No, ma'am.  He wouldn't come out of his cell.  That's

6  what I was told.

7  Q.   Okay.  Did you speak to anybody else besides Kathryn

8  Hayes and myself about this case?

9  A.   Mr. Davis.

02:22:15PM  10  Q.   Were you able to interview him?

11  A.   On the -- by telephone, yes, ma'am, briefly.  It was not

12  a long interview.

13  Q.   And, of course, you were present here for the testimony

14  of Dr. Quijano and Mr. Davis and Dr. Mosnik.

02:22:29PM  15  A.   Yes, ma'am.  And Gladys Aldridge.

16  Q.   Is it important to weigh someone's motive for testifying

17  or giving a certain statement when evaluating how to use the

18  data they give you?

19  A.   Of course.  We apply -- and it is a very subjective

02:22:49PM  20  thing; but we weigh the importance, the quality of testimony,

21  in the same fashion as any other kind of evidence.

22  Q.   Did you see any special issues in credibility or motive

23  come up with any of the testimony that you heard or any of the

24  documents that you reviewed?

02:23:05PM  25  A.   I mean, there were questions by both sides, the lawyers

1   on both sides, you know, questioning the utility of different

2   evidence and the testimony.  Of course, I think Mr. Davis'

3   testimony was important to me.  Gladys Aldridge's testimony

4   was important in a fashion.  I weighed it -- in terms of

02:23:34PM   5   reliability, I didn't give it as much weight as I would

6   Mr. Davis', for example, and certainly not as much weight as I

7   would give to Dr. Quijano.

8   Q.   Okay.  Let me ask you for your --

9           THE COURT:  Do you have an objection?

02:23:45PM  10           MR. RYTTING:  Yeah.  I just object to the relevancy

11   of this testimony and the competency of the witness to be

12   judging, I guess, credibility before the Court.

13           THE COURT:  Overruled.

14   BY MS. ODEN:

02:24:00PM  15   Q.   I would like to get your reaction, if I may, to

16   Dr. Quijano's testimony, the portion in which he said, "If the

17   attorney Mr. Bates' testimony during punishment phase was

18   accurate and was representative of the majority of

19   Mr. Aldridge's communications with his attorneys, then he

02:24:23PM  20   would agree that Mr. Aldridge was not competent at the time of

21   trial."

22   A.   Right.  I mean, I'll paraphrase my understanding; that

23   clearly if you have got someone who is so delusional that you

24   cannot, at least the majority of the time, communicate with

02:24:45PM  25   them and get them to respond in a fashion that is important in

1  competency-type issues, then you would probably call them

2  incompetent.

3  Q.   Was that your understanding of the data you were provided

4  by Mr. Davis and by Mr. Bates' testimony, that the majority of

02:25:05PM  5  the time Mr. Aldridge was not able to communicate in that

6  fashion?

7  A.   No.   I didn't see their testimony or Bates' testimony as

8  indicating that to be the case.  I mean, I thought Mr. Davis

9  made it pretty clear that most of the time, you know, he

02:25:22PM 10  wasn't overtly hostile and was adequately responsive; and he

11  talked a lot about the guy having weird ideas.  But there

12  didn't appear to be anything that was so intense and so

13  frequently intense that it was impairing his capacity to

14  cooperate and collaborate with his lawyers.

02:25:42PM 15  Q.   What is your opinion of Dr. Quijano's process or the way

16  that he developed an opinion on Mr. Aldridge's competency to

17  stand trial and his sanity?

18  A.   I mean, in essence, I didn't have a problem with it

19  because it looked so similar to what I do and what I see a lot

02:26:02PM 20  of psychologists do and what I've seen psychologists and

21  psychiatrists do over the years in terms of, say, coming up

22  with a competency opinion and a sanity opinion.

23            You know, in addition to background

24  information, as far as the exam goes itself, you're collecting

02:26:18PM 25  clinical input from the person; and you're basically doing a

1 mental status examination throughout that.  And at some point

2 in your interview, you get into questions related specifically

3 to competency to stand trial; and he appeared to do that in

4 his exam.

02:26:37PM 5 Q.   Are you familiar with --

6            MR. RYTTING:  Your Honor, I do have an objection.  I

7 don't believe this witness has an independent opinion about

8 Mr. Aldridge's competency to stand trial.  My understanding of

9 his testimony is that he is just here to make -- to grade --

02:26:55PM 10 as he said, grade two papers.  I believe that's something for

11 the Court to do and not this witness to come in and give a

12 professional opinion about the quality of the reports or the

13 exam in this case.

14            I don't know if he has a background for making

02:27:13PM 15 this type of decision -- judgment in the first place.  Is he a

16 professor that is supposed to be grading these papers?  I

17 don't understand the basis of his testimony -- of his expert

18 testimony if it is not going to be about Mr. Aldridge.

19            THE COURT:  All right.  Does this witness have an

02:27:32PM 20 opinion to express about Mr. Aldridge's competency to stand

21 trial in 1990?

22            MS. ODEN:  Your Honor, at the deposition conducted

23 by Mr. Rytting and Ms. Hayes, he was asked his opinion of

24 Mr. Aldridge's competency; and he does have an opinion about

02:27:53PM 25 it.  He was primarily writing his report to express his

1  opinion about whether or not Dr. Quijano's process was

2  adequate to achieve an accurate result.  I do believe he has

3  an opinion about Mr. Aldridge's competency, but it is based on

4  the work that was done at the time of the trial.

02:28:14PM 5           MR. RYTTING:  Based on the deposition, I think the

6  testimony now he is here basically to grade Quijano's -- the

7  two papers that's here to bolster -- here to bolster Quijano's

8  methodology.  That's it.  I don't see the independent position

9  coming forth.  I disagree he came up with an independent

02:28:42PM 10  opinion based on his -- the deposition.  In fact, he said he

11  could not because he did not examine the client.

12           THE COURT:  All right.  Here's my opinion on that.

13  I think it would be useful for me to know what this witness'

14  opinion is about the competency of Mr. Aldridge to stand trial

02:28:58PM 15  in 1990 and what that is based upon.

16             To the extent that he has criticism of either

17  Dr. Quijano or Dr. Mosnik and their procedures or he thinks

18  that they did a good job, I am going to take that into

19  consideration in the mix; but I don't think we need to spend a

02:29:16PM 20  lot of time on it because that's really my job, is to evaluate

21  those opinions.

22           MS. ODEN:  Okay.

23           THE COURT:  But to the extent that he has something

24  to offer on those, I'm happy to hear it; but I don't think we

02:29:25PM 25  ought to spend a lot of time on it.  But I'm more interested

1 in knowing if he does have an opinion on competency in 1990,

2 what that opinion is, and what it is based on.

3                MS. ODEN:  Yes, sir.

4                Judge, with that understanding I may change the

02:29:39PM  5 order of my direct around a little bit.  There may still be

6 some questions dealing with his opinion about the procedure

7 itself.

8                THE COURT:  All right.

9 BY MS. ODEN:

02:29:49PM 10 Q.   Dr. Allen, when someone does a competency examination,

11 what is meant by "transparency" in terms of the report that is

12 produced?

13 A.   To leave an adequate trail of evidence, to leave your

14 footprints of what you have done so that the Court has some

02:30:08PM 15 idea of what you did.  You know, take enough notes so that

16 they know what questions you asked.  If you didn't write down

17 the questions or you don't have a form that you use, is there

18 enough in the way of answers to reveal the question that you

19 asked.  Keep your data so that the court has a -- so that in a

02:30:28PM 20 court of law people can track you.

21 Q.   Okay.  When you read Dr. Quijano's report, were you able

22 to gleam enough information from it that you could basically

23 recreate questions that were asked and answers that were given

24 in terms of the competency examination itself?

02:30:49PM 25 A.   Yes.

1    Q.   Is there a standard format used by forensic psychologists

2    to conduct such an examination?

3    A.   Are we talking now or in 1990?

4    Q.   Well, let's say in 1990 first.

02:31:05PM   5    A.   And the answer is yes.  I mean, as part of your training,

6    whether you're coming out of a program in forensic psychology

7    or going to training seminars, there was an understanding of

8    this is what competency involves and these are the kind of

9    questions that you want to get answered in a competency

02:31:26PM  10   examination.

11              So, there was a lot of overlap -- as to what

12   psychologists in the field who did this regularly, there was a

13   lot of overlap in what they were doing and the kinds of

14   questions they were asking.

02:31:37PM  15   Q.   And did you find adequate transparencies in Dr. Quijano's

16   report, or maybe this is just another way of saying the same

17   thing.  Did you find adequate transparencies in Dr. Quijano's

18   report that you could basically get data from his report about

19   Mr. Aldridge's competency in 1990?

02:31:56PM  20   A.   Yes.

21              MR. RYTTING:  I object to the leading question.

22              THE COURT:  I'm going to allow it.  Overruled.

23   BY MS. ODEN:

24   Q.   And describe what kind of information you were able to

02:32:07PM  25   gather.

1  A.   Well, in his dialogue, when he got around to the part

2  that involved direct competency issues, you could tell from

3  his notations -- they weren't always in quotes, but he was

4  summarizing what the examinee was telling him sometimes in

02:32:21PM  5  quotes.  It was clear that he was attempting to establish

6  whether or not the defendant had an adequate sufficient

7  understanding of what he was charged with and that he had that

8  understanding not just a factual but a rational level.  Is it

9  a felony, for example?  You know, are you facing the death

02:32:41PM  10  penalty, kinds of things?

11            MR. RYTTING:  I'm going to have to renew my

12  objection.  Dr. Quijano is the person who is in a position to

13  talk about what he was doing in that exam at that point, and

14  he is making guesses about about what Dr. Quijano had in mind

02:32:58PM  15  and what he asked.

16            THE COURT:  All right.  Let's just --

17            MS. ODEN:  It's the basis for his opinion, Your

18  Honor.

19            THE COURT:  All right.  All right.  I'll allow it.

02:33:06PM  20  A.   It was clear from his examination that he was -- I

21  believe I was still answering.

22  BY MS. ODEN:

23  Q.   Please.  Go ahead.

24  A.   -- that he was appraising whether or not the defendant

02:33:16PM  25  could appraise the functions of various courtroom

1  participants.  It was those kinds of questions that in my

2  opinion were adequately outlined in his report that reflected

3  he was indeed doing a competency examination.

4  Q.   And since Mr. Aldridge was unwilling to cooperate with

02:33:33PM  5  you in a more current evaluation, were you able to get that

6  kind of information, for example, from Dr. Mosnik's report

7  since Mr. Aldridge was cooperative with Dr. Mosnik?

8  A.   I just saw nothing in Dr. Mosnik's report that gave me

9  any indication -- and there's no evidence of competency

02:33:54PM 10  examination.  There was lots of evidence about neuropsych

11  data, but nothing related to competency that showed a

12  comprehensive exam had been done.

13  Q.   Is it possible to retroactively assess someone's

14  competency?

02:34:10PM 15  A.   I am going to answer that is two-fold at least.  I can't

16  clinically examine you today on competency issues and

17  automatically assume that makes you competent 10 years ago or

18  20 years ago.  I can't do that.  If I have enough data

19  historically, I can use that data to reach a reasonable

02:34:36PM 20  conclusion about your competency 10 years ago or 20 years ago,

21  if I have got enough data about your mental functioning.  I

22  might have data in there that shows me, well, you knew what

23  your Miranda rights were, for example.

24          I can even ask you questions today about

02:34:54PM 25  20 years ago and maybe get some insights as to whether or not

1  you were competent.  It would not be a solid.  If you can't

2  remember a lot of things, for example, which a lot of us don't

3  remember yesterday very well, it is going to impair or distort

4  some of that information.

02:35:15PM  5       So, I can give you a reasoned opinion and --

6  also with some caveats that the opinion, you know, is weaker

7  because of the absence of A, B, or C.  But, yeah, you can give

8  an opinion.  It may not be as good or solid.

9  Q.   Is it important -- for example, if you had been able to

02:35:38PM 10  test Mr. Aldridge or to examine him for his competency, would

11  you have administered tests of his cognitive abilities or

12  neuropsychological tests to reach a conclusion about his

13  competency?

14  A.   Current?

02:35:53PM 15  Q.   Current.

16  A.   You just in general don't have to administer all those

17  things to perform a competency exam.  You administer whatever

18  tests you need to administer to answer the questions that you

19  need to address.

02:36:13PM 20       If you're determining in your exam, for

21  example, that -- you know, I ask this person what they were

22  charged with and I know factually they're charged with, say,

23  vehicular homicide and they're telling me that they were

24  jaywalking, I've got to account for that discrepancy.  Are

02:36:32PM 25  they pulling my leg, or do we have some kind of bizarre memory

1   problem going on or some mental disorder?  So, I might come up

2   with a test to account for that discrepancy.

3                       But did I go in and give you a rash of 10 or 15

4   or 20 tests that have nothing to do with the legal question,

02:36:51PM 5   that's a waste.

6   Q.   Is it necessary to determine, for example, whether

7   Mr. Aldridge has schizophrenia in order to determine whether

8   or not he was competent in 1990?

9   A.   It is not his schizophrenia -- the answer is no, I mean,

02:37:09PM 10   because it is not his schizophrenia, per se, that makes him

11   competent or not.  The issue is:  Is he or is he not

12   competent; and if he is not, how do you explain it?  Why not?

13   What specifically about him makes him incompetent in terms of

14   the two factors and in terms of getting into the specifics of,

02:37:30PM 15   say, you know, multiple questions relating to those two

16   factors?

17   Q.   Based on the testimony that you heard here and the

18   documents that you reviewed, including Dr. Quijano's report

19   and statements of other doctors and things like that, were you

02:37:47PM 20   able to form an opinion whether or not Mr. Aldridge was

21   competent to stand trial in 1990?

22   A.   Yes.

23   Q.   And what is that opinion?

24   A.   It appeared to me that he was competent to stand trial in

02:38:00PM 25   1990, based on the records that I saw, my conversation with

1  Doug Davis and Quijano's report.  That appeared to me to be

2  the most parsimonious conclusion.

3  Q.   And having heard additional testimony by Mr. Davis and

4  Dr. Quijano and considering some of the perspectives of

02:38:25PM  5  Dr. Mosnik presented in this hearing, has your opinion on

6  Mr. Aldridge's competency in 1990 changed?

7  A.   No, ma'am.

8  Q.   Considering all that data, again, were you able to form

9  an opinion on Mr. Aldridge's sanity at the time he committed

02:38:41PM  10  the offense?

11  A.   Yes, ma'am.

12  Q.   And what is that opinion?

13  A.   That he was sane at the time of the crime.

14  Q.   So, how do we account for all the data that we hear so

02:38:55PM  15  much about, of all these different explanations and delusions

16  and hallucinations and voices in his ear?  How does all that

17  fit in?

18  A.   There are two patterns in a case like this that you

19  actually have to understand.  One is the person -- the

02:39:17PM  20  examinee's history or criminal pattern of behavior, and second

21  is their psychiatric history or their psychiatric pattern of

22  behavior.  For example, in assessing sanity at the time of a

23  crime, the approach is to get everything you can, evidence

24  wise, to tell you what was going on at that time.  Are there

02:39:50PM  25  any collateral witnesses, any witnesses, any fingerprints,

1   whatever forensic evidence you can get your hands on?

2           You also are interested in anything pretty

3   close to before the time of the crime to indicate mental

4   status, motive, intent, et cetera, and immediately after the

02:40:12PM   5   crime.  So, you have this one, two, three, picture of present,

6   past, and post crime and what in that picture, evidence wise,

7   tells you whether or not that person knew of the wrongfulness

8   of his conduct.

9   Q.   So, let's talk about the case here.  What did you see in

02:40:39PM  10   the pre-crime period, of the evidence that you reviewed, that

11   indicated that Mr. Aldridge was sane at the time he committed

12   the offense?

13   A.   I thought it was very telling that you have someone with

14   a criminal history that goes back to age 14, several days

02:40:58PM  15   before the capital murder buying a gun, lying on the form that

16   he had to fill out -- you know, name, address, date, whatever

17   is on that form -- which requires some degree of rationality,

18   lying that he was not a convicted felon.  And I got no

19   evidence that indicates that at that time he was showing a

02:41:25PM  20   psychotic level of behavioral disorganization, battling at the

21   counter, not able to count money or whatever.  He was able to

22   purchase that gun in an adequately rational and coherent

23   state.  I will put it that way.

24   Q.   What about the time of the crime itself, in terms of

02:41:47PM  25   either his criminal history or his psychiatric history, told

1  you that he was sane at the time he committed that offense?

2  A.   When it comes to the issue of sanity, if you have -- if

3  you are dealing with a crime scene that looks like or fits

4  into a history of criminal activity that this person has been

02:42:12PM 5  engaged in before, which is exactly what we have here --

6            MR. RYTTING:  I'm going to object to this witness'

7  expertise to talk about patterns of criminal activity.  I

8  don't believe he is qualified to do so or that they have

9  qualified him to make statements about this as a forensic

02:42:32PM 10  scientist.  I'm not even sure there is a forensic science that

11  addresses these patterns of criminal activity or profile,

12  whatever it may be.

13            THE COURT:  All right.

14            MS. ODEN:  Judge, any lay witness can see that

02:42:44PM 15  there's a pattern of robberies and assaults in Mr. Aldridge's

16  life.  I don't think you have to be an expert to see that.

17            THE COURT:  Overruled.  I'm going to allow it.

18  A.   In fact, as Phil Resnik points out in his chapter, any

19  time you are dealing with sanity at the time of a crime that

02:43:08PM 20  fits the same criminal pattern as before, then the likelihood

21  that you are dealing with a sane criminal act goes up

22  considerably.  And that's what we have here.  In addition,

23  then you have after -- I mean, there's more I could say about

24  the crime scene and that kind of behavior, but --

02:43:36PM 25  BY MS. ODEN:

1   Q.   Well, let me ask you specifically about that.  Was

2   there -- was there anything perhaps in statements of other

3   people that had talked to Mr. Aldridge or police records,

4   anything about the scene of the crime that indicated to you

02:43:50PM  5   that Mr. Aldridge knew what he was doing was wrong at the time

6   that he was committing the offense?

7   A.   Yes.

8   Q.   What did you see?

9   A.   Well, the statements and interactions with family

02:44:01PM  10   afterwards were very telling.  He flees the scene with the

11   money.  His interactions with Gladys, you know, there are

12   later statements by Mr. Ford, the nephew -- or nephews, all

13   indicated that he knew darn well that he had killed someone,

14   he had committed robbery, and he had a conscious intent and

02:44:32PM  15   plan to flee, I mean, that he knew what he had done is wrong.

16   Q.   Did he do anything, to your knowledge, at the scene to

17   prevent his identity from being connected to the crime scene?

18   A.   If I could qualify it, the answer is yes.  And when you

19   see these complex mental symptoms presented to explain a

02:45:01PM  20   crime -- and I mean complex mental symptoms with

21   hallucinations on various levels and delusions on various

22   levels -- when, in fact, if you simply look at it in terms of

23   the past criminal history, you have to ask the -- I had to ask

24   myself the question:  Was I committing this crime because of

02:45:22PM  25   this psychosis excuse I was using after I was arrested, or did

1 I make the guy open the safe so my fingerprints wouldn't be on

2 it?

3                    And when you're looking at crime scenes

4 forensically, you have got to think along those lines.  The

02:45:45PM 5 excuse used was a mental illness kind of an excuse.  I felt

6 like it was over the top, not in terms of making it bizarre in

7 quality but over the top for other reasons that I hope to get

8 into.  So, I think it was an excuse.  I mean, he killed the

9 guy -- he said so later -- so he could get away clean, no

02:46:09PM 10 eyewitnesses.  Secondly, he had the guy -- Ben Stone, I

11 believe -- open the safe so his fingerprints wouldn't be on

12 it.

13 Q.   So, what are the reasons that you think his explanation

14 was over the top?

02:46:23PM 15 A.   There were symptoms that I believe he was showing prior

16 to buying the gun, prior to committing capital murder -- the

17 family members have talked about them, for example -- such

18 things as T.D.C. sending people to follow him and the Nazis

19 and that kind of thing and even a letter in '89 that included,

02:46:55PM 20 among other things, being -- the eyes of children, molested by

21 children, and so on.

22                    But if you notice at the time of his arrest --

23 and those police interviews are incredibly important in

24 understanding sanity and sometimes competency issues later.

02:47:12PM 25 So, you have got this -- Houston Police Department people

1  where he clearly appears to be -- the examinee clearly appears

2  to be aware of his rights.  "I don't have to talk to these

3  guys.  I have got a right to a lawyer."  And nothing at that

4  time indicated any hallucination or delusion revolving around

02:47:35PM  5  his boss sexually assaulting him or ghosts on the roof or any

6  of that stuff that was later provided as his reason for

7  killing the victim.

8              And, clinically, if you assume that that must

9  have been -- if I assume that was a peak moment of his

02:47:55PM  10  psychosis, where it was so severe, so out of hand he killed

11  somebody and took the money, 10 days later, to assume that it

12  wouldn't be an issue, he wouldn't spontaneously report it to

13  police officers when given a chance, I see that as an

14  inconsistency.

02:48:18PM  15  Q.   Is that inconsistency something that you have seen

16  presented previously with any schizophrenic patients or

17  schizophrenic examinees, the ability to have that big -- you

18  know, one day you are having this huge peak in psychosis and

19  10 days later you are completely over it?

02:48:37PM  20  A.   I mean, it is possible, you know; but it doesn't usually

21  cycle quite that fast, especially in, you would assume, an

22  untreated schizophrenia.  But it isn't just the ten days until

23  the time of arrest.  It is the same day.  None of that came

24  out with Gladys Aldridge or Mr. Ford or James Thomas.  None of

02:49:02PM  25  that was evident in any of their statements, in any of their

1  accounts of interaction with him.  So, on the day of the crime

2  up to the time of arrest, we have zero evidence of a florid

3  psychosis, which is atypical.

4  Q.   We've heard some reference to the idea that if he really,

02:49:30PM  5  really, really believed those delusions, then he wouldn't be

6  competent.  Is that psychologically true?

7  A.   No.  It is not automatic.

8  Q.   What about if he really was truly schizophrenic at the

9  time, then he wasn't competent?

02:49:51PM  10  A.   It is not automatic.  I mean, there's studies that

11  demonstrate it.

12  Q.   Okay.  Are you familiar with anything in the literature

13  that correlates the presence of -- or having untreated

14  schizophrenia with being incompetent to stand trial?

02:50:15PM  15  A.   Right.  Basically the research says this.  If you are

16  psychotic, which includes schizophrenia, the likelihood that

17  you are going to be incompetent is elevated.  But there's

18  tremendous variation.  Now, the studies range from a

19  correlation of .25 to around .45, where -- which means as

02:50:49PM  20  incompetency rises in some studies, 25 percent of the time

21  they're psychotic.  So, it is not automatic at all.  In fact,

22  it is one of those areas where there is some difficulty

23  merging the behavioral science with the requirements of the

24  law.  They are often like merging water and vinegar.  Okay.

02:51:20PM  25  And it is not always a perfect fit.  But in terms of following

1  the standards and asking the right questions during

2  examination, it is often the case that people who are

3  psychotic are competent to stand trial.

4  Q.   And that correlation -- or the range of correlations that

02:51:38PM  5  you just mentioned, does that mean assume treated, medicated,

6  schizophrenia?

7  A.   It doesn't matter.  The study was just are they psychotic

8  at the time or not.  Some were on medicine; some weren't.  But

9  they were all psychotic.

10  Q.   Okay.

11  A.   Because sometimes you could still be pretty crazy and be

12  medicated.

13  Q.   Okay.  Are schizophrenics avolitional in the sense that

14  they cannot control their behavior because of their delusions?

02:52:08PM  15  A.   In general it is described as an avolitional disorder,

16  and the DSM talks about it.  In assessing things like

17  competency, you have to -- you are making a judgment as the

18  extent to which volition remained intact, whether it is at the

19  time of the crime or it is remained in tact, say, during your

02:52:30PM  20  competency examination.  But it is not that hat they are

21  without volition 24/7.

22  Q.   If someone presents as being without control over their

23  behavior 24/7, what does the literature say, what does your

24  experience say, about that presentation?

02:52:56PM  25  A.   They're either organic.  It means something is wrong with

1  their brain that you're going to see on an MRI or some organic

2  test.  Or they're extremely well coached malingerers,

3  well-versed malingerers.

4  Q.   And --

02:53:11PM 5  A.   And even then it is not that they are avolitional 24/7.

6  It is that -- because there are rest periods.  You can't act

7  mentally ill every minute of every day.  You get rest periods.

8  And during those rest periods, you will see their capacity for

9  volition present.

02:53:32PM 10  Q.   Do you think that that is what is going on in this case?

11  Do you think -- do you think Mr. Aldridge is malingering

12  schizophrenia?

13  A.   No.

14  Q.   Do you think he is malingering at all?

02:53:45PM 15  A.   Yes.  But we call it exaggeration or fainting, and --

16  malingering depends on the circumstance -- definitions you

17  use.  But the definition I use is that malingering occurs and

18  there's no symptom -- objective symptoms to account for what

19  they're showing you.  It is totally fake.

02:54:09PM 20  Q.   Okay.

21  A.   But exaggeration or fainting -- you can have a mental

22  illness and exaggerate to avoid prosecution or exaggerate to

23  win a civil lawsuit, a civil suit.  They are not incompatible.

24  Q.   Okay.  Is it forensically or scientifically reliable to

02:54:27PM 25  conclude that Mr. Aldridge was not competent in 1990 because

1  he had the same symptoms reportedly then that he does now, and

2  he's not competent now; therefore, he wasn't competent then?

3  A.   False conclusion.  I mean, it is a good example of

4  confirmation bias as well as a -- it is an illusory

02:54:52PM  5  correlation.  Because you are showing a certain set of

6  symptoms, you can't conclude -- and you haven't really done a

7  competency exam, maybe; but you can't conclude the symptoms

8  now made him incompetent, you know, 16 years ago.

9  Q.   Can you comment on -- we've heard something about

02:55:17PM  10  schizophrenia whether it waxes or wanes or whether it -- once

11  it starts, it's pervasive and constant to the same degree for

12  the rest of your life.

13  A.   May I use a couple of examples?  The first case I ever

14  dealt with, forensic psychiatric unit, Rusk State Hospital.

02:55:39PM  15  My Master's degree internship, my boss tells me to go evaluate

16  this guy.  I mean, I am right out of school.  I am an idiot.

17  I come back from the examination protesting as to why he's

18  incarcerated --

19          MR. RYTTING:  I object on the grounds of relevance,

02:55:56PM  20  if I may.  I don't know where this is going.

21          MS. ODEN:  Judge, I think it's an example for him to

22  illustrate his answer.

23          THE COURT:  All right.  I'll allow it.  Overruled.

24  A.   The patient I was evaluating was sitting there reading

02:56:07PM  25  Einstein's Cosmology and listening to Johann Sebastian Bach,

1   and I didn't get that.  He was a Ph.D. mathematician.  He was

2   rational.  He was coherent.  He was logical.  I could find

3   nothing that made him look schizophrenia until I go tell my

4   boss this story who was already familiar with the story who

02:56:30PM   5   returns me to the patient.  Of course, my boss knew exactly

6   what button to push.  And suddenly it was clear that this man

7   was incredibly delusional and very dangerous.

8                   Yes, you can be schizophrenic.  You can read

9   novels.  You can drive cars.  You can make change.  You can

02:56:49PM   10   plan crimes.  You can commit crimes.  You can do all kinds of

11   things and be schizophrenic.  You can have moments of clarity.

12   Some are more severe and have more of what I'll call diseased

13   moments, if you will.

14                   Does it mean you're never capable of rationally

02:57:11PM   15   understanding anything ever or providing factual information?

16   And the answer is no.  I mean, they often can do that.  Is

17   there a lot of individual variation?  Of course there is.

18   Some people are worse in the illness than others.  Age of

19   onset makes a difference.

02:57:29PM   20                   For example, if schizophrenia starts when you

21   are 45, you are more likely to have -- that's when you are

22   more likely to have like old factory hallucinations and

23   tactile hallucinations.  You already hardly get those when the

24   onset is in the 20s.  I think I answered your question.

02:57:47PM   25   Q.   Okay.  So, the logical question for me, then, is:  Well,

1    what about when you're schizophrenia is motivated by or

2    spurred by contact with the criminal justice system?  There

3    are some statements made by Mr. Aldridge that he feels this

4    whole system is out to persecute him and torture him as part

02:58:10PM 5    of a government experiment.  So, how could he be competent to

6    stand trial when that's the button that gets pushed for him?

7    A.   Because competency does not require some sort of pristine

8    state of mental health.  You don't have to be -- and it

9    doesn't require that you have a law degree.  It doesn't

02:58:41PM 10   require that you are a certified legal assistant.  It doesn't

11   require that kind of knowledge or information.  It requires

12   just a sufficient -- that's the word, sufficient -- present

13   ability to deal with proceedings rationally and factually.

14   Sufficient, not superior, sufficient.  Sufficient, present

02:59:06PM 15   ability to cooperate and collaborate with your attorney.

16              That includes pretty simple things.  It is not

17   a really high standard in Texas.  I don't know about other

18   states.  But it can include things like if I tell you to be

19   quiet, the person is quiet.  You can't talk out in court.  And

02:59:31PM 20   they comply.  That's part of competency.

21   Q.   How about Mr. Davis' testimony that he was able to

22   redirect Mr. Aldridge during conversation?

23              MR. RYTTING:  I don't recall that testimony, Your

24   Honor.  I believe that's a misstatement of the record.

02:59:49PM 25              THE COURT:  All right.  The record will speak for

1  itself on that.

2  BY MS. ODEN:

3  Q.   Go ahead, Doctor.

4  A.   I got that in my conversation with Mr. Davis and by

02:59:57PM  5  telephone, and it is an important issue.  It is, in fact, in

6  my circles anyway, well-known that things like hallucinations

7  in schizophrenics decrease when they are distracted, when they

8  get involved in activities.  And they often will report that,

9  you know, I like to mow the lawn because then the voices don't

03:00:23PM  10  bother me as much.  Just as an example.

11         When asked about his ability to control his

12  apparent weird ideas, Mr. Davis began to talk to me in those

13  terms; and I then asked him specifically --

14         MR. RYTTING:  Your Honor, I will object to the

03:00:42PM  15  hearsay.

16         THE WITNESS:  Hearsay, I'm sorry.

17         MR. RYTTING:  It would be one thing if he got -- if

18  Doug Davis hadn't testified here today, but here he is talking

19  about a conversation regarding the subject that he obviously

03:00:52PM  20  did not touch during this evidentiary hearing or testify to.

21         MS. ODEN:  Judge, he is an expert.  He can rely on

22  any admissible evidence if it's the type that are only relied

23  on by an expert in his field to form his opinion.

24         THE COURT:  All right.  Overruled.

03:01:07PM  25  A.   He is redirectable, and that's not at all uncommon.

BY MS. ODEN:

Q.   So, how does that fit into the idea of whether or not schizophrenia waxes and wanes?

A.   Because it does.  It is a long-term disease or disorder that waxes and wanes in the severity of symptoms that are exhibited over time.  It does not -- even though it is a severe disorder, it's a psychotic disorder, it does not mean that they are delusional every minute of every day any more than you and I are thinking about our own personal religious beliefs when we're driving our car.

Now, you can drive your car and not sit there and feel like you have to reverse your, say, Christian philosophy or something any more than someone who is delusional.  When they are driving a car, they are not necessarily thinking about their paranoid delusions or that the FBI is after them.

The same applies with the hallucinatory, the perceptual distortions of schizophrenia.  They are not there all the time.  Often they, for example, get worse only when they're going to bed and they close their eyes, for example; and it gets worse and disturbs their sleep.  But if they're up and moving around during the day, that's a part of the waxing and waning that I think Dr. Quijano was talking about.

Q.   Did you -- in reviewing the records or in conducting -- in receiving the data that you've received, did you see any

1  examples around, either, before or during or right after the

2  crime, behavior on Mr. Aldridge's part that indicated the

3  symptoms were waxing or waning?

4  A.   What time frame?

03:03:03PM  5  Q.   Before, during, or shortly after the crime.

6  A.   You know, I don't have any evidence that just prior to

7  the crime, like December 29th, the gun buying, that any of

8  that was driven by hallucinations or delusions.  I've got

9  nothing that says -- other than his report after his arrest,

03:03:22PM  10  that says the crime itself was driven by hallucinations or

11  delusions.  The behavior doesn't fit that, in my opinion.

12          And then afterwards, the interactions with

13  family, I got nothing there.  Even his interactions with the

14  police officers, HPD, he made some references to Allah, but

03:03:44PM  15  there was nothing about sexual assaults or ghosts on the roof

16  or --

17  Q.   But Dr. Mosnik says that's because he wasn't specifically

18  questioned by those people about those mental ideas?

19  A.   Well, here's my problem with that.  Why is it you got to

03:04:01PM  20  specifically question him to get a symptom?  When Quijano

21  talks to him, he starts spewing all these symptoms intensely,

22  voluntarily, with no apparent need for specific questions?

23  And that appears to be the same case in the way I read

24  Dr. Mosnik's notes.  You don't have to ask a specific question

03:04:29PM  25  in his case, apparently, for him talk a lot.  He loves talking

1 about his symptoms.

2 Q.   What about the argument that his explanations for the

3 crime, the Sufis and the Nazis and all that stuff must be true

4 because those ideas appear in writings of his before the

03:04:50PM 5 crime; and they appear in writings of his after the crime?

6 A.   After arrest.  I mean, there's an important distinction

7 to make there.

8 Q.   Okay.

9 A.   There was some writing -- the letter, for example,

03:05:04PM 10 January 6th, where he's talking about a lot of this stuff.

11 But nowhere in the letter is he saying he committed the crime

12 because of these delusions, that Ben Stone was sexually

13 assaulting him, and the ghost was telling him to kill her -- I

14 forget the details.  That may not be an accurate

03:05:28PM 15 representation, but that -- I don't believe that was in the

16 letter of January 6th, three days after the crime.

17 Q.   Is it possible that his schizophrenia, because it is

18 untreated or for whatever reason, has genuinely gotten worse

19 to the point where now currently, or in 2006 when Dr. Mosnik

03:05:47PM 20 evaluated him, that now he really is incompetent?  Is that

21 possible?

22 A.   It's -- no.  It is possible.  I mean, mental status could

23 deteriorate over time.

24 Q.   But I thought schizophrenia was this permanent thing;

03:06:03PM 25 that once you get it, that's as bad as it is going to be.

1    *A.*   No.  Schizophrenia is just described as a long-term

2    disorder.  If you read the DSM, there is a statement made in

3    there where -- because we don't know -- writers and

4    researchers in the field don't know, of course, there are

03:06:32PM  5    probably cases that totally go away; and they act like they

6    never happen.  We can't say that never happens.

7             In general, it is a very severe disorder that

8    actually tends to begin gradually.  There's a prodromal phase,

9    the acute phrase.  And then over time, with chronicity, it can

03:06:52PM 10    last until death; and it tends to take on a deteriorating

11    course.  The deterioration isn't just some sort of increase in

12    symptoms, like the hallucinations get worse.  It is an

13    increase in the negative symptoms, where they more slovenly --

14    don't interact as much, stay more alone.  And if you've ever

03:07:18PM 15    been to a state hospital and you've seen in the -- say the

16    chronic psychotic ward, you'll see a lot of those people

17    there.  They are very burned-out schizophrenics.

18    *Q.*   Did you see any indication in the T.D.C.J. records that

19    you reviewed, specifically around the time that he had first

03:07:32PM 20    been admitted to death row, that indicated that he may be in a

21    waxing or a waning phase?

22    *A.*   Well, clearly, there was an intake eval I believe by a --

23    I'm not sure if it was a social worker or a counselor or a

24    psychologist.  I'm not sure.  And they documented the apparent

03:07:58PM 25    delusion beliefs and distorted perceptions and so on.  But

1  clearly they also documented statements.  They clearly were

2  pretty rational and coherent in their nature and indicated

3  that he certainly wasn't in any kind of -- just totally

4  irrational state.

03:08:16PM  5          I mean, he started talking about -- that, you

6  know, his lawyers had a doctor see him.  I assume Quijano.

7  But they messed up.  They didn't have Quijano testify, and

8  that gave him grounds for an appeal.  That's pretty rational

9  stuff.  I mean, it fits in also with his maybe paranoid

03:08:40PM 10  nature, but it's also rational in that context.

11          MS. ODEN:  For the Court's reference, that's

12  Respondent's Exhibit 25 at Pages 93 to 95.

13  BY MS. ODEN:

14  Q.   You were present during Dr. Mosnik's testimony this

03:09:01PM 15  morning.

16  A.   Yes, ma'am.

17  Q.   And you were present when she and I read through a lot of

18  entries in the Houston Police Department records regarding

19  different things that Mr. Aldridge had said pre arrest and

03:09:15PM 20  post arrest.

21          Do you have any comment to make on that data

22  and how it plays into the hypothesis of whether or not he was

23  competent and sane?

24  A.   Well, the statement to Houston Police, if I can start

03:09:32PM 25  there, clearly indicated he was aware of his right to remain

1   silent and his right to an attorney.  That's a competence

2   issue right there.  It was present January 13th, 1990, two --

3   which would be about two and a half months before Quijano saw

4   him, evaluated him.

03:09:56PM  5            Also at that time, the absence of his psychotic

6   excuse for the crime that seemed to emerge later when he had

7   more time, you know, to think about it, was absent on

8   January 13th when he was talking to the policemen.  And those

9   police observations are critically important when I'm

03:10:18PM  10   assessing sanity.  If I can get police statements close to the

11   time of the crime, that is good stuff.

12   Q.   Did you independently consider all the data available to

13   you when you were making your opinion in this case?

14   A.   Say that again, please.

03:10:38PM  15   Q.   Did you independently consider the data available to you

16   when you were forming your opinion in this case, or did you

17   rely on Dr. Quijano's opinion to form your own opinion?

18   A.   Well, I was analyzing and assessing his opinion.  So,

19   yeah, I formed my own opinion based on as much information as

03:10:58PM  20   I had available to me, which was considerable.

21   Q.   Doctor, is there any question that I have asked that

22   isn't clear or you feel like you haven't had a chance to fully

23   answer because I'm not phrasing it the right way?  Anything

24   you may want to add that I may have cut you off on?

03:11:36PM  25   A.   I believe I made my position clear on the issue of

1   competence -- and I didn't mean to -- maybe I misstated it

2   when I was trying to describe my role, but I thought I had

3   made it clear that Ms. Hayes wanted to know what I thought

4   about the guy's competency in 1990.  So, obviously, I was

03:11:57PM 5   going to have an opinion on that issue.

6         I can't think of anything right now, ma'am,

7   so...

8         MS. ODEN:  No other questions at this time.

9         THE COURT:  All right.  Let's take an afternoon

03:12:06PM 10   break for about 20 minutes.  Reconvene at 3:30.  And I do

11   expect us to be through by 5:00, if not earlier.

12         MR. RYTTING:  Yes, Your Honor.

13         THE COURT:  Okay.

14    (Break)

03:37:19PM 15         THE COURT:  All right.  Mr. Rytting?

16         MR. RYTTING:  Yes.

17               **CROSS-EXAMINATION**

18 **BY MR. RYTTING:**

19 *Q.*   Dr. Allen, you evidently have been doing a lot of reading

03:37:25PM 20   since in between your deposition and now.  Is that fair to

21   say?

22 *A.*   I have read some more of the file.

23 *Q.*   Isn't it true at your deposition that you read -- when

24   you were asked about journals and texts on schizophrenia, you

03:37:41PM 25   couldn't name any?

1    A.   On schizophrenia, right.  I hardly ever read on

2    schizophrenia.  These are forensic psychology texts I was

3    referring to.

4    Q.   Okay.  So, you hardly read about schizophrenia.  In fact,

03:37:49PM  5    you are probably not even qualified to even make a diagnosis

6    of schizophrenia, are you?

7    A.   Well, the board of examiners would disagree with you on

8    that.

9    Q.   But you believe the field hasn't changed much in

03:38:00PM  10    20 years.  Did you not say that in your deposition?

11    A.   From my point of view.  I mean, I don't know how long

12    DSM-IV has been out, but there hasn't been a whole lot of

13    breakthrough since that was published.

14    Q.   And, in fact, you couldn't name a program or any -- you

03:38:19PM  15    know, university program or any, say, nationally known figures

16    in the field, could you?

17    A.   I don't recall you asking me about any programs, but I

18    couldn't remember any author's names regarding schizophrenia

19    that I had read.

03:38:30PM  20    Q.   And when it comes to the pharmacology that deals with

21    schizophrenia, the drugs that are administered, you didn't

22    know how those worked?

23    A.   Yeah.  I couldn't tell you the specific actions like,

24    say, of an old tranquilizer like Thorazine or anything like

03:38:49PM  25    that.

1  *Q.*   Or what part of the brain was particularly affected.

2  *A.*   Probably not without some refresher reading.

3  *Q.*   In fact, what you said in the deposition, "Well,

4  everything is connected, the whole thing."

03:39:04PM 5  *A.*   That's true.  Every part of the brain is connected to

6  every other.

7  *Q.*   Now, you said you relied heavily on certain types of

8  information.  And I would like to first turn to the police

9  reports, and you extol their reliability, I guess, or validity

03:39:47PM 10  for your type of investigation; is that correct?

11  *A.*   Yeah.  Police reports can really help you the closer they

12  are to the crime.

13  *Q.*   And respondent has already alluded to what's numbered

14  HPD060, which is, I believe, part of your Exhibit 17.  I'd

03:40:10PM 15  hate the record to be confused, but I believe that's so.

16         MR. RYTTING:  May I approach the --

17         THE COURT:  You may.

18         MR. RYTTING:  -- the witness?

19  BY MR. RYTTING:

03:40:25PM 20  *Q.*   And would you read the interview with Garfield Aldridge.

21  Have you seen that before?

22  *A.*   (Witness reading.)  Is this the date of arrest?  I don't

23  see a date on this.

24  *Q.*   Have you read it before?

03:41:16PM 25  *A.*   Yes.

1    Q.    And doesn't it say here that the suspect was asked about

2    the murder and robbery at the McDonald's joint.  Garfield then

3    went into a lengthy speech about his duty to Allah and his

4    holy journey of which he needed to make?

03:41:36PM  5    A.    Yes, sir.

6    Q.    And this isn't a lengthy account of that speech, is it?

7    A.    No, sir.

8    Q.    And we have no idea what he said to the police from this

9    report, do we?

03:41:51PM  10    A.    Well, there was no mention of being sexually assaulted by

11    Ben Stone.  I thought that was important.

12    Q.    Well, you don't know if there was any mention of being

13    assaulted by Ben Stone from this, do you?

14    A.    There was no mention in the report of being assaulted by

03:42:02PM  15    Ben Stone, which I assumed would have been a salient piece of

16    information that I assume the defendant at that time would

17    have made.

18    Q.    Why would you assume that?

19    A.    Because he is supposed to be psychotic and that was

03:42:16PM  20    supposed to be his reason for killing the guy.

21    Q.    How do you know that that didn't come up?  Who is making

22    a determination about what salient is?  Mr. Aldridge or the

23    police?

24    A.    Me.  Me.

03:42:27PM  25    Q.    No.  In making this report, who is making the

1    determination of --

2    A.   What goes into the report would be the police officer.

3    Q.   And what they've certainly determined is that there was a

4    lot -- in fact, a lengthy speech that was not salient.

03:42:37PM  5    A.   About Allah.  His hallucination or delusion about

6    Ben Stone was not listed in here.  I agree with you.  There

7    was a lengthy speech about Allah and his holy journey and

8    admitting to being there when Stone was killed.

9    Q.   But we don't know if this went on for, say, 15 or 20

03:43:00PM 10    minutes.

11   A.   That's true.

12   Q.   And we do know that his hallucinations about Allah and

13   his holy journey --

14   A.   That's true.

03:43:04PM 15   Q.   -- holy journey is intertwined with his other delusions

16   including delusions about killing Mr. Stone, don't we?

17   A.   No.

18   Q.   That isn't evident from Quijano's report?

19   A.   The alleged delusion of being sexually assaulted by Stone

03:43:23PM 20   is all part of everything else; is that what you're saying?

21   Q.   Well, haven't you read things in the record about not

22   only the murder but the case against him being involved --

23   being part of a plot or conspiracy against him to prevent him

24   from going to Iran and realizing his religious destiny.  Have

03:43:49PM 25   you not read things like that?

1    A.   I have read that, but I am having trouble with your

2    characterization.  Are you talking about the case against him,

3    which has to do with competency and then his reason --

4    Q.   I'm talking about --

5    A.   Wait a minute.

6                    -- and then about his reason for the murder?

7    Could you clarify that for me?

8    Q.   No.  I'm talking about -- okay.  What I am trying to get

9    at is this:  This is a police report that you -- of the type

03:44:09PM 10   that you say are reliable.  It -- by its own statement, it

11   admits that it leaves out a lengthy speech of what may be

12   highly relevant information about his mental state.  Is that

13   fair to say?

14   A.   Well, probably not in that -- I agree with what you're

03:44:30PM 15   saying, that they didn't include a lot about this regarding

16   Allah.  But when it came to the murder of be Ben Stone, they

17   report him saying nothing.  There's no report his

18   acknowledging that he was there, that it had anything to do

19   with sexual assault; and I am making the assumption that:

03:44:50PM 20   Boy, that was a sure good chance for him to give them that

21   reason for killing the guy.

22   Q.   Well, does he have any insight into his illness at all?

23   A.   Probably.

24   Q.   How do you know that?

03:45:00PM 25   A.   He knows enough, for example, that after committing the

1    murder, he was hanging out with relatives.  He was giving them

2    rational explanations for what he did.  So, he must know

3    enough about his illness.  And it requires some insight to

4    suppress your own symptoms at times, which they often do.

03:45:20PM 5    Q.   You haven't examined this patient or defendant, have you?

6    A.   No, sir.  He wouldn't cooperate --

7    Q.   So, you are making a diagnosis --

8    A.   Wait a minute.  He would not cooperate with me.

9         THE COURT:  One at a time, please.

03:45:30PM 10   BY MR. RYTTING:

11   Q.   So, you are making a diagnosis, essentially, a very

12   refined diagnosis, isn't it, about his --

13   A.   About what?  Which diagnosis are you referring to?

14   Q.   Well, about his -- whether he is malingering and whether

03:45:41PM 15   he has insight into his illness, without having seen him?

16   A.   It is not a diagnosis.

17   Q.   You are providing a psychological opinion.

18   A.   Right.

19   Q.   Doesn't that usually require an interview of the patient?

03:45:54PM 20   A.   No.  It works like this, if you want me to explain it.

21   Q.   And in your experience, how informed or conscious of

22   mental illness are police officers that are doing the

23   interviews?

24   A.   In the bigger cities, Houston is one of them, they're

03:46:23PM 25   real aware of mental health issues.

1  Q.   Since -- in 1990 were they?  Is that the recent

2  development?

3  A.   Yeah.  Even in 1990, probably the Harris County Jail was

4  one of the biggest mental health providers around.

03:46:32PM 5  Q.   I am talking about this was done by a police officer, I

6  believe.

7  A.   Right.  The big city police officers certainly have --

8  get more training than, say, a small town cop does on mental

9  illness issues.

03:46:45PM 10  Q.   Did they have any training that you know of in 1990?

11  A.   No, sir.  I couldn't objectively tell you what the

12  training would be.

13  Q.   So, you can't argue that it's a relatively recent

14  development they started using mental health units or mental

03:46:59PM 15  health training?

16  A.   No, sir.  No, sir.

17  Q.   In fact, they don't have -- and, in fact, police officers

18  don't have the type of training, generally, to make a

19  determination about what is relevant, certainly

03:47:19PM 20  psychologically relevant, in a lengthy speech about Allah,

21  what is religious and what is complete delusion.

22  A.   I don't know that they would be able to distinguish what

23  is delusion and what is, say, a malingered delusion or

24  anything like that.

03:47:38PM 25  Q.   And you sit here and you said that you look at all the

1    evidence and you look at things fairly; is that correct?

2    A.   Say what?

3    Q.   You try to look at all the evidence, pro and con, and

4    make a fair assessment of it, correct?

03:47:55PM  5    A.   Yeah.

6    Q.   When you make your decision, right?

7    A.   I try to gobble up as much information as I can.

8    Q.   And you sat here in the courtroom while Dr. Quijano

9    testified; is that right?

03:48:03PM 10    A.   Sir, you are going to have to get closer.  I can't hear

11   you now.

12   Q.   And you sat in the courtroom when Dr. Quijano testified?

13   A.   Yes, sir.

14   Q.   And Doug Davis testified?

03:48:09PM 15   A.   Yes, sir.

16   Q.   And Doug Davis plainly said that Randolph Bates'

17   testimony about the interactions between himself and

18   Mr. Aldridge was representative of the way that their

19   interactions went throughout the proceedings.

03:48:25PM 20   A.   Yes, sir.

21   Q.   There's no mistake about that.

22   A.   That sometimes he was with them and sometimes he wasn't,

23   yes.

24   Q.   No.  That he was largely irrational throughout the

03:48:35PM 25   representation.  And did you not hear Doug --

1          MS. HAYES:  I need to object since I cross -- I

2     questioned Doug, and she wasn't here.  I think the record will

3     speak for itself about the actual terms that were used.

4          THE COURT:  All right.

03:48:50PM  5  BY MR. RYTTING:

6     Q.   And, in fact, Doug said that the way that he recalled

7     Mr. Aldridge was -- mental state was similar -- and statements

8     about the crime was similar to what Dr. Quijano discovered

9     during his interview of Mr. Aldridge, correct?

03:49:05PM 10  A.   Sir, I'm not getting your question.  You mentioned

11    something about the crime.

12    Q.   Did Doug Davis not testify on the stand that throughout

13    the representation, Mr. Aldridge's statements about the crime

14    were similar in nature to what Dr. Quijano discovered during

03:49:26PM 15  his interview of the client?

16    A.   Yes.

17    Q.   And does that not raise some concern in your mind that

18    Mr. Aldridge was incompetent to stand trial?

19    A.   No.

03:49:39PM 20  Q.   No concern at all?

21    A.   Sir, you've just confused the question with sanity with a

22    question about competency.

23    Q.   Why do you think there is -- okay.  Strike that.

24         Is it your opinion that mental illness cannot

03:50:00PM 25  cause someone to be incompetent?

*500*

1   *A.*   Yeah.  Mental illness can be so severe that it can render

2   them incompetent.

3   *Q.*   All right.  And if someone is so delusional that they

4   think that what happened during the crime is what was stated

03:50:19PM 5   in the psychological interview of Dr. Quijano, is that not

6   some evidence that they're incompetent?

7   *A.*   No, sir.  It is more evidence of insanity at that point

8   than competency.

9   *Q.*   Were you not here when Dr. Quijano said that he had a

03:50:40PM 10  fixed delusional and the beliefs that he expressed during his

11  interview were unchanging and unlikely to be changed during

12  the course of the trial?

13  *A.*   Yes, sir.  I remember that.

14  *Q.*   And a client that maintains those beliefs during the

03:50:53PM 15  course of the trial, is he not -- is there not some reason to

16  believe he is incompetent?

17  *A.*   Yeah, if those beliefs are such that they are impairing

18  his appreciation of various components related to competency.

19  *Q.*   In Dr. Quijano's report -- first off, just to be clear,

03:51:58PM 20  what you are calling the components of competency are the

21  series of questions that Dr. Quijano asked about who the judge

22  is, what does your attorney -- no, who is your attorney, so

23  the direct questions he was talking about when he testified;

24  is that correct?

03:52:18PM 25  *A.*   Not exactly.

1  *Q.*   Well, to be more clear --

2          MR. RYTTING:  If I may approach the witness.

3          THE COURT:  You may.

4  BY MS. ODEN:

03:52:42PM  5  *Q.*   On Page 9 is the series of questions that resulted in the

6  first full paragraph on Page 9, correct?  That's been talked

7  about, what you call the components of the competency exam.

8  *A.*   Point it out to me.

9  *Q.*   (Indicating.)

03:53:11PM  10  *A.*   Now, what is your question?

11  *Q.*   Is that what you consider the components of a competency

12  exam?

13  *A.*   No, sir.

14  *Q.*   Now, you realize that at -- well, let me ask another

03:53:51PM  15  question.

16          Isn't that section you just looked at -- can I

17  ask what you are referring to?

18  *A.*   I was just moving my stuff around.

19  *Q.*   Is that section I just showed you on Page 9 what

03:54:09PM  20  Dr. Quijano considers to be his competency exam as opposed to

21  his psychiatric injury?

22  *A.*   Yeah.  At that point in his report on that page, he was

23  getting into competency issues.

24  *Q.*   And isn't clear, even from this part of the exam, that

03:54:26PM  25  Mr. Aldridge did not understand basic facts about the legal

1  system?

2  A.   I don't recall.  What are you referring to?

3  Q.   Well, doesn't he say right here the prosecution witnesses

4  say what they are told to say and whatever they think they

03:54:43PM 5  should say?

6  A.   Close enough.

7  Q.   Isn't that what it says?

8  A.   That's what it says.  That's close enough for competency.

9  Q.   And you have been doing competency exams for how long?

03:54:54PM 10 A.   Well, actually, I started in '75 during that year of

11 intern --

12 Q.   You have done hundreds of them?

13 A.   Probably thousands.

14 Q.   And you have used methodology like this?

03:55:04PM 15 A.   Like what?

16 Q.   In which this is good enough for competency.

17 A.   Yes, sir.

18 Q.   For even a defendant like Mr. Aldridge who is seriously

19 mentally ill and clearly floridly psychotic during the

03:55:20PM 20 interview?

21 A.   I don't know how psychotic he was.  Quijano thought he

22 was psychotic, but he wasn't so psychotic he couldn't answer

23 competency questions.

24 Q.   Was he so psychotic that he gave the account of the crime

03:55:28PM 25 that we have gone over several times in this case in which

1  there are spirits that are raping and assaulting him?

2  A.   Sir, when you move away, I can't hear you over here.  I'm

3  sorry.

4  Q.   I'm sorry.  Well, he gave an account in the forensic

03:55:43PM  5  interview.  He took down a report in which he was so

6  delusional and so psychotic that he thought that -- that he

7  reported that spirits were sexually assaulting him and forcing

8  him to kill the victim; isn't that correct?

9  A.   That's one of the -- that's the stuff he told Quijano.

03:55:59PM 10  Q.   Right.  That's what he told Quijano.  And Quijano

11  testified that he firmly believed that, did he not?

12  A.   Right.

13  Q.   And he testified not only that he believed it during --

14  A.   Well, I'm not sure if he testified that he firmly

03:56:11PM 15  believed it.  He testified that he thought the defendant

16  firmly believed it.

17  Q.   That -- of course.

18  A.   Right.

19  Q.   Of course.  I didn't mean to think that Dr. Quijano

03:56:25PM 20  thought this was what the crime was.

21              Now, you agree that certainly by the time of

22  trial, Mr. Aldridge was experiencing -- was in a full-blown

23  ep -- not episode -- but his schizophrenia was full blown,

24  correct?

03:57:12PM 25  A.   I really don't know.  I mean, he was still in a

1  schizophrenic process at that time.  How full blown it was, I

2  don't know.

3  Q.   Then you realized he had a fixed delusional system at

4  that time, correct?

03:57:25PM  5  A.   Well, he had a delusion system.  I mean, it is fixed by

6  definition.  A delusion is a delusion.

7  Q.   One of the things you fastened upon was the day that he

8  bought the gun.

9  A.   Say again.

03:57:44PM 10  Q.   One of the things that you fastened upon was the day that

11  he bought the gun and his conduct at that time.

12  A.   Right.

13  Q.   But we know very little about the conduct at that time,

14  don't we?

03:57:54PM 15  A.   On that day, correct.

16  Q.   And we know very little about his beliefs and his

17  mentation on that day, do we -- right?

18  A.   On that particular day, we don't know what he was

19  thinking or saying, other than filling out the form.

03:58:07PM 20  Q.   Turning to another piece of information, you testified on

21  direct exam that when he entered the Texas Department of

22  Criminal Justice, that he didn't exhibit signs of mental

23  illness; is that correct?

24  A.   I testified to that?

03:58:36PM 25  Q.   Did you -- I just asked.

1  A.   It's a question?

2  Q.   Did you?

3  A.   No.  The -- whoever was taking -- doing that intake

4  documented symptoms.  I mean, I remember reading the report.

03:58:49PM 5  But he also -- I think I testified that he also showed

6  rationality in talking about he had a good appeal because his

7  lawyers didn't call the doctor to his -- to testify for him.

8  Q.   Well, do you think he had a good appeal?

9  A.   I don't know.  That's a legal question.

03:59:12PM 10  Q.   Do you think he understood the legal ramifications or the

11  legal posture of his case?

12  A.   Posture?

13  Q.   Yeah.

14  A.   No, not unless he at least went to a year or two of law

03:59:27PM 15  school.

16  Q.   Well --

17  A.   I mean, I don't know of a criteria that says he has to

18  understand a, quote, legal posture of his case to be

19  competent.

03:59:38PM 20  Q.   No.  I'm just saying you -- this is one piece of

21  information here.  He says -- in which they report he says

22  that he has a good -- something like a good prospect for

23  appeal, and that's it.  What does that tell you about his

24  mental state?  Why would he say that --

03:59:56PM 25  A.   I think it is important --

1  *Q.*   -- as a condition of rational?

2  *A.*   I think it is important because the position you are

3  portraying is as if -- if someone is schizophrenic, it's like

4  they don't have a moment of lucidity or rationality for the

04:00:10PM  5  rest of their lives.  And that's just not the way it works.

6                  There are lots of moments of rationality and

7  lucidity, and here -- the guy has just been sent to death row;

8  and, yet, he is still having moments of clarity on admission

9  to T.D.C. or T.D.C.J.

04:00:29PM  10  *Q.*   Define clarity.  What is clarity for you, Doctor?

11  *A.*   His position at that time, if that's what we are talking

12  about -- or do you want some sort of global definition of

13  clarity?

14  *Q.*   I want to know what you think clarity is and how you made

04:00:42PM  15  the diagnosis that there -- or made the -- formed the opinion

16  based on a couple of sentences that he was having a moment of

17  clarity.

18  *A.*   He was aware at that moment and was able to rationally,

19  coherently inform that social worker or whatever that a

04:01:01PM  20  psychologist that evaluated him was not called to testify on

21  his behalf; and so, he thinks he has an appeal.  That, to me,

22  is a pretty good legal understanding, at least in some sort of

23  strategic fashion about an appeal.  And here we are on an

24  appeal, I guess.

04:01:17PM  25  *Q.*   And you don't even know how he formed that belief, do

1  you?

2  A.   I don't know how anyone forms a belief other than through

3  experience.

4  Q.   You don't even know --

04:01:25PM  5  A.   Let me finish answering the question.

6           -- other than through experience.

7  Q.   You don't even know if even Randolph Bates told him:

8  Hey, you have a good chance for appeal, Aldridge, as he goes

9  down to -- led away.

04:01:41PM  10  A.   I don't know that Bates said that.  But if -- you know,

11  if he got that advice from his lawyer, he obviously is able to

12  benefit from his lawyer's expert advice.

13  Q.   He is obviously able to repeat it.

14  A.   Yeah.

04:01:54PM  15  Q.   Which is different from being able to understand it,

16  isn't it?

17  A.   Well, if you can repeat it, it's at least one step toward

18  understanding.

19  Q.   And during that same -- but wouldn't you say the more

04:02:12PM  20  important forensic information is the further discussion that

21  followed in which it is found that he was suffering from

22  auditory and visual hallucinations day and night, command

23  hallucinations including commands to hurt himself and others,

24  hallucinations interfering with sleep, poor concentration, et

04:02:33PM  25  cetera?

1  A.   Right.

2  Q.   Not to mention persecutory and grandiose hallucinations

3  and the possibility he believes himself to possess special

4  powers.

04:02:49PM  5  A.   Right.  It is a lot.

6  Q.   That is a lot.  And isn't that the most important

7  forensic information in this file?

8  A.   Regarding what?  Important relevant to what?

9  Q.   Relative to a -- relative assessment of whether he was

04:03:09PM  10  competent to stand trial.

11  A.   No.

12  Q.   And whether he was --

13  A.   That is post admission to T.D.C. jail but not necessarily

14  relevant at all to his competence to stand trial in 1990.

04:03:22PM  15  Q.   Well, you have no information at all that he had a moment

16  of clarity in between Dr. Walter Quijano's interview and the

17  interview in T.D.C.J. and certainly no information that he had

18  such a moment of clarity during the trial, do you?

19  A.   He had moments of clarity apparently, pretty obviously,

04:03:49PM  20  during Quijano's interview, was able to answer questions

21  related to competency.  There apparently were lots of moments

22  of clarity interacting with his lawyers during the course of

23  the trial.

24  Q.   So, in your view -- well, we don't even know how he

04:04:05PM  25  answered to Quijano.  We don't know if he nodded his head up

1  and down to these questions or not, do we?

2  A.   Well, in a sense I have two reports to believe.  Here's

3  his or Mosnik's.  And Mosnik has got no information whatsoever

4  about his responses.

04:04:20PM  5  Q.   That wasn't the question.  The question was:  We don't

6  know how he reacted to Dr. Quijano's questions, whether he

7  just nodded up and down.

8  A.   I believe we do.  I believe Quijano did a good job at

9  times quoting and other times summarizing what the defendant

04:04:40PM 10  told him at that time.

11  Q.   Is the method that Dr. Quijano described directing --

12  using direct questions and operationalizing the question the

13  method that you use when you are determining competency?

14  A.   Our methodologies are similar.

04:05:19PM 15  Q.   Well, that wasn't the question.  Do you use -- you heard

16  him describe how he questioned people after he's conducted his

17  clinical interview.

18  A.   Yes.

19  Q.   And he says:  I use direct questions.  And he gave some

04:05:34PM 20  examples of his direct questions.

21  A.   Yes.

22  Q.   And he says:  I operationalize the concept.  Is that what

23  you do?

24  A.   Yeah, basically.  You want to ask operationalized

04:05:46PM 25  questions so that you have a standardized approached --

1   approach, rather.

2   Q.   So, you, like Dr. Quijano, use the clinical interview and

3   then structure for -- change the questions that you ask based

4   on your diagnosis.  Is that fair to say?

04:06:07PM  5   A.   No.

6   Q.   Well, tell me why that's not fair to say.

7   A.   Because the question doesn't make sense.

8   Q.   I will let it go at that.

9           Now, you said several times when you were

04:06:48PM 10   deposed, did you not, that what you were mainly doing was

11   grading Walter Quijano's papers.  In fact, that was the phrase

12   you used, "grading his papers."

13   A.   Yes, sir.

14   Q.   Is that what you are doing now?  Is that what your

04:07:06PM 15   opinion is based on now, grading -- mainly on grading his

16   papers?

17   A.   Well, it was initially a big focus of what I was doing;

18   but I certainly wasn't limited to it.  I mean, I wound up

19   grading Mosnik's paper and Walter's paper.  And we are going

04:07:23PM 20   to wind up getting -- and have and will get into all kinds of

21   areas.

22   Q.   Now, you testified that you didn't see anything between

23   the time of the commission of the -- you know, pre arrest that

24   had to do with his delusional accounts of the crime or his

04:08:14PM 25   legal situation, correct?

1  A.   I didn't think so.  There was a letter that did have some

2  sexual references to it.  I want to say it was about six

3  months before the crime.  But nothing close to his specific

4  excuse about the guy sexually assaulting him.

04:08:34PM  5  Q.   But you are aware of our -- I believe it is our

6  Exhibit 3, which is the letter dated January 6th, 1990,

7  correct?

8  A.   Right.  Just after the crime.

9  Q.   Right.  And he talks about that masons and others that

04:09:02PM  10  plotted against him --

11  A.   Right.

12  Q.   -- to stop his release from prison; is that correct?  Do

13  you remember that?

14  A.   Yes, sir.

04:09:10PM  15  Q.   And he also talked about his flight, correct?

16  A.   His runaway flight, you mean?

17  Q.   Yeah.  His supposed flight --

18  A.   Right.

19  Q.   -- from the crime?

04:09:25PM  20  A.   Right.

21  Q.   In this letter.  And it is thoroughly delusional; is it

22  not?

23  A.   It appears to be, yes, sir.

24  Q.   In fact, every line of this seems to be thoroughly

04:09:40PM  25  delusional.

```
 1  A.    Seems to be.

 2  Q.    Well, there's no question that Mr. Aldridge firmly

 3  believes what's in this document, right?

 4  A.    I'm not convinced of that yet.

 5  Q.    What grounds do you have to think that he doesn't believe

 6  every line that's written in this document?

 7  A.    I'll do it this way.  Maybe this will cut through some --

 8  save us some time.

 9  Q.    What grounds, independent of that book that you have,

10  based on the evidence?

11  A.    This will be related to the evidence.

12  Q.    Furthermore --

13  A.    (Witness reading from textbook.)  When you are looking at

14  psychosis in defendants --

15          MR. RYTTING:  I'm going to have to object to him

16  just reading from a textbook.

17  A.    I'm not going to just read from the textbook.

18              -- pleading insanity, one of the things you

19  look at is a non-psychotic alternative rational motive for the

20  crime.  Do you have to explain the crime only in terms of a

21  psychotic explanation, especially when it is provided by the

22  defendant; or is there any evidence of alternative solutions?

23              I'm still answering your question about the

24  letter of January 6th.

25  BY MR. RYTTING:
```

04:09:49PM

04:10:18PM

04:10:35PM

04:10:48PM

04:11:02PM

1   Q.   I don't see how you are answering my question.

2              MR. RYTTING:  And I object to the -- well, I think

3   it was nonresponsive to the question --

4              THE COURT:  All right.

04:11:07PM 5   MR. RYTTING:  -- just to pull out a book and start

6   reading from it.

7              MS. ODEN:  Your Honor, he wasn't reading from it.

8              MR. RYTTING:  If they want to do that on redirect,

9   they can.

04:11:13PM 10  MS. ODEN:  I think he was pointing at a chart.

11             THE COURT:  All right.

12             MR. RYTTING:  I don't know if any of this is in

13  evidence.  It's an attempt to get a learned treatise into

14  evidence.  And I don't even know why he has it up there on the

04:11:27PM 15  stand.

16             THE COURT:  All right.  I'm going to sustain the

17  objection to the responsiveness of the answer.  Let's go on to

18  something else.

19             MR. RYTTING:  May I ask him to remove that from the

04:11:36PM 20  lectern?

21             THE WITNESS:  Do you want me to take it to the

22  table, Your Honor?

23             THE COURT:  No, you can just leave it.

24             MR. RYTTING:  Leave it there.  Put them to the side.

04:11:57PM 25  BY MR. RYTTING:

1  Q.   When I said evidence, I mean something in the record.

2  Let's leave it to that.

3            What in the record -- what in the record

4  includes our exhibits, including those reports of the other

04:12:21PM  5  psychologists that have actually interviewed the defendant.

6  What have you seen that makes you -- and the testimony at

7  trial -- at the evidentiary -- what makes you believe that he

8  didn't believe -- what makes you think he didn't believe every

9  single line of this document?

04:12:36PM 10  A.   The day of the crime, we're talking about somewhere after

11  5:00 a.m. --

12  Q.   I am asking about this document.  Well, maybe he's --

13  point to something that he doesn't believe in.

14            MS. ODEN:   Your Honor, if he could be permitted to

04:12:49PM 15  answer the question.

16            THE COURT:   Let's let him answer.

17            MR. RYTTING:   Okay.  I'll strike that last question

18  and just ask him to --

19  BY MR. RYTTING:

04:12:55PM 20  Q.   Point to a sentence in this document that you believe

21  Mr. Aldridge -- that you think Mr. Aldridge doesn't believe

22  in.

23  A.   No.  I can't.  I don't know.

24  Q.   And we can say the same about by his other letters that

04:13:19PM 25  have been introduced into evidence.  Can you can point to a

1  single line in there in which you can say:  I have reason to

2  doubt that Mr. Aldridge believes this sentence?

3  *A.*   He's going to claim belief in all of that, sir.

4  *Q.*   Sure he is going to claim belief.

04:13:35PM  5  *A.*   Correct.

6  *Q.*   And the reason he is going to claim belief is because he

7  actually believes it.

8  *A.*   That is your argument.  That's your position.  I don't

9  have to believe everything a defendant says, and I'm not

04:13:50PM 10  supposed to.  I am supposed to be skeptical about it.

11  *Q.*   Well, didn't Dr. Quijano testify that he thought that

12  everything he said in his interview was true?

13  *A.*   Right.  And I thought Quijano -- right.  And I thought --

14  one of my criticisms was Quijano didn't do enough to assess

04:14:08PM 15  malingering.

16  *Q.*   Do you think that the antisocial personality disorder is

17  an appropriate diagnosis for this client after the -- say,

18  after 1986?

19  *A.*   No.  It was before that, but not after that.

04:14:37PM 20  *Q.*   At your deposition you were shown what is R -- Exhibit 4.

21  And I would like to approach the witness.

22  *A.*   I recall this.  I don't know the date that it was

23  written.

24  *Q.*   Would you argue if it was -- the date was during voir

04:15:34PM 25  dire in this case?

1  *A.*   No, sir.

2  *Q.*   And during your deposition, you indicated a note like

3  this was -- should occasion further investigation another

4  psych -- perhaps another psychological interview; isn't that

04:15:53PM  5  correct?

6  *A.*   Well, possibly.

7  *Q.*   Well, do you believe that now?

8  *A.*   Well, after listening to Davis' testimony, I thought that

9  if he had enough evidence or concern to trigger another

04:16:08PM 10  evaluation, he would have done it.  So, apparently that letter

11  wasn't enough to trigger his concern that if there hadn't been

12  enough, like, deterioration in his client or something.

13  *Q.*   I didn't ask about Davis' concern.  I asked about yours.

14  This -- you have a client -- or a defendant diagnosed such as

04:16:34PM 15  Mr. Aldridge.  You have a psychological interview pretrial

16  disclosed that he is delusional and has a fixed delusional

17  system centered on his legal situation and on his...  He is

18  paranoid.  And this letter comes out near the time of trial,

19  approximately 30 days after the first interview.

04:16:55PM 20          Say you were the -- retained by the defense,

21  and you get this letter.  What would you recommend they do?

22  *A.*   Nothing.  Go to trial if they thought the guy was

23  competent.

24  *Q.*   If they thought the guy was confident?

04:17:11PM 25  *A.*   If I thought the guy was competent, I could still take it

```
 1   to trial.  You asked me what I would do if I was legal
 2   counsel, right?
 3   Q.   No.  If you were advising legal counsel.
 4   A.   If I --
 5   Q.   If they said:  Hey --
 6   A.   I'm sorry?
 7   Q.   -- this is what we are getting from our client -- if they
 8   said:  Hey, this is what we are getting from our client,
 9   letters like this --
10   A.   Right.
11   Q.   -- would you recommend --
12            MS. ODEN:  Objection, Your Honor, to the
13   characterization of letters in the plural.  There is no
14   indication that there was any other communication from
15   Mr. Aldridge aside from this note that was of this nature.
16            THE COURT:  All right.  The question is:  If you
17   were advising defense counsel in your capacity as an expert
18   and you got -- and they got a letter like this, which you saw,
19   what would you recommend they do?
20   A.   I would ask them questions.  I wouldn't make a
21   recommendation based on one letter.
22   BY MR. RYTTING:
23   Q.   And if you had information from defense counsel -- I
24   mean, from defense counsel that had -- that was similar to
25   what Mr. Bates testified to regarding the irrationality of his
```

1   conversations with the client and about his client that he was

2   being pursued by -- pursued and there was a conspiracy against

3   him and you had information from lead counsel saying this is

4   how our client is throughout our representation, what would

04:18:33PM 5   you recommend him do near the time of trial?

6   A.   I wouldn't recommend anything until I asked the lawyers a

7   series of questions.

8   Q.   Well --

9   A.   Sir?

04:18:46PM 10   Q.   And what would you ask them?

11   A.   I would say:  Guys -- I would meet with both of them, and

12   I'd say:  Guys, give me your sense of his understanding about

13   facts of the case.  You tell me what you think he knows he's

14   charged with.  Does he know how serious it is?  Does he know

04:19:16PM 15   what the punishment is?  I would launch into other questions.

16   It would be very similar to the same competency questions I

17   would ask the defendant.

18           I would ask the lawyers:  Is he able to -- is

19   he aware of -- does he demonstrate sufficient ability to

04:19:30PM 20   understand who you are?  Does he know what the judge is doing?

21   Does he know what a jury is?  Does he know what the DA is

22   after, what's their role?

23   Q.   And we have no evidence that this was done by the defense

24   counsel near the time of trial?

04:19:46PM 25   A.   Well, you just asked me a hypothetical.  I don't know in

1  that sense what was done.

2  Q.  I am just asking -- I'm asking another question.  Do you

3  have any evidence that this was done from the testimony that

4  you heard today?

04:19:55PM  5  A.  No.

6  Q.  I would like you to go on the record saying that even if

7  you had all the evidence that's come before you, that you've

8  seen -- let's call it pretrial that came -- that -- evidence

9  of Mr. Aldridge's condition pretrial, you would not recommend

04:20:29PM  10  to defense counsel, if you were retained as their expert, to

11  get a competency hearing?

12  A.  They got a competency hearing.  You mean competency

13  opinion from Quijano?

14  Q.  No.  Competency hearing.  Do you know what a competency

04:20:46PM  15  hearing is?

16  A.  Yes.

17  Q.  Okay.  Would you not recommend that they request one?

18  A.  They could request one; but if they already hired an

19  expert that said he was competent, what they've got to do

04:20:59PM  20  before they get a hearing is request another competency exam,

21  wouldn't they?

22  Q.  Is that your understanding of the standard?

23  A.  (No response.)

24  Q.  How long have you been doing this work again?

04:21:09PM  25  A.  Wait a minute.  They already have a competency opinion

1   that the guy is competent.  Now the prosecution is going to

2   say:  We don't want to go to court and argue.  He is

3   competent.  Don't they have to get another opinion before they

4   request a hearing.  They're going to request --

04:21:26PM  5   Q.   That's your understanding of --

6   A.   I think so.

7   Q.   Okay.

8   A.   I think so.  I mean, I'm no lawyer.

9   Q.   Let me just clarify.  Would it surprise you to know that

04:21:33PM 10   what you can -- all you have to do is have -- you must request

11   a hearing --

12   A.   Yeah.

13   Q.   -- if you have clear evidence raising a bona fide or

14   substantial doubt about your client's competency from any

04:21:46PM 15   source?

16   A.   Okay.  I'll take your word for it.

17   Q.   And here we have a history of pronounced irrational

18   behavior, do we not?

19   A.   There was a lot of irrational behavior reported pre --

04:22:02PM 20   Q.   We have a history of pronounced irrational behavior.

21   Isn't that what Dr. Quijano testified?

22   A.   Yeah, there was a lot of irrational behavior.

23   Q.   And you agree with that?

24   A.   There was a lot of irrational behavior.

04:22:15PM 25   Q.   And we have testimony of his relatives about this --

1    about this history of irrational history.  Cheryl Aldridge,

2    Virginal Aldridge, Gladys Aldridge, and the other sisters

3    whose statements were in the record.

4    A.   Right.

04:22:32PM 5    Q.   And this was all available to counsel at the time of

6    trial, correct?

7    A.   Right.

8    Q.   Now, you -- do you believe you are in a position, sitting

9    right there, to make a determination, 19 years later, about

04:23:10PM 10    whether Mr. -- about whether Mr. Aldridge was competent to

11    stand trial, without having interviewed this client?

12    A.   With limitations.  And that I could be at a disadvantage

13    in terms of reliability and accuracy because I didn't get to

14    examine him.

04:23:31PM 15    Q.   And, in fact, you realize that he was -- he was paranoid?

16    A.   He was --

17    Q.   Paranoid, correct?

18    A.   Apparently.

19    Q.   Paranoid?

04:23:50PM 20    A.   Apparently.

21    Q.   Yeah.  Do you have any reason to think that he wasn't?

22    A.   No.  That wasn't the problem, that he was paranoid.

23    Q.   And you realize that he incorporated and has a history of

24    incorporating attorneys and judges into his delusional system;

04:24:11PM 25    isn't that right?

1  A.   Yes, sir, among other things.

2  Q.   And you don't know at all whether at trial Mr. Aldridge

3  had incorporated the judge or his attorneys into his

4  delusional system?

04:24:28PM  5  A.   As I sit here now, I don't recall all those details.  I

6  remember him expressing concern about whether or not his

7  lawyers wind up a part of the conspiracy.  I forget what he

8  said about the judge.

9  Q.   Well, didn't he say in his -- well, he may not have said

04:24:52PM 10  anything about the judge.

11  A.   Well, just based on your --

12  Q.   The point is we don't know -- he has a history of

13  incorporating people in the legal system to his delusional

14  system, and we don't know if he thought that the judge who was

04:25:03PM 15  supposed to be trying his case was conspiring against him

16  in -- as part of his wild and fixed delusional system, do we?

17  A.   I guess not.

18  Q.   And there would be no way to tell without a hearing at

19  the time of trial that explored that, is there?

04:25:20PM 20  A.   No.  I mean, there could be other data available that

21  might reflect that.

22  Q.   And -- or we can put it this way.  There is some evidence

23  that he's already incorporated his attorneys into his

24  delusional system and thought they were conspiring against

04:25:43PM 25  him, isn't there?

1  A.   Yeah.   The paranoid beliefs about lawyers was there.   It

2  has been there for a long time, apparently.

3  Q.   And we have Brenda Garrett's statement that's in evidence

4  that says that he thought his attorneys were conspiring

04:26:00PM 5  against him.

6  A.   Right.

7  Q.   We have Quijano who said that he would wait and see --

8  who reports that Mr. Garfield said he would wait to see if his

9  attorneys would conspire against him.

04:26:09PM 10  A.   Right.

11  Q.   Now, is that a -- do you think that's a rational

12  understanding about what your attorney is or will do?

13  A.   No, not necessarily.   It doesn't make him incompetent at

14  the time, but that's not necessarily delusional.

04:26:27PM 15          MR. RYTTING:   No.   That's not responsive.   I ask

16  that that be stricken.

17          THE COURT:   Sustained.

18          MR. RYTTING:   Your Honor, I will pass the witness.

19          THE COURT:   All right.   Thank you.

04:27:18PM 20          MS. ODEN:   Briefly, Your Honor.

21          THE COURT:   All right.

22                    **REDIRECT EXAMINATION**

23  **BY MS. ODEN:**

24  Q.   Dr. Allen, you have reviewed quite a few police reports

04:27:26PM 25  as a forensic psychologist, right?

1  A.   Many.

2  Q.   And in your experience, do police officers make an

3  attempt to record suspects or defendants' statements that may

4  reveal a potential legal defense to a crime?

04:27:43PM 5  A.   Yes.

6  Q.   Why was that sentence in Dr. Quijano's report, the

7  sentence that I believe said prosecution witnesses say what

8  they're told to say.  They say what they think they should

9  say?  Why is that good enough for competency?

04:28:05PM 10  A.   Well, and given the guy's history, I thought it reflected

11  a sense of the paranoia that prosecution witnesses are going

12  to be against him.  Okay.  But he then qualified it with the

13  second sentence or phrase.  I forget.  But on the one hand,

14  they are going to say what the prosecution tells them to say.

04:28:29PM 15  That's paranoid.

16  Q.   But they say what they think they should say?

17  A.   But then he qualified it with they are going to say what

18  they think they should say.

19  Q.   And why is that enough for competence?

04:28:47PM 20  A.   Because in everything I have read about what the standard

21  is, you are not talking about some capacity to talk the

22  philosophy of law or theory of defense or anything like that

23  but rather basic concepts that reflect sufficient ability to

24  deal rationally and factually with the system or your lawyers.

04:29:18PM 25  That's it.

1  *Q.*   And would it be an uncommon belief for a defendant to

2  have that the prosecution witnesses say what they're told to

3  say?

4  *A.*   Well, that's true.  I mean, I've had that response on

04:29:32PM 5  many occasions where, you know, if they're a prosecution

6  witness, if their lips are moving, they are lying, that kind

7  of an attitude.  And they are not mentally ill.  They are in

8  jail.  They are angry.  They are scared.

9  *Q.*   If Mr. Aldridge was psychotic enough to give this crazy

04:29:53PM 10  account of his crime to Dr. Quijano and if he firmly believed

11  that crazy account, why is that alone not enough to make him

12  incompetent?

13  *A.*   The way I approach it, the way I have been taught to

14  approach it is that the account in an insanity defense is an

04:30:19PM 15  excuse.  This is my excuse so I don't get criminally

16  prosecuted.  And that's important in America law, that if you

17  don't have that capacity to appreciate wrongfulness --

18          MR. RYTTING:  May I -- I thought the question was

19  about competency.

04:30:37PM 20          MS. ODEN:  Judge, if he could just be permitted to

21  finish his sentence, I'm sure we would see the relevance to

22  the question.

23          THE COURT:  All right.  Go ahead.

24  *A.*   I've lost it now.  What's the question?

04:30:48PM 25  BY MS. ODEN:

*Stephanie Kay Carlisle-Neisser, CSR, RPR    713.250.5157*

1  *Q.*   The question was: If Mr. Aldridge was crazy enough to

2  give a crazy account of the facts of the crime to Dr. Quijano

3  and he firmly believed that delusional account, why is that

4  alone not enough to make him incompetent?

04:31:06PM 5  *A.*   Because competency has to do with sufficient present

6  ability to appreciate the legal proceedings and that all that

7  craziness has to be so severe that it impairs his ability to

8  rationally cooperate and collaborate with his attorneys in his

9  own defense. You've got to have both, and all it talks about

04:31:36PM 10  is sufficient present ability. And you can be mentally ill

11  and have that ability.

12  *Q.*   Okay. Did you review the testimony at trial of Jorge

13  Guerra who was the pawnshop clerk? He testified at

14  guilt/innocence.

04:31:56PM 15  *A.*   Oh, yeah. Yes.

16  *Q.*   Did you take into consideration his testimony that when

17  Mr. Aldridge came in to buy the gun, he was not acting crazy?

18  *A.*   He testified that there -- right, he was not acting

19  crazy. Nothing he said indicated a disorganized behavior or

04:32:18PM 20  thinking that's so typical of schizophrenics that are active

21  with their thought disturbance. That's true. I had forgotten

22  about that.

23        MS. ODEN: For the Court's records, that's Volume 16

24  of the reporter's record at Page 25 and 26.

04:32:35PM 25  BY MS. ODEN:

1  Q.   I would like to talk a little bit about the kinds of

2  questions that Dr. Quijano was asking in his competency

3  evaluation and I believe the kinds of questions you've said

4  you asked in your competency evaluations.  Mr. Rytting wanted

04:32:55PM  5  to know if there was any evidence of moments of clarity

6  between Dr. Quijano's evaluation and Mr. Aldridge's entry into

7  T.D.C.J. for death row.

8          Those questions that are asked in a competency

9  evaluation, can they be answered with nods?

04:33:14PM 10  A.   Actually, it is possible, I suppose.  What comes to mind

11  isn't someone who is mentally ill but someone who is hearing

12  impaired and sometimes you have to apply competency standards

13  to those people.

14  Q.   Okay.  Well, let's bring it to this case specifically.

04:33:35PM 15  For example --

16  A.   Okay.

17  Q.   -- Dr. Quijano, if you will recall, said that an example

18  of a question was:  Do you understand your Fifth Amendment

19  right?  What is it?  What is the purpose of your Fifth

04:33:49PM 20  Amendment right?

21          Can those kind of questions -- could

22  Mr. Aldridge have answered those kinds of competency questions

23  by nodding?

24  A.   No.

04:33:59PM 25  Q.   Would he have had to answer with words to communicate?

1    *A.*    Words, phrases, clauses, sentences, to some extent, yes.

2    *Q.*    Okay.  Mr. Rytting took back a question that he asked

3    that I think I would like you to answer.  He asked:  What

4    evidence in the record makes you think that Aldridge did not

04:34:33PM  5    believe every line of some of the writings that he produced?

6                    And you began your answer with a phrase that

7    was something like:  A non-psychotic rational alternative

8    explanation.  Would you like to finish that answer?

9    *A.*    Right.

04:34:50PM  10                    I've mentioned earlier that what is important

11    is not only the psychiatric history but the criminal history.

12    To what extent does the crime in question match the

13    psychiatric history versus the criminal history?

14                    Well, my opinion is that this crime matches a

04:35:08PM  15    criminal history that includes theft and robbery and shooting

16    people, you know.  Post crime there was nothing that I could

17    see that reflected any kind of irrationality about the crime.

18                    But, though impulsive, there was rational

19    interaction with Gladys Aldridge, rational explanations about

04:35:39PM  20    what he did, that he got into a struggle, that he killed the

21    guy, that he did a robbery, that he robbed the guy to make it

22    look like a robbery.  Of course he killed the guy, so there

23    would be no witnesses.  I mean, all of that was rational.

24    There was nothing there driven by hallucinations or delusions.

04:36:02PM  25    *Q.*    So, why does that indicate to you that Mr. Aldridge may

1  not have believed every line of his explanations after arrest?

2  A.   Because it appears to me, even though there was evidence

3  prior to buying the gun, prior to the crime, of weird beliefs

4  and crazy stuff, Hitler and people following, even though that

04:36:28PM 5  existed, the escalation in that really began to occur post

6  arrest.

7              You could even count the letter on January the

8  6th that he wrote during his escape where -- and in that

9  letter he actually incorporates, you know, his sister and a

04:36:46PM 10 couple of nephews into the letter but nothing about the sexual

11 assault, this alleged sexual assault.

12 Q.   You heard Dr. Quijano testify about the importance of

13 perceiving a secondary gain in evaluating whether a person is

14 malingering or embellishing.

04:37:08PM 15 A.   Right.

16 Q.   Can you comment on that?

17 A.   The basic idea in a criminal evaluation or any forensic

18 evaluation is to make sure you're clear on what any external

19 goal is, in some fashion to avoid prosecution and in civil

04:37:25PM 20 cases it's to win money.  But that's a secondary gain issue.

21             And a big role for forensic psychologists and

22 psychiatrists is developed into this issue of competency to

23 stand trial.  It's become something that experts are very much

24 involved in and -- as well as sanity at the time of the crime.

04:37:48PM 25 Q.   Would any reliable or scientifically valid analysis of

1  the post-arrest statements of Mr. Aldridge have to address the

2  issue of secondary gain possibilities for him?

3  A.   Of course.   I mean, once you see there is arrest, then to

4  what extent is all of that useable in terms of a sanity

04:38:12PM  5  defense?  And often what gets incorporated there is

6  incompetency because they often go hand in hand.  That's not

7  to say that he has no symptoms.

8  Q.   Is it common or uncommon for criminal defendants to have

9  suspicious beliefs about their attorney's trustworthiness?

04:38:29PM 10  A.   Common.

11  Q.   Does that indicate that they would be incompetent?

12  A.   No.

13  Q.   Why not?

14  A.   It still boils down to whether or not there is enough,

04:38:46PM 15  sufficient cooperation still going on.  I may just hate

16  lawyers.  It doesn't mean I don't hire them.  I may hate the

17  legal system.  That doesn't mean I am not going to have a --

18  try to get a good lawyer if I wind up in the legal system.

19              So, too, you can be suspicious about your

04:39:09PM 20  lawyers, about the motives of lawyers; but it doesn't

21  automatically make you incompetent.  It has to do with -- you

22  know, competency is very much a global concept.  It is not

23  just one thing.

24  Q.   And I would like to talk a little bit about what exactly

04:39:26PM 25  happens at a competency hearing.  Hypothetically speaking, if

1   Doug Davis and Randy Bates had gotten the opinion that they

2   got from Dr. Quijano, that the defendant was competent, and

3   for some reason --

4            MR. RYTTING:  I'll object to -- withdraw the

04:39:48PM   5   objection until later.

6            THE COURT:  All right.

7   BY MS. ODEN:

8   Q.   -- and so, they have this opinion that he is competent

9   and then later they decide they want a competency hearing, in

04:40:00PM   10  your experience if they presented Dr. Quijano as their witness

11  and then told the Court:  We need -- we think that there's a

12  reason to believe he is not competent, would the Court make a

13  decision right then and there on the defendant's competence?

14  What would the Court do?

04:40:23PM   15  A.   They would order another exam.  Now, they don't have

16  hearings like that anymore.  But in 1990 -- okay.  You already

17  have a court-appointed expert.  The lawyer still worried.  The

18  prosecutor's position could be -- the expert you pick says

19  he's competent.  What's there to have a hearing about?  What's

04:40:50PM   20  there to argue about?  We agree.

21            I think I'm answering your question.

22  Q.   You are.

23  A.   If they are that concerned, they would have -- in my

24  opinion, I think they would have to get -- or ask the judge

04:41:01PM   25  for another evaluation, which they can do.

1  *Q.*   Were you here when Mr. Davis said that if there had been

2  a concern of his, that he would have informed the judge and

3  requested a second evaluation?

4  *A.*   Right.

04:41:13PM 5  *Q.*   And is that a common practice in your experience?

6  *A.*   Very common.  I've had cases where the -- it is

7  usually -- the motion is filed usually by the defense lawyer.

8  Okay?  I'm concerned.  I want a competency exam.

9              MR. RYTTING:  I'll object to the relevancy to the

04:41:35PM 10  issues that we have in this proceeding, what's going on

11  generally in other cases that he knows about.

12              THE COURT:  Sustained.

13  BY MS. ODEN:

14  *Q.*   Having heard all of the questions that you have heard

04:41:44PM 15  from Mr. Rytting and considered all the evidence that you have

16  available to you, have you changed your opinion on whether

17  Mr. Aldridge was competent at the time he was tried in 1990.

18  *A.*   No.

19  *Q.*   Have you changed your opinion on whether he was sane at

04:42:01PM 20  the time he committed this offense?

21  *A.*   No.

22  *Q.*   And what are those opinions?

23  *A.*   That he was, number one, competent to stand trial at the

24  time, consistent with Quijano's conclusions, and that he was

04:42:14PM 25  sane at the time of his crime.

1          MS. ODEN:  No other questions, Your Honor.

2          THE COURT:  All right.  Mr. Rytting, do you have

3    anything further?

4          MR. RYTTING:  Just a couple of questions.

5                      **RECROSS-EXAMINATION**

6    **BY MR. RYTTING:**

7    Q.   You mentioned a secondary gain; but you've heard

8    throughout, from every expert that testified, that there's no

9    evidence that Mr. Aldridge had any insight into his disease or

04:43:02PM 10   into his mental illness?

11   A.   What does that have to do with secondary gain?  I don't

12   understand your question.

13   Q.   Well, isn't this business that you're talk -- when you

14   talk about secondary gain, you are talking about someone who

04:43:13PM 15   is making up their symptoms intentionally, volitionally, for

16   the purpose of bamboozling the Court or putting on an

17   insanity -- or putting on an insanity defense that really is

18   not legitimate, right?  Isn't that what you're talking about?

19   A.   No, sir.

04:43:29PM 20   Q.   Well, then tell me what is this business of secondary

21   gain that --

22   A.   There was a term that -- excuse me.

23          Secondary gain was a term that Quijano used.

24   When she asked me the question about it, I used the term

04:43:44PM 25   "external goal," like to avoid prosecution.

1    Q.   So, do you think that -- you maintain that his external

2    goal is to avoid prosecution by giving a delusional account of

3    the crime?

4    A.   Yes.  Or to minimize punishment, yeah.

04:44:02PM 5    Q.   And you do this without ever having interviewed him,

6    correct?

7    A.   That's what everything points to, and I didn't examine

8    the guy --

9    Q.   Even if --

04:44:13PM 10             MS. ODEN:  If Dr. Allen could be permitted to finish

11   his answer.

12             THE COURT:  Yes.  Permit him to answer, please.

13   A.   I didn't get to examine the guy now and I didn't examine

14   him in '90, but everything points to that.

04:44:25PM 15   BY MR. RYTTING:

16   Q.   It points to an attempt to exaggerate his system -- his

17   symptoms in order to avoid prosecution, in your --

18   A.   Or minimize punishment, yes, sir.

19   Q.   Or minimize punishment?

04:44:37PM 20   A.   Yes, sir.

21   Q.   Okay.  So, the question, then, is:  How does someone --

22   you claim that he's doing this, that he is doing this to

23   minimize punishment.  He is exaggerating his symptoms.  At the

24   same time you realize he doesn't have insight into his

04:44:57PM 25   illness; is that correct?

1   *A.   No, sir.*

2   *Q.   You don't have any reason to think he has insight into*

3   *his illness, do you?*

4   *A.   Yes, sir.*

04:45:04PM 5   *Q.   Dr. Quijano did not testify that he had insight into his*

6   *illness, and he examined him; isn't that correct?*

7   *A.   Correct.*

8   *Q.   And Dr. Brown examined him, too, and said he had no*

9   *insight into his illness.*

04:45:14PM 10   *A.   Correct.*

11   *Q.   But you, who have never examined the patient, are willing*

12   *to give this opinion -- this psychological opinion, even*

13   *though you agree that Dr. Quijano is a very competent --*

14   *A.   Yes, sir.  He is very good.*

04:45:26PM 15   *Q.   -- psychologist?*

16          *And even though you have no idea of how the*

17   *field has changed -- that deals with schizophrenia has changed*

18   *in the last 20 years, correct?*

19   *A.   I don't know how much it has changed.  I mean, my*

04:45:52PM 20   *expertise is forensics, not schizophrenia.*

21          MR. RYTTING:  Pass the witness.

22          MS. ODEN:  Doctor --

23          THE COURT:  Can I just ask the witness one or two

24   quick questions?

04:46:06PM 25          Dr. Allen, did you review the evaluations that

1    were done in 1995 of Mr. Aldridge?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  And do you agree that at least in 1995

4    Mr. Aldridge was incompetent to stand trial?

04:46:19PM  5              THE WITNESS:  That's what it looks like in '95,

6    although even then I wish they had done more to assess the

7    malingering issue.  But I know how the exams are that they do

8    in Harris County on a contract basis, too.

9              THE COURT:  But you agree with the opinions of

04:46:36PM 10    Dr. Silverman and Dr. Brown in 1995 that Mr. Aldridge was

11    incompetent at that time to stand trial?

12              THE WITNESS:  Well, if I can clarify, because there

13    was competency to stand trial, competency to waive counsel,

14    competency to be executed.  Frankly, Judge, I don't know what

04:46:52PM 15    standard they are referring to or -- do you see my problem

16    there?  If it was competent -- if it is only competency to

17    stand trial in 1995, I would have to lean in that direction.

18              THE COURT:  All right.  Okay.  Go ahead.

19                    **FURTHER REDIRECT EXAMINATION**

04:47:12PM 20    **BY MS. ODEN:**

21    *Q.*    Talking about having insight into his own illness and

22    mentioning Dr. Brown and Dr. Silverman's reports, did you take

23    into consideration a statement in one of those reports

24    reportedly from Mr. Aldridge himself that he thinks he might

04:47:26PM 25    have been incompetent in the past but thinks he is better now?

```
 1  A.   I remember that, but I also --
 2  Q.   You laughed.  Tell us.  Tell us more.
 3  A.   Even that may not reflect insight, but the problem is
 4  that insight to hallucinations is not absent 24/7 in a
 5  schizophrenic.  There are occasions where they have insight.
 6  It is not something that's gone forever, every moment, every
 7  second.  So, it is a mischaracterization of insight works.
 8          And the other problem regarding the issue of
 9  insight isn't the presence of some of this stuff.  It is the
10  prolific presence of every symptom.  Most schizophrenics have
11  auditory hallucinations.
12          MR. RYTTING:  I'll have to object that this is not
13  responsive.  I'd like it to be question and answer rather than
14  a treatise.
15          THE COURT:  All right.  Overruled.
16          Go ahead.
17  A.   75, 80 percent have auditory hallucinations.  About half
18  have visual hallucinations.  But when you combine them, that
19  incidence goes down.  And then when you start adding
20  somatosensory hallucinations where they have strange
21  sensations -- in this case he feels anal penetration.  So, we
22  are talking some kind of tactile somatosensory hallucinations
23  which are much, much more rare.  You rarely get those
24  combinations.
25          And when you get rare combinations in a
```

04:47:48PM
04:48:10PM
04:48:24PM
04:48:39PM
04:48:57PM

1    forensic criminal case, especially a murder case, the

2    likelihood of exaggeration, which means he has some insight,

3    goes up.  And he could have auditory hallucinations.  He can

4    have delusions.  But the likelihood of all of these things is

04:49:18PM  5    incredibly small.  I'm not saying it is absolute.  But the

6    suspicion of exaggeration because of an external goal, you

7    ought to be incredibly suspicious.  It is a sign of

8    exaggeration or malingering.

9              MS. ODEN:  No other questions.

04:49:40PM 10              THE COURT:  All right.  Mr. Rytting.

11              **FURTHER RECROSS-EXAMINATION**

12    **BY MR. RYTTING:**

13    *Q.*   Doctor, isn't that a classic example of hindsight bias?

14    *A.*   No, sir.  It's -- that is a classic example of what the

04:49:52PM 15    best writers and researchers in the field believe and what the

16    statistics show.  And if you want me to reference the

17    textbook, I have it here.  I will let you copy it.

18    *Q.*   Are you not assuming, Doctor, that because he has so many

19    symptoms, that he must be exaggerating?

04:50:09PM 20    *A.*   That's one criteria I would use combined with the other

21    criminological variables that I talked about.

22              MR. RYTTING:  No further questions.

23              THE COURT:  All right.

24              MS. ODEN:  Nothing further.

04:50:21PM 25              THE COURT:  Are we finished?

1        You may step down.

2            THE WITNESS:  Thank you, Your Honor.

3            THE COURT:  Thank you.

4       (Witness released)

04:50:23PM 5            MS. ODEN:  We are done, Judge.

6            THE COURT:  All right.  Mr. Rytting.

7            MR. RYTTING:  Just briefly, Your Honor, on rebuttal

8    we call Dr. Mosnik.

9            THE COURT:  All right.  Dr. Mosnik.

04:50:44PM 10            You are still under oath.

11        (**DIANE MOSNIK, M.D.,** witness, sworn)

12                **DIRECT EXAMINATION**

13   **BY MR. RYTTING:**

14   *Q.*   Dr. Mosnik, I want you to address the last discussion

04:50:56PM 15   that Dr. Allen had about whether multiple symptoms is an

16   indication of exaggeration and, therefore, an insight into a

17   patient's condition.  What -- or how balanced do you think is

18   that chain of events in your experience in this field?

19   *A.*   Well, I think those are two different things.  I think it

04:51:19PM 20   is rare to see a patient with this number of symptoms.  It

21   does exist.  As Dr. Allen indicated, it does exist.  And, in

22   fact, it is an indication of a greater severity of illness.

23   It is also present when the patient goes untreated for a

24   longer period of time.

04:51:35PM 25            And somatic delusions or whether or not they

1    are really somatic delusions or hallucinations -- which I

2    never said this patient had somatic hallucinations.  I said he

3    had somatic delusions.  So, to have a variety of types of

4    delusions is not as uncommon.  To have a variety of types of

04:51:51PM  5    hallucinations is less common.

6              So, whether or not he -- you know, so, that

7    characterization of his symptoms is incorrect.  So, he had

8    somatic delusions, which is more common.  And I did not say

9    that he had somatic hallucinations.  But the greater

04:52:13PM  10   presentation of symptoms like this and these delusions is

11   indicative of a more severe illness overall.

12             It is unrelated to his insight.  And the fact

13   about insight is a patient either has insight into their

14   illness or not.  They don't sometimes.  Now, if you have a

04:52:32PM  15   fixed delusion or you experience hallucinations, you either

16   believe them or you don't.  Once they are fixed, you don't

17   sometimes say:  Oh, now I don't believe in it.  And there's

18   certainly no indication in the record that at any point

19   Mr. Aldridge doesn't believe them, that there's any glimmer of

04:52:48PM  20   insight that he has expressed through any of his writings or

21   any of his statements from family members or anything like

22   that.

23             So, in fact, patients who don't have insight,

24   don't have insight for the length of their illness, unless

04:53:04PM  25   there's something to change the severity of their illness like

1    medication.

2            MR. RYTTING:  Your Honor, I have no further

3    questions.

4            THE COURT:  All right.  Do you have any questions of

04:53:13PM  5    the doctor?

6            MS. ODEN:  Very briefly.

7                      **CROSS-EXAMINATION**

8    **BY MS. ODEN:**

9    *Q.*   Doctor, what's the difference between a somatic delusion

04:53:19PM 10   and a somatic hallucination?

11   *A.*   A somatic delusion is a belief.  It is a fixed false

12   belief that is held even in the face of disconfirmatory or

13   contradictory evidence.

14   *Q.*   Okay.

04:53:30PM 15   *A.*   A hallucination is an actual physical sensation.  Like an

16   auditory hallucination is an auditory sensation.

17   *Q.*   So, you're saying that Mr. Aldridge has delusions but not

18   hallucinations that are somatic?

19   *A.*   That's what I was given as his diagnosis, yes.

04:53:47PM 20   *Q.*   So, you don't think that he really truly believes he

21   feels pain in his ear when the voice speaks in his ear?

22   *A.*   Yes.  I think that he believes that.  I said he has

23   somatic delusions.  He believes that.

24   *Q.*   That's not a hallucination?

04:54:01PM 25   *A.*   No.  That's a somatic delusion.

1    Q.   Okay.  And you also said that -- that the greater number

2    of symptoms is an indication -- becomes present when it goes

3    untreated for so long?

4    A.   I said that it can be an indication of more -- a greater

04:54:17PM  5    severity of illness.

6    Q.   So, in other words, the longer it goes untreated,

7    potentially the more symptoms they will display or experience?

8    A.   That can be.

9    Q.   Okay.  And you said either they have insight or not.

04:54:30PM 10    There's no glimmer of insight sometimes and no insight other

11    times; is that right?

12    A.   In this case, yes.

13    Q.   Okay.  Doctor, when were you licensed as a psychologist?

14    A.   The year that I was licensed?

15    Q.   Yes.

16    A.   I obtained my license in June of 2001.

17    Q.   Thank you?

18             MS. ODEN:  No other questions.

19             THE COURT:  All right.  Mr. Rytting.

04:54:51PM 20             MR. RYTTING:  No, Your Honor.

21             THE COURT:  Okay.  Thank you.  You may step down.

22        (Witness released)

23             THE COURT:  All right.  So, we are done with the

24    evidence in this case.  Would the parties like to take a few

04:55:03PM 25    minutes to sum up orally, or do you prefer to do it in

1 writing?

2      MS. HAYES:  As much as I hate to suggest it, I think

3 it would probably be better to do it in writing.

4      THE COURT:  Mr. Rytting.

04:55:26PM 5      MR. RYTTING:  I will agree with that unless the

6 Judge wants to hear a brief jury speech.

7      THE COURT:  I have heard several already.  What kind

8 of time line would you like to be able to submit your briefs

9 in?

04:55:48PM 10      MS. HAYES:  What would be an estimate of when the

11 transcript is --

12      THE COURT:  You need the transcript first.  Okay.

13      What do we think on the transcript?

14      THE REPORTER:  Three weeks.

04:56:05PM 15      THE COURT:  Three weeks.

16      All right.  About three weeks on the

17 transcript.

18      MR. RYTTING:  If the Court would indulge me maybe a

19 brief statement, I do believe -- can I make one or two --

04:56:24PM 20      THE COURT:  Sure.  Sure.  We have come this far.  We

21 might as well.

22      MR. RYTTING:  I mean, I would just like to make a --

23 make a closing statement that I believe we have shown that we

24 have met the standard of proof that showed that at the time of

04:56:44PM 25 trial neither the judge or the defense attorneys had the

1    requisite information regarding Mr. Aldridge's mental illness

2    and his incompetency to stand trial to meet the threshold that

3    obligated them to request a competency hearing.

4              And I don't believe that we have heard

04:57:08PM 5    testimony from the other side that indicates that there is any

6    reasonable way to determine competency.  I think we have an

7    inordinate amount of evidence indicating that he was

8    incompetent to stand trial, and we also meet that threshold.

9              The extraordinary sickness of Mr. Aldridge was

04:57:30PM 10   present long before trial; continued throughout the entire

11   proceedings; and interfered, I think, absolutely with his

12   ability to assist counsel in any way.  And the only glimmer of

13   hope that they could have to dispel the real solid

14   probability, if not certain that he was incompetent at trial,

04:57:57PM 15   would be to have had a hearing at that time, something that we

16   do not have on the record and it should have been done.

17             THE COURT:  All right.  Yes?

18             MS. HAYES:  Admittedly, this is a hard case to go

19   reconstruct 20 years later.  It is difficult because trial

04:58:20PM 20   counsel -- there aren't records available anymore, at least

21   for that area.  But I think when the Court looks to the other

22   records, such as the HPD records and other statements, things

23   that are very important -- we're talking about explanations

24   that are provided by Mr. Aldridge right after the crime -- I

04:58:38PM 25   think those are certainly very important as far his level of

1  functioning, as well.

2              I believe also there's sufficient -- the Court

3  can certainly rely on what Mr. Davis has said about his

4  experience and his qualifications; that if something had

04:58:56PM  5  changed, then he would be aware of that and would make the

6  Court aware, make the trial judge aware.  But he said that it

7  is prudent that Mr. Aldridge functioned pretty much the same,

8  and it was -- sometimes they couldn't communicate well; other

9  times they could.  It wasn't a constant factor.

04:59:15PM 10              And so, with Mr. Davis and his experience that

11  he knows to do it and that he would have done it and would

12  have contacted the Court if there was really a problem, I

13  think there has to be a lot vested with that and that idea.

14              Overall, I think there's a lot of evidence

04:59:30PM 15  showing that he has a mental illness, varying degrees at

16  varying stages.  And -- but if mental was it alone or if a

17  defendant with delusions would be rendered per se incompetent,

18  then we wouldn't be having to do the whole hearing.  I think

19  there's a lot out there that proves about his functioning

04:59:47PM 20  level to assist that the Court should consider.

21              And on that grounds, then I don't believe that

22  they have made the standard that they need to for their

23  claims.

24              THE COURT:  All right.  Thank you.

04:59:57PM 25              Why don't we -- would 10 days after you receive

1  the transcript be sufficient to prepare your briefs?

2  Two weeks.

3           MR. RYTTING:  Two weeks, Your Honor.

4           THE COURT:  Two weeks.  All right.  We'll assume

05:00:12PM 5  that the transcript will be available in about three weeks,

6  but you'll have two weeks from the date the transcript is

7  available to submit briefs.  And I'd like simultaneous briefs

8  by both sides.  I don't want to go back and work on this any

9  more than we already have.

05:00:28PM 10          MS. HAYES:  And with a page limit or --

11          THE COURT:  Yes.

12          MS. HAYES:  How limited do you want it?

13          THE COURT:  No more than 25 pages.  And you can

14  attach exhibits if you think you need to, but I think we

05:00:43PM 15 have -- you can just refer to the exhibits that are in the

16  record, I think.  That should be sufficient.

17               All right.  Is there anything else,

18  Mr. Rytting?

19          MR. RYTTING:  No, Your Honor.

05:00:51PM 20          THE COURT:  All right.  Anything else from the

21  respondents?

22          MS. HAYES:  Nothing, Your Honor.

23          THE COURT:  All right.  We are adjourned.  Thank you

24  very much.

05:00:55PM 25      (Concluded)

1                           * * *

2  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled cause, to the best
3  of my ability.

4

5  //s_____        1/13/10
   Stephanie Kay Carlisle-Neisser CSR, RPR      Date
6  Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$40** [1] - 381:5

## '

**'72** [1] - 334:5
**'75** [1] - 502:10
**'80** [1] - 311:11
**'85** [1] - 453:21
**'87** [1] - 454:1
**'89** [1] - 475:19
**'90** [2] - 311:12, 534:14
**'95** [1] - 536:5
**'How** [1] - 386:7
**'Tell** [1] - 391:15
**'The** [1] - 386:9
**'What** [1] - 385:22
**'Yes** [1] - 386:5
**'You** [1] - 386:3

## /

**//s** [1] - 547:5

## 1

**1** [3] - 415:7, 415:19, 435:4
**1/13/10** [1] - 547:5
**10** [7] - 345:18, 468:17, 468:20, 470:3, 476:11, 476:19, 545:25
**10-year** [1] - 395:3
**12** [2] - 389:17, 389:19
**120** [1] - 397:6
**12548** [1] - 307:18
**13th** [2] - 489:2, 489:8
**14** [2] - 408:10, 472:14
**14th** [1] - 397:4
**15** [6] - 314:5, 342:10, 375:9, 410:25, 470:3, 494:9
**150** [1] - 459:1
**16** [2] - 480:8, 526:23
**17** [9] - 311:10, 375:9, 376:22, 408:9, 409:10, 443:7, 443:14, 444:10, 492:14
**177** [1] - 397:6
**17th** [1] - 380:6

**18** [7] - 375:9, 442:25, 443:7, 443:19, 445:1, 445:2
**19** [2] - 321:12, 521:9
**1972** [6] - 326:11, 331:14, 331:20, 334:1, 355:13, 355:15
**1974** [1] - 411:1
**1975** [1] - 395:11
**1980** [6] - 310:20, 343:4, 394:11, 394:12, 395:24, 396:3
**1980s** [1] - 394:16
**1981** [2] - 396:8, 396:17
**1982** [1] - 396:20
**1983** [3] - 397:3, 397:4, 397:9
**1984** [1] - 397:9
**1985** [1] - 452:20
**1986** [3] - 398:14, 410:13, 515:18
**1987** [1] - 343:4
**1989** [4] - 345:17, 415:2, 415:12, 449:24
**1990** [49] - 350:5, 361:14, 362:7, 363:1, 368:20, 373:6, 373:13, 394:18, 394:25, 395:3, 396:8, 410:13, 415:3, 415:4, 415:7, 415:18, 415:19, 417:6, 417:23, 433:7, 434:6, 434:18, 434:19, 435:4, 435:5, 435:14, 458:11, 458:12, 463:21, 464:15, 465:1, 466:3, 466:4, 466:19, 470:8, 470:21, 470:25, 471:6, 479:25, 489:2, 490:4, 497:1, 497:3, 497:10, 508:14, 511:6, 531:16, 532:17
**1992** [1] - 311:9
**1995** [4] - 536:1, 536:3, 536:10, 536:17
**1:00** [1] - 411:7
**1st** [3] - 434:18, 434:19, 435:14

## 2

**2** [3] - 307:8, 310:2, 345:25
**20** [15] - 314:5, 321:12, 326:8, 338:21, 456:19, 456:20, 468:18, 468:20, 468:25, 470:4, 490:10, 491:10, 494:9, 535:18, 544:19
**200** [1] - 459:1
**2001** [1] - 542:16
**2006** [1] - 486:19
**2009** [2] - 307:8, 310:2
**20s** [1] - 481:24
**20th** [1] - 411:1
**23rd** [1] - 398:14
**24/7** [5] - 428:9, 478:21, 478:23, 479:5, 537:4
**25** [5] - 477:19, 477:20, 488:12, 526:24, 546:13
**26** [2] - 417:6, 526:24
**271** [1] - 385:20
**272** [2] - 385:20, 386:18
**274** [1] - 380:8
**275** [1] - 380:8
**27th** [1] - 396:17
**282** [1] - 382:16
**29th** [2] - 350:5, 485:7
**2nd** [1] - 345:17

## 3

**3** [5] - 346:11, 416:13, 416:15, 417:4, 511:6
**30** [7] - 311:23, 418:4, 434:12, 434:20, 435:5, 456:12, 516:19
**30th** [4] - 417:23, 418:2, 434:6, 435:11
**33** [1] - 396:18
**36** [1] - 396:20
**37** [1] - 345:9
**3:30** [1] - 490:10

## 4

**4** [2] - 389:22, 515:20
**40s** [1] - 345:10

**42** [3] - 345:11, 345:12, 347:6
**44** [3] - 376:22, 377:15, 377:25
**45** [2] - 477:19, 481:21

## 5

**515** [1] - 308:4
**54** [2] - 378:8, 398:15
**55** [2] - 381:1, 398:15
**5:00** [2] - 490:11, 514:11
**5th** [1] - 396:20

## 6

**60** [1] - 387:6
**68** [1] - 381:9
**6:30** [1] - 379:10
**6th** [9] - 415:3, 415:7, 415:18, 433:7, 486:10, 486:16, 511:6, 512:24, 529:8

## 7

**7** [2] - 389:22, 390:22
**702** [2] - 363:21, 363:25
**713.250.5157** [1] - 308:5
**75** [1] - 537:17
**77002** [1] - 308:4
**77006** [1] - 307:16
**78** [1] - 379:9
**78711** [1] - 307:19
**7:00** [1] - 379:10

## 8

**8** [5] - 389:17, 389:19, 389:22, 423:14, 424:1
**8/30/1990** [1] - 418:9
**80** [1] - 537:17
**800** [1] - 459:12
**8016** [1] - 308:4
**819** [1] - 307:15
**8th** [1] - 397:3

## 9

**9** [5] - 410:25, 424:1,

## 2

**501:5, 501:6, 501:19
93** [1] - 488:12
**95** [1] - 488:12
**9:00** [1] - 307:8

## A

**A&M** [2] - 452:9, 452:10
**A-L-L-E-N** [1] - 452:3
**a.m** [1] - 514:11
**A.M** [1] - 307:8
**AAS** [1] - 408:19
**abilities** [2] - 423:8, 469:11
**ability** [33] - 312:13, 319:1, 321:2, 324:25, 327:8, 329:17, 329:18, 329:23, 332:10, 333:25, 334:18, 362:20, 363:1, 368:18, 371:6, 398:21, 400:16, 427:8, 428:18, 450:9, 450:16, 476:17, 482:13, 482:15, 483:11, 518:19, 524:23, 526:6, 526:7, 526:10, 526:11, 544:12, 547:3
**able** [69] - 313:7, 318:20, 319:25, 320:25, 321:16, 321:19, 323:16, 324:6, 324:22, 327:18, 328:15, 330:1, 331:12, 332:13, 333:18, 334:3, 334:4, 335:23, 339:7, 340:10, 347:25, 348:3, 356:8, 359:1, 365:24, 371:20, 395:8, 396:2, 397:15, 399:2, 400:21, 401:7, 401:9, 402:10, 402:21, 406:22, 408:17, 408:19, 416:20, 419:3, 420:4, 427:17, 429:22, 433:18, 450:3, 450:13, 454:2, 459:15, 460:10, 462:5, 465:21, 466:24, 468:5, 469:9, 470:20, 471:8,

472:21, 482:21,
497:22, 506:18,
507:11, 507:13,
507:15, 508:20,
518:18, 543:8
**above-entitled** [1] -
547:2
**absence** [3] -
405:18, 469:7, 489:5
**absent** [2] - 489:7,
537:4
**absolute** [1] - 538:5
**Absolutely** [2] -
419:10, 427:14
**absolutely** [2] -
327:5, 544:11
**abstract** [1] - 423:8
**abuse** [1] - 415:16
**academic** [2] -
452:23, 453:3
**accept** [2] - 438:21,
456:20
**accepted** [1] -
438:22
**accepting** [2] -
323:10, 457:6
**accomplish** [1] -
332:13
**According** [2] -
378:3, 387:5
**account** [28] - 379:8,
381:5, 382:15,
386:23, 387:1,
387:3, 387:4,
394:17, 394:18,
400:4, 440:22,
444:17, 444:19,
445:5, 455:23,
469:24, 470:2,
471:14, 479:18,
493:6, 502:24,
503:4, 525:10,
525:11, 525:14,
526:2, 526:3, 534:2
**accounts** [10] -
363:10, 364:7,
364:25, 376:9,
394:25, 414:14,
455:21, 456:1,
477:1, 510:24
**accumulate** [1] -
360:17
**accuracy** [2] -
400:15, 521:13
**accurate** [11] -
363:15, 364:8,
399:25, 400:6,
400:14, 400:16,
403:5, 413:8,
461:18, 464:2,

486:14
**accurately** [3] -
363:11, 365:1, 427:8
**achieve** [4] - 387:17,
388:25, 432:25,
464:2
**acknowledging** [1] -
495:18
**act** [5] - 392:15,
441:11, 473:21,
479:6, 487:5
**acted** [2] - 337:8,
381:7
**acting** [2] - 384:22,
526:17, 526:18
**action** [1] - 349:17
**Action** [1] - 307:3
**actions** [4] - 366:1,
417:2, 426:19,
491:23
**active** [2] - 369:5,
526:20
**actively** [2] - 406:7,
444:3
**activities** [1] - 483:8
**activity** [3] - 473:4,
473:7, 473:11
**acts** [4] - 422:18,
444:1, 444:3
**actual** [3] - 394:4,
499:3, 541:15
**acute** [1] - 487:9
**add** [2] - 427:18,
489:24
**added** [1] - 378:25
**adding** [1] - 537:19
**addition** [5] - 320:6,
416:16, 422:8,
462:23, 473:22
**additional** [3] -
367:14, 438:16,
471:3
**address** [4] - 469:19,
472:16, 530:1,
539:14
**addressed** [1] -
414:5
**addresses** [2] -
393:24, 473:11
**adequate** [5] - 464:2,
465:13, 466:15,
466:17, 467:6
**adequately** [4] -
371:21, 462:10,
468:2, 472:22
**adjourned** [1] -
546:23
**administer** [3] -
469:16, 469:17,
469:18

**administered** [3] -
422:22, 469:11,
491:21
**admissibility** [3] -
325:18, 325:22,
326:11
**admissible** [1] -
483:22
**admission** [3] -
435:22, 506:8,
508:13
**admissions** [3] -
459:4, 459:6
**admit** [3] - 328:2,
387:15, 389:1
**admits** [2] - 403:3,
495:11
**Admitted** [1] - 347:7
**admitted** [6] - 328:4,
347:6, 381:3,
387:14, 459:5,
487:20
**Admittedly** [1] -
544:18
**admitting** [3] -
440:21, 459:3, 494:8
**adolescence** [1] -
442:23
**adopted** [1] - 407:9
**adult** [1] - 442:25
**adulthood** [2] -
444:6, 444:7
**advance** [1] - 313:8
**adversarial** [3] -
368:1, 369:24,
370:12
**advice** [3] - 378:25,
507:11, 507:12
**advised** [2] - 326:25,
388:3
**advisement** [1] -
432:4
**advising** [2] - 517:3,
517:17
**affect** [7] - 329:20,
362:20, 365:7,
365:9, 397:10,
398:18, 448:7
**affected** [8] - 319:1,
329:18, 333:1,
348:13, 427:7,
427:11, 492:1
**affecting** [2] - 340:5,
409:25
**affects** [4] - 426:22,
427:6, 448:5, 448:17
**affidavit** [9] - 403:3,
412:4, 413:9,
413:11, 431:6,
431:7, 431:9,

431:13, 439:12
**affidavits** [4] - 439:1,
439:7, 439:10,
440:13
**affixed** [1] - 350:15
**afraid** [2] - 386:15,
386:20
**African** [2] - 315:9,
398:7
**afternoon** [2] -
381:8, 490:9
**afterwards** [3] -
414:10, 474:10,
485:12
**AG's** [1] - 458:1
**Age** [1] - 481:18
**age** [4] - 442:25,
443:6, 443:14,
472:14
**ago** [9] - 311:23,
379:11, 453:9,
468:17, 468:18,
468:20, 468:25,
480:8
**agree** [23] - 312:20,
355:8, 357:14,
358:21, 359:5,
409:14, 429:10,
431:9, 435:14,
437:2, 439:5,
442:22, 455:5,
461:20, 494:6,
495:14, 503:21,
520:23, 531:20,
535:13, 536:3,
536:9, 543:5
**agreed** [4] - 328:19,
355:5, 413:12,
431:24
**agreeing** [1] - 431:14
**agreement** [4] -
310:4, 312:22,
323:10, 323:11
**ahead** [9] - 361:7,
362:17, 452:1,
455:10, 467:23,
483:3, 525:23,
536:18, 537:16
**aided** [1] - 307:25
**AI** [3] - 375:7, 375:8,
375:13
**alcoholic** [1] -
405:25
**ALDRIDGE** [1] -
307:3
**Aldridge** [204] -
307:22, 314:16,
315:4, 315:10,
315:13, 315:19,
315:20, 316:3,

316:4, 316:6,
316:10, 316:15,
317:11, 317:13,
318:3, 318:7,
318:23, 319:19,
320:22, 321:19,
323:14, 323:16,
324:4, 324:22,
325:8, 326:16,
326:20, 327:18,
328:18, 328:23,
329:7, 329:10,
330:20, 331:11,
331:13, 331:22,
332:1, 332:5,
333:17, 334:17,
335:22, 337:2,
337:14, 338:8,
338:22, 340:11,
340:13, 340:15,
342:3, 343:22,
344:22, 345:17,
345:22, 346:12,
347:12, 347:21,
348:22, 349:11,
350:8, 350:15,
351:24, 352:5,
352:21, 355:20,
355:23, 356:2,
356:6, 357:7, 357:9,
357:11, 358:4,
358:17, 358:18,
367:4, 368:7, 369:6,
371:15, 373:2,
374:7, 375:1, 375:5,
375:10, 376:2,
376:5, 376:8, 378:3,
379:4, 386:21,
387:7, 387:9, 390:4,
390:14, 390:16,
390:20, 395:11,
399:23, 399:24,
400:20, 401:7,
401:12, 401:18,
401:20, 401:24,
402:10, 402:19,
403:11, 403:18,
406:4, 406:7, 407:9,
409:14, 410:11,
414:7, 417:16,
418:5, 419:12,
419:18, 422:7,
422:22, 425:10,
425:14, 426:6,
428:8, 428:17,
429:7, 429:12,
429:16, 432:6,
433:25, 434:1,
441:25, 445:12,
445:16, 446:21,
447:2, 447:5,

447:14, 447:19,
447:24, 449:18,
449:22, 458:9,
459:19, 460:15,
461:20, 462:5,
463:18, 464:14,
468:4, 468:7,
469:10, 470:7,
470:20, 472:11,
474:3, 474:5,
476:24, 479:11,
479:25, 482:3,
482:22, 488:19,
492:20, 493:22,
498:18, 499:7,
499:9, 499:18,
501:25, 502:18,
503:22, 507:8,
512:2, 514:21,
515:2, 516:15,
517:15, 521:1,
521:2, 521:10,
522:2, 525:9, 526:1,
526:17, 527:22,
528:4, 528:19,
528:25, 530:1,
532:17, 533:9,
536:1, 536:4,
536:10, 536:24,
540:19, 541:17,
544:9, 544:24, 545:7
**Aldridge's** [38] -
318:19, 319:15,
320:1, 324:25,
329:19, 333:25,
336:14, 353:14,
373:4, 373:12,
382:15, 390:5,
392:25, 394:10,
394:18, 395:4,
422:2, 425:7,
426:13, 429:19,
441:18, 457:25,
461:3, 461:19,
462:16, 463:8,
463:20, 463:24,
464:3, 466:19,
471:6, 471:9,
473:15, 485:2,
499:13, 519:9,
527:6, 544:1
**alibi** [1] - 439:24
**Allah** [9] - 387:13,
388:2, 485:14,
493:3, 494:5, 494:7,
494:12, 495:16,
497:20
**alleged** [2] - 494:19,
529:11
**ALLEN** [2] - 309:11,

451:21
**Allen** [11] - 437:5,
451:16, 451:19,
452:3, 465:10,
490:19, 523:24,
534:10, 535:25,
539:15, 539:21
**Allen's** [1] - 408:22
**allow** [6] - 354:12,
372:22, 466:22,
467:19, 473:17,
480:23
**allowed** [6] - 322:17,
335:11, 350:25,
420:20, 421:19,
422:19
**alluded** [2] - 343:3,
492:13
**almost** [2] - 310:25,
321:12
**alogia** [1] - 432:20
**alone** [4] - 487:14,
525:11, 526:4,
545:16
**ALSO** [1] - 307:22
**alternative** [4] -
439:23, 512:19,
512:22, 528:7
**alternatives** [1] -
382:5
**Amendment** [3] -
325:25, 527:18,
527:20
**America** [1] - 525:16
**American** [2] - 315:9,
398:7
**amount** [3] - 341:7,
341:10, 544:7
**anal** [2] - 346:14,
537:21
**anally** [1] - 346:15
**analogy** [1] - 457:10
**analysis** [2] - 449:4,
529:25
**analyzing** [1] -
489:18
**Andrea** [1] - 372:15
**anger** [1] - 391:1
**angry** [2] - 391:2,
525:8
**anhedonia** [1] -
432:20
**animosity** [2] -
315:2, 319:5
**answer** [29] - 324:2,
329:8, 334:4,
336:21, 340:1,
344:12, 363:14,
424:23, 447:8,
466:5, 468:15,

469:18, 470:9,
474:18, 480:22,
481:16, 489:23,
502:22, 508:20,
513:17, 514:15,
514:16, 527:25,
528:3, 528:6, 528:8,
534:11, 534:12,
537:13
**answered** [22] -
319:9, 320:10,
323:24, 324:2,
324:11, 327:21,
328:8, 331:6,
338:23, 339:11,
339:12, 357:13,
358:11, 359:8,
374:3, 399:5, 466:9,
481:24, 508:25,
527:9, 527:22
**answering** [8] -
328:24, 338:18,
362:14, 467:21,
507:5, 512:23,
513:1, 531:21
**answers** [9] - 368:6,
373:4, 373:12,
376:3, 401:1, 401:6,
425:17, 465:18,
465:23
**Anthony** [8] -
348:22, 355:23,
356:1, 356:25,
381:11, 381:14
**Anthony's** [1] -
366:24
**antisocial** [27] -
407:16, 408:6,
421:25, 422:5,
422:11, 422:14,
422:15, 422:16,
422:20, 422:23,
442:6, 442:8,
442:10, 442:18,
442:24, 443:13,
443:20, 443:24,
444:4, 444:7,
444:11, 444:18,
445:6, 445:7, 445:9,
445:10, 515:16
**anytime** [1] - 436:20
**anyway** [1] - 483:6
**apartment** [9] -
381:6, 381:8,
383:10, 383:12,
384:24, 385:2,
386:13, 386:14,
386:16
**apathy** [1] - 407:11
**apologize** [1] - 404:7

**apparent** [3] -
483:12, 485:22,
487:24
**appeal** [10] - 406:14,
417:20, 488:8,
505:6, 505:8,
505:23, 506:21,
506:23, 506:24,
507:8
**appear** [11] - 320:21,
369:6, 402:25,
406:25, 407:4,
407:5, 424:1, 448:6,
462:12, 486:4, 486:5
**APPEARANCES** [2] -
307:12, 308:1
**appeared** [9] - 320:3,
320:4, 320:24,
349:15, 420:21,
420:25, 463:3,
470:24, 471:1
**appellate** [1] -
417:19
**application** [1] -
454:21
**applies** [1] - 484:17
**apply** [3] - 311:8,
460:19, 527:12
**appoint** [1] - 317:8
**appointed** [5] -
313:3, 313:5,
316:13, 453:14,
531:17
**appointment** [2] -
317:23, 366:12
**appraise** [1] - 467:25
**appraising** [1] -
467:24
**appreciate** [2] -
525:17, 526:6
**appreciated** [1] -
417:19
**appreciation** [1] -
500:18
**apprise** [1] - 319:16
**approach** [17] -
311:16, 318:17,
322:19, 332:3,
376:19, 416:4,
418:13, 423:22,
434:8, 456:6,
471:23, 492:16,
501:2, 510:1,
515:21, 525:13,
525:14
**approached** [4] -
319:2, 319:6, 320:5,
509:25
**appropriate** [2] -
439:18, 515:17

**appropriately** [1] -
414:5
**April** [1] - 397:3
**area** [1] - 544:21
**areas** [5] - 367:6,
423:7, 426:24,
477:22, 510:21
**arenas** [1] - 455:2
**argue** [9] - 348:24,
405:22, 406:1,
437:4, 444:21,
497:13, 515:24,
520:2, 531:20
**argued** [1] - 437:5
**arguing** [1] - 431:25
**argument** [5] -
351:9, 392:8, 419:2,
486:2, 515:8
**arise** [2] - 319:15,
323:6
**arisen** [1] - 318:19
**arose** [4] - 313:18,
318:2, 318:7, 323:18
**arrest** [20] - 387:4,
388:3, 414:9,
414:10, 415:3,
415:4, 435:25,
475:22, 476:23,
477:2, 485:9, 486:6,
488:19, 488:20,
492:22, 510:23,
529:1, 529:6, 530:1,
530:3
**arrested** [6] - 376:9,
382:3, 387:3, 388:9,
395:1, 474:25
**article** [1] - 457:19
**articles** [1] - 454:10
**articulations** [1] -
382:1
**aside** [2] - 333:5,
517:15
**asociality** [1] -
432:20
**aspects** [1] - 371:5
**assault** [8] - 337:5,
374:14, 389:6,
449:18, 449:22,
495:19, 529:11
**assaulted** [7] -
320:11, 358:11,
417:13, 493:10,
493:13, 493:14,
494:19
**assaulting** [10] -
374:9, 375:2,
375:12, 375:16,
390:25, 476:5,
486:13, 503:1,
503:7, 511:4

**assaults** [4] - 310:25, 384:4, 473:15, 485:15
**assert** [1] - 400:16
**asserts** [1] - 403:1
**assess** [14] - 314:18, 320:25, 335:25, 336:14, 336:20, 336:23, 341:15, 343:13, 407:21, 424:21, 425:2, 468:13, 515:14, 536:6
**assessing** [4] - 471:22, 478:16, 489:10, 489:18
**assessment** [9] - 318:1, 340:20, 343:18, 343:19, 362:24, 446:11, 454:11, 498:4, 508:9
**assessments** [4] - 397:16, 420:16, 420:23, 453:15
**assist** [12] - 315:10, 321:16, 329:11, 334:3, 371:6, 450:3, 450:5, 450:6, 450:9, 450:13, 544:12, 545:20
**assistance** [1] - 372:16
**assistant** [2] - 459:24, 482:10
**assisting** [3] - 315:19, 372:12, 372:17
**Associate's** [1] - 408:20
**associated** [1] - 441:21
**Associates** [1] - 307:15
**assume** [17] - 317:24, 328:21, 332:7, 342:16, 350:10, 369:18, 438:12, 468:17, 476:8, 476:9, 476:11, 476:21, 478:5, 488:6, 493:16, 493:18, 546:4
**assumed** [3] - 369:9, 391:8, 493:15
**assuming** [3] - 331:16, 384:20, 538:18
**Assuming** [1] - 318:7

**assumption** [4] - 457:6, 457:7, 457:9, 495:19
**attach** [1] - 546:14
**attempt** [5] - 338:1, 420:7, 513:13, 524:3, 534:16
**attempted** [2] - 366:3, 399:18
**attempting** [2] - 390:20, 467:5
**attempts** [2] - 419:19, 420:8
**attending** [1] - 428:21
**attention** [4] - 340:6, 343:9, 365:8, 420:11
**attitude** [2] - 320:5, 525:7
**attorney** [20] - 325:1, 334:9, 334:13, 335:3, 350:24, 351:13, 367:13, 368:15, 369:15, 373:1, 373:3, 402:20, 445:22, 447:6, 461:17, 482:15, 489:1, 500:22, 523:12
**Attorney** [2] - 307:18, 370:22
**attorney's** [11] - 310:19, 311:5, 311:15, 313:1, 313:25, 316:23, 321:18, 343:11, 429:13, 434:16, 530:9
**Attorney's** [2] - 311:9, 314:21
**attorney/client** [2] - 322:3, 429:14
**attorneys** [28] - 362:21, 365:20, 367:7, 367:23, 369:3, 370:19, 370:23, 372:12, 401:25, 406:12, 410:7, 420:10, 429:23, 450:5, 450:6, 450:9, 450:11, 450:17, 453:17, 461:19, 521:24, 522:3, 522:23, 523:4, 523:9, 526:8, 543:25
**attorneys'** [1] - 369:2
**atypical** [1] - 477:3
**audio** [1] - 390:8
**auditory** [9] - 420:6,

427:1, 432:13, 507:22, 537:11, 537:17, 538:3, 541:16
**August** [6] - 411:1, 415:2, 417:23, 418:2, 434:6, 435:5
**Austin** [1] - 307:19
**author** [1] - 457:20
**author's** [1] - 491:18
**authorities** [1] - 391:22
**automatic** [3] - 477:7, 477:10, 477:21
**automatically** [2] - 468:17, 530:21
**autopsy** [1] - 329:22
**available** [17] - 362:25, 365:20, 402:23, 403:4, 420:24, 420:25, 437:3, 438:12, 489:12, 489:15, 489:20, 521:5, 522:20, 532:16, 544:20, 546:5, 546:7
**avenue** [1] - 369:13
**avoid** [5] - 479:22, 529:19, 533:25, 534:2, 534:17
**avolitional** [3] - 478:13, 478:15, 479:5
**awaiting** [2] - 337:9, 337:12
**aware** [30] - 320:7, 324:21, 334:25, 336:4, 341:12, 346:21, 350:18, 352:15, 374:6, 387:4, 395:11, 397:16, 398:13, 398:17, 414:3, 417:15, 449:13, 458:14, 458:17, 476:2, 488:25, 496:25, 506:18, 511:5, 518:19, 545:5, 545:6
**ax** [1] - 356:13
**Axelrod** [7] - 413:5, 413:9, 413:12, 413:23, 431:8, 431:9, 431:18
**Axis** [1] - 422:9

# B

**Bach** [1] - 480:25
**Bachelor's** [1] - 452:7
**backed** [1] - 391:14
**background** [3] - 452:5, 462:23, 463:14
**backtracking** [1] - 371:24
**backwards** [2] - 394:18, 456:17
**bad** [4] - 330:7, 387:23, 393:7, 486:25
**bag** [2] - 378:11, 383:9
**balanced** [1] - 539:17
**bamboozling** [1] - 533:16
**bank** [1] - 381:5
**barbaric** [1] - 391:23
**bargain** [2] - 323:7, 324:13
**bargains** [1] - 324:12
**bars** [1] - 444:9
**base** [2] - 432:8, 440:10
**Based** [3] - 324:4, 464:5, 470:17
**based** [25] - 312:22, 326:22, 341:11, 341:19, 362:24, 365:5, 394:17, 395:4, 425:4, 430:1, 432:25, 446:4, 458:16, 464:3, 464:10, 464:15, 465:2, 470:25, 489:19, 506:16, 510:3, 510:15, 512:10, 517:21, 522:11
**basic** [6] - 367:5, 372:8, 424:18, 501:25, 524:23, 529:17
**basing** [1] - 440:8
**basis** [9] - 330:14, 359:7, 410:12, 414:19, 454:3, 463:17, 467:17, 536:8
**Bates** [35] - 315:1, 315:8, 315:18, 316:3, 316:12, 317:6, 317:13,

317:16, 317:21, 318:8, 330:1, 331:19, 337:6, 338:2, 338:7, 338:20, 339:2, 339:4, 352:16, 352:20, 353:3, 366:10, 366:22, 399:12, 399:20, 402:25, 403:7, 411:17, 411:19, 411:25, 507:7, 507:10, 517:25, 531:1
**Bates'** [17] - 318:1, 339:17, 340:8, 357:17, 358:2, 398:24, 399:10, 399:25, 400:4, 400:8, 400:14, 429:6, 429:11, 461:17, 462:4, 462:7, 498:16
**bathing** [1] - 398:11
**battery** [1] - 422:21
**battling** [1] - 472:20
**Baylor** [2] - 412:23, 412:25
**beat** [1] - 456:19
**beaten** [4] - 334:7, 334:14, 404:24, 405:13
**beating** [1] - 405:8
**became** [2] - 391:2, 443:4
**become** [4] - 370:19, 381:12, 381:20, 529:23
**becomes** [1] - 542:2
**becoming** [3] - 354:4, 442:13, 444:10
**bed** [1] - 484:20
**BEFORE** [1] - 307:10
**began** [4] - 316:6, 483:12, 528:6, 529:5
**begin** [2] - 457:9, 487:8
**beginning** [3] - 367:7, 453:14, 453:21
**behalf** [2] - 332:13, 506:21
**behaved** [1] - 441:21
**behavior** [28] - 320:1, 320:6, 394:14, 398:16, 398:20, 410:23, 416:2, 420:4, 440:20, 441:19,

443:18, 444:15,
444:18, 445:2,
445:11, 471:20,
471:22, 473:24,
478:14, 478:23,
485:2, 485:11,
520:18, 520:19,
520:20, 520:22,
520:24, 526:19
**behavioral** [7] -
453:22, 454:21,
454:22, 455:13,
456:3, 472:20,
477:23
**behaviors** [4] -
422:14, 422:16,
445:10
**behind** [6] - 375:21,
375:22, 378:11,
386:12, 400:4, 444:9
**belabor** [1] - 430:12
**belief** [17] - 330:22,
330:23, 346:21,
353:14, 369:13,
370:13, 374:20,
417:13, 419:21,
506:25, 507:2,
515:3, 515:4, 515:6,
525:1, 541:11,
541:12
**beliefs** [34] - 320:7,
320:14, 320:15,
329:4, 330:20,
338:8, 339:7, 340:7,
340:16, 341:19,
345:2, 345:4, 345:5,
345:7, 346:23,
347:9, 349:7,
349:20, 349:25,
352:13, 353:18,
353:22, 353:23,
353:24, 375:4,
484:10, 487:25,
500:10, 500:14,
500:17, 504:16,
523:1, 529:3, 530:9
**believable** [2] -
352:3
**believes** [7] - 508:3,
512:3, 515:2, 515:7,
541:20, 541:22,
541:23
**Bellfort** [1] - 386:11
**Ben** [15] - 374:8,
375:3, 375:8,
375:14, 387:14,
391:16, 434:1,
475:10, 486:12,
493:11, 493:13,
493:15, 494:6,

495:16
**benefit** [1] - 507:12
**best** [12] - 330:5,
337:24, 348:3,
410:3, 410:7,
410:10, 410:23,
437:2, 447:19,
457:23, 538:15,
547:2
**better** [8] - 310:23,
324:20, 342:2,
382:20, 410:17,
426:21, 536:25,
543:3
**between** [20] -
331:19, 359:6,
390:19, 393:24,
394:2, 403:16,
405:9, 409:10,
413:3, 423:6,
426:23, 445:16,
449:14, 490:20,
498:17, 508:16,
510:22, 527:6, 541:9
**bias** [9] - 456:2,
456:8, 456:23,
456:25, 457:5,
457:16, 457:17,
480:4, 538:13
**biased** [1] - 456:5
**biases** [1] - 457:3
**big** [6] - 352:7,
378:5, 476:17,
497:7, 510:17,
529:21
**bigger** [1] - 496:24
**biggest** [1] - 497:4
**binder** [1] - 377:3
**bit** [14] - 310:17,
324:20, 338:23,
338:24, 339:2,
339:3, 339:4,
356:13, 371:24,
386:1, 398:21,
465:5, 527:1, 530:24
**bizarre** [1] - 320:20,
469:25, 475:6
**black** [5] - 315:4,
344:22, 345:2,
345:4, 354:13
**blackout** [2] - 391:1,
433:25
**blackouts** [7] -
433:14, 433:15,
433:16, 433:17,
433:19, 433:23
**blacks** [1] - 415:13
**block** [1] - 420:8
**blocked** [2] - 416:19,
416:22

**blocking** [3] -
416:18, 419:10,
432:18
**blood** [1] - 391:16
**blow** [1] - 390:22
**blown** [6] - 442:5,
442:13, 443:5,
503:22, 503:23,
504:1
**board** [2] - 452:21,
491:7
**body** [2] - 391:19,
392:6
**boils** [1] - 530:14
**bolster** [2] - 464:7
**bona** [1] - 520:13
**book** [2] - 512:9,
513:5
**boss** [4] - 476:5,
480:15, 481:4, 481:5
**bother** [2] - 406:13,
483:10
**bottom** [1] - 389:22
**bought** [4] - 328:4,
341:5, 504:8, 504:11
**Boulevard** [1] -
307:15
**Bowl** [2] - 457:11,
457:13
**box** [2] - 383:16,
441:12
**Box** [1] - 307:18
**boxes** [1] - 419:15
**Boy** [1] - 495:20
**brain** [11] - 423:7,
426:14, 426:21,
426:23, 426:25,
428:19, 448:25,
479:1, 492:1, 492:5
**brain's** [1] - 428:18
**bread** [3] - 395:12,
395:13, 395:17
**break** [7] - 342:6,
342:19, 411:6,
411:8, 443:4,
443:11, 490:10
**Break** [2] - 342:11,
490:14
**breakthrough** [1] -
491:13
**Brenda** [1] - 523:3
**Brian** [1] - 378:1
**bridge** [2] - 315:9,
315:18
**brief** [5] - 408:3,
451:13, 455:5,
543:6, 543:19
**briefly** [5] - 432:7,
452:5, 460:11,
539:7, 541:6

**Briefly** [1] - 523:20
**briefs** [4] - 543:8,
546:1, 546:7
**bring** [2] - 426:9,
527:14
**bringing** [1] - 343:8
**brother** [3] - 378:2,
379:4, 385:23
**brother's** [1] -
381:16
**brother-in-law** [1] -
378:2
**brought** [2] - 340:6,
454:13
**Brown** [4] - 422:9,
535:8, 536:10,
536:22
**bugs** [4] - 395:12,
395:17, 395:20,
395:22
**built** [1] - 390:25
**burned** [1] - 487:17
**burned-out** [1] -
487:17
**bushes** [2] - 378:11,
386:14
**business** [3] -
343:25, 533:13,
533:20
**button** [2] - 481:6,
482:6
**buy** [1] - 526:17
**buying** [4] - 472:15,
475:16, 485:7, 529:3
**buys** [2] - 359:1,
379:13
**BY** [92] - 310:14,
312:25, 313:19,
314:6, 316:1, 317:1,
318:6, 318:12,
319:13, 320:16,
324:18, 326:15,
327:7, 327:16,
328:3, 330:18,
331:10, 333:16,
333:24, 336:13,
337:1, 339:18,
341:25, 343:2,
345:20, 346:13,
347:8, 347:19,
353:13, 354:16,
354:23, 355:3,
355:25, 356:20,
357:15, 358:16,
359:3, 360:8, 364:4,
372:24, 374:5,
377:16, 380:1,
383:24, 389:18,
407:7, 409:13,
411:13, 411:24,

416:6, 416:10,
418:3, 418:11,
418:15, 421:16,
421:24, 423:24,
428:7, 430:11,
432:5, 434:10,
435:9, 443:1,
451:25, 461:14,
465:9, 466:23,
467:22, 473:25,
483:2, 484:1,
488:13, 490:18,
492:19, 496:10,
499:5, 501:4,
512:25, 513:25,
514:19, 517:22,
523:23, 525:25,
526:25, 531:7,
532:13, 533:6,
534:15, 536:20,
538:12, 539:13,
541:8

---

## C

**cab** [1] - 342:20
**calm** [1] - 387:9
**cannot** [7] - 392:17,
422:12, 425:4,
442:10, 461:24,
478:14, 499:24
**capable** [4] - 321:4,
402:18, 406:23,
481:14
**capacity** [7] - 321:18,
430:15, 462:13,
479:8, 517:17,
524:21, 525:17
**capital** [5] - 310:22,
332:14, 388:3,
472:15, 475:16
**car** [8] - 378:11,
385:1, 385:3,
385:10, 484:10,
484:11, 484:14
**card** [1] - 381:5
**care** [1] - 436:8
**career** [1] - 452:25
**Carlisle** [1] - 547:5
**CARLISLE** [1] -
308:3
**Carlisle-Neisser** [1] -
547:5
**CARLISLE-
NEISSER** [1] - 308:3
**Carmen** [1] - 413:5
**carrying** [1] - 388:4
**cars** [3] - 379:12,
379:14, 481:9

**CASE** [1] - 345:11
**case** [99] - 311:21, 313:12, 313:15, 314:20, 317:23, 318:19, 319:15, 322:10, 322:17, 322:21, 323:12, 324:10, 325:8, 325:24, 326:1, 329:14, 330:1, 330:10, 332:11, 333:7, 335:5, 341:4, 351:17, 351:19, 360:24, 361:8, 366:1, 369:5, 369:11, 376:13, 376:17, 380:19, 392:24, 393:3, 393:4, 393:17, 399:16, 402:25, 403:6, 411:20, 412:2, 412:23, 413:2, 414:2, 419:12, 420:25, 421:4, 421:18, 421:22, 422:5, 428:11, 430:13, 430:18, 435:19, 440:5, 440:24, 440:25, 445:23, 446:13, 448:6, 448:8, 449:4, 450:7, 450:12, 451:9, 457:25, 459:16, 459:20, 460:8, 462:8, 463:13, 471:18, 472:9, 478:2, 479:10, 480:13, 485:23, 485:25, 489:13, 489:16, 494:22, 495:2, 502:25, 505:11, 505:18, 515:25, 518:13, 522:15, 527:14, 537:21, 538:1, 542:12, 542:24, 544:18
**case-by-case** [1] - 449:4
**cases** [14] - 313:23, 322:22, 372:11, 393:19, 436:9, 436:10, 453:12, 453:14, 453:17, 454:1, 487:5, 529:20, 532:6, 532:11
**categories** [1] - 442:2

**caught** [2] - 385:2, 386:25
**caused** [2] - 348:2, 417:11
**causes** [1] - 448:25
**causing** [1] - 416:20
**caveats** [1] - 469:6
**cell** [2] - 397:14, 460:5
**center** [1] - 386:13
**centered** [1] - 516:17
**certain** [14] - 323:4, 323:23, 339:3, 339:22, 343:21, 421:11, 423:13, 423:16, 425:9, 427:17, 460:17, 480:5, 492:7, 544:14
**Certainly** [3] - 313:17, 351:15, 425:18
**certainly** [24] - 317:7, 317:10, 319:2, 326:19, 366:19, 371:12, 384:15, 395:22, 406:21, 406:25, 407:4, 421:6, 426:9, 461:6, 488:3, 494:3, 497:7, 497:19, 503:21, 508:17, 510:18, 540:18, 544:25, 545:3
**certainty** [1] - 402:19
**certificate** [1] - 410:25
**certified** [1] - 482:10
**certify** [1] - 547:2
**cetera** [7] - 384:19, 387:25, 407:11, 452:24, 453:2, 472:4, 507:25
**chain** [1] - 539:18
**chair** [4] - 310:9, 411:17, 412:22, 451:23
**challenge** [3] - 326:10, 331:14, 355:13
**challenging** [2] - 331:20, 355:15
**chance** [8] - 334:21, 439:2, 449:10, 459:19, 476:13, 489:22, 495:20, 507:8
**Chances** [1] - 348:7
**chances** [2] - 334:22, 355:8
**change** [23] - 320:4,

350:7, 352:8, 352:10, 352:12, 352:13, 352:17, 374:23, 375:14, 394:14, 400:16, 405:6, 424:25, 425:4, 446:3, 446:7, 446:13, 450:11, 465:4, 481:9, 510:3, 540:25
**changed** [13] - 320:8, 322:8, 414:11, 471:6, 491:9, 500:11, 532:16, 532:19, 535:17, 535:19, 545:5
**changes** [3] - 349:16, 377:20, 405:7
**changing** [1] - 414:8
**chapter** [2] - 454:16, 473:18
**characterization** [4] - 330:19, 495:2, 517:13, 540:7
**characterize** [3] - 327:17, 329:1, 419:8
**characterized** [1] - 423:17
**charge** [1] - 343:23
**charged** [5] - 336:7, 467:7, 469:22, 518:14
**charges** [5] - 335:23, 344:6, 368:3, 373:9, 424:3
**chart** [1] - 513:10
**check** [3] - 321:9, 323:6, 385:16
**Cheryl** [1] - 521:1
**child** [2] - 353:15, 353:25
**childhood** [1] - 396:1
**children** [3] - 346:17, 475:20, 475:21
**chime** [1] - 316:7
**choice** [1] - 323:3
**chose** [5] - 325:4, 365:21, 366:20, 369:14
**Chris** [1] - 377:4
**Christian** [1] - 484:12
**chronic** [4] - 405:22, 458:25, 459:2, 487:16
**chronicity** [1] - 487:9
**chronologically** [1] - 392:25

**circles** [1] - 483:6
**circumstance** [1] - 479:16
**circumstances** [2] - 371:2, 415:9
**cite** [1] - 454:2
**cities** [1] - 496:24
**city** [4] - 388:5, 405:10, 405:12, 497:7
**City** [1] - 387:19
**Civil** [1] - 307:3
**civil** [6] - 311:2, 311:4, 314:7, 479:23, 529:19
**civilly** [1] - 459:5
**claim** [5] - 456:21, 515:3, 515:4, 515:6, 534:22
**claimed** [1] - 332:18
**claiming** [1] - 456:13
**claims** [1] - 545:23
**clarification** [3] - 373:25, 431:18, 435:1
**clarify** [5] - 326:7, 353:2, 495:7, 520:9, 536:12
**clarity** [12] - 481:11, 506:8, 506:10, 506:13, 506:14, 506:17, 508:16, 508:18, 508:19, 508:22, 527:5
**classic** [2] - 538:13, 538:14
**classification** [1] - 397:6
**clauses** [1] - 528:1
**clean** [3] - 456:7, 457:4, 475:9
**clear** [20] - 316:15, 330:16, 332:25, 346:20, 358:12, 373:19, 387:19, 456:18, 462:9, 467:5, 467:20, 481:6, 489:22, 489:25, 490:3, 500:19, 501:1, 501:24, 520:13, 529:18
**clearly** [11] - 384:25, 420:4, 420:9, 461:23, 476:1, 487:22, 488:1, 488:25, 502:19
**clerk** [1] - 526:13
**client** [21] - 311:17, 312:18, 312:19,

350:11, 424:11, 424:20, 424:24, 437:9, 450:8, 464:11, 499:15, 500:14, 515:17, 516:12, 516:14, 517:7, 517:8, 518:1, 518:4, 521:11
**client's** [2] - 312:2, 520:14
**clients** [3] - 314:15, 316:24, 424:18
**clinic** [2] - 406:11, 446:1
**clinical** [6] - 423:18, 436:9, 445:17, 462:25, 509:17, 510:2
**clinically** [3] - 453:5, 468:16, 476:8
**Clinician** [1] - 454:18
**Close** [1] - 502:6
**close** [5] - 472:3, 484:20, 489:10, 502:8, 511:3
**closer** [4] - 320:18, 403:4, 492:11, 498:10
**closest** [1] - 373:2
**closing** [1] - 543:23
**clothes** [2] - 378:13, 384:19
**clothing** [1] - 385:11
**co** [3] - 315:1, 317:8, 359:23
**co-counsel** [3] - 315:1, 317:8, 359:23
**coached** [1] - 479:2
**coat** [1] - 383:17
**coffee** [1] - 387:10
**cognitive** [6] - 368:23, 369:1, 422:21, 422:24, 423:8, 469:11
**coherent** [5] - 397:5, 419:4, 472:22, 481:2, 488:2
**coherently** [1] - 506:19
**Colburn** [6] - 372:7, 422:1, 430:18, 430:24, 431:10, 432:2
**Colburn's** [2] - 413:2, 414:1
**collaborate** [3] - 462:14, 482:15, 526:8
**collaborating** [1] - 420:1

**collateral** [1] - 471:25

**collected** [1] - 387:9

**collecting** [3] - 455:14, 457:8, 462:24

**collection** [1] - 457:4

**College** [1] - 412:25

**Collins** [4] - 375:8, 375:13, 375:15

**colored** [2] - 354:19, 354:24

**combinations** [2] - 537:24, 537:25

**combine** [1] - 537:18

**combined** [1] - 538:20

**comfortable** [2] - 318:8, 318:9

**coming** [15] - 313:15, 346:24, 360:21, 362:14, 363:13, 364:6, 365:2, 365:4, 365:22, 390:15, 394:23, 419:7, 462:21, 464:9, 466:6

**command** [8] - 403:18, 403:23, 404:2, 404:3, 404:5, 416:1, 432:14, 507:22

**commands** [2] - 392:16, 507:23

**comment** [5] - 355:18, 431:15, 480:9, 488:21, 529:16

**comments** [1] - 438:18

**Commerce** [1] - 452:10

**Commission** [1] - 438:3

**commission** [2] - 441:18, 510:23

**commit** [3] - 389:4, 389:8, 481:10

**committed** [12] - 384:17, 389:9, 389:11, 392:5, 433:8, 459:13, 471:9, 472:11, 473:1, 474:14, 486:11, 532:20

**committing** [6] - 322:15, 389:1, 474:6, 474:24, 475:16, 495:25

**common** [5] - 530:8,

532:5, 532:6, 540:5, 540:8

**Common** [1] - 530:10

**communicate** [15] - 318:20, 327:8, 327:9, 339:7, 339:20, 340:10, 398:22, 399:3, 400:21, 401:7, 402:21, 461:24, 462:5, 527:25, 545:8

**communicated** [2] - 323:8, 323:15

**communicating** [7] - 315:10, 318:22, 340:3, 340:13, 340:17, 369:13, 420:7

**communication** [4] - 329:2, 339:24, 340:15, 517:14

**communications** [4] - 340:16, 402:11, 429:15, 461:19

**companies** [1] - 453:2

**compared** [1] - 421:2

**comparing** [1] - 373:11

**compensate** [1] - 371:16

**competence** [6] - 393:25, 489:1, 490:1, 508:14, 524:19, 531:13

**Competency** [1] - 519:14

**competency** [108] - 311:17, 312:2, 319:3, 319:4, 362:2, 362:7, 367:5, 371:5, 371:19, 373:5, 373:13, 403:6, 413:4, 413:22, 413:24, 414:2, 423:13, 423:18, 429:20, 430:14, 430:19, 430:20, 431:11, 431:21, 447:14, 449:15, 450:16, 453:15, 454:12, 458:11, 458:17, 461:11, 462:1, 462:16, 462:22, 463:3, 463:8, 463:20, 463:24, 464:3, 464:14, 465:1, 465:10, 465:24,

466:8, 466:9, 466:19, 467:2, 468:3, 468:9, 468:11, 468:14, 468:16, 468:20, 469:10, 469:13, 469:17, 471:6, 475:24, 478:17, 478:20, 480:7, 482:7, 482:20, 490:4, 495:3, 499:22, 500:8, 500:18, 500:20, 501:7, 501:11, 501:20, 501:23, 502:8, 502:9, 502:16, 502:23, 508:21, 509:13, 518:16, 519:11, 519:12, 519:14, 519:20, 519:25, 520:14, 524:9, 525:19, 526:5, 527:2, 527:4, 527:8, 527:12, 527:22, 529:22, 530:22, 530:25, 531:9, 532:8, 536:13, 536:14, 536:16, 544:3, 544:6

**competency-type** [1] - 462:1

**competent** [47] - 349:15, 361:4, 361:14, 363:7, 364:18, 368:18, 393:12, 393:16, 393:18, 394:3, 399:24, 399:25, 402:20, 430:24, 432:2, 461:20, 468:17, 469:1, 470:8, 470:11, 470:12, 470:21, 470:24, 477:6, 477:9, 478:3, 479:25, 480:2, 482:5, 488:23, 505:19, 508:10, 516:23, 516:25, 519:19, 520:1, 520:3, 521:10, 531:2, 531:8, 531:12, 531:19, 532:17, 532:23, 535:13, 536:16

**complainant** [3] - 328:2, 341:7, 341:9

**complaints** [1] - 398:6

**complete** [3] - 396:2, 405:17, 497:21

**completely** [1] - 476:19

**complex** [3] - 386:13, 474:19, 474:20

**comply** [1] - 482:20

**components** [4] - 500:18, 500:20, 501:7, 501:11

**comprehend** [1] - 427:9

**comprehensive** [1] - 468:12

**computer** [1] - 307:25

**computer-aided** [1] - 307:25

**con** [1] - 498:3

**con's** [1] - 323:9

**concentration** [1] - 507:24

**concept** [4] - 406:3, 456:24, 509:22, 530:22

**concepts** [2] - 457:16, 524:23

**concern** [8] - 349:14, 499:17, 499:20, 516:9, 516:11, 516:13, 522:6, 532:2

**concerned** [3] - 387:24, 531:23, 532:8

**concise** [1] - 397:5

**conclude** [3] - 479:25, 480:6, 480:7

**Concluded** [1] - 546:25

**concluding** [1] - 402:18

**conclusion** [32] - 326:22, 345:1, 360:18, 363:13, 363:14, 364:6, 364:22, 364:25, 365:2, 365:4, 365:5, 365:7, 402:14, 403:8, 414:20, 415:8, 419:7, 430:3, 432:9, 436:21, 437:2, 438:19, 438:20, 441:16, 455:11, 455:20, 455:24, 456:7, 468:20, 469:12, 471:2, 480:3

**conclusions** [8] - 360:22, 365:9,

365:23, 366:2, 440:8, 455:6, 455:19, 532:24

**condition** [7] - 334:18, 405:15, 405:22, 427:12, 506:1, 519:9, 539:17

**conduct** [17] - 348:8, 397:15, 426:19, 441:25, 442:3, 442:8, 442:17, 442:23, 443:23, 444:6, 444:22, 446:4, 446:7, 466:2, 472:8, 504:11, 504:13

**conducted** [2] - 463:22, 509:16

**conducting** [1] - 484:24

**conduit** [1] - 315:10

**conferred** [1] - 317:13

**confession** [4] - 325:18, 325:22, 334:14, 405:3

**confessions** [6] - 326:11, 331:14, 334:1, 334:5, 355:13, 355:15

**confidence** [1] - 455:18

**confident** [3] - 430:1, 430:5, 516:24

**confidential** [1] - 445:24

**confidentiality** [1] - 446:12

**confirmation** [4] - 456:24, 457:5, 457:17, 480:4

**confirmed** [1] - 429:5

**conflict** [3] - 322:8, 322:14, 422:2

**conflicting** [2] - 436:25, 437:18

**confronted** [1] - 405:6

**confused** [4] - 369:20, 458:8, 492:15, 499:21

**connected** [3] - 474:17, 492:4, 492:5

**connections** [1] - 423:6

**conscious** [2] - 474:14, 496:21

**consent** [5] - 367:21, 369:16, 369:18,

369:19, 369:22
**consider** [18] -
312:13, 338:15,
338:18, 340:6,
340:17, 354:1,
360:14, 436:13,
437:6, 437:11,
439:2, 439:16,
439:18, 443:12,
489:12, 489:15,
501:11, 545:20
**considerable** [1] -
489:20
**considerably** [1] -
473:22
**consideration** [3] -
464:19, 526:16,
536:23
**considered** [2] -
437:12, 532:15
**Considering** [1] -
471:8
**considering** [5] -
333:7, 437:3,
437:10, 437:14,
471:4
**considers** [1] -
501:20
**consistent** [30] -
332:19, 333:11,
340:12, 370:3,
370:8, 370:11,
370:13, 407:20,
412:19, 414:13,
414:15, 414:17,
414:25, 415:8,
415:12, 415:17,
417:4, 417:8, 419:6,
419:17, 420:2,
422:23, 433:13,
433:14, 433:16,
435:24, 436:2,
532:24
**consistently** [3] -
427:7, 432:6, 437:16
**conspiracies** [2] -
339:1, 339:5
**conspiracy** [6] -
401:13, 401:19,
401:21, 494:23,
518:2, 522:7
**conspire** [1] - 523:9
**conspiring** [3] -
522:15, 522:24,
523:4
**constant** [5] -
428:16, 428:20,
428:21, 480:11,
545:9
**constantly** [7] -

428:11, 428:12,
428:13, 428:14,
428:23, 447:25
**constitutional** [1] -
426:2
**consult** [4] - 359:23,
450:17, 450:18,
453:17
**consultations** [1] -
453:23
**consulted** [2] -
318:18, 355:9
**consults** [1] - 453:23
**contact** [9] - 319:19,
372:25, 387:18,
395:8, 395:9,
399:20, 399:21,
411:19, 482:2
**contacted** [1] -
545:12
**contacts** [1] - 316:22
**contained** [1] -
419:15
**contempt** [4] - 418:5,
418:17, 434:6,
434:11
**Contempt** [2] -
418:6, 435:1
**content** [8] - 414:16,
415:11, 416:17,
417:9, 419:8,
419:21, 432:7,
432:17
**context** [2] - 404:1,
488:10
**continually** [4] -
403:1, 428:22,
428:25, 429:1
**continuance** [2] -
334:21, 335:1
**continue** [2] -
374:14, 416:21
**Continued** [1] -
308:1
**continued** [2] -
320:15, 544:10
**CONTINUED** [1] -
360:7
**Continued)**............
**..360** [1] - 309:9
**continues** [1] -
346:18
**continuing** [4] -
407:13, 416:1,
416:19, 452:20
**contract** [1] - 536:8
**contradicted** [1] -
440:18
**contradictions** [3] -
421:1, 436:18,

436:20
**contradictory** [1] -
541:13
**contrary** [2] - 404:24,
438:19
**contributed** [1] -
368:17
**control** [10] - 368:4,
368:5, 368:7, 368:8,
390:23, 391:1,
432:11, 478:14,
478:22, 483:11
**controverted** [1] -
431:19
**convene** [1] - 312:12
**conversation** [8] -
336:1, 356:10,
365:17, 399:6,
470:25, 482:22,
483:4, 483:19
**conversations** [9] -
321:14, 343:21,
352:21, 357:17,
357:18, 401:6,
403:2, 429:15, 518:1
**conversing** [1] -
432:14
**converted** [1] - 354:4
**converting** [2] -
354:18, 354:25
**convicted** [2] -
395:1, 472:18
**convictions** [1] -
331:20
**convinced** [2] -
457:11, 512:4
**cool** [1] - 385:24
**cooperate** [14] -
370:4, 370:9,
370:24, 370:25,
460:1, 460:3,
462:14, 468:4,
482:15, 496:6,
496:8, 526:8
**cooperation** [1] -
530:15
**cooperative** [1] -
468:7
**cop** [1] - 497:8
**copied** [1] - 418:19
**copies** [5] - 335:8,
335:11, 335:13,
377:2, 377:3
**copy** [9] - 345:13,
376:23, 376:24,
377:4, 377:11,
377:12, 435:1,
435:3, 538:17
**copying** [2] - 418:18,
418:25

**correct** [99] - 310:5,
310:6, 337:3, 343:5,
343:23, 344:3,
344:9, 344:20,
345:22, 346:22,
348:2, 348:11,
348:12, 349:8,
349:12, 350:20,
351:1, 351:3, 351:7,
351:8, 351:10,
351:25, 352:5,
352:14, 352:25,
353:4, 353:6,
356:22, 357:20,
357:22, 360:20,
363:8, 363:16,
364:20, 365:16,
367:19, 368:21,
370:2, 372:3, 375:3,
376:5, 382:14,
387:1, 387:5, 396:5,
401:16, 405:7,
405:25, 408:2,
408:5, 410:2,
412:10, 413:15,
413:17, 414:6,
415:19, 415:22,
419:16, 425:21,
425:23, 425:25,
427:13, 427:18,
427:19, 429:3,
429:9, 430:16,
430:21, 430:25,
434:4, 434:18,
435:7, 439:3, 439:4,
439:6, 441:6,
492:10, 498:1,
498:4, 499:9,
500:24, 501:6,
503:8, 503:24,
504:4, 504:15,
504:23, 510:25,
511:7, 511:12,
511:15, 516:5,
521:6, 521:17,
534:6, 534:25,
535:6, 535:18, 547:2
**Correct** [13] - 337:4,
343:6, 344:4, 387:2,
390:13, 402:8,
405:4, 431:16,
435:6, 443:2, 515:5,
535:7, 535:10
**correctly** [4] -
362:13, 367:5,
369:23, 394:10
**correlates** [1] -
477:13
**correlation** [6] -
394:2, 449:9,

449:14, 477:19,
478:4, 480:5
**correlations** [2] -
449:16, 478:4
**correspond** [1] -
317:15
**corresponded** [1] -
317:17
**corroborate** [1] -
439:13
**corroborated** [3] -
439:9, 441:19,
441:23
**Cosmology** [1] -
480:25
**counsel** [28] - 315:1,
317:8, 327:9,
345:13, 347:12,
359:23, 371:7,
372:15, 372:17,
372:19, 398:22,
411:19, 412:3,
413:11, 414:7,
517:2, 517:3,
517:17, 517:23,
517:24, 518:3,
518:24, 519:10,
521:5, 536:13,
544:12, 544:20
**counsel's** [1] -
376:21
**counseling** [1] -
404:20
**counselor** [1] -
487:23
**count** [3] - 445:7,
472:21, 529:7
**counter** [1] - 472:21
**countries** [1] -
380:25
**country** [2] - 380:22,
388:15
**County** [3] - 310:20,
497:3, 536:8
**county** [3] - 312:8,
405:9, 405:12
**couple** [6] - 411:14,
425:24, 480:13,
506:16, 529:10,
533:4
**course** [32] - 317:12,
319:18, 319:22,
320:2, 323:4, 323:7,
323:21, 323:22,
329:25, 331:2,
343:25, 344:25,
352:13, 352:17,
415:20, 420:22,
452:20, 459:10,
460:13, 460:19,

461:2, 481:5, 481:17, 487:4, 487:11, 500:12, 500:15, 503:17, 503:19, 508:22, 528:22, 530:3
**COURT** [156] - 307:1, 308:3, 310:3, 310:7, 310:11, 312:5, 313:16, 314:2, 314:4, 315:25, 316:17, 318:5, 318:11, 318:25, 319:11, 320:13, 322:23, 324:14, 324:17, 326:14, 327:3, 327:14, 327:22, 330:12, 331:7, 333:9, 333:22, 336:12, 336:21, 336:25, 339:14, 340:1, 342:6, 342:10, 342:12, 342:15, 342:18, 342:22, 342:24, 345:14, 345:19, 346:9, 347:1, 347:4, 347:6, 353:9, 354:12, 354:22, 355:2, 356:9, 356:16, 356:19, 357:14, 358:2, 358:12, 358:15, 359:11, 359:13, 359:16, 359:20, 359:24, 360:3, 363:17, 363:23, 364:1, 372:22, 374:4, 376:20, 377:4, 379:23, 383:23, 411:5, 411:9, 411:23, 416:5, 418:14, 421:15, 421:23, 423:23, 428:3, 428:5, 430:7, 432:3, 434:9, 442:16, 450:21, 450:25, 451:4, 451:7, 451:11, 451:14, 451:17, 451:19, 451:22, 461:9, 461:13, 463:19, 464:12, 464:23, 465:8, 466:22, 467:16, 467:19, 473:13, 473:17, 480:23, 482:25, 483:24, 490:9, 490:13, 490:15, 492:17,

496:9, 499:4, 501:3, 513:4, 513:11, 513:16, 513:23, 514:16, 517:16, 523:17, 523:19, 523:21, 525:23, 531:6, 532:12, 533:2, 534:12, 535:23, 536:3, 536:9, 536:18, 537:15, 538:10, 538:23, 538:25, 539:3, 539:6, 539:9, 541:4, 542:19, 542:21, 542:23, 543:4, 543:7, 543:12, 543:15, 543:20, 544:17, 545:24, 546:4, 546:11, 546:13, 546:20, 546:23
**Court** [32] - 308:3, 310:17, 313:3, 313:6, 319:4, 319:16, 322:8, 326:8, 332:4, 334:13, 340:19, 342:2, 343:9, 369:14, 401:22, 409:17, 409:20, 452:1, 461:12, 463:11, 465:14, 531:11, 531:12, 531:14, 533:16, 543:18, 544:21, 545:2, 545:6, 545:12, 545:20, 547:6
**court** [19] - 316:25, 317:3, 319:22, 336:5, 343:16, 343:19, 351:21, 412:8, 420:2, 426:4, 434:17, 441:1, 449:3, 453:14, 465:19, 465:20, 482:19, 520:2, 531:17
**Court's** [4] - 313:9, 340:6, 488:11, 526:23
**court-appointed** [2] - 453:14, 531:17
**Court-appointed** [1] - 313:3
**courtroom** [3] - 467:25, 498:8, 498:12
**courts** [1] - 420:10
**cover** [3] - 434:7,

434:14, 434:24
**covered** [2] - 326:3, 326:4
**Cowboy** [1] - 456:10
**Cowboys** [2] - 456:19, 457:11
**craziness** [1] - 526:7
**crazy** [8] - 478:11, 525:9, 525:11, 526:1, 526:2, 526:17, 526:19, 529:4
**creative** [1] - 423:10
**credibility** [2] - 460:22, 461:12
**credible** [2] - 440:4, 440:7
**crime** [89] - 311:1, 327:10, 327:18, 327:19, 328:1, 328:5, 329:21, 330:21, 331:1, 337:16, 356:3, 356:7, 357:1, 357:22, 358:5, 358:9, 358:20, 358:23, 363:5, 376:4, 382:2, 384:1, 403:14, 403:15, 410:1, 410:14, 414:14, 414:18, 433:25, 435:19, 435:20, 439:25, 441:18, 449:17, 449:21, 471:13, 471:23, 472:3, 472:5, 472:6, 472:10, 472:24, 473:3, 473:19, 473:24, 474:4, 474:17, 474:20, 474:24, 475:3, 477:1, 478:19, 485:2, 485:5, 485:7, 485:10, 486:3, 486:5, 486:11, 486:16, 489:6, 489:11, 492:12, 499:8, 499:11, 499:13, 500:4, 502:24, 503:20, 510:24, 511:3, 511:8, 511:19, 512:20, 514:10, 524:4, 525:10, 526:2, 528:12, 528:14, 528:16, 528:17, 529:3, 529:24, 532:25, 534:3, 544:24

**crimes** [2] - 481:10
**Criminal** [2] - 417:17, 504:22
**criminal** [26] - 336:7, 371:25, 391:23, 404:13, 404:22, 422:18, 430:17, 443:18, 453:14, 454:1, 471:20, 472:14, 472:25, 473:4, 473:7, 473:11, 473:20, 473:21, 474:23, 482:2, 528:11, 528:13, 528:15, 529:17, 530:8, 538:1
**criminally** [2] - 459:13, 525:15
**criminological** [1] - 538:21
**crisp** [1] - 455:9
**criteria** [7] - 442:17, 442:21, 442:22, 443:20, 443:22, 505:17, 538:20
**critically** [1] - 489:9
**criticism** [1] - 464:16
**criticisms** [1] - 515:14
**critiqued** [1] - 457:23
**Cross** [4] - 309:6, 309:9, 309:12, 309:18
**cross** [24] - 310:4, 322:23, 329:12, 329:18, 329:23, 340:9, 342:13, 347:25, 348:5, 348:8, 348:10, 348:14, 349:3, 351:7, 351:22, 351:23, 355:5, 355:7, 359:21, 374:4, 412:7, 417:15, 426:12, 499:1
**CROSS** - 343:1, 360:7, 490:17, 541:7
**Cross-Examination** [4] - 309:6, 309:9, 309:12, 309:18
**cross-examination** [12] - 310:4, 340:9, 342:13, 348:8, 351:7, 351:22, 351:23, 355:7, 359:21, 412:7, 417:15, 426:12
**CROSS-EXAMINATION** [4] -

343:1, 360:7, 490:17, 541:7
**cross-examine** [5] - 329:12, 329:18, 329:23, 347:25, 349:3
**cross-examining** [4] - 348:5, 348:10, 348:14, 355:5
**crossed** [1] - 355:19
**CSR** [1] - 547:5
**cups** [1] - 387:10
**Current** [2] - 469:14, 469:15
**current** [5] - 362:23, 367:9, 369:7, 458:13, 468:5
**custody** [1] - 443:19
**cut** [3] - 381:6, 489:24, 512:7
**cycle** [1] - 476:21

# D

**DA** [5] - 335:15, 343:3, 350:25, 447:4, 518:21
**DA's** [1] - 335:7
**dangerous** [1] - 481:7
**Daniel** [2] - 412:9, 430:13
**darn** [1] - 474:13
**data** [66] - 360:17, 363:10, 363:15, 364:7, 364:8, 364:10, 364:17, 364:21, 365:1, 365:5, 365:6, 365:10, 395:15, 396:24, 397:12, 397:15, 397:16, 397:20, 403:9, 403:10, 403:16, 436:20, 436:21, 436:22, 436:25, 437:3, 437:6, 437:18, 438:2, 438:4, 438:9, 438:13, 438:17, 438:19, 438:22, 440:8, 441:16, 444:17, 444:19, 445:5, 446:12, 455:6, 455:14, 455:21, 455:24, 456:1, 456:16, 457:4, 457:8, 460:18, 462:3, 465:19, 466:18,

468:11, 468:18,
468:19, 468:21,
468:22, 471:8,
471:14, 484:25,
488:21, 489:12,
489:15, 522:20
**Date** [1] - 547:5
**date** [19] - 380:5,
409:11, 413:22,
414:1, 414:5, 418:1,
418:10, 434:20,
434:21, 435:2,
435:10, 435:13,
441:22, 472:16,
492:22, 492:23,
515:22, 515:24,
546:6
**dated** [6] - 345:17,
380:6, 411:1, 415:7,
417:22, 511:6
**dates** [3] - 311:22,
321:14, 397:8
**Davis** [32] - 310:5,
310:7, 310:15,
313:14, 316:17,
319:10, 343:3,
359:17, 365:25,
366:22, 399:18,
400:11, 400:20,
402:9, 429:3, 429:5,
460:9, 460:14,
462:4, 462:8, 471:1,
471:3, 483:4,
483:12, 483:18,
498:14, 498:16,
499:12, 531:1,
532:1, 545:3, 545:10
**DAVIS** [2] - 309:5,
310:12
**Davis'** [8] - 398:23,
403:1, 429:21,
461:2, 461:6,
482:21, 516:8,
516:13
**day-to-day** [1] -
410:12
**days** [8] - 328:5,
472:14, 476:11,
476:19, 476:22,
486:16, 516:19,
545:25
**dead** [2] - 391:16,
391:20
**deal** [3] - 381:11,
482:13, 524:24
**dealing** [14] - 318:2,
318:7, 324:5,
329:10, 334:8,
335:22, 342:3,
357:8, 357:11,

363:5, 465:6, 473:3,
473:19, 473:21
**dealings** [3] - 314:8,
314:22, 316:24
**deals** [2] - 491:20,
535:17
**dealt** [4] - 320:2,
330:13, 459:6,
480:14
**death** [19] - 323:23,
323:25, 324:3,
336:17, 338:17,
395:1, 400:12,
404:14, 406:5,
406:8, 406:20,
409:7, 435:22,
467:9, 487:10,
487:20, 506:7, 527:7
**death-penalty** [1] -
338:17
**debatable** [1] -
393:13
**December** [2] -
396:17, 485:7
**deception** [1] -
454:14
**decide** [6] - 316:11,
322:19, 322:24,
340:22, 447:11,
531:9
**decided** [4] - 311:8,
331:22, 378:18,
388:1
**decision** [3] -
463:15, 498:6,
531:13
**declining** [1] -
397:23
**decrease** [2] -
405:18, 483:7
**deep** [1] - 391:12
**defend** [1] - 347:20
**defendant** [39] -
315:3, 320:11,
321:23, 321:25,
322:14, 322:25,
323:2, 323:6, 323:8,
325:2, 333:12,
334:14, 338:12,
340:22, 343:18,
355:5, 355:12,
357:5, 357:19,
412:9, 424:2, 450:5,
450:6, 467:6,
467:24, 493:16,
496:5, 502:18,
503:15, 509:9,
512:22, 514:5,
515:9, 516:14,
518:17, 525:1,

531:2, 545:17
**defendant's** [4] -
322:18, 327:8,
394:17, 531:13
**Defendant's** [2] -
345:25, 416:13
**defendants** [12] -
311:13, 313:24,
314:12, 314:22,
317:22, 322:6,
334:10, 343:4,
343:8, 352:2,
512:14, 530:8
**defendants'** [1] -
524:3
**defending** [1] -
317:12
**defense** [61] -
311:16, 312:1,
312:17, 313:15,
314:10, 314:24,
319:14, 319:18,
321:15, 321:16,
321:17, 325:1,
329:11, 331:2,
331:9, 332:10,
332:13, 332:16,
332:24, 334:5,
334:8, 334:10,
334:13, 334:19,
341:3, 341:10,
343:11, 349:1,
349:8, 350:24,
351:13, 368:15,
381:14, 381:15,
384:17, 388:10,
388:12, 412:3,
429:23, 429:24,
434:16, 439:23,
450:3, 450:9,
450:14, 453:12,
453:16, 516:20,
517:17, 517:23,
517:24, 518:23,
519:10, 524:4,
524:22, 525:14,
526:9, 530:5, 532:7,
533:17, 543:25
**deficits** [4] - 423:1,
427:20, 448:24,
449:2
**defied** [1] - 330:22
**Define** [1] - 506:10
**defined** [1] - 423:4
**definitely** [2] -
392:11, 392:12
**definition** [5] - 442:1,
455:4, 479:17,
504:6, 506:12
**definitions** [1] -

479:16
**degree** [12] - 402:19,
408:20, 439:9,
448:23, 450:17,
452:7, 452:8,
472:17, 480:11,
480:15, 482:9
**degrees** [1] - 545:15
**delay** [1] - 334:23
**delivered** [1] -
459:25
**delusion** [18] -
331:4, 375:4, 417:9,
428:19, 476:4,
487:25, 494:5,
494:19, 497:21,
497:23, 504:5,
504:6, 540:15,
541:9, 541:11,
541:25
**delusional** [39] -
329:5, 330:20,
349:11, 349:18,
350:1, 350:11,
350:16, 357:5,
374:20, 393:2,
405:1, 406:17,
415:9, 416:16,
419:5, 419:21,
444:14, 445:11,
461:23, 481:7,
484:8, 484:14,
500:3, 500:10,
503:6, 504:3,
510:24, 511:21,
511:25, 516:16,
521:24, 522:4,
522:13, 522:16,
522:24, 523:14,
526:3, 534:2
**delusions** [50] -
328:25, 329:1,
349:19, 349:23,
357:7, 361:21,
361:23, 362:6,
382:9, 382:12,
395:16, 404:12,
406:19, 414:16,
417:13, 419:9,
432:7, 432:10,
432:11, 432:12,
433:3, 441:20,
444:20, 444:22,
445:6, 448:6,
471:15, 474:21,
477:5, 478:14,
484:15, 485:8,
485:11, 486:12,
494:15, 494:16,
528:24, 538:4,

539:25, 540:1,
540:3, 540:4, 540:8,
540:10, 541:17,
541:23, 545:17
**demonstrate** [3] -
369:12, 477:11,
518:19
**demonstrated** [1] -
407:11
**denied** [1] - 383:14
**Denno** [3] - 325:16,
325:23, 326:2
**department** [9] -
376:15, 404:13,
412:24, 420:15,
436:4, 437:17,
438:23, 438:25,
439:8
**Department** [12] -
321:21, 329:22,
330:13, 365:13,
377:18, 417:17,
420:12, 436:17,
437:15, 475:25,
488:18, 504:21
**deposed** [1] - 510:10
**deposition** [9] -
463:22, 464:5,
464:10, 490:20,
490:23, 491:10,
492:3, 515:20, 516:2
**depth** [1] - 374:19
**dermatitis** [1] - 398:8
**describe** [11] - 316:2,
339:1, 368:4,
394:11, 418:16,
423:5, 426:7, 434:1,
466:24, 490:2,
509:16
**described** [5] -
352:4, 352:11,
478:15, 487:1,
509:11
**describes** [1] -
328:17
**describing** [4] -
357:21, 403:13,
404:2, 441:17
**description** [1] -
455:5
**descriptions** [1] -
357:6
**deserved** [1] -
382:21
**designs** [1] - 418:20
**despite** [3] - 347:21,
369:15, 404:24
**destiny** [3] - 388:17,
388:18, 494:24
**details** [9] - 356:7,

357:1, 357:21,
357:25, 372:5,
372:9, 418:20,
486:14, 522:5
**detectives** [4] -
330:4, 330:15,
350:22, 351:18
**deteriorate** [1] -
486:23
**deteriorating** [1] -
487:10
**deterioration** [2] -
487:11, 516:12
**determination** [4] -
493:22, 494:1,
497:19, 521:9
**determinations** [1] -
420:23
**determine** [6] -
430:23, 431:11,
432:1, 470:6, 470:7,
544:6
**determined** [3] -
322:5, 322:6, 494:3
**determining** [3] -
362:1, 469:20,
509:13
**developed** [3] -
442:5, 462:16,
529:22
**development** [5] -
394:9, 443:15,
443:16, 497:2,
497:14
**diagnosed** [1] -
516:14
**diagnosis** [38] -
361:9, 368:16,
368:17, 410:21,
422:7, 422:9,
422:11, 422:12,
422:13, 422:14,
422:25, 425:1,
425:2, 425:5,
441:24, 442:9,
442:10, 442:18,
442:23, 442:24,
443:13, 443:23,
444:4, 444:7, 445:8,
445:21, 459:4,
491:5, 496:7,
496:11, 496:12,
496:13, 496:16,
506:15, 510:4,
515:17, 541:19
**diagnostic** [3] -
443:20, 459:4, 459:8
**dialogue** [1] - 467:1
**DIANE** [4] - 309:8,
309:17, 360:6,

539:11
**difference** [8] -
359:5, 374:25,
390:19, 424:10,
446:10, 446:12,
481:19, 541:9
**differences** [2] -
319:25, 323:22
**different** [29] - 320:7,
338:6, 341:20,
346:24, 353:22,
358:14, 361:19,
361:20, 373:10,
376:3, 376:6, 376:8,
381:25, 382:4,
382:6, 382:11,
387:2, 389:3, 408:1,
417:1, 446:8, 446:9,
461:1, 471:15,
488:19, 507:15,
539:19
**difficult** [3] - 321:13,
346:15, 544:19
**difficulty** [4] - 312:1,
318:22, 416:18,
477:22
**diminished** [1] -
430:15
**dire** [2] - 312:13,
515:25
**DIRECT** [3] - 310:13,
451:24, 539:12
**Direct** [3] - 309:6,
309:12, 309:18
**direct** [14] - 319:12,
319:19, 349:10,
403:2, 403:21,
424:13, 424:19,
465:5, 467:2,
500:23, 504:21,
509:12, 509:19,
509:20
**directed** [2] - 446:21,
453:5
**directing** [3] - 368:5,
368:6, 509:11
**direction** [1] - 536:17
**directionality** [1] -
450:18
**directly** [2] - 401:21,
432:15
**director** [1] - 458:25
**disabilities** [1] -
348:19
**disadvantage** [1] -
521:12
**disagree** [5] -
348:23, 426:17,
426:20, 464:9, 491:7
**disagreed** [4] -

413:21, 431:2,
431:24, 431:25
**disagreement** [2] -
413:3, 413:19
**disciplinary** [3] -
338:5, 444:16, 445:2
**disciplines** [1] -
445:3
**disclosed** [1] -
516:16
**disconfirmatory** [1] -
541:12
**discount** [4] - 438:2,
438:4, 438:6, 439:20
**discovered** [2] -
499:8, 499:14
**discrepancies** [1] -
420:21
**discrepancy** [2] -
469:24, 470:2
**discuss** [2] - 321:23,
340:7
**discussed** [4] -
326:5, 344:1, 344:2,
348:6, 457:17
**discussing** [1] -
344:14
**discussion** [3] -
362:21, 507:20,
539:14
**Discussion** [1] -
434:23
**discussions** [1] -
429:23
**disease** [6] - 350:15,
426:22, 448:5,
448:24, 484:4, 533:9
**diseased** [1] -
481:12
**disorder** [33] - 422:1,
422:5, 422:10,
422:11, 422:15,
422:20, 422:24,
428:25, 432:16,
441:25, 442:3,
442:8, 442:9,
442:11, 442:18,
442:19, 442:23,
442:24, 443:23,
444:6, 444:8,
444:22, 445:6,
445:8, 445:9, 470:1,
478:15, 484:4,
484:7, 487:2, 487:7,
515:16
**disorganization** [1] -
472:20
**disorganized** [2] -
416:13, 526:19
**dispel** [1] - 544:13

**display** [2] - 444:12,
542:7
**disregard** [1] -
444:13
**dissertation** [1] -
453:9
**distinction** [1] -
486:6
**distinguish** [2] -
445:16, 497:22
**distinguishes** [1] -
449:13
**distort** [1] - 469:3
**distorted** [2] -
427:10, 487:25
**distortions** [1] -
484:18
**distracted** [1] - 483:7
**district** [7] - 310:19,
311:5, 311:14,
313:1, 313:25,
316:23, 335:3
**DISTRICT** [3] -
307:1, 307:1, 307:11
**District** [1] - 308:3
**disturbance** [1] -
526:21
**disturbs** [1] - 484:21
**DIVISION** [1] - 307:2
**doctor** [8] - 312:10,
312:15, 312:17,
313:5, 313:17,
488:6, 505:7, 541:5
**Doctor** [15] - 363:17,
411:4, 411:9,
435:11, 439:22,
447:16, 450:25,
483:3, 489:21,
506:10, 535:22,
538:13, 538:18,
541:9, 542:13
**doctoral** [2] - 452:15,
452:16
**doctors** [4] - 313:21,
431:1, 431:23,
470:19
**document** [8] -
418:16, 419:8,
459:25, 512:3,
512:6, 514:9,
514:12, 514:20
**documentary** [1] -
385:19
**documentation** [1] -
413:10
**documented** [3] -
487:24, 488:1, 505:4
**documents** [10] -
335:8, 418:21,
418:24, 419:1,

419:12, 419:14,
419:18, 441:10,
460:24, 470:18
**domains** [2] - 423:9,
427:1
**done** [30] - 312:6,
329:6, 343:14,
344:10, 349:12,
382:19, 397:16,
430:23, 431:2,
431:10, 432:1,
436:11, 453:3,
464:4, 465:14,
468:12, 474:15,
480:6, 497:5,
502:12, 516:10,
518:23, 519:1,
519:3, 536:1, 536:6,
539:5, 542:23,
544:16, 545:11
**double** [1] - 323:6
**double-check** [1] -
323:6
**doubt** [4] - 381:15,
400:15, 515:2,
520:14
**DOUG** [2] - 309:5,
310:12
**Doug** [12] - 313:14,
429:3, 429:21,
471:1, 483:18,
498:14, 498:16,
498:25, 499:2,
499:6, 499:12, 531:1
**down** [28] - 330:6,
339:17, 359:17,
378:14, 379:21,
381:19, 386:1,
390:15, 390:19,
391:12, 391:15,
392:2, 407:20,
407:24, 418:19,
434:2, 439:10,
442:21, 450:25,
465:16, 503:5,
507:9, 509:1, 509:7,
530:14, 537:19,
539:1, 542:21
**Dr** [155] - 310:5,
324:21, 328:16,
338:4, 341:13,
341:15, 350:10,
350:12, 350:14,
352:9, 357:4, 357:6,
359:21, 360:3,
360:9, 373:20,
373:21, 376:2,
377:17, 389:4,
389:11, 389:12,
389:15, 390:3,

390:12, 390:15,
392:5, 392:12,
399:23, 400:3,
401:24, 402:6,
408:22, 410:7,
410:9, 411:14,
412:22, 412:24,
413:1, 413:5, 413:6,
413:9, 413:12,
413:16, 413:23,
416:11, 417:5,
422:8, 422:9,
423:13, 423:17,
424:4, 425:11,
428:4, 429:11,
429:21, 430:12,
431:8, 431:9,
431:16, 431:18,
431:19, 433:15,
433:17, 433:24,
437:5, 437:12,
446:15, 446:16,
447:11, 447:12,
447:20, 447:21,
451:12, 451:16,
451:19, 454:16,
455:5, 458:4, 458:6,
460:14, 461:7,
461:16, 462:15,
464:1, 464:17,
465:10, 465:21,
466:15, 466:17,
467:12, 467:14,
468:6, 468:7, 468:8,
470:18, 471:4,
471:5, 484:23,
485:17, 485:24,
486:19, 488:14,
489:17, 490:19,
498:8, 498:12,
499:8, 499:14,
500:5, 500:9,
500:19, 500:21,
501:20, 503:19,
508:16, 509:6,
509:11, 510:2,
515:11, 520:21,
523:24, 524:6,
525:10, 526:2,
527:2, 527:6,
527:17, 529:12,
531:2, 531:10,
534:10, 535:5,
535:8, 535:13,
535:25, 536:10,
536:22, 539:8,
539:9, 539:14,
539:15, 539:21
**drafted** [1] - 419:12
**dramatic** [1] - 320:20
**dramatically** [1] -

320:8
**draw** [4] - 363:14,
364:23, 365:7, 365:9
**drew** [1] - 391:3
**drink** [1] - 405:25
**drive** [2] - 481:9,
484:11
**driven** [3] - 485:8,
485:10, 528:24
**driving** [3] - 385:22,
484:10, 484:14
**drop** [1] - 391:9
**dropped** [1] - 386:12
**drug** [1] - 453:2
**drugs** [1] - 491:21
**DSM** [6] - 405:16,
442:2, 478:16,
487:2, 491:12
**DSM-IV** [1] - 491:12
**Dubai** [1] - 415:13
**during** [63] - 316:22,
319:9, 319:22,
323:6, 323:22,
331:1, 331:15,
332:8, 337:22,
338:20, 340:8,
344:25, 345:16,
348:16, 349:12,
349:18, 350:1,
350:4, 367:14,
367:21, 367:24,
393:4, 394:15,
400:10, 403:14,
404:22, 414:17,
415:20, 433:10,
433:18, 433:23,
433:25, 447:1,
447:14, 447:20,
447:23, 461:17,
478:1, 478:19,
479:8, 482:22,
483:20, 484:22,
485:1, 485:5,
488:14, 499:9,
499:14, 500:4,
500:10, 500:11,
500:14, 502:10,
502:19, 503:13,
507:19, 508:18,
508:20, 508:22,
515:24, 516:2, 529:8
**During** [5] - 310:21,
320:2, 323:4,
342:19, 412:13
**duty** [3] - 375:6,
387:13, 493:3
**dynamics** [2] -
425:15, 425:19
**dysfunction** [3] -
427:4, 427:5, 448:25

# E

**ear** [7] - 374:12,
391:24, 417:11,
433:14, 471:16,
541:21
**early** [2] - 316:8,
394:15
**easier** [1] - 443:8
**Eddie** [6] - 387:1,
387:5, 420:17,
420:18, 421:1, 421:4
**education** [3] -
409:7, 452:6, 452:21
**educational** [2] -
410:25, 452:11
**Edward** [6] - 383:8,
383:10, 383:11,
383:12, 383:14
**effect** [3] - 332:16,
332:21, 400:13
**effort** [2] - 395:7,
399:11
**Einstein's** [1] -
480:25
**Either** [1] - 409:23
**either** [13] - 332:11,
352:12, 365:13,
409:23, 440:2,
454:4, 464:16,
472:25, 478:25,
485:1, 540:13,
540:15, 542:9
**elder** [1] - 436:8
**elevated** [1] - 477:17
**eliminates** [1] -
422:10
**embassy** [2] -
380:23, 387:19
**embellishing** [1] -
529:14
**emerge** [1] - 489:6
**emotional** [1] -
421:21
**emphasis** [2] -
373:4, 373:12
**emphasize** [1] -
407:8
**employed** [1] - 312:8
**employees** [1] -
375:21
**end** [5] - 338:6,
352:8, 386:10,
426:3, 455:20
**ended** [3] - 362:14,
388:2, 388:4
**endorses** [1] -
416:18
**enemies** [2] -

380:21, 384:10
**engage** [5] - 362:20,
422:13, 423:7,
429:22, 429:23
**engaged** [1] - 473:5
**engaging** [4] -
443:24, 444:1,
444:2, 444:3
**entered** [2] - 443:6,
504:21
**entire** [5] - 319:14,
319:24, 387:23,
435:12, 544:10
**entitled** [1] - 547:2
**entity** [1] - 419:25
**entries** [1] - 488:18
**entry** [2] - 346:14,
527:6
**environment** [2] -
427:1, 427:9
**environmental** [1] -
404:9
**ep** [1] - 503:23
**episode** [1] - 503:23
**episodes** [1] -
416:17
**escalation** [1] -
529:5
**escape** [1] - 529:8
**escaping** [1] -
384:18
**especially** [4] -
419:18, 476:21,
512:21, 538:1
**essence** [1] - 462:18
**essentially** [1] -
496:11
**establish** [3] -
313:14, 350:6, 467:5
**established** [1] -
349:24
**Estimate** [1] - 314:2
**estimate** [2] - 314:5,
543:10
**estimating** [1] -
401:1
**et** [7] - 384:19,
387:25, 407:11,
452:23, 453:2,
472:4, 507:24
**Eugene** [1] - 412:24
**eval** [1] - 311:19,
312:2, 487:22
**evaluate** [6] -
443:25, 458:9,
459:23, 460:2,
464:20, 480:15
**evaluated** [4] -
371:19, 486:20,
489:4, 506:20

**evaluating** [9] -
371:25, 400:5,
430:19, 430:20,
436:21, 455:12,
460:17, 480:24,
529:13
**evaluation** [22] -
312:6, 341:13,
367:25, 373:13,
395:2, 397:20,
400:13, 413:24,
420:22, 447:14,
447:20, 460:1,
460:3, 468:5,
516:10, 527:3,
527:6, 527:9,
529:17, 529:18,
531:25, 532:3
**evaluations** [7] -
372:1, 372:4, 372:6,
437:16, 458:19,
527:4, 535:25
**events** [12] - 357:21,
357:25, 358:5,
358:9, 412:6, 419:6,
423:10, 424:3,
433:18, 433:22,
441:17, 539:18
**eventually** [1] -
370:19
**evidence** [72] -
312:14, 312:22,
321:24, 332:23,
350:25, 351:16,
351:19, 362:24,
364:13, 385:19,
387:24, 394:22,
395:16, 397:21,
401:10, 403:12,
404:24, 404:25,
405:7, 408:21,
408:23, 420:1,
427:4, 430:1, 432:4,
433:1, 437:23,
440:10, 449:17,
449:21, 457:12,
460:21, 461:2,
465:13, 468:9,
468:10, 471:23,
472:1, 472:6,
472:10, 472:19,
477:2, 483:22,
485:6, 498:1, 498:3,
500:6, 500:7,
512:10, 512:11,
512:22, 513:13,
513:14, 514:1,
514:25, 516:9,
518:23, 519:3,
519:7, 519:8,

520:13, 522:22, 523:3, 527:5, 528:4, 529:2, 532:15, 533:9, 541:13, 542:24, 544:7, 545:14
**evident** [3] - 436:19, 476:25, 494:18
**evidentiary** [3] - 451:10, 483:20, 514:7
**evidently** [1] - 490:19
**exact** [2] - 319:20, 418:19
**exactly** [6] - 390:14, 418:22, 473:5, 481:5, 500:25, 530:24
**exaggerate** [3] - 479:22, 534:16
**exaggerating** [2] - 534:23, 538:19
**exaggeration** [6] - 479:15, 479:21, 538:2, 538:6, 538:8, 539:16
**exam** [18] - 423:18, 452:19, 462:24, 463:4, 463:13, 467:13, 468:12, 469:17, 469:20, 480:7, 501:7, 501:12, 501:20, 501:24, 504:21, 519:20, 531:15, 532:8
**examination** [28] - 310:4, 340:9, 342:13, 348:8, 349:10, 351:7, 351:22, 351:23, 355:7, 359:21, 403:21, 412:7, 417:15, 426:12, 431:20, 446:4, 459:7, 463:1, 465:10, 465:24, 466:2, 466:10, 467:20, 468:3, 468:10, 478:2, 478:20, 480:17
**Examination** [14] - 309:6, 309:6, 309:7, 309:9, 309:9, 309:10, 309:12, 309:12, 309:13, 309:13, 309:14, 309:14, 309:18, 309:18

**EXAMINATION** [14] - 310:13, 343:1, 353:12, 360:7, 411:12, 430:10, 451:24, 490:17, 523:22, 533:5, 536:19, 538:11, 539:12, 541:7
**examine** [14] - 317:19, 329:12, 329:18, 329:23, 347:25, 349:3, 459:19, 464:11, 468:16, 469:10, 521:14, 534:7, 534:13
**examined** [4] - 496:5, 535:6, 535:8, 535:11
**examinee** [4] - 445:16, 446:5, 467:4, 476:1
**examinee's** [1] - 471:20
**examinees** [1] - 476:17
**examiners** [2] - 452:21, 491:7
**examining** [4] - 348:5, 348:10, 348:14, 355:5
**example** [31] - 318:20, 343:22, 348:22, 396:16, 433:24, 440:23, 444:18, 455:3, 458:11, 461:6, 467:9, 468:6, 468:23, 469:2, 469:9, 469:21, 470:6, 471:22, 475:17, 480:3, 480:21, 481:20, 483:10, 484:19, 484:20, 486:9, 495:25, 527:15, 527:17, 538:13, 538:14
**examples** [8] - 432:17, 447:1, 447:3, 447:10, 480:13, 485:1, 509:20
**exams** [4] - 453:15, 502:9, 536:7
**excellent** [2] - 418:18, 418:25
**except** [3] - 320:11, 438:23, 459:17
**Except** [1] - 451:12

**exclude** [2] - 422:4, 422:19
**excuse** [14] - 366:22, 367:15, 387:10, 396:8, 418:23, 474:25, 475:5, 475:8, 489:6, 511:4, 525:15, 533:22
**executed** [7] - 363:7, 413:20, 430:20, 430:24, 431:11, 432:2, 536:14
**execution** [2] - 413:22, 414:1, 414:5
**executive** [2] - 423:1, 423:3
**exhaustive** [1] - 433:6
**Exhibit** [18] - 345:12, 345:25, 375:9, 376:22, 389:19, 416:13, 416:15, 417:4, 418:4, 423:14, 424:1, 434:12, 488:12, 492:14, 511:6, 515:20
**exhibit** [11] - 345:8, 345:15, 346:11, 347:1, 353:16, 379:9, 382:16, 387:6, 389:15, 416:14, 504:22
**exhibited** [1] - 484:6
**exhibiting** [1] - 398:16
**exhibits** [4] - 459:16, 514:4, 546:14, 546:15
**exist** [3] - 382:10, 539:21
**existed** [1] - 529:5
**exists** [1] - 362:16
**expect** [2] - 321:18, 490:11
**expectations** [1] - 321:15
**experience** [24] - 310:18, 311:11, 311:12, 313:14, 314:12, 317:22, 318:1, 343:3, 371:25, 387:23, 445:14, 458:21, 478:24, 496:21, 507:3, 507:6, 524:2, 531:10, 532:5, 539:18, 540:15, 542:7, 545:4, 545:10
**experienced** [1] -

403:18
**experiences** [1] - 419:9
**experiencing** [3] - 406:8, 420:6, 503:22
**experiment** [1] - 482:5
**expert** [23] - 313:2, 313:3, 313:8, 313:9, 370:5, 370:10, 370:25, 371:1, 372:16, 412:12, 412:15, 413:1, 463:17, 473:16, 483:21, 483:23, 507:12, 517:17, 519:10, 519:19, 531:17, 531:18, 533:8
**expertise** [2] - 473:7, 535:20
**experts** [3] - 413:5, 413:21, 529:23
**explain** [25] - 310:17, 315:3, 318:13, 322:24, 323:21, 324:22, 325:3, 325:7, 325:10, 325:24, 329:12, 340:20, 342:2, 353:20, 358:21, 419:19, 422:1, 422:2, 445:15, 455:10, 470:12, 474:19, 496:20, 512:20
**explained** [7] - 325:12, 326:1, 329:13, 331:3, 331:12, 344:10, 379:13
**explaining** [5] - 324:7, 325:1, 329:10, 329:14, 329:15
**explains** [1] - 358:19
**explanation** [15] - 358:24, 363:10, 363:14, 364:7, 364:9, 364:10, 375:15, 382:6, 384:2, 426:18, 455:9, 456:1, 475:13, 512:21, 528:8
**explanations** [8] - 381:25, 382:12, 471:15, 486:2, 496:2, 528:19, 529:1, 544:23

**explored** [1] - 522:19
**express** [4] - 373:19, 406:22, 463:20, 463:25
**expressed** [4] - 347:9, 414:13, 500:10, 540:20
**expressing** [7] - 316:17, 321:4, 403:25, 406:24, 407:5, 420:9, 522:6
**expression** [3] - 346:21, 349:7, 404:9
**expressions** [1] - 417:3
**extensive** [1] - 419:3
**extensively** [3] - 414:24, 423:12, 423:16
**extent** [9] - 319:1, 349:5, 355:10, 464:16, 464:23, 478:18, 528:1, 528:12, 530:4
**external** [4] - 529:18, 533:25, 534:1, 538:6
**extol** [1] - 492:9
**extra** [2] - 376:23, 379:14
**extraordinary** [1] - 544:9
**extremely** [3] - 330:15, 330:24, 479:2
**eyes** [6] - 346:16, 375:20, 375:22, 416:22, 475:20, 484:20
**eyewitnesses** [1] - 475:10

**F**

**face** [2] - 444:12, 541:12
**faced** [2] - 336:10, 336:15
**facilities** [1] - 453:4
**facing** [3] - 336:16, 424:3, 467:9
**fact** [49] - 316:10, 321:13, 326:22, 332:12, 332:17, 338:3, 341:4, 341:6, 341:9, 341:19, 348:4, 354:24, 358:8, 359:8, 369:10, 369:15, 371:4, 374:22,

376:8, 385:14, 388:14, 397:8, 401:11, 413:11, 413:12, 422:25, 424:20, 427:6, 436:17, 437:5, 444:9, 464:10, 473:18, 474:22, 477:21, 483:5, 491:4, 491:14, 492:3, 494:4, 497:17, 499:6, 510:11, 511:24, 521:15, 539:22, 540:12, 540:23

**factor** [1] - 545:9

**factors** [2] - 470:14, 470:16

**factory** [1] - 481:22

**facts** [18] - 327:19, 327:25, 329:21, 330:2, 330:21, 332:19, 333:12, 341:11, 341:12, 351:17, 358:5, 358:9, 358:25, 363:10, 424:22, 501:25, 518:13, 526:2

**factual** [7] - 373:19, 376:3, 376:6, 376:7, 426:10, 467:8, 481:15

**factually** [3] - 469:22, 482:13, 524:24

**failure** [1] - 432:24

**fainting** [2] - 479:15, 479:21

**fair** [17] - 317:2, 319:23, 330:19, 332:7, 332:9, 333:3, 334:22, 341:7, 349:3, 355:13, 362:7, 419:8, 490:20, 495:13, 498:4, 510:4, 510:6

**fairly** [2] - 315:16, 498:1

**faith** [1] - 354:18

**fake** [1] - 479:19

**fall** [1] - 457:5

**False** [1] - 480:3

**false** [2] - 457:9, 541:11

**familiar** [11] - 377:19, 393:23, 394:7, 396:9, 397:2, 397:3, 404:21, 456:24, 463:5, 477:12, 481:4

**family** [27] - 338:2, 338:10, 348:10, 348:17, 349:2, 355:17, 355:19, 355:20, 356:2, 356:12, 356:13, 376:9, 382:2, 382:19, 383:18, 383:25, 384:14, 384:16, 384:20, 394:22, 408:3, 408:4, 474:9, 475:17, 485:13, 540:21

**Family** [2] - 410:7, 410:12

**far** [11] - 323:10, 323:16, 326:4, 327:8, 332:14, 344:19, 396:1, 397:16, 462:24, 543:20, 544:25

**fashion** [8] - 338:6, 455:25, 460:21, 461:4, 461:25, 462:6, 506:23, 529:19

**fast** [2] - 337:18, 476:21

**fast-food** [1] - 337:18

**fastened** [2] - 504:7, 504:10

**Faust** [2] - 457:21, 457:22

**FAUST** [1] - 457:22

**faxed** [1] - 389:20

**FBI** [1] - 484:16

**February** [1] - 396:3

**federal** [1] - 371:9

**fell** [1] - 391:17

**felon** [3] - 328:9, 341:5, 472:18

**felony** [1] - 467:9

**felt** [12] - 312:22, 334:2, 337:3, 341:18, 368:24, 370:18, 373:18, 375:20, 401:11, 401:12, 401:15, 475:5

**few** [6] - 328:4, 334:9, 360:14, 454:9, 523:24, 542:24

**fide** [1] - 520:13

**field** [14] - 452:12, 452:22, 454:8, 454:10, 456:3, 457:18, 466:12,

483:23, 487:4, 491:9, 491:16, 535:17, 538:15, 539:18

**fifth** [1] - 378:14

**Fifth** [3] - 325:24, 527:18, 527:19

**fight** [1] - 392:18

**fighting** [3] - 380:15, 392:18, 420:5

**figure** [1] - 409:17

**figures** [1] - 491:15

**figuring** [1] - 355:7

**file** [6] - 335:3, 335:5, 365:13, 439:1, 490:22, 508:7

**filed** [6] - 388:4, 411:25, 412:1, 412:4, 419:18, 532:7

**files** [2] - 335:14, 434:16

**fill** [1] - 472:16

**filling** [1] - 504:19

**finally** [1] - 383:15

**findings** [4] - 424:9, 431:20, 438:14

**fine** [2] - 320:24, 397:19

**finger** [1] - 314:20

**fingerprints** [4] - 387:25, 471:25, 475:1, 475:11

**finish** [8] - 354:22, 383:23, 391:21, 443:8, 507:5, 525:21, 528:8, 534:10

**finished** [5] - 342:16, 342:17, 342:18, 451:9, 538:25

**firearm** [1] - 388:4

**firm** [2] - 311:2, 314:7

**firmly** [6] - 503:11, 503:14, 503:16, 512:2, 525:10, 526:3

**first** [18] - 319:10, 352:8, 380:12, 382:18, 383:14, 440:22, 441:4, 450:15, 451:15, 463:15, 466:4, 480:13, 487:19, 492:8, 500:19, 501:6, 516:19, 543:12

**fit** [5] - 455:2, 471:17, 477:25, 484:2, 485:11

**fits** [5] - 331:3,

364:15, 473:3, 473:20, 488:9

**five** [3] - 311:7, 314:12, 431:1

**fixed** [13] - 350:16, 405:1, 428:15, 428:16, 428:20, 500:10, 504:3, 504:5, 516:16, 522:16, 540:15, 540:16, 541:11

**fled** [1] - 341:9

**flee** [1] - 474:10

**flees** [1] - 474:10

**flight** [7] - 415:21, 415:24, 416:14, 433:10, 511:15, 511:16, 511:17

**floor** [2] - 386:9, 391:13

**florid** [1] - 477:2

**floridly** [3] - 406:4, 406:7, 502:19

**focus** [3] - 320:17, 338:1, 510:17

**focused** [4] - 447:3, 447:10, 452:18, 453:22

**fold** [1] - 468:15

**folks** [1] - 315:5

**follow** [2] - 360:21, 475:18

**followed** [1] - 507:21

**following** [5] - 346:5, 414:18, 415:4, 477:25, 529:4

**food** [2] - 337:18, 395:21

**footprints** [1] - 465:14

**FOR** [2] - 307:14, 307:17

**forced** [1] - 416:3

**forces** [2] - 434:1, 434:2

**forcing** [1] - 503:7

**Ford** [30] - 378:2, 378:3, 378:8, 378:10, 378:12, 378:15, 378:16, 378:19, 378:21, 378:23, 378:25, 379:2, 379:4, 379:10, 379:13, 379:15, 379:18, 379:25, 380:2, 381:1, 381:6, 387:5, 420:17, 420:18, 421:1, 421:4, 439:10, 439:22,

474:12, 476:24

**Ford's** [4] - 378:19, 385:21, 387:1, 439:11

**foregoing** [1] - 547:2

**Forensic** [2] - 454:15, 454:17

**forensic** [27] - 413:1, 436:10, 439:19, 445:14, 445:16, 446:5, 452:4, 452:12, 452:15, 453:11, 453:13, 453:20, 454:20, 466:1, 466:6, 472:1, 473:9, 473:10, 480:14, 491:2, 503:4, 507:20, 508:7, 523:25, 529:17, 529:21, 538:1

**forensically** [2] - 475:4, 479:24

**forensics** [1] - 535:20

**forever** [1] - 537:6

**forget** [4] - 420:7, 486:14, 522:7, 524:13

**forgot** [1] - 383:6

**forgotten** [1] - 526:21

**fork** [1] - 444:12

**form** [12] - 328:11, 365:14, 369:16, 369:17, 465:17, 470:20, 471:8, 472:15, 472:17, 483:23, 489:17, 504:19

**Formal** [1] - 428:25

**formal** [2] - 432:16, 452:11

**format** [8] - 418:19, 419:1, 424:25, 425:4, 426:11, 446:13, 466:1

**formed** [3] - 489:19, 506:15, 506:25

**former** [1] - 350:25

**forming** [5] - 366:25, 373:14, 454:24, 455:14, 489:16

**forms** [5] - 328:8, 328:10, 456:4, 507:2

**formulate** [1] - 413:21

**forth** [2] - 405:9, 464:9

**forward** [3] - 310:7,

332:16, 451:19
**Foster** [1] - 378:1
**foundations** [1] -
454:5
**four** [2] - 311:7,
314:11
**fourth** [1] - 381:10
**frame** [3] - 311:20,
409:5, 485:4
**Frankly** [1] - 536:14
**frankly** [3] - 330:25,
348:6, 458:7
**free** [1] - 434:22
**frequently** [4] -
458:19, 458:20,
458:22, 462:13
**Friday** [15] - 367:15,
376:10, 377:22,
380:9, 400:23,
401:5, 401:14,
403:22, 431:1,
431:4, 441:1, 441:8,
456:10, 459:18
**friend** [1] - 311:5
**friends** [1] - 441:22
**front** [3] - 326:12,
389:13, 427:23
**frontal** [5] - 423:5,
423:6, 427:3, 427:5,
449:1
**fulfill** [1] - 388:16
**full** [10] - 379:9,
382:17, 442:5,
442:13, 443:5,
443:11, 501:6,
503:22, 503:23,
504:1
**full-blown** [4] -
442:5, 442:13,
443:5, 503:22
**fully** [1] - 489:22
**function** [1] - 458:13
**functional** [1] -
405:20
**functioned** [1] -
545:7
**functioning** [11] -
422:25, 423:2,
423:3, 426:21,
432:24, 432:25,
433:1, 449:1,
468:21, 545:1,
545:19
**functions** [1] -
467:25
**furnished** [1] - 387:9
**furniture** [1] - 381:6
**FURTHER** [2] -
536:19, 538:11
**Furthermore** [1] -

512:12
**future** [2] - 388:8,
389:6

---

## G

**gain** [8] - 529:13,
529:20, 530:2,
533:7, 533:11,
533:14, 533:21,
533:23
**gambit** [1] - 310:25
**Gamble** [1] - 383:14
**game** [1] - 456:11
**Garfield** [60] - 378:3,
378:4, 378:5,
378:10, 378:12,
378:15, 378:16,
378:17, 378:18,
378:24, 378:25,
379:2, 379:5, 379:8,
379:11, 379:12,
379:15, 379:16,
379:17, 379:18,
379:19, 379:20,
379:25, 380:3,
380:13, 380:21,
381:3, 381:22,
382:2, 382:18,
382:20, 382:23,
383:6, 383:11,
383:17, 383:19,
384:1, 385:20,
385:22, 385:24,
386:2, 386:5, 386:8,
386:9, 386:12,
386:13, 386:18,
386:23, 387:2,
387:7, 387:12,
387:22, 388:1,
388:2, 388:6, 388:9,
492:20, 493:2, 523:8
**Garfield's** [6] -
381:8, 383:6, 384:1,
386:11, 386:14,
387:18
**Garrett's** [1] - 523:3
**gather** [2] - 446:24,
466:25
**GED** [2] - 396:2,
408:17
**general** [10] - 322:22,
336:1, 343:25,
344:13, 371:15,
418:16, 423:5,
469:16, 478:15,
487:7
**General** [1] - 307:18
**General's** [1] -
370:22

**generality** [1] -
330:11
**Generally** [3] -
311:15, 312:16,
316:4
**generally** [8] -
311:18, 311:25,
312:6, 313:4,
343:16, 363:9,
497:18, 532:11
**genuinely** [1] -
486:18
**GEORGETTE** [1] -
307:17
**ghost** [1] - 486:13
**ghosts** [2] - 476:5,
485:15
**girlfriend** [1] -
383:13
**given** [19] - 323:9,
333:10, 352:7,
410:21, 413:8,
421:2, 422:7,
422:11, 426:11,
429:20, 437:23,
440:22, 442:25,
443:17, 455:16,
465:23, 476:13,
524:10, 541:19
**Gladys** [17] - 378:12,
379:2, 379:5, 381:2,
381:7, 382:15,
386:14, 386:15,
386:21, 440:4,
440:14, 460:15,
461:3, 474:11,
476:24, 521:2,
528:19
**Gladys'** [1] - 378:25
**gleam** [1] - 465:22
**glimmer** [3] - 540:19,
542:10, 544:12
**global** [2] - 506:12,
530:22
**goal** [8] - 338:11,
387:18, 388:25,
529:19, 533:25,
534:2, 538:6
**goals** [1] - 453:1
**gobble** [1] - 498:7
**God** [1] - 391:3
**government** [2] -
413:2, 482:5
**grade** [4] - 458:5,
463:9, 463:10, 464:6
**grading** [6] - 463:16,
510:11, 510:12,
510:15, 510:19
**gradually** [1] - 487:8
**grandiose** [2] -

432:12, 508:2
**grasp** [1] - 336:4
**GRAY** [1] - 307:10
**great** [5] - 332:15,
406:14, 416:21,
416:23, 457:20
**greater** [4] - 539:22,
540:9, 542:1, 542:4
**Green** [1] - 372:7
**GREGORY** [1] -
307:14
**grill** [1] - 391:5
**grind** [1] - 356:13
**Grossman** [1] -
412:22
**ground** [1] - 342:20
**grounds** [7] -
359:11, 406:14,
480:19, 488:8,
512:5, 512:9, 545:21
**group** [1] - 354:25
**guards** [3] - 337:11,
415:14, 419:23
**Guerra** [1] - 526:13
**guess** [34] - 311:6,
312:7, 313:24,
315:6, 315:16,
315:24, 317:14,
320:17, 326:7,
330:23, 331:18,
332:20, 334:2,
339:20, 343:14,
345:6, 346:24,
349:22, 353:22,
374:22, 383:17,
419:25, 426:13,
440:6, 448:23,
450:2, 453:13,
456:8, 456:17,
461:12, 492:9,
506:24, 522:17
**guesses** [1] - 467:14
**guessing** [1] - 314:1
**guiding** [1] - 416:2
**guilt** [2] - 326:2,
326:4
**guilt/innocence** [11]
- 325:9, 326:17,
326:21, 326:23,
332:11, 333:6,
348:16, 355:24,
356:4, 366:25,
526:14
**gun** [29] - 328:4,
341:5, 359:1,
378:25, 379:1,
379:3, 379:5, 383:6,
383:9, 383:15,
383:16, 385:15,
385:16, 385:17,

386:9, 391:10,
391:25, 441:12,
441:13, 472:15,
472:22, 475:16,
485:7, 504:8,
504:11, 526:17,
529:3
**guy** [25] - 317:9,
386:6, 386:7, 391:9,
391:18, 391:24,
462:11, 475:1,
475:9, 475:10,
480:16, 493:20,
495:21, 506:7,
511:4, 516:22,
516:24, 516:25,
520:1, 528:21,
528:22, 534:8,
534:13
**guys** [1] - 476:3
**Guys** [2] - 518:11,
518:12
**gym** [2] - 378:11,
383:9

---

## H

**H-05-608** [1] - 307:4
**habeas** [2] - 371:9,
371:11
**habit** [1] - 457:5
**half** [4] - 366:4,
366:23, 489:3,
537:17
**halfway** [1] - 381:11
**hallucination** [7] -
395:23, 476:4,
494:5, 541:10,
541:15, 541:16,
541:24
**hallucinations** [47] -
374:20, 375:19,
392:16, 403:18,
403:23, 404:2,
404:3, 404:5, 406:8,
406:24, 416:2,
417:10, 417:12,
420:3, 420:6,
432:13, 432:14,
432:21, 433:2,
433:3, 471:16,
474:21, 481:22,
481:23, 483:6,
485:8, 485:10,
487:12, 494:12,
507:22, 507:23,
507:24, 508:2,
528:24, 537:4,
537:11, 537:17,
537:18, 537:20,

537:22, 538:3,
540:1, 540:2, 540:5,
540:9, 540:15,
541:18
**Hallucinations** [1] -
428:20
**hallucinatory** [2] -
419:9, 484:17
**hampered** [1] - 338:3
**hand** [6] - 370:21,
376:24, 476:10,
524:13, 530:6
**Handbook** [1] -
454:15
**handing** [1] - 345:24
**handle** [1] - 360:1
**handled** [1] - 313:24
**handling** [1] - 317:22
**hands** [1] - 472:1
**handy** [1] - 454:17
**hang** [2] - 354:8,
403:7
**hanging** [1] - 496:1
**hangs** [1] - 403:6
**happy** [2] - 368:23,
464:24
**hard** [2] - 407:20,
544:18
**hardly** [3] - 481:23,
491:1, 491:4
**HARLAN** [1] - 307:14
**harm** [1] - 415:15
**Harmon's** [1] - 412:8
**Harris** [3] - 310:20,
497:3, 536:8
**hat** [1] - 478:20
**hate** [4] - 492:15,
530:15, 530:16,
543:2
**Hayes** [4] - 458:1,
460:8, 463:23, 490:3
**HAYES** [67] - 307:17,
310:6, 310:14,
312:25, 313:13,
313:19, 314:3,
314:6, 315:24,
316:1, 317:1, 318:6,
318:12, 319:13,
320:16, 324:18,
326:7, 326:15,
327:7, 327:15,
327:16, 328:3,
330:18, 331:10,
333:16, 333:24,
336:13, 337:1,
339:15, 339:18,
341:23, 341:25,
342:5, 342:8,
342:19, 342:23,
346:8, 347:5,

347:16, 353:11,
353:13, 354:16,
354:23, 355:3,
355:22, 355:25,
356:20, 357:15,
358:4, 358:14,
358:16, 359:3,
359:12, 377:1,
377:8, 377:10,
377:12, 389:17,
451:16, 451:18,
499:1, 543:2,
543:10, 544:18,
546:10, 546:12,
546:22
**Hayes............310** [1]
- 309:6
**Hayes..........353** [1] -
309:7
**head** [8] - 344:19,
386:8, 391:25,
407:23, 409:12,
434:2, 454:7, 508:25
**health** [8] - 313:14,
343:8, 397:14,
482:8, 496:25,
497:4, 497:14,
497:14
**hear** [9] - 382:22,
383:21, 407:3,
464:24, 471:14,
498:10, 498:25,
503:2, 543:6
**heard** [16] - 354:15,
429:3, 430:2,
460:23, 470:17,
471:3, 477:4, 480:9,
509:15, 519:4,
529:12, 532:14,
533:7, 543:7, 544:4
**hearing** [32] - 313:8,
319:4, 325:16,
325:20, 325:23,
326:3, 326:9,
328:20, 365:15,
381:25, 382:4,
382:5, 383:18,
383:25, 451:10,
471:5, 483:20,
519:11, 519:12,
519:14, 519:15,
519:20, 520:4,
520:11, 522:18,
527:11, 530:25,
531:9, 531:19,
544:3, 544:15,
545:18
**hearings** [1] - 531:16
**Hearsay** [1] - 483:16
**hearsay** [4] - 312:3,

351:3, 351:4, 483:15
**heavily** [2] - 349:2,
492:7
**held** [2] - 434:23,
541:12
**help** [14] - 317:10,
321:19, 324:20,
342:2, 369:10,
378:6, 416:7, 420:3,
445:22, 450:6,
450:12, 458:7,
492:11
**helped** [2] - 356:2,
378:16
**helper** [1] - 409:3
**helpful** [1] - 366:18
**helping** [2] - 384:24,
384:25
**herself** [1] - 440:11
**hid** [3] - 378:11,
385:10, 386:13
**hide** [2] - 385:1,
385:3
**hiding** [1] - 384:13
**high** [1] - 482:17
**highly** [1] - 495:12
**HILDER** [1] - 307:14
**Hilder** [1] - 307:15
**himself** [21] - 331:23,
332:2, 332:8, 354:1,
389:1, 391:2, 391:3,
391:10, 403:3,
403:19, 403:20,
403:24, 404:4,
404:6, 406:22,
406:25, 407:5,
498:17, 507:23,
508:3, 536:24
**hinder** [2] - 334:18,
347:17
**hindered** [1] - 347:15
**hindrance** [1] -
347:13
**hindsight** [5] - 456:2,
456:15, 456:23,
457:16, 538:13
**Hindsight** [1] - 456:8
**hire** [1] - 530:16
**hired** [5] - 314:25,
368:15, 453:16,
458:1, 519:18
**his..** [1] - 516:17
**historically** [1] -
468:19
**history** [24] - 395:3,
408:12, 443:18,
444:5, 444:22,
471:20, 471:21,
472:14, 472:25,
473:4, 474:23,

520:17, 520:20,
521:1, 521:23,
522:12, 524:10,
528:11, 528:13,
528:15
**hit** [1] - 385:23
**Hitler** [1] - 529:4
**hold** [2] - 320:15,
325:5
**holding** [1] - 407:20
**holy** [5] - 387:13,
493:4, 494:7,
494:13, 494:15
**home** [1] - 378:16
**homicide** [5] - 330:4,
330:14, 350:22,
351:18, 469:23
**honest** [2] - 339:25,
345:3
**Honor** [62] - 310:6,
311:20, 313:11,
313:13, 314:1,
318:10, 318:24,
319:8, 320:9,
322:20, 325:14,
327:2, 327:12,
331:5, 336:11,
339:12, 342:9,
342:14, 345:8,
347:5, 347:16,
353:8, 353:11,
355:1, 355:22,
356:14, 357:13,
359:15, 363:19,
372:20, 376:19,
377:8, 383:20,
411:4, 421:13,
421:21, 427:24,
431:22, 434:8,
450:20, 450:23,
451:9, 463:6,
463:22, 467:18,
482:24, 483:14,
490:12, 513:7,
513:22, 514:14,
517:12, 523:18,
523:20, 533:1,
539:2, 539:7, 541:2,
542:20, 546:3,
546:19, 546:22
**HONORABLE** [1] -
307:10
**hooked** [1] - 311:4
**hope** [2] - 475:7,
544:13
**hospital** [3] - 446:2,
459:6, 487:15
**Hospital** [4] - 452:16,
452:17, 458:24,
480:14

**hostile** [3] - 315:7,
401:15, 462:10
**hostility** [6] - 315:11,
315:12, 315:15,
319:5, 337:3, 401:12
**hour** [2] - 366:4,
366:23
**house** [2] - 378:19,
381:16
**HOUSTON** [2] -
307:2, 307:9
**Houston** [18] -
307:16, 308:4,
321:21, 329:21,
330:13, 365:12,
376:14, 377:17,
380:7, 412:25,
416:3, 420:12,
436:17, 437:15,
475:25, 488:18,
488:24, 496:24
**HPD** [9] - 330:4,
330:9, 350:19,
350:22, 351:18,
356:22, 420:13,
485:14, 544:22
**HPD060** [1] - 492:14
**huge** [2] - 457:19,
476:18
**human** [1] - 456:4
**hundred** [1] - 310:23
**hundreds** [2] -
459:8, 502:12
**hurt** [9] - 333:14,
333:15, 382:24,
403:19, 403:20,
403:24, 404:4,
404:5, 507:23
**hygiene** [1] - 397:23
**hypotheses** [10] -
361:1, 361:2, 361:5,
361:7, 362:18,
363:2, 455:6,
455:14, 455:16,
457:4
**hypothesis** [16] -
360:18, 361:12,
361:17, 362:4,
362:5, 362:10,
362:12, 362:13,
364:11, 364:18,
365:11, 436:23,
456:18, 456:20,
488:22
**hypothetical** [1] -
518:25
**Hypothetically** [1] -
530:25
**hypothetically** [1] -
399:24

## I

**I-45** [1] - 378:21
**i.e** [1] - 387:25
**idea** [14] - 311:22, 323:1, 330:16, 375:11, 441:12, 441:13, 455:23, 465:15, 477:4, 484:2, 493:8, 529:17, 535:16, 545:13
**ideas** [4] - 462:11, 483:12, 485:18, 486:4
**ideation** [1] - 419:5
**identification** [1] - 378:17
**identity** [1] - 474:17
**idiot** [1] - 480:16
**ignore** [1] - 457:15
**ill** [18] - 311:13, 313:23, 314:8, 314:12, 314:15, 314:22, 317:22, 343:4, 428:9, 428:11, 428:12, 428:14, 447:24, 479:7, 502:19, 525:7, 526:10, 527:11
**illness** [35] - 329:19, 332:12, 332:17, 333:5, 337:25, 347:21, 348:2, 368:17, 403:13, 403:14, 475:5, 479:22, 481:18, 495:22, 496:3, 496:15, 496:22, 497:9, 499:24, 500:1, 504:23, 533:10, 534:25, 535:3, 535:6, 535:9, 536:21, 539:22, 540:11, 540:14, 540:24, 540:25, 542:5, 544:1, 545:15
**illogicality** [1] - 432:18
**illusory** [1] - 480:4
**illustrate** [1] - 480:22
**imagine** [1] - 327:25
**imagining** [1] - 375:1
**imitation** [1] - 391:20
**immediately** [2] - 356:3, 472:4
**impact** [2] - 362:2, 425:3

**impacted** [1] - 329:18
**impair** [2] - 362:7, 469:3
**impaired** [2] - 449:3, 527:12
**impairing** [2] - 462:13, 500:17
**impairment** [1] - 448:25
**Impairment** [1] - 432:24
**impairs** [1] - 526:7
**impeached** [1] - 441:7, 441:10
**implies** [1] - 450:18
**implying** [2] - 384:11, 388:23
**importance** [3] - 424:8, 460:20, 529:12
**important** [27] - 341:19, 399:15, 445:15, 445:19, 446:3, 446:8, 454:2, 454:15, 455:20, 460:16, 461:3, 461:4, 461:25, 469:9, 475:23, 483:5, 486:6, 489:9, 493:11, 505:25, 506:2, 507:20, 508:6, 525:16, 528:10, 544:23, 544:25
**Important** [1] - 508:8
**impression** [3] - 381:2, 384:16, 401:18
**improved** [1] - 334:22
**impulsive** [1] - 528:18
**in-depth** [1] - 374:19
**incarcerated** [1] - 480:18
**incarceration** [2] - 398:14, 404:22
**incarcerations** [3] - 396:8, 396:11, 396:16
**incidence** [1] - 537:19
**incident** [2] - 343:17, 381:18
**include** [4] - 335:15, 459:5, 482:18, 495:15
**included** [5] - 310:24, 335:17,

356:22, 421:7, 475:19
**includes** [4] - 477:16, 482:16, 514:4, 528:15
**including** [9] - 419:23, 432:20, 437:14, 443:3, 443:11, 470:18, 494:16, 507:23, 514:4
**incompatible** [1] - 479:23
**incompetence** [2] - 402:15, 413:20
**incompetency** [5] - 413:14, 413:15, 477:20, 530:6, 544:2
**incompetent** [36] - 312:11, 312:19, 312:23, 341:18, 393:22, 403:11, 413:20, 429:16, 429:25, 430:3, 448:3, 448:11, 448:14, 449:7, 462:2, 470:13, 477:14, 477:17, 480:8, 486:20, 499:18, 499:25, 500:2, 500:6, 500:16, 523:13, 525:12, 526:4, 530:11, 530:21, 536:4, 536:11, 536:25, 544:8, 544:14, 545:17
**incomplete** [1] - 440:22
**inconsistencies** [3] - 365:6, 365:8, 403:16
**inconsistency** [2] - 476:14, 476:15
**inconsistent** [3] - 370:21, 402:13, 402:17
**incorporate** [1] - 382:8
**incorporated** [6] - 346:24, 419:24, 521:23, 522:3, 522:23, 530:5
**incorporates** [2] - 419:5, 529:9
**incorporating** [2] - 521:24, 522:13
**incorrect** [1] - 540:7
**increase** [5] - 404:8, 404:9, 404:11, 487:11, 487:13

**incredibly** [4] - 475:23, 481:7, 538:5, 538:7
**indeed** [1] - 468:3
**independent** [5] - 424:21, 463:7, 464:8, 464:9, 512:9
**independently** [2] - 489:12, 489:15
**indicate** [8] - 312:18, 375:25, 396:8, 406:14, 431:13, 472:3, 528:25, 530:11
**indicated** [19] - 312:1, 312:10, 349:14, 376:1, 408:24, 413:2, 417:18, 446:18, 472:11, 474:4, 474:13, 476:4, 485:2, 487:20, 488:2, 488:25, 516:2, 526:19, 539:21
**indicates** [5] - 371:12, 378:1, 414:12, 472:19, 544:5
**indicating** [3] - 409:2, 462:8, 544:7
**Indicating** [1] - 501:9
**indication** [13] - 394:13, 395:22, 397:22, 407:13, 414:22, 468:9, 487:18, 517:14, 539:16, 539:22, 540:18, 542:2, 542:4
**indications** [1] - 393:9
**indicative** [1] - 540:11
**indicator** [1] - 337:25
**individual** [4] - 312:11, 375:25, 395:20, 481:17
**individuals** [5] - 314:8, 375:21, 376:7, 437:25, 441:20
**indulge** [1] - 543:18
**infidel** [1] - 387:16
**inflict** [2] - 400:12, 415:16
**influence** [3] - 417:1, 420:4, 432:11
**influenced** [3] - 362:25, 416:22, 417:10

**influences** [2] - 377:20, 417:12
**influential** [1] - 454:8
**inform** [4] - 322:8, 327:18, 446:10, 506:19
**informant** [2] - 440:4, 440:8
**information** [60] - 327:9, 327:10, 327:17, 355:14, 355:20, 366:18, 368:16, 377:20, 378:7, 384:10, 399:15, 402:6, 402:22, 402:23, 403:4, 403:15, 420:1, 420:8, 420:20, 426:8, 427:10, 428:18, 429:20, 436:6, 436:13, 436:14, 437:21, 438:15, 438:16, 439:20, 441:17, 441:23, 445:21, 445:23, 446:1, 455:17, 457:24, 462:24, 465:22, 466:24, 468:6, 469:4, 481:15, 482:11, 489:19, 492:8, 493:16, 495:12, 498:7, 504:20, 505:21, 507:20, 508:7, 508:15, 508:17, 509:3, 517:23, 518:3, 544:1
**informed** [7] - 332:1, 411:19, 412:3, 440:2, 459:23, 496:21, 532:2
**infrequently** [2] - 458:19, 458:22
**inherent** [2] - 415:11, 447:8
**initial** [3] - 367:13, 459:7
**injury** [2] - 453:25, 501:21
**inmate** [5] - 372:18, 372:25, 373:1, 444:11
**inmates** [3] - 337:12, 372:4, 372:13
**innocence** [2] - 326:2, 326:4
**inordinate** [1] - 544:7
**input** [4] - 348:8,

348:9, 426:25, 462:25
**inquired** [1] - 357:4
**insane** [3] - 340:22, 340:23, 341:18
**insanity** [8] - 341:3, 341:10, 363:5, 500:7, 512:18, 525:14, 533:17
**inside** [2] - 383:17, 407:9
**insight** [25] - 495:22, 496:3, 496:15, 533:9, 534:24, 535:2, 535:5, 535:9, 536:21, 537:3, 537:4, 537:5, 537:7, 537:9, 538:2, 539:16, 540:12, 540:13, 540:20, 540:23, 540:24, 542:9, 542:10
**insights** [2] - 458:12, 468:25
**insistence** [1] - 333:10
**instance** [1] - 340:25
**instead** [1] - 321:14
**institutions** [1] - 453:1
**instructed** [1] - 325:5
**instruction** [1] - 354:19
**insubstantial** [1] - 426:8
**intact** [2] - 422:24, 478:18
**intake** [4] - 406:4, 406:12, 487:22, 505:3
**intellectual** [1] - 427:17
**intelligent** [1] - 368:24
**intend** [2] - 342:17, 342:18
**intending** [1] - 375:18
**intense** [2] - 462:12, 462:13
**intensely** [1] - 485:21
**intent** [3] - 367:22, 472:4, 474:14
**intention** [1] - 392:15
**intentionally** [2] - 392:14, 533:15
**interact** [1] - 487:14
**interacted** [1] -

352:16
**interacting** [1] - 508:22
**interaction** [4] - 324:4, 460:4, 477:1, 528:19
**interactions** [10] - 357:19, 400:1, 401:3, 423:6, 474:9, 474:11, 485:12, 485:13, 498:17, 498:19
**interconnections** [1] - 426:23
**interest** [2] - 322:9, 322:14
**interested** [3] - 368:25, 464:25, 472:2
**interfere** [1] - 456:5
**interfered** [2] - 329:1, 544:11
**interference** [1] - 348:1
**interfering** [1] - 507:24
**intern** [1] - 502:11
**internship** [3] - 452:15, 452:16, 480:15
**interpret** [1] - 428:18
**interpretation** [2] - 390:3, 398:19
**interrupt** [1] - 310:4
**interrupted** [1] - 391:23
**interspersed** [1] - 353:22
**intertwined** [3] - 374:11, 374:18, 494:15
**interview** [43] - 317:19, 319:21, 350:5, 365:25, 367:14, 367:22, 367:24, 368:4, 368:5, 368:7, 368:9, 381:19, 387:7, 388:2, 388:5, 390:9, 424:8, 424:24, 437:8, 437:20, 437:25, 447:23, 459:8, 460:10, 460:12, 463:2, 492:20, 496:19, 499:9, 499:15, 500:5, 500:11, 502:20, 503:5, 508:16, 508:17, 508:20, 509:17,

510:2, 515:12, 516:4, 516:15, 516:19
**interviewed** [5] - 352:9, 417:5, 514:5, 521:11, 534:5
**interviewing** [2] - 424:18, 424:19
**interviews** [4] - 397:15, 447:13, 475:23, 496:23
**intricate** [1] - 418:19
**introduce** [1] - 452:1
**introduced** [3] - 345:16, 346:2, 514:25
**introducing** [1] - 345:21
**investigating** [1] - 329:25
**investigation** [4] - 380:18, 411:15, 492:10, 516:3
**involuntary** [1] - 334:15
**involved** [13] - 326:10, 356:3, 357:16, 375:4, 376:13, 381:12, 381:21, 445:24, 453:25, 467:2, 483:8, 494:22, 529:24
**involves** [1] - 466:8
**involving** [1] - 412:8
**Iran** [2] - 387:20, 494:24
**Iranian** [2] - 387:18, 388:15
**irrational** [16] - 352:21, 352:23, 357:18, 448:4, 448:12, 448:19, 448:22, 448:24, 488:4, 498:24, 520:17, 520:19, 520:20, 520:22, 520:24, 521:1
**irrationality** [2] - 517:25, 528:17
**irrefutable** [1] - 444:25
**irrelevant** [1] - 421:22
**Islam** [1] - 346:19
**Islamic** [1] - 345:5
**Islamic-related** [1] - 345:5
**issue** [15] - 325:22, 414:4, 420:17,

470:11, 473:2, 476:12, 483:5, 489:2, 489:25, 490:5, 529:20, 529:22, 530:2, 536:7, 537:8
**issues** [13] - 445:15, 454:12, 458:2, 458:10, 460:22, 462:1, 467:2, 468:16, 475:24, 496:25, 497:9, 501:23, 532:10
**itself** [9] - 331:1, 335:21, 462:24, 465:7, 465:24, 472:24, 483:1, 485:10, 499:3
**IV** [1] - 491:12

# J

**Jackson** [3] - 325:15, 325:23, 326:2
**jail** [9] - 319:21, 337:9, 337:12, 388:5, 397:14, 404:24, 405:10, 508:13, 525:8
**Jail** [1] - 497:3
**jam** [1] - 378:5
**James** [16] - 348:22, 355:22, 356:1, 356:24, 366:24, 372:7, 378:20, 380:9, 381:20, 381:23, 383:17, 410:24, 430:18, 476:24
**JAMES** [1] - 307:14
**January** [13] - 415:3, 415:7, 415:18, 415:19, 433:7, 486:10, 486:16, 489:2, 489:8, 511:6, 512:24, 529:7
**jaywalking** [1] - 469:24
**job** [13] - 337:18, 343:11, 350:23, 351:18, 391:21, 406:12, 407:20, 418:18, 418:25, 436:25, 464:18, 464:20, 509:8
**jobs** [2] - 407:22
**Johann** [1] - 480:25
**joint** [1] - 493:2
**Jones** [2] - 456:13,

457:15
**Jorge** [1] - 526:12
**journals** [2] - 452:23, 490:24
**journey** [5] - 387:13, 493:4, 494:7, 494:13, 494:15
**Journeyman** [1] - 454:18
**Joyce** [2] - 383:14, 383:15
**Jr** [4] - 383:8, 383:10, 383:13
**Judge** [13] - 316:20, 332:3, 359:22, 363:24, 412:8, 465:4, 473:14, 480:21, 483:21, 525:20, 536:14, 539:5, 543:6
**JUDGE** [1] - 307:11
**judge** [16] - 317:8, 319:3, 319:6, 322:16, 325:7, 447:19, 500:21, 518:20, 522:3, 522:8, 522:10, 522:14, 531:24, 532:2, 543:25, 545:6
**Judge's** [1] - 377:12
**judged** [1] - 390:2
**judges** [3] - 419:24, 420:10, 521:24
**judging** [1] - 461:12
**Judgment** [1] - 418:6
**judgment** [3] - 353:6, 463:15, 478:17
**June** [2] - 395:2, 542:16
**jurors** [1] - 338:15
**jury** [22] - 310:24, 312:12, 312:13, 312:18, 312:21, 323:24, 324:2, 325:5, 325:7, 326:5, 326:10, 326:12, 331:15, 333:13, 338:15, 339:9, 400:12, 427:23, 518:21, 543:6
**justice** [5] - 336:5, 372:1, 404:13, 404:22, 482:2
**Justice** [2] - 417:17, 504:22
**justified** [1] - 341:1

## K

**KATHERINE** [1] - 307:17
**Kathryn** [2] - 458:1, 460:7
**Kathy** [3] - 376:24, 377:6, 377:11
**KAY** [1] - 308:3
**Kay** [1] - 547:5
**keel** [3] - 320:4, 352:5, 352:6
**keep** [7] - 351:13, 379:1, 381:4, 446:21, 452:20, 454:10, 455:17
**Keep** [1] - 465:19
**kept** [2] - 351:11, 444:10
**kick** [1] - 456:11
**kill** [10] - 341:1, 374:13, 375:7, 375:18, 381:14, 381:22, 381:23, 387:17, 486:13, 503:8
**killed** [14] - 374:7, 375:13, 386:6, 386:7, 387:14, 388:20, 388:21, 390:25, 474:13, 475:8, 476:10, 494:8, 528:20, 528:22
**killing** [9] - 341:9, 375:7, 375:11, 387:15, 390:23, 476:7, 493:20, 494:16, 495:21
**kind** [28] - 313:14, 334:17, 337:14, 353:21, 368:12, 371:24, 373:11, 381:13, 391:2, 395:15, 399:15, 408:20, 408:25, 460:21, 466:8, 466:24, 468:6, 469:25, 473:24, 475:5, 475:19, 482:11, 488:3, 525:6, 527:21, 528:17, 537:22, 543:7
**Kind** [1] - 405:24
**kinds** [13] - 321:18, 337:23, 373:5, 373:7, 394:21, 466:13, 467:10,

468:1, 481:10, 510:20, 527:1, 527:3, 527:22
**knelt** [1] - 392:2
**knowing** [2] - 341:6, 465:1
**knowledge** [8] - 330:9, 364:15, 367:23, 412:2, 425:19, 454:22, 474:16, 482:11
**known** [2] - 483:6, 491:15
**knows** [4] - 495:25, 518:13, 532:11, 545:11

## L

**lack** [1] - 434:3
**Lai** [1] - 412:24
**laid** [1] - 458:2
**largely** [2] - 329:23, 498:24
**last** [16] - 314:25, 321:7, 322:11, 335:2, 365:17, 374:23, 375:14, 378:23, 380:11, 383:5, 450:2, 487:10, 514:17, 535:18, 539:14
**last-minute** [2] - 374:23, 375:14
**latitude** [3] - 319:12, 327:23, 364:1
**laughed** [1] - 537:2
**launch** [1] - 518:15
**law** [9] - 325:3, 343:25, 378:2, 465:20, 477:24, 482:9, 505:14, 524:22, 525:16
**lawn** [1] - 483:9
**laws** [1] - 390:1
**lawsuit** [1] - 479:23
**lawyer** [10] - 311:16, 312:1, 314:24, 388:1, 476:3, 507:11, 520:8, 530:18, 531:17, 532:7
**lawyer's** [1] - 507:12
**lawyers** [15] - 388:6, 419:23, 460:25, 462:14, 488:6, 505:7, 508:22, 518:6, 518:18, 522:7, 523:1,

524:24, 530:16, 530:20
**lay** [4] - 391:12, 418:22, 434:2, 473:14
**lead** [8] - 315:20, 316:9, 424:19, 442:8, 444:6, 456:6, 518:3
**leading** [19] - 315:22, 318:4, 327:12, 333:20, 336:11, 337:15, 354:21, 355:1, 359:7, 411:22, 416:23, 421:13, 427:24, 442:13, 446:24, 447:9, 447:11, 466:21
**lean** [1] - 536:17
**learned** [4] - 354:17, 411:25, 459:17, 513:13
**learning** [1] - 354:18, 354:25
**least** [14] - 316:8, 329:8, 332:14, 333:17, 397:25, 439:9, 459:12, 461:24, 468:15, 505:14, 506:22, 507:17, 536:3, 544:20
**leave** [5] - 380:22, 465:13, 513:23, 514:2
**Leave** [1] - 513:24
**leaves** [1] - 495:11
**leaving** [1] - 388:5
**lectern** [1] - 513:20
**led** [1] - 507:9
**left** [6] - 310:20, 311:4, 314:7, 351:11, 391:24, 441:5
**leg** [1] - 469:25
**legal** [43] - 367:9, 367:25, 369:7, 371:16, 371:17, 371:20, 371:21, 371:22, 373:20, 387:8, 406:23, 415:10, 418:20, 418:24, 419:1, 419:19, 419:20, 419:23, 420:3, 422:18, 426:10, 442:1, 445:21, 445:25, 454:23, 458:2, 470:4,

482:10, 501:25, 505:9, 505:10, 505:11, 505:18, 506:22, 510:25, 516:17, 517:1, 517:3, 522:13, 524:4, 526:6, 530:17, 530:18
**legitimate** [1] - 533:18
**length** [1] - 540:24
**lengthy** [7] - 387:12, 493:3, 493:6, 494:4, 494:7, 495:11, 497:20
**less** [3] - 315:11, 388:6, 540:5
**letter** [26] - 345:15, 345:25, 346:3, 346:6, 415:11, 415:12, 415:18, 415:19, 416:17, 449:24, 475:19, 486:9, 486:11, 486:16, 511:1, 511:6, 511:21, 512:24, 516:10, 516:18, 516:21, 517:18, 517:21, 529:7, 529:9, 529:10
**letters** [5] - 345:21, 394:23, 514:24, 517:9, 517:13
**letting** [3] - 321:23, 385:1, 385:3
**level** [10] - 338:16, 371:9, 371:12, 371:13, 371:20, 432:25, 467:8, 472:20, 544:25, 545:20
**levels** [2] - 474:21, 474:22
**liability** [1] - 430:17
**liberty** [1] - 322:1
**license** [2] - 452:14, 542:16
**licensed** [2] - 542:13, 542:14
**licensing** [1] - 452:19
**lied** [3] - 328:10, 341:5, 440:22
**life** [14] - 323:13, 323:25, 337:14, 337:15, 338:19, 390:2, 405:22, 407:9, 408:14, 442:13, 443:2, 443:10, 473:16,

480:12
**life-long** [1] - 405:22
**light** [4] - 338:14, 339:4, 339:23, 450:7
**likeable** [1] - 317:9
**likelihood** [5] - 333:5, 473:20, 477:16, 538:2, 538:4
**likely** [6] - 328:22, 329:16, 393:16, 393:21, 481:21, 481:22
**Likely** [1] - 333:3
**likewise** [1] - 364:17
**limit** [2] - 427:24, 546:10
**limitations** [1] - 521:12
**limited** [2] - 510:18, 546:12
**limits** [1] - 313:9
**line** [19] - 313:12, 330:8, 354:11, 363:20, 364:22, 372:21, 390:10, 392:23, 394:9, 419:4, 428:2, 428:5, 511:24, 512:6, 514:9, 515:1, 528:5, 529:1, 543:8
**lines** [3] - 315:17, 338:10, 475:4
**lips** [1] - 525:6
**list** [4] - 397:8, 432:8, 433:6, 457:12
**listed** [2] - 431:1, 494:6
**listen** [1] - 322:18
**listening** [2] - 480:25, 516:8
**literally** [1] - 395:16
**literature** [5] - 393:23, 449:13, 457:17, 477:12, 478:23
**litigation** [1] - 453:25
**live** [1] - 387:20
**Lived** [1] - 408:3
**lives** [1] - 506:5
**living** [2] - 337:19, 408:14
**lobe** [5] - 423:6, 427:3, 427:5, 449:1
**logical** [5] - 419:4, 419:6, 423:10, 481:2, 481:25
**long-term** [2] - 484:4, 487:1
**look** [31] - 321:9, 335:12, 335:20,

349:23, 352:22, 363:9, 364:13, 365:6, 365:10, 380:16, 381:24, 383:16, 384:17, 388:11, 416:7, 435:12, 435:15, 439:11, 442:12, 449:10, 457:12, 457:14, 458:4, 458:6, 474:22, 481:3, 497:25, 498:1, 498:3, 512:19, 528:22
**looked** [8] - 341:20, 391:15, 396:14, 438:6, 438:22, 439:7, 462:19, 501:16
**Looking** [1] - 425:6
**looking** [25] - 340:21, 364:6, 364:9, 364:10, 364:17, 364:25, 365:4, 371:5, 379:9, 380:7, 381:9, 382:17, 383:8, 389:22, 392:24, 394:18, 394:21, 416:11, 438:24, 456:10, 456:16, 456:17, 475:3, 512:13
**looks** [4] - 377:11, 473:3, 536:5, 544:21
**loosened** [1] - 391:8
**lose** [2] - 315:15, 456:14
**losing** [1] - 392:18
**loss** [1] - 428:24
**lost** [2] - 456:12, 525:24
**loves** [1] - 485:25
**Lovett** [1] - 307:15
**LPC's** [1] - 395:2
**lucidity** [2] - 506:4, 506:7
**lunch** [1] - 411:6
**Lunch** [1] - 411:8
**lying** [3] - 472:15, 472:18, 525:6

**M**

**M.D** [3] - 309:8, 309:17, 360:6
**M.D.,witness** [1] - 539:11
**ma'am** [14] - 455:1,

457:19, 458:15, 458:18, 458:23, 459:17, 459:21, 460:5, 460:11, 460:15, 471:7, 471:11, 488:16, 490:6
**main** [4] - 338:1, 339:17, 361:6
**maintain** [3] - 419:3, 432:6, 534:1
**maintains** [1] - 500:14
**major** [4] - 349:16, 350:7, 352:10, 352:19
**majority** [5] - 315:5, 400:1, 461:18, 461:24, 462:4
**malingered** [1] - 497:23
**malingerers** [2] - 479:2, 479:3
**malingering** [10] - 454:14, 479:11, 479:14, 479:16, 479:17, 496:14, 515:15, 529:14, 536:7, 538:8
**man** [4] - 317:10, 374:12, 381:23, 481:6
**manager** [14] - 374:8, 374:24, 375:6, 375:11, 375:12, 380:13, 381:13, 381:21, 383:2, 388:20, 388:21, 388:22, 449:19, 449:23
**MANAGER** [1] - 345:11
**managers** [2] - 375:1, 375:21
**manipulative** [1] - 398:16
**manner** [2] - 407:1, 407:6
**March** [5] - 307:8, 310:2, 350:5, 396:20, 417:6
**Marcus** [1] - 372:7
**mark** [1] - 345:12
**marked** [1] - 345:24
**marshaling** [1] - 351:19
**masons** [1] - 511:9
**Master's** [2] - 452:8, 480:15
**match** [1] - 528:12

**matches** [1] - 528:14
**material** [1] - 459:18
**mathematician** [1] - 481:1
**matter** [5] - 369:17, 387:22, 452:22, 452:25, 478:7
**matters** [2] - 333:18, 333:21
**Maxey** [4] - 380:17, 380:18, 380:20, 439:10
**maximum** [1] - 459:10
**McDonald's** [13] - 375:22, 381:13, 381:21, 382:24, 383:2, 386:2, 386:3, 387:12, 449:19, 449:23, 450:1, 493:2
**mean** [77] - 315:3, 316:12, 328:25, 330:5, 330:23, 337:10, 339:16, 339:21, 339:22, 339:23, 340:23, 346:5, 348:7, 349:23, 352:7, 352:22, 353:20, 353:25, 362:9, 362:13, 373:2, 382:10, 395:25, 399:9, 405:17, 408:9, 410:5, 418:19, 428:13, 433:21, 446:7, 448:23, 453:14, 454:9, 460:25, 461:22, 462:8, 462:18, 466:5, 470:9, 473:23, 474:15, 474:20, 475:8, 476:20, 477:10, 478:5, 480:3, 480:16, 481:14, 481:16, 484:7, 486:6, 486:22, 488:5, 488:9, 490:1, 491:11, 503:19, 503:25, 504:5, 505:4, 505:17, 510:18, 511:16, 514:1, 517:24, 519:12, 520:8, 522:20, 525:4, 528:23, 530:3, 530:16, 530:17, 535:19, 543:22
**meaning** [3] -

372:18, 438:13, 450:3
**means** [8] - 339:4, 339:16, 437:11, 438:14, 438:15, 477:19, 478:25, 538:2
**meant** [3] - 399:12, 456:2, 465:11
**mechanical** [1] - 307:24
**medical** [10] - 396:7, 396:15, 396:17, 397:1, 397:14, 398:14, 418:22, 418:23, 453:2, 453:23
**medicated** [4] - 449:5, 449:7, 478:5, 478:12
**medication** [4] - 393:16, 404:19, 405:20, 541:1
**medications** [1] - 393:18
**Medicine** [1] - 412:25
**medicine** [2] - 453:22, 478:8
**meet** [7] - 366:9, 371:16, 399:18, 437:8, 518:11, 544:2, 544:8
**meeting** [2] - 366:3, 366:22
**meets** [2] - 442:17, 442:22
**Meets** [1] - 442:21
**member** [3] - 312:6, 312:7, 356:13
**members** [18] - 338:10, 348:10, 348:17, 349:2, 355:18, 355:19, 355:21, 356:2, 356:12, 382:2, 383:19, 383:25, 408:3, 408:4, 410:12, 412:19, 475:17, 540:21
**memory** [6] - 329:8, 355:9, 427:13, 427:15, 434:3, 469:25
**memory..** [1] - 423:2
**men** [1] - 398:7
**Men** [1] - 346:15
**menial** [1] - 407:22
**Mental** [2] - 333:5, 500:1

**mental** [42] - 313:14, 320:3, 329:19, 332:12, 332:17, 337:25, 338:14, 343:8, 343:13, 347:21, 348:2, 368:17, 397:14, 403:13, 403:14, 458:13, 463:1, 468:21, 470:1, 473:2, 474:19, 474:20, 475:5, 479:21, 482:8, 485:18, 486:22, 495:12, 496:22, 496:25, 497:4, 497:8, 497:14, 499:7, 499:24, 504:22, 505:24, 533:10, 544:1, 545:15, 545:16
**mentally** [19] - 311:13, 313:23, 314:8, 314:12, 314:15, 314:22, 317:22, 343:4, 348:19, 428:9, 428:11, 428:12, 428:14, 447:24, 479:7, 502:19, 525:7, 526:10, 527:11
**mentation** [1] - 504:17
**mention** [10] - 335:19, 365:24, 403:17, 404:23, 407:10, 408:21, 421:25, 447:24, 454:18, 478:5, 499:10, 528:10, 533:7
**mentioned** [11] - 334:20, 344:22, 407:10, 408:21, 421:25, 447:24, 454:18, 478:5, 499:10, 528:10, 533:7
**mentioning** [1] - 536:22
**mentions** [1] - 433:24
**merging** [2] - 477:23, 477:24
**mess** [1] - 457:3
**messed** [1] - 488:7
**met** [6] - 328:18, 352:8, 442:2, 443:20, 443:22, 543:24
**method** [4] - 360:21,

424:13, 509:11, 509:13
**methodologies** [1] - 509:14
**methodology** [2] - 464:8, 502:14
**Mexico** [2] - 387:19, 452:8
**mid-1987** [1] - 310:21
**middle** [1] - 386:17
**midnight** [2] - 379:19, 380:3
**might** [24] - 326:13, 333:1, 334:18, 336:17, 338:16, 338:17, 340:25, 360:12, 365:7, 377:1, 377:23, 388:7, 405:24, 406:19, 406:22, 411:5, 417:19, 422:2, 439:5, 468:22, 470:1, 522:21, 536:24, 543:21
**mighty** [1] - 349:25
**MILLER** [1] - 307:10
**mind** [12] - 322:14, 349:22, 352:23, 354:6, 354:13, 354:14, 416:19, 428:23, 454:7, 467:14, 499:17, 527:10
**Mine** [1] - 345:9
**mine** [1] - 311:5
**minimize** [4] - 534:4, 534:18, 534:19, 534:23
**minute** [9] - 354:8, 363:17, 374:23, 375:14, 479:7, 484:8, 495:5, 496:8, 519:25
**minutes** [5] - 342:10, 359:22, 490:10, 494:10, 542:25
**Miranda** [1] - 468:23
**Mirandized** [1] - 382:17
**mischaracterizatio n** [1] - 537:7
**misheard** [1] - 404:7
**mishmash** [1] - 353:21
**mislead** [1] - 326:8
**misstated** [1] - 490:1
**misstatement** [1] - 482:24

**mistake** [2] - 435:13, 498:21
**mistaken** [1] - 435:5
**mitigate** [1] - 338:1
**mix** [1] - 464:19
**molest** [4] - 346:15, 346:17, 346:18, 415:16
**molested** [6] - 346:18, 353:15, 353:24, 417:14, 449:25, 475:20
**molesting** [4] - 374:16, 374:17, 375:20, 375:23
**moment** [7] - 476:9, 506:4, 506:16, 506:18, 508:15, 508:18, 537:6
**moments** [7] - 481:11, 481:13, 506:6, 506:8, 508:19, 508:21, 527:5
**Monday** [2] - 456:9, 456:12
**Monday-morning** [1] - 456:9
**money** [15] - 341:8, 378:10, 379:14, 380:16, 381:4, 381:5, 381:23, 387:17, 388:10, 388:16, 391:18, 472:21, 474:11, 476:11, 529:20
**month** [1] - 311:10
**months** [4] - 311:3, 345:18, 489:3, 511:3
**morbid** [2] - 432:25, 433:1
**morning** [13] - 310:15, 310:16, 360:9, 360:10, 374:24, 375:6, 382:24, 385:23, 398:23, 429:21, 456:9, 456:12, 488:15
**MOSNIK** [4] - 309:8, 309:17, 360:6, 539:11
**Mosnik** [20] - 310:5, 359:21, 360:3, 360:9, 377:17, 411:14, 416:11, 428:4, 430:12, 451:12, 460:14, 464:17, 468:7, 471:5, 485:17,

486:19, 509:3, 539:8, 539:9, 539:14
**Mosnik's** [9] - 431:19, 455:5, 458:6, 468:6, 468:8, 485:24, 488:14, 509:3, 510:19
**most** [14] - 316:8, 363:11, 363:15, 364:8, 393:20, 400:3, 437:3, 453:1, 453:3, 455:24, 456:1, 462:9, 471:2, 508:6
**Most** [1] - 537:10
**mostly** [1] - 311:14
**motel** [3] - 378:16, 378:24, 386:18
**Motel** [2] - 378:21, 383:7
**mother** [1] - 381:11
**mother's** [2] - 383:10, 383:12
**motion** [5] - 418:5, 418:17, 434:6, 434:11, 532:7
**Motion** [2] - 418:5, 435:1
**motivated** [1] - 482:1
**motivation** [1] - 400:8
**motive** [6] - 358:22, 400:4, 460:16, 460:22, 472:4, 512:19
**motives** [1] - 530:20
**move** [2] - 356:14, 503:2
**moved** [2] - 334:25, 408:1
**moving** [4] - 386:1, 484:22, 501:18, 525:6
**mow** [1] - 483:9
**MR** [147] - 307:14, 307:14, 307:17, 307:17, 311:20, 312:3, 313:11, 314:1, 315:22, 316:14, 318:4, 318:10, 318:24, 319:8, 320:9, 322:20, 324:9, 324:15, 325:14, 325:18, 325:20, 327:2, 327:12, 327:21, 330:8, 331:5, 333:8, 333:20, 336:11, 336:19, 336:22,

339:11, 342:9, 342:14, 342:17, 343:2, 345:8, 345:12, 345:15, 345:20, 346:10, 346:13, 347:3, 347:8, 347:18, 347:19, 353:8, 354:8, 354:10, 354:21, 355:1, 356:14, 357:13, 357:24, 358:7, 359:2, 359:7, 359:15, 363:19, 372:20, 373:24, 376:23, 377:9, 377:13, 383:20, 409:5, 409:9, 410:24, 411:2, 411:13, 411:24, 416:4, 416:6, 416:10, 418:2, 418:3, 418:9, 418:11, 418:13, 418:15, 421:16, 421:24, 423:22, 423:24, 428:1, 428:7, 430:6, 431:17, 434:25, 435:4, 435:7, 442:15, 450:23, 451:9, 451:12, 461:10, 463:6, 464:5, 466:21, 467:11, 473:6, 480:19, 482:23, 483:14, 483:17, 490:12, 490:16, 490:18, 492:16, 492:18, 492:19, 496:10, 499:5, 501:2, 512:15, 512:25, 513:2, 513:5, 513:8, 513:12, 513:19, 513:24, 513:25, 514:17, 514:19, 517:22, 523:15, 523:18, 525:18, 531:4, 532:9, 533:4, 533:6, 534:15, 535:21, 537:12, 538:12, 538:22, 539:7, 539:13, 541:2, 542:20, 543:5, 543:18, 543:22, 546:3, 546:19
**MRI** [1] - 479:1
**MS** [153] - 308:3, 310:6, 310:14,

312:25, 313:13, 313:19, 314:3, 314:6, 315:24, 316:1, 317:1, 318:6, 318:12, 319:13, 320:16, 324:18, 326:7, 326:15, 327:7, 327:15, 327:16, 328:3, 330:18, 331:10, 333:16, 333:24, 336:13, 337:1, 339:15, 339:18, 341:23, 341:25, 342:5, 342:8, 342:19, 342:23, 346:8, 347:5, 347:16, 353:11, 353:13, 354:16, 354:23, 355:3, 355:22, 355:25, 356:20, 357:15, 358:4, 358:14, 358:16, 359:3, 359:12, 359:22, 359:25, 360:8, 363:24, 364:4, 372:24, 374:2, 374:5, 376:19, 376:21, 376:24, 377:1, 377:3, 377:6, 377:8, 377:10, 377:11, 377:12, 377:15, 377:16, 379:24, 380:1, 383:22, 383:24, 389:17, 389:18, 407:7, 409:6, 409:10, 409:13, 411:3, 411:22, 418:1, 418:8, 421:13, 421:21, 427:23, 428:4, 430:9, 430:11, 431:22, 432:5, 434:8, 434:10, 435:3, 435:6, 435:8, 435:9, 443:1, 450:19, 451:16, 451:18, 451:25, 461:14, 463:22, 464:22, 465:3, 465:9, 466:23, 467:17, 467:22, 473:14, 473:25, 480:21, 483:2, 483:21, 484:1, 488:11, 488:13, 490:8, 499:1, 501:4, 513:7, 513:10, 514:14, 517:12,

523:20, 523:23, 525:20, 525:25, 526:23, 526:25, 531:7, 532:13, 533:1, 534:10, 535:22, 536:20, 538:9, 538:24, 539:5, 541:6, 541:8, 542:18, 543:2, 543:10, 544:18, 546:10, 546:12, 546:22

**multiple** [3] - 325:12, 470:15, 539:15

**murder** [20] - 323:13, 331:1, 332:14, 384:17, 387:11, 388:3, 389:1, 389:5, 389:8, 392:5, 415:9, 472:15, 475:16, 493:2, 494:22, 495:6, 495:16, 496:1, 538:1

**murders** [2] - 310:22, 310:24

**Muslim** [18] - 315:5, 316:11, 316:15, 344:23, 345:2, 345:4, 354:1, 354:4, 354:7, 354:13, 354:18, 380:24, 387:16, 387:20, 388:15, 388:22, 398:1

**must** [6] - 346:4, 476:8, 486:3, 496:2, 520:10, 538:19

**Mystics** [2] - 384:6, 384:13

---

## N

**name** [10] - 337:19, 375:17, 378:22, 386:20, 449:25, 457:20, 459:24, 472:16, 490:25, 491:14

**named** [3] - 378:3, 378:20, 412:9

**namely** [1] - 447:13

**names** [2] - 372:8, 491:18

**narration** [1] - 391:24

**NATHANIEL** [1] - 307:7

**nationally** [1] - 491:15

**nature** [15] - 344:6,

---

361:11, 361:18, 368:1, 368:2, 369:24, 370:12, 371:8, 371:11, 373:8, 448:17, 488:2, 488:10, 499:14, 517:15

**Nazis** [5] - 374:17, 384:8, 415:13, 475:18, 486:3

**near** [3] - 516:18, 518:5, 518:24

**necessarily** [8] - 382:8, 406:16, 447:25, 449:7, 484:15, 508:13, 523:13, 523:14

**necessary** [1] - 470:6

**need** [25] - 313:18, 325:24, 342:6, 348:5, 371:15, 371:19, 374:2, 377:10, 379:6, 386:5, 389:23, 434:24, 435:7, 447:18, 451:4, 451:12, 464:19, 469:18, 469:19, 485:22, 499:1, 531:11, 543:12, 545:22, 546:14

**needed** [14] - 329:11, 341:20, 375:12, 378:6, 381:4, 387:13, 388:1, 388:2, 388:16, 423:20, 431:2, 431:10, 432:1, 493:4

**needs** [4] - 321:4, 359:25, 388:14, 388:15

**negative** [3] - 428:23, 432:19, 487:13

**NEISSER** [1] - 308:3

**Neisser** [1] - 547:5

**nephew** [4] - 378:3, 378:19, 378:20, 474:12

**nephew's** [1] - 378:19

**nephews** [3] - 355:23, 474:12, 529:10

**network** [1] - 393:2

**neurologist** [1] - 412:24

**neurology** [1] - 412:24

---

**neuropsych** [6] - 396:9, 396:18, 396:21, 438:11, 438:14, 468:10

**neuropsychiatric** [2] - 396:22, 438:15

**Neuropsychologic al** [1] - 396:23

**neuropsychologica l** [5] - 396:24, 397:10, 430:22, 438:15, 469:12

**neuropsychology** [2] - 396:22, 452:18

**neurosurgeon** [1] - 412:23

**neurosurgeons** [1] - 453:24

**neurosurgery** [1] - 412:22

**never** [11] - 315:15, 381:3, 401:11, 401:12, 401:15, 457:14, 481:14, 487:6, 535:11, 540:2

**New** [1] - 452:7

**new** [3] - 395:21, 455:16, 459:18

**newest** [1] - 353:15

**news** [1] - 382:22

**next** [4] - 311:10, 324:19, 380:12, 381:16

**nice** [1] - 456:7

**nicotine** [1] - 453:9

**night** [2] - 374:23, 507:22

**nine** [1] - 311:3

**Nobody** [1] - 382:9

**nobody** [1] - 406:17

**non** [4] - 387:16, 423:9, 512:19, 528:7

**non-Muslim** [1] - 387:16

**non-psychotic** [2] - 512:19, 528:7

**non-verbal** [1] - 423:9

**None** [2] - 476:23, 476:24

**none** [2] - 332:6, 372:1

**Nonetheless** [1] - 427:20

**nonresponsive** [1] - 513:3

**normal** [3] - 396:9, 396:18, 397:10

**normally** [2] - 322:16, 426:14

---

**notations** [1] - 467:3

**note** [3] - 399:14, 516:2, 517:15

**notebook** [1] - 377:2

**noted** [6] - 387:22, 397:3, 397:4, 397:9, 398:15, 399:17

**notes** [11] - 321:10, 321:22, 335:8, 335:12, 396:7, 397:1, 406:11, 438:17, 438:25, 465:15, 485:24

**nothing** [18] - 385:23, 430:13, 456:12, 456:19, 456:20, 468:8, 468:11, 470:4, 476:3, 481:3, 485:9, 485:13, 485:15, 495:17, 511:3, 528:16, 528:24, 529:10

**Nothing** [8] - 334:20, 359:12, 359:15, 409:1, 516:22, 526:19, 538:24, 546:22

**notice** [3] - 349:15, 396:15, 475:22

**noticed** [1] - 320:5

**novels** [1] - 481:9

**November** [1] - 397:4

**nowhere** [2] - 392:21, 486:11

**number** [14] - 311:24, 316:24, 319:20, 319:23, 346:24, 361:19, 375:4, 389:15, 394:4, 445:3, 532:23, 539:20, 542:1

**numbered** [3] - 346:11, 389:20, 492:13

**numbers** [2] - 389:21, 427:18

**numerous** [5] - 374:17, 376:1, 416:25, 419:14, 456:4

**nurse** [1] - 459:6

**nut** [1] - 379:5

---

## O

**o'clock** [1] - 411:7

---

**oath** [6] - 310:8, 360:5, 400:19, 400:20, 437:24, 539:10

**object** [31] - 314:1, 315:22, 316:14, 318:4, 319:8, 322:20, 324:9, 327:13, 330:8, 333:20, 336:22, 347:16, 356:14, 357:24, 358:7, 359:2, 359:7, 363:19, 372:20, 442:15, 461:10, 466:21, 473:6, 480:19, 483:14, 499:1, 512:15, 513:2, 531:4, 532:9, 537:12

**Objection** [6] - 354:8, 354:21, 355:1, 411:22, 421:13, 517:12

**objection** [12] - 312:3, 313:11, 347:4, 351:4, 363:18, 363:21, 363:25, 461:9, 463:6, 467:12, 513:17, 531:5

**objective** [1] - 479:18

**objectively** [1] - 497:11

**obligated** [1] - 544:3

**observations** [6] - 410:3, 410:10, 410:18, 410:20, 410:23, 489:9

**observe** [3] - 363:11, 364:7, 403:17

**observed** [1] - 350:8

**obtained** [3] - 437:22, 438:9, 542:16

**Obviously** [1] - 338:19

**obviously** [9] - 348:24, 351:21, 367:17, 372:15, 483:19, 490:4, 507:11, 507:13, 508:19

**occasion** [2] - 310:21, 516:3

**occasions** [4] - 334:9, 343:14, 525:5, 537:5

**occur** [2] - 331:17,

529:5
**occurred** [7] - 328:1, 330:24, 330:25, 358:6, 358:10, 433:18, 435:25
**occurs** [1] - 479:17
**October** [5] - 345:17, 434:18, 434:19, 435:4, 435:14
**odd** [8] - 320:14, 320:15, 329:4, 338:8, 340:7, 349:7, 349:25
**odds** [2] - 449:8, 449:9
**Oden** [1] - 342:19
**ODEN** [88] - 307:17, 359:22, 359:25, 360:8, 363:24, 364:4, 372:24, 374:2, 374:5, 376:19, 376:21, 376:24, 377:3, 377:6, 377:11, 377:15, 377:16, 379:24, 380:1, 383:22, 383:24, 389:18, 407:7, 409:6, 409:10, 409:13, 410:24, 411:3, 411:22, 418:1, 418:8, 421:13, 421:21, 427:23, 428:4, 430:9, 430:11, 431:22, 432:5, 434:8, 434:10, 435:3, 435:6, 435:8, 435:9, 443:1, 450:19, 451:25, 461:14, 463:22, 464:22, 465:3, 465:9, 466:23, 467:17, 467:22, 473:14, 473:25, 480:21, 483:2, 483:21, 484:1, 488:11, 488:13, 490:8, 501:4, 513:7, 513:10, 514:14, 517:12, 523:20, 523:23, 525:20, 525:25, 526:23, 526:25, 531:7, 532:13, 533:1, 534:10, 535:22, 536:20, 538:9, 538:24, 539:5, 541:6, 541:8, 542:18
**Oden**.............**541**

[1] - 309:18
**Oden**.............**451** [1] - 309:12
**Oden**.............**430** [1] - 309:10
**Oden**............**523** [1] - 309:13
**Oden**....**536** [1] - 309:14
**OF** [1] - 307:1
**offense** [12] - 328:17, 336:7, 336:15, 336:16, 374:23, 377:25, 433:8, 471:10, 472:12, 473:1, 474:6, 532:20
**offer** [1] - 464:24
**offered** [3] - 323:11, 323:12, 447:12
**offering** [2] - 347:1, 347:3
**offers** [1] - 323:7
**office** [13] - 310:19, 310:20, 311:6, 311:15, 313:2, 313:25, 316:23, 335:7, 335:15, 366:4, 366:23, 391:13, 458:1
**Office** [4] - 307:18, 311:9, 314:21, 370:23
**officer** [2] - 438:25, 494:2, 497:5
**officers** [8] - 380:18, 420:13, 476:13, 485:14, 496:22, 497:7, 497:17, 524:2
**OFFICIAL** [1] - 308:3
**Official** [1] - 547:6
**often** [19] - 319:18, 319:19, 319:20, 329:1, 334:12, 334:16, 379:13, 379:14, 398:7, 428:25, 453:14, 455:15, 477:24, 478:2, 481:16, 483:8, 496:4, 530:5, 530:6
**Often** [1] - 484:19
**old** [2] - 481:22, 491:24
**Olympic** [2] - 378:21, 383:7
**once** [7] - 349:14, 388:9, 391:14, 443:18, 480:10, 486:25, 530:3
**Once** [1] - 540:16

**one** [55] - 315:8, 315:19, 318:15, 322:11, 338:18, 341:23, 343:7, 344:12, 345:24, 358:13, 360:11, 362:23, 364:21, 365:12, 368:8, 370:21, 374:16, 378:6, 380:18, 382:5, 382:23, 398:4, 398:23, 399:5, 414:10, 414:22, 423:4, 428:13, 429:5, 436:15, 453:8, 457:23, 458:25, 459:13, 472:5, 476:18, 477:22, 483:17, 496:24, 497:4, 503:9, 505:20, 507:17, 512:18, 515:14, 517:21, 519:17, 519:18, 524:13, 530:23, 532:23, 535:23, 536:23, 538:20, 543:19
**One** [9] - 340:19, 397:21, 407:8, 425:24, 426:2, 471:19, 496:9, 504:7, 504:10
**ones** [5] - 361:6, 372:4, 419:19, 459:17
**onset** [2] - 481:19, 481:24
**open** [10] - 335:3, 335:5, 343:16, 343:19, 362:14, 362:15, 391:6, 434:2, 475:1, 475:11
**open-ended** [1] - 362:14
**opened** [1] - 395:21
**opening** [1] - 325:23
**operated** [1] - 426:14
**operationalize** [1] - 509:22
**operationalized** [1] - 509:24
**operationalizing** [2] - 424:13, 509:12
**operative** [1] - 330:21
**opinion** [82] - 316:18, 317:5, 320:22, 323:1, 323:9, 324:5,

333:25, 336:9, 341:17, 361:8, 365:14, 366:25, 370:7, 373:14, 377:20, 377:21, 393:14, 397:11, 398:18, 412:12, 412:15, 412:18, 412:20, 413:22, 414:1, 424:16, 429:19, 430:22, 431:25, 448:9, 449:6, 462:15, 462:16, 462:22, 463:7, 463:12, 463:20, 463:23, 463:24, 464:1, 464:3, 464:10, 464:12, 464:14, 465:1, 465:2, 465:6, 467:17, 468:2, 469:5, 469:6, 469:8, 470:20, 470:23, 471:5, 471:9, 471:12, 483:23, 485:11, 489:13, 489:16, 489:17, 489:18, 489:19, 490:5, 496:17, 499:24, 506:15, 510:15, 519:13, 519:25, 520:3, 528:14, 531:1, 531:8, 531:24, 532:16, 532:19, 535:12
**opinions** [5] - 453:18, 454:25, 464:21, 532:22, 536:9
**opportunity** [12] - 313:20, 314:22, 317:2, 319:15, 321:9, 356:25, 366:9, 411:6, 417:22, 419:11, 437:25, 438:8
**opposed** [3] - 351:24, 423:18, 501:20
**opposing** [2] - 345:13, 414:7
**Opposing** [1] - 347:12
**options** [4] - 323:17, 324:6, 324:23, 429:23
**orally** [1] - 542:25
**order** [9] - 324:19, 371:16, 371:20,

420:23, 430:23, 465:5, 470:7, 531:15, 534:17
**ordinarily** [3] - 348:13, 349:1, 420:14
**organic** [2] - 478:25, 479:1
**original** [6] - 363:1, 456:18, 456:20, 457:7, 457:8, 457:22
**originally** [1] - 354:5
**orthopedic** [1] - 453:24
**Otherwise** [1] - 391:21
**ought** [2] - 464:25, 538:7
**outlined** [1] - 468:2
**outside** [3] - 325:21, 326:10, 452:11
**Overall** [1] - 545:14
**overall** [2] - 339:23, 340:5, 540:11
**overblown** [1] - 320:19
**overlap** [2] - 466:11, 466:13
**overridingly** [1] - 427:7
**overrule** [1] - 316:18
**Overruled** [21] - 312:5, 313:16, 318:11, 318:25, 319:12, 320:13, 330:12, 331:7, 333:9, 336:25, 340:2, 354:12, 364:2, 372:22, 442:16, 461:13, 466:22, 473:17, 480:23, 483:24, 537:15
**overt** [2] - 315:15, 337:3
**overtly** [1] - 462:10
**own** [26] - 313:3, 337:20, 345:6, 346:23, 348:10, 353:17, 353:22, 369:9, 394:18, 394:25, 397:25, 401:25, 402:20, 408:15, 440:18, 450:3, 450:9, 450:14, 452:23, 484:9, 489:17, 489:19, 495:10, 496:4, 526:9, 536:21
**owner** [1] - 391:7

# P

p.m [1] - 379:11
P.O [1] - 307:18
pack [1] - 395:21
Pacman [2] - 456:13, 457:14
page [18] - 346:8, 346:9, 346:10, 346:11, 360:13, 377:6, 377:13, 378:15, 378:23, 379:7, 379:10, 380:12, 383:5, 386:10, 389:21, 418:21, 501:22, 546:10
PAGE [1] - 309:2
Page [23] - 346:11, 375:9, 376:22, 377:25, 378:8, 379:9, 380:8, 381:1, 381:9, 382:16, 385:20, 387:6, 390:22, 396:18, 396:20, 397:6, 410:25, 424:1, 501:5, 501:6, 501:19, 526:24
pages [4] - 377:7, 389:20, 546:13
Pages [3] - 389:22, 398:15, 488:12
pain [5] - 415:16, 416:21, 417:11, 433:13, 541:21
pains [4] - 346:7, 346:14, 416:23, 420:5
panic [1] - 385:24
paper [4] - 378:5, 458:5, 510:19
papers [6] - 463:10, 463:16, 464:7, 510:11, 510:12, 510:16
paragraph [12] - 378:9, 378:14, 378:23, 379:10, 381:10, 382:17, 383:5, 385:21, 386:18, 390:11, 392:23, 501:6
paragraphs [1] - 380:11
paranoia [1] - 524:11
paranoid [9] - 449:18, 449:22, 484:15, 488:9,

516:18, 521:15, 521:22, 523:1, 524:15
Paranoid [2] - 521:17, 521:19
paraphrase [1] - 461:22
Pardon [1] - 325:14
parent [1] - 455:4
Park [1] - 452:17
parsimonious [2] - 455:25, 471:2
part [37] - 316:8, 339:17, 354:17, 373:25, 374:11, 381:3, 385:20, 391:7, 395:5, 401:13, 401:18, 401:21, 403:9, 404:25, 412:15, 412:17, 419:24, 426:13, 426:14, 440:14, 450:15, 452:14, 459:11, 466:5, 467:1, 482:4, 482:20, 484:22, 485:2, 492:1, 492:5, 492:14, 494:20, 494:23, 501:24, 522:7, 522:16
partial [1] - 405:16
Partial [1] - 405:17
participants [1] - 468:1
participate [2] - 334:19, 368:25
participated [1] - 453:7
participating [1] - 429:24
participation [1] - 368:19
particular [20] - 314:20, 315:6, 316:10, 316:11, 316:16, 330:10, 333:21, 343:17, 343:20, 344:16, 356:10, 358:9, 366:16, 411:16, 414:19, 414:25, 415:6, 416:12, 420:17, 504:18
particularly [1] - 492:1
parties [1] - 542:24
partner [2] - 314:11, 381:2
parts [2] - 426:20, 426:22

Pass [2] - 342:5, 535:21
pass [1] - 353:8, 430:6, 523:18
passage [4] - 346:5, 353:16, 388:13, 388:19
passages [2] - 416:12, 425:22
passed [1] - 452:19
passport [3] - 378:13, 384:19, 385:11
past [3] - 472:6, 474:23, 536:25
patient [27] - 361:3, 361:9, 361:18, 364:11, 393:15, 393:20, 397:19, 424:20, 424:24, 425:1, 445:12, 445:17, 446:1, 446:5, 447:13, 448:14, 449:5, 449:6, 480:24, 481:5, 496:5, 496:19, 535:11, 539:20, 539:23, 540:2, 540:13
patient's [3] - 426:25, 427:8, 539:17
patients [10] - 393:20, 393:24, 424:18, 427:5, 427:12, 437:20, 459:1, 459:13, 476:16, 540:23
pattern [11] - 415:1, 419:17, 422:22, 422:25, 425:15, 443:17, 443:18, 471:20, 471:21, 473:15, 473:20
patterns [3] - 471:18, 473:7, 473:11
Pause [3] - 341:24, 360:2, 416:9
pawnshop [1] - 526:13
paying [1] - 365:7
PC [1] - 307:15
peace [1] - 387:20
peak [2] - 476:9, 476:18
penalty [6] - 323:23, 324:3, 336:17, 338:17, 400:12, 467:10
penetration [1] -

537:21
People [1] - 348:13
people [39] - 312:12, 315:7, 370:18, 371:25, 374:17, 374:18, 375:4, 375:17, 375:20, 376:1, 376:12, 395:12, 395:18, 409:7, 410:4, 410:5, 410:6, 410:17, 410:22, 411:15, 415:15, 436:15, 437:24, 438:9, 448:21, 458:22, 465:20, 474:3, 475:18, 475:25, 478:2, 481:18, 485:18, 487:16, 509:16, 522:13, 527:13, 528:16, 529:4
per [2] - 470:10, 545:17
perceive [1] - 427:8
perceiving [1] - 529:13
percent [2] - 477:20, 537:17
perception [1] - 456:5
perceptions [1] - 487:25
perceptual [1] - 484:18
perfect [1] - 477:25
perform [2] - 427:17, 469:17
performance [1] - 318:2
performed [2] - 317:3, 366:2
Perhaps [1] - 406:3
perhaps [7] - 338:15, 338:17, 360:11, 422:13, 436:9, 474:2, 516:4
period [6] - 319:24, 394:15, 409:9, 429:7, 472:10, 539:24
periods [4] - 408:3, 479:6, 479:7, 479:8
perjury [1] - 322:15
permanent [2] - 405:15, 486:24
permissible [1] - 387:17
Permit [1] - 534:12
permits [1] - 422:4

permitted [3] - 514:14, 525:20, 534:10
persecute [1] - 482:4
persecutory [1] - 508:2
persisted [1] - 350:16
person [34] - 312:23, 346:6, 361:13, 362:19, 362:20, 365:25, 370:16, 371:3, 371:15, 371:19, 374:14, 375:25, 395:8, 395:9, 405:19, 405:24, 409:23, 411:16, 422:13, 428:21, 436:15, 436:16, 443:24, 446:5, 448:3, 462:25, 467:12, 469:21, 471:19, 472:7, 473:4, 482:19, 529:13
personal [8] - 330:9, 345:6, 346:23, 353:17, 353:23, 452:25, 453:25, 484:9
personality [25] - 317:10, 407:17, 408:7, 422:1, 422:5, 422:11, 422:15, 422:20, 422:23, 442:6, 442:9, 442:11, 442:18, 442:24, 443:13, 443:15, 443:16, 443:21, 444:4, 444:8, 444:11, 445:6, 445:8, 445:9, 515:16
personally [3] - 314:24, 437:9, 438:1
perspective [3] - 422:17, 450:10, 450:12
perspectives [1] - 471:4
pertaining [1] - 403:13
pertains [1] - 446:12
pertinent [1] - 327:9
pervasive [2] - 444:13, 480:11
Pesell [2] - 413:5, 413:23
petitioner [1] - 458:10

**Petitioner** [1] - 307:4
**PETITIONER** [1] - 307:14
**petitioner's** [2] - 370:23, 370:25
**Petitioner's** [3] - 347:6, 389:19, 417:4
**Ph.D** [2] - 452:9, 481:1
**pharmacology** [1] - 491:20
**phase** [9] - 326:2, 326:9, 337:22, 345:16, 398:25, 400:10, 461:17, 487:8, 487:21
**Phil** [1] - 473:18
**PHILIP** [1] - 307:14
**philosophy** [2] - 484:13, 524:22
**phone** [5] - 366:1, 366:6, 366:7, 366:14, 379:18
**photographic** [1] - 405:7
**phrase** [6] - 403:7, 443:3, 487:9, 510:11, 524:13, 528:6
**phrases** [1] - 528:1
**phrasing** [1] - 489:23
**physical** [2] - 346:6, 541:15
**physically** [1] - 415:15
**physician** [1] - 453:8
**pick** [1] - 531:18
**picking** [2] - 336:2, 395:13
**picture** [4] - 378:4, 405:11, 472:5, 472:6
**piece** [5] - 374:21, 378:6, 493:15, 504:20, 505:20
**pistol** [4] - 386:19, 386:21, 391:3
**pitching** [1] - 392:11
**place** [10] - 330:3, 337:18, 373:4, 373:12, 373:15, 373:18, 375:14, 405:8, 424:8, 463:15
**placed** [1] - 388:5
**plain** [1] - 388:10
**plainly** [1] - 498:16
**plaintiff's** [1] - 353:16
**Plaintiff's** [2] - 434:12, 434:20
**plan** [3] - 415:24,

474:15, 481:10
**planning** [1] - 375:10
**players** [1] - 373:10
**playoffs** [1] - 456:11
**plays** [1] - 488:22
**plea** [8] - 323:7, 323:10, 323:11, 323:17, 324:6, 324:12, 324:13, 324:23
**pleading** [1] - 512:18
**pleadings** [1] - 419:13
**plot** [1] - 494:23
**plotted** [1] - 511:10
**plumber's** [1] - 409:3
**plumbing** [3] - 408:25, 409:1, 410:24
**plural** [1] - 517:13
**point** [22] - 312:17, 314:13, 331:22, 342:7, 344:25, 362:22, 364:21, 365:13, 372:9, 382:23, 398:4, 402:2, 430:12, 431:24, 443:15, 443:22, 443:25, 458:23, 458:25, 463:1, 467:13, 486:19, 491:11, 500:7, 501:22, 514:13, 514:25, 522:12, 540:18
**Point** [2] - 501:8, 514:20
**pointed** [1] - 397:21
**pointing** [2] - 380:11, 513:10
**points** [5] - 362:23, 473:18, 534:7, 534:14, 534:16
**police** [46] - 330:4, 334:6, 335:11, 335:14, 335:17, 335:19, 356:22, 374:18, 376:14, 377:23, 377:25, 380:7, 381:9, 381:17, 386:15, 386:20, 387:3, 388:7, 388:12, 420:15, 436:3, 438:23, 438:25, 439:1, 439:8, 439:14, 440:20, 440:21, 474:3, 475:23, 476:13, 485:14, 489:9,

489:10, 492:8, 493:8, 493:23, 494:2, 495:9, 496:22, 497:5, 497:7, 497:17, 523:24, 524:2
**Police** [13] - 321:21, 329:21, 330:13, 365:13, 377:17, 420:12, 436:17, 437:15, 437:17, 475:25, 488:18, 488:24, 492:11
**policemen** [1] - 489:8
**policy** [5] - 335:3, 335:5, 335:7, 335:9, 335:10
**poor** [1] - 507:24
**poorly** [1] - 407:9
**portion** [4] - 367:24, 442:12, 443:10, 461:16
**portions** [1] - 389:24
**portray** [2] - 338:13, 419:6
**portraying** [2] - 338:12, 506:3
**posed** [1] - 363:6
**position** [15] - 391:9, 410:3, 410:8, 410:10, 410:18, 413:3, 444:2, 464:8, 467:12, 489:25, 506:2, 506:11, 515:8, 521:8, 531:18
**positive** [1] - 314:19
**possess** [1] - 508:3
**possession** [1] - 415:3
**possibilities** [1] - 530:2
**possibility** [3] - 421:25, 422:10, 508:3
**possible** [21] - 311:17, 315:2, 329:25, 330:23, 349:4, 364:8, 393:11, 395:25, 405:21, 411:18, 425:13, 426:18, 455:21, 455:22, 457:13, 468:13, 476:20, 486:17, 486:21, 486:22, 527:10
**Possibly** [1] - 344:21
**possibly** [4] - 332:12, 338:15,

458:10, 516:6
**Post** [1] - 528:16
**post** [6] - 452:16, 472:6, 488:20, 508:13, 529:5, 530:1
**post-arrest** [1] - 530:1
**post-doctoral** [1] - 452:16
**posture** [2] - 505:11, 505:18
**Posture** [1] - 505:12
**potential** [2] - 384:15, 524:4
**potentially** [6] - 365:21, 384:11, 404:15, 425:3, 445:10, 542:7
**Potentially** [1] - 408:8
**potpourri** [2] - 345:7, 353:18
**poverty** [1] - 432:17
**power** [1] - 380:24
**powers** [1] - 508:4
**practice** [13] - 311:4, 314:10, 315:6, 436:3, 436:9, 436:10, 439:18, 452:4, 452:19, 453:4, 453:13, 453:21, 532:5
**practiced** [1] - 311:6
**practicing** [4] - 316:16, 343:25, 439:19, 453:19
**praising** [1] - 350:19
**pre** [7] - 432:25, 433:1, 452:15, 472:10, 488:19, 510:23, 520:19
**pre-crime** [1] - 472:10
**pre-doctoral** [1] - 452:15
**pre-morbid** [2] - 432:25, 433:1
**prefer** [1] - 542:25
**preference** [1] - 452:25
**preliminary** [1] - 455:14
**prepare** [2] - 391:5, 546:1
**preparing** [4] - 365:13, 365:14, 450:14, 459:20
**presence** [9] - 325:21, 326:10, 331:15, 405:19,

414:16, 422:12, 477:13, 537:9, 537:10
**present** [36] - 312:16, 332:11, 337:23, 337:24, 338:4, 338:6, 338:9, 355:12, 387:14, 396:24, 398:22, 401:4, 403:12, 406:25, 415:18, 418:25, 428:13, 428:22, 428:25, 429:1, 447:23, 448:1, 450:16, 460:13, 472:5, 479:9, 482:12, 482:14, 488:14, 488:17, 489:2, 526:5, 526:10, 539:23, 542:2, 544:10
**PRESENT** [1] - 307:22
**presentation** [8] - 332:22, 414:17, 435:24, 436:2, 445:22, 446:4, 478:24, 540:10
**presentations** [1] - 435:25
**presented** [10] - 338:7, 339:8, 369:14, 420:2, 432:6, 439:22, 471:5, 474:19, 476:16, 531:10
**presents** [2] - 361:19, 478:22
**presume** [1] - 384:20
**presumption** [1] - 457:6
**pretrial** [3] - 516:15, 519:8, 519:9
**pretty** [20] - 310:25, 317:17, 318:14, 320:14, 328:19, 330:16, 339:8, 340:16, 349:21, 351:20, 374:19, 462:9, 472:2, 478:11, 482:16, 488:2, 488:8, 506:22, 508:19, 545:7
**Pretty** [2] - 319:20, 349:9
**prevent** [5] - 332:12, 389:5, 420:9, 474:17, 494:23

**previous** [2] - 372:5, 431:4
**previously** [6] - 310:12, 346:3, 356:21, 360:6, 391:4, 476:16
**primarily** [2] - 401:2, 463:25
**primary** [3] - 398:23, 427:2, 454:4
**principles** [2] - 454:24, 455:10
**prison** [28] - 354:4, 354:19, 354:25, 374:18, 394:15, 394:23, 395:12, 396:4, 396:5, 398:1, 398:15, 407:9, 408:9, 408:17, 408:18, 408:19, 408:25, 409:6, 409:11, 415:14, 443:6, 443:14, 443:23, 443:24, 444:17, 445:2, 445:4, 511:12
**prisoners** [3] - 415:13, 415:15, 419:22
**prisons** [2] - 453:2, 453:4
**pristine** [1] - 482:7
**private** [1] - 452:19
**privilege** [1] - 322:3
**pro** [5] - 372:4, 372:17, 372:18, 372:25, 498:3
**pro's** [1] - 323:9
**probability** [1] - 544:14
**problem** [20] - 312:1, 318:2, 318:7, 318:16, 318:19, 322:15, 338:5, 340:4, 386:24, 423:8, 424:16, 437:10, 462:18, 470:1, 485:19, 521:22, 536:15, 537:3, 537:8, 545:12
**problems** [8] - 311:17, 319:16, 320:3, 338:14, 343:8, 348:2, 419:19, 444:16
**procedure** [2] - 424:17, 465:6
**procedures** [2] - 369:21, 464:17
**proceeded** [1] -

341:21
**proceeding** [6] - 369:3, 369:25, 370:8, 370:22, 412:8, 532:10
**Proceedings** [1] - 307:24
**PROCEEDINGS** [1] - 307:10
**proceedings** [25] - 332:8, 367:10, 367:23, 367:25, 368:2, 368:18, 369:7, 371:6, 371:9, 371:12, 371:17, 371:21, 373:8, 373:20, 412:11, 414:9, 420:3, 426:10, 430:2, 445:25, 482:13, 498:19, 526:6, 544:11, 547:2
**process** [12] - 340:5, 367:21, 384:18, 417:19, 427:2, 455:19, 456:6, 457:4, 459:13, 462:15, 464:1, 504:1
**processed** [1] - 459:11
**processing** [1] - 459:12
**proclaiming** [1] - 439:19
**prodromal** [1] - 487:8
**produced** [3] - 307:25, 465:12, 528:5
**professional** [7] - 310:18, 318:15, 341:17, 341:21, 410:9, 448:9, 463:12
**professor** [1] - 463:16
**profile** [2] - 422:21, 473:11
**profits** [1] - 346:19
**program** [3] - 466:6, 491:14, 491:15
**programs** [1] - 491:17
**progressed** [1] - 320:18
**projected** [1] - 427:3
**projections** [1] - 426:24
**prolific** [1] - 537:10
**promote** [1] - 369:10
**prong** [1] - 450:15

**pronounced** [2] - 520:17, 520:20
**proof** [1] - 543:24
**property** [2] - 379:5, 381:8
**prosecuted** [1] - 525:16
**prosecution** [14] - 323:12, 323:23, 479:22, 502:3, 520:1, 524:7, 524:11, 524:14, 525:2, 525:5, 529:19, 533:25, 534:2, 534:17
**prosecutor** [2] - 334:8, 334:12
**prosecutor's** [1] - 531:18
**prosecutors** [1] - 453:16
**prospect** [1] - 505:22
**protect** [1] - 384:10
**protected** [1] - 445:25
**protections** [1] - 426:2
**protesting** [1] - 480:17
**prove** [2] - 383:11, 457:8
**proves** [1] - 545:19
**provide** [6] - 368:15, 412:14, 438:17, 445:20, 453:18, 458:12
**provided** [9] - 345:13, 412:15, 439:24, 440:9, 441:16, 462:3, 476:6, 512:21, 544:24
**providers** [1] - 497:4
**providing** [6] - 372:12, 372:16, 412:11, 481:15, 496:17
**prudent** [1] - 545:7
**psych** [1] - 516:4
**psychiatric** [9] - 452:15, 459:1, 471:21, 472:25, 480:14, 501:21, 528:11, 528:13
**psychiatrist** [6] - 312:8, 314:18, 349:13, 349:14, 350:3, 350:5
**psychiatrists** [2] - 462:21, 529:22

**psychological** [8] - 424:8, 431:10, 448:9, 496:17, 500:5, 516:4, 516:15, 535:12
**psychologically** [2] - 477:6, 497:20
**psychologist** [13] - 312:9, 314:18, 431:19, 452:3, 453:7, 453:11, 453:20, 459:3, 487:24, 506:20, 523:25, 535:15, 542:13
**psychologists** [8] - 453:1, 453:3, 462:20, 466:1, 466:12, 514:5, 529:21
**Psychology** [2] - 454:15, 454:17
**psychology** [10] - 439:20, 452:4, 452:7, 452:8, 452:9, 452:13, 454:20, 454:22, 466:6, 491:2
**psychosis** [5] - 474:25, 476:10, 476:18, 477:3, 512:14
**psychotic** [23] - 406:4, 406:7, 417:1, 472:20, 477:16, 477:21, 478:3, 478:7, 478:9, 484:7, 487:16, 489:5, 493:19, 502:19, 502:1, 502:22, 502:24, 503:6, 512:19, 512:21, 525:9, 528:7
**psychotics** [1] - 459:9
**publication** [1] - 453:8
**published** [5] - 452:22, 452:23, 453:6, 453:9, 491:13
**pull** [3] - 377:6, 392:2, 513:5
**pulled** [2] - 377:1, 392:7
**pulling** [1] - 469:25
**pulse** [1] - 381:5
**punishment** [24] - 325:9, 326:5, 326:9, 331:15, 332:11, 333:18, 336:15, 337:22, 337:23,

338:1, 338:11, 338:20, 345:16, 348:19, 355:13, 398:25, 400:10, 403:7, 461:17, 518:15, 534:4, 534:18, 534:19, 534:23
**purchase** [1] - 472:22
**purchased** [1] - 328:8
**purports** [1] - 357:7
**purpose** [4] - 341:15, 392:15, 527:19, 533:16
**purposes** [2] - 351:21, 445:22
**pursuant** [1] - 415:24
**pursue** [1] - 366:20
**pursued** [2] - 518:2
**push** [1] - 481:6
**pushed** [1] - 482:6
**put** [14] - 310:5, 314:19, 330:1, 332:16, 334:2, 348:14, 348:18, 348:20, 375:14, 387:23, 391:25, 420:14, 472:23, 522:22
**Put** [1] - 513:24
**putting** [1] - 533:16, 533:17

## Q

**qualifications** [1] - 545:4
**qualified** [7] - 317:5, 317:7, 473:8, 473:9, 491:5, 524:12, 524:17
**qualify** [3] - 443:13, 444:4, 474:18
**quality** [3] - 460:20, 463:12, 475:7
**quarterbacking** [1] - 456:9
**QUARTERMAN** [1] - 307:7
**queried** [1] - 423:12
**questioned** [6] - 338:20, 406:17, 423:16, 485:18, 499:2, 509:16
**questioning** [12] - 313:12, 338:21,

340:8, 354:11,
357:16, 363:20,
372:21, 383:19,
384:1, 413:10,
438:21, 461:1
**questions** [101] -
313:7, 321:2, 323:5,
323:23, 324:1,
328:24, 329:8,
338:18, 340:19,
344:3, 344:8,
360:11, 363:6,
367:4, 367:6,
367:14, 367:20,
368:6, 368:9,
368:10, 368:11,
368:12, 373:5,
373:8, 373:13,
376:5, 376:7, 401:2,
401:6, 411:3,
411:15, 412:7,
424:11, 424:14,
424:20, 424:22,
424:25, 425:4,
425:13, 426:11,
426:12, 426:15,
427:24, 428:1,
428:8, 428:9, 446:9,
446:14, 446:16,
446:18, 446:21,
446:25, 447:2,
447:11, 447:12,
450:24, 460:25,
463:2, 465:6,
465:16, 465:17,
465:23, 466:9,
466:14, 468:1,
468:24, 469:18,
470:15, 478:1,
485:22, 490:8,
500:21, 500:23,
501:5, 502:23,
508:20, 509:1,
509:6, 509:12,
509:19, 509:20,
509:25, 510:3,
517:20, 518:7,
518:15, 518:16,
527:2, 527:3, 527:8,
527:21, 527:22,
532:14, 533:1,
533:4, 535:24,
538:9, 538:22,
541:3, 541:4, 542:18
**quick** [1] - 535:24
**quiet** [2] - 482:19
**Quijano** [90] -
324:21, 328:16,
338:4, 341:15,
350:9, 350:10,
350:12, 350:14,

352:9, 357:4, 357:6,
373:20, 376:2,
389:4, 389:11,
390:12, 390:15,
392:5, 392:12,
399:23, 400:3,
401:24, 402:6,
410:7, 410:9, 413:6,
413:16, 413:23,
417:5, 422:8,
423:17, 424:4,
425:11, 429:11,
433:15, 433:17,
446:15, 446:16,
447:11, 447:12,
447:20, 447:21,
454:16, 460:14,
461:7, 464:17,
467:12, 467:14,
471:4, 484:23,
485:20, 488:6,
488:7, 489:3, 498:8,
498:12, 499:8,
499:14, 500:5,
500:9, 500:21,
501:20, 502:21,
503:9, 503:10,
503:19, 508:25,
509:8, 509:11,
510:2, 515:11,
515:13, 515:14,
519:13, 520:21,
523:7, 525:10,
526:2, 527:2,
527:17, 529:12,
531:2, 531:10,
533:23, 535:5,
535:13
**Quijano's** [32] -
328:16, 341:13,
373:21, 389:12,
389:15, 390:3,
423:13, 429:21,
433:24, 437:12,
447:20, 458:4,
461:16, 462:15,
464:1, 464:6, 464:7,
465:21, 466:15,
466:17, 470:18,
471:1, 489:17,
494:18, 500:19,
508:16, 508:20,
509:6, 510:11,
524:6, 527:6, 532:24
**quite** [10] - 322:11,
338:23, 338:24,
339:2, 339:3, 339:4,
387:2, 454:9,
476:21, 523:24
**quotations** [1] -
425:22

**quote** [2] - 390:20,
505:18
**quotes** [4] - 425:10,
426:5, 467:3, 467:5
**quoting** [1] - 509:9

## R

**radically** [2] - 320:8,
322:7
**radio** [1] - 382:22
**Raines** [1] - 332:3
**raise** [2] - 417:19,
499:17
**raised** [1] - 334:10
**raising** [1] - 520:13
**ramble** [1] - 402:11
**ramifications** [1] -
505:10
**Randolph** [6] -
315:1, 411:17,
429:6, 429:11,
498:16, 507:7
**random** [1] - 438:25
**Randy** [13] - 315:1,
315:8, 316:5, 316:9,
316:11, 316:22,
318:8, 318:14,
338:2, 338:7,
338:20, 353:3, 531:1
**range** [3] - 394:7,
477:18, 478:4
**rape** [5] - 331:3,
331:9, 333:10,
358:18
**raped** [6] - 320:12,
327:25, 330:22,
332:18, 349:8,
358:10
**raping** [1] - 503:1
**rare** [3] - 537:23,
537:25, 539:20
**rarely** [1] - 537:23
**rash** [1] - 470:3
**rather** [9] - 311:21,
322:22, 384:2,
386:24, 419:3,
456:20, 510:1,
524:23, 537:13
**rational** [38] -
362:20, 376:3,
389:25, 399:6,
399:7, 402:22,
406:15, 407:1,
407:5, 415:24,
419:4, 419:7,
423:10, 426:10,
426:14, 427:6,
427:10, 427:20,

448:5, 448:7,
448:18, 448:25,
449:2, 450:17,
467:8, 472:22,
481:2, 488:2, 488:8,
488:10, 496:2,
506:1, 512:19,
523:11, 528:7,
528:18, 528:19,
528:23
**rationality** [4] -
472:17, 505:6,
506:4, 506:6
**rationally** [10] -
386:24, 401:7,
406:22, 429:22,
450:3, 481:14,
482:13, 506:18,
524:24, 526:8
**reach** [4] - 365:24,
455:11, 468:19,
469:12
**reacted** [1] - 509:6
**reaction** [3] - 395:16,
421:21, 461:15
**Read** [1] - 336:21
**read** [37] - 336:24,
346:2, 346:3, 346:5,
346:16, 353:16,
380:9, 382:15,
387:7, 395:14,
406:11, 420:20,
431:6, 431:12,
439:2, 440:25,
441:2, 441:3,
441:10, 454:10,
465:21, 481:8,
485:23, 487:2,
488:17, 490:22,
490:23, 491:1,
491:4, 491:19,
492:20, 492:24,
494:21, 494:25,
495:1, 512:17,
524:20
**reading** [13] -
377:25, 378:9,
386:17, 389:7,
480:24, 490:19,
492:2, 492:22,
505:4, 512:13,
512:16, 513:6, 513:7
**readjust** [1] - 455:16
**reads** [1] - 424:2
**ready** [3] - 311:3,
342:12, 359:20
**real** [4] - 407:19,
409:17, 496:25,
544:13
**reality** [3] - 397:23,

443:4, 443:12
**realize** [6] - 350:9,
350:14, 501:14,
521:15, 521:23,
534:24
**realized** [2] - 381:17,
504:3
**realizing** [1] - 494:24
**Really** [1] - 453:21
**really** [31] - 315:14,
319:1, 321:6, 329:3,
329:5, 340:17,
345:3, 387:22,
388:1, 408:12,
408:14, 409:4,
455:7, 456:11,
456:18, 458:23,
464:20, 477:4,
477:5, 477:8, 480:6,
482:17, 486:20,
492:11, 503:25,
529:5, 533:17,
540:1, 541:20,
545:12
**reason** [22] - 315:7,
334:23, 341:16,
366:16, 374:7,
374:10, 381:15,
411:18, 443:12,
476:6, 486:18,
493:20, 495:3,
495:6, 495:21,
500:15, 515:1,
515:6, 521:21,
531:3, 531:12, 535:2
**reasonable** [5] -
395:16, 402:18,
450:17, 468:19,
544:6
**reasoned** [1] - 469:5
**reasoning** [2] -
358:22, 423:8
**reasons** [7] - 315:8,
369:8, 445:3,
457:12, 457:14,
475:7, 475:13
**rebuttal** [2] - 451:13,
539:7
**REBUTTAL** [1] -
309:16
**recalled** [1] - 499:6
**receipt** [1] - 424:7
**receive** [1] - 545:25
**received** [2] - 445:3,
484:25
**receives** [1] - 426:25
**receiving** [3] - 416:1,
445:14, 484:25
**recent** [2] - 497:1,
497:13

**recollect** [1] - 344:16
**recollection** [7] - 319:14, 329:7, 335:22, 358:1, 403:5, 412:5, 431:5
**recollections** [1] - 357:11
**recommend** [8] - 333:6, 516:21, 517:11, 517:19, 518:5, 518:6, 519:9, 519:17
**recommendation** [1] - 517:21
**recommended** [3] - 323:14, 332:20, 333:12
**reconstruct** [1] - 544:19
**reconvene** [1] - 411:7
**Reconvene** [1] - 490:10
**record** [35] - 326:9, 326:20, 331:17, 332:6, 338:21, 345:9, 348:21, 355:22, 362:24, 380:17, 410:24, 414:12, 421:17, 434:23, 440:13, 440:20, 449:18, 449:21, 482:24, 482:25, 492:15, 494:21, 499:2, 514:1, 514:3, 519:6, 521:3, 524:3, 526:24, 528:4, 540:18, 544:16, 546:16, 547:2
**recorded** [2] - 307:24, 392:4
**recording** [2] - 390:8, 390:9
**records** [45] - 321:8, 321:9, 321:10, 338:5, 356:22, 376:14, 376:15, 377:18, 395:5, 395:7, 396:7, 396:11, 396:15, 396:17, 397:1, 397:5, 397:6, 397:9, 397:13, 398:14, 408:24, 409:2, 410:25, 412:5, 418:22, 418:23, 421:8, 430:2, 436:18, 437:16, 437:17, 438:3,

438:5, 438:23, 439:24, 446:11, 470:25, 474:3, 484:24, 487:18, 488:18, 526:23, 544:20, 544:22
**recounting** [1] - 437:13
**recourse** [1] - 426:3
**recreate** [1] - 465:23
**RECROSS** [3] - 430:10, 533:5, 538:11
**Recross** [3] - 309:10, 309:13, 309:14
**recross** [2] - 359:14, 430:8
**RECROSS-EXAMINATION** [3] - 430:10, 533:5, 538:11
**Recross-Examination** [3] - 309:10, 309:13, 309:14
**rectal** [1] - 346:14
**recused** [1] - 369:4
**redirect** [7] - 353:10, 402:10, 402:21, 411:14, 429:3, 482:22, 513:8
**Redirect** [4] - 309:7, 309:9, 309:13, 309:14
**REDIRECT** [4] - 353:12, 411:12, 523:22, 536:19
**redirectable** [1] - 483:25
**reduce** [1] - 323:12
**Reentry** [1] - 404:13
**refer** [3] - 353:15, 389:12, 546:15
**reference** [4] - 376:21, 477:4, 488:11, 538:16
**referenced** [1] - 433:7
**references** [3] - 416:25, 485:14, 511:2
**referred** [1] - 418:5
**referring** [10] - 376:21, 377:17, 378:8, 389:21, 410:6, 491:3, 496:13, 501:17, 502:2, 536:15
**refined** [1] - 496:12
**refining** [1] - 455:17

**reflect** [4] - 425:19, 522:21, 524:23, 537:3
**reflected** [9] - 338:9, 339:8, 349:20, 357:18, 400:1, 421:17, 468:2, 524:10, 528:17
**reflective** [1] - 429:14
**reflects** [5] - 332:6, 348:21, 352:24, 416:13, 434:17
**refresher** [1] - 492:2
**refused** [3] - 319:5, 371:3, 407:10
**refuses** [1] - 397:19
**refute** [1] - 436:14
**refuted** [1] - 438:23
**refutes** [3] - 364:11, 364:18, 365:10
**refuting** [2] - 436:22, 444:25
**regard** [1] - 334:3
**regarding** [16] - 324:25, 325:2, 334:1, 366:1, 412:1, 412:2, 416:14, 431:23, 459:25, 483:19, 488:18, 491:18, 495:15, 517:25, 537:8, 544:1
**Regarding** [1] - 508:8
**regards** [2] - 381:18, 405:2
**regions** [2] - 426:23, 427:2
**regular** [2] - 330:14, 454:3
**regularly** [1] - 466:12
**rejecting** [1] - 323:10
**related** [13] - 328:18, 345:5, 358:5, 424:3, 444:14, 444:21, 457:2, 457:3, 463:2, 468:11, 500:18, 508:21, 512:11
**relates** [1] - 445:23
**relating** [1] - 470:15
**relationship** [1] - 393:24
**relationships** [1] - 429:15
**Relative** [1] - 508:9
**relative** [2] - 424:7, 508:9
**relatively** [2] - 428:16, 497:13
**relatives** [2] - 496:1,

520:25
**release** [1] - 511:12
**released** [9] - 359:19, 409:11, 415:14, 419:22, 445:24, 446:11, 451:6, 539:4, 542:22
**releasing** [1] - 415:15
**relevance** [6] - 313:12, 322:21, 354:10, 442:15, 480:19, 525:21
**Relevance** [1] - 363:23
**relevancy** [4] - 363:20, 372:20, 461:10, 532:9
**relevant** [10] - 333:18, 333:20, 336:23, 362:1, 410:20, 495:12, 497:19, 497:20, 508:8, 508:14
**reliability** [4] - 439:13, 461:5, 492:9, 521:13
**reliable** [8] - 351:20, 351:24, 439:6, 454:8, 456:7, 479:24, 495:10, 529:25
**relied** [7] - 350:12, 351:16, 355:14, 355:19, 398:24, 483:22, 492:7
**religion** [4] - 315:6, 316:16, 345:4, 387:24
**religions** [2] - 349:23, 349:24
**religious** [10] - 345:2, 345:7, 346:21, 353:18, 388:16, 388:17, 432:11, 484:9, 494:24, 497:21
**rely** [13] - 330:16, 348:4, 349:2, 349:5, 355:4, 355:6, 356:6, 399:10, 454:3, 454:24, 483:21, 489:17, 545:3
**relying** [3] - 356:6, 356:8, 399:9
**remain** [1] - 488:25
**remained** [2] - 478:18, 478:19
**remember** [67] - 313:20, 315:12,

316:5, 316:19, 317:12, 317:21, 320:10, 320:19, 321:5, 321:7, 326:23, 327:1, 327:4, 327:6, 327:20, 327:24, 328:4, 328:6, 328:7, 329:3, 329:13, 329:15, 331:8, 331:21, 333:19, 340:3, 340:14, 341:8, 344:20, 348:9, 348:18, 348:20, 350:21, 354:6, 355:11, 356:9, 356:10, 356:15, 356:17, 358:8, 358:17, 360:4, 366:8, 366:20, 366:21, 372:5, 372:7, 372:8, 372:9, 380:21, 400:25, 401:3, 401:6, 403:2, 411:21, 429:10, 457:20, 458:3, 459:24, 469:2, 469:3, 491:18, 500:13, 505:4, 511:13, 522:6, 537:1
**remembered** [3] - 386:2, 399:19, 399:22
**remembers** [1] - 359:9
**remembrance** [1] - 340:13
**remission** [2] - 405:16, 405:17
**removal** [1] - 405:18
**remove** [1] - 513:19
**render** [1] - 500:1
**rendered** [1] - 545:17
**renew** [1] - 467:11
**repeat** [4] - 364:3, 423:15, 507:13, 507:17
**repeated** [1] - 390:24
**repeatedly** [1] - 366:8
**repetitive** [1] - 360:12
**Rephrase** [1] - 318:5
**rephrase** [4] - 315:24, 324:15, 327:14, 333:22
**rephrasing** [1] - 425:11

**replete** [1] - 419:9
**replied** [1] - 431:19
**reply** [2] - 437:5,
440:14
**report** [71] - 312:17,
324:21, 328:17,
335:17, 335:19,
335:21, 350:12,
359:1, 365:14,
372:12, 372:17,
373:21, 373:25,
377:23, 377:25,
380:7, 381:10,
389:7, 389:12,
389:16, 389:22,
389:23, 395:4,
396:24, 399:17,
400:15, 423:14,
423:17, 424:7,
425:6, 429:21,
430:25, 433:13,
433:17, 433:18,
433:24, 437:10,
437:12, 437:15,
437:18, 439:8,
439:14, 463:25,
465:11, 465:21,
466:16, 466:18,
468:2, 468:6, 468:8,
470:18, 471:1,
476:12, 483:8,
485:9, 493:9,
493:14, 493:25,
494:2, 494:18,
495:9, 495:17,
500:19, 501:22,
503:5, 505:4,
505:21, 524:6
**reported** [5] -
373:20, 403:17,
415:12, 503:7,
520:19
**reportedly** [2] -
480:1, 536:24
**reporter** [1] - 443:9
**REPORTER** [8] -
308:3, 325:17,
325:19, 379:21,
379:25, 407:3,
442:20, 543:14
**Reporter** [1] - 547:6
**reporter's** [1] -
526:24
**reporting** [1] -
433:22
**reports** [35] - 321:21,
329:22, 330:6,
330:16, 335:11,
350:19, 350:25,
351:3, 351:14,

351:22, 357:6,
394:13, 395:18,
395:25, 398:17,
420:12, 420:14,
420:15, 433:12,
433:14, 433:16,
436:4, 438:12,
463:12, 492:9,
492:11, 509:2,
514:4, 523:8,
523:24, 536:22,
536:23
**represent** [5] -
316:23, 319:2,
331:23, 332:2, 332:8
**representation** [14] -
319:22, 319:24,
344:25, 347:10,
347:13, 347:15,
352:14, 352:18,
352:25, 429:13,
486:15, 498:25,
499:13, 518:4
**representative** [2] -
461:18, 498:18
**representatives** [1] -
419:23
**represented** [4] -
356:4, 373:1, 429:6,
429:7
**representing** [2] -
372:13, 406:13
**represents** [1] -
429:12
**request** [9] - 387:10,
419:7, 519:17,
519:18, 519:20,
520:4, 520:10, 544:3
**requested** [6] -
317:8, 319:4,
336:24, 341:13,
385:11, 532:3
**requests** [1] - 384:22
**require** [5] - 482:7,
482:9, 482:10,
482:11, 496:19
**required** [4] -
323:22, 369:17,
371:10, 452:21
**requirements** [1] -
477:23
**requires** [3] - 472:17,
482:11, 496:3
**requisite** [1] - 544:1
**research** [6] - 453:3,
454:5, 454:10,
454:11, 457:23,
477:15
**researchers** [2] -
487:4, 538:15

**residences** [1] -
408:1
**resisted** [1] - 391:22
**Resnik** [1] - 473:18
**respond** [3] - 329:8,
368:22, 461:25
**responded** [2] -
344:16, 368:9
**Respondent** [3] -
307:8, 421:25,
423:12
**respondent** [7] -
370:23, 412:1,
412:7, 417:16,
420:11, 423:16,
492:13
**RESPONDENT** [1] -
307:17
**Respondent's** [4] -
375:9, 376:22,
389:19, 488:12
**respondent's** [3] -
371:1, 382:16,
459:16
**Respondents** [1] -
451:15
**respondents** [1] -
546:21
**responding** [1] -
328:23
**responds** [1] -
340:10
**response** [9] -
353:17, 385:7,
412:1, 414:8, 425:7,
425:8, 441:9,
519:23, 525:4
**responses** [1] -
509:4
**responsible** [1] -
337:18
**responsive** [3] -
462:10, 523:15,
537:13
**responsiveness** [1] -
513:17
**rest** [7] - 362:17,
403:10, 479:6,
479:7, 479:8,
480:12, 506:5
**result** [6] - 329:19,
336:17, 408:6,
444:19, 445:11,
464:2
**resulted** [2] - 324:3,
501:5
**results** [2] - 350:16,
423:25
**resume** [1] - 360:4
**retained** [2] - 516:20,

519:10
**retroactively** [1] -
468:13
**return** [1] - 416:3
**returns** [1] - 481:5
**reveal** [2] - 465:18,
524:4
**reverse** [1] - 324:19,
484:12
**review** [21] - 321:20,
356:21, 356:25,
365:12, 365:21,
365:22, 366:24,
373:18, 395:6,
413:8, 414:24,
417:22, 419:11,
420:22, 420:24,
421:7, 423:18,
459:15, 526:12,
535:25
**reviewed** [13] -
365:17, 372:10,
397:13, 414:23,
419:1, 422:4, 430:3,
457:23, 460:24,
470:18, 472:10,
487:19, 523:24
**reviewing** [1] -
413:10, 418:23,
418:24, 484:24
**revolving** [1] - 476:4
**rewording** [1] -
390:3
**Richard** [1] - 454:14
**rid** [1] - 379:2
**rights** [6] - 325:11,
331:12, 387:8,
444:13, 468:23,
476:2
**rise** [1] - 338:16
**rises** [1] - 477:20
**risk** [2] - 453:15,
454:11
**rob** [1] - 386:3
**robbed** [2] - 341:7,
528:21
**robberies** [3] -
310:24, 354:5,
473:15
**robbery** [14] - 331:2,
331:3, 380:17,
381:2, 381:24,
384:18, 385:25,
387:11, 388:11,
474:14, 493:2,
528:15, 528:21,
528:22
**Robert** [1] - 412:22
**rocket** [1] - 455:13
**Rogers** [1] - 454:14

**role** [12] - 313:1,
315:20, 329:10,
331:19, 368:12,
368:14, 369:2,
369:7, 457:25,
490:2, 518:22,
529:21
**roles** [2] - 316:2,
373:9
**roof** [3] - 374:13,
476:5, 485:15
**room** [4] - 378:16,
378:18, 378:21,
378:24
**routinely** [3] -
351:11, 452:20,
453:11
**row** [11] - 395:1,
404:14, 406:5,
406:8, 406:20,
409:7, 409:8,
435:22, 487:20,
506:7, 527:7
**RPR** [1] - 547:5
**Rulford** [15] -
307:22, 390:22,
391:1, 391:2, 391:3,
391:9, 391:10,
391:12, 391:20,
391:22, 391:23,
392:2, 392:5, 392:7,
392:21
**RULFORD** [1] -
307:3
**Rulford's** [2] -
390:25, 392:4
**run** [2] - 310:25,
338:6
**runaway** [1] - 511:16
**running** [1] - 391:9
**Rusk** [4] - 308:4,
452:16, 458:24,
480:14
**Rutgers** [1] - 453:7
**Rytting** [19] - 342:25,
347:2, 411:11,
412:4, 418:1,
435:13, 450:22,
451:7, 463:23,
490:15, 527:4,
528:2, 532:15,
533:2, 538:10,
539:6, 542:19,
543:4, 546:18
**RYTTING** [143] -
307:14, 311:20,
312:3, 313:11,
314:1, 315:22,
316:14, 318:4,
318:10, 318:24,

319:8, 320:9,
322:20, 324:9,
324:15, 325:14,
325:18, 325:20,
327:2, 327:12,
327:21, 330:8,
331:5, 333:8,
333:20, 336:11,
336:19, 336:22,
339:11, 342:9,
342:14, 342:17,
343:2, 345:8,
345:12, 345:15,
345:20, 346:10,
346:13, 347:3,
347:8, 347:18,
347:19, 353:8,
354:8, 354:10,
354:21, 355:1,
356:14, 357:13,
357:24, 358:7,
359:2, 359:7,
359:15, 363:19,
372:20, 373:24,
376:23, 377:9,
377:13, 383:20,
409:5, 409:9, 411:2,
411:13, 411:24,
416:4, 416:6,
416:10, 418:2,
418:3, 418:9,
418:11, 418:13,
418:15, 421:16,
421:24, 423:22,
423:24, 428:1,
428:7, 430:6,
431:17, 434:25,
435:4, 435:7,
442:15, 450:23,
451:9, 451:12,
461:10, 463:6,
464:5, 466:21,
467:11, 473:6,
480:19, 482:23,
483:14, 483:17,
490:12, 490:16,
490:18, 492:16,
492:18, 492:19,
496:10, 499:5,
501:2, 512:15,
512:25, 513:2,
513:5, 513:8,
513:12, 513:19,
513:24, 513:25,
514:17, 514:19,
517:22, 523:15,
523:18, 525:18,
531:4, 532:9, 533:4,
533:6, 534:15,
535:21, 537:12,
538:12, 538:22,

539:7, 539:13,
541:2, 542:20,
543:5, 543:18,
543:22, 546:3,
546:19
**Rytting............490**
[1] - 309:12
**Rytting...........343** [1]
- 309:6
**Rytting...........539** [1]
- 309:18
**Rytting...........533** [1]
- 309:13
**Rytting............411** [1]
- 309:9
**Rytting..538** [1] -
309:14

**S**

**safe** [8] - 380:16,
381:24, 391:6,
391:14, 391:18,
434:2, 475:1, 475:11
**sales** [1] - 379:13
**salient** [3] - 493:15,
493:22, 494:4
**sane** [9] - 349:15,
363:7, 471:13,
472:11, 473:1,
473:21, 488:23,
532:19, 532:25
**sanity** [19] - 311:18,
340:20, 341:16,
372:1, 453:15,
454:12, 458:11,
458:17, 462:17,
462:22, 471:9,
471:22, 473:2,
473:19, 475:24,
489:10, 499:21,
529:24, 530:4
**sat** [3] - 366:23,
498:8, 498:12
**save** [1] - 512:8
**saw** [17] - 343:15,
354:15, 357:8,
369:13, 395:12,
395:19, 410:12,
418:22, 433:12,
435:10, 446:1,
453:22, 459:8,
468:8, 470:25,
489:3, 517:18
**scared** [1] - 525:8
**scene** [6] - 473:3,
473:24, 474:4,
474:10, 474:16,
474:17

**scenes** [1] - 475:3
**scheduled** [1] -
366:3
**schema** [1] - 419:24
**schizo** [1] - 448:16
**schizophrenia** [63] -
361:3, 361:10,
361:13, 361:18,
362:6, 364:11,
364:16, 393:11,
393:15, 393:20,
393:21, 393:25,
394:2, 394:10,
395:24, 405:15,
407:14, 409:24,
410:21, 422:8,
422:10, 422:13,
423:1, 427:5, 427:8,
428:24, 432:19,
442:6, 442:9,
447:13, 448:3,
448:14, 448:21,
449:14, 449:15,
458:14, 458:22,
470:7, 470:9,
470:10, 476:22,
477:14, 477:16,
478:6, 479:12,
480:10, 481:3,
481:20, 482:1,
484:3, 484:18,
486:17, 486:24,
490:24, 491:1,
491:2, 491:4, 491:6,
491:18, 491:21,
503:23, 535:17,
535:20
**Schizophrenia** [1] -
487:1
**schizophrenic** [17] -
397:22, 409:15,
409:18, 409:20,
409:23, 442:13,
443:5, 448:11,
448:19, 476:16,
476:17, 477:8,
481:8, 481:11,
504:1, 506:3, 537:5
**schizophrenics** [7] -
459:2, 478:13,
483:7, 487:17,
526:20, 537:10
**school** [2] - 480:16,
505:15
**schools** [1] - 453:3
**science** [6] - 454:21,
454:22, 455:2,
456:3, 473:10,
477:23
**scientific** [6] -

360:21, 402:19,
454:24, 455:3,
455:10, 456:6
**scientifically** [2] -
479:24, 529:25
**scientist** [7] -
360:14, 363:9,
363:13, 364:5,
455:13, 473:10
**scuffle** [1] - 381:13
**se** [6] - 372:4,
372:17, 372:18,
372:25, 470:10,
545:17
**seat** [2] - 310:8,
451:22
**Sebastian** [1] -
480:25
**second** [18] - 316:21,
340:9, 341:23,
346:10, 361:12,
379:9, 382:17,
385:21, 386:17,
392:23, 411:17,
428:5, 436:16,
451:18, 471:20,
524:13, 532:3, 537:7
**Secondary** [1] -
533:23
**secondary** [11] -
454:4, 454:13,
457:20, 457:24,
529:13, 529:20,
530:2, 533:7,
533:11, 533:14,
533:20
**Secondly** [1] -
475:10
**section** [9] - 423:13,
423:17, 423:25,
424:1, 424:2,
424:14, 425:6,
501:16, 501:19
**security** [1] - 459:11
**see** [54] - 315:14,
316:4, 317:2,
319:25, 326:23,
335:15, 357:25,
359:5, 359:25,
363:21, 369:14,
371:3, 377:19,
389:23, 390:22,
396:11, 396:14,
397:12, 398:5,
402:1, 419:3,
419:17, 434:24,
450:7, 450:12,
455:14, 458:10,
460:22, 462:7,
462:19, 464:8,

472:9, 473:14,
473:16, 474:8,
474:19, 476:13,
479:1, 479:8,
484:25, 487:16,
487:18, 488:6,
492:23, 510:22,
513:1, 523:7, 523:8,
525:21, 528:17,
530:3, 536:15,
539:20
**seeing** [3] - 395:17,
396:19, 454:1
**seek** [2] - 360:17,
426:3
**seeking** [1] - 386:24
**self** [6] - 381:14,
381:15, 384:17,
388:10, 388:12,
395:4
**self-defense** [5] -
381:14, 381:15,
384:17, 388:10,
388:12
**sell** [1] - 379:12
**seminar** [1] - 445:15
**seminars** [1] - 466:7
**sending** [1] - 475:18
**sensation** [2] -
541:15, 541:16
**sensations** [1] -
537:21
**sense** [15] - 332:20,
344:13, 369:21,
369:25, 436:8,
456:17, 457:3,
458:3, 458:10,
478:13, 509:2,
510:7, 518:12,
519:1, 524:11
**sensory** [4] - 426:24,
427:2, 427:9, 428:18
**sent** [3] - 395:1,
434:17, 506:7
**sentence** [8] -
323:13, 338:19,
514:20, 515:2,
524:6, 524:7,
524:13, 525:21
**sentences** [3] -
403:6, 506:16, 528:1
**sentencing** [1] -
412:13
**separate** [3] -
335:16, 335:21,
358:25
**September** [1] -
435:11
**sequencing** [2] -
419:6, 423:10

**sergeant** [1] - 381:16
**Sergeant** [4] - 378:1, 380:17, 380:20, 439:10
**series** [4] - 425:17, 500:21, 501:5, 518:7
**serious** [4] - 336:16, 340:4, 344:8, 518:14
**seriously** [1] - 502:18
**seriousness** [1] - 343:23
**Serrano** [1] - 413:1
**session** [2] - 319:10, 367:7
**set** [3] - 395:20, 414:1, 480:5
**setting** [3] - 445:17, 446:2, 446:6
**seven** [1] - 458:25
**several** [12] - 345:21, 348:17, 359:8, 387:9, 413:4, 420:11, 456:4, 459:5, 472:14, 502:25, 510:9, 543:7
**severe** [15] - 361:23, 361:24, 362:6, 393:2, 393:3, 427:20, 449:2, 476:10, 481:12, 484:7, 487:7, 500:1, 526:7, 540:11
**severely** [1] - 409:25
**severity** [11] - 336:9, 336:15, 361:11, 361:20, 404:11, 448:6, 449:2, 484:5, 539:22, 540:25, 542:5
**sexual** [11] - 310:24, 374:14, 384:4, 389:5, 449:18, 449:22, 485:15, 495:19, 511:2, 529:10, 529:11
**sexually** [15] - 320:11, 346:7, 358:10, 374:9, 375:1, 375:12, 375:16, 390:24, 417:13, 476:5, 486:12, 493:10, 494:19, 503:7, 511:4
**shared** [1] - 412:20
**shareholder** [1] - 391:8
**shave** [1] - 398:8
**shaving** [3] - 398:1, 398:4, 398:11

**shed** [2] - 339:3, 339:23
**sheet** [5] - 377:22, 377:24, 434:7, 434:14, 434:24
**shift** [2] - 374:23, 375:14
**shoot** [4] - 311:3, 340:25, 380:14, 391:5
**shooting** [2] - 328:2, 528:15
**shoots** [3] - 359:4, 434:2, 434:3
**short** [1] - 326:9
**shortly** [1] - 485:5
**shot** [4] - 328:13, 386:8, 391:14, 392:2
**show** [4] - 348:19, 368:24, 373:25, 538:16
**showed** [9] - 366:4, 377:22, 381:16, 414:25, 436:18, 468:11, 501:19, 505:5, 543:24
**showering** [1] - 398:12
**showing** [9] - 365:19, 389:20, 405:11, 423:1, 472:19, 475:15, 479:19, 480:5, 545:15
**shown** [3] - 434:11, 515:20, 543:23
**shows** [1] - 468:22
**sickness** [1] - 544:9
**side** [8] - 322:1, 322:18, 364:22, 367:12, 386:11, 427:6, 513:24, 544:5
**sides** [4] - 370:22, 460:25, 461:1, 546:8
**sign** [3] - 369:16, 397:24, 538:7
**significant** [3] - 405:18, 419:5, 432:19
**signs** [1] - 504:22
**silent** [1] - 489:1
**Silverman** [2] - 422:9, 536:10
**Silverman's** [1] - 536:22
**similar** [11] - 347:9, 376:5, 406:2, 406:3, 462:19, 499:7, 499:8, 499:14, 509:14, 517:24,

518:16
**simple** [1] - 482:16
**simplest** [1] - 455:25
**Simply** [1] - 454:21
**simply** [2] - 455:21, 474:22
**simultaneous** [1] - 546:7
**single** [4] - 344:5, 428:13, 514:9, 515:1
**sister** [1] - 529:9
**sisters** [4] - 440:11, 441:19, 441:23, 521:2
**sit** [3] - 484:11, 497:25, 522:5
**sitting** [2] - 480:24, 521:8
**situation** [9] - 338:17, 352:7, 391:11, 406:23, 415:10, 416:14, 419:20, 510:25, 516:17
**six** [2] - 312:12, 511:2
**skeptical** [1] - 515:10
**skills** [2] - 408:14, 424:19
**skin** [2] - 398:5, 398:6
**skipping** [1] - 378:14
**sleep** [2] - 484:21, 507:24
**slovenly** [1] - 487:13
**slow** [2] - 379:21, 442:21
**slower** [1] - 379:23
**small** [3] - 386:12, 497:8, 538:5
**smart** [1] - 317:9
**so...** [1] - 490:7
**social** [3] - 432:24, 487:23, 506:19
**solely** [1] - 440:10
**solid** [3] - 469:1, 469:8, 544:13
**solutions** [1] - 512:22
**solve** [1] - 386:24
**solving** [1] - 423:9
**somatic** [15] - 432:12, 433:3, 539:25, 540:1, 540:2, 540:3, 540:8, 540:9, 541:9, 541:10, 541:11, 541:18, 541:23, 541:25

**Somatic** [1] - 433:2
**somatosensory** [2] - 537:20, 537:22
**someone** [21] - 312:8, 313:4, 314:18, 370:19, 437:11, 439:19, 452:22, 455:12, 461:23, 465:10, 472:13, 474:13, 478:22, 484:13, 499:25, 500:3, 506:3, 527:11, 533:14, 534:21
**Someone** [1] - 437:4
**Sometime** [1] - 409:10
**Sometimes** [2] - 312:15, 335:18
**sometimes** [16] - 311:18, 324:1, 340:10, 340:11, 399:2, 453:16, 467:4, 475:24, 478:11, 498:22, 527:12, 540:14, 540:17, 542:10, 545:8
**somewhat** [5] - 315:6, 338:13, 352:23, 354:19, 354:24
**Somewhat** [1] - 376:6
**somewhere** [2] - 354:15, 514:10
**Sorry** [1] - 407:25
**sorry** [23] - 325:17, 331:21, 347:18, 354:9, 364:3, 372:23, 373:7, 377:13, 379:21, 379:24, 397:4, 402:5, 406:6, 407:3, 409:12, 414:21, 418:8, 423:15, 442:20, 483:16, 503:3, 503:4, 517:6
**sort** [14] - 315:18, 334:10, 338:8, 339:3, 339:16, 345:6, 368:13, 413:25, 428:15, 436:25, 482:7, 487:11, 506:12, 506:22
**sorts** [1] - 446:9
**sound** [1] - 340:12
**sounded** [1] - 379:15
**sounds** [1] - 363:20

**source** [4] - 436:6, 436:13, 454:15, 520:15
**sources** [5] - 426:3, 439:20, 454:4, 454:13, 457:24
**SOUTHERN** [1] - 307:1
**spare** [1] - 376:25
**speaking** [8] - 316:6, 329:6, 344:13, 376:14, 392:24, 429:1, 441:20, 530:25
**speaks** [2] - 446:17, 541:21
**special** [2] - 460:22, 508:3
**specialist** [1] - 398:5
**Specific** [1] - 432:17
**specific** [15] - 311:12, 311:21, 311:22, 321:12, 321:13, 374:10, 401:6, 416:17, 447:1, 448:15, 485:22, 485:24, 491:23, 511:3
**specifically** [22] - 327:20, 327:24, 328:14, 343:24, 346:1, 350:21, 359:9, 359:10, 388:24, 401:23, 423:8, 426:24, 432:13, 449:25, 463:2, 470:13, 474:1, 483:13, 485:17, 485:20, 487:19, 527:14
**specifics** [7] - 314:14, 322:18, 333:19, 339:15, 340:3, 340:14, 470:14
**Speculation** [3] - 318:10, 327:2, 333:8
**speculation** [4] - 318:24, 324:9, 336:22, 421:14
**speech** [9] - 387:12, 432:17, 493:3, 493:6, 494:4, 494:7, 495:11, 497:20, 543:6
**spend** [2] - 457:7, 464:19, 464:25
**spent** [1] - 404:21
**spewing** [1] - 485:21
**spirit** [4] - 391:19,

392:6, 392:22
**spirits** [14] - 338:22, 338:24, 339:5, 369:12, 375:19, 390:23, 392:13, 416:20, 416:23, 417:10, 433:13, 441:21, 503:1, 503:7
**spontaneously** [1] - 476:12
**spurred** [1] - 482:2
**squabble** [1] - 383:1
**stable** [1] - 428:16
**staff** [2] - 337:12, 398:15
**stage** [2] - 332:22, 414:8
**stages** [1] - 545:16
**stand** [50] - 310:5, 317:19, 333:18, 334:2, 353:3, 360:4, 361:4, 361:14, 365:19, 393:25, 394:3, 411:10, 413:4, 413:24, 420:21, 421:2, 429:16, 429:20, 429:25, 430:3, 430:14, 430:19, 439:2, 441:11, 447:14, 458:17, 462:17, 463:3, 463:8, 463:20, 464:14, 470:21, 470:24, 477:14, 478:3, 482:6, 499:12, 499:18, 508:10, 508:14, 513:15, 521:11, 529:23, 532:23, 536:4, 536:11, 536:13, 536:17, 544:2, 544:8
**standard** [9] - 345:2, 371:17, 466:1, 482:17, 519:22, 524:20, 536:15, 543:24, 545:22
**standardized** [1] - 509:25
**standards** [2] - 478:1, 527:12
**standing** [2] - 375:21, 375:22
**start** [6] - 378:9, 395:24, 442:20, 488:24, 513:5, 537:19
**started** [10] - 310:19, 314:10, 342:15,

376:9, 411:14, 446:19, 454:1, 488:5, 497:14, 502:10
**starting** [5] - 376:22, 383:22, 402:11, 424:2, 452:6
**starts** [5] - 346:6, 385:21, 480:11, 481:20, 485:21
**state** [10] - 412:11, 413:7, 429:2, 472:23, 482:8, 487:15, 488:4, 495:12, 499:7, 505:24
**State** [12] - 325:23, 348:16, 348:20, 348:21, 355:17, 371:18, 372:23, 449:20, 452:16, 453:12, 458:24, 480:14
**State's** [2] - 313:2, 333:7
**statement** [29] - 316:14, 325:15, 333:3, 335:18, 335:20, 355:6, 376:11, 380:8, 385:21, 390:7, 390:11, 408:22, 413:8, 413:18, 421:2, 426:20, 439:5, 439:6, 440:21, 440:23, 441:4, 460:17, 487:2, 488:24, 495:10, 523:3, 536:23, 543:19, 543:23
**statements** [41] - 335:16, 351:6, 351:20, 356:22, 356:24, 376:12, 397:17, 397:25, 415:25, 417:18, 420:12, 420:19, 426:4, 437:23, 437:24, 440:10, 440:11, 440:14, 440:17, 440:18, 440:19, 440:20, 441:1, 441:2, 449:24, 470:19, 473:9, 474:2, 474:9, 474:12, 476:25, 482:3, 488:1, 489:10, 499:7, 499:13, 521:3,

524:3, 530:1, 540:21, 544:22
**states** [4] - 395:3, 413:12, 426:2, 482:18
**STATES** [2] - 307:1, 307:11
**statistics** [1] - 538:16
**status** [9] - 343:13, 396:9, 396:18, 396:21, 397:10, 397:14, 463:1, 472:4, 486:22
**stay** [1] - 487:14
**steal** [2] - 383:11, 387:17
**stenography** [1] - 307:24
**step** [5] - 359:17, 450:25, 507:17, 539:1, 542:21
**Stephanie** [1] - 547:5
**STEPHANIE** [1] - 308:3
**steps** [3] - 318:21, 332:2, 332:6
**sticking** [1] - 444:11
**sticks** [1] - 388:10
**still** [23] - 310:8, 315:21, 330:20, 341:15, 360:4, 385:15, 391:13, 393:11, 427:20, 439:16, 439:18, 455:3, 465:5, 467:21, 478:11, 503:25, 506:8, 512:23, 516:25, 530:14, 530:15, 531:17, 539:10
**stole** [2] - 381:23, 388:15
**Stone** [19] - 374:8, 375:3, 375:8, 375:14, 375:16, 387:14, 387:16, 434:1, 475:10, 486:12, 493:11, 493:13, 493:15, 494:6, 494:8, 494:16, 494:19, 495:16
**stop** [4] - 361:12, 390:24, 392:17, 511:12
**stops** [2] - 443:15, 443:16
**store** [2] - 379:12, 386:12

**stores** [1] - 378:12
**stories** [1] - 352:2
**story** [18] - 322:1, 322:19, 328:19, 352:3, 381:15, 388:10, 392:11, 404:23, 405:6, 414:8, 414:10, 414:11, 414:15, 415:8, 415:9, 441:4, 481:4
**strange** [3] - 340:16, 391:16, 537:20
**strategic** [1] - 506:23
**strategy** [1] - 322:24
**stress** [1] - 404:9
**stricken** [2] - 431:24, 523:16
**strike** [2] - 356:15, 514:17
**Strike** [1] - 499:23
**strip** [1] - 386:12
**structure** [1] - 510:3
**struggle** [3] - 380:14, 381:21, 528:20
**stuck** [1] - 404:23
**studies** [3] - 477:10, 477:18, 477:20
**study** [1] - 478:7
**studying** [2] - 408:24, 409:3
**stuff** [10] - 456:13, 476:6, 486:3, 486:10, 488:9, 489:11, 501:18, 503:9, 529:4, 537:9
**stupid** [1] - 457:10
**subject** [4] - 351:21, 387:10, 425:14, 483:19
**subjective** [1] - 460:19
**submit** [2] - 543:8, 546:7
**submitted** [1] - 419:13
**subpoena** [2] - 321:8, 412:1
**subsequent** [4] - 341:9, 350:8, 403:15, 422:6
**substantial** [1] - 520:14
**substantive** [1] - 436:16
**subsumes** [1] - 442:10
**subtract** [1] - 427:18
**successfully** [1] - 396:2

**suddenly** [1] - 481:6
**suffered** [1] - 337:25
**suffering** [2] - 416:24, 507:21
**suffers** [1] - 350:15
**sufficient** [14] - 329:7, 450:16, 467:6, 482:12, 482:14, 518:19, 524:23, 526:5, 526:10, 530:15, 545:2, 546:1, 546:16
**Sufficient** [2] - 482:14
**Sufi** [2] - 384:6, 384:13
**Sufis** [1] - 486:3
**suggest** [1] - 543:2
**suggested** [4] - 400:11, 414:7, 417:16, 417:17
**suggestion** [2] - 413:20, 426:12
**suggests** [1] - 413:12
**suit** [1] - 479:23
**Suite** [1] - 308:4
**sum** [1] - 542:25
**summarizing** [2] - 467:4, 509:9
**summary** [2] - 390:11, 458:2
**Super** [2] - 457:11, 457:13
**superior** [1] - 482:14
**support** [5] - 394:22, 415:14, 436:22, 438:13, 438:20
**supported** [2] - 455:15
**supports** [5] - 364:10, 364:18, 365:10, 415:7, 422:25
**suppose** [2] - 388:17, 527:10
**supposed** [10] - 374:24, 382:23, 455:1, 463:16, 493:19, 493:20, 511:17, 515:10, 522:15
**suppress** [1] - 496:4
**surgeons** [2] - 453:24
**surmising** [2] - 401:9, 444:19
**surprise** [1] - 520:9
**surprised** [1] - 421:19

**surrendered** [1] - 391:3
**surrounding** [3] - 412:6, 433:23, 441:18
**suspect** [8] - 316:8, 356:11, 381:12, 381:20, 387:11, 421:17, 439:23, 493:1
**suspects** [1] - 524:3
**suspicion** [1] - 538:6
**suspicious** [3] - 530:9, 530:19, 538:7
**sustain** [2] - 355:2, 513:16
**Sustained** [10] - 327:14, 336:12, 356:19, 357:14, 359:11, 411:23, 421:15, 421:23, 523:17, 532:12
**switched** [1] - 375:8
**sworn** [19] - 310:12, 335:18, 335:20, 360:6, 376:12, 380:8, 385:21, 439:1, 439:5, 439:7, 439:9, 439:11, 440:21, 440:22, 440:25, 441:4, 451:20, 451:21, 539:11
**symbols** [1] - 418:21
**sympathetic** [1] - 338:14
**sympathy** [1] - 400:11
**symptom** [6] - 445:5, 445:6, 445:7, 479:18, 485:20, 537:10
**symptomatology** [1] - 393:19
**symptoms** [53] - 352:11, 361:10, 361:11, 361:16, 361:19, 361:20, 362:19, 392:25, 393:7, 404:10, 405:18, 405:19, 407:16, 409:25, 417:1, 417:12, 422:6, 428:13, 428:15, 428:24, 432:8, 432:19, 435:24, 447:25, 448:15, 448:17, 474:19, 474:20, 475:15, 479:18,

480:1, 480:6, 480:7, 484:5, 485:3, 485:21, 486:1, 487:12, 487:13, 496:4, 505:4, 530:7, 533:15, 534:17, 534:23, 538:19, 539:15, 539:20, 540:7, 540:10, 542:2, 542:7
**system** [23] - 350:16, 372:1, 404:22, 405:1, 422:18, 428:19, 454:23, 482:2, 482:4, 502:1, 504:3, 504:5, 516:17, 521:24, 522:4, 522:13, 522:14, 522:16, 522:24, 524:24, 530:17, 530:18, 534:16
**systematic** [2] - 455:19, 456:6

# T

**T.D.C** [5] - 395:2, 438:5, 475:18, 506:9, 508:13
**T.D.C.J** [9] - 396:7, 396:12, 396:18, 406:11, 443:19, 487:18, 506:9, 508:17, 527:7
**table** [1] - 513:22
**tact** [1] - 478:19
**tactile** [3] - 427:1, 481:23, 537:22
**take..** [1] - 434:22
**talks** [4] - 478:16, 485:21, 511:9, 526:9
**tasks** [3] - 317:14, 369:1, 427:18
**taught** [1] - 525:13
**team** [6] - 318:16, 318:18, 412:16, 412:17, 412:18, 412:21
**technical/legal** [1] - 458:3
**telephone** [2] - 460:11, 483:5
**temper** [1] - 315:15
**temporal** [1] - 427:4
**ten** [1] - 476:22
**tend** [1] - 456:5
**tends** [2] - 487:8, 487:10

**term** [6] - 423:5, 484:4, 487:1, 533:22, 533:23, 533:24
**terminology** [1] - 458:3
**terms** [20] - 332:10, 374:19, 403:12, 417:10, 441:20, 461:4, 462:21, 465:11, 465:24, 470:13, 470:14, 472:24, 474:22, 475:6, 477:25, 483:13, 499:3, 512:20, 521:13, 530:4
**Terrol** [4] - 379:4, 379:6, 386:21
**test** [5] - 360:18, 423:13, 469:10, 470:2, 479:2
**tested** [2] - 351:7, 363:3
**testified** [35] - 314:25, 320:10, 325:15, 325:19, 331:14, 333:1, 333:17, 350:14, 352:20, 355:24, 356:21, 358:17, 400:25, 401:2, 402:9, 402:20, 421:4, 483:18, 498:9, 498:12, 498:14, 500:23, 503:11, 503:13, 503:14, 503:15, 504:20, 504:24, 505:5, 510:22, 517:25, 520:21, 526:13, 526:18, 533:8
**testify** [40] - 312:15, 322:25, 323:2, 324:25, 325:4, 325:8, 325:9, 326:17, 326:18, 326:21, 326:22, 326:24, 326:25, 331:13, 332:20, 333:6, 333:13, 333:15, 334:1, 348:22, 355:18, 356:5, 365:14, 400:17, 401:5, 401:11, 406:13, 421:10, 421:11, 431:5, 459:20, 483:20, 488:7,

499:12, 505:7, 506:20, 515:11, 529:12, 535:5
**testifying** [6] - 325:11, 353:3, 400:9, 401:17, 441:7, 460:16
**testimony** [74] - 326:4, 330:8, 336:24, 337:23, 338:2, 338:7, 339:17, 357:17, 358:3, 366:24, 367:2, 398:23, 398:24, 399:10, 399:25, 400:5, 400:14, 400:23, 401:4, 402:12, 402:25, 403:1, 403:3, 403:21, 405:2, 417:20, 420:23, 420:24, 421:3, 421:7, 424:12, 429:6, 429:11, 429:14, 429:21, 430:12, 431:4, 431:23, 436:19, 437:24, 446:17, 446:18, 447:2, 454:19, 460:13, 460:20, 460:23, 461:2, 461:3, 461:11, 461:16, 461:17, 462:4, 462:7, 463:9, 463:17, 463:18, 464:6, 470:17, 471:3, 482:21, 482:23, 488:14, 498:17, 514:6, 516:8, 519:3, 520:25, 526:12, 526:16, 544:5
**testing** [20] - 361:2, 361:5, 361:8, 362:4, 362:9, 362:12, 362:13, 362:18, 368:13, 368:23, 368:25, 369:8, 369:9, 422:19, 430:23, 431:2, 431:10, 432:1, 457:4
**tests** [5] - 422:21, 469:11, 469:12, 469:18, 470:4
**TEXAS** [2] - 307:1, 307:9
**Texas** [10] - 307:16, 307:18, 307:19, 308:4, 417:17,

438:3, 452:9, 482:17, 504:21
**text** [1] - 457:21
**textbook** [5] - 454:16, 512:13, 512:16, 512:17, 538:17
**textbooks** [2] - 454:2, 454:7
**texts** [2] - 490:24, 491:2
**thalamus** [1] - 427:3
**THE** [176] - 307:10, 310:3, 310:7, 310:10, 310:11, 312:5, 313:16, 314:2, 314:4, 315:25, 316:17, 316:20, 318:5, 318:11, 318:25, 319:11, 320:13, 322:23, 324:14, 324:17, 325:17, 325:19, 326:14, 327:3, 327:5, 327:14, 327:22, 330:12, 331:7, 333:9, 333:22, 336:12, 336:21, 336:25, 339:14, 340:1, 342:6, 342:10, 342:12, 342:15, 342:18, 342:22, 342:24, 345:14, 345:19, 346:9, 347:1, 347:4, 347:6, 353:9, 354:9, 354:12, 354:22, 355:2, 356:9, 356:16, 356:18, 356:19, 357:14, 358:2, 358:12, 358:15, 359:11, 359:13, 359:16, 359:18, 359:20, 359:24, 360:3, 363:17, 363:23, 364:1, 372:22, 374:4, 376:20, 377:4, 379:21, 379:23, 379:25, 383:23, 407:3, 407:4, 411:5, 411:9, 411:23, 416:5, 418:14, 421:15, 421:23, 423:23, 428:3, 428:5, 430:7, 432:3, 434:9, 442:16, 442:20, 450:21, 450:25,

451:2, 451:4, 451:7, 451:11, 451:14, 451:17, 451:19, 451:22, 461:9, 461:13, 463:19, 464:12, 464:23, 465:8, 466:22, 467:16, 467:19, 473:13, 473:17, 480:23, 482:25, 483:16, 483:24, 490:9, 490:13, 490:15, 492:17, 496:9, 499:4, 501:3, 513:4, 513:11, 513:16, 513:21, 513:23, 514:16, 517:16, 523:17, 523:19, 523:21, 525:23, 531:6, 532:12, 533:2, 534:12, 535:23, 536:2, 536:3, 536:5, 536:9, 536:12, 536:18, 537:15, 538:10, 538:23, 538:25, 539:2, 539:3, 539:6, 539:9, 541:4, 542:19, 542:21, 542:23, 543:4, 543:7, 543:12, 543:14, 543:15, 543:20, 544:17, 545:24, 546:4, 546:11, 546:13, 546:20, 546:23

**theft** [1] - 528:15

**thefts** [1] - 310:25

**themes** [3] - 415:11, 415:17, 417:9

**theory** [1] - 524:22

**therapy** [1] - 404:19

**therefore** [3] - 332:19, 480:2, 539:16

**thermal** [2] - 425:14, 425:19

**they've** [3] - 456:12, 494:3, 519:19

**thief** [1] - 391:7

**thin** [1] - 426:8

**Thinking** [1] - 332:10

**thinking** [15] - 326:12, 332:22, 375:5, 375:7, 375:13, 406:17, 416:13, 426:13, 427:21, 450:7, 450:12, 484:9,

**484**:15, 504:19, 526:20

**thinks** [1] - 370:21, 464:17, 506:21, 536:24, 536:25

**third** [3] - 346:11, 378:9, 436:16

**THOMAS** [2] - 309:11, 451:21

**Thomas** [7] - 355:23, 378:20, 380:9, 381:20, 452:3, 476:24

**Thomas'** [1] - 378:22

**Thorazine** [1] - 491:24

**thorough** [1] - 330:15

**thoroughly** [2] - 511:21, 511:24

**thoughts** [12] - 320:7, 406:15, 414:13, 416:19, 416:21, 417:2, 419:7, 420:5, 420:9, 423:10, 432:18, 449:1

**thousands** [1] - 502:13

**three** [10] - 324:1, 367:5, 367:14, 367:19, 436:10, 457:21, 472:5, 486:16, 543:16, 546:5

**Three** [2] - 543:14, 543:15

**three-volume** [1] - 457:21

**threshold** [2] - 544:2, 544:8

**throughout** [20] - 317:13, 317:17, 319:18, 320:15, 347:9, 352:24, 393:3, 393:7, 397:9, 415:4, 415:17, 429:7, 429:12, 463:1, 498:19, 498:24, 499:12, 518:4, 533:8, 544:10

**Throughout** [1] - 319:24

**thrown** [1] - 345:5

**Thursday** [2] - 314:25, 335:2

**tickets** [1] - 310:22

**Tidwell** [1] - 378:21

**tie** [3] - 324:20, 363:24, 391:8

**tied** [1] - 328:25

**ties** [1] - 363:15

**timing** [1] - 382:9

**title** [1] - 418:21

**today** [8] - 342:16, 342:17, 400:23, 441:11, 468:16, 468:24, 483:18, 519:4

**today's** [1] - 401:4

**together** [6] - 311:6, 314:11, 330:1, 363:15, 363:24, 423:7

**took** [14] - 316:9, 316:20, 330:2, 353:3, 378:10, 378:20, 388:10, 388:24, 390:23, 405:8, 452:18, 476:11, 503:5, 528:2

**top** [9] - 378:10, 381:10, 389:21, 392:23, 409:11, 454:7, 475:6, 475:7, 475:14

**topic** [2] - 339:22, 457:24

**topics** [3] - 339:3, 357:12, 454:11

**torture** [2] - 415:16, 482:4

**torturing** [1] - 419:22

**total** [1] - 458:24

**totally** [3] - 479:19, 487:5, 488:3

**touch** [4] - 391:6, 391:13, 397:22, 483:20

**touched** [1] - 346:7

**toward** [1] - 507:17

**towards** [2] - 401:15, 446:17

**town** [1] - 386:11, 497:8

**trace** [1] - 386:20

**track** [2] - 446:22, 465:20

**traffic** [1] - 310:22

**trail** [2] - 402:24, 465:13

**train** [1] - 409:6

**training** [15] - 354:17, 371:16, 371:20, 371:23, 445:14, 452:11, 452:12, 458:21, 466:5, 466:7, 497:8, 497:10, 497:12, 497:15, 497:18

**tranquilizer** [1] - 491:24

**TRANSCRIPT** [1] - 307:10

**transcript** [9] - 307:24, 543:11, 543:12, 543:13, 543:17, 546:1, 546:5, 546:6, 547:2

**transcription** [1] - 307:25

**transparencies** [2] - 466:15, 466:17

**transparency** [1] - 465:11

**tray** [1] - 395:21

**treat** [1] - 445:20

**treated** [6] - 393:15, 393:17, 404:16, 404:18, 449:15, 478:5

**treatise** [2] - 513:13, 537:14

**tremendous** [2] - 330:5, 477:18

**tremendously** [1] - 449:8

**trial** [108] - 311:12, 317:17, 320:18, 320:19, 321:8, 321:10, 323:4, 323:7, 323:15, 331:23, 332:8, 334:22, 334:24, 337:9, 337:12, 341:22, 345:16, 345:18, 345:21, 345:25, 349:12, 349:18, 350:2, 350:4, 350:11, 350:17, 357:5, 361:4, 361:14, 363:1, 363:8, 364:19, 367:2, 368:19, 368:20, 371:10, 371:13, 373:10, 393:25, 394:3, 398:24, 402:4, 402:7, 402:24, 403:4, 409:18, 410:1, 410:15, 410:22, 411:17, 412:6, 413:4, 413:24, 415:5, 429:17, 429:20, 429:25, 430:4, 430:14, 430:19, 439:23, 447:15, 458:17, 461:21, 462:17,

463:3, 463:8, 463:21, 464:4, 464:14, 470:21, 470:24, 477:14, 478:3, 482:6, 499:18, 500:12, 500:15, 503:22, 508:10, 508:14, 508:18, 508:23, 514:7, 516:18, 516:22, 517:1, 518:5, 518:24, 521:6, 521:11, 522:2, 522:19, 526:12, 529:23, 532:23, 536:4, 536:11, 536:13, 536:17, 543:25, 544:2, 544:8, 544:10, 544:14, 544:19, 545:6

**trials** [1] - 310:24

**tried** [8] - 310:23, 314:17, 337:5, 337:23, 338:5, 418:22, 441:11, 532:17

**trigger** [4] - 392:2, 392:7, 516:9, 516:11

**trouble** [1] - 495:1

**true** [12] - 357:6, 393:9, 457:6, 477:6, 486:3, 490:23, 492:5, 494:11, 494:14, 515:12, 525:4, 526:21

**truly** [2] - 477:8, 541:20

**trust** [1] - 402:1

**trusted** [3] - 353:6, 388:6, 388:7

**trustworthiness** [1] - 530:9

**truthfully** [2] - 353:3, 400:17

**try** [9] - 310:22, 348:19, 351:13, 366:12, 395:9, 400:11, 498:3, 498:7, 530:18

**trying** [12] - 313:13, 321:8, 326:8, 326:23, 337:24, 338:13, 359:5, 401:1, 418:25, 490:2, 495:8, 522:15

**turn** [2] - 382:22, 492:8

**turned** [6] - 378:4, 391:19, 443:19,

445:1, 445:2
**turning** [1] - 420:17
**Turning** [1] - 504:20
**turns** [1] - 370:20
**twice** [1] - 386:8
**two** [30] - 323:25,
355:23, 356:2,
359:22, 360:11,
361:5, 361:6,
362:23, 371:5,
394:21, 436:15,
438:11, 441:2,
447:1, 463:10,
464:7, 468:15,
470:14, 470:15,
471:18, 472:5,
489:2, 489:3,
505:14, 509:2,
535:23, 539:19,
543:19, 546:6
**Two** [3] - 546:2,
546:3, 546:4
**two-fold** [1] - 468:15
**Tyler** [2] - 452:17,
453:8
**type** [21] - 311:1,
312:14, 317:19,
319:5, 321:24,
338:17, 344:8,
344:12, 361:20,
362:6, 393:19,
414:16, 424:16,
432:7, 448:15,
462:1, 463:15,
483:22, 492:10,
495:9, 497:18
**types** [7] - 329:22,
344:2, 417:1,
452:12, 492:7,
540:3, 540:4
**typical** [1] - 526:20
**typically** [2] - 405:20,
442:24

# U

**U.S** [3] - 308:3,
311:9, 314:21
**Ultimately** [1] -
409:14
**unchanging** [1] -
500:11
**unclear** [1] - 434:5
**uncommon** [4] -
483:25, 525:1,
530:8, 540:4
**under** [9] - 310:8,
360:4, 376:6, 388:3,
400:19, 400:20,

432:3, 437:24,
539:10
**Under** [1] - 389:25
**underlined** [2] -
389:24, 390:1
**underlining** [1] -
390:11
**underneath** [1] -
424:2
**understandings** [1] -
373:20
**understood** [6] -
324:23, 336:16,
344:14, 368:2,
387:8, 505:10
**undone** [1] - 383:4
**Unfortunately** [1] -
398:22
**unit** [5] - 452:15,
459:1, 459:4,
459:11, 480:14
**UNITED** [2] - 307:1,
307:11
**units** [1] - 497:14
**universities** [2] -
453:2, 453:4
**university** [1] -
491:15
**University** [3] -
452:8, 452:9, 452:17
**unless** [5] - 376:24,
451:12, 505:14,
540:24, 543:5
**Unless** [1] - 377:1
**unlikely** [2] - 330:24,
500:11
**unmedicated** [1] -
429:2
**unqualified** [1] -
317:6
**unrelated** [1] -
540:12
**unreliable** [1] - 351:6
**unresponsive** [1] -
336:19
**unsworn** [1] - 439:6
**untreated** [8] -
393:21, 449:14,
476:22, 477:13,
486:18, 539:23,
542:3, 542:6
**unwilling** [2] -
370:25, 468:4
**unwillingness** [2] -
370:4, 370:9
**up** [54] - 310:22,
311:4, 323:5,
325:23, 328:25,
334:7, 336:2,
337:15, 340:25,

345:9, 345:10,
359:20, 360:3,
361:8, 362:14,
366:4, 374:6, 378:4,
381:16, 383:17,
391:1, 397:17,
401:1, 401:10,
442:13, 443:2,
443:11, 443:22,
449:8, 452:20,
454:10, 455:20,
459:12, 460:23,
462:21, 464:9,
470:1, 473:21,
477:2, 484:21,
488:7, 493:21,
498:7, 508:25,
509:7, 510:18,
510:20, 513:14,
522:7, 530:18,
533:15, 538:3,
542:25
**upsmanship** [1] -
318:15
**urging** [2] - 392:9,
392:12
**useable** [1] - 530:4
**useful** [1] - 464:13
**utility** [1] - 461:1
**utilized** [3] - 403:9,
403:10, 441:17

# V

**vague** [1] - 384:2
**valid** [4] - 369:19,
369:22, 529:25
**validity** [1] - 492:9
**value** [1] - 420:13
**variables** [1] -
538:21
**variation** [2] -
477:18, 481:17
**variety** [4] - 416:25,
458:11, 540:3, 540:4
**various** [8] - 426:23,
453:17, 453:23,
454:11, 467:25,
474:21, 500:18
**varying** [2] - 545:15,
545:16
**vehicular** [1] -
469:23
**verbal** [4] - 423:2,
423:9, 427:13
**verify** [2] - 436:17,
438:17
**versed** [1] - 479:3
**version** [5] - 328:17,

357:1, 357:22,
389:3, 416:11
**versus** [6] - 325:15,
325:23, 390:21,
445:17, 449:15,
528:13
**vested** [1] - 545:13
**victim** [6] - 320:12,
328:13, 349:8,
359:4, 390:23,
390:24, 391:4,
391:5, 391:8,
391:12, 391:14,
391:15, 392:1,
392:3, 476:7, 503:8
**victim's** [3] - 391:19,
391:25, 392:6
**Victor** [1] - 413:1
**video** [1] - 390:9
**view** [3] - 369:10,
491:11, 508:20
**vinegar** [1] - 477:24
**violated** [1] - 390:1
**Virginal** [1] - 521:2
**Virginia's** [1] - 367:2
**visits** [1] - 397:14
**visual** [6] - 395:22,
427:1, 427:15,
432:21, 507:22,
537:18
**voice** [6] - 374:12,
374:13, 392:9,
392:17, 541:21
**voices** [5] - 415:25,
432:13, 432:14,
471:16, 483:9
**voir** [2] - 312:13,
515:24
**volition** [3] - 478:18,
478:21, 479:9
**volitionally** [1] -
533:15
**volume** [1] - 457:21
**Volume** [3] - 326:8,
338:21, 526:23
**voluntarily** [2] -
459:6, 485:22
**voracity** [1] - 420:18
**VS** [1] - 307:6

# W

**Wait** [4] - 428:5,
495:5, 496:8, 519:25
**wait** [3] - 402:1,
523:7, 523:8
**waited** [1] - 366:4
**waive** [1] - 536:13
**walk** [2] - 340:25,

391:19
**walked** [2] - 391:13,
391:14
**walking** [1] - 391:17
**Walter** [2] - 508:16,
510:11
**Walter's** [1] - 510:19
**wanes** [3] - 480:10,
484:3, 484:5
**waning** [3] - 484:23,
485:3, 487:21
**wants** [3] - 392:10,
398:5, 543:6
**ward** [1] - 487:16
**warden** [1] - 459:24
**warning** [1] - 326:13
**waste** [1] - 470:5
**water** [1] - 477:24
**waxes** [3] - 480:10,
484:3, 484:5
**waxing** [3] - 484:22,
485:3, 487:21
**ways** [1] - 446:3
**weaker** [1] - 469:6
**weapon** [1] - 328:8
**Wednesday** [1] -
379:11
**week** [2] - 365:18,
379:11
**weeks** [8] - 543:14,
543:15, 543:16,
546:2, 546:3, 546:4,
546:5, 546:6
**weigh** [2] - 460:16,
460:20
**weighed** [1] - 461:4
**weight** [7] - 373:15,
373:16, 373:17,
373:18, 441:15,
461:5, 461:6
**weird** [3] - 462:11,
483:12, 529:3
**welding** [2] - 408:25,
409:1
**well-known** [1] -
483:6
**well-versed** [1] -
479:3
**West** [1] - 386:11
**Western** [1] - 452:7
**whatsoever** [2] -
412:5, 509:3
**whereabouts** [2] -
356:3, 439:24
**white** [1] - 315:7
**whole** [9] - 389:23,
408:14, 426:22,
435:16, 441:3,
482:4, 491:12,
492:4, 545:18

**wild** [1] - 522:16
**willing** [4] - 370:24, 438:20, 455:16, 535:11
**willingness** [2] - 370:3, 370:8
**win** [3] - 456:19, 479:23, 529:20
**wind** [3] - 510:20, 522:7, 530:18
**Wisconsin** [1] - 436:9
**wise** [2] - 471:24, 472:6
**wish** [1] - 536:6
**withdraw** [2] - 322:17, 531:4
**withholding** [1] - 384:9
**witness** [29] - 310:9, 310:12, 335:15, 342:5, 351:19, 353:8, 360:4, 360:6, 374:1, 411:10, 430:6, 450:22, 451:15, 451:18, 451:21, 451:22, 461:11, 463:7, 463:11, 463:19, 473:14, 492:18, 501:2, 515:21, 523:18, 525:6, 531:10, 535:21, 535:23
**Witness** [7] - 359:19, 407:23, 451:6, 492:22, 512:13, 539:4, 542:22
**WITNESS** [14] - 310:10, 316:20, 327:5, 354:9, 356:18, 359:18, 407:4, 451:2, 483:16, 513:21, 536:2, 536:5, 536:12, 539:2
**witness'** [2] - 464:13, 473:6
**WITNESSES** [2] - 309:4, 309:16
**witnesses** [19] - 317:18, 329:12, 329:18, 332:23, 348:1, 348:5, 355:5, 356:5, 356:8, 387:25, 420:13, 451:8, 471:25, 502:3, 524:7, 524:11, 525:2, 528:23

**woman** [1] - 371:4
**women** [1] - 346:15
**wondering** [1] - 379:1
**word** [6] - 352:5, 387:20, 388:17, 456:8, 482:12, 520:16
**wording** [1] - 446:15
**Words** [1] - 528:1
**words** [8] - 390:4, 390:5, 390:14, 392:4, 425:24, 426:2, 527:25, 542:6
**worker** [2] - 487:23, 506:19
**works** [3] - 496:20, 506:5, 537:7
**world** [1] - 407:19
**worried** [1] - 531:17
**worry** [1] - 386:6
**worse** [9] - 333:15, 393:5, 393:6, 404:14, 481:18, 484:19, 484:21, 486:18, 487:12
**worsening** [1] - 392:25
**wound** [1] - 510:18
**wrapped** [1] - 383:16
**write** [3] - 330:5, 330:6, 465:16
**writers** [2] - 487:3, 538:15
**writes** [1] - 439:10
**writing** [10] - 395:19, 415:6, 416:7, 416:12, 417:4, 417:22, 463:25, 486:9, 543:1, 543:3
**writings** [21] - 329:4, 338:7, 338:9, 339:8, 349:21, 352:22, 394:15, 395:19, 414:22, 414:24, 415:2, 415:4, 415:17, 420:10, 433:7, 452:23, 486:4, 486:5, 528:5, 540:20
**written** [10] - 328:17, 335:18, 335:20, 345:16, 390:1, 390:19, 415:20, 433:10, 512:6, 515:23
**wrongfulness** [2] - 472:7, 525:17
**wrote** [5] - 390:15, 415:13, 433:8,

454:16, 529:8

**Y**

**y'all** [5] - 320:23, 321:1, 328:19, 337:23, 357:8
**Yates** [1] - 372:15
**year** [9] - 321:7, 418:8, 452:14, 452:16, 459:8, 459:12, 502:10, 505:14, 542:14
**years** [24] - 311:7, 311:10, 311:23, 314:12, 321:12, 330:14, 404:21, 405:25, 408:10, 412:23, 458:25, 459:5, 462:21, 468:17, 468:18, 468:20, 468:25, 480:8, 491:10, 521:9, 535:18, 544:19
**Yeh** [2] - 412:9, 430:13
**yesterday** [2] - 367:15, 469:3
**yourself** [4] - 352:17, 360:14, 368:5, 452:1
**Youth** [1] - 438:3
**youth** [3] - 441:25, 442:3, 444:23

**Z**

**zero** [1] - 477:2
**Ziskin** [1] - 457:21
**ZISKIN** [1] - 457:22