## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| RULFORD GARFIELD ALDRIDGE, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-608 |
| | § | |
| RICK THALER, | § | |
| | § | |
| *Respondent*. | § | |

### MEMORANDUM OPINION AND ORDER

In 1990, the State of Texas tried Rulford Garfield Aldridge for capital murder and sentenced him to death. Concerns about Aldridge's mental health arose before trial and have persisted after his incarceration. In the subsequent decades, no court has fully explored Aldridge's mental state contemporaneous with trial. Notwithstanding, Aldridge has personally petitioned various courts for relief, though signs of paranoid schizophrenia permeate his *pro se* pleadings.

When Aldridge's mental illness interfered with state habeas review, the state corrective process ground to a halt. The state courts have since refused to subject Aldridge's custody to constitutional scrutiny. Because Texas has forfeited its right to be the first forum for resolving constitutional challenges to Aldridge's conviction and sentence, his efforts to seek redress have culminated in the appointment of federal counsel, the filing of a federal habeas petition, and the development of his claims in an evidentiary hearing.

Through appointed counsel, Aldridge seeks federal habeas corpus relief from both his capital conviction and death sentence. The writ of habeas corpus is an extraordinary remedy. The Constitution honors the writ of habeas corpus as "a vital instrument for the protection of individual

liberty[.]" *Boumediene v. Bush*, ___ U.S. ___, 128 S. Ct. 2229, 2246 (2008).  Federal habeas relief is "a bulwark against convictions that violate fundamental fairness.  Those few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Brecht v. Abrahamson*, 507 U.S. 619, 633-34 (1993) (internal citations and quotation marks omitted) (alteration in original).  Aldridge has shown that his is an extraordinary case where constitutional error infected both his conviction and sentence.  For the reasons outlined below, the court issues a conditional writ of habeas corpus.

## BACKGROUND

In 1990, the State of Texas charged Aldridge with murdering Ben Stone during a robbery.[1] Early in the morning of January 3, 1990, Houston police officers investigated an apparent robbery and murder at a McDonald's restaurant where Aldridge worked.  Aldridge often helped manager Ben Stone open the business at around 5:00 a.m.  When the police arrived, they found Mr. Stone lying dead.  An assailant had shot him twice in the head.  Approximately $2,000 was missing from the restaurant's safe.  Because there had been no forced entry, the police began looking for Aldridge, fearing that the assailant had abducted him.

With his history of armed robbery, Aldridge unsurprisingly became a suspect.  Witnesses had seen Aldridge loitering around before Mr. Stone was scheduled to open the restaurant.  He was seen fleeing the scene.  Family members saw him soon afterwards with a gun and a large amount of cash.  Aldridge's half brother took some of the stolen proceeds and later reported him to the police.  Ten days after the robbery/murder, the police arrested Aldridge.

---

[1]    Aldridge's federal habeas petition does not challenge the evidence that led to his conviction.

Various circumstances from the murder and Aldridge's strange flight from justice have both supported and detracted from the question of whether Aldridge suffered from an impaired mental state in 1990. Aldridge displayed some calculated thought during that time. He bought the murder weapon beforehand and concealed his criminal record during the purchase. He disposed of the gun afterwards. He left little evidence at the crime scene and took great pains to elude detection. For instance, he hid in the bushes outside his apartment while a nephew obtained his passport and other belongings. He rented a hotel room in Houston after the murder, ostensibly to avoid detection. He fled the city. On those facts, the State has claimed that Aldridge made calculated, rational decisions right after the murder.

Other circumstances, however, suggested that Aldridge was mentally ill. Aldridge's sister told the police that he "was talking all kind of crazy stuff like was going to move to Iran[.]" Respondent's Federal Habeas Evidentiary Hearing Exhibits ("Resp. Ex.") 17 at HPD 041. After the murder, Aldridge fled Houston intending to repatriate to a Muslim nation, but returned after an odd journey that took him to San Antonio, Mexico City, Toronto and then back. During his travel, Aldridge produced writings which at trial were deemed religious, but are now labeled delusional. The police interviewed Aldridge. The police report records that, when asked about the crime:

> [Aldridge] went into a lengthy speech about his duty to Allah and his holy journey of which he needed to make. He admitted being present when Ben Stone was killed but would not admit to actually doing the killing. He stated that since Stone was an infidel, non Muslim [sic], that it was permissible to kill him and steal the money to achieve his goal. [Aldridge's] goal was to make contact with the Iranian embassy in Mexico City, and then fly to Iran to live in peace as a good Muslim[sic]. Again, he stated that whatever he had to do to get there did not really matter.

Resp. Ex. 17 at HPD 060.[2]  After asking for an attorney, Aldridge told the police officer "that he trusted lawyers even less than he trusted the police and said that he might want to talk in the future." Resp. Ex. 17 at HPD 060.  When they arrested Aldridge, the police found writings that gave a bizarre narrative of his life, describing how evil spirits acting in concert with global forces conspire against him.  Some essential features of this delusion have remained constant over time.  This paradoxical mix of logical action and delusional thought has existed throughout the ensuing legal proceedings.

The court has elsewhere summarized the trial and post-judgment proceedings in this case at great length.  Dkt. 76 at 4-23.  The court incorporates by reference that in-depth review.  The court will briefly address the context of those proceedings when discussing the claims based on Aldridge's mental illness.

This case comes before the court to address the matters raised by the petition for a writ of habeas corpus filed by Aldridge's appointed counsel.  Aldridge's federal habeas petition raises eleven grounds for relief:

(1)     Aldridge was incompetent at the time of trial;

(2)     The trial court violated Aldridge's constitutional rights by not *sua sponte* holding a competency hearing;

(3)     Texas law prevented the jury from giving mitigating effect to Aldridge's evidence as required by the Supreme Court's *Penry* jurisprudence;

(4)     Aldridge is presently incompetent to be executed;

(5)     The Eighth Amendment prohibits executing the mentally ill;

---

[2]     The police report also noted that "while [Aldridge] would like to have put this entire bad experience off on his religion; he was also very concerned with the evidence against him ie. fingerprints, witnesses, etc."  Resp. Ex. 17 at HPD 060.

(6)     Trial counsel failed to investigate, prepare, and present valuable mitigating evidence at trial;

(7)     Trial counsel failed to request a hearing on Aldridge's competency;

(8)     Trial counsel failed to investigate Aldridge's history of mental illness for its mitigating effect;

(9)     Trial counsel failed to present evidence of Aldridge's mental illness in the penalty phase;

(10)    Trial counsel failed to present an insanity defense; and

(11)    Appellate counsel should have raised a claim attacking Aldridge's competency to stand trial.

This court has held an evidentiary hearing.  The parties have provided detailed briefing on each issue.  Aldridge's petition is now ripe for consideration.[3]

## ANALYSIS

Aldridge's petition raises two categories of claims: those attacking his conviction and those attacking his sentence.  Specifically, claims one, two, seven, ten and eleven all challenge Aldridge's conviction and claims three through six, eight and nine all seek reversal of his punishment.  For the reasons discussed at length below, the court grants Aldridge habeas relief from both his conviction and sentence.

## CLAIMS RELATING TO ALDRIDGE'S CAPITAL CONVICTION

Aldridge challenges how his attorneys and the trial court responded to indicia of his mental illness.  At its heart, Aldridge's petition alleges that he was insane when he committed the crime and

---

[3]     Although Aldridge has made numerous *pro se* attempts to insert himself personally into these proceedings or extinguish them completely, the court has not authorized hybrid representation.  The court has found that Aldridge's mental illness requires reliance only on the pleadings filed by appointed counsel.

5

incompetent when tried for that offense.  The court must decide whether the failure to appreciate the severity of Aldridge's mental illness rendered his trial fundamentally unfair.  The court will first address Aldridge's competency to stand trial and then discuss whether trial counsel and the trial court should have done more because of Aldridge's mental illness.

## I.      Aldridge's Competency to Stand Trial

The Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process."  *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *see also Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975); *Pate v. Robinson*, 383 U.S. 375, 378 (1966).  Competency provides a foundation upon which other constitutional rights depend:

> Competency to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper*, 517 U.S. at 354 (quotation omitted).  A two-part inquiry scrutinizes a defendant's competency.  An inmate is only competent to stand trial when: (1) "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, 402 (1960) (internal quotation marks omitted); *see also Indiana v. Edwards*, ___ U.S. ___, 128 S. Ct. 2379, 2383 (2008); *Godinez v. Moran*, 509 U.S. 289, 396 (1993); *Drope*, 420 U.S. at 171-72.  Texas has adopted by statute a functionally identical standard for competence.  *See* TEX. CODE CRIM. PROC. ANN. art. 46B.003; *see also White v. Estelle*, 459 U.S. 1118, 1122 n.2 (1983)

(Marshall, J., dissenting from denial of certiorari) (recognizing that "[t]he State of Texas has adopted essentially the same standard").[4]

Incompetency claims in habeas corpus proceedings arise in two distinct circumstances: a procedural context (a claim that the trial court should have held a competency hearing) or a substantive context (a claim that the petitioner was actually incompetent at the time of trial).  *See United States v. Williams*, 819 F.2d 605, 607-09 (5th Cir. 1987); *Enriquez v. Procunier*, 752 F.2d 111, 113-14 (5th Cir. 1984); *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980).  Here, Aldridge argues both that he was incompetent and that the trial court did not act to ensure his competency. In a separate claim, Aldridge also faults his trial attorneys for not perceiving that his mental illness made him incompetent.

Incompetency determinations can be difficult when made contemporaneous to trial.  The passage of years makes the retroactive evaluation of competency a daunting task.  The unique nature of federal habeas proceedings creates a two-stage procedure for a retrospective evaluation.  First, a federal habeas petitioner must meet a high standard to warrant a backward-looking inquiry into his mental state:

> Before the federal district court has a duty to investigate a habeas petitioner's claim of incompetency, the petitioner must show that there are sufficient facts to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner to meaningfully participate and cooperate with counsel during trial.

---

[4]     Competency to stand trial is defined in Texas as (1) sufficient present ability to consult with counsel with a reasonable degree of rational understanding, or (2) the ability to understand, both rationally and factually, the criminal proceedings.  TEX. CODE CRIM. PROC. ANN. art. 46B.003.

*Moody v. Johnson*, 139 F.3d 477, 481 (5th Cir. 1998) (quotation omitted); *see also Washington v. Johnson*, 90 F.3d 945, 950 (5th Cir. 1996).  The court found that Aldridge's petition and related pleadings demonstrated a serious question about his competency that required additional inquiry.

Second, a court must decide "whether the quantity and quality of available evidence is adequate to arrive at an assessment [of an inmate's trial competency] that could be labeled as more than mere speculation."  *Bouchillon v. Collins*, 907 F.2d 589, 594 n.14 (5th Cir. 1990) (quotations omitted).  Recognizing "the inherent difficulties of such a nunc pro tunc determination under the most favorable circumstances," *Drope*, 420 U.S. at 183, the parties now agree that "sufficient evidence now exists to enable the court to render a reliable decision on Aldridge's competency to stand trial," though they differ in what should be the result of that inquiry.  Dkt. 151 at 11.[5]  The evidence available in this case has sufficed for a meaningful *nun pro tunc* inquiry into Aldridge's competency to stand trial.  *See Wheat v. Thigpen*, 793 F.2d 621, 631 (5th Cir. 1986) (finding sufficient information to hold a hearing where, as in the instant case, there was an adequate transcript, useful testimony, and expert assistance); *Martin v. Estelle*, 583 F.2d 1373, 1374 (5th Cir. 1978) (finding that expert and lay testimony and the trial record aided in "forming an accurate picture of defendant's mental state at the time of trial").

To that end, this court authorized an evidentiary hearing to develop: "(1) Aldridge's allegation that he was incompetent to stand trial and (2) that his trial attorneys should have done

---

[5]    Having found a bona fide question of Aldridge's incompetency, "[i]f the court finds that a meaningful competency hearing cannot be conducted, then of course, the writ must issue." *Martin v. Estelle*, 583 F.2d 1373, 1374 (5th Cir. 1978).

more to investigate and act on his mental condition." Dkt. 102.[6]  The parties presented testimony and evidence in an evidentiary hearing held on February 26 and 27 and March 2, 2009.  The court will rely on the testimony and evidence from the federal hearing, as well as the relevant record evidence, to decide whether Aldridge could rationally consult with counsel and rationally understand the proceedings against him.  In that review, Aldridge must "shoulder the burden of proving his incompetence by a preponderance of the evidence."  *Cooper*, 517 U.S. at 355; *see also Medina*, 505 U.S. at 449.

Because no state court has assessed Aldridge's competency to stand trial, this court's review of the issue is *de novo*.  The court faces a complex and intricate history.  Notwithstanding the halted state court proceedings, voluminous records provide insight into Aldridge's mental state, both as reflected in the transcript and through Aldridge's own writings.  Aldridge's federal proceedings have generated substantial arguments, affidavits, testimony and evidence relating to his mental state.  The court must assimilate that information into a clearer picture of Aldridge's competence at trial.  In doing so, the court pauses to note various factors which complement the legal standards that form the backbone of the competency-to-stand-trial analysis.

*First* - The two decades that have passed since Aldridge's conviction raise serious concerns about the distorting effects of time.  As noted by Dr. Walter Y. Quijano in the evidentiary hearing, "Both insanity and competency are time limited.  They are describing the person at that moment in time, not five years later or 20 years later."  Transcription of the Federal Evidentiary Hearing at 106 (hereinafter cited as "F.E.H. at ___").  Federal courts "'are acutely aware of the hazards connected

---

[6]    A reviewing court may hold one hearing to resolve both procedural and substantive incompetency claims.  *See Acosta v. Turner*, 666 F.2d 949, 956 (5th Cir. 1982).

with retrospective competency hearings[.]'" *Wheat*, 793 F.2d at 630 (quoting *United States v. Makris*, 535 F.2d 899, 904 (5th Cir. 1976)).   Accurate recollection decays with time and post-trial experiences blur the memory of events.   Dr. Thomas G. Allen explained in his evidentiary hearing testimony the imprecision which accompanies any attempt to pinpoint an individual's mental state two decades in the past:

> I can't clinically examine you today on competency issues and automatically assume that makes you competent 10 years ago or 20 years ago.   I can't do that.   If I have enough data historically, I can use that data to reach a reasonable conclusion about your competency 10 years ago or 20 years ago, if I have got enough data about your mental functioning. . . . .   I can even ask you questions today about 20 years ago and maybe get some insights as to whether or not you were competent. It would not be a solid [sic]. If you can't remember a lot of things, for example, which a lot of us don't remember yesterday very well, it is going to impair or distort some of that information.   So, I can give you a reasoned opinion and – also with some caveats that the opinion, you know, is weaker because of the absence of A, B, or C. But, yeah, you can give an opinion. It may not be as good or solid.

F.E.H. at 468-69.

Nonetheless, this court has found sufficient "contemporaneous expert examination and data from the date of the trial [are] still available to warrant an adequate and meaningful determination[.]" *Lokos*, 625 F.2d at 1268 n.5; *see also Reynolds v. Norris*, 86 F.3d 796, 803 (8th Cir. 1996) ("The passage of time is not an insurmountable obstacle if sufficient contemporaneous information is available."); *Wheat*, 793 F.2d at 630 (finding the availability of evidence, not the length of time since trial, determinative to whether a court can hold a retrospective hearing); *Bruce v. Estelle*, 536 F.2d 1051, 1057 (5th Cir. 1976) ("A reliable reconstruction of petitioner's mental status . . . depends less on time than on the state of the record.").   Although memories will fade after twenty years, the parties have produced ample expert and lay insight into Aldridge's mental condition at the time of trial.   *See Moran v. Godinez*, 57 F.3d 690, 696 (9th Cir. 1994) (noting that "medical reports

10

contemporaneous to the time of the initial hearing greatly increase the chance for an accurate retrospective evaluation of a defendant's competence").  In addition, information from both before and after the trial proceedings exists that can corroborate testimony about Aldridge's mental state contemporaneous with trial.  *See Bouchillon*, 907 F.2d at 592 n.8 (relying on medical records before and after trial to support a finding of trial incompetency).  Sufficient contemporaneous information relating to Aldridge's competency exists, with some allowance made for the passage of time when evaluating testimony.

*Second* - As a corollary to this court's heightened sensitivity to the passage of time, *post hoc* review should regard evidence closest in time to trial as the most reliable for determining a defendant's competency.  "The proper inquiry for an incompetency claim is the petitioner's mental state *at or near the time of trial*."  *See Goynes v. Dretke*, 139 F. App'x. 616, 619 (5th Cir. 2005).  Even intractable mental illness can ebb and flow in its expression.  The court, therefore, must focus on how Aldridge functioned in 1990, not on how he functions now.

*Third* - A witness' usefulness to the competency inquiry depends, in part, on his or her personal interaction with, and observations of, the defendant.  The court has received information from many sources that have varying levels of personal insight into Aldridge's mental illness.  As competency to stand trial marries psychological concepts with legal processes, the most important testimony in this case comes from attorneys and mental-health professionals.  Each of those sources, however, shines a different light on Aldridge's mental state.

Generally, the close interaction presumed by the lawyer/client relationship makes trial counsel the best source of information about a defendant's competency.  "Because legal competency is primarily a function of defendant's role in assisting counsel in conducting the defense, the

11

defendant's attorney is in the best position to determine whether the defendant's competency is suspect." *Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996); *see also Medina*, 505 U.S. at 450; *Drope*, 420 U.S. at 177 n.13; *Bryson v. Ward*, 187 F.3d 1193, 1201 (10th Cir. 1999); *Galowski v. Berge*, 78 F.3d 1176, 1182 (7th Cir. 1992).  An attorney's opinion of his client's competency to stand trial, however, is not dispositive.  Even though "[t]he observations of those interacting with petitioner surely are entitled to substantial weight," a reviewing court must not treat those observations as determinative: "personal observations cannot overcome the significant doubt about . . . competence raised by . . . clinical evidence."  *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001).  Attorneys are not trained mental heath professionals and may not fully appreciate the pervading and debilitating nature of mental illness during the thick of trial.

Testimony from expert witnesses also comes with caveats.  Psychologists are not lawyers. Identifying a mental illness does not necessarily describe its interaction with the legal process.  *Cf. Kansas v. Crane*, 534 U.S. 407, 413 (2002) ("[T]he science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law.").  Federal law recognizes that "[t]he subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations," because "[p]sychiatric diagnosis . . . is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician." *Addington v. Texas*, 441 U.S. 418, 430 (1979).  Respondent's expert Dr. Allen correctly observed that competency "is one of those areas where there is some difficulty merging the behavioral science with the requirements of the law.  They are often like merging water and vinegar.  . . . And it is not always

a perfect fit." F.E.H. at 477. The court must carefully weigh the expert and lay testimony about Aldridge's mental state in relation to the requisite legal standard.

In doing so, testimony by mental-health experts who have personally examined the defendant often carries greater weight than those who have only reviewed the record. *Cf. Demosthenes v. Baal*, 495 U.S. 731, 736 (1990) (expressing skepticism for conclusory opinions by doctors who have not personally examined the prisoner when determining mental competency for next-friend purposes); *Dowthitt v. Johnson*, 230 F.3d 733, 746 (5th Cir. 2000) (finding an expert opinion to be unpersuasive where it was "based on [the expert's] review of a portion of the paper record, and [the expert] did not personally interview [the defendant]"). First-hand observation, particularly that contemporaneous with trial, heightens the usefulness of testimony in determining Aldridge's competence.

*Fourth* - While Respondent demurs that Aldridge may have exaggerated his symptoms at various points, the parties seemingly agree that he suffered from mental illness at trial. Mental illness and incompetence, nonetheless, are not necessarily coexistent conditions. *See McCoy v. Lynaugh*, 874 F.2d 954, 960-61 (5th Cir. 1989); *United States v. Williams*, 819 F.2d 605, 608 (5th Cir. 1987). The court must shift through the indicia of mental illness to see if its pervasiveness and manifestation degrades the core concerns of the competency inquiry: a defendant's factual and rational understanding of his trial and his rational ability to consult with counsel.

*Finally* - "Competency is contextual." *Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996); *see also United States v. Atkins*, 294 F. App'x 892, 899 (5th Cir. 2008) (looking at the nature of the criminal charges against a defendant to determine his ability to assist in his defense). Generally, an attorney has much greater responsibilities in conducting a defense than the client.

"The defendant need not participate in the bulk of trial decisions, which he may leave entirely to counsel[.]" *Watts*, 87 F.3d at 1288.  Nevertheless, a defendant's competency strongly comes into question if mental illness impairs his ability to understand, participate in, or ratify his attorney's decisions. *See Cooper*, 517 U.S. at 364 (noting that, if an inmate "lacks the ability to communicate effectively with counsel, he may be unable to exercise other rights deemed essential to a fair trial"); *see Edwards*, ___ U.S. at ___, 128 S. Ct. at 2386 (referring to the rational communication component as "be[ing] able to work with counsel at trial").

In a capital case, defense attorneys have the special obligation to marshal evidence that would militate against the State's ability to carry out the ultimate punishment.  Trial counsel often will rely on the capital defendant to provide viable avenues for a mitigation investigation.  A capital defendant's mental illness – while itself possibly providing grounds for imposing a sentence less than death – may also hinder that defendant's ability to consult with counsel in a manner that provides sufficient insight into defense strategy.  The seriousness of the charges against Aldridge must factor into his ability to understand his legal plight and his ability to assist his attorneys in crafting a meaningful defense.

With those guiding principles in mind, the court will turn to the evidence and testimony that discloses Aldridge's mental state at the time of trial.

### A.      Background Information Involving Aldridge's Mental State

#### 1.      Before and During Trial

In early 1990, the State of Texas charged Aldridge with capital murder.  Trans. Vol. I at 6. On January 16, 1990, the trial court appointed Doug Davis as counsel.  Trans. Vol. I at 10.  The trial court appointed Randolph Bates as co-counsel on February 7, 1990.  Trans. Vol. I at 15.

14

Early in the prosecution, the State filed a notice of intent to use records that detailed Aldridge's criminal history.  Trans. Vol. I at 17.  The extensive records included information from Aldridge's previous arrests, both as a youth and as an adult.  The detailed records did not include any reference to a significant history of mental illness during Aldridge's prior interactions with the criminal justice system.

Aldridge was in prison from 1972 until 1986.  The prison records do not contain any indication of major mental health concern.  Family members, however, have described how letters from Aldridge during that period became increasingly filled with "crazy talk and nasty language" that included rambling discussions "about devils and Nazis and the FBI, who . . . had hired people to assassinate him[.]"  Petitioner's Federal Habeas Evidentiary Hearing Exhibits ("Pet. Ex.") 24.

Family members have confirmed that Aldridge engaged in bizarre behavior when released from prison in 1986.  Aldridge's conduct was paranoid, laden with conspiratorial fears, and, in many ways, irrational.  While living with family he described how evil spirits surrounded the house and wanted to kill him.  He accused family members of being in league with the forces against him.  Family members accordingly limited their association with him.  During this period, Aldridge showed some signs of independence by holding down a job, buying a car, and living alone.  However, a medical doctor in 1988 examined Aldridge for an unrelated issue and opined that "[t]here is a significant possibility of psychiatric disturbance present."  Pet. Ex. 19.

Trial counsel early on recognized that Aldridge's mental health would be an issue.  On March 23, 1990, trial counsel filed a "Motion for Appointment of Independent Mental Health Expert."  Trans. Vol. I at 121.  Trial counsel asserted that, if the jury were to find Aldridge guilty of capital murder, the defense would present evidence of his "present mental status."  Trial counsel argued that

it was "imperative to retain a mental health expert solely for the purpose of advising counsel concerning [Aldridge's] past and present mental state." The motion, however, did not specify what issues brought Aldridge's mental state into question.

On that same date, trial counsel also filed a "Notice of Intention to Raise Defense of Insanity." Trans. Vol. I at 157. Trial counsel alleged that, at the time of the alleged offense, "as a result of mental disease or defect, [Aldridge] did not know that his conduct was wrong and was incapable of conforming his conduct to the requirements of the law he allegedly violated." Trans. Vol. I at 157. The motion specifically requested that an appointed "examiner also submit a report setting for his observations and findings concerning (1) whether the Defendant is presently mentally ill and requires observation and/or treatment or hospitalization in a mental hospital for his own welfare and protection or the protection of others; or (2) whether the Defendant is a mentally retarded person[.]" Trans. Vol. I at 163.

2.      Dr. Quijano's 1990 Evaluation

On March 26, 1990, the trial court approved the motion for the appointment of a mental health expert. The defense retained Dr. Walter Y. Quijano, a psychologist with substantial experience testifying in capital cases. Dr. Quijano interviewed Aldridge on March 26, 1990, and performed several psychological tests. Dr Quijano consulted with Aldridge's attorneys and ultimately gave them a written report with his observations on May 15, 1990, near the end of the guilt/innocence phase.[7]

---

[7]      The trial transcript does not contain Dr. Quijano's report and nothing suggests that the trial court was aware of its results. While Dr. Quijano produced the report late in the trial proceedings, the testimony in the federal evidentiary hearing suggested that he had conferred with trial counsel about his conclusions well before that point.

16

Dr. Quijano's 1990 report provides an important, though later shown to be incomplete, insight into Aldridge's mental state contemporaneous with trial. Dr. Quijano's 1990 report indicates that trial counsel contacted him to "conduct competency to stand trial, insanity, and future dangerousness evaluations." As a result, Dr. Quijano made several important observations about Aldridge's mental condition. He recorded that Aldridge's speech contained "association, delusion, or hallucination disorders." His impulse control, insight, and judgment were poor. Aldridge described how spirits visited and tormented him, interfering with sleep and other activities. Dr. Quijano noted "serious suspiciousness and a thinking disorder."

Dr. Quijano corroborated his report with similar observations by trial counsel and family members. Dr. Quijano reported that Aldridge's family verified his strange conduct: "[t]he family communicated to defense counsel he has always exhibited strange behaviors but they did not understand what they were and not to the point of requiring obvious psychiatric care." Dr. Quijano also reviewed writings Aldridge produced between 1988 and 1990, noting that they were "replete with association and delusional contents." Ultimately, Dr. Quijano opined that Aldridge suffered from "Schizophrenic disorder, paranoid type and adult anti-social behaviors. There is some hesitation to use the impression of anti-social personality because of the involvement of the schizophrenic process." Noting that he had been asked to decide "whether the Defendant is mentally ill and requires observation and/or treatment or hospitalization in a mental hospital for the Defendant's own welfare and protection or for the protection of others," Dr. Quijano answered "yes."

Having found that Aldridge met the clinical requirements for a diagnosis of mental illness, Dr. Quijano's 1990 report turned to whether he met the legal standard for competency. Dr. Quijano first evaluated whether Aldridge had a factual and rational understanding of the murder. Dr. Quijano

opined that he had a factual understanding because Aldridge "knew he was accused of capital

murder."  With regard to a rational understanding, Dr. Quijano observed:

> He considered the charges against him serious from his point of view because they
> place him before man and because he violated written laws by taking a life for which
> he will be judged; and from the points of view of man and God but he was not sure
> why.  He appeared to appreciate the extrinsic and intrinsic wrongfulness of the
> conduct charged.

Dr. Quijano then related Aldridge's explanation of the crime.[8]  Aldridge integrated a delusional

---

[8]     In the evidentiary hearing, Dr. Quijano described how he performed this portion of the
interview.  Dr. Quijano asked Aldridge to describe his crimes and allowed him to speak
uninterrupted.  Dr. Quijano testified that open-ended questions allow an individual with
schizophrenia to engage in "free-flowing conversation" with "crazy talk."   Directed
questions, on the other hand, may "allow the schizophrenic individual to focus."  F.E.H. at
117-28.  Dr. Quijano reported Aldridge's version of the crime as follows:

> [Aldridge] opened a checking account, God's account opened for His
> purposes and touched only with his permission to go to Egypt. The
> guy, surrounded by a white supremacist effort camouflaged as a
> Muslim but actually working for prison officials, had a vision of
> [Aldridge] being the Muslim messiah described in Muslim literature.
> The guy and the supremacist devised a plot to prevent the vision in
> the middle east from coming to life. The victim who was made to feel
> little about himself, was set up by the guy and the supremacist to
> prevent the trip to the middle east. They knew [Aldridge] did not
> believe in weapons and they had to devise a way for him to have one.
> One day he was fired upon on the way to work but he still refused to
> get one because he believed all life was sacred and he had no right to
> interfere no matter how diabolic unless it affected him. They began
> to sexually assault him at work and the deceased was a participant.
> The guy felt that was a soft spot in him as told by the white
> supremacist. The victim followed him around and [Aldridge] could
> feel sexual assault as the victim stood behind him. The victim then
> told [Aldridge] on many occasions that the only way he would stop
> sexually molesting him was for [Aldridge] to kill him.
>
> The harassment got worse. They would come to his apartment to
> sexually assault him and he had to cancel his middle east trip
> although his money and passport were already ready because of a

(continued...)

narrative into the facts of the crime, primarily blaming the killing on the victim's association with the spirits that sexually assaulted Aldridge.  Notwithstanding his delusional account of the crime, Dr. Quijano found Aldridge competent because, when asked direct questions he was able to "suspend" his schizophrenia and "focus on the nitty-gritty."  F.E.H. at 120.  Dr. Quijano found that Aldridge adequately understood the role of trial participants and especially that of his attorneys.  Dr. Quijano was of the opinion that Aldridge "knew the events leading to arrest and related them to the charge, the consequences of a guilty verdict, and the proceedings in court.  In sum, he appeared to have a rational understanding of the proceedings against him."

Dr. Quijano went on to discuss whether Aldridge could assist his attorneys.  Dr. Quijano related that Aldridge's attorneys "complained that the defendant related strange and fantastic stories about the conducts charged."  While Aldridge "did not know yet if he could trust his lawyer," he told Dr. Quijano that "he and the lawyer understood each other well."  Aldridge said that he wanted his attorneys to advance a defense that "the victim was part of a conspiracy with individuals and spirits that repeatedly harassed him by sexual assault, control of his thoughts, and preventing him from fulfilling his religious destiny in a muslim country."

Nevertheless, Dr. Quijano thought that Aldridge was able to communicate with his attorneys because he "knew his counsel, had sufficient interpersonal rapport with him, communicated the facts of the [crime] to him, and participated in his defense strategy."  Dr. Quijano, however, cautioned trial

---

[8]     (...continued)
strong last minute effort of the spirits by participating in sexually assaulting him. He saw one of the spirits and drew a picture of it and sent it to an ambassador from a Muslim country. The sexual assaults against him became too powerful for him that he could no longer sleep. The night before the conducts charged he was sexually assaulted all night long.

counsel that they "should be advised of the defendant's delusional system which he uses to explain the conducts charged and to tease out facts from fantasy by objective corroboration."

Dr. Quijano also gave his expert opinion about the feasibility of an insanity defense. Dr. Quijano looked for "[b]ehaviors prior, during, and after the conducts charged . . . for indices of knowledge the acts are wrong." Given Aldridge's preparation for the crime, the facts associated with the killing, and his flight, Dr. Quijano was of the opinion that: "There were behaviors and thoughts that indicated appreciation of wrongfulness of the conducts charged although the thoughts, more than the overt behaviors (i.e., fleeing) were included in the web of his delusions." Nonetheless, "the weight of the data favored the impression that the defendant knew his conducts were wrong." Dr. Quijano stated: "The defendant is seriously mentally ill with the diagnosis of schizophrenic disorder, paranoid type. He should be treated psychiatrically and compassionately. Yet the standard of insanity is cognitive only (i.e., not knowing at the time of the act that the conduct charged was wrong) and unfortunately, the defendant did not meet it." The defense did not call Dr. Quijano as a witness in either the guilt/innocence or penalty phase of trial.[9]

<blockquote>3.    Aldridge's Trial Proceedings</blockquote>

The transcript of the guilt/innocence phase of trial contains some information about Aldridge's mental state. Aldridge passed his attorneys a note during jury selection that showed the existence of active psychosis contemporaneous with trial:

---

[9]    On the back of a "Harris County Sheriff's Department Detention Bureau Referral for Psychiatric Screening" someone scrawled "It should be noted THAT: Deputies NOR other inmates report any unusual behavior; they and Dr. Quijano (ex-TDC psychologist) thinks [sic] this maybe a 'GAME' to beat this Cap. Mur. Case. I am making this report at Dr. Quijano's request 'just in Case' these feelings are real and this Inmate is Mentally Ill." Dkt. 95, Exhibit D at 2. The parties have never developed the importance, if any, of those handwritten notations.

> In the letter I wrote detailing the plot against me, "MASONS" contributed a lot to my problems leading up to this trial.  There are "Masons" in "my family" who also contributed apart, they even threw me into the streets upon my release from prison. I'm bias against "NO-ONE."  I cannot risk "MASONIC" control upon the Jurors.

Pet. Ex. 4.  Testimony in the guilt/innocence phase, however, inferentially showed some stability in his mental state because he was a good worker.  On May 16, 1990, the jury found Aldridge guilty of capital murder.  Trans. Vol. I at 216.

Punishment phase testimony shed greater light on Aldridge's mental illness, but did not necessarily alert the trial court that he was not competent.  To show Aldridge's propensity toward violence, the prosecution sought to introduce into evidence Aldridge's confession to an unrelated robbery.  Trial counsel tried to suppress the statement because Aldridge claimed that the police coerced him to confession.  Aldridge testified about the police interrogation.

Aldridge's trial testimony did not provide any obvious sign of incompetence.  His responses corresponded fairly well with the questions asked.  For instance, when Mr. Davis asked if the police used force against him in taking the statement, Aldridge responded: "I was beaten.  There were [sic] even an attorney who came to visit me and he observed a cut over my eye, and I told him how it got there.  I told him I was being abused by officers asking me to questions [sic] or trying to force me to confess."  Tr. Vol. 20 at 55.  Aldridge said that the officers physically abused him: "In an effort to get me to plead guilty, and to confess."  Tr. Vol. 20 at 55.

On cross-examination, Aldridge answered questions about the alleged beating appropriately. Aldridge even described why he did not report the abuse he received: "I didn't want to risk it.  I didn't know that much back then.  I was young and didn't know that much about the system and I wouldn't challenge the system much back then."  Tr. Vol. 20 at 58.  Through his cross-examination,

Aldridge did not stray from the questions asked and did not give any answer that explicitly suggested an insane mind. Aldridge seemed to answer questions directly and logically, though the record now suggests that his answers may have fit within a delusional framework. Tr. Vol. 20 at 54-61, 71-73.

The prosecution called Dr. Clifford K. Moy, a practicing psychiatrist who had not examined Aldridge, to "distinguish people who are honestly mentally ill versus people claiming mental illness because they don't want to bear responsibility for what they did[.]" Tr. Vol. 20 at 169. Dr. Moy discussed how mentally ill individuals could not hold down a job for a lengthy period, commit crimes that required planning, or hide their illness. Tr. Vol. 20 at 169-72. The prosecution questioned Dr. Moy in a manner suggesting that Aldridge was a sociopath.

On cross-examination, the defense had Dr. Moy read some of Aldridge's writings that the police collected at the time of his arrest. Dr. Moy did not consider this writing to be delusional. Tr. Vol. 20 at 183. He testified: "In looking at the way the letter is written, the vocabulary and the grammar and the sentence structure are all there. The thoughts and sentences are clear. The thoughts are clearly expressed – the numerous references to, I assume the Koran, do appear to me to be allegorical." Tr. Vol. 20 at 185. From the letter, Dr. Moy was "doubtful" that Aldridge suffered from mental illness or was experiencing "grandiose ideation." Tr. Vol. 20 at 187. Later in his testimony, Dr. Moy admitted that an individual who "sees spirits, who feels that there's a conspiracy against him by family members, T.D.C. people, employers, hears voices, feels that he is physically and sexually assaulted by spirits" would likely be mentally ill "[i]f they actually did have those experiences[.]" Tr. Vol. 20 at 197. Trial counsel later challenged Dr. Moy's ability to diagnose Aldridge as sane or insane based on the information before him.

The defense called five punishment-phase witnesses: Dr. James Marquart, Virginia Aldridge, Cheryl Aldridge, Brenda Garrett, and W. Randolph Bates, Jr.  Dr. Marquart, an associate professor of criminal justice at Sam Houston State University who routinely testified in capital cases, explained the difficulty in accurately predicting a capital defendant's future propensity toward violence.  Dr. Marquart had not examined Aldridge and did not have any information specific to his case.

A niece, Virginia Lee Aldridge, testified that "he used to say strange things all the time and he used to act real strange[.]"  Tr. Vol. 20 at 222.  His strange ideas involved people trying to kill him.  Tr. Vol. 20 at 223-25.  Aldridge "felt the same people who killed Adolph Hitler [were] trying to kill him[.]"  Tr. Vol. 20 at 225.  The prosecution's cross-examination, however, showed that during these periods of bizarre behavior Aldridge was still able to work and otherwise function normally.  Another niece, Cheryl Aldridge, described how conversations with Aldridge were "kind of strange."  Tr. Vol. 20 at 236-37.  She verified that Aldridge believed a conspiracy existed to kill him.  Aldridge told her that, during his prior incarceration, prison guards and prisoners tried to torture and kill him.  On cross-examination, however, she agreed that he never seemed "so mentally ill that [she] needed to get him some help."  Tr. Vol. 20 at 242.  In fact, she considered him "different" but not "crazy."  Tr. Vol. 20 at 242.

Aldridge's sister, Brenda Garrett, testified that Aldridge spoke about spirits and plots to kill him "[q]uite a bit."  Tr. Vol. 20 at 246.  She related how he talked about how a "spirit was being sent from the prison to torture him."  Tr. Vol. 20 at 247.  Ms. Garrett described an injury when Aldridge "got hit in the head with an ax when he was in prison."  Tr. Vol. 20 at 250.

Aldridge's trial attorney Mr. Bates testified in the punishment phase.  Direct questioning by his other attorney, Mr. Davis, discussed the note that Aldridge passed to counsel during voir dire. The prosecution's cross-examination did not address the substance of the note, but inquired into whether trial counsel and Aldridge could "speak with each other intelligently," whether Aldridge had displayed violence, and whether Aldridge could answer questions asked of him.  Tr. Vol. 24 at 258. In essence, the prosecution asked whether Aldridge appeared competent and sane.  Mr. Bates answered that Aldridge could "sometimes" speak intelligently and answer questions, but had not been violent.  Tr. Vol. 24 at 258.  On redirect, Mr. Davis engaged Mr. Bates in the following colloquy:

> Mr. Davis:  . . . without going into what Mr. Aldridge said, can you describe the, I guess the tenor of the conversations that we had with him?
>
> Mr. Bates:  There would be time when I would ask him a question and he would respond appropriately to the questions.  There would be other times that I would ask him a question and his answer had nothing to do with what I asked him about.
>
> Mr. Davis:  How would you characterize his thoughts?  Were there anything odd about them or — to you?
>
> Mr. Bates:  Quite odd.
>
> Mr. Davis:  Was there any talk about spirits controlling people?
>
> Mr. Bates:  Quite a bit of talking about that.
>
> Mr. Davis:  People after him?
>
> Mr. Bates:  Yes.
>
> Mr. Davis:  Different groups?
>
> Mr. Bates:  Yes.

24

Tr. Vol. 20 at 259.  On recross-examination, the prosecution questioned Mr. Bates' motive in testifying, implying that he was just "trying to save [Aldridge's] life[.]"  Tr. Vol. 20 at 260.  Further redirect consisted of one question:

> Mr. Davis:   Did the – again, without going into the conversation, did the conversation, was it rational, to you?
>
> Mr. Bates:   No.

Tr. Vol. 20 at 260.  The State responded with a single question: "Never rational to kill anybody, is it?"  Tr. Vol. 20 at 260.

The defense then read into the record some of Aldridge's writings that they had previously submitted into evidence.  The first letter, written to someone in Dubai, interlaced discussion about the Muslim faith with Aldridge's delusional ideas.  Aldridge's letter complained about sexual violation by spirits, supernatural visions, and his role as a religious messenger.  Tr. Vol. 20 at 261-65.  Another sample of his writing discussed how Aldridge had since his youth been under the "watchful eyes of many spirits."  Also, in a discussion laced with verbal imagery, Aldridge described his conversion to the Islamic faith, discussed interaction with spirits, and told of his desire to flee to a Muslim country.  Tr. Vol. 20 at 266-75.

Trial counsel's closing argument emphasized Aldridge's mental illness.  Trial counsel informed the jury:

> Mr. Aldridge suffers from delusions. I think that's fairly obvious from what you heard in those letters.  He thinks there are people after him.  He thinks that he can communicate with spirits. He has a problem. . . .  His actions are based on his delusions. . . .  He thinks that he suffers from physical and sexual assaults by spirits. He thinks there are inmates, that he sees people chasing him all the time, there are people looking at him through windows.

Tr. Vol. 21 at 298.  Notwithstanding trial counsel's pleas for the jury to extend mercy because of Aldridge's mental illness, the jury answered Texas' special issues in a manner requiring the imposition of a death sentence.[10]

### 4.      Shortly After Trial

Concerns about Aldridge's mental state persisted after sentencing.  On Aldridge's admission to the Texas Department of Criminal Justice ("TDCJ") system, a preliminary psychological screening by the unit psychologist raised serious concerns about Aldridge 's mental condition.  A report dated June 28, 1990  – approximately a month after trial – noted that Aldridge suffered from "mild anxiety, suspiciousness, lack of cooperation, and destructibility; moderate unusual thought content, blunted affect, and emotional withdrawal; severe unusual thought content, and extremely severe hallucinations."  Dkt. 57 at Exhibit D, entry dated June 28, 1990.  The TDCJ employee diagnosed Aldridge with "Schizophrenia, paranoid type, chronic" and recommended medication. Dkt. 57 at Exhibit D, entry dated June 28, 1990.  A subsequent report noted that Aldridge suffers from a "paranoid personality dis[order]" with delusional thinking.  Dkt. 57 at Exhibit D, entry dated August 8, 1990.  While the intake evaluations confirm the existence of profound schizophrenic symptoms shortly after trial, TDCJ has never treated Aldridge's mental illness.

Three months after trial, Aldridge began submitting numerous and voluminous *pro se* pleadings to federal and state courts.  These filings contain a consistent delusional and rambling tone. Aldridge fills his pleadings with lengthy legal citations and with irrational claims, general circling around his belief that a governmental conspiracy involving the prosecutors, the courts, and trial

---

[10]      During deliberations, the jury sent out a note regarding a "dispute as to Dr. Moy's statements regarding 'Allegorical' and 'Grandiose.'"  The jury wanted to review that portion of the testimony.  Trans. Vol. I at 236

counsel brought about his conviction. Aldridge's post-trial legal submissions indicate a rudimentary understanding of the legal system. He apparently understands the roles of the various participants, though he integrates them all into the conspiracy against him. He cites cases and engages in some legal argument. Yet a conspiratorial view of the criminal justice system saturates his rambling narrative, accusing each component of the legal system of persecuting him.

Aldridge sent a letter to a federal district court judge on August 31, 1990, complaining that an "alleged Prison Group had [him] arrested, charged, and convicted on a charge of Capital Murder.'" Pet. Ex. 32. He subsequently submitted similarly delirious letters. Pet. Ex. 32. In a 217-page "Motion for Contempt Judgment" that he dated October 1, 1990, Aldridge discussed the conspiracy that led to his arrest and conviction for capital murder. He drew his trial attorneys into the conspiracy. He accused Mr. Davis of "work[ing] with the court" to secure his conviction. He faulted counsel for not calling any of the witnesses he suggested. He also accused the jury of being in on the conspiracy, receiving payment to give him a death sentence. Pet. Ex. 30.

Aldridge filed a *pro se* federal habeas action in 1991. As his first ground for relief, Aldridge claimed that "state court appointed counsels conspired with the state trial court to convict me for a crime they know I did not commit." *Aldridge v. Collins*, H-91-CV-2276, Dkt. 1. Aldridge included a 3000-page pleading giving his perception of the trial. He repeatedly and thoroughly incorporates his trial attorneys into a prosecutory delusion in which all trial participants acted against him. His sense of the trial drama differs significantly from the record. He accuses every individual of making absurd statements about his guilt and repeatedly lambasting his defense. Aldridge perceived that everyone remotely connected to his criminal case – attorneys, judges, witnesses, jurors, spectators, and jailors – conspired to orchestrate the murder, frame Aldridge, and convict him. Aldridge even

explained that unidentified people instructed him not to inform the trial court of the vast conspiracies against him, a directive in which defense counsel concurred.

The record also contains a "Motion for Injunctive Relief" Aldridge filed in the United States Supreme Court on January 13, 1992. This motion accused the trial court and his appellate attorneys of being in "active concert" with many others, including escaped death-row inmates, who all "participated in planning or carrying out the capital murder for which petitioner is incarcerated or committed an overt act in furtherance of the conspiracy . . . prior to and after the commission of the capital murder in January 1990." Pet. Ex. 29.

On May 18, 1992, the Court of Criminal Appeals denied a *pro se* motion for the appointment of new appellate counsel. This pleading accused trial counsel and the trial judge of joining the conspiracy, headed by "an iranian sufi mystic," to incarcerate Aldridge. These pleadings echo the incoherent ones Aldridge filed in federal court. Again, while his writings include legal citations and indicate some knowledge of the legal process, they are also laden with references to mystical spirits, imaginary conspiracies, and hallucinatory episodes.

Correspondence between Aldridge and others also reveals the pervasiveness of his mental illness. In a May 10, 1993, letter to the Texas Resource Center, Aldridge blamed his conviction on his "ex-State Prosecutor defense counsel" who conspired to "suppress the true facts of [his] case[.]" Pet. Ex. 14. By that point, Aldridge had incorporated every attorney in Harris and the surrounding counties into his conspiratorial theories. A December 8, 1993, letter to the same organization further blamed their death-row clients for killing the victim and framing Aldridge. Pet. Ex. 13. Most importantly, his letter also labels defense attorneys as governmental actors and otherwise incorporates the criminal justice system into the conspiracy against him.

28

In all, Aldridge's post-trial writings display varying levels of lucidity and are saturated with legal citations, some of which are even appropriate, but also manifest pervasively delusional paranoia. Aldridge's writings soon after his conviction confirm mental illness and raise a substantial question about his competency to stand trial only a short time before.

> 5.   Halted State Habeas Proceedings

The Court of Criminal Appeals denied Aldridge's direct appeal in 1993. *Aldridge v. State*, No. 71,090 (Tex. Crim. App. May 5, 1993). The trial judge, the Honorable Judge Brian Rains, presided over Aldridge's state habeas proceeding. Even though the state court appointed Mr. Thomas Moran to represent Aldridge sometime in early 1994, he initially filed nothing on Aldridge's behalf. Shortly before the United States District Court closed Aldridge's first federal action, Aldridge filed a *pro se* "Motion for Leave to Appear Before this Court to Unequivocally Waive Court Appointed Counsels" in state court. Dkt. 66, Exhibit 4. On December 14, 1994, Mr. Moran filed a "Motion for Competency Evaluation" in the state trial court. Mr. Moran recognized Aldridge's request to proceed *pro se* and opined that Aldridge "has the absolute right . . . to proceed pro se and his desire should be accommodated if he is competent to make such a choice. In such a case, counsel would withdraw and allow Applicant to continue the habeas process without counsel." Mr. Moran asked the trial court "to order a psychiatric examination limited to the issue of competency to waive counsel." Dkt. 66, Exhibit 5.

On December 19, 1994, the trial court ordered a "limited competency examination be conducted" to determine if Aldridge was "incompetent to waive counsel." Dkt. 66, Exhibit 5. The state habeas court appointed Dr. Jerome Brown and Dr. Edward Silverman to evaluate Aldridge's

competency to proceed *pro se* on state habeas review.  Both psychologists found that Aldridge was unable to represent himself competently.

On January 27, 1995, Dr. Silverman submitted a report opining that Aldridge "is suffering from a serious mental illness characterized by a very well organized and well ingrained prosecutory delusional system."  Recognizing that the "guidelines with regard to competency to waive counsel are quite vague," Dr. Silverman felt that it was "abundantly clear . . . that Mr. Aldridge's request to represent himself in court is based on irrational thinking and that this request is a direct manifestation of a serious mental illness of psychotic proportions.  In this regard, it is the opinion of this examiner that Mr. Aldridge should be incompetent to waive his right to counsel."  Dkt. No. 57, Exhibit I.

On January 31, 1995, Dr. Brown submitted a report to the habeas court.  Dr. Brown opined that "[t]he defendant's delusional disorder essentially makes him unable to realistically and competently assess his current legal situation and respond accordingly.  This delusional process also renders him unable to utilize his attorneys in an effective or helpful fashion."  On that basis, Dr. Brown found Aldridge

> *NOT COMPETENT to stand trial.  He is very delusional and interprets his legal situation in terms of these delusional ideas.  Consequently, they color and distort his interpretation of everything that is taking place in the legal proceedings against him. The defendant would not be able to assist his attorney with a reasonable degree of rational understanding because of his current mental state.  He would not be able to form a rational or factual understanding of the proceedings.*  It is recommended that he be transferred to a psychiatric facility where longer term care can be provided for him.  If this is done, it is expected that his competency could be restored in the near future.

Dkt. 57, Exhibit J (emphasis added).  Nothing shows that TDCJ treated his mental illness or reevaluated him after that point in time.

30

On March 3, 1995, the state habeas court held a hearing to determine Aldridge's competency to represent himself. Aldridge was the only testifying witness. The state habeas court and Mr. Moran questioned Aldridge, exploring the conspiracy theory behind Aldridge's *pro se* pleadings. The state habeas court then made the following oral findings:

> This Court would then make the finding that Mr. Aldridge is not competent to represent himself in the appellate process, then the State habeas corpus proceedings would – I don't know if I have any statement to make to [United States District Judge] Black, but would make the same statement to Judge Black based upon this hearing and the proceedings and the ability to observe Mr. Aldridge as I have and the testimony he's giving that he is not competent to represent himself on appeal. He may be a well learned individual having spent a number of years in the Texas Department of Criminal Justice, but I believe based upon his testimony that he is hiding behind the conspiracy factor in that this is his grasp to keep himself alive at this time by claiming that everybody involved in this process is involved in this conspiracy from myself to the twelve people on the jury, the two lawyers that this Court appointed to represent Mr. Aldridge, and I – I extremely take issue with anybody who takes the position that I am appointing incompetent lawyers to represent people who are charged with crimes, especially a capital murder.

> If nothing else comes out of this record, it's my statement that I appointed nothing but competent, extremely capable lawyers . . . in trial and on appeal . . . . Just so happens that twelve people decided to believe the evidence and found you guilty.

The state habeas court concluded:

> You are not able to represent yourself on appeal in the habeas corpus proceedings in this court or in the state courts or in the federal courts. Mr. Moran is going to stay on the case. . . . [B]ased on the same testimony given by Mr. Aldridge, the questions asked by Mr. Moran and by this Court, Mr. Aldridge is not competent to waive counsel to represent himself. . . . And because of this conspiracy theory, this is his, this is his only life raft that he can look for and when a person – I think it's obvious from Mr. Aldridge's answers to these questions that these lawyers are fine and they'd be fine if they weren't a part of this conspiracy, and I think that that's what this Court basically is making its decision on is everyone is all right if they just weren't part of this conspiracy and that Mr. Aldridge's one out.

Dkt. 66, Exhibit 6.  The state habeas court, however, then orally granted "a motion that Mr. Aldridge

be evaluated to determine his competency to be executed."  The state habeas court agreed to issue

formal written findings, though the record contains no such findings.  Dkt. 66, Exhibit 6.

On March 3, 1995, the state habeas court entered a written order authorizing another

evaluation of Aldridge's mental state, this time to review his competency for execution.  The trial

court ordered Dr. Brown and Dr. Silverman to reevaluate Aldridge's competency in that context.

Dkt. 66, Exhibit 7.  On March 22, 1995, Dr. Silverman's office wrote a letter to the state habeas

court stating that Aldridge refused to cooperate in the evaluation.  Dkt. 66, Exhibit 8.  Dr. Silverman

apparently did not prepare a report as required by the March 3, 1995 order.

On March 27, 1995, Dr. Brown submitted his report finding Aldridge incompetent to be

executed.  Dr. Brown noted that Aldridge "continues to exhibit the same delusional ideation he has

always exhibited when seen by this examiner."  Dr. Brown again found that his

> delusional ideas pervade and distort every aspect of his legal situation and present
> circumstances.  Because of his continuing bizarre and peculiar interpretation of what
> is happening to him, he has not been able to assist his attorney with a reasonable
> degree of rational understanding, nor does he have an appropriate understanding of
> his sentence and the execution that might otherwise be imminent.  He is rigid,
> determined, and unmovable about these ideas and only intensive psychiatric care can
> produce any reasonable recovery of his faculties or his contact with reality.  Based
> on these findings and the defendant's current mental status, he would be considered
> NOT COMPETENT to be executed or otherwise have the sentence against him
> carried out.

Dkt. 57, Exhibit A.

On April 25, 1995, Mr. Moran sent a letter to the District Attorney's Office containing

proposed findings of fact relating to Aldridge's competency.[11]  Mr. Moran wanted the findings to

---

[11]     The record contains the joint proposed findings of fact and conclusions of law regarding
(continued...)

specify that "Aldridge is both incapable of assisting counsel in preparation of a writ of habeas corpus and incapable of proceeding pro se."  Mr. Moran also wanted the state habeas court to find Aldridge incompetent to be executed.  Mr. Moran expressed a desire to hold Aldridge's proceedings in abeyance:

> Also, there is no reason for the order to ship everything to the Court of Criminal Appeals.  There is nothing on file and there is no reason to get the folks in Austin involved at this point.  If they do get involved, I'll have to file a real writ and you'll have to respond.
>
> As we discussed, I'll prepare a bare bones application [for a] writ of habeas corpus shortly and will file it along with an order adopting the findings of fact, ordering that the writ be held in abeyance until such time as Rulford is competent and granting leave to amend.

Dkt. 73, Exhibit B.[12]

The state habeas court never officially stayed Aldridge's state habeas action.  The parties assume that an October 31, 1995, letter from the District Attorney's Office to the Court of Criminal

---

[11]      (...continued)
Aldridge's competency.  The proposed order is not signed.  There are handwritten alterations to the proposed order which Aldridge attributes to the trial court.  The notations refuse to find that Aldridge was incompetent to stand trial, represent himself, or be executed.  The annotations also state that "The Court finds, having observed Mr. Aldridge in the original trial and the hearing to determine his competency to represent himself, that Mr. Aldridge does have an appropriate understanding of his sentence and his imminent execution.  Mr. Aldridge is using his conspiracy theory to avoid his execution."  The annotations conclude: "At this time, Rulford G. Aldridge is not competent to represent himself on appeal and should not be allowed to waive counsel . . . [and] is competent to be executed[.]"  Dkt. 66, Exhibit 9; Dkt. 73, Exhibit C.  While these notations generally reflect the state habeas court's comments in the March 3, 1995 hearing, the state habeas court never officially adopted these, or any other, findings.

[12]      For reasons undisclosed by the record, the state habeas court ordered a new competency evaluation on June 14, 1995, this time authorizing Dr. Floyd Jennings and Dr. Ramon Laval to examine Aldridge.  Dkt. 66, Exhibit 10.  The record does not contain any evaluation in response to that order.

Appeals resulted in an "informal stay" of the state proceedings.  The letter listed several death row inmates, including Aldridge, who were "presently incompetent to be executed."  The District Attorney's Office stated that it would "periodically request that the trial courts order re-evaluation," but until they became competent it would take no steps "to continue or begin the habeas process[.]"  Dkt. 73, Exhibit A.[13]

The "informal stay" of Aldridge's proceedings did not stop him from seeking relief *pro se*. In April 1997, Aldridge apparently filed several motions in the Court of Criminal Appeals including a mandamus request.  On May 7, 1997, the Court of Criminal Appeals denied the requests without written order.  *Ex parte Aldridge*, No. 7,530-04 (Tex. Crim. App. 1997).  Aldridge also apparently filed a motion to recuse Judge Rains from his habeas case in June 1997.  On July 8, 1997, the District Attorney's Office sent a letter to Mr. Moran discussing the recusal motion.  At this point, the District Attorney's Office adopted the theory that Aldridge was not only incompetent for execution, but he was *incompetent to assist habeas counsel*.  The letter affirmed that "Aldridge is presently incompetent and unable to assist counsel in habeas proceedings because of his present incompetence."  Dkt. 66, Exhibit 11.  The letter included proposed findings of fact and conclusions of law denying the recusal motion until Aldridge regained competency.[14]  The record does not show that the Texas courts adjudicated Aldridge's motion to recuse Judge Rains.

---

[13]     This letter was apparently a response to an inquiry by the Court of Criminal Appeals into the status of several death row inmates' habeas proceedings.  Dkt. 73, Exhibit E, at 5 n.3.

[14]     Specifically, the proposed findings stated: "The Court finds that habeas counsel Tom Moran has been and continues to be unable to adequately advance habeas claims in state district court because of defendant's present inability to assist counsel with a reasonable degree of rational understanding, his present inability to form a rational or factual understanding of the proceedings, and his present incompetency."  Dkt. 66, Exhibit 11.

34

On February 1, 2005, Aldridge filed several *pro se* pleadings in state habeas court, including a "Motion for Leave to Appear Before the Court to Unequivocally Waive Court Appointed Counsel." Dkt. 66, Exhibit 13. The District Attorney's Office filed a response on February 10, 2005. The State reaffirmed that Aldridge was incompetent to represent himself. The State noted that Aldridge "has furnished no evidence that he is now competent to represent himself in *habeas proceedings*" and "request[ed] that the trial court appoint the applicant counsel for the purpose of representing the applicant while the applicant is again evaluated for the competency to waive counsel and competency to be executed." Dkt. 55, Exhibit 14. The state district court did not issue any order, hold any hearing, or make any attempt to acknowledge Aldridge's renewed attempt to avail himself of the state habeas process.[15] In fact, the state courts have not exerted any judicial review over Aldridge's conviction and sentence since 1995, his personal attempts to secure relief notwithstanding. Without any doubt, "circumstances exist that render [any available State corrective] processes ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B).[16]

---

[15]  Texas has long employed a two-forum rule (also called the "*Powers* doctrine" and the "habeas abstention doctrine") under which the state courts decline to exert habeas jurisdiction when the federal courts have a parallel petition under consideration. *See Ex parte Green*, 548 S.W.2d 914, 916 (Tex. Crim. App. 1977) ("A petitioner must decide which forum he will proceed in, because [the Texas Court of Criminal Appeals] will not, and a trial court in this State should not, consider a petitioner's application so long as the federal courts retain jurisdiction over the same matter."). The Court of Criminal Appeals, however, has stated that the two forum rule only applies "when the applicant also has a *writ pending* in the federal courts that relates to the same conviction or same 'matter.'" *Ex parte Soffar*, 143 S.W.3d 804, 805 (Tex. Crim. App. 2004) (emphasis added). The two-forum rule did not prevent the state courts from acting on Aldridge's *pro se* pleadings until he filed a federal petition in 2006. The state court never acknowledged Aldridge's pleadings, much less gave notice that it felt constrained from ruling on his case.

[16]  Respondent has protested throughout that principles of comity and federalism require the federal courts to postpone adjudication of Aldridge's claims until he fully exhausts state
(continued...)

6.      Federal Proceedings

Aldridge's delusional attempts to seek redress culminated in the filing of a federal petition by appointed counsel in 2006.   Aldridge largely builds his case for incompetency on two foundations: (1) a revised opinion from Dr. Quijano now finding that he was incompetent to stand trial in 1990 and (2) post-trial psychiatric examinations which find him presently mentally ill and incompetent.  Aldridge bolsters these foundations with information from his writings, accounts from lay witnesses, and indications of mental illness in the record.

As his first argument, Aldridge asserts that Dr. Quijano did not have a full picture in 1990 of his mental state and ability to interact with counsel.  With his federal habeas petition in 2006, Aldridge provided a statement in which Dr. Quijano revised his opinion of Aldridge's competence to stand trial.  Dr. Quijano admits that reasonable experts could disagree with the conclusion he reached in 1990: "[a]lthough I concluded that Mr. Aldridge was competent to stand trial, other professionals in my field certainly could have reached the opposite conclusion.  If counsel had consulted with me about my report I would have informed them of this."

More importantly, Dr. Quijano's 2006 statement reevaluates Aldridge's competency in light of information he did not have in 1990.  Dr. Quijano gave several reasons for changing his opinion: (1) he previously did not adequately understand how Aldridge interacted with his attorneys, and specifically with respect to the insight from Mr. Bates' trial testimony; (2) he did not know that

---

[16]       (...continued)
court remedies.  The state courts responded with silence to opportunities to reinvigorate Aldridge's state habeas action.  As discussed at length elsewhere, it is clear that no state remedy is effectively available to Aldridge, and presumably to any other death-row inmate whose case the State of Texas places in legal limbo.  Federal consideration of Aldridge's claims is not only available, but necessary for justice to be done in the case of one sentenced to die.

Aldridge insisted on a "delusional defense" that "work[ed] at cross purposes with the misidentification defense"; and (3) additional information from family members provided better insight into the severity of Aldridge's illness.  With a fuller picture, Dr. Quijano would have found that Aldridge's mental illness, especially as "exacerbated by the client's relationship to the legal system," rendered him incompetent to stand trial.  Dr. Quijano's 2006 statement suggests that, with a full understanding of the limited lawyer/client relationship, he would have found Aldridge incompetent.  Dkt. 57, Exhibit N.

As his second underlying argument, Aldridge relies on post-trial psychological evaluations to make a retrospective judgment about his trial competency.  Of primary importance, Aldridge relies on (1) the 1995 evaluations by Dr. Brown and Dr. Silverman finding him incompetent for a variety of legal purposes and (2) a new psychological evaluation by Dr. Diane M. Mosnik, a clinical neuropsychologist who examined him in March 2006, finding him retrospectively and currently incompetent to stand trial.  Dr. Mosnik opined that Aldridge could not "rationally and with understanding consult with his attorneys regarding his legal defense."  Dr. Mosnik found that Aldridge "has completely incorporated his attorneys, the judges, and the United States judicial system into his delusional system, as well as member[s] of his family, believing that they are all conspiring against him[.]"  Dr. Mosnik concluded "with absolute confidence that Mr. Aldridge was NOT COMPETENT to Stand Trial at the time of his initial trial and that he WAS NOT able to consult rationally with his attorneys to assist in his defense."  Dkt. 57, Exhibit L.

Aldridge supports the experts' opinions with affidavits from family members who observed his bizarre behavior before and during trial.  Their statements amplify the testimony given in the punishment phase of trial.  Family members confirm that Aldridge's mental illness began well before

1990 and was active throughout the trial proceedings.  Importantly, family members explain that Aldridge did not trust his attorneys or the trial judge and, in fact, had incorporated them into his delusional framework.  For example, Aldridge's sister Brenda Garrett confirms that Aldridge strongly felt that his attorneys were working against his interests.  Ms. Garrett explained:

> I visited [Aldridge] when he was in the County Jail [when] he was awaiting trial for killing Mr. Ben Stone. . . .  I remember trying to explain to [Aldridge] that his lawyers were trying to help him.  I would say, there are here to help you.  He did not want to hear it.  *He would tell me that his lawyers and the judge were against him. He did not want anything to do with his lawyers.  He said he wanted a different judge and different attorneys.  A lot of the conversation was [Aldridge] telling me how his lawyers were trying to put the blame on him for things other people were doing.*  He would give me the names of people who had committed the crimes, very strange names; they were like names from another language.  [Aldridge] would also ask me to get in touch with various people who he said could help him.

Dkt. 57, Exhibit G, Affidavit of Brenda Garrett, dated September 29, 2006 (emphasis added).  Ms. Garrett stated that: "Mr. Bates told us that [Aldridge] was refusing to talk with him or with the White lawyer representing him."

Respondent counters Aldridge's evidence of incompetency with an affidavit from Dr. Thomas G. Allen, a forensic psychologist who attempted to examine Aldridge in 2007.  Aldridge would not cooperate in that examination.  After reviewing the reports, the trial record, the family members' affidavits, Dr. Mosnik's evaluation, and Dr. Quijano's new affidavit,  Dr. Allen did not believe that Aldridge was incompetent at trial.  Dr. Allen thought that the trial record showed that Aldridge could sufficiently communicate with counsel.  Dr. Allen provided a detailed criticism of Dr. Mosnik's report.  He thought that Dr. Mosnik failed to make a sufficient evaluation of Aldridge's present mental state, improperly projected her results backwards to the time of trial, and failed to account for the possibility of changes in his mental state.  Also, Dr. Allen accused both Dr. Quijano

and Dr. Mosnik of failing to account adequately for malingering.  In sum, Dr. Allen thought that Dr. Quijano initially performed a comprehensive and accurate assessment of Aldridge's mental state contemporaneous with trial.  Dkt. 96, Exhibit C.

       7.     Federal Evidentiary Hearing Testimony

In light of the seriousness of Aldridge's claims, the conflicted record, and the availability of sufficient information to make a reliable inquiry into Aldridge's mental state, the court ordered an evidentiary hearing which was held on February 26-27 and March 1, 2009.  The court will review the substance of the resultant testimony below.

*Dr. Walter Y. Quijano* - The fact that Dr. Quijano was the only mental-health expert to evaluate Aldridge contemporaneous with his trial proceedings makes his the most important testimony from the evidentiary hearing.[17]  The parties, however, only pinned down Dr. Quijano's opinion with difficulty.  He staunchly defended his 1990 conclusion, but also testified that he would have reached a different conclusion if he had more information.[18]  As Respondent has recognized, "Dr. Quijano did not recant his original opinion, and instead offered a different opinion – that

---

[17]    Aldridge called Mr. Davis as his first witness in the evidentiary hearing.  Because of its central role in Aldridge's case, the court will review Dr. Quijano's testimony first.

[18]    The parties deposed Dr. Allen, Dr. Quijano, and Mr. Davis in preparation for the hearing.  In his deposition testimony, Dr. Quijano gave confusing answers.  For example, when asked if he "did something incorrect" in his 1990 evaluation, he responded: "No.  The affidavit was – I asked questions, given new facts, and consider this, consider that; and, of course, you have to factor in those – the new facts introduced.  But the original one, I think, is still correct."  Pet. Ex. 34 at 60.  With the follow-up question "it's still your opinion today that he is – that he would have been competent to stand trial," he answered "Yes."  Pet. Ex. 34 at 60.  Still, he testified that the new evidence should have prompted counsel to seek a competency hearing.  Dr. Quijano had difficulty expressing when was defending his 1990 report based on the information he then possessed, as opposed to reevaluating the circumstances based on new information.

Aldridge was incompetent – based on new (or rather, previously unknown) evidence." Dkt. 151 at 17.

Dr. Quijano was emphatic that he had performed an adequate examination in 1990: "He was competent when I saw him." F.E.H. at 90.[19] Dr. Quijano seemed defensive when the questioning implied that he had not made an adequate investigation into Aldridge's competency to stand trial.[20] To that end, Dr. Quijano defended the integrity of his opinion in 1990:

> [T]he reason I found him competent in spite of being schizophrenic, because when it was time – when the time came to focus on the nitty-gritty, he was able to suspend; and there was no intrusion, what we call thought interjection or thought intrusion, into the discussion. And that must have been what happened with the lawyers; that in a free-flowing conversation, there is this wild talk, but then when it comes to answering the 'yes' or 'no,' where do we go, he is able to do that.

F.E.H. at 120.

---

[19]    While Dr. Quijano found no evidence of malingering, he wondered whether Aldridge somehow exaggerated the symptoms of his schizophrenia. F.E.H. at 71. Nonetheless, he testified that Aldridge himself was not aware of his mental illness and believed the delusional ideas he communicated to others. F.E.H. at 76. Although, "there were times when [he was] able to discuss the case rationally, coherently," Dr. Quijano testified that "there was no doubt" that Aldridge was delusional around the time of trial. F.E.H. at 69, 92. Aldridge's delusions were "directly related to the offense," including "the victim having . . . sexually assaulted him." F.E.H. at 70. Dr. Quijano, however, recognized that you cannot "confuse mental illness with incompetent." F.E.H. at 82. He clarified: "Just because a person is mentally ill does not mean he is necessarily incompetent to stand trial. There are two separate questions." F.E.H. at 98.

[20]    For instance, Dr. Quijano forcefully defended his and the trial attorneys' efforts to examine Aldridge, rejecting the insinuation that they did not communicate until mid-trial. The defense received a written report from Dr. Quijano during trial. Dr. Quijano, however, testified that he already informed trial counsel of its contents. Dr. Quijano testified that his written report was by no means his only communication with the defense team. In fact, he testified that he "had a series of conversations with them . . . given the gravity of this case, the complexity of this case, it is improbable that the expert and the lawyers would not talk." F.E.H. at 76. He explained that he often waited to deliver a final report because, with "constant postponement of trail and things like that," new information would accumulate. F.E.H. at 110.

40

Dr. Quijano explained the comment from his 2006 statement which implies that other experts could have reached a different conclusion. Dr. Quijano qualified that: "Although I concluded that Mr. Aldridge was competent to stand trial, other professionals in my field certainly could have reached the opposite conclusion. If counsel consulted with me about my report, I would have to inform them of this." F.E.H. at 88. He clarified, however, that any expert viewing the same evidence he did, and who correctly applied the law, would have also found Aldridge competent. Dr. Quijano thus considered that he made an adequate assessment of Aldridge's competency based on the information before him in 1990.

Still, Dr. Quijano testified that additional information would have required him to find Aldridge incompetent. Reviewing Mr. Bates' punishment phase testimony caused Dr. Quijano to reevaluate his professional opinion. If he could have factored that "new data" into the information he had around the time of trial, he would have found that Aldridge was incompetent to stand trial. Nevertheless, he did not fully understand how Aldridge interacted with his attorneys until he gave his statement in 2006.[21]

---

[21]    Dr. Quijano 1990 report stated that Aldridge "did not know yet if he could trust his lawyer and he wanted to wait and see what he has done[.]" In itself, that sentiment expresses little more than the apprehension many defendants may feel toward the appointment of counsel. Aldridge, however, infused that concern with his own mental illness. He wanted to see if his attorney "will pursuit [sic] avenues the defendant opened for him or if he will conspire with others." The unsettled nature of the question about Aldridge's ability to consult with counsel is hardly surprising because at that point he had only spoken with his trial counsel three times. That brief contact, however, had alerted trial counsel that serious questions existed about Aldridge's competency. Dr. Quijano's report then noted that Aldridge and his "lawyer understood each other well." As proof, Dr. Quijano outlined the several facts Aldridge understood about the charges he faced. Dr. Quijano's 1990 evaluation seemed to focus only on Aldridge's factual understanding, almost to the exclusion of his rational understanding: "Now, he can couch that in strange ways, crazy ways. But if he is able to tell us what he is charged with, what led to that and what he did afterwards, then he would be competent to

(continued...)

With the "new data" provided by Mr. Bates' trial testimony – if the "description is meant to describe most of their interactions" with Aldridge – Dr. Quijano now feels that Aldridge was not competent to stand trial.  F.E.H. at 133, 139.  In essence, a fuller understanding of Aldridge's competency was the last puzzle piece that would have led to a finding of incompetency.

When considering the full standard and evidence, Dr. Quijano provided credible testimony. To the extent, however, that his opinion in 1990 resulted from either an imprecise definition of competency or an incomplete view of the record, his opinion cannot reliably represent Aldridge's mental state.

*Dr. Jerome Brown* - Dr. Brown testified that, during his two examinations of Aldridge in 1995, Aldridge could not discuss his legal situation outside of his delusional ideas:

> his explanation of the legal circumstances was never able to be given without referring to the context of his delusions.  In other words, he could not understand his legal situation other than in the broad context of his delusional beliefs about those proceedings as well as the people in those proceedings, including his own attorneys.

F.E.H. at 145.[22]  On that basis, he found Aldridge incompetent to stand trial, as well as for other legal purposes.  Dr. Brown testified that if Aldridge exhibited the same delusional beliefs and thought disorders in 1990 that he had observed in 1995, there was a "high probability" that Aldridge would not have been competent to stand trial.  F.E.H. at 146.

---

[21]  (...continued)
stand trial, and if can work with his lawyers."  F.E.H. at 102.  In essence, Dr. Quijano found that Aldridge had a factual understanding of the charges and an ability to consult with counsel.  His report, however, does not extensively discuss whether the understanding and communication was rational.

[22]  Dr. Brown explained that Aldridge "is capable, when you are not covering his delusional areas, of responding to you in a fairly straightforward, articulate, and reasonably intelligent fashion."  F.E.H. at 155.

Importantly, Dr. Brown showed professional restraint and did not conclusively find Aldridge incompetent in 1990. F.E.H. at 150. He testified that he could not make that kind of retrospective conclusion. However, Dr. Brown opined: "what I've seen in Dr. Quijano's report is very, very similar to what I saw in Mr. Aldridge." F.E.H. at 150. Dr. Brown was unable to state whether there had been any degradation in Aldridge's mental condition between 1990 and when he interviewed him in 1995. While he noted that some content in Aldridge's delusions had changed over time, the type, manner, and general theme were fixed and pervasive. In sum, Dr. Brown described Dr. Quijano's observations in 1990 as consistent with what he saw in 1995. F.E.H. at 148. Because of that, Dr. Quijano's conclusion that Aldridge was competent "surprised" Dr. Brown. F.E.H. at 154. He stated: "[B]ased on what Dr. Quijano reported in his report, I would not consider Mr. Aldridge competent[.]" F.E.H. at 148.

Dr. Brown's familiarity with Aldridge makes his testimony an important factor in deciding whether a preponderance of the evidence shows that Aldridge was competent. Dr. Brown considered the proper legal standard and had enough information to make a reliable assessment of Aldridge's mental state in 1995. The State of Texas relied on his 1995 assessment to cripple state habeas review. His federal evidentiary hearing testimony credibly established that (1) sensible experts could disagree with Dr. Quijano's conclusion based on the information he had in 1990 and (2) that Aldridge's mental state in 1990 was similar to that when he was found legally incompetent five years later.

*Douglas Davis* - Given the lapse of time, Mr. Davis was unable to remember many details about representing Aldridge, though he could recall broad outlines about the trial. Mr. Davis explained: "I don't even remember what occurred during the trial. . . . I have tried a number of

capital murders.  I have tried probably 150 jury trials in the course of my career.  I don't remember.

I just don't.  I don't have any records of it.  It is 19 years ago, and I don't even remember where I was

living at the time[.]"  F.E.H. at 25.

Mr. Davis remembered that Aldridge "had mental problems," acted "strangely," and "had a

lot of odd beliefs, mostly dealing with . . . Islam as he believes it to be."  F.E.H. at 10, 14, 17.

Nonetheless, Mr. Davis felt that Aldridge's "odd beliefs" did not impair his competency to stand

trial: "We went over the evidence with him.  He seemed to understand what was going on, and he

didn't have outbursts in trial."  F.E.H. at 25.  Mr. Davis opined that not all the discussions with

Aldridge were "just loony . . . He understood what was going on."  F.E.H. at 38.  He stated: "[I]t

wasn't like this guy was just out of his mind when we were talking to him.  He appeared to be

coherent.  You could speak to him about what was going on.  He seemed to understand what was

going on.  He would speak with us.  He had odd beliefs."  F.E.H. at 65.

Mr. Davis defended his representation of Aldridge, especially given Dr. Quijano's

conclusions:

> Dr. Quijano said that Mr. Aldridge was competent and that he was sane, and I believe
> that myself.  So, his opinion dovetailed what I believed.  I feel that Mr. Aldridge had
> mental problems, but I felt that he was – had a coherent understanding of what was
> going on.  He was able to assist Randy Bates and me.  Again, he had strange beliefs,
> no question; but as far as his ability to understand what was going on, Dr. Quijano
> found that he was competent and able to assist us and understand the proceedings.
> I felt that myself, and I still feel that way today.

F.E.H. at 24; *see also* F.E.H. at 63.  He relied heavily on Dr. Quijano's recommendation:"I had him

evaluated by an expert.  That's the best I can do.  . . . I felt that because Dr. Quijano was conversant

with prisoners and had dealt with them on a regular basis, that he would be more aware [of possible

malingering]."  F.E.H. at 37.  Mr. Davis based part of his conclusion that Aldridge was competent

on the fact that "he was able to hold a responsible job prior to this killing."  F.E.H. at 49.

Mr. Davis testified that the defense attorneys would have approached the trial judge if they

felt that they had difficulty conferring with Aldridge.  Mr. Davis' testimony, however, suggested that

the attorneys did not rely on Aldridge to provide them much information.  He could not remember

if they discussed the guilt/innocence defense strategy with Mr. Aldridge, though he assumed that

they had.  F.E.H. at 39.  They did not rely on him to provide facts about the crime but focused on the

police reports.  They did not utilize him in cross-examination.  While they recognized that Aldridge

was delusional, the only decision which Mr. Davis felt that his schizophrenia impacted was his desire

to tell his delusional account of the murders to the jury.

Mr. Davis also reaffirmed that Mr. Bates' testimony represented Aldridge's mental state

throughout their representation.  F.E.H. at 27.  Mr. Davis, however, admitted that his ability to

ascertain a client's competency was that of a layman since he had no psychological training.

Insofar as he could provide specific details about trial, Mr. Davis seemed defensive, but

credible.  He could not remember many specifics about his representation of Aldridge.  After two

decades, he was left with the impression that Aldridge understood that he faced a capital murder

charge and could communicate with his attorneys.  Mr. Davis, however, did not provide much detail

about Aldridge's ability to assist in his defense, other than to provide a delusional explanation for

the crime.

*Gladys Aldridge* - Aldridge's oldest sister testified about his upbringing, previous

incarcerations, strange behavior when released from custody, actions after the murder, and mental

state during trial.  Gladys testified that her brother's behavior began to change after a head injury

while in prison.  Apparently, Aldridge suffered an axe blow to the head in 1976.  The letters he sent his family thereafter became laden with "very strange" thoughts.  When released from custody, Aldridge lived with Gladys for a time.  Aldridge acted bizarrely and described delusional, conspiratorial fears.  He incorporated his family into his paranoia.  Ms. Aldridge credibly recalled that Aldridge experienced mental health concerns before and around the time of trial, which permeated his thinking and relationships with others.  Gladys, however, did not provide any direct testimony about Aldridge's interaction with his attorneys.

*Dr. Diane N. Mosnik* - Dr. Mosnik's testimony covered both Aldridge's current mental state and his competency in 1990.  From her examination in 2006, Dr. Mosnik concluded that Aldridge's delusions filtered into his factual understanding of the proceedings against him.  Dr. Mosnik testified that Dr. Quijano's observations in 1990 were consistent with what she observed in 2006.  She also noted a consistent pattern of delusion through his pre-trial writings, in Dr. Quijano's examination and other trial events, and afterwards.

Dr. Mosnik drew a distinction between Aldridge's factual understanding of his crime and a rational understanding:

> I asked questions relating to his understanding of the proceedings against him.  He was able to tell me that he was on death row for capital murder.  However, he was never able to state that in the absence of his delusional explanation for that.  So while he said, I'm on death row for capital murder.  I didn't commit any murders.  They murdered me.  They are trying to murder me by setting me up for capital murder and would go on and on in his delusional network.  So, he was never able to state or recognize that he was actually on death row because he committed an act of– you know, that he did the act.

F.E.H. at 204.  Aldridge transposed this delusional mind set over the entire proceedings, leading him to say that he has "an attorney appointment . . but [hasn't] had any attorneys who actually worked

46

for [him] or who have been helpful to [him] and they are all part of this conspiracy." F.E.H. at 204. Aldridge could not keep his understanding of the proceedings against him "separate from his delusional explanation." F.E.H. at 204. In fact, Dr. Mosnik testified that Aldridge's incorporation of the legal system into his delusional framework was "pervasive." F.E.H. at 212. She related: "He was actually able to name almost all of his attorneys and the judges involved in his cases, and all of them are involved in this network of Nazis and Sufi mystics that are out to murder him, release other prisoners from prison to come after him and torture him and torturing him with spirits." F.E.H. at 212-13. His "delusions incorporate the court system and are very prosecutory in nature." F.E.H. at 225.

Dr. Mosnik's review of Aldridge's history led her to opine that "the severity and the extent of his delusional network, the content of his delusions was very consistent over time and . . . fixed[.]" F.E.H. at 206. While Aldridge exhibited periods of "relative stability" in between "acute episodes," Dr. Mosnik testified that "the presence of those systems, hallucinations, delusion, as well thought disorder and the negative symptoms of schizophrenia are still present." F.E.H. at 228.

Dr. Mosnik testified that, while she thought his symptoms had progressed over time, he was incompetent at the time of trial. She explained that Aldridge's delusional belief system caused him to insist on an "irrational defense." Also, she observed that his paranoia made him perceive that the judiciary and his attorneys were persecuting him. Dr. Mosnik considered Mr. Bates' trial testimony and Brenda Garrett's affidavit as strong corroboration for her opinion that Aldridge's delusional belief system made him incompetent in 1990. Dr. Mosnik testified that the circumstances of a

47

capital murder trial would only exacerbate Aldridge's illness, particularly when he had already incorporated the legal system into his delusional framework.[23]

*Dr. Thomas G. Allen* - Respondent retained Dr. Allen to evaluate Aldridge, "grade Dr. Quijano's paper," and critique Dr. Mosnik's report. F.E.H. at 456. When Dr. Allen tried to evaluate Aldridge, Aldridge would not cooperate. Based on Dr. Allen's review of Dr. Quijano's report and his discussion with Mr. Davis, he thought Aldridge was competent to stand trial in 1990. F.E.H. at 471.

Dr. Allen noted that the presence of a severe mental illness did not make a defendant incompetent unless it impairs his relationship with counsel: "Because competency has to do with sufficient present ability to appreciate the legal proceedings and that all that craziness has to be so severe that it impairs his ability to rationally cooperate and collaborate with his attorneys in his own defense. You've got to have both, and all it talks about is sufficient present ability. And you can be mentally ill and have that ability." F.E.H. at 526. While asserting that the inquiry looks at whether "sufficient cooperation is going on," F.E.H. at 530, Dr. Allen nevertheless discounted the need to have much input from a mentally ill defendant:

> Because competency does not require some sort of pristine state of mental health. You don't have to be – and it doesn't require that you have a law degree. It doesn't require that you are a certified legal assistant. It doesn't require that kind of knowledge or information. It requires just a sufficient – that's the word, sufficient – present ability to deal with proceedings rationally and factually. Sufficient, not superior, sufficient. Sufficient, present ability to cooperate and collaborate with your attorney.

---

[23]    Dr. Mosnik disagreed with some of Dr. Quijano's testimony about Aldridge's ability to set aside his illness at times. Specifically, Dr. Mosnik did not agree with Dr. Quijano's testimony that the effects of schizophrenia could "wax and wane," though she admitted that the illness could increase in severity and then return to stability.

That includes pretty simple things.  It is not a really high standard in Texas.  I don't know about other states. But it can include things like if I tell you to be quiet, the person is quiet. You can't talk out in court. And they comply. That's part of competency.

F.E.H. at 482.

Dr. Allen thought that Dr. Quijano performed an adequate investigation in 1990.  F.E.H. at 462.  Dr. Allen found no evidence of impaired mental ability before and contemporaneous with the crime:

And I got no evidence that indicates that at that time he was showing a psychotic level of behavioral disorganization, battling at the counter, not able to count money or whatever.  He was able to purchase that gun in an adequately rational and coherent state. . . .  The excuse used was a mental illness kind of an excuse. I felt like it was over the top, not in terms of making it bizarre in quality but over the top for other reasons that I hope to get into. So, I think it was an excuse. I mean, he killed the guy – he said so later – so he could get away clean, no eyewitnesses.  Secondly, he had the guy – Ben Stone, I believe –  open the safe so his fingerprints wouldn't be on it.

F.E.H. at 472-73.[24]  Dr. Allen based this decision on several factors.  Primarily, Dr. Allen thought that Aldridge's level of planning and actions at the time of the crime belied a debilitating mental illness.  Also, his interaction with family members, as recorded in police statements, did not include

---

[24]      Dr. Allen testified:

Yes, you can be schizophrenic. You can read novels. You can drive cars. You can make change. You can plan crimes. You can commit crimes. You can do all kinds of things and be schizophrenic. You can have moments of clarity.  Some are more severe and have more of what I'll call diseased moments, if you will.  Does it mean you're never capable of rationally understanding anything ever or providing factual information?  And the answer is no. I mean, they often can do that. Is there a lot of individual variation? Of course there is.  Some people are worse in the illness than others.

F.E.H. at 481.

any mention of a delusional framework. Dr. Allen thought that Aldridge's excuse for the crime was "over the top."

Repeatedly throughout his testimony, Dr. Allen hinted that he thought that Aldridge might be malingering. He felt that Aldridge began "spewing all these symptoms [of schizophrenia] intensely, voluntarily, with no apparently need for questions" when interviewed by Dr. Quijano and Dr. Mosnik. F.E.H. at 485. He also felt that Aldridge exhibited "pretty rational stuff" when he described in his TDCJ entrance evaluation that he had grounds for appeal. Dr. Allen still agreed that Aldridge was suffering from schizophrenia around the time of trial. F.E.H. at 503-04. Dr. Allen opined: "He had moments of clarity, apparently, pretty obviously, during Quijano's interview, was able to answer questions related to competency. There apparently were lots of moments of clarity interacting with his lawyers during the course of trial." F.E.H. at 508. Dr. Allen, however, agreed that Aldridge's writings immediately after the crime were thoroughly delusional. F.E.H. at 511-12.

Dr. Allen did not completely agree with the finding of incompetency in 1995:

The court:      And do you agree that at least in 1995 Mr. Aldridge was incompetent to stand trial?

Dr. Allen:      That's what it looks like in '95, although even then I wish they had done more to assess the malingering issue. But I know how the exams are that they do in Harris County on a contract basis, too.

The court:      But you agree with the opinions of Dr. Silverman and Dr. Brown in 1995 that Mr. Aldridge was incompetent at that time to stand trial?

Dr. Allen:      Well, if I can clarify, because there was competency to stand trial, competency to waive counsel, competency to be executed. Frankly, Judge, I don't know what standard they are referring to or – do you see my problem there? If it was competent – if it is only competency to stand trial in 1995, I would have to lean in that direction.

F.E.H. at 536.

Dr. Allen's testimony was not entirely credible. He had not personally interacted with Aldridge. He seemed to apply a definition of competency that is more exacting than required by precedent, minimizing the inquiry into whether a defendant could rationally consult with and assist counsel. Moreover, in light of the consistent expert testimony diagnosing Aldridge with schizophrenia, Dr. Allen's repeated complaint that Aldridge may have been malingering makes his testimony less believable. This is especially the case as the mental health experts who examined Aldridge personally all agreed that he suffered from pervasive mental illness. Dr. Allen's skepticism about Aldridge's schizophrenia lessened the credibility of his testimony about competency.

### B.    Analysis

As previously noted, a defendant is competent to stand trial when he demonstrates (1) an ability to consult with and assist his lawyers with a reasonable degree of rational understanding and (2) a rational and factual understanding of the proceedings against him. Aldridge's burden on federal habeas review is not to prove his incompetence at trial conclusively. Aldridge must only establish incompetence by a preponderance-of-the-evidence standard. *See Moody*, 139 F.3d at 481; *Washington*, 90 F.3d at 950; *Bruce*, 536 F.2d at 1059. Aldridge must show that the existence of incompetency "is more probable than its nonexistence[.]" *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 622 (1993). This standard "goes to how convincing the evidence in favor of a fact must be in comparison with the evidence against it before that fact may be found[.]" *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997); *see also United States v. Wilson*, 322 F3d. 353, 361 (5th Cir. 2003). In this context, if the evidence of incompetency is more convincing than the evidence otherwise, the court must find

51

in Aldridge's favor.  At its core, the court's inquiry decides whether Aldridge's mental illness impaired his right to a fair trial.

The parties seemingly agree that Aldridge suffered from some degree of mental illness at the time of trial.[25]  The parties' disagreement comes in the depth of his problems, and how that influenced the fairness of his trial.  This disagreement is understandable as the Supreme Court has "previously emphasized the difficulty of retrospectively determining an accused's competence to stand trial." *Pate*, 383 U.S. at 387.  Even under the best circumstances the interplay between an inmate's mental illness and his constitutional rights is complex, nuanced, and not easy to classify. *See Lokos v. Capps*, 625 F.2d 1258, 1267 (5th Cir. 1980) ("One need not be catatonic, raving or frothing, to be unable to understand the nature of the charges against him and to be unable to relate realistically to the problems of his defense.").

The parties agree that Aldridge could engage in some level of communication with his attorneys, though they have different opinions about the nature of those discussions.  Aldridge also seems to have possessed a rough factual understanding of how the law and courts operate.[26]  Even

---

[25]    Respondent conceded that "there's a lot of evidence showing that he has a mental illness, varying degrees at varying stages," though correctly qualifying that "if a defendant with delusions would be rendered per se incompetent, then we wouldn't be having to do the whole hearing."  F.E.H. at 545.  Dr. Allen has repeatedly said that the experts who examined Aldridge personally should have tested him for malingering, suggesting that he thought Aldridge was faking mental illness.  In light of the consistent opinion by the other experts, Dr. Allen did not credibly call into question the diagnosis that Aldridge suffered from paranoid schizophrenia.

[26]    Dr. Quijano's 1990 evaluation suggests that Aldridge probably had a factual understanding of the trial proceedings.  Dr. Quijano's review of whether he had a rational understanding, however, did not delve into the effects of his delusional thoughts.  In fact, Dr. Quijano's 1990 report only restated his factual understanding:

(continued...)

the ranting, delusional pleadings he has filed in federal court throughout the past several years indicate a basic understanding that he is incarcerated under a death sentence.  The evidence shows that Aldridge understood that he stood trial for capital murder, though he now argues that mental illness warped his comprehension beyond rationality.

A factual understanding and basic ability to talk with counsel, however, are not enough to satisfy the right to a fair trial.  A defendant must have the "ability to communicate *effectively*[.]"

---

[26]         (...continued)
> The defendant described the alleged conduct he was charged of [sic].
> He considered the charges against him serious from his point of view
> because they place him before man and because he violated written
> laws by taking a life for which he will be judged; and from the point
> of view of man and God but he was not sure why.  He appeared to
> appreciate the extrinsic and intrinsic wrongfulness of the conduct
> charged.

Specifically, Aldridge described the relative functions of the trial participants as follows:

> The judge determines the facts and passes the sentence.  The jury
> hears the facts and recommends the punishment.  The DA takes the
> victim's side and is trying to find him guilty.  The defense lawyer
> defends him.  The prosecution witnesses sa[y] what they are told to
> say and whatever they think they should say.  The defense witnesses
> tell the truth.  He understood he can speak in the courtroom only
> when asked to.  He knew he was not obligated to answer questions
> because of the Fifth Amendment rights (in his word, "constitutional
> protections").  If lies were told about him during the trial, the
> defendant would argue against the testimony through his lawyer.  If
> he thought the trial was unfair, he would appeal through his lawyer.
> If his legal representation was thought to be inadequate and/or
> incompetent, the defendant would "seek recourse through other
> sources in court."

On that basis, Dr. Quijano found that Aldridge "knew the events leading to arrest and related them to the charge, the consequences of a guilty verdict, and the proceedings in court.  In sum, he appeared to have a rational understanding of the proceedings against him."

*Cooper*, 517 U.S. at 364 (emphasis added).  Competency requires "a *rational* as well as factual understanding of the proceedings" and an ability to consult "with a reasonable degree of *rational* understanding.'"  *Dusky*, 362 U.S. at 402 (quotation omitted and emphasis added).  Therefore, the question this court faces comes down to modifiers and adjectives: was his understanding and ability to consult with counsel *rational*?  Absent rational communication with counsel, a defendant's role as the "master of his own defense" is illusory.  *Moore v. Johnson*, 194 F.3d 586, 606 (5th Cir. 1999); *see also Faretta v. California*, 422 U.S. 806, 819 (5th Cir. 1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense.")  Without a rational understanding, punishment has no value because a defendant cannot understand what has brought it about.  *Cf. Panetti v. Quarterman*, 551 U.S. 930, 958-59 (2007) ("Gross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose.").[27]

Nevertheless, cases do not provide a strict definition of the "rational" component.  Due to the diverse factors that may impede a defendant's ability to receive a fair trial, terms such as "rational" belie the creation of bright-line tests.  *See Cooper*, 517 U.S. at 365 ("[I]nexactness and uncertainty characterize competency proceedings, making it difficult to ascertain whether a

---

[27]   The Supreme Court considered *Panetti* in the context of incompetency-to-be-executed claims.  There, the Supreme Court observed that, while "a concept like rational understanding is difficult to define," delusional ideation can skew a defendant's understanding to the point of irrationality.  *See Panetti*, 551 U.S. at 958-59.  Even though the relationship between an incompetent-to-be-executed claim and an incompetent-to-stand trial claim is not clear, some authorities suggest that they are similar because competency at trial creates a presumption of competency at execution. *See Ford v. Wainwright*, 477 U.S. 399, 425-426 1986) (Powell, J., concurring); *In re Heidnik*, 112 F.3d 105, 112 n.7 (3d Cir. 1997).

defendant is simply mentally ill, incompetent, or malingering."). Some courts "have used a sufficient contact with reality as the touchstone for ascertaining the existence of a rational understanding." *Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1991); *see also United States v. Hemsi*, 901 F.2d 293, 296 (2d Cir. 1990) (finding no rational understanding when the defendant was "not able to assist properly in his defense," "only on rare, nonthreatening occasions could . . . maintain his composure," and "impaired sense of reality prevented him from focusing on his legal needs and from acting effectively on his intellectual understanding" which "prevent[ed] him from cooperating rationally in his defense"); *Balfour v. Haws*, 892 F.2d 556, 561 (7th Cir. 1989) (finding a defendant competent when he "was rational and in touch with reality at the time of his trial"). That inquiry includes an evaluation of whether the defendant's "mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him." *Lafferty*, 949 F.2d at 1551.

At a minimum, a court's competency review must center specifically on the relationship between the mental illness and the legal process. By implication, "rational" must refer to some quality of the mental illness that impedes an otherwise-adequate factual understanding or relationship. Rational must not only mean that mental illness permeates the defendant's understanding or relationship with counsel, but that it does so in some debilitating manner. The law does not measure the quantity of communication or understanding, but assesses the quality of those factors. The court gauges how mental illness influenced the core concerns of the competency inquiry.

The experts who have examined Aldridge have found that he suffered from intractable schizophrenia at trial. Mental illness and competency to stand trial are separate concepts – one a

55

scientific classification used for diagnostic purposes and the other a legal standard used to ensure the protection of constitutional rights.  *See Clark v. Arizona*, 548 U.S. 735, 775 (2006) (reviewing psychological diagnostic concerns over "the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis").  The essential features of schizophrenia make an investigation into competency critical.  Under the classification system set out by the American Psychiatric Association, characteristic symptoms of schizophrenia include "bizarre delusions," "disorganized thinking and behavior," and hallucinations.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS DSM-IV-TR, at 299-300 (4th ed. 2000) (hereinafter "DSM-IV-TR").[28]  Schizophrenia involves both positive and negative symptoms.  "The positive symptoms appear to reflect an excess or distortion

---

[28]   The Fifth Circuit has taken judicial notice of DSM-IV because its "authoritative nature makes the criteria 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'"  *United States v. Long*, 562 F.3d 325, 334 n.22 (5th Cir. 2009) (quoting FED. R. EVID. 201(b)).  The DSM-IV-TR cautions:

> When the DSM-IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," or "mental defect." In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is usually required beyond that contained in the DSM-IV diagnosis. This might include information about the individual's function. It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.

DSM-IV-TR at xxxii-iii.

of normal functions, whereas the negative symptoms appear to reflect a diminution or loss of normal functions." *Id.* at 299. Positive symptoms include hallucinations and delusions; negative symptoms include restrictions in expression, fluency of thought and speech, and goal-oriented behavior. *See id.*

Both Dr. Quijano and Dr. Mosnik specified that Aldridge's schizophrenia was of the "paranoid type."[29] "The essential feature of the Paranoid Type of Schizophrenia is the presence of prominent delusions or auditory hallucinations in the context of a relative preservation of cognitive functioning and affect." DSM-IV-TR, at 313. As is markedly the case with Aldridge, "[d]elusions are typically prosecutory or grandiose, or both." *Id.* The combination of those delusional qualities "with anger may predispose the individual to violence." *Id.* at 314. Also, the delusions are "usually organized around a coherent theme." *Id* at 313. Consistent with family member testimony that Aldridge did not exhibit any sign of mental illness until the mid-1980's, "[o]nset tends to be later in life than other types of Schizophrenia, and the distinguishing characteristics may be more stable over time." *Id.* at 314.[30] The question here is whether Aldridge's schizophrenia in 1990 was prominent and pervasive enough to impair his ability to understand the proceedings against him or consult with counsel.

---

[29]   Dr. Mosnik noted that characteristics of disorganized schizophrenia marked Aldridge's illness. "The essential features of the Disorganized Type of Schizophrenia are disorganized speech, disorganized behavior, and flat or inappropriate affect." DSM-IV-Tr, at 314.

[30]   While "[s]ome evidence suggests that the prognosis for the Paranoid type may be considerably better than for the other types of Schizophrenia, particularly with regard to occupational functioning and capacity for independent living[,]" DSM-IV-TR, at 314, the effect of treatment on Aldridge is unclear as the State of Texas has never treated his mental illness, even though he was first diagnosed with schizophrenia while in their custody and that diagnosis was reaffirmed after trial and during his halted state habeas proceedings.

Dr. Quijano's 2006 opinion serves as the backbone of Aldridge's case.  Given his examination of Aldridge contemporaneous to the trial, Dr. Quijano possesses the most detailed insight into Aldridge's mental state.  But, Dr. Quijano's federal evidentiary hearing testimony seemed somewhat conflicted.  On one hand, he defended his 1990 conclusion based on the available information.  On the other, he testified that he would have changed his opinion if given more information.  Mr. Bates' testimony turned Dr. Quijano's opinion.  In essence, Dr. Quijano previously did not know that Aldridge's communication with trial counsel was "irrational" and that he often responded to questions with delusional answers.  Specifically, the piece of the puzzle that Dr. Quijano did not have until 2006 was Aldridge's incorporation of the trial participants into his delusions.

The record is not clear as to why Dr. Quijano misunderstood Aldridge's ability to consult rationally with his attorneys or misapprehended his understanding of the trial process.  Dr. Quijano complained that his "contact with Mr. Aldridge's attorneys was limited[.]"  Because of that limitation, perhaps he did not comprehend how long Aldridge had suffered from schizophrenic illness and how pervasive it had been.  If Dr. Quijano had the information from Mr. Bates' trial testimony and the lay accounts from family members, he would have advised that the trial court probe Aldridge's competency through Texas' statutorily established procedure:

> If defense counsel had informed me about his intended defense, I could have assured him that in relationship to that defense, insistence on the delusional defense meant that the defendant was not able to consult with counsel with a reasonable degree of understanding, and that counsel should consider requesting a hearing to determine competency.

This information would have conclusively shown that Aldridge was not malingering.  More important, Dr. Quijano would then have known that "Aldridge's delusional thinking was associated

with his experience in and perception of the criminal justice system." This would have impacted the defense because "the symptoms of Mr. Aldridge's mental illness would become more acute and pervasive in the courtroom than they were in the more controlled and less confrontational setting of a forensic psychological interview."[31]

One prominent feature of Dr. Quijano's testimony was that he did not emphasize the rational component of the competency inquiry: whether a defendant "has sufficient present ability to consult with his lawyer with a *reasonable* degree of *rational* understanding" and "he has a *rational* as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402 (emphasis added). Dr. Quijano described the test for competency as follows: "It is not the presence or absence of mental illness. It is his ability to understand what he is charged with, the consequences of the proceedings, and his ability to work with his lawyers. That is the criteria used, not the presence or absence of mental illness. The presence or absence of mental illness can explain competency but does not cause it." F.E.H. at 101. Dr. Quijano, however, based his evaluation more on a factual than a rational understanding. For instance, he expressed: "He can still relate how [the capital murder charge] developed and the consequences, what he did before, what he did after, what he did during. He can clearly state that. Now, he can couch that in strange ways, crazy ways. But if he is able to tell us what he is charged with, what led to that and what he did afterwards, then he would be competent

---

[31]    Dr. Quijano testified that Mr. Bates' testimony would cause him to revise his opinion "if that description is meant to describe most of their interactions." F.E.H. at 139. Mr. Bates' himself stated that sometimes Aldridge could answer questions rationally, though "other times" he did not. Tr. Vol. 20 at 259. Dr. Quijano described this as "sometime yes, sometimes no," but still presumably sufficient to show incompetency. F.E.H. at 140. Mr. Davis agreed that Mr. Bates' trial testimony adequately represented their communication with Aldridge. He agreed that Mr. Bates' testimony was "a better indication of what Aldridge was . . . like and how he behaved." F.E.H. at 28.

to stand trial, and if he can work with his lawyers." F.E.H. at 102. Conspicuously absent from his testimony is emphasis on the required element that a defendant's understanding and communication with his attorneys be rational. For example, Dr. Quijano expressed: "If the person is mentally ill, hallucinating, delusional, whatever, that's one question. The next question is: Can he understand the proceedings in court? If he does, it does not matter whether he is mentally ill or not. He is competent." F.E.H. at 82. Dr. Quijano's revised opinion, however, takes into account whether Aldridge could rationally consult with counsel.

Psychological examinations a few years after trial aid in interpreting the integrity of Dr. Quijano's revised opinion. In 1995 – only five years after trial – Dr. Brown and Dr. Silverman found Aldridge incompetent for various legal purposes, including to stand trial. They described his illness as "a very well organized and well ingrained prosecutory delusional system." According to Dr. Brown, the effects of Aldridge's schizophrenia "color and distort his interpretation of everything that is taking place in the legal proceedings against him." His thought disorder made him "unable to realistically and competently assess his current legal situation and respond accordingly. This delusional process also renders him unable to utilize his attorneys in an effective or helpful fashion." Dr. Brown's observations suggested that Aldridge had a factual understanding of legal proceedings, but "he believes that the judicial process as well as the legal representation he has had is driven and influenced by a government conspiracy against him. These delusional ideas pervade and distort every aspect of his legal situation and his present circumstances. . . . He is rigid, determined, and unmoveable about these ideas and only intensive psychiatric care can produce any reasonable recovery of his faculties or his contact with reality." Dr. Silverman echoed those findings, emphasizing that Aldridge thought his lawyers were "part of a conspiracy to keep the truth from

coming forth and to protect the federal government."   According to Dr. Silverman, Aldridge's "irrational thinking" in 1995 influenced his litigious rambling, which were "a direct manifestation of a serious mental illness of psychotic proportions."

Nothing in the record or in the evidentiary hearing testimony has seriously called the 1995 evaluations into question.  The State of Texas has assumed that Dr. Brown and Dr. Silverman made a valid and comprehensive assessment of Aldridge's mental state.[32]  Respondent, however, argues that the 1995 evaluations are "far removed from his January 1990 offense and May 1990 trial and, as such, [are] irrelevant."  Dkt. 151 at 14.

To the contrary, the 1995 competency evaluations serve as a vantage point from which to view Aldridge's mental state in 1990.  The 1995 evaluations provide an important benchmark because Dr. Brown credibly testified that Dr. Quijano's 1990 report contained observations similar to what he saw in 1995.  Nonetheless, the court uses caution in assessing the 1995 evaluations.  Dr. Quijano accurately testified that "There should be no retroactive application of a competency opinion done five years later, then making it applicable to five years before.  It cannot be done."  F.E.H. at 107.  The court by no means treats the State's determination that Aldridge was incompetent in 1995 as an unwavering indicator that he also was incompetent at trial.  Degradation in Aldridge's mental state could have reduced his mental ability during that five-year period.  Still, the 1995 evaluations serve as a useful reference point; Aldridge's competency at the time of trial becomes clearer as it is consistent with or divergent from the well-documented findings in 1995.  The question that remains is whether there was an increase in the severity of Aldridge's symptoms between 1990 and 1995.

---

[32]   Even Dr. Allen, who believes that Aldridge was not competent in 1990, admitted that he was incompetent in 1995, though he weakened his agreement by qualifying that he wished "they had done more to assess the malingering issue."  F.E.H. at 536.

As the court will discuss below, the recollection of family members, writings by Aldridge before and after trial, statements from his attorneys, and expert evaluations establish that Aldridge's mental state in 1990 was similar to that in 1995. *See Reese v. Wainwright*, 600 F.2d 1085, 1091 (5th Cir. 1979) ("The relevant factors in assessing competency are a defendant's past medical history, the opinion of psychiatric experts and the defendant's behavior during trial."); *Martin*, 583 F.2d at 1374 (relying on medical evidence, lay testimony, and the trial transcript to reconstruct a defendant's mental state). Reviewing that evidence, the court finds that Aldridge has shown that it is more likely than not that he was incompetent at the time of trial.

*Family Members*- Family members have credibly attested that the onset of Aldridge's delusions happened well before trial. Family members saw the first manifestations of his illness during his TDCJ incarceration. Before his release from custody in 1986, Aldridge began infusing his writing with delusional ranting. By the time he committed the murder, family members detected a consistent pattern of delusional behavior. These delusions assumed a persecution complex in which various individuals, family members, and agencies were out to get Aldridge.

Ultimately, family members have testified that Aldridge incorporated his trial attorneys into this delusional framework. Aldridge's family observed that this paranoia continued throughout trial and integrated itself into his perception of the trial. Respondent has not disputed Brenda Garrett's affidavit in which she conveys Aldridge's conspiratorial concerns about his trial attorneys. Ms. Garrett's affidavit importantly shows that the same problems existed at trial which caused two psychologists to find Aldridge incompetent in 1995. In other words, the testimony from family members suggests that Aldridge did not suffer significant mental degradation from his 1990 trial to the 1995 evaluations.

62

*Aldridge's Writings*- One of the strongest indicators that Aldridge was actively delusional at the time of trial comes from his personal writings. Aldridge's writing, and most particularly his frequent and lengthy legal filings, show a constant stream of delusional ideation extending from immediately after the murder until the present day. These writing memorialize a chain of paranoia with remarkably consistent features. Importantly, his early writings confirm that he had incorporated his attorneys and other trial participants into his conspiratorial delusions.

The writings collected by the police at the time of Aldridge's arrest are of a delusional nature. Trial testimony describing them as religious or allegorical fails to capture their essence. These writings confirm that Aldridge already adopted a conspiratorial mind set in which various people and organizations acted in concert against him. Pet. Ex. 3. The conspiratorial paranoia persisted when Aldridge passed his attorneys the delusional note during jury selection. Nothing has suggested that Aldridge manufactured this note to feign insanity. Soon after trial, Aldridge began filing pleadings in both state and federal court. Only months after sentencing, he produced lengthy legal documents which confirm that Aldridge's schizophrenia was florid. Importantly, only months after sentencing he petitioned courts for redress because his attorneys had allegedly conspired against him.

To be sure, Aldridge's more recent filings have contained increasingly delusional themes. In her 2006 evaluation, Dr. Mosnik noted "an unmistakable and substantial deterioration in the thought processes and mental and cognitive functioning of Mr. Aldridge over the past ten years." Even so, the constant thread of conspiracy against him, and its inclusion of those appointed to represent his legal interests, exists vividly throughout his writings. The writings during the time period closest to trial mirror the 1995 evaluations and corroborate Dr. Quijano's new opinion.

*Trial Counsel's Testimony*- The parties disagree on how to interpret the testimony from Aldridge's trial counsel.  Respondent relies heavily on Mr. Davis' testimony to assert that Aldridge could meet the factual and rational components of the competency inquiry.  Mr. Davis did not consider Aldridge incompetent, though his testimony did not unflinchingly detract from such a finding.  Mr. Davis agreed with Mr. Bates' testimony that schizophrenia colored the lawyer/client discussions.[33]

Mr. Davis' testimony showed that Aldridge's trial attorneys had some level of communication with him.[34]  Mr. Davis suggested that, when pressed and directed, Aldridge could emerge from the cloud of his mental illness and answer questions.  Contemporaneous with trial, Mr. Bates opined that Aldridge could sometimes answer questions appropriately.  But Mr. Bates' trial testimony intimated that rational communication was hit-and-miss, with Aldridge's "odd beliefs" often tainting discussions.  This testimony is consistent with Dr. Quijano's observation that "mentally ill people can conduct long conversations without being, quote, crazy at the time."  F.E.H. at 93.  Dr. Allen also testified that schizophrenics can have "moments of clarity."  F.E.H. at 481.

---

[33]   To summarize, Mr. Davis also characterized Aldridge's thinking and communication as "quite odd."  F.E.H. at 17.  Nonetheless, he did not think that Aldridge's mental illness colored his communication and understanding to the point of incompetency.  In essence, he testified: "it wasn't like his conversations were all just looney.  He understood what was going on.  He basically said he killed this man because he raped him a number of times.  I didn't believe that.  End of story."  F.E.H. at 38.  Mr. Davis' evidentiary hearing testimony acknowledged the existence of some unusual thought patterns – though he largely attributed them to odd religious convictions instead of mental illness: "it wasn't like this guy was just out of his mind when we were talking to him.  He appeared to be coherent.  You could speak to him about what was going on.  He seemed to understand what was going on.  He would speak to us.  He has odd beliefs."  F.E.H. at 65.

[34]   Ms. Garrett, however, related that Mr. Bates told her that Aldridge had stopped talking to his attorneys.

The fact that sometimes Aldridge could come out of his madness long enough to show a factual understanding of the trial does not necessarily render him competent.

Although time has admittedly blurred his recollection, Mr. Davis' testimony shows that he could converse with Aldridge. In those discussions, Aldridge would display some understanding, though within the context of his perceived belief system. But the competence standard requires that an inmate be able to do more than answer questions. An inmate is competent when he is able "to *consult* with counsel, and to *assist* in preparing his defense." *Drope*, 420 U.S. at 171 (emphasis added). The competency inquiry certainly does not require that a defendant have an ability to represent himself or possess an extensive legal knowledge. *See Edwards*, ___ U.S. at ___, 128 S. Ct. at 2383-86 (noting distinction between defendants competent to be tried and defendants competent to defend themselves). Yet the standard implies more than a factual knowledge of legal proceedings. A defendant must be able to make critical decisions – such as whether or not to plead guilty or to testify. A defendant must be able to add meaningful assistance to the progress of his case – such as by identifying witnesses, ratifying defenses, and providing mitigation evidence. *See Cooper*, 517 U.S. at 364 (outlining the rights exercised by a defendant that require his competent cognition). Without the ability to make crucial decisions and add relevant information to the defense, communication does not amount to the consultation or assistance required in Supreme Court cases. *See Cooper*, 517 U.S. at 364; *Drope*, 420 U.S. at 171; *Dusky*, 362 U.S. at 402.

Mr. Davis did not describe any meaningful role Aldridge played in the defense or useful information he provided counsel. Mr. Davis testified: "I'm assuming that he helped us because we had – we did have rational conversations with him." F.E.H. at 39. Mr. Davis' testimony may show that Aldridge had a basic factual understanding of the proceedings and a rudimentary ability to

communicate.  But the only specific information that Mr. Davis remembered Aldridge providing was his claim that the victim sexually assaulted him.  F.E.H. at 39.  Mr. Davis' evidentiary hearing testimony did not show that Aldridge's mental illness allowed him to add anything of value to the defense.  Aldridge insisted on a delusional defense and provided an irrational excuse for having given the police a statement in his earlier case.

These factors alone do not render Aldridge's ability to consult with counsel irrational; many criminal defendants ask their attorneys to assert a defense that may not be rooted in the facts.  Here, the nature of Aldridge's communication distinguishes his case and makes incompetence likely. Given the persistent nature of Aldridge's mental illness and its constant emergence in the defense – such as in his bizarre justification for the crime and his fear that Masons would serve on his jury – it seems likely that trial counsel did not perceive the pervasive extent of Aldridge's mental problems.

Evidence suggests that Aldridge's delirious thoughts may have contributed to an impaired lawyer/client relationship.  In 1990, Aldridge informed Dr. Quijano that he did not know if he could trust his attorneys.  Aldridge's sister explains that by the time of trial Aldridge had incorporated his attorneys into his delusional worldview.  His writings after trial have consistently reconfirmed that he dragged them into the insane conspiracy to ensure his conviction and death.  Courts have found a defendant incompetent when he integrates trial counsel and the trial courts into conspiratorial delusions. *See United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007) ("[A]lthough Ghane had a factual understanding of the charges against him, his understanding was not rational because he believed the charges were part of a wide ranging government conspiracy[.]"); *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. 1998) ("[T]he defendant was delusional and suffered

from 'paranoid ideation,' causing him to believe that his lawyer was participating in a conspiracy, along with the prosecutor and the judge, to incarcerate him for reasons unrelated to the charge against him."); *United States v. Hiebert*, 30 F.3d 1005, 1007 (8th Cir. 1994) ("Hiebert was incompetent to stand trial because Hiebert apparently believed that the judge and the attorneys were part of a conspiracy against him.").

The evidence does not show what, if anything, Aldridge contributed to the defense other than bizarre defensive theories and paranoid concerns. Mr. Bates' testimony supports a finding of no rational communication and Mr. Davis' testimony does not necessarily refute such a finding.

*Expert Opinion-* Dr. Mosnik's evaluation in 2006 confirms Dr. Quijano's revised opinion. Dr. Mosnik's testing affirmed that Aldridge suffered from schizophrenia in 2006 and before. Respondent did not substantially challenge Dr. Mosnik's ultimate diagnosis of schizophrenia, even after challenging portions of her diagnostic approach. Most germane to the issues before the court, Dr. Mosnik found that "Aldridge exhibited the signs and symptoms of psychosis and met criteria for a diagnosis of Schizophrenia, prior to, during, and following the arrest that led to his current incarceration[.]"

Relying on the statements of family members, Dr. Mosnik opined that "symptoms of psychosis, specifically hallucinations, delusional ideation, withdrawal from people, and significantly decreased affective responsivity toward his family, were clearly evident at least since his release from prison in 1986." Dr. Mosnik also opined that Aldridge's testimony in the suppression hearing "is actually comprised of an incorporation of his delusional beliefs about a conspiracy of those in the judicial system acting against him. The presence of delusional thinking is demonstrated by the fact that Mr. Aldridge's thought processes cannot sequentially follow the logical sequence of questions

67

posed by the attorneys." Dr. Mosnik's report opined that "Aldridge appeared to have some factual knowledge of the events of the offense, [however] those facts as presented were clearly intricately interwoven into a delusional system that the defendant could not separate." In her evidentiary hearing testimony she explained: "[T]he persecutory delusions are grandiose, the religious delusions. They're intertwined in his experience of the events leading up to the crime, during the actual time of the crime. They are even included in his supposedly factual rendering of his understanding of the court proceedings." F.E.H. at 207.

Dr. Mosnik endorsed Dr. Quijano's diagnosis of schizophrenia, but – like Dr. Brown – strongly questioned how he could have found him competent in 1990 given the information he had. In her report, she stated:

> it is unclear how Dr. Quijano can in any way come to the conclusion that the defendant was competent and able to consult with his attorneys. Although Dr. Quijano indicates that Mr. Aldridge appeared to have some factual knowledge of the events of the offense, those facts as presented were clearly intricately interwoven into a delusional system that the defendant could not separate. Dr. Quijano himself stated that Mr. Aldridge didn't know if he could trust his lawyers or if they "will conspire with others" and that Aldridge's own attorneys reported that he "related strange and fantastic stories about the conducts charged." Dr. Quijano also noted that the defendant's argument was that the events were part of a conspiracy with spirits repeatedly harassing him. In fact, Dr. Quijano advised the defendant's counsel "of the defendant's delusional system which he used to explain the conducts charged and to tease out facts from fantasy by objective corroboration."

Dr. Mosnik opined that "Aldridge was without a doubt suffering from a severe, active psychotic condition beginning sometime in his mid to late twenties (at the time of the typical age of onset for schizophrenia) prior to, during, and subsequent to the offense."

Dr. Mosnik thought it was curious that Dr. Quijano's report mentioned that Aldridge did not yet know if he could trust his lawyers because they may "conspire with others" and Dr. Quijano also

advised trial counsel "to tease out facts from fantasy" when reviewing Aldridge's account, but he still thought that they were rationally communicating. Accordingly, Dr. Mosnik found that Aldridge "did not at the time of the original trial have sufficient ability to consult rationally with his lawyers in regards to his defense, and that, although he had some factual understanding regarding the offense, his factual understanding was so distorted by his delusional framework that it could not reasonably be extricated to form a coherent factual representation of the offense."[35]

Only Dr. Allen believes that Aldridge was competent at trial. Dr. Allen's opinion seems colored by his insinuation that Aldridge was malingering. He hinted that Aldridge "loves to talk about his symptoms" and was too quick when "spewing all these symptoms intensely." F.E.H. at 485-86. He questioned whether Dr. Quijano accurately identified mental illness: "I don't know how psychotic he was. Quijano thought he was psychotic, but he wasn't so psychotic he couldn't answer competency questions." F.E.H. at 502. Dr. Allen questioned whether Aldridge actually believed his writings. F.E.H. at 511-12. Elsewhere, though, he admitted that Aldridge had a fixed delusional system by the time of trial. F.E.H. at 504. In light of the corroborating evidence, Dr. Allen's testimony did not credibly lessen the likelihood that Aldridge was incompetent in 1990.

## C.    Conclusion of Aldridge's Incompetency-to-Stand-Trial Claim

The whole of the evidence in this case paints "a profile of a defendant with a severe psychiatric disorder which most probably caused him to misperceive important elements of the

---

[35]     Dr. Mosnik continued: "Furthermore, this examiner finds that the defendant, Mr. Aldridge, does not at this time have sufficient ability to consult rationally with his lawyers in regards to assisting with his defense, and does not possess a clear factual understanding of the offense." Aldridge's current competence is only relevant to the instant proceedings insofar as it confirms his earlier mental state. The court makes no finding about Aldridge's competence to participate in any future legal proceeding.

proceedings against him and likely interfered with his ability to relate the true facts to his counsel." *Bruce*, 536 F.2d at 1063.  Given the two decades since Aldridge's conviction, the court cannot say with absolute certainty whether he was competent to stand trial or not.  Aldridge has not conclusively shown incompetence, but that is not his burden.  Aldridge must only show by a preponderance of evidence that he was not competent.

Given Dr. Quijano's reversal, all of the experts who personally examined Aldridge found that his mental illness made him incompetent.  The evidence credibly shows that his mental state at trial was similar to which caused experts in 1995 to find him incompetent.  Taking into consideration the full panoply of available evidence, Aldridge has shown that it is more probable than not that he could not "consult with his lawyer with a reasonable degree of rational understanding" and did not have a "a rational . . . understanding of the proceedings against him."  *Dusky*, 362 U.S. at 402.

Aldridge's mental illness likely hampered his defense because he could not aid counsel in assessing the charges he faced and in formulating strategy.  Aldridge insisted on a delusional justification for the murder, creating a situation where counsel was likely left without any assistance in developing a viable defense.  The difficulty with his mental illness likely extended into the punishment phase.  Aldridge's petition charges trial counsel with failing to investigate avenues of mitigation.  An incompetent defendant who views the world through a delusional belief system – and particularly one who has incorporated family members and attorneys into the conspiracy against him – may be exceptionally unable to provide counsel with information that would encourage the jury toward leniency.  Delusional justification for the murder may preclude reliance on remorse or rehabilitation as a sympathy-generating argument.

70

Taken as a whole, Aldridge has shown that the evidence of incompetence is more convincing that the evidence otherwise. He has met the preponderance-of-the-evidence standard and, thus, merits a new trial. The court is well aware that granting habeas relief two decades after trial has serious implications. Well-established principles of comity, federalism, and finality place rigorous limits on the writ of habeas corpus. Society has a valid interest in the consistent enforcement of criminal judgments. At the same time, the Constitution protects the individual rights of defendants and ensures that fairness will govern the process which condemns a man to die. The writ of habeas corpus balances these competing interests, often through Congressional mandate.

Here, Aldridge has shown by a preponderance of the evidence that he did not enjoy the most basic of rights: to understand and participate rationally in the criminal action against him. Enforcement of this right, especially two decades after trial, imposes a heavy burden on the State. The Supreme Court has observed that finding a defendant incompetent "imposes an expense on the state treasury and frustrates the State's interest in the prompt disposition of criminal charges." *Cooper*, 517 U.S. at 365. Nevertheless, "[w]hile important state interests are unquestionably at stake, . . . the defendant's fundamental right to be tried only while competent outweighs the State's interest in the efficient operation of its criminal justice system." *Id.*

The State of Texas had a chance to decide whether Aldridge's conviction and sentence passed constitutional scrutiny, but elected not to subject his case to judicial review. Texas forfeited its right to be the first forum for the consideration of Aldridge's claims. The passage of time creates a heavy burden on the criminal justice system, one for which the State of Texas bears the blame. The

71

Constitution requires that Aldridge only face the trial of criminal charges while competent.[36]  The court will grant habeas relief on Aldridge's claim that he was incompetent to stand trial.

## II.     The Failure of the Trial Court and Attorneys to Uncover Aldridge's Mental Illness

Aldridge raises four additional claims that challenge the interplay between his mental illness and his criminal trial.  Aldridge argues that the trial court should have held a hearing to explore his competence to stand trial.  He faults his trial attorneys for not recognizing that he was incompetent.  Also, he alleges that appellate counsel should have raised a claim based on his incompetence.  Finally, he complains that trial counsel should have raised an insanity defense.  While the grant of relief on his substantive incompetency claim renders those claims moot, the court will briefly discuss their merits briefly below.

### A.     Aldridge's *Pate* Claim

Aldridge argues that the trial court violated his due process rights by not *sua sponte* holding a competency hearing under *Pate v. Robinson*, 383 U.S. 375, 385 (1966).  Court must "jealously guard[] . . . an incompetent criminal defendant's fundamental right not to stand trial."  *Cooper*, 517 U.S. at 363.  "[A] habeas petitioner may allege that state procedures were inadequate to ensure that he was competent to stand trial."  *Carter v. Johnson*, 131 F.3d 452, 459 n.10 (5th Cir. 1997).  "A court must sua sponte conduct an inquiry into a defendant's mental capacity if the evidence raises a bona fide doubt as to the defendant's competency at that time."  *Lokos*, 625 F.2d at 1261.  The Fifth Circuit has recognized that

---

[36]     This court expresses no opinion of Aldridge's current mental status or his ability to appreciate any continued legal proceedings.  The state courts will have to evaluate Aldridge's existing competency to stand trial.

A *Pate* violation is a procedural error by the trial court and it may occur only in the time frame encompassed by the trial itself and immediately related proceedings . . . It is always open for the defendant to later assert his actual incompetence at trial in a subsequent collateral proceeding, but the substantive claim should not be confused with a defendant's procedural rights under *Pate* to a hearing whenever a bona fide doubt as to competence surfaces at trial.

*Porter v. Estelle*, 709 F.2d 944, 949 n.3 (5th Cir. 1983) (quotation omitted).

Essentially, the *Pate* inquiry is: "'Did the trial judge receive information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense.'" *Roberts v. Dretke*, 381 F.3d 491, 497 (5th Cir. 2004) (quoting *Lokos*, 625 F.2d at 1261); *see also Reese*, 600 F.2d at 1091 ("The emphasis in a *Pate* analysis is on what the trial court did in light of what it then knew."). In that respect, this court's inquiry on the *Pate* issue is unaffected by the ultimate question of his substantive incompetency. Instead, the court must evaluate whether the objective factors before the trial court should have prodded the trial court into making additional inquiries. *See Mathis v. Dretke*, 124 F. App'x. 865, 875 (5th Cir. 2005) ("The test to determine whether a *Pate* procedural violation has occurred is an objective one based on what was known to the trial court at the time of the trial.").

Because "[n]ot all people who have a mental problem are rendered by it legally incompetent," not every sign of insanity requires a full competency hearing. *Bouchillon*, 907 F.2d at 593. "There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope*, 420 U.S. at 180. The Fifth Circuit,

73

however, has identified factors which may raise a "bona fide doubt" about a defendant's competency, such as "(1) any history of irrational behavior, (2) the defendant's demeanor at trial, and (3) any prior medical opinion on competency." *Mata v. Johnson*, 210 F.3d 324, 328 (5th Cir. 2000).  Any one of these factors "standing alone" may signal that the trial court should have held a competency hearing. *Porter*, 709 F.2d at 949.

Aldridge points to the following facts that should have prompted the trial court to hold a competency hearing:

- Aldridge hid in bushes after the murder while family members secured his passport from his apartment.

- Even though Aldridge secured a hotel room after the murder, he stayed with his nephew.

- Aldridge fled to San Antonio, to Mexico and Canada, and then strangely back to Houston.

- Testimony from family members in the punishment phase described Aldridge's odd behavior after his incarceration for another crime.

- Outside of the jury's presence, Aldridge described how he thought the police coerced him into confessing to an earlier crime.

- Writings introduced in the punishment phase, presumably created during Aldridge's flight,  include paranoid and delusional themes.

- Trial counsel told the jury that Aldridge was "delusional."[37]

The facts outlined above did not objectively alert the trial court to the need for a competency hearing.  The trial court had information that Aldridge engaged in illogical or strange behavior after his arrest, but that alone did not mean he could not consult with counsel or appreciate the criminal

---

[37]    Aldridge also relies on the fact that during jury selection he gave his attorneys a note that expressed fear of Masonic control over jurors.  The record does not show that the trial court was aware of that note.

proceedings against him. *See Johnson v. Estelle*, 704 F.2d 232, 239 (5th Cir.1983) (noting that "a seemingly irrational crime" does not provide trial court notice of defendant's possible incompetency). The trial record does not disclose that Aldridge's demeanor or affect during trial suggested the active presence of mental illness. Trial counsel had filed a motion for the appointment of a mental health expert. The motion only reported that the defense "intend[ed] to offer evidence in mitigation of the special issues submitted to the jury during the penalty phase of trial regarding his present mental state." Trans. at 121. The trial court could rely on counsel's duty to apprise the court if the mental health professional's observations would necessitate a hearing. Objective information in the guilt/innocence phase would not have compelled the trial court to hold a hearing.

The punishment phase testimony likewise was not concrete enough alone to compel a competency hearing. Aldridge chose to testify that the police beat him before he confessed in 1972, but outside of additional information about his mental illness the record does not disclose that the depth of his delusional system was apparent from his testimony. While the parties now debate whether his responses fit into a delusional framework, his responses to questioning did not seem permeated with insanity. Evidence of Aldridge's mental problems was rather weak. Without the context provided by later mental health examinations and factual development, the trial court would have before it evidence of mental illness, but not necessarily incompetence. Even then, the trial court would have evaluated those comments in light of Dr. Moy's skepticism that Aldridge was mentally ill. The objective information before the trial court reconfirmed mental illness, but did not prompt further inquiry into incompetency.

Evidence external to that before the trial court now puts Aldridge's mental illness into a context that was not then known to the trial court.[38] The trial court could not place the evidence into the context of psychological issues and delusions. The testimony did not reflect the core concerns present in later inquiries, namely his incorporation of the prosecution, the trial court, and his attorneys into his delusional conspiracy theories. "*Pate* does not require that a trial judge be an omniscient psychiatrist, but that he act reasonably on the objective facts put before him." *Reese*, 600 F.2d at 1092. With the limited objective information available, the trial court did not perceive the need for a hearing. This is not to say that Aldridge's competency to stand trial should not have been investigated further in 1990, only that the objective information did not obligate the trial judge to that inquiry. "'[O]ne cannot fault a trial judge for failing to determine a question that he has no reason to believe is an issue.'" *Id.* at 1093 (quoting *Davis v. Alabama*, 545 F.2d 460, 464 (5th Cir. 1977)).

B.      Ineffective-Assistance-of-Counsel Claims

Aldridge also faults trial counsel for not placing sufficient information before the trial court to require inquiry into his competence. In essence, Aldridge claims the trial counsel provided ineffective assistance by failing to recognize that the severity and pervasiveness of his mental illness rendered him incompetent. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the

---

[38]      Nothing in the record indicates that Aldridge's demeanor would signal mental impairment. The court would note that, other than outbursts during the beginning, Aldridge's demeanor at the evidentiary hearing would not conclusively indicate incompetency absent additional information. Aldridge seemed to pay attention to the proceedings, though he occasionally would nod his head and murmur as if conversing with someone. His blunted affect, however, did not show signs of mania or obvious insanity that would unquestionably compel a court to investigate his mental status. Nonetheless, the court cannot and does not rely on current observations to extrapolate what his demeanor may have been like in 1990.

trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Under the *Strickland* standard, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3, (2003); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

Trial counsel has a special duty to identify and act on a criminal defendant's mental concerns. The presumably close interaction between a lawyer and his client makes his the primary, and often decisive, means by which constitutionally significant mental-health concerns are resolved.  "The appointment of counsel is a critical juncture along the road of a criminal prosecution. If counsel fails here to alert the court to the defendant's mental status the fault is unlikely to be made up[.]" *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990).

Here, trial counsel identified that Aldridge's mental state would be an essential concern, both to his ability to stand trial and to the course of his defense.  To that end, trial counsel alerted the trial court of potential concerns by requesting the assistance of a mental-health expert.  Trial counsel retained the services of Dr. Quijano and provided him access to Aldridge.  After the examination, trial counsel consulted with Dr. Quijano, up to and through trial.  Dr. Quijano assured counsel that, while insane, Aldridge was both still criminally culpable and able to stand trial.  Counsel relied on that expert opinion.

The court has found that additional information by trial counsel would have given Dr. Quijano the information he needed to make an accurate assessment of Aldridge's competency.  In

fact, trial counsel would provide an essential element needed to make that assessment, unless Dr. Quijano could observe their communications directly. Aldridge asks this court to find that trial counsel provided ineffective assistance by not giving Dr. Quijano the last piece of information he needed to find him incompetent.

The court finds that trial counsel acted responsibly and professionally when confronted with Aldridge's mental illness. Competency to stand trial is a difficult inquiry, and one that is best informed through expert assistance. Trial counsel had every reason to rely on Dr. Quijano's opinion and Aldridge has not shown that trial counsel could have perceived that additional inquiry was necessary. This deference to trial counsel's actions extends to the appellate representation. Even assuming that a fact-intensive inquiry into an inmate's competency is appropriate on appeal, Aldridge has not shown that appellate counsel provided ineffective assistance in not aggressively attacking his competency to stand trial.

By the same token, counsel did not provide ineffective assistance by failing to raise an insanity defense. The evidence is much weaker on this issue than on his competency claim. Dr. Mosnik, however, has opined that Aldridge "did suffer from a serious mental illness and was actively delusional at the time of offense. He did not know the nature and quality of the act he was doing and he did not know that what he was doing was wrong." Dkt. 57, Exhibit L. Under Texas law, an insanity defense is available if, "at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE ANN. § 8.01 (Vernon 2003). When raising an insanity defense under Texas law, "[t]here is a general presumption of sanity and the defendant bears the burden of proving, by a preponderance of the evidence, his

insanity at the time of the conduct charged." *Martinez v. State*, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993).

The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of merit, viability, or realistic chance for success." *Knowles v. Mirzayance*, ___ U.S. ___, 129 S. Ct. 1411, 1420 (2009). Here, Mr. Davis credibly testified that he did not assert an insanity defense because it would be "extremely difficult to prove" and "as a general rule, insanity defenses don't work." F.E.H. at 41. While Dr. Quijano found that Aldridge suffered from mental illness, trial counsel felt handicapped because he did not have an expert opinion that Aldridge was insane. Mr. Davis explained:

> The main reason I didn't put on an insanity defense is there was no finding by Dr. Quijano that he was insane. Insanity in Texas was extremely difficult to prove. I think it had to be basically that what the defendant – when he committed the murder, committed the crime, that he didn't know what he was doing was wrong. I don't think there's any indication from the way this crime was committed that Mr. Aldridge didn't know it was wrong. He fled afterwards, after he robbed and killed the complainant. And as a general rule, insanity defenses don't work.

F.E.H. at 41. Despite the evidence showing Aldridge's mental illness and suggesting its role in the murder, trial counsel inquired into the possibility of raising an insanity defense, evaluated the merits of that argument, and strategically refrained from bringing that before the jury. Aldridge has not shown that trial counsel erred in that assessment. Moreover, Aldridge has not shown a reasonable probability of a different result, especially considering the heavy burden that accompanies an insanity defense in Texas. Aldridge has not shown that trial counsel rendered ineffective assistance by failing to raise an insanity defense.

It is unconscionable that full inquiry into Aldridge's mental state has taken two decades. This court implicitly premises its finding of constitutional error in the guilt/innocence phase on the

assumption that a full and comprehensive examination into Aldridge's competency in 1990 would have resulted in the same finding that this court makes on federal habeas review.  Be that as it may, trial counsel took steps to investigate Aldridge's mental state and then relied on the opinions of the psychologist who examined him.  This is not a case of ineffective representation.  The court, therefore, will deny Aldridge's ineffective-assistance-of-counsel claim.

### CLAIMS CHALLENGING ALDRIDGE'S DEATH SENTENCE

Several of Aldridge's arguments contend that constitutional error infected the punishment phase of his trial.  Specifically, claims three through six, eight, and nine all seek reversal of his sentence because Texas law limited the jury's review of mitigating evidence (claim three); Aldridge is incompetent to be executed (claim four); the Eighth Amendment precludes the execution of insane inmates (claim five); and trial counsel error in championing Aldridge's mitigating evidence and litigating his mental health (claims six, eight, and nine).  Because this court has found that constitutional error infected Aldridge's conviction, the court need not address all Aldridge's punishment phase claims.  However, in the interest of justice the court will briefly review Aldridge's argument under the jurisprudence flowing from *Penry v. Johnson*, 492 U.S. 302 (1989) ("*Penry I*"), that the jury did not have an adequate vehicle to consider his sentence (claim 3) because the law plainly shows that his sentencing violated the Constitution.

Cases have already discussed the *Penry* jurisprudence extensively.  *See, e.g., Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006).  This court need not repeat the complete constitutional and legal history of the *Penry* line of cases. Nonetheless, a brief overview of the *Penry* landscape places Aldridge's state and federal proceedings into a broader context.

80

Without comprehensively addressing its application to Texas' capital sentencing scheme, by the time of Aldridge's trial the Supreme Court had firmly held that a jury must be empowered to give effect to a defendant's mitigating evidence. *See Lockett v. Ohio*, 438 U.S. 586, 602 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303-05 (1976). In 1989, the *Penry I* Court held that Texas' then-effective system did not always provide an effective vehicle for considering some mitigating evidence. *See Penry I*, 492 U.S. at 327-28. The Supreme Court found that some elements of that defendant's mental retardation and child abuse evidence transcended the jury's specific inquiry under the special issues. Penry's evidence (1) had a mitigating thrust that went beyond the deliberateness question and (2) became a "two-edged sword" because the future dangerousness question only gave it aggravating effect. "In order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,'" *Penry I* required that "the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." *Id.* at 328 (quoting *Woodson*, 428 U.S. at 305)).

After the *Penry I* decision in 1989, Texas did not hold a regular legislative session until 1991. Until the Texas state legislature could revise the capital sentencing scheme in accordance with *Penry I*, Texas courts attempted to correct the statutory inadequacy through certain additional jury instructions, now referred to as "nullification instructions." Texas' judicially made instruction authorized the jury to answer one of the special issues in the negative – even though a strict reading of the other jury instructions would require otherwise – if sufficient mitigating evidence required the jury to deliver a life sentence.

In the instant case, the defense filed motions to have the jury instructed in a manner that would provide an adequate vehicle to consider mitigating evidence. For example, on March 23,

1990, the defense filed "Defendant's Requested Special Instruction Number Five Penalty Phase."

Trans. Vol. I at 103.  The defense also unsuccessfully requested a definition of "deliberately" in the

first special issue that would have provided the jury an opportunity to consider mitigating evidence.

Trans. Vol. I at 165.  The defense filed an objection to the proposed jury instructions because they

"limit[ed] the jury's discretion to consider mitigating evidence."  Trans. Vol. I at 116.  The trial court

ultimately delivered a jury instruction that read as follows:

> You are instructed that the law recognized the existence of certain facts or circumstances which, though not justifying or excusing the offense, may properly be considered in determining whether to impose the death sentence.  Such circumstances, in fairness and mercy, may be considered by you as extenuating or reducing the degree of moral culpability of the defendant, so that it may be appropriate to reduce, diminish, or lessen the punishment to be imposed, because of such mitigating circumstances giving you, as jurors, the option to recommend against the penalty of death by the answer that you make to the special issue on this matter.
>
> Under our law, you cannot be precluded from considering as a mitigating factor any aspect of a defendant's character or record that the defendant proffers as a basis for a sentence less than death.
>
> In this case, the defendant, Rulford Garfield Aldridge, has proffered the following matters as evidence of mitigating facts or circumstances: a lengthy history of mental problems.
>
> A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case.  If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability when answering the issue under consideration.  *If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to that special issue under consideration.*

Trans. Vol. I at 224-25 (emphasis added).

In 2001, the Supreme Court again revisited Texas' review of mitigating evidence, this time in the case that resulted from Johnny Paul Penry's retrial.  The State of Texas retried Penry during the legislative gap before the enactment of a mitigation special issue, using a nullification instruction in Penry's retrial almost identical to the one given to Aldridge's jury.  In *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"), the Supreme Court reiterated that "a sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances."  532 U.S. at 797 (quoting *Johnson v. Texas*, 509 U.S. 350, 381 (1993) (O'Connor, J., dissenting)).  In granting relief to Penry for the second time, the Supreme Court identified two fatal flaws in the "nullification instruction" that his jury considered.  "First, it reasoned that the instruction could be read as a gloss on the special issues, rather than as a vehicle to override them."  *Garcia v. Quarterman*, 257 F. App'x 717, 721 (5th Cir. 2007); *see Penry II*, 532 U.S. at 798.  Second, even if the instruction did not confuse the jury, "it would have been both logically and ethically impossible for a juror to follow both sets of instructions."  *Penry II*, 532 U.S. at 799.  The Supreme Court observed:

> Because Penry's mitigating evidence did not fit within the scope of the special issues, answering those issues in the manner prescribed on the verdict form necessarily meant ignoring the command of the supplemental instruction.  And answering the special issues in the mode prescribed by the supplemental instruction necessarily meant ignoring the verdict form instructions.  Indeed, jurors who wanted to answer one of the special issues falsely to give effect to the mitigating evidence would have had to violate their oath to render a true verdict.

*Id.* at 799-800.  Accordingly, "the supplemental instruction thus inserted 'an element of capriciousness' into the sentencing decision, 'making the jurors' power to avoid the death penalty dependent on their willingness' to elevate the supplemental instruction over the verdict form instructions."  *Id.* at 800 (quoting *Roberts v. Louisiana*, 428 U.S. 325, 335 (1976)).

The Supreme Court again considered Texas' stop-gap use of the nullification instruction in *Smith v. Texas*, 543 U.S. 37 (2004). The *Smith* Court reaffirmed that a "nullification instruction" could not constitutionally force a jury to return a "false answer" to avoid the death sentence. *See id.* at 48. Against that background, Aldridge contends that the jury instructions did not allow the jury to give meaningful effect to his mitigating evidence.

The jury instruction that the trial court gave Aldridge's jury suffers from the same constitutional defects as in *Penry II* and *Smith*. Respondent does not distinguish the jury instructions considered by Aldridge's jury from those found defective by the Supreme Court. Nor does Respondent maintain that the special issues adequately provided a vehicle for the consideration of Aldridge's punishment-phase evidence. In fact, Respondent concedes that "Aldridge's jury may have been prevented from assigning mitigating value to evidence of [Aldridge's] bizarre beliefs and unusual behavior." Dkt. 95 at 60. Aldridge has shown that *Penry* error infected his sentencing and thus "he is in custody in violation of the Constitution[.]" 28 U.S.C. § 2254(a).

Respondent, however, argues that any resultant error was harmless. In some cases, jurisprudential principles like the harmless-error doctrine render habeas relief unavailable notwithstanding constitutional error. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court clarified the application of harmless error in habeas proceedings, holding that "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637. The standard established in *Brecht* requires a court to consider and determine "whether the error 'had substantial and injurious effect

84

or influence in determining the jury's verdict.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

      The Supreme Court has not addressed the question of how the harmless-error doctrine applies in *Penry* cases. *See Smith v. Texas*, 550 U.S. at 316 (Souter, J., concurring) (" In some later case, we may be required to consider whether harmless error review is ever appropriate in a case with error as described in Penry[.]   We do not and need not address that question here."); *Garcia v. Quarterman*, 257 F. App'x 717, 724 (5th Cir. 2007) ("[T]he question whether some types of *Penry* error might be subject to harmless error review has not been squarely decided by and remains unresolved by the United States Supreme Court.").   The Supreme Court "has *never* applied a harmless-error analysis to a *Penry* claim or given any indication that harmless error might apply in" such cases. *Nelson v. Quarterman*, 472 F.3d 287, 314 (5th Cir. 2006).   In the absence of controlling Supreme Court precedent on this matter, the Court must defer to the Fifth Circuit precedent which "forecloses any argument that a *Penry* error can be subject to harmless error review." *Mines v. Quarterman*, 267 F. App'x. 356, 362 n.3 (5th Cir. 2008); *see also Nelson*, 472 F.3d at 315 ("Given that the entire premise of the *Penry* line of cases rests on the possibility that the jury's reasoned moral response might have been different from its answers to the special issues had it been able to fully consider and give effect to the defendant's mitigating evidence, it would be wholly inappropriate for an appellate court, in effect, to substitute its own moral judgment for the jury's in these cases.").[39]

---

[39]    Even if *Penry* error were subject to a harmless error analysis, Respondent has not shown that it did not actually prejudice Aldridge's trial.   The defense presented evidence of Aldridge's mental illness, including its impact on the murder itself.   Without the nullification instruction, the special issues themselves did not provide an adequate vehicle for the jury to
(continued...)

Aldridge has conclusively shown that constitutional error infected his sentencing proceedings.  Independent of the constitutional violation in the trial of his guilt, the Constitution entitles Aldridge to a new punishment hearing in which the jury can give meaningful effect to his mitigating evidence.  The court grants habeas relief on Aldridge's *Penry* claim.

### Certificate of Appealability

The AEDPA prevents appellate review of a habeas petitioner's claims unless the district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); Fed. R. App. Pro. Rule 22(b).  Respondent, however, does not need a COA to appeal issues in habeas cases.  *See* Fed. R. App. P. 22(b)(3).  This court can *sua sponte* consider the issue of whether any claims merit consideration by the appellate court.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Under the appropriate standard, the claims for which this court has denied relief do not require appellate review.  This court will not issue a COA.

---

[39]     (...continued)
give a reasoned moral response to Aldridge's mitigating evidence, especially concerning his mental illness.  In fact, the future dangerousness special issue would force the jury to give only aggravating effect to his mental illness.  Respondent does not make a convincing case that the *Penry* error did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.

## CONCLUSION

For the foregoing reasons, the court **ORDERS** the following:

1.    Petitioner Rulford Garfield Aldridge's Petition for Writ of Habeas Corpus (Dkt. 1) is provisionally **GRANTED** with respect to his competency-to-stand-trial and *Penry* claims.  Respondent's summary judgment motion on those grounds is **DENIED**.

2.    Respondent Rick Thaler, Director, Texas Department of Criminal Justice, Correctional Institutions Division, shall release Petitioner Rulford Garfield Aldridge from custody unless within 180 days the State of Texas institutes new criminal proceedings against him.  The 180-day time period shall not commence until the conclusion of any appeal from this Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings.

3.    Any outstanding motions are **DENIED WITHOUT PREJUDICE**.

4    With the exception of the aforementioned issues, Petitioner Rulford Garfield Aldridge's Petition for Writ of Habeas Corpus is **DENIED**.

5.    A Certificate of Appealability is **DENIED** with respect to the claims rejected by this court.

Signed at Houston, Texas on March 17, 2010.

Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY